**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE DELTA DENTAL ANTITRUST LITIGATION | **CIVIL ACTION NO.**<br><br>1:19-CV-06734<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

<u>**Page**</u>

NATURE OF THE ACTION ..................................................................2

PARTIES ..............................................................................................5

    A.    Plaintiffs ............................................................................5

    B.    Defendants .......................................................................11

JURISDICTION, VENUE, AND PERSONAL JURISDICTION ..............21

INTERSTATE COMMERCE ...............................................................22

FACTUAL BACKGROUND ................................................................22

    A.    The Delta Dental State Insurers ......................................22

    B.    The Dental Providers ......................................................26

    C.    The Relevant Goods, Services, and Geographic Markets....................28

    D.    Delta Dental's Market Dominance .................................29

FACTUAL ALLEGATIONS .................................................................30

I.    AS PART OF THE CONSPIRACY, DELTA DENTAL IS ENGAGED IN AN UNLAWFUL MARKET ALLOCATION MECHANISM ................................30

II.    AS PART OF THE CONSPIRACY, DELTA DENTAL IS ENGAGED IN UNLAWFUL PRICE FIXING ....................................33

III.    AS PART OF THE CONSPIRACY, DELTA DENTAL IS ENGAGED IN UNLAWFUL REVENUE RESTRICTIONS ...............................36

IV.    DELTA DENTAL HAS EARNED SIGNIFICANT PROFITS FROM ITS UNLAWFUL CONSPIRACY, AND FUNNELED THEM INTO EXCESSIVE EXECUTIVE COMPENSATION AND CAPITAL RESERVES ...................................37

V.    DELTA DENTAL'S ANTICOMPETITIVE AGREEMENTS SHOULD BE ENJOINED, AND DEFENDANTS SHOULD BE COMPELLED TO ALLOW COMPETITIVE MARKET CONDITIONS....................................40

VI.    PLAINTIFFS HAVE SUFFERED ANTITRUST INJURY .............................44

CLASS ACTION ALLEGATIONS ........................................................49

CAUSES OF ACTION .........................................................................51

PRAYER FOR RELIEF ........................................................................53

Plaintiffs Robert S. Dolgow D.D.S., P.A.; B. Kyle Benton, D.D.S. P.A.; Kaufman &

Kaufman Smile Design Studio LLC; Legacy Dental Associates P.C.; Dr. Rick Lindley, DDS,

FICD; Dr. Steven P. Dultz DMD; Simon and Simon, PC.; Tooth Town Pediatric Dentistry,

PLLC; Mary M. Fisher, DDS, P.C.; Bemus Point Dental, LLC; Rittenhouse Smiles, P.C.,

Timothy C. Verharen, D.D.S.; and Drs. DelMonico and Trocchio, Ltd., individually and on

behalf of themselves and all others similarly situated, bring this class action based upon personal

knowledge of their own acts and upon information and belief as to all other matters alleged,

including the investigation of Plaintiffs' counsel, against Defendants Arizona Dental Insurance

Service, Inc., d/b/a Delta Dental of Arizona; Delta Dental Plan of Arkansas, Inc.; Delta Dental of

California; Colorado Dental Service Inc. d/b/a Delta Dental of Colorado; Delta Dental of

Connecticut; Delta Dental of Delaware, Inc.; Delta Dental of the District of Columbia;  Hawaii

Dental Service; Delta Dental of Idaho, Inc. d/b/a Delta Dental of Idaho; Delta Dental of Illinois;

Delta Dental of Indiana, Inc.; Delta Dental of Iowa; Delta Dental of Kansas Inc.; Delta Dental of

Kentucky, Inc.; Maine Dental Service Corporation, d/b/a Delta Dental Plan of Maine; Dental

Service of Massachusetts Inc. d/b/a Delta Dental of Massachusetts; Delta Dental Plan of

Michigan, Inc.; Delta Dental of Minnesota; Delta Dental of Missouri;  Delta Dental of Nebraska;

Delta Dental Plan of New Hampshire, Inc., Delta Dental of New Jersey, Inc.; Delta Dental Plan

of New Mexico, Inc.; Delta Dental of New York Inc.; Delta Dental of North Carolina; Delta

Dental Plan of Ohio, Inc.; Delta Dental Plan of Oklahoma; Oregon Dental Service d/b/a Delta

Dental of Oregon; Delta Dental of Pennsylvania; Delta Dental of Puerto Rico, Inc.; Delta Dental

of Rhode Island; Delta Dental of South Dakota; Delta Dental of Tennessee;  Delta Dental Plan of

Vermont, Inc., Delta Dental of Virginia; Delta Dental of Washington; Delta Dental Plan of West

Virginia, Inc.; Delta Dental of Wisconsin, Inc.; Delta Dental Plan of Wyoming d/b/a Delta

Dental of Wyoming; and Delta Dental Insurance Company (collectively, the "Delta Dental State

Insurers"); DeltaUSA; and Delta Dental Plans Association (all together with the Delta Dental State Insurers, "Delta Dental" or "Defendants").

## NATURE OF THE ACTION

1.     This case involves Delta Dental's coordinated agreement not to compete among the various separate Delta Dental entities and Delta Dental's unlawful misuse of monopsony power in the market for dental insurance across the United States.  Delta Dental secured this power through its artificial territorial division of that market among the Delta Dental State Insurers, and is abusing it to: (1) restrict competition between the Delta Dental State Insurers when operating under the "Delta Dental" brand (the "**Market Allocation Mechanism**"); (2) reduce the amounts of reimbursement paid by the Delta Dental State Insurers to the dentists and dental practices who are reimbursed by Delta Dental insurance (the "**Price Fixing**"), and (3) restrict competition among the Delta Dental State Insurers when operating under *non*-"Delta Dental" brands (the "**Revenue Restrictions**").

2.     The Delta Dental State Insurers are predominantly not-for-profit dental services corporations that operate in 39 state or multi-state territories across the United States.  They reimburse dentists and dental practices—like the named Plaintiffs—that accept Delta Dental insurance (collectively, the "Dental Providers") to reimburse the providers for dental services provided to Delta Dental insureds under Delta Dental insurance contracts.  The Delta Dental State Insurers are supported in turn by the Delta Dental Plans Association, a nationwide entity that acts as an administrator and watchdog for the Delta Dental insurance plans offered to the Delta Dental insureds via the Delta Dental State Insurers.  Delta Dental Plans Association is funded and controlled by the Delta Dental State Insurers, and acts as a vehicle for their concerted activity, including via a contract entered into by each Delta Dental State Insurer with the Delta Dental Plans Association (the "Delta Dental Plan Agreement").

2

3.      Defendants are now the largest providers of insurance for dental services in the U.S., and have approximately 200,000 dental locations across the U.S.  By carving the 50 U.S. States into 39 exclusive territories in which the Delta Dental State Insurers are guaranteed to be free from competition from other Delta Dental State Insurers, the Delta Dental State Insurers have each secured monopsony power within their assigned territories, and Defendants as a group have secured monopsony control over the market for dental insurance across the U.S.  Absent the monopsony powers and territorial protections secured to Defendants by the Market Allocation Mechanism, dental plan sponsors and members would have greater choice as to the dental insurance they choose to purchase, and the Dental Providers would have greater choice in the dental insurance they choose to accept from their patients.

4.      Defendants have built upon the monopsony control achieved through the Market Allocation Mechanism to further unlawfully restrict competition in the market for dental insurance through the Price Fixing, and the Revenue Restrictions.

5.      Defendants' Price Fixing takes the form of agreement as to the rates at which they will reimburse the Dental Providers for the services the providers offer to Delta Dental insureds. By conspiratorial agreement, Defendants set these prices at lower than market rates, and then abuse their monopsony control of the dental insurance market to force these rates onto the Dental Providers.  The Dental Providers, faced with a large number of patients who have purchased Delta Dental insurance (and naturally wish to be treated by a provider that accepts it) have little or no choice but to acquiesce to Defendants' non-competitive and artificially low reimbursement rates.  Absent the Price Fixing and the Market Allocation Mechanism which leaves providers few or no alternative insurance plans to accept from patients, the Dental Providers would have greater choice in the dental insurance they choose to accept, and thus greater choice in the reimbursement rates received for their services.

6.     These two mechanisms are buttressed by a third:  Defendants' Revenue
Restrictions which takes the form of Defendants agreeing—via the Delta Dental Plan
Agreement—that the Delta Dental State Insurers will limit the amount of revenue they derive
from dental insurance sold *other* than under the "Delta Dental" brand, or that they will derive
from administering "Delta Dental" plans.  Many of the Delta Dental State Insurers could develop
and offer dental insurance under non-Delta Dental plans that would compete with their Delta
Dental plan offerings (or with the Delta Dental plan offerings of other Delta Dental State
Insurers), or they could compete to provide the services involved in administering Delta Dental
plans.  Instead, each of the Delta Dental State Insurers affirmatively agrees, including via the
Delta Dental Plan Agreement, to limit the extent to which such competition occurs in order to
retain the valued Delta Dental business.  As a result of the Revenue Restrictions, the Delta
Dental State Insurers—who, per the Market Allocation Mechanism, have already agreed not to
compete with other Delta Dental State Insurers *under the Delta Dental brand*—further agree to
limit their competition with each other and with non-Delta Dental insurance providers *under
non-Delta Dental brands*.  The Delta Dental State Insurers thus risk losing their Delta Dental
franchise if they conduct too much business under other brands, or provide too many
administrative services under the Delta Dental brand, in competition with the Delta Dental plans
that they or other Delta Dental State Insurers offer.  Absent the restraints on competition for non-
Delta branded insurance business imposed by the Revenue Restrictions, the groups who purchase
dental plans for their members (and, by extension, those members) would have greater choice in
the dental insurance they could choose to purchase, and the Dental Providers would have greater
choice in the dental insurance they chose to accept from patients.  Absent the restraint on
competition for administration of Delta branded business imposed by the Revenue Restrictions,

companies seeking to have their dental insurance plans administered by third parties would have greater choice among available administrators.

7.     All three mechanisms reduced competition in the market for dental insurance throughout the United States.  This decreased competition has harmed the Dental Providers (in the form of reduced choice in the dental insurance plans they can accept from patients, and lower reimbursement rates paid to them under those plans), and has also harmed dental plan sponsors and members (in the form of higher premiums paid to Dental Providers in a non-competitive market, and through lower quality services offered to patients by the Dental Providers that have received artificially low reimbursement from Defendants).[1]  While Defendants are predominantly non-profit entities, they have reaped the benefits of their anticompetitive conspiracy, as reflect in lavish executive compensation and disproportionately large capital reserves.

8.     The Market Allocation Mechanism, the Price Fixing, and the Revenue Restrictions also have given Delta Dental unparalleled dominance in the market for dental insurance.  Delta Dental's dominance in this market gives Delta Dental monopsonist control of the rates of reimbursement paid to the Dental Providers.

## PARTIES

**A.     Plaintiffs**

9.     Plaintiff Robert S. Dolgow D.D.S., P.A. ("Dr. Dolgow," or "Plaintiff"), is a dental services provider and a citizen of the state of Florida.  During the relevant time period, Dr. Dolgow provided and continues to provide dental goods and services to consumers insured by Delta Dental pursuant to his in-network contract with Delta Dental Florida.  As a result of the

---

[1] Plaintiffs seek to represent a class of  Dental Providers who have been reimbursed by Delta Dental Insurance and not Delta Dental insureds.

anticompetitive conduct alleged herein, Dr. Dolgow was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than he would have been in a competitive market, and was reimbursed and continues to be reimbursed less for providing dental goods and services than he would have been but for such conduct. Dr. Dolgow has been injured and continues to be inured in his business or property as a result of Defendants' violations of the antitrust laws.

10.    Plaintiff B. Kyle Benton, D.D.S., P.A ("Dr. Benton," or "Plaintiff"), is a dental services provider and a citizen of the state of Arkansas. During the relevant time period, Dr. Benton provided and continues to provide dental goods and services to consumers insured by Delta Dental pursuant to his in-network contract with Delta Dental Plan of Arkansas, Inc. As a result of the anticompetitive conduct alleged herein, Dr. Benton was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than he would have been in a competitive market, and was reimbursed and continues to be reimbursed less for providing dental goods and services than he would have been but for such conduct. Dr. Benton has been injured and continues to be injured in his business or property as a result of Defendants' violations of the antitrust laws.

11.    Plaintiff Kaufman & Kaufman Smile Design Studio LLC ("Dr. Kaufman," or "Plaintiff"), is a dental services provider and a citizen of the state of Illinois. During the relevant time period, Dr. Kaufman provided and continues to provide dental goods and services to consumers insured by Delta Dental pursuant to his in-network contract with Delta Dental of Illinois. As a result of the anticompetitive conduct alleged herein, Dr. Kaufman was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than he would have been in a competitive market, and was reimbursed and continues to be reimbursed less for providing dental goods and services than he would have been

6

but for such conduct. Dr. Kaufman has been injured and continues to be injured in his business or property as a result of Defendants' violations of the antitrust laws.

12. Plaintiff Legacy Dental Associates, P.C. ("Dr. Osborne," or "Plaintiff"), is a dental services provider and a citizen of the state of Texas. During the relevant time period, Dr. Osborne provided and continues to provide dental goods and services to consumers insured by Delta Dental pursuant to his in-network contract with Delta Dental Insurance Company. As a result of the anticompetitive conduct alleged herein, Dr. Osborne was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than he would have been in a competitive market, and was reimbursed and continues to be reimbursed less for providing dental goods and services than he would have been but for such conduct. Dr. Osborne has been injured and continues to be injured in his business or property as a result of Defendants' violations of the antitrust laws.

13. Plaintiff Dr. Rick Lindley, DDS, FICD ("Dr. Lindley," or "Plaintiff"), is a dental services provider and a citizen of the state of California. During the relevant time period, Dr. Lindley provided and continues to provide dental goods and services to consumers insured by Delta Dental pursuant to his in-network contract with Delta Dental of California. As a result of the anticompetitive conduct alleged herein, Dr. Lindley was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than he would have been in a competitive market, and was reimbursed and continues to be reimbursed less for providing dental goods and services than he would have been but for such conduct. Dr. Lindley has been injured and continues to be injured in his business or property as a result of Defendants' violations of the antitrust laws.

14. Plaintiff Dr. Steven P. Dultz DMD ("Dr. Dultz" or "Plaintiff") is a dental services provider and a citizen of the state of New Jersey. During the relevant time period, Dr. Dultz

provided dental goods and services to consumers insured by Delta Dental pursuant to his in-network contract with Delta Dental New Jersey, Inc. As a result of the anticompetitive conduct alleged herein, Dr. Dultz was deprived of the choice of accepting dental patients under a greater number of insurance plans than he would have been in a competitive market, and was reimbursed less for providing dental goods and services than he would have been but for such conduct. Dr. Dultz has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

15.     Plaintiff Simon and Simon, PC d/b/a City Smiles ("City Smiles," or "Plaintiff"), is a dental practice located in Chicago, IL that serves Delta Patients as an in-network provider for Delta Dental of Illinois. During the relevant time period, City Smiles provided and continues to provide dental goods and services to consumers insured by Delta Dental pursuant to his in-network contract with Delta Dental of Illinois. As a result of the anticompetitive conduct alleged herein, City Smiles was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than he would have been in a competitive market, and was reimbursed and continues to be reimbursed less for providing dental goods and services than he would have been but for such conduct. City Smiles has been injured and continues to be injured in his business or property as a result of Defendants' violations of the antitrust laws.

16.     Plaintiff Mary M. Fisher, DDS, P.C. ("Dr. Fisher," or "Plaintiff"), is a dental services provider and a Michigan professional corporation. During the relevant time period, Dr. Fisher provided and continues to provide dental goods and services to patients insured by Delta Dental pursuant to its in-network contract with Delta Dental Plan of Michigan, Inc. As a result of the anticompetitive conduct alleged herein, Dr. Fisher was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans

8

than it would have been in a competitive market and was reimbursed and continues to be reimbursed less for providing dental goods and services than it would have been but for such conduct. Dr. Fisher has been injured and continues to be injured in its business or property as a result of Defendants' violations of the antitrust laws.

17. Plaintiff Tooth Town Pediatric Dentistry, PLLC ("Tooth Town," or "Plaintiff"), is a dental services provider and a Michigan professional limited liability company. During the relevant time period, Tooth Town provided and continues to provide dental goods and services to patients insured by Delta Dental pursuant to its in-network contract with Delta Dental Plan of Michigan, Inc. As a result of the anticompetitive conduct alleged herein, Tooth Town was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than it would have been in a competitive market and was reimbursed and continues to be reimbursed less for providing dental goods and services than it would have been but for such conduct. Tooth Town has been injured and continues to be injured in its business or property as a result of Defendants' violations of the antitrust laws.

18. Plaintiff Bemus Point Dental, LLC ("Bemus Point," or "Plaintiff"), is a dental services provider and a New York State professional corporation. During the relevant time period, Bemus Point provided and continues to provide dental goods and services to patients insured by Delta Dental of New York Inc. and was reimbursed and continues to be reimbursed by Delta Dental of New York Inc. for said goods and services. As a result of the anticompetitive conduct alleged herein, Bemus Point was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than it would have been in a competitive market and was reimbursed and continues to be reimbursed less for providing dental goods and services than it would have been but for such conduct. Bemus Point has been injured

9

and continues to be injured in its business or property as a result of Defendants' violations of the antitrust laws.

19.     Plaintiff Rittenhouse Smiles, P.C. ("Rittenhouse," or "Plaintiff"), is a dental services provider located in Philadelphia, Pennsylvania.  During the relevant time period, Rittenhouse provided and continues to provide dental goods and services to patients insured by Delta Dental pursuant to its in-network contract with Delta Dental of Pennsylvania.  Due to the anticompetitive conduct alleged herein, Rittenhouse was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than it would have been in a competitive market and was reimbursed and continues to be reimbursed less for providing dental goods and services than it would have been but for such conduct.  Rittenhouse has been injured and continues to be injured in its business or property as a result of Defendants' violations of the antitrust laws.

20.     Plaintiff Timothy C. Verharen, D.D.S. ("Dr. Verharen" or "Plaintiff") is a dental services provider and a citizen of the state of Washington. During the relevant time period, Dr. Verharen provided and continues to provide dental goods and services to consumers insured by Delta Dental pursuant to his in-network contract with Delta Dental of Washington. As a result of the anticompetitive conduct alleged herein, Dr. Verharen was deprived and continues to be deprived of the choice of accepting dental patients under a greater number of insurance plans than he would have been in a competitive market and was reimbursed and continues to be reimbursed less for providing dental goods and services than he would have been but for such conduct. Dr. Verharen has been injured and continues to be injured in his business or property as a result of Defendants' violations of the antitrust laws.

21.     Plaintiff Drs. DelMonico and Trocchio, Ltd., ("Drs. DelMonico and Trocchio," or "Plaintiff"), is a dental practice located in Elmwood Park, IL that serves Delta Patients as an in-

network provider for Delta Dental of Illinois. During the relevant time period, Drs. DelMonico and Trocchio provided and continue to provide dental goods and services to consumers insured by Delta Dental pursuant to its in-network contract with Delta Dental of Illinois. As a result of the anticompetitive conduct alleged herein, Drs. DelMonico and Trocchio was deprived and continue to be deprived of the choice of accepting dental patients under a greater number of insurance plans than it would have been in a competitive market, and was reimbursed and continues to be reimbursed less for providing dental goods and services than it would have been but for such conduct. Drs. DelMonico and Trocchio has been injured and continues to be injured in its business or property as a result of Defendants' violations of the antitrust laws.

### B.  **Defendants**

22.     Delta Dental Plans Association is located at 1515 22nd St # 450, Oak Brook, IL 60523, USA. Throughout the class period, Delta Dental Plans Association was comprised of and managed by a network of the Delta Dental State Insurers as listed and alleged herein.

23.     Delta Dental Insurance Company is located at P.O. Box 2059 Mechanicsburg, PA 17055-2059, and has Payer #AARP1. Delta Dental Insurance Company is the Delta Dental licensee for Alabama, Florida, Georgia, Louisiana, Mississippi, Montana, Nevada, Texas, and Utah. Throughout the class period, Delta Dental Insurance Company had significant market power in respect to the markets for dental insurance in the states of Alabama, Florida, Georgia, Louisiana, Mississippi, Montana, Nevada, Texas, and Utah and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

24.     DeltaUSA is located at 1515 W 22nd Street, Suite 450, Oak Brook, IL 60523. DeltaUSA is a subsidiary of Delta Dental Plans Association and facilitates Defendants' ability to centrally administer their national and multi-state dental insurance programs, and thereby to implement Defendants' anticompetitive conduct.

11

25.     Arizona Dental Insurance Service, Inc., d/b/a Delta Dental of Arizona ("Delta Arizona") is located at P.O. Box 43026 Phoenix, AZ 85080, and has Payer #86027.  Delta Arizona is the Delta Dental licensee for Arizona.  Throughout the class period, Delta Arizona had significant market power in respect to the market for dental insurance in the state of Arizona, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

26.     Delta Dental Plan of Arkansas, Inc. ("Delta Arkansas") is located at P.O. Box 15965 N. Little Rock, AR 72231-5965, and has Payer #CDAR1.  Delta Arkansas is the Delta Dental licensee for Arkansas.  Throughout the class period, Delta Arkansas had significant market power in respect to the market for dental insurance in the state of Arkansas, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

27.     Delta Dental of California ("Delta California") is located at P.O. Box 997330 Sacramento, CA 95899-7330, and has Payer #77777.  Delta California is the Delta Dental licensee for California.  Throughout the class period, Delta California had significant market power in respect to the market for dental insurance in the state of California, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

28.     Colorado Dental Service Inc. d/b/a/ Delta Dental of Colorado ("Delta Colorado") is located at P.O. Box 173803 Denver, CO 80217-3803, and has Payer #84056.  Delta Colorado is the Delta Dental licensee for Colorado.  Throughout the class period, Delta Colorado had significant market power in respect to the market for dental insurance in the state of Colorado, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

29.     Delta Dental of Connecticut ("Delta Connecticut") is a subsidiary of Delta Dental of New Jersey, Inc. ("Delta New Jersey") and has Payer #22189.  Delta Connecticut shares an

address with Delta New Jersey. Delta Connecticut is the Delta Dental licensee for Connecticut. Throughout the class period, Delta Connecticut had significant market power in respect to the market for dental insurance in the state of Connecticut, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

30.     Delta Dental of Delaware, Inc. ("Delta Delaware") shares an address with Delta Dental of Pennsylvania, and has Payer #51022. Delta Delaware is the Delta Dental licensee for Delaware. Throughout the class period, Delta Delaware had significant market power in respect to the market for dental insurance in the state of Delaware, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

31.     Delta Dental of the District of Columbia ("Delta DC") shares an address with Delta Dental of Pennsylvania), and has Payer #52147. Delta DC is the Delta Dental licensee for the District of Columbia. Throughout the class period, Delta DC had significant market power in respect to the market for dental insurance in the District of Columbia, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

32.     Hawaii Dental Service ("Delta Hawaii") is located at 700 Bishop Street, Suite 700 Honolulu, HI 96813, and has Payer #99010. Delta Hawaii is the Delta Dental licensee for Hawaii. Throughout the class period, Delta Hawaii had significant market power in respect to the market for dental insurance in the state of Hawaii, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

33.     Delta Dental of Idaho, Inc. d/b/a Delta Dental of Idaho ("Delta Idaho") is located at P.O. Box 2870 Boise, ID 83701, and has Payer #82029. Delta Idaho is the Delta Dental licensee for Idaho. Throughout the class period, Delta Idaho had significant market power in respect to the market for dental insurance in the state of Idaho, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

34.     Delta Dental of Illinois ("Delta Illinois") is located at P.O. Box 5402 Lisle, IL 60532, and has Payer #05030 (group plans) and Payer #IDIND (IL individual plans only).  Delta Illinois is the Delta Dental licensee for Illinois.  Throughout the class period, Delta Illinois had significant market power in respect to the market for dental insurance in the state of Illinois, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

35.     Delta Dental of Indiana, Inc. ("Delta Indiana") is located at P.O. Box  9085 Farmington Hills, MI 48333-9085, and has Payer #DDPIN.  Delta Indiana is the Delta Dental licensee for Indiana.  Throughout the class period, Delta Indiana had significant market power in respect to the market for dental insurance in the state of Indiana, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

36.     Delta Dental of Iowa ("Delta Iowa") is located at P.O. Box 9000 Johnston, IA 50131-9000, and has Payer #CDIA1.  Delta Iowa is the Delta Dental licensee for Iowa.  Throughout the class period, Delta Iowa had significant market power in respect to the market for dental insurance in the state of Iowa, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

37.     Delta Dental of Kansas Inc. ("Delta Kansas") is located at 1619 N. Waterfront Parkway P.O. Box 789769 Wichita, KS 67278-9769, and has Payer #E3960.  Delta Kansas is the Delta Dental licensee for Kansas.  Throughout the class period, Delta Kansas had significant market power in respect to the market for dental insurance in the state of Kansas, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

38.     Delta Dental of Kentucky, Inc. ("Delta Kentucky") is located at P.O. Box 242810 Louisville, KY 40224-2810, and has Payer #CDKY1.  Delta Kentucky is the Delta Dental licensee for Kentucky.  Throughout the class period, Delta Kentucky had significant market

14

power in respect to the market for dental insurance in the state of Kentucky, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

39.     Maine Dental Service Corporation, d/b/a Delta Dental Plan of Maine ("Delta Maine"), is located at P.O. Box 2002 Concord, NH 03302-2002, and has Payer #02027.  Maine Dental Service Corporation is the Delta Dental licensee for Maine.  Throughout the class period, Maine Dental Service Corporation had significant market power in respect to the market for dental insurance in the state of Maine, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

40.     Dental Service of Massachusetts Inc. d/b/a Delta Dental of Massachusetts ("Delta Massachusetts") is located at P.O. Box 2907 Milwaukee, WI 53201, and has Payer #04614. Delta Massachusetts is the Delta Dental licensee for Massachusetts.  Throughout the class period, Delta Massachusetts had significant market power in respect the market for dental insurance in the state of Massachusetts, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

41.     Delta Dental Plan of Michigan, Inc. ("Delta Michigan") is located at 4100 Okemos Road, Okemos, MI 48864, and has Payer #DDPMI.  Delta Michigan is the Delta Dental licensee for Michigan.  Throughout the class period, Delta Michigan had significant market power in respect to the market for dental insurance in the state of Michigan, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

42.     Delta Dental of Minnesota ("Delta Minnesota") is located at P.O. Box 59238 Minneapolis, MN 55459-0238, and has Payer #26004 or 07000.  Delta Minnesota is the Delta Dental licensee for Minnesota and North Dakota.  Throughout the class period, Delta Minnesota had significant market power in respect to the markets for dental insurance in the states of

Minnesota and North Dakota, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

43.     Delta Dental of Missouri ("Delta Missouri") is located at P.O. Box 8690 St. Louis, MO 63126-0690, and has Payer #43090. Delta Missouri is the Delta Dental licensee for Missouri and South Carolina. Throughout the class period, Delta Missouri had significant market power in respect to the markets for dental insurance in the states of Missouri and South Carolina, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

44.     Delta Dental of Nebraska ("Delta Nebraska") is located at P.O. Box 245 Minneapolis, MN 55440-0245, and has Payer #07027. Delta Nebraska is the Delta Dental licensee for Nebraska. Throughout the class period, Delta Nebraska had significant market power in respect to the market for dental insurance in the state of Nebraska, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

45.     Delta Dental Plan of New Hampshire, Inc. ("Delta New Hampshire") is located at P.O. Box 2002 Concord, NH 03302-2002, and has Payer #02027. Delta Dental Plan of New Hampshire, Inc. is the Delta Dental licensee for the state of New Hampshire. Throughout the class period, Delta Dental Plan of New Hampshire, Inc. had significant market power in respect to the markets for dental insurance in the state of New Hampshire, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association. Delta New Hampshire also does business in New Hampshire, Maine and Vermont under the registered trade name Northeast Delta Dental.

46.     Delta Dental of New Jersey ("Delta New Jersey") is located at P.O. Box 222 Parsippany, NJ 07054, and has Payer #22189. Delta New Jersey is the Delta Dental licensee for New Jersey. Throughout the class period, Delta New Jersey had significant market power in

respect to the market for dental insurance in the state of New Jersey, and exercised control

together with the other Delta Dental State Insurers over Delta Dental Plans Association.

47.     Delta Dental Plan of New Mexico, Inc. ("Delta New Mexico") is located at 2500

Louisiana Blvd., N.E. Suite 600 Albuquerque, NM 87110, and has Payer #85022.  Delta New

Mexico is the Delta Dental licensee for New Mexico.  Throughout the class period, Delta New

Mexico had significant market power in respect to the market for dental insurance in the state of

New Mexico, and exercised control together with the other Delta Dental State Insurers over

Delta Dental Plans Association.

48.     Delta Dental of New York Inc. ("Delta New York") shares an address with Delta

Dental of Pennsylvania, and has Payer #11198.  Delta New York is the Delta Dental licensee for

New York.  Throughout the class period, Delta New York had significant market power in

respect to the market for dental insurance in the state of New York, and exercised control

together with the other Delta Dental State Insurers over Delta Dental Plans Association.

49.     Delta Dental of North Carolina ("Delta North Carolina") is located at P.O. Box

9085 Farmington Hills, MI 48333-9085, and has Payer #56101.  Delta North Carolina is the

Delta Dental licensee for North Carolina.  Throughout the class period, Delta North Carolina had

significant market power in respect to the market for dental insurance in the state of North

Carolina, and exercised control together with the other Delta Dental State Insurers over Delta

Dental Plans Association.

50.     Delta Dental Plan of Ohio, Inc. ("Delta Ohio") is located at P.O. Box 9085

Farmington Hills, MI 48333-9085, and has Payer #DDPOH.  Delta Ohio is the Delta Dental

licensee for Ohio.  Throughout the class period, Delta Ohio had significant market power in

respect to the market for dental insurance in the state of Ohio, and exercised control together

with the other Delta Dental State Insurers over Delta Dental Plans Association.

51.     Delta Dental Plan of Oklahoma ("Delta Oklahoma") is located at P.O. Box 548809 Oklahoma City, OK 73154-8809, and has Payer #22229 and CDOK1.  Delta Oklahoma is the Delta Dental licensee for Oklahoma.  Throughout the class period, Delta Oklahoma had significant market power in respect to the market for dental insurance in the state of Oklahoma, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

52.     Oregon Dental Service d/b/a Delta Dental of Oregon ("Delta Oregon") is located at 601 SW 2nd Avenue Portland, OR 97204, and has Payer #CDOR1.  Delta Oregon is the Delta Dental licensee for Oregon and Alaska.  Throughout the class period, Delta Oregon had significant market power in respect to the market for dental insurance in the states of Oregon and Alaska, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

53.     Delta Dental of Pennsylvania ("Delta Pennsylvania") is located at P.O. Box 2105 Mechanicsburg, PA 17055-6999, and has Payer #23166.  Delta Pennsylvania is the Delta Dental licensee for Pennsylvania and Maryland.  Throughout the class period, Delta Pennsylvania had significant market power in respect to the market for dental insurance in the states of Pennsylvania and Maryland, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

54.     Delta Dental of Puerto Rico, Inc. ("Delta Puerto Rico") is located at P.O. Box 9020992 San Juan, PR 00902-0992, and has Payer #680652604.  Delta Puerto Rico is the Delta Dental licensee for Puerto Rico.  Throughout the class period, Delta Puerto Rico had significant power in respect to the market for dental insurance in Puerto Rico, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

18

55.     Delta Dental of Rhode Island ("Delta Rhode Island") is located at P.O. Box 1517 Providence, RI 02901-1517, and has Payer #05029.  Delta Rhode Island is the Delta Dental licensee for Rhode Island.  Throughout the class period, Delta Rhode Island had significant market power in respect to the market for dental insurance in the state of Rhode Island, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

56.     Delta Dental of South Dakota ("Delta South Dakota") is located at P.O. Box 1157 Pierre, SD 57501, and has Payer #54097.  Delta South Dakota is the Delta Dental licensee for South Dakota.  Throughout the class period, Delta South Dakota had significant market power in respect to the market for dental insurance in the state of South Dakota, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

57.     Delta Dental of Tennessee ("Delta Tennessee") is located at 240 Venture Circle Nashville, TN 37228-1699, and has Payer #CDTN1.  Delta Tennessee is the Delta Dental licensee for Tennessee.  Throughout the class period, Delta Tennessee had significant market power in respect to the market for dental insurance in the state of Tennessee, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

58.     Delta Dental Plan of Vermont, Inc. ("Delta Vermont") is located at P.O. Box 2002 Concord, NH 03302-2002, and has Payer #02027.   Delta Vermont is the Delta Dental licensee for Vermont.  Throughout the class period, Delta Vermont had significant market power in respect to the market for dental insurance in the state of Vermont, and exercised control over together with the other Delta Dental State Insurers Delta Dental Plans Association.

59.     Delta Dental of Virginia ("Delta Virginia") is located at 4818 Starkey Rd., Roanoke, VA 24018-8510, and has Payer #54084.  Delta Virginia is the Delta Dental licensee for Virginia.  Throughout the class period, Delta Virginia had significant market power in respect to

the market for dental insurance in the state of Virginia, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

60.     Delta Dental of Washington ("Delta Washington") is located at P.O. Box 75983 Seattle, WA 98175, and has Payer #91062.  Delta Washington is the Delta Dental licensee for Washington.  Throughout the class period, Delta Washington had significant market power in respect to the market for dental insurance in the state of Washington, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

61.     Delta Dental Plan of West Virginia, Inc. ("Delta West Virginia") shares an address with Delta Pennsylvania, and has Payer #31096.  Delta West Virginia is the Delta Dental licensee for West Virginia.  Throughout the class period, Delta West Virginia had significant market power in respect to the market for dental insurance in the state of West Virginia, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

62.     Delta Dental of Wisconsin, Inc. ("Delta Wisconsin") is located at P.O. Box 828 Stevens Point, WI 54481, and has Payer #39069.  Delta Wisconsin is the Delta Dental licensee for Wisconsin.  Throughout the class period, Delta Wisconsin had significant market power in respect to the market for dental insurance in the state of Wisconsin, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

63.     Delta Dental Plan of Wyoming d/b/a Delta Dental of Wyoming ("Delta Wyoming") is located at P.O. Box 29 Cheyenne, WY 82003-0029, and has Payer #CDWY1. Delta Wyoming is the Delta Dental licensee for Wyoming.  Throughout the class period, Delta Wyoming had significant market power in respect to the market for dental insurance in the state of Wyoming, and exercised control together with the other Delta Dental State Insurers over Delta Dental Plans Association.

20

## JURISDICTION, VENUE, AND PERSONAL JURISDICTION

64.     Plaintiffs bring federal antitrust claims under Sections 1 of the Sherman Act, 15 U.S.C. §§ 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

65.     This Court has personal jurisdiction over each Defendant on multiple bases, including because: (1) some of the Defendants, including Delta Illinois, and parent companies Delta Dental Plan Association and DeltaUSA, are incorporated in, located in, or have entered into contracts with Dental Providers in Illinois in this District; (2) all of the Defendants have significant business in and contacts with Illinois including in this District through national insurance programs, both by way of their provision of dental goods, services, and facilities to consumers insured by Delta Dental in Illinois, and by their division of revenue resulting from such provision; (3) all Defendants conspired with Delta Dental Illinois and Delta Dental Plans Association; (4) all of the Defendants use the same forms containing the same terms and conditions—as prepared and proscribed by Delta Dental Plans Association—when dealing with Dental Providers; (5) all of the Defendants require Dental Providers who are in the individual provider networks of each Defendant to accept patients of the other Defendants, often without compensation for services rendered, and (6) Delta Dental Plans Association and DeltaUSA conducted significant corporate business in Illinois and in this District, including the selection and appointment of its present board members.

66.     Accordingly, this Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because the Defendants transacted business in this District.  This Court also has personal jurisdiction under Illinois law because Defendants participated in a conspiracy in which Delta Dental parent entities and at least one conspirator committed acts in furtherance of the conspiracy in Illinois.  This Court also has jurisdiction

because Defendants either in person or through their agents and co-conspirators transacted business, contracted to supply goods and services, regularly do business, and derive revenue within the state of Illinois.

67.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 because Defendants transact business in this District, and 28 U.S.C. § 1391, because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

## INTERSTATE COMMERCE

68.     Defendants' activities as set out in this Consolidated Complaint have substantially affected and are within the flow of interstate trade and commerce.  Many of the Dental Providers, including Plaintiff, provide services, goods, or facilities to persons who reside in other states.

69.     The Delta Dental Plans Association is involved in interstate commerce.  It controls many of the operations of each of the individual Delta Dental State Insurers, controls the marketing and use of the "Delta Dental" brand by each of the Delta Dental State Insurers, and dictates the terms and conditions—even to the point of drafting the "Delta Dental Provider Agreement"—that each Delta Dental State Insurer imposes on each Dental Provider.

70.     Plaintiffs and other Dental Providers have used interstate banking facilities and have purchased substantial quantities of goods and services across state lines for use in providing dental services to Delta Dental insured consumers.

## FACTUAL BACKGROUND

### A.     The Delta Dental State Insurers

71.     The Delta Dental State Insurers are predominately not-for-profit entities that provide insurance plans for dental goods and services in their respective states or multi-state areas.  Through the insurance plans they offer and administer, the Delta Dental State Insurers

reimburse the cost of dental goods and services provided to dental patients across the United States by the Dental Providers—the dentists and dental practices who accept patients with Delta Dental insurance.

72.     The earliest Delta Dental State Insurers were created in approximately 1954 when dental service corporations were formed in states such as California, Oregon and Washington.  A dental service corporation is a legally constituted not-for-profit organization, incorporated on a state-by-state basis, that negotiates and administers contracts for dental care.  These corporations were created in response to requests from entities (such as workers unions) wishing to obtain a comprehensive plan for dental services for their members, and with the aim of increasing public access to oral health care.  The dental service plans offered by the dental service corporations, which have since become Delta Dental State Insureds, were intended to provide full payment to dental service providers, with no additional payment required from a patient for their treatment beyond an agreed copayment or deductible.

73.     In the 1960's there was an increase in the number of state dental association-sponsored service corporations, and in the size of the groups or entities requesting dental care plans from the corporations.  In response, in 1966, the National Association of Dental Service Plans (later renamed as the "Delta Dental Plans Association") was created to bring together and coordinate the Delta Dental State Insurers.  From its creation, Delta Dental Plans Association worked to coordinate dental benefit programs for Delta Dental customers (and potential customers) that had employees in multiple states by allocating their insurance business (and potential business) to different Delta Dental State Insurers based on the states or territories in which the customer's employees were based.

74.     For example, in 1967, the Delta Dental State Insurer predecessor to Delta Dental Washington began providing dental insurance programs to labor unions, and sold the first multi-

23

state dental insurance program to the International Association of Machinists. With the assistance of Delta Dental Plans Association, Delta Dental Washington ceded administration for enrollees for this plan in states other than Washington to other Delta Dental State Insurers, beginning the territorial allocation that persists through to today.

75.     Coverage was provided this way until the late 1980s when Delta Dental of California won the bid for the Office of the Civilian Health and Medical Program of the Uniformed Services program. To centralize administration of this very large account, the Delta Dental State Insurers agreed to share their provider data through the Delta Dental Plans Association. This led to the creation of the National Provider File, which was made available for commercial accounts in 1990 via DeltaCare USA, and which provided Delta Dental coverage to organizations with employees and subscribers located in multiple states. It also gave Delta Dental Plans Association access to the prices charged by Dental Providers across the country, and facilitated Defendants' implementation of their Price Fixing.

76.     Delta Dental Plans Association currently offers three dental plans through the Delta Dental State Insurers: (1) Delta Dental Premier, (2) Delta Dental PPO, and (3) DeltaCare USA:

a.      Delta Dental Premier is a traditional fee-for-service plan that allows patients to visit any licensed dentist and to change dentists at any time without notifying Delta Dental. Delta Dental Premier dentists agree to abide by Delta Dental's determination of fees. When a patient visits a Delta Dental Premier dentist, Delta Dental ensures the patient pays no more than the co-insurance percentage specified by their coverage. Delta Dental Premier is Delta Dental's largest dentist network.

b.      Delta Dental PPO is Delta Dental's preferred provider organization plan (a mid-priced fee-for-service plan). Under Delta Dental PPO, patients have the flexibility to visit any licensed dentist, and usually enjoy lower out-of-pocket costs because PPO dentists have agreed to accept reduced fees for covered procedures when treating PPO patients. Delta Dental PPO is Delta Dental's second largest dentist network.

      c.     DeltaCare USA is a prepaid plan that features set copayments, no annual deductibles and no maximums for covered benefits. In most states, a patient must select a primary care dentist in the DeltaCare USA network dentist from whom they will receive treatment. Typically, a patient's out-of-pocket expenses will be lower with DeltaCare USA than with Delta Dental Premier or Delta Dental PPO.

77.     Delta Dental Plans Association contracts with the Delta Dental State Insurers to offer these plans pursuant to the "Delta Dental Plans Agreement," under which the Delta Dental State Insurers are allowed to conduct marketing and advertising using the Delta Dental trademarks and copyrights in exchange for adhering to various rules governing the scope and conduct of their business. Defendants collectively police the Delta Dental State Insurers' compliance with the Delta Dental Plans Agreement to ensure the Delta Dental State Insurers are abiding by its rules, and possess the power to terminate a Delta Dental State Insurer's contract in the event of non-compliance.

78.     The benefits provided by the Delta Dental State Insurers to patients who obtain goods or services from Dental Providers as Delta Dental insureds are defined in the form of a range of benefits set forth in a document called a "Statement of Variability." The actual reimbursement rates paid by the Delta Dental State Insurers to the Dental Providers are set in the Delta Dental Provider Agreement entered into between the Delta Dental State Insurer and the Dental Provider, and are not filed with nor subject to review by any state insurance regulatory authorities. The reimbursement rate paid to non-par Dental Providers are set forth in the agreement between the insured and the Delta Dental State Insurer. Neither set of rates are filed with or subject to review by any state regulatory authorities.

79.     In large part through the anticompetitive agreements and practices set out in this Consolidated Complaint—including through the collective coordination and management undertaken by Delta Dental Plans Association on their behalf—the separate Delta Dental State Insurers have grown collectively to become "[t]he most extensive dental network offering the

widest selection of dentists nationwide."[2]  As of January 2019, it is estimated that the Delta

Dental State Insurers were insuring more than 78 million dental patients in the United States.

**B.**     **The Dental Providers**

80.     The Dental Providers are dentists and dental practices—including named

Plaintiffs in this proceeding—who are effectively forced to accept patients who are insured by

Delta Dental, and lower-than-market reimbursement for dental goods and services provided to

those patients, because of the Delta Dental State Insurers' market dominance and the

anticompetitive practices described in this Consolidated Complaint.

81.     Most dental services in the United States are provided under a fee-for-service

concept, in which a dentist or dental practice is reimbursed depending on whether the dentists are

participating or nonparticipating (often referred to as *par* and *nonpar*) in respect to a given dental

plan.  A participating dentist is one who has entered into a contractual agreement with a dental

insurer to provide dental goods and services to persons who are eligible under a given dental

insurance plan.

82.     The Dental Providers receive reimbursement for dental goods and services

provided to patients with Delta Dental insurance as participating Delta Dental dentists pursuant

to contracts they enter into with the Delta Dental State Insurers (the "Delta Dental Provider

Agreements").  These agreements stipulate the terms, conditions, and rates under which the

Dental Providers can seek reimbursement from Delta Dental for services a dental patient elects to

receive when visiting a Dental Provider pursuant to a Delta Dental plan.

---

[2]  Delta Dental Website, "About Delta Dental insurance":
https://www.dentalinsurance.com/delta-dental-insurance

83.     The Delta Dental State Insurers actively solicit all dentists and dental practices in their assigned territory to participate in the Delta Dental plans.  The terms and conditions imposed by the Delta Dental Provider Agreements require that the Dental Providers will:

a.      Charge Delta Dental insured patients the amounts established by the Delta Dental State Insurer, such that the Dental Provider can neither increase nor decrease its fees for Delta Dental insured patients;

b.      Accept an agreed-upon schedule of rates (and where applicable, co-payments) for goods and services as payment-in-full for any goods and services provided to Delta Dental insureds, and not charge the insured any further amounts other than copayments or deductibles as specified under the Delta Dental Provider Agreement;

c.      Submit to audits by auditors from Delta Dental, who ensure that the Dental Providers are charging patients the amounts set out in the Delta Dental Provider Agreement (and ancillary manual, which is an extension of the Delta Dental Provider Agreement), and otherwise adhere to any and all conditions in the agreement (and manual);

d.      Conform their operations to a manual written and maintained by the Delta Dental Plans Association and enforced by the Delta Dental State Insurers; and

e.      Accept and treat patients from outside the territory of the Delta Dental State Insurer with which the dentist has contracted, who are insured by a different Delta Dental State Insurer, without an assignment of benefits from the patient's Delta Dental State Insurer (meaning that the dentist must collect the fee for services from the usually out-of-State patient, with a low probability of collection).

84.     As outlined in more detail below, the Dental Providers—including named Plaintiffs in this proceeding—are routinely required to accept a discount of as much as 35%, or more, on market rates from the Delta Dental State Insurers when requesting reimbursement for the goods and services they provide to Delta Dental insureds.[3]

---

[3]   Indeed, Defendants themselves boast of achieving "the industry's best effective discount – averaging 19.6% nationally," as compared to average industry charges.  *See, e.g.,* Delta Dental, *Measuring Overall Network Value: Effective Discounts* (2011) https://www.deltadentalco.com/uploadedFiles/Brokers/EffectiveDiscount.pdf  This is possible only at the expense of Plaintiffs and the class.

85.     This "take it or leave it" reimbursement rate discount is imposed upon the Dental Providers by way of the Delta Dental Provider Agreement, and is an unavoidable cost of doing business with Delta Dental insureds.  Given Defendants' monopsony control, the artificially low reimbursement rates that the Dental Providers are effectively forced to accept under the Dental plans are necessary—from the provider's point of view—to the alternative of refusing to accept Delta Dental insurance at all.  This is because out-of-network dentists and dental providers can claim reimbursement for goods and services provided to Delta Dental insureds, but must accept *even more* of a reduction in rates than in-network dentists like the Dental Providers for doing so.

86.     Defendants similarly set up further disincentives to ensure that dental service providers in the Delta Dental State Insurers' territories are faced with the Hobson's choice of either (1) accepting Delta Dental patients at discounted reimbursement rates pursuant to a Delta Dental Provider Agreement, or (2) accepting those patients on economic terms that are even more punitive for the providers.

**C.     The Relevant Goods, Services, and Geographic Markets**

87.     Delta Dental abused its market power to artificially restrain competition for insurance with respect to dental goods and services.  The relevant product market includes insurance provided to dental patients who purchase dental insurance for themselves, or groups who purchase dental insurance on behalf of their members, for dental good and services including, but not limited to, diagnostic routine periodic examinations, bitewings, X-rays, cleanings, fluoride treatments, sealants, space maintainers, minor emergency procedures, fillings, tooth extractions, biopsy of oral tissue, frenectomy, non-surgical periodontics, endodontics, crowns, and dentures.

88.     The relevant geographic markets for such dental insurance is the whole United States comprising the territories that the Defendants have allocated to themselves pursuant to the

Market Allocation Mechanism, and/or, in the alternative, the territories that the Defendants have allocated to themselves pursuant to the Market Allocation Mechanism.

        **D.**    **Delta Dental's Market Dominance**

      89.    Through the above-described anticompetitive practices, and including through their subsidiaries and affiliates, the Delta Dental State Insurers have achieved an unprecedented degree of dominance in the market for dental insurance. They are often the largest providers of dental insurance plans within the territory they have been assigned under the Market Allocation Mechanism, and are often the *only* viable provider of dental insurance for a patient in a given state. The Delta Dental State Insurers across the country had an average of *65% market share* in their given allocated territories in 2017.

      90.    Delta Dental's market share has remained consistently high across the country in recent history. As shown in the following chart, Delta Delta's average market share across the whole of the United States remained between 59% and 65% between 2013 and 2017.



## US Nationwide Delta Dental Market Share

2013-2017 Average = 62.4%

Source: S&P database of insurance filings,
California DMHC, Hawaii Insurance Commissioner

91.     These market share figures are conservative because they do not include revenue derived by Defendants through their administration of self-funded ERISA plans, and their underwriting for publicly-insured programs such as Medicare Advantage and Medicaid. Through such plan and programs, Defendants derive significant additional revenue and hold significant further market share in the form of Dental Providers that must deal with Delta Dental to receive reimbursements for patients covered by such plans and programs.

92.     But for the anticompetitive restrictions described in this Consolidated Complaint, all of the above-described Delta Dental State Insurers would offer insurance for dental services outside of their assigned territories, throughout the United States, and in competition with the other Delta Dental State Insurers.  Such competition would result in greater dental insurance choice to dental plan sponsors and members, and higher reimbursement rates and payments to the Dental Providers.

## FACTUAL ALLEGATIONS

**I.      AS PART OF THE CONSPIRACY, DELTA DENTAL IS ENGAGED IN AN UNLAWFUL MARKET ALLOCATION MECHANISM**

93.     The Market Allocation Mechanism is an agreement among Defendants to provide dental insurance *exclusively* in the territories where the Delta Dental State Insurers are located and is part of an unlawful horizontal conspiracy to allocate the market for dental insurance within each of those territories and across the United States.

94.     In furtherance of their agreement not to compete, and by way of the Delta Dental Plans Agreement, Defendants have agreed (1) that the market for dental insurance will be divided into 39 territories allocated to the exclusive control of a particular Delta Dental State Insurer, and (2) that the Delta Dental State Insurers will not sell or attempt to sell dental insurance to dental plan sponsors or members outside of each Delta Dental State Insurer's allocated territory.

30

95.     Evidence of the Market Allocation Mechanism exists in the Delta Dental State

Insurers' Annual Statements to the insurance departments responsible for the provision and

administration of insurance in each of the states where the Delta Dental State Insurers have

operated.  The Delta Dental State Insurers are required to file these statements -which do not

contain any reimbursement rates-to report their annual revenues and profits, and in so doing have

confirmed the operation of the Market Allocation Mechanism. For example, Schedule T to these

annual statements is entitled "Premiums and Other Considerations: Allocated by States and

Territories," and requires each of the Delta Dental State Insurers to list the total amount of

premiums received from Delta Dental insureds on a state-by-state basis.  Copies of these

statements demonstrate that the Delta Dental State Insurers obtained revenue from premiums

*exclusively* from insureds located *within* the territory allocated to each Delta Dental State Insurer.

In no case—including when the market for dental insurance could reasonably be expected to

extend to dental plan sponsors and members located across state lines—did a Delta Dental State

Insurer report *any* income received from outside of its allocated territory.[4]

96.     This deliberate allocation of the territories in which each Delta Dental State

Insurer can conduct its business, and the corresponding agreement that the Delta Dental State

Insurers will not compete with each other in respect of dental insurance business outside of their

respective allocated areas, has no legitimate insurance-based need.  It does not serve to transfer

or spread the risk of patients insured by Delta Dental.  Nor is it a necessary component of the

relationship between Delta Dental and patients with Delta Dental insurance.  Instead, it serves

---

[4] See, e.g., *Annual Statement of the Delta Dental Plan of Arkansas, Inc., to the Insurance Department of the State of* Arkansas (Year Ending December 31, 2016), at 38; *Annual Statement of The Delta Dental Plan of New Mexico, Inc. to the Insurance Department of the State of New Mexico* (Year Ending December 31, 2016), at 38; *Annual Statement of the Delta Dental of Iowa to the Insurance Department of the State of Iowa* (Year Ending December 31, 2017), at 38; *Annual Statement of the Delta Dental of Rhode Island to the Insurance Department of the State of Rhode Island* (Year Ending December 31, 2017), at 38.

31

only Delta Dental, by reducing competition in the market for dental insurance in all of the territories in which the Delta Dental State Insurers are based, and thus reducing competition across the United States as a whole.

97.     In the absence of the Market Allocation Mechanism the Delta Dental State Insurers would compete for dental insurance business outside of and between the territories they presently have allocated exclusively among themselves.  Dental plan sponsors and members in Carson City, Nevada, for example, would not be restricted to accepting the terms and conditions of the plans offered by Delta Dental Insurance Company (headquartered approximately 2400 miles away in Georgia).  Instead, they could also consider the terms and conditions of any plans offered by Delta Dental California and available to their neighbors 130 miles away in Sacramento, California, and vice versa.  Delta Dental Insurance Company and Delta Dental California would then be required to compete for these dental insurance customers, as would all of the Delta Dental State Insurers in respect of dental plan sponsors and members in all of the markets for dental insurance across the U.S.  Multiple other examples of the Market Allocation Mechanism exist—such as Delta Dental Connecticut's only selling insurance to plan sponsors and members in Connecticut, and not in the greater New York area—and further demonstrate the anticompetitive and economically artificial nature of the mechanism, which has no policy or risk allocation benefit to patients.

98.     Competition between the Delta Dental State Insurers would benefit dental plan sponsors and members by driving down the premium prices that members as patients are required to pay for such insurance, or by increasing the scope of the coverage offered under an insurance policy for the same premium price.  Such competition would also give the Delta Dental Providers greater choice in respect of the dental insurance plans they could accept from potential dental patients.  This choice would free the providers from the dominant control and

below-market reimbursement rates imposed upon them by whichever Delta Dental State Insurer is allocated exclusive control of the territory in which the provider is based.[5]

99.     Due to Defendants' implementation and maintenance of the Market Allocation Mechanism, Plaintiffs and the Dental Providers have received less reimbursement for the goods and services they provided to the Delta Dental insureds, and have been injured in their property and business as a result.

## II.     AS PART OF THE CONSPIRACY, DELTA DENTAL IS ENGAGED IN UNLAWFUL PRICE FIXING

100.     In addition to participating in the Market Allocation Mechanism to dividing and controlling the territories in which the Delta Dental State Insurers offer dental insurance, Defendants have also colluded to use their dominant market position to fix artificially low rates at which they reimburse Dental Providers for goods and services provided to Delta Dental insureds.

101.     The Price Fixing is a collusive agreement reached among Defendants, and implemented through the Delta Dental Provider Agreement entered between the Delta Dental State Insurers and the Dental Providers.  Defendants draw upon their access to market rates data for dental goods and services across the U.S. via the records obtained and held by Delta Dental Plans Association, and use these to collectively determine the below market rates they will impose upon the Dental Providers pursuant to the Delta Dental Provider Agreement. Defendants coordinate their reimbursement rates through the Delta Dental Plans Association by, among

---

[5] A dental insurer offering a dental plan needs at least two things for the plan to succeed: (1) patients willing to pay the dental insurer's premiums in exchange for the terms and coverage offered by the plan, and (2) dental providers willing to accept patients under that plan given the reimbursement rates the dental insurer is offering for the good and services provided to the dental patient.  In a free and competitive market, patients will not accept the plan if the dental insurer's premiums are too high, and dental providers will not accept the plan if the dental insurer's reimbursement rates are too low.

other things, agreeing on the form of the agreements that the Delta Dental State Insurers enter into with the Delta Providers, sharing their reimbursement data, and policing the reimbursement rates of the other Delta Dental State Insurers.

102.     As set forth above, the Dental Providers are effectively forced to enter into the Delta Dental Provider Agreement with their respective Delta Dental State Insurers—and to accept the artificially low reimbursement rates set out there—because of Defendants' monopsony control of the market for dental insurance in territories allocated to the Delta Dental State Insurers across the U.S.  In California, for example, Delta Dental California controls approximately 87% of the dental insurance market.  A dentist or dental practice in that State accordingly is faced with an overwhelming majority of patients who have subscribed to one of the Delta Dental insurance plans, and wish to be treated by a dentist or dental practice willing to accept that plan.  The dentist or dental practice can either turn away the patient, accept the patient as a nonpar (non-participating) Delta Dental dentist, or accept the patient as a *par* (participating) Delta Dental dentist.  Both turning away the patient, or accepting them as a nonparticipating Delta Dental dentist (subject to very low reimbursement rates and other disincentives that nonpar dentists receive), are deeply suboptimal choices for the dentist.[6]  With no realistic alternative, the dentist—like the majority of the Dental Providers serving as named Plaintiffs in this Consolidated Complaint—is required to accept the Delta Dental Provider Agreement and its below market rates in order to access the majority of dental patients in the provider's state, and thereby to maintain a viable dentistry business.

103.     The lower-than-market reimbursement received from the relevant Delta Dental State Insurer may also have incentivized dentists across the U.S. to provide sub-optimal care, or

---

[6] Indeed, dentists are highly constrained by law in the extent to which they can decline patients on the basis of a patient's ability to pay, or a patient's chosen method of payment.

even forgoing medically necessary care.  For example, a dentist—knowing that the reimbursement she or he will receive from Delta Dental will not cover a procedure that is necessary or optimal for a patient—may be required to provide a more limited procedure.  Dental patients, receiving a light cleaning (*i.e.*, supra-gingival) rather than a deep cleaning (*i.e.*, sub-gingival), or a tooth extraction rather than more extensive treatments such as endodontic therapy and/or a crown, are disadvantaged in such situations as a result.  As another example of the consequences of Delta Dental's anticompetitive reimbursement practices: Dental Providers are often required to accept and treat patients from outside the territory of the Delta Dental State Insurer with which the dentist has contracted, without an assignment of benefits from the patient's Delta Dental State Insurer (meaning that the dentist must collect the fee for services from the usually out-of-State patient, with a low probability of collection).  As a result, a dentist may opt to do only temporary or highly necessary work for an out-of-State patient who is not insured by the Delta Dental State Insurer with which that dentist has contracted.  In such circumstances, the dentist knows that the patient's Delta Dental State Insurer will not reimburse the dentist directly for the work, and the dentist will have to collect from that out-of-State patient.

104.    Absent the Price Fixing and the Market Allocation Mechanism which gives the Dental Providers no choice but to accept the rates as determined via the Price Fixing, the Dental Providers would have a choice among the dental insurance plans they could accept from their patients. They would then be better positioned to negotiate with the Delta Dental State Insurers for higher reimbursement rates for the goods and services they provide to Delta Dental insureds under Delta Dental insurance plans.

105.    Due to Defendants' implementation and maintenance of the Price Fixing, Plaintiffs and the Dental Providers have received less reimbursement for the goods and services

they provided to Delta Dental insureds, and have been injured in their property and business as a result.

## III.   AS PART OF THE CONSPIRACY, DELTA DENTAL IS ENGAGED IN UNLAWFUL REVENUE RESTRICTIONS

106.    In addition to the Market Allocation Mechanism and the Price Fixing, Defendants have engaged in a third mechanism to restrict the amount of revenue that any Delta Dental State Insurer is permitted to derive from selling dental insurance outside of the "Delta Dental" brand.

107.    The Revenue Restrictions are set by the Delta Dental Plans Association, and agreed to by the Delta Dental State Insurers pursuant to the Delta Dental Plan Agreement.  They mandate that the Delta Dental State Insurers limit or restrain the extent to which they conduct dental insurance business and derive revenues other than under the Delta Dental brand.

108.    Several of the Delta Dental State Insurers do conduct dental insurance business other than under the Delta Dental brand, and all of the Delta Dental State Insurers *could* do so. Indeed, through their administration of the Delta Dental plans, the Delta Dental State Insurers have the skills and knowledge required to conduct a significant amount of business in offering dental services that would compete with other Delta Dental plans.  Yet the Delta Dental State Insurers even where they have incorporated for profit subsidiaries to conduct certain dental insurance business have operated carefully to avoid competing with the plans offered by other Delta Dental State Insurers, or the dental businesses operated by the subsidiaries of other Delta Dental State Insurers.

109.    The Revenue Restrictions thus amount to a significant restraint on trade because they directly limit the amount of competition and the number of competitors in the market in which the Delta Dental State Insurers (or their subsidiaries) could compete for customers. Absent the Revenue Restrictions, there would be greater competition for dental insurance and other dental services, which would result in greater insurance choice and lower premiums for

36

dental plan sponsors and members, and greater insurance choice and higher rates of
reimbursement for dental goods and services provided by dentists and dental practices.

## IV. **DELTA DENTAL HAS EARNED SIGNIFICANT PROFITS FROM ITS UNLAWFUL CONSPIRACY, AND FUNNELED THEM INTO EXCESSIVE EXECUTIVE COMPENSATION AND CAPITAL RESERVES**

110.    While many of the Defendants are not-for-profit entities, their directors and
executives have received lavish executive compensation as a reward for implementing and
maintaining the highly profitable conspiracy described above.

111.    For example, a review of the Delta Dental State Insurers' publicly available
Inland Revenue Service Form 990's ("Return of Organization Exempt from Income Tax") for
2016 demonstrates that the executives of these not-for-profit companies are frequently receiving
million, or *multi*-million, dollar annual salaries.  The following table provides a sample of the
salaries paid to the executives responsible for maintaining Defendants' conspiracy:

| Examples of Delta Dental State Insurers' Executive Compensation in 2016 | | |
|---|---|---|
| **Delta Dental State Insurer** | **Executive, and Title** | **Compensation** |
| Delta Dental California | Anthony S. Barth, President/CEO | 6,043,710[7] |
| Delta Dental Delaware, Inc. | Gary D. Radine, Former President/CEO | $7,607,525 |
|  | Michael J. Castro, EVP/CFO | $2,711,964 |
|  | Michael G. Hankinson, EVP/CLO | $2,040,945 |
| Delta Dental District of Columbia | Nilesh C. Patel, EVP | $1,806,328 |
|  | Alicia F. Weber, SVP | $1,573,356 |
| Delta Dental Illinois | Bernard Glossy, President/CEO | $1,280,552 |
| Delta Dental New York Inc. | Michael G. Hankinson, EVP/CLO | $2,040,945 |

---

[7]  Plus $8,284,122 in "other compensation from the organization and related
organizations." Form 990 for Delta Dental of California, Inc. (2016), Part VII.

|  | Belinda Martinez, EVP | $1,928,593 |
|  | Rick R. Doering, SVP | $1,561,892 |
| Delta Dental Plan of Ohio, Inc. | Laura L. Czelada, President/CEO | $9,213,107[8] |
|  | Goran Jurkovic, CFO | $1,636,919[9] |
| Delta Dental Virginia | Dr. George A. Levicki, President | $1,077,511 |
| Delta Dental Rhode Island | Joseph Nagle, President/CEO | $1,438,636 |

112.    These extravagant compensation packages belie the Delta Dental companies'
status as not-for-profit entities, and explain Defendants' powerful motive to implement and
maintain the above-described conspiracy.  As the following chart demonstrates, more than half
of the not-for-profit Delta Dental State Insurer's CEO receive compensation of more than
$1,000,000 per year:

---

[8] Plus $2,693,718 in "other compensation from the organization and related organizations." Form 990 for Delta Dental Plan of Ohio, Inc. (2016), Part VII.
[9] Plus $1,412,846 in "other compensation from the organization and related organizations."  *Id.*



113.     These figures do not represent typical compensation in the not-for-profit industry. The average Delta Dental State Insurer CEO's compensation (across the 31 entities who report the relevant data) in 2016 was $3,145,912, whereas the average U.S. not-for-profit CEO's compensation during the same time period was $146,653.[10]  The average Delta Dental State Insurer CEO thus earned more than *20 times* the amount of the average nonprofit CEO in the U.S.

114.     In at least one state, a coalition of concerned dentists has petitioned the state attorney general to investigate whether the nature and extent of the compensation received by the

---

[10] See, https://www.payscale.com/research/US/Job=Chief_Executive_Officer_(CEO)%2C_Non-Profit_Organization/Salary

executives of the local Delta Dental State Insurer violates the laws regarding compensation paid to executives of a charitable organization.[11]

115.    Defendants have also used the illicit revenue derived from their conspiracy to build excessive capital reserves, far beyond their annual liabilities.  For example, in 2016 Delta Dental New Jersey had total assets of $321 million, and total liabilities of only $80 million; Delta Dental Illinois had total assets of $145 million compared to total liabilities of only $44.8 million; Delta Dental Plan of Ohio, Inc. had total assets of almost $200 million, and total liabilities of only $37.8 million; and Delta Dental Rhode Island had total assets of almost $114 million, and total liabilities of only $21.8 million.

116.    Together, the exorbitant salaries and bulging reserves demonstrate that Delta Dental's "not-for-profit" companies are in fact motivated to and do derive significant supra-competitive profits from their anticompetitive practices.

## V.    DELTA DENTAL'S ANTICOMPETITIVE AGREEMENTS SHOULD BE ENJOINED, AND DEFENDANTS SHOULD BE COMPELLED TO ALLOW COMPETITIVE MARKET CONDITIONS

117.    As discussed above, the Delta Dental State Insurers have considerable market power for insurance of dental goods and services in respect to each of territories in which the Delta Dental State Insurers conduct business.  Defendants are using that market power to engage in anticompetitive practices that are causing ongoing harm in each of the territories allocated to the Delta Dental State Insurers and thus across the United States as a whole.

118.    The Market Allocation Mechanism is anticompetitive because it prevents competition among the Delta Dental State Insurers within and between each of the territories allocated to the Delta Dental State Insurers.  This lack of competition in turn strengthens the

_____

[11] Petition against Dental Service of Massachusetts, Inc., d/b/a Delta Dental and its Affiliates regarding Misuse of Charitable Assets and Anticompetitive Conduct that harms Dental Healthcare Consumers in Massachusetts (May 23, 2017) ("Massachusetts Petition"), at 10.

market dominance of the Delta Dental State Insurers, which creates an unfair barrier to entry for non-Delta Dental branded dental insurance providers seeking to provide dental insurance within the Delta Dental territories. This Mechanism is implemented and enforced by the Delta Dental Plan Agreement. Pursuant to that agreement, the Delta Dental State Insurers restrict their offering of dental insurance to their assigned territories; in exchange, they enjoy supra-competitive premiums as a result of exercising their monopsony power and underpaying the Dental Providers. These supra-competitive profits are funneled back to Delta Dental Plans Association, and distributed to the other Delta Dental State Insurers. In order to remedy these anticompetitive practices, Defendants should be enjoined from their territorial restrictions and the Delta Dental State Insurers should be permitted to offer Delta Dental insurance outside of their assigned territories and in competition with other Delta Dental State Insurers.

119.    The Revenue Restrictions are also anticompetitive because they place a direct cap on the amount of business the Delta Dental State Insurers can generate under their non-Delta Dental insurance plans and in competition to their Delta Dental business. These restrictions are also implemented via the Delta Dental Plan Agreement, and prevent the Delta Dental State Insurers from developing and offering dental insurance under non-Delta Dental plans that would compete with their Delta Dental plan offerings, and prevent the Delta Dental State Insurers from competing with the Delta Dental plan offerings of other Delta Dental State Insurers. Defendants should be enjoined from the Revenue Restrictions, and allowed to derive an unlimited amount of revenue from their non-Delta Dental-branded dental insurance business. This would allow dental plan sponsors and members greater choice for dental insurance, which would in turn allow the Dental Providers greater choice in the insurance plans they could chose to accept (and thus also in the reimbursement rates they were offered pursuant to those plans).

120.     The Price Fixing is also anticompetitive.  Fair competition between the Delta Dental State Insurers is restricted by Defendants': (1) agreeing among themselves to the rates at which they will reimburse the Dental Providers for the goods and services the providers offer to Delta Dental insureds, and then (2) abusing their monopsony control to force these artificially low rates onto the Dental Providers.  Defendants should be enjoined from colluding to set the reimbursement rates offered to the Dental Providers, so the providers (and their patients) can benefit from the higher reimbursement rates that would result if the Delta Dental State Insurers were forced to compete.

121.     Delta Dental's conduct in engaging in the Market Allocation Mechanism, the Price Fixing, and the Revenue Restrictions is all per se anticompetitive.

122.     At the same time, Defendants possess market power in any relevant market, the conspiracy has significant anticompetitive effects in respect of non-substitutable products within any relevant market, and the conspiracy had no or insufficient pro-competitive justifications when measured against the anticompetitive conduct alleged.  Thus, Defendants are liable for each mechanism of the alleged conspiracy even under a quick-look or rule-of-reason analysis.

123.     The Delta Dental State Insurers, including those acting through the Delta Dental Plans Association, exercise considerable market power in the territories in which they operate.  Together, and on average when acting through the Delta Dental Plans Association, the Delta Dental State Insurers control 65% of the market for dental insurance across the U.S.

124.     Defendants have exercised their market power to achieve significantly anticompetitive purposes with few or no compensatory features in respect of each of the alleged conspiracy.  The Market Allocation Mechanism is a horizontal territorial division agreed and enforced by the Delta Dental State Insurers with each other and through the Delta Dental Plans Association.  It serves the sole purpose of protecting each of the Delta Dental State Insurers from

competition by other Delta Dental State Insurers within the territories allocated to each insurer. These territorial allocations serve no pro-competitive purpose, and exist only to protect the market dominance of each of the Delta Dental State Insurers in its assigned territory.

125.    The Price Fixing is an agreement among the Delta Dental State Insurers, who would be competitors but for the Market Allocation Mechanism, and exists solely to allow the Delta Dental State Insurers to share the Delta Dental Providers' pricing information among themselves, thereby to determine the lowest and most punitive rates of reimbursement that the Delta Dental Providers are willing to accept.  The Price Fixing, in theory, could have the pro-competitive benefit of lowering the dental insurance premiums paid by dental insurance plan sponsors and members in each territory in which Defendants conduct business.  Or, it could allow Delta Dental to return significant funds to the Dental Providers and communities that Delta Dental ostensibly serves so the providers can invest in better facilities, equipment, and patient services.  Delta Dental does neither of these things, however.  Instead, as set out above, Delta Dental channels the lion's share of the profits it makes from its conspiracy to keep reimbursement rates artificially low and to use profits for lavish compensation for its executives and over-inflated capital reserves.  No plausible procompetitive benefit is achieved or advanced by Delta Dental's imposition of punishingly below-market reimbursement rates to the Dental Providers.  To the contrary, the low reimbursement rates, combined with the fact that Dental Providers had little choice but to accept them due to Delta Dental's market dominance, has—for the reasons explained above—likely reduced or lessened the services providers were able to perform on insureds in the relevant markets.

126.    The Revenue Restrictions also have the anticompetitive effect of reducing the amount of competition among the Delta Dental State Insurers in each of the territories in which they conduct business by directly reducing the extent to which the Delta Dental State Insurers

will compete when conducting business *other* than under the Delta Dental brand. Pursuant to the Delta Dental Plan Agreement and implemented through the Delta Dental Plans Association, the Delta Dental State Insurers entered into the Revenue Restrictions with the sole purpose of ensuring that they do not compete with each other's Delta Dental franchise business through non-Delta Dental branded business. There is no pro-competitive benefit to the conspiracy, which exists solely to enhance the territorial divisions achieved by the Market Allocation Mechanism and to preserve Defendants' market dominance so they can impose the Price Fixing and Revenue Restrictions.

127. Absent the Market Allocation Mechanism, the Price Fixing, and the Revenue Restrictions, the Delta Dental State Insurers would compete with each other in respect to the markets for dental insurance, between and outside of their assigned territories, and in a way that would naturally produce higher reimbursement rates for the Dental Providers and/or lower premiums for dental insurance plan sponsors and members.

## VI.  PLAINTIFFS HAVE SUFFERED ANTITRUST INJURY

128. Plaintiffs have suffered antitrust injury in respect of each of the three mechanisms of Defendants' conspiracy.

129. The Market Allocation Mechanism is an illegal horizontal market allocation agreement and has caused antitrust injury to Plaintiffs. By allocating the markets in which the Delta Dental State Insurers can offer dental insurance, Defendants have restrained competition in a way that has reduced the number of insurance plans available to dental patients served by the Dental Providers, and thus restrained competition among dental insurance providers for the reimbursement rates offered to the Dental Providers. Dental Providers—faced with the overwhelming dominance of the Delta Dental State Insurers in their allocated territories, and the Delta Dental State Insurers' refusal to conduct business across or outside of those territories—are

faced with a "take it or leave it" scenario for the reimbursement rates they are offered by the Delta Dental State Insurer in their territory.

130.    Absent the Market Allocation Mechanism, there would be more competition among dental insurers for the insurance premium business of dental plan sponsors and members, and for the dental goods and services business of dentists and dental practices. This competition would increase the reimbursement rates available to the Dental Providers. This competition also would decrease the premiums (or increase the coverage) available to dental plan sponsors and members.

131.    The Price Fixing has caused antitrust injury to Plaintiffs. By colluding to fix the reimbursement rates paid by the Delta Dental State Insurers to the Dental Providers, rather than allowing those rates to be set by competition among the Delta Dental State Insurers, Defendants have reduced competition and set artificially low the amounts that the Dental Providers receive as reimbursement for goods and services provided to Delta Dental insureds. Absent the conspiracy, competition among the Delta Dental State Insurers would naturally lead to higher reimbursement rates for the Dental Providers.

132.    The Revenue Restrictions have caused antitrust injury to Plaintiffs. By colluding to agree that the Delta Dental State Insurers will limit the revenue from non-Delta Dental branded business, Defendants have directly reduced the amount of competition in the market for dental insurance. Absent the restrictions, the Delta Dental State Insurers would conduct more dental insurance business apart from and in competition with their Delta Dental-branded dental insurance business. This increased competition would again result in increased reimbursement rates to the Dental Providers, who would have the choice of accepting patients (and thus reimbursement rates) under multiple insurance plans, and not just the Delta Dental plans from the Delta Dental State Insurers.

133.    The Dental Providers have suffered direct harm as a result of Defendants'
anticompetitive acts and conspiracy.  According to the American Dental Association's Health
Policy Institute's most recent study, there were 198,515 practicing dentists in the United States.
According to Delta Dental Plans Association, the 39 Delta Dental Plans have the largest network
of dentists in the country and more than 78 million people are insured by Delta Dental.  While a
dentist may decline to become a member of the Delta Dental network, or not accept Delta Dental
Insurance, to do so means being denied immediate (or preferred) access to the largest group of
potential dental patients in the United States because there are significant disincentives for
patients to seek treatment by an "out-of-network" dentist.  On information and belief,
approximately 70% of the dentists in the country have signed or are bound by the Delta Dental
Provider Agreement.

134.    Given Delta Dental's market power, Defendants can (a) charge consumers
insurance premiums in keeping with, or even above, market rates, (b) pay dentists and dental
practices below-market rates for services rendered to Delta Dental insureds pursuant to the Delta
Dental Provider Agreement, and (c) retain the difference as a profit without being taxed upon it
due to Delta Dental's "non-profit" status.

135.    Delta Dental has exerted its monopsony power to pay less reimbursement to the
Dental Providers in a way that has had effects across the whole of the dental services industry in
the United States.  Since 2011, both GDP per capita, mean U.S. household income, and the
average salary for a physician have been slowly and steadily growing.  For example, as
demonstrated in the following table, the average salary for a physician (unlike dentists) grew
from $200,000 to $300,000 during that time:[12]

---

[12]   Leslie Kane, *Medscape Physician Compensation Report 2018* (April 11, 2018)
https://www.medscape.com/slideshow/2018-compensation-overview-6009667#3



136.    This salary increase for physicians reflects a broader trend, with growth in healthcare spending sitting at a robust 3.0%-5.8% per annum during the same period:

### Growth in Spending on Healthcare Services: 2010 to 2018



Source: Altarum Center for Value in Health Care. Percentages are year-over-year.

137.    By contrast however, dentists on average have seen regular and consistent *declines* in their earnings.  As demonstrated by the following table, both general practitioner and specialist dentists have seen a decline of about 1.5% in their incomes since 2010, despite the broader healthcare trend:



Morgan Stanley
**Dentist Earnings**

MORGAN STANLEY RESEARCH
Life Science Tools & Diagnostics
May 21, 2018

**Figure 1:** Dentist Earnings, GDP Per Capita, Mean U.S. Household Income, 1981 to 2016 (2016 dollars)

Source: ADA Health Policy Institute; Bureau of Economic Analysis; U.S. Census Bureau, Current Population Survey. **Note:** Dentist net income data are based on the ADA Health Policy Institute annual *Survey of Dental Practice* with years 2000-2016 weighted to adjust for nonresponse bias. Shaded areas denote recession years according to National Bureau of Economic Research. GDP is deflated using the GDP deflator. Dentist earnings and U.S. household income are deflated using the All-Item CPI. All values are in constant 2016 dollars.

138.    Moreover, the negative trends in the incomes of dentists and dental practices is *not* present in those segments of the dental market where the Delta Dental State Insurers are not present and exercising their monopsony powers. For example, dental insurance does not typically cover cosmetic procedures. As a result, patients do not select the dentists from whom they receive cosmetic dental services based on the insurance plans accepted by those dentists. Instead, dentists who provide cosmetic dental procedures are free to do so at the prices they set, and are not subject to the reimbursement rates provided by dental insurers like Delta Dental. Rates and revenues in the cosmetic dentistry market are thus free from significant interference by dental insurers like Delta Dental. Unsurprisingly, and in stark contrast to the markets for dental

services in which Delta Dental does operate, the U.S. market for cosmetic dentistry has grown and is projected to continue growing in the near future.[13]

139.    This example makes clear the impact of Defendants' control over the Dental Providers: the Injunctive Class and Damages Class (defined below) will continue to lose and have lost earnings because Delta Dental has used its monopsony power to depress dental treatment reimbursement rates as compared to a competitive market environment.

## CLASS ACTION ALLEGATIONS

140.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Rules 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, and seek injunctive relief on behalf of the following class (the "Injunction Class"):

> All Dental Providers, not owned, employed by, or involved in the management or directorship of any of the Defendants, who provide dental goods or services within the United States and were reimbursed by a Delta Dental Defendant.

141.    Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, and seek monetary damages on behalf of the following class (the "Damages Class"):

> All Dental Providers, not owned, employed by, or involved in the management or directorship of any of the Defendants, who provided dental goods or services to a Delta Dental Insured, and who were reimbursed directly by a Defendant or subject to a Delta Dental Plan Agreement within the United States from October 11, 2015, to the present.

---

[13]    Grand View Research, *Cosmetic Dentistry Market Analysis, By Product (Dental Systems & Equipment, Dental Implants, Dental Bridges, Dental Crowns, Dental Veneers, Orthodontic Braces, Bonding Agents, Inlays & Onlays), By Region (U.S., Canada, Germany, U.K., China, India, South Africa, Brazil, Mexico), And Segment Forecast To 2024* (July 2016).

142.    There are thousands of members of the Class as described above, the exact number and their identities being known by Delta Dental, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

143.    There are numerous questions of law and fact common to each Class member, including, but not limited to:

a.    Whether the conduct of Defendants in respect of the Market Allocation Mechanism as alleged in this Consolidated Complaint caused damages to Plaintiffs and other members of each Class and the amount and extent of those damages;

b.    Whether the conduct of Defendants in respect of the Revenue Restrictions as alleged in this Consolidated Complaint caused damages to Plaintiffs and other members of each Class and the amount and extent of those damages;

c.    Whether the conduct of Defendants in respect of the Price Fixing as alleged in this Consolidated Complaint caused damages to Plaintiffs and other members of each Class and the amount and extent of those damages; and

d.    Whether the conduct of Defendants in respect of the three above-described mechanisms combined in full, or in part, caused damages to Plaintiffs and other members of the Class and the amount and extent of those damages.

144.    Plaintiffs are members of the Classes, have claims that are typical of the claims of the Class members, have interests coincident with and not antagonistic to those of the other members of the Class, and will fairly and adequately protect the interests of the members of the Classes.  In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

145.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications.

146.     The questions of law and fact common to the members of the Damages Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

147.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  The Damages Class is readily definable and is one for which records should exist in the files of Delta Dental Plans Association and/or the Delta Dental State Insurers or others, and a class action will eliminate the possibility of repetitious litigation.

148.     Class treatment will also permit the adjudication of relatively small claims by many members of the Classes who otherwise could not afford to litigate claims such as those asserted in this Consolidated Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT ONE – INJUNCTIVE RELIEF PER 15 U.S.C. §§ 1 & 26

149.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

150.     This is a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

151.    As explained in Count Two, Defendants' Market Allocation Mechanism, their Price Fixing, and their Revenue Restrictions constitute violations of Section 1 of the Sherman Act, 15 U.S. C. § 1 under a per se, quick look, or rule of reason analysis.

152.    Defendants' unlawful conduct threatens to continue to injure Plaintiffs.  Plaintiffs seek a permanent injunction prohibiting Defendants and all others acting in concert from continuing their illegal conspiracy and ordering them to take appropriate remedial action to correct and eliminate any remaining effects of any of the conspiracy.

153.    Plaintiffs reserve the right to seek preliminary injunctions as appropriate.

## COUNT TWO – MONETARY DAMAGES AND INTEREST

## PER 15 U.S.C. §§ 1 & 15

**(MARKET ALLOCATION, PRICE FIXING, AND REVENUE RESTRICTION CONSPIRACY)**

154.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

155.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

156.    As alleged more specifically above, Defendants have used a Market Allocation Mechanism, Price Fixing, and Revenue Restrictions to engage in a conduct not to compete among themselves which represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

157.    Defendants have agreed to divide and allocate the geographic markets for the provision of dental insurance into a series of exclusive territories for each of the Delta Dental State Insurers. By so doing, Delta Dental has agreed to suppress competition and to increase its receipts by decreasing payments to Dental Providers in violation of Section 1 of the Sherman Act.  Due to the lack of competition that results from Defendants' illegal conduct, Dental

Providers who choose not to be in-network have an extremely limited market for the dental services they provide. Defendants' market allocation agreements are per se illegal under Section 1 of the Sherman Act.

158.     Defendants have also agreed among themselves to fix reimbursement rates for the Dental Providers, and to limit the amount of business the Delta Dental State Insurers will do in competition with other Delta Dental plans. By doing so, Defendants have agreed to suppress competition by fixing and maintaining payments to the Dental Delta Providers at less than competitive levels in violation of Section 1 of the Sherman Act. Defendants' Price Fixing and Revenue Restrictions agreement is per se illegal under Section 1 of the Sherman Act.

159.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

## PRAYER FOR RELIEF

160.     WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated persons and entities, respectfully requests that the Court:

      a.      Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and Appoint Plaintiffs as Class Representatives, and Counsel for Plaintiffs as Class Counsel;

      b.      Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

c. Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any Delta Dental State Insurers may compete;

d. Permanently enjoin Defendants from continuing with their Market allocation, price fixing, and revenue restrictions and remedying all effects or vestiges of that conduct;

e. Permanently enjoin Defendants from retaliating against any Plaintiffs for participation in the litigation or enforcement of any remedy;

f. Require on-going periodic reporting on compliance by the Defendants, monitoring by the Court, and a process through which class members will be represented regarding any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

g. Award Plaintiff and the Damages Class damages in the form of three times the amount of damages suffered by Plaintiffs and members of the Damages Class as proven at trial;

h. Award costs and attorneys' fees to Plaintiffs;

i. Award prejudgment interest; and

j. Award any such other and further relief as may be just and proper.


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Dated: November 26, 2019

Respectfully submitted,

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By: /s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Toby E. Futter
Joseph Kiefer
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212 849-7000
stephenneuwirth@quinnemanuel.com
tobyfutter@quinnemanuel.com
josephkeifer@quinnemanuel.com

Leonid Feller, P.C.
Athena Dalton
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705-7400
leonidfeller@quinnemanuel.com
athenadalton@quinnemanuel.com

*Plaintiffs' Interim Co-Lead Class Counsel*

**WOLLMUTH MAHER & DEUTSCH LLP**

By: /s/ Ronald J. Aranoff
Ronald J. Aranoff
Cassandra Postighone
500 Fifth Avenue-12th Floor
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
raranoff@wmd-law.com
cpostighone@wmd-law.com

*Plaintiffs' Interim Co-Lead Class Counsel*

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Gregory Arenson
Elana Katcher
850 Third Avenue
New York, New York 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

*Chair, Plaintiffs' Interim Executive Committee*

**SPECTOR ROSEMAN & KODROFF, P.C.**
Eugene A. Spector
Jeffrey L. Spector
William G. Caldes
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkattorneys.com
jspector@srkattorneys.com
bcaldes@srkattorneys.com

*Member, Plaintiffs' Interim Executive Committee*

**CARNEY, BATES, AND PULLIAM, PLLC**
William P. Creasman
519 W. 7th St.
Little Rock, Arkansas 72201
Telephone: (501) 312-8500
wcreasman@cbplaw.com

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Stephanie M. Beige
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
bernstein@bernlieb.com
beige@bernlieb.com

**MALKINSON & HALPERN, P.C.**
John R. Malkinson
33 North Dearborn Street, Suite 1540
Chicago, IL 60602
Telephone: (312) 427-9600
jmalkinson@mhtriallaw.com

*Member, Plaintiffs' Interim Executive Committee*

**RADICE LAW FIRM**
John Radice
April Dawn Lambert
475 Wall Street
Princeton, NJ 08540
Telephone (312) 339-7140
radice@radicelawfirm.com
alambert@radicelawfirm.com

*Member, Plaintiffs' Interim Executive Committee*

**PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**
Gregory P. Hansel
Randall B. Weill
Michael S. Smith
Elizabeth F. Quinby
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com
equinby@preti.com

*Member, Plaintiffs' Interim Executive Committee*

**FREED KANNER LONDON & MILLEN LLC**
William H. London
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
wlondon@fklmlaw.com

**KELLER ROHRBACK L.L.P.**
Mark A. Griffin
Raymond Farrow
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Mgriffin@kellerrohrback.com
Rfarrow@kellerrohrback.com

**REINHARDT WENDORF & BLANCHFIELD**
Garrett D. Blanchfield, Jr.
Brant D. Penney
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: (651) 287-2100
Facsimile: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

**MCLAFFERTY LAW FIRM, P.C.**
David P. McLafferty
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 940-4000 ext.12
dmclafferty@mclaffertylaw.com