# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

American Dental Association, Peppy Dental, and Janis B. Moriarty, DMD,

                                Plaintiffs

v.

Delta Dental Insurance Company; DeltaCare USA; Delta USA Inc.; DDPA; Delta Dental Insurance Company Alabama; Delta Dental of Alaska; Delta Dental of Arizona; Delta Dental of Arkansas; Delta Dental of California; Delta Dental of Colorado; Delta Dental of Connecticut; Delta Dental of Delaware; Delta Dental of the District of Columbia; Delta Dental of Florida; Delta Dental Insurance Company–Georgia; Hawaii Dental Service; Delta Dental of Idaho; Delta Dental of Illinois; Delta Dental of Indiana; Delta Dental of Iowa; Delta Dental of Kansas; Delta Dental of Kentucky; Delta Dental Insurance Company–Louisiana; Delta Dental of Maryland; Delta Dental of Massachusetts; Delta Dental of Michigan; Delta Dental of Minnesota; Delta Dental Insurance Company–Mississippi; Delta Dental of Missouri; Delta Dental Insurance Company–Montana; Delta Dental of Nebraska; Delta Dental Insurance Company–Nevada; Delta Dental of New Jersey; Delta Dental of New Mexico; Delta Dental of New York; Delta Dental of North Carolina; Delta Dental of North Dakota; Northeast Delta Dental (of Maine, New Hampshire and Vermont); Delta Dental of Ohio; Delta Dental of Oklahoma; Delta Dental of Oregon; Delta Dental of Pennsylvania; Delta Dental of Puerto Rico; Delta Dental of Rhode Island; Delta Dental of South Carolina; Delta Dental of South Dakota; Delta Dental of Tennessee; Delta Dental Insurance Company–Texas; Delta Dental Insurance Company–Utah; Delta Dental of Virginia; Delta Dental of Washington; Delta Dental of West Virginia; Delta Dental of Wisconsin; and Delta Dental of Wyoming; Dentegra Group. Inc.; Dentegra Insurance Co.; and Renaissance Health Service Corporation.

                                Defendants.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ......................................................................2

PARTIES ...............................................................................................................9
    A.    Plaintiffs ....................................................................................................9
    B.    Defendants .................................................................................................10

JURISDICTION AND VENUE ..............................................................................21

INTERSTATE COMMERCE .................................................................................22

FACTUAL ALLEGATIONS ...................................................................................23
    A.    The Development Of The Delta Dental System. ......................................23
    B.    The Current Dominance Of The Delta Dental System. ...........................28
    C.    Defendants' Market Allocation Scheme. .................................................31
    D.    Defendants' Joint Anticompetitive Compensation of Dentists. ..............36

CLASS ACTION ALLEGATIONS .........................................................................55

CAUSES OF ACTION ............................................................................................58

COUNT ONE –NATIONWIDE INJUNCTIVE RELIEF .......................................58

COUNT TWO – NATIOWIDE MONETARY DAMAGES .....................................58

COUNT THREE – NEW YORK MONETARY DAMAGES ....................................60

COUNT FOUR – MASSACHUSETTS MONETARY DAMAGES ...........................61

PRAYER FOR RELIEF ..........................................................................................62

JURY DEMAND .....................................................................................................63

1.      Plaintiffs the American Dental Association ("ADA"), Peppy Dental ("Peppy"), a dentist practice located in Jamestown, New York, and Janis B. Moriarty, DMD ("Moriarty"), a dentist practicing in Winchester, Massachusetts (collectively "Plaintiffs", with Peppy and Moriarty sometimes being referred to herein as the "Provider Plaintiffs"), bring this action for (a) injunctive relief; (b) damages on behalf of a nationwide class of dentists in the Delta Dental provider network; and (c) damages on behalf of a New York state class of dentists in the Delta Dental provider network, based upon personal knowledge of their own acts and upon information and belief as to all other matters alleged herein, against: (1) the Delta Dental Plan Association ("DDPA") and its affiliated national entities, Delta Dental Insurance Company; DeltaCare USA; and Delta USA Inc.; (2) the 39 independent Delta Dental companies (collectively, "Plans"), which are: Delta Dental Insurance Company--Alabama ("DDAL"); Delta Dental of Alaska ("DDAK"); Delta Dental of Arizona ("DDAZ"); Delta Dental of Arkansas ("DDAR"); Delta Dental of California ("DDCA"); Delta Dental of Colorado ("DDCO"); Delta Dental of Connecticut ("DDCN"); Delta Dental of Delaware ("DDDE"); Delta Dental of the District of Columbia ("DDDC"); Delta Dental of Florida ("DDFL"); Delta Dental Insurance Company–Georgia ("DDGA"); Hawaii Dental Service ("HDS"); Delta Dental of Idaho ("DDID"); Delta Dental of Illinois ("DDIL"); Delta Dental of Indiana ("DDIN"); Delta Dental of Iowa ("DDIA"); Delta Dental of Kansas ("DDKS"); Delta Dental of Kentucky ("DDKY"); Delta Dental Insurance Company–Louisiana ("DDLA"); Delta Dental of Maryland ("DDMD"); Delta Dental of Massachusetts ("DDMA"); Delta Dental of Michigan ("DDMI"); Delta Dental of Minnesota ("DDMN"); Delta Dental Insurance Company–Mississippi ("DDMS"); Delta Dental of Missouri ("DDMO"); Delta Dental Insurance Company–Montana ("DDMT"); Delta Dental of Nebraska ("DDNE"); Delta Dental Insurance Company–Nevada ("DDNV"); Delta Dental of New Jersey ("DDNJ"); Delta Dental of New Mexico ("DDNM"); Delta Dental of

New York ("DDNY"); Delta Dental of North Carolina ("DDNC"); Delta Dental of North

Dakota ("DDND"); Northeast Delta Dental (of Maine, New Hampshire and Vermont)("NDD"));

Delta Dental of Ohio ("DDOH"); Delta Dental of Oklahoma ("DDOK"); Delta Dental of

Oregon ("DDOR"); Delta Dental of Pennsylvania ("DDPN"); Delta Dental of Puerto Rico

("DDPR"); Delta Dental of Rhode Island ("DDRI"); Delta Dental of South Carolina ("DDSC");

Delta Dental of South Dakota ("DDSD"); Delta Dental of Tennessee ("DDTN"); Delta Dental

Insurance Company–Texas ("DDTX"); Delta Dental Insurance Company–Utah ("DDUT");

Delta Dental of Virginia ("DDVA"); Delta Dental of Washington ("DDWA"); Delta Dental of

West Virginia ("DDWV"); Delta Dental of Wisconsin ("DDWI"); and Delta Dental of

Wyoming ("DDWY"); and (3) two major holding companies and certain subsidiaries thereof —

(a) the Dentegra Group, Inc. ("DGI"); (b) Renaissance Health Service Corporation ("RHSC")—

that own wholly or in part a number of the Plans. The first two groups of Defendants are referred

to collectively herein as "Delta Dental". All three groups of Defendants are referred to

collectively herein as "Defendants."

## INTRODUCTION AND SUMMARY

2.        This case involves a contract, combination, or conspiracy among the DDPA and

its members and affiliates of members to allocate territories of operation within the United

States and its territories in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3).

Defendants are independent companies who have agreed with each other to allocate markets into

geographic areas in which they agree not to compete.  This contract, combination, or conspiracy

is a *per se* violation of the Sherman Act. Its harm is reflected in suppression of compensation

below levels that would prevail in a competitive marketplace to dentists who are members of the

Delta Dental provider network, as well as in the value and choices of dental care available to

patients who are subscribers to the dental insurance provided by Delta Dental.

3.     The United States Supreme Court has repeatedly stated: "[c]ollusion is the supreme evil of antitrust." *Verizon Communic'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 408 (2004).  The Court has also explained that the types of collusion condemned by the antitrust laws as unlawful *per se* include horizontal agreements among competitors to fix prices or to divide markets, and encompass agreements to divide markets or submarkets between potential, as well as actual, competitors.  *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48-49 (1990).  These prohibitions of *per se* illegal conduct are at the core of the antitrust law's protection of our free enterprise system.

4.     Plaintiffs challenging the *per se* illegal agreements are the American Dental Association, an association of dental providers throughout the United States that has over 163,000 members, a family-owned dentistry practice that is part of DDNY's provider network, and a general dentistry practitioner who is part of DDMA's provider network.

5.     The existence of the *per se* illegal restraints on competition are documented.  The market allocation agreements at issue are reached and implemented through the DDPA license agreements with member Plans, which set forth limitations on their ability to compete. "Each Delta Dental plan's operations are restricted to the state of domicile."[1] No Plan competes on a "Delta Dental" branded basis with any other Plan in another state.

6.     These restrictions, which have been rigorously followed by member Plans, prevent competition that would otherwise be taking place among the Plans. "[P]lans have recognized that the restrictions of the brand curtail opportunities for growth in underserved regions of other states."[2] Likewise, "Delta plans with stronger capital balances are unable to

---

[1] A.M. Best Research, *Delta Dental Plans Strengthen Ties as New Innovations Unfold* 2 (Oct. 13, 2008), http://www3.ambest.com/bestweekpdfs/sr795299508011full.pdf at 2. This report, prepared by A.M. Best Co. ("AMB") is referred to in this complaint as the "AMB Report."

[2] *Id.* at 5.

expand the brand outside their states of domicile, hence limiting the number of opportunities to seek profitable growth."[3]

7.      This effect of the contract, combination, or conspiracy to allocate territories has been, and was intended to, fix levels of compensation paid to dentists who are members of the Delta Dental provider network at levels below those that would have existed had the Plans been allowed to compete for provider services within each other's respective territories. As set forth in detail below, this restraint injures both Delta Dental network providers and their patients.

8.      In the United States as a whole, the DDPA asserts that Delta Dental is the "nation's leading provider of dental insurance," serving over 80 million Americans in all 50 states and in United States territories. [4] It claims that, with its Plans, Delta Dental "provide[s] coverage to more Americans than any other dental insurance company."[5] As of 2014, Delta Dental claimed to process "97 million dental claims or approximately 1.8 million every week" and posted $19.5 billion in revenue.[6]

9.      As noted above, territorial allocations among actual *or potential* competitors are *per se* violations of Sections 1 and 3 of the Sherman Act.   Horizontal market allocations between competitors lower output and raise prices because "[a] firm that is free from effective competition will reduce its output below the competitive level (whether directly or...indirectly by raising price)." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984). The agreed-upon territorial restraints challenged here resulted in unlawful collusive

---

[3] *Id.* at 8.

[4] Delta Dental, *The Delta Dental Organization*, http://dentalinsurancealabama.com/wp-content/uploads/2017/02/DDPAFactSheet-2015.pdf (last visited Nov. 22, 2019).

[5] http://dentalinsurancealabama.com/wp-content/uploads/2017/02/DDPAFactSheet-2015.pdf.

[6] *Id*.

suppression of compensation paid to dentists by Delta Dental below the level that would prevail in a competitive marketplace. This is also a *per se* violation of Sections 1 and 3 of the Sherman Act and is challenged in this complaint.

10.     The individual Plans enjoy remarkable market dominance in regions throughout the United States.  The Plans have agreed not to compete against one another in their respective territories to entrench and perpetuate the dominant market position that each of them has historically enjoyed in their respective areas by insulating individual Plans from competition in those areas.  Their market power is the direct result of the illegal conspiracy to divide and allocate markets unlawfully.

11.     The fact that the restraints may be imposed through licensing agreements with the DDPA does not make them less facially anticompetitive, as confirmed by a recent court decision finding the analogous territorial restrictions agreed to by members of the Blue Cross Blue Shield Association ("BCBSA") to be *per se* violations of the Sherman Act.  *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241 (N.D. Ala. 2018) ("*BCBS*"), *appeal denied,* 2018 WL 7152887 (11th Cir. Dec. 12, 2018).

12.     These practices have been condemned by dentists and state dental associations. For example, the California Dental Association ("CDA") and certain dentists brought a lawsuit against DDCA, alleging contractual and unfair competition claims associated with its proposal in 2011 to lower compensation to dentists under its standardized provider agreement for the Delta Dental Premier network. *California Dental Ass'n, et al. v. Delta Dental of Cal.*, No. CGC 14-538849 (Cal. App. Dep't Super. Ct.) ("CDA Case"). The case was settled in 2015 for over $65 million, a settlement that was finally approved in 2018.[7]

_____

[7] California Dental Association, *Delta Dental Litigation Resolution*, https://www.cda.org/Portals/0/pdfs/delta_settlement_summary.pdf (last visited Nov. 22, 2019).

5

13.     Similarly, in June of 2018, the Washington State Dental Association ("WSDA")
filed a complaint with the Antitrust Division of the Washington State Attorney General's
("AG") Office, alleging that DDWA engaged in illegal practices. On its website, the WSDA
explained in detail how DDWA's anticompetitive conduct (including 2011 rate cuts similar to
those applied by DDCA) has injured both dentists and patients:

> Unfortunately, the impact of Delta's market power is well-known to dentists and their
> patients. Given its predominant market share, the company wields substantial bargaining
> leverage when contracting with dentists. Delta effectively offers its contracts to dental
> providers on a "take it or leave it" basis, with no room for negotiation, and with complete
> control of rates and terms.

> For example, in 2011, Delta unilaterally and dramatically reduced its reimbursement rates
> for network dentists by approximately 15 percent. These new rates failed to cover many
> dentists' costs for the provision of some services. In the first five years following that
> precipitous reduction, Delta increased its benefit plan enrollees by 27 percent, its
> premium revenue by 30 percent, and its premium revenue-per-patient by 2 percent.

> During that same period, Delta's Chief Executive Officer's compensation increased by
> 127 percent and its Board Chairman's compensation increased by 115 percent. Only 10
> percent of Delta's increased premium revenue-per-patient was directed towards patient
> care and the company's cash and investments increased by 67 percent.

> While the company dramatically reduced reimbursements to dentists, it appears Delta
> retained the bulk of its savings for its corporate benefit, rather than passing these savings
> along to the dental patients covered by its plans.

> "There is concern that patients are losing access to care as a result of Delta's
> reimbursement rates and what many perceive as predatory behavior," says WSDA
> Executive Director Bracken Killpack, noting that, in addition to driving some dentists to
> leave the market, others have been forced to sell their practices and retire earlier than they
> otherwise would have.

> Delta's actions have had other negative consequences for patients as well, including
> reduced access to innovations in dental care. For example, patient radiation exposure
> from digital X-rays can be as little as 10 percent of the exposure from film-based
> radiography. But reduced reimbursement means that many dentists can no longer afford
> these capital-intensive technological advances for their practices and their patients.

> Similarly, the fee reduction has forced many dentists to eliminate or reduce the volume of
> Medicaid patients or uncompensated care they provide. Because Washington's Medicaid
> reimbursement rates are already extremely low, serving these patients places a significant
> financial burden on dental practices. When Delta unilaterally reduced reimbursement
> rates for non-Medicaid patients, whose care would otherwise help a dental practice cover

this burden, it made it unaffordable for many dentists to provide discounted or free care to meet the needs of this underserved population.

Other changes imposed by Delta aren't driven by, or aligned with, improved patient care. The company requires preventive periodontal services or treatments to be made in multiple visits simply for administrative, not clinical reasons. It has changed benefit coverage of some diagnostic procedure codes, including eliminating coverage for bitewing films essential in detecting disease between teeth, increasing intervals between coverage for panoramic X-rays, and refusing coverage for certain standard periodic X-rays for children. Over the years, patients have come to expect these and similar basic diagnostic services to be covered by their dental benefit plans. When these necessary diagnostic tools aren't covered, patients are surprised and often frustrated to learn that they now must bear the cost. Some who may be unable to afford the additional expense are forced to refuse important procedures, running the risk that they may require more complex and expensive future care.[8]

14.    As a third example, in June of 2018, DDMA decided to adjust reimbursement to dentists under its Delta Dental Premier and Preferred Provider Organization ("PPO") by, *inter alia*, eliminating its prior practice of applying the National Dental Consumer Price Index in determining dentists' fees.   One dentist explained in a public hearing that:

It is not uncommon to come out of school with $500,000 in dental school debt, plus college debt of $200,000 in addition to another $200,000 of debt during an unpaid pediatric dental residency.

In this city itself, Boston University or Tufts University are examples.  The idea of starting a career with approximately a million dollars in debt at current rates of close to 7 percent interest places an enormous stress on today's providers.

This alone takes over ten years to pay out ordinary income.  This is not.. mention[ed] anywhere in Delta's presentation of supposed, quote, unquote "profit."

Furthermore, practice acquisition debt can range from 500,000 to over 5 million dollars in costs…. It is naive to think that these fee reductions will not be offset by shifting costs to cash paying patients and out-of-network patients.

Furthermore, some offices will inevitably be unable to treat lower reimbursing plans like MassHealth. We have treated MassHealth patients and take significant fee reimbursement cuts with the knowledge that we are providing a service to an underserved community.

With further cuts to our practice's collection, we will be challenged to provide treatment to Medicaid plans without losing money.

---

[8] https://www.wsda.org/news/blog/2018/07/02/wsda-asks-attorney-general-to-investigate-potential-delta-antitrust-practices.

****

Now that [Delta Dental] they have a significant share of the market, they are looking to slash reimbursement and control the future of dental reimbursement in an unregulated fashion.

Their business model will continue to cut reimbursement as they see the patient as no more than a number in their profits.

We see the patient as people, and we do not want this level of care, compassion, and trust to be eroded by the greed of insurance companies.

Delta's request is about profitability and dominance. A healthy, responsive, and willing marketplace is not one dominated by a huge insurance company.[9]

15.     Without judicial intervention, Delta Dental's practices will continue to

undercompensate dentists who are part of its network and will result in harm to patients.

Plaintiffs therefore ask the Court to certify a class action for injunctive relief under Fed. R. Civ.

P. 23(b)(2) and Peppy and Moriarty seek to certify (a) a nationwide class action under Fed. R.

Civ. P. 23(b)(3) for treble damages and (b) alternative New York (for Peppy) and Massachusetts

(for Moriarty) statewide class actions under Fed. R. Civ. P. 23(b)(3) for treble damages.

16.     The injunctive relief class is defined as follows:

> All Delta Dental Providers, not owned or employed by any of the Defendants, that provide dental goods or services to Delta Dental insureds pursuant to a Delta Dental insurance policy within the United States and its territories.

The nationwide treble damage class is defined as follows:

> All Delta Dental providers, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the United States and its territories and within four years of the date of filing of this action.

The alternative New York treble damages class is defined as follows:

> All Delta Dental Providers in the State of New York, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of New York

---

[9] Pp. 119-20 of https://www.massdental.org › media › 030819-DOI-Delta-Hearing-Transcript.

and within four years of the date of filing of this action.

The alternative Massachusetts treble damages class is defined as follows:

> All Delta Dental Providers in the State of Massachusetts, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of Massachusetts and within four years of the date of filing of this action.[10]

## PARTIES

### A.     Plaintiffs

17.     The ADA is a non-profit organization with its headquarters located at 211 East Chicago Ave., Chicago, IL 60611.  The ADA was formed in 1859 and is the oldest and largest dental professional association in the world, with over 163,000 members.  The ADA exists to serve and support its membership in providing dental care to their patients and to ensure the advancement of the profession of dentistry.

18.     More specifically, the ADA has long advocated on behalf of its members and their patients against Delta Dental's unreasonable billing practices, including arbitrary and unfair disallowances of reimbursement of reasonable medical procedures, and inadequate explanations of dental benefits policies.[11]  It has also published in the *Journal of the American Dental Association* concerning the dangers of Delta Dental's market power.[12]

---

[10] Plaintiffs anticipate adding additional Provider Plaintiffs who will be able to represent classes in other specific states.

[11] *See, e.g.*, David Burger, ADA to Delta Dental: Stop Objectionable Practices in EOBs (Aug. 30, 2017) https://www.ada.org/en/publications/ada-news/2017-archive/august/ada-to-delta-dental-stop-objectionable-practices-in-eobs; Kelly Soderlund, *ADA Asks Delta Dental to Reject Proposed Disallow Policy* (May 9, 2016) https://www.ada.org/en/publications/ada-news/2016-archive/may/ada-asks-delta-dental-to-reject-proposed-disallow-policy; Kelly Soderlund, *ADA Dispute Against Delta Dental Policy Escalates* (June 30, 2016) https://www.ada.org/en/publications/ada-news/2016-archive/june/ada-dispute-against-delta-dental-policy-escalates; *Dental Benefit Payer Policy FRegarding Scaling and Root Planning*, American Dental Association (Apr. 27, 2016) https://success.ada.org/en/dental-benefits/~/media/48F17AB5618A495FA01C435990D4BED6.pdf.

[12] *See, e.g.*, Mark Vujicic, Niodita Gupta, et al., *Why We Need More Data on the Dental Insurance*

19.     A majority of ADA member dentists who are currently in private practice have signed agreements with Delta Dental.  The ADA seeks injunctive relief in this action, but does not seek damages on its own behalf.  The ADA brings this claim on behalf of its member dentists, each of whom has standing to bring a claim in his or her own right, and in order to protect the interests of its member dentists, which is germane and, indeed, central to the ADA's purpose.  Neither the injunctive claim nor the relief requested requires the participation of any individual ADA member dentist for adjudication, but the ADA member dentists are suffering immediate and threatened injury because of Delta Dental's unlawful actions.

20.     Plaintiff Peppy is a family-owned dental practice located at 1237 Main Street, Jamestown, New York 14701.[13] Peppy is part of DDNY's provider network and provides dental care services to subscribers to Delta Dental insurance coverage provided by DDNY.

21.     Plaintiff Moriarty is a general practice family and cosmetic dentist whose business address is 607 Main Street, Winchester, Massachusetts 01890.[14] Moriarty is part of DDMA's provider network and provides dental care services to subscribers to Delta Dental insurance coverage provided by DDMA. Since June 7, 2019, Moriarty has served as President of the Massachusetts Dental Society ("MDS"), a 5,000-member professional association.

### B.     Defendants

22.     Defendant DDPA is located at 1515 22nd St # 450, Oak Brook, IL 60523, USA. DDPA is a national association of 39 independent Delta Dental companies. The member Plans of the DDPA vote on its actions and elect its officers, often officers of an individual Plan.

23.     Defendant Delta Dental Insurance Company is located at P.O. Box 2059

---

*Market*, https://jada.ada.org/article/S0002-8177(17)31067-X/pdf (last visited Nov. 22, 2019).

[13] *See* Peppy Dental, http://peppydental.net/ (last visited Nov. 22, 2019).

[14] *See* My Healthy Smile, https://www.myhealthysmile.net/ (last visited Nov. 22, 2019).

Mechanicsburg, PA 17055-2059, and has Payer #AARP1. Defendant DeltaCare USA is located at P.O. Box 1810 Alpharetta, GA 30023, and has Claims Payer #DDCA2 and Encounter Payer #DDCA3. Defendant Delta USA Inc. is located at 1515 W 22nd Street, Suite 450, Oak Brook, IL 60523. Throughout the class period, Delta Dental Insurance Company, DeltaCare® USA, and Delta USA Inc. were affiliates or subsidiaries of DDPA, and acted in concert with DDPA and the Plans to devise and implement the alleged contract, combination or conspiracy.

24. Defendant DDAL shares an address with DDGA and is located at P.O. Box 1809, Alpharetta, GA 30023-1809. Throughout the class period, DDAL and DDGA exercised control over the DDPA.

25. Defendant DDAK shares an address with Defendant DDOR and is located at 601 SW 2nd Avenue, Portland, OR 97204, and has Payer #CDOR1. Throughout the class period, DDAK and DDOR exercised control over the DDPA.

26. Defendant DDAZ is located at P.O. Box 43026, Phoenix, AZ 85080, and has Payer #86027. Throughout the class period, DDAZ exercised control over the DDPA.

27. Defendant DDAR is located at P.O. Box 15965, N. Little Rock, AR 72231-5965, and has Payer #CDAR1. Throughout the class period, DDAR exercised control over the DDPA.

28. Defendant DDCA is located at P.O. Box 997330, Sacramento, CA 95899-7330, and has Payer #77777. Throughout the class period, DDCA exercised control over the DDPA.

29. Defendant DDCO is located at P.O. Box 173803, Denver, CO 80217-3803, and has Payer #84056. Throughout the class period, DDCO exercised control over the DDPA.

30. Defendant DDCN shares an address with Defendant DDNJ and has Payer #22189. Throughout the class period, DDCN and DDNJ exercised control over the DDPA.

31.     Defendant DDDE shares an address with Defendant DDPN, and has Payer #51022. Throughout the class period, DDDE exercised control over the DDPA.

32.     Defendant DDDC shares an address with Defendant DDPN and has Payer #52147. Throughout the class period, DDDC exercised control over the DDPA.

33.     Defendant DDFL shares an address with Defendant DDGA. Throughout the class period, DDFL exercised control over the DDPA.

34.     Defendant DDGA is located at P.O. Box 1809, Alpharetta, GA 30023-1809, and has Payer #94276. Throughout the class period, DDGA exercised control over the DDPA.

35.     Defendant HDS is located at 700 Bishop Street, Suite 700, Honolulu, HI 96813, and has Payer #99010. Throughout the class period, HDS exercised control over the DDPA.

36.     Defendant DDID is located at P.O. Box 2870, Boise, ID 83701, and has Payer #82029. Throughout the class period, DDID exercised control over the DDPA.

37.     Defendant DDIL is located at P.O. Box 5402, Lisle, IL 60532, and has Payer #05030 (group plans) and Payer #IDIND (IL individual plans only). Throughout the class period, DDIL exercised control over the DDPA.

38.     Defendant DDIN is located at P.O. Box 9085, Farmington Hills, Ml 48333-9085, and has Payer #DDPIN. Throughout the class period, DDIN exercised control over the DDPA.

39.     Defendant DDIA is located at P.O. Box 9000, Johnston, IA 50131-9000, and has Payer #CDIA1. Throughout the class period, DDIA exercised control over the DDPA.

40.     Defendant DDKS is located at 1619 N. Waterfront Parkway, P.O. Box 789769, Wichita, KS 67278-9769, and has Payer #E3960. Throughout the class period, DDKS exercised

control over the DDPA.

41.     Defendant DDKY is located at P.O. Box 242810, Louisville, KY 40224-2810, and has Payer #CDKY1. Throughout the class period, DDKY exercised control over the DDPA.

42.     Defendant DDLA shares an address with Defendant DDGA. Throughout the class period, DDLA exercised control over the DDPA.

43.     Defendant DDMD shares an address with Defendant DDPN and has Payer #23166. Throughout the class period, DDMD exercised control over the DDPA.

44.     Defendant DDMA is located at P.O. Box 2907, Milwaukee, WI 53201, and has Payer #04614. Throughout the class period, DDMA exercised control over the DDPA.

45.     Defendant DDMI is located at P.O. Box 9085, Farmington Hills, MI 48333-9085, and has Payer #DDPMI. Throughout the class period, DDMI exercised control over the DDPA.

46.     Defendant DDMN is located at P.O. Box 59238, Minneapolis, MN 55459-0238, and has Payer #26004 or 07000. Throughout the class period, DDMN exercised control over the DDPA.

47.     Defendant DDMS shares an address with Defendant DDGA. Throughout the class period, DDMS exercised control over the DDPA

48.     Defendant DDMO is located at P.O. Box 8690, St. Louis, MO 63126-0690, and has Payer  #43090.  Throughout the class period, DDMO exercised control over the DDPA.

49.     Defendant DDMT shares an address with Defendant DDGA. Throughout the class period, DDMT exercised control over the DDPA.

50.     Defendant DDNE is located at P.O. Box 245, Minneapolis, MN 55440-0245, and has Payer #07027. Throughout the class period, DDNE exercised control over

the DDPA.

51.     Defendant DDNV shares an address with Defendant DDGA. Throughout the class period, DDNV exercised control over the DDPA.

52.     Defendant DDNJ is located at P.O. Box 222, Parsippany, NJ 07054, and has Payer #22189. Throughout the class period, DDNJ exercised control over the DDPA.

53.     Defendant DDNM is located at 2500 Louisiana Blvd., N.E., Suite 600, Albuquerque, NM 87110, and has Payer #85022. Throughout the class period, DDNM exercised control over the DDPA.

54.     Defendant DDNY shares an address with Defendant DDPA and has Payer #11198. Throughout the class period, DDNY exercised control over the DDPA.

55.     Defendant DDNC is located at P.O. Box 9085, Farmington Hills, Ml 48333-9085, and has Payer #56101. Throughout the class period, DDNC exercised control over the DDPA.

56.     Defendant DDND is located at P.O. Box 59238, Minneapolis, MN 55459-0238, with Payer #26004. Throughout the class period, DDND controlled as much as 38.1% of the market for dental insurance in the state of North Dakota, and exercised control over the DDPA.

57.     Defendant NDD (comprising Plans in Maine, New Hampshire and Vermont) ("Delta Northeast") is located at P.O. Box 2002, Concord, NH 03302-2002, and has Payer #02027. Throughout the class period, NDD exercised control over the DDPA.

58.     Defendant DDOH is located at P.O. Box 9085, Farmington Hills, MI 48333-9085, and has Payer #DDPOH. Throughout the class period, DDOH exercised control over the DDPA.

59.     Defendant DDOK is located at P.O. Box 548809, Oklahoma City, OK 73154-

8809, and has Payer #22229 and CDOK1. Throughout the class period, DDOK exercised control over the DDPA.

60.     Defendant DDOR is located at 601 SW 2nd Avenue, Portland, OR 97204, and has Payer #CDOR1. Throughout the class period, DDOR exercised control over the DDPA.

61.     Defendant DDPN is located at P.O. Box 2105, Mechanicsburg, PA 17055-6999, and has Payer #23166. Throughout the class period, DDPA exercised control over the DDPN.

62.     Defendant DDPR is located at P.O. Box 9020992, San Juan, PR 00902-0992, and has Payer #680652604. Throughout the class period, DDPR exercised control over the DDPA.

63.     Defendant DDRI is located at P.O. Box 1517, Providence, RI 02901-1517, and has Payer #05029. Throughout the class period, DDRI exercised control over the DDPA.

64.     Defendant DDSC is located at P.O. Box 8690, St. Louis, MO 63126-0690, and has Payer #43091. Throughout the class period, DDSC exercised control over the DDPA.

65.     Defendant DDSD is located at P.O. Box 1157, Pierre, SD 57501, and has Payer #54097. Throughout the class period, DDSD exercised control over the DDPA.

66.     Defendant DDTN is located at 240 Venture Circle, Nashville, TN 37228-1699, and has Payer #CDTN1. Throughout the class period, DDTN exercised control over the DDPA.

67.     Defendant DDTX shares an address with Defendant DDGA. Throughout the class period, DDTX exercised control over the DDPA.

68.     Defendant DDUT shares an address with Defendant DDGA. Throughout the class period, DDUT exercised control over the DDPA.

69.     Defendant DDVA is located at 4818 Starkey Rd., Roanoke, VA 24018-8510,

and has Payer #54084. Throughout the class period, DDVA exercised control over the DDPA.

70.     Defendant DDWA is located at P.O. Box 75983, Seattle, WA 98175, and has

Payer #91062. Throughout the class period, DDWA exercised control over the DDPA.

71.     Defendant DDWV shares an address with Defendant DDPA, and has Payer

#31096. Throughout the class period, DDWV exercised control over the DDPA.

72.     Defendant DDWI is located at P.O. Box 828, Stevens Point, WI 54481, and has

Payer #39069. Throughout the class period, DDWI exercised control over the DDPA.

73.     Defendant DDWY is located at P.O. Box 29, Cheyenne, WY 82003-0029,

and has Payer #CDWY1. Throughout the class period, DDWY exercised control over the

DDPA.

74.     Defendant DGI is a holding company for DDCA and DDMI that is

headquartered at 560 Mission St., Suite 13900, San Francisco, CA 94105. The two Plans

formed an alliance in 2000. As explained in a *San Francisco Business Times* article from

that year:

> The combined market share of the two plans will make the new holding company the
> largest provider of private dental insurance in the nation, covering 14 percent of enrollees
> in traditional, PPO and HMO dental programs. …
>
> The new structure gives Delta Dental of California the opportunity to expand outside its
> saturated home market, where it is already the market leader.
>
> In California, the company reached a point "where we can only grow by stealing from
> our competitors," said Jeff Album, the company's director of public affairs. Other states,
> however, are a "fresh market," he said. "As the employment rate sinks to record lows,
> there is a trend for employers to use every tool at their disposal to retain employees and
> attract new ones.
>
> Both Delta units will maintain separate assets and identities, but Delta hopes that
> operating through a unified company will have "special appeal to companies in other
> states that have employees in California and California companies with employees in
> those other states," Album said.[15]

---

[15] Cynthia Robinson, *Dental Plans Unite to Take Bigger Bite of Market*, San Francisco Business Times
(Mar. 26, 2000), https://www.bizjournals.com/sanfrancisco/stories/2000/03/27/story8.html.

Within a year, the two Plans became part of DGI.[16]

75. A 2017 Delaware Department of Insurance Examiner's Report on DGI and its wholly owned subsidiary, Dentegra Insurance Company ("DIC"), headquartered at One Delta Drive in Mechanicsburg, Pennsylvania, shows the following organizational structure:[17]

---

[16] *Delta Dental Plans Officially Become Dentegra Group Inc.*, California Healthline (Jan. 17, 2001), https://californiahealthline.org/morning-breakout/delta-dental-plans-officially-become-dentegra-group-inc/.

[17] Delaware Department of Insurance, *Report on Examination of Dentegra Insurance Company as of Dec. 31, 2015*, (May 16, 2017), https://insurance.delaware.gov/wp-content/uploads/sites/15/2017/05/DentegraInsCo2015web.pdf.



Insurance Holding Company System of Delta Dental of California

As the chart reflects, DDCA is an entity under which there are two sub-parent companies, DDCA and DDPN. Among the entities under the "Dentegra" banner other than DDCA and DDPN are: (a) a number of Plans in the South and West operated by Delta Dental Insurance Company (DDAL, DDGA, DDLA, DDMS, DDMT, DDNV, DDTX, and DDUT) and (b) a number of Plans off of or along the Eastern Seaboard (DDDC, DDPR, DDDE, DDNY, and

DDWV). DGI works closely with DDPA and its member Plans in implementing the anticompetitive scheme described herein.

76.     Defendant RHSC is another holding company that wholly or partly owns or controls a number of Plans. Its business address is P.O. Box 30416, Lansing, Michigan 48909-7916. According to a New York State Department of Financial Services Examiner's Report issued in February of 2018 on one of its subsidiaries, the Renaissance Health Insurance Company of New York, the holdings of RHSC are structured as follows:[18]

---

[18] New York State Department of Financial Services, *Report on Examination of Renaissance Health Ins. Co. of New York as of Dec. 31, 2015* 15 (Feb. 13, 2018), https://www.dfs.ny.gov/docs/insurance/exam_rpt/15638c15.pdf.



As this report reflects, operating under the RHSC banner are DDMI, DDAR, DDOH, DDNM, DDIN, DDNC, DDKY, and DDTN. A Federal Election Commission report from November of 2007 indicates that RHSC principally serves as a holding company for DDMI, DDTN, and "other companies that it directly owns or controls."[19] RHSC works closely with DDPA and its member Plans in implementing the anticompetitive scheme described herein.

## JURISDICTION AND VENUE

77.     Plaintiffs bring federal antitrust claims under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

78.     This Court has personal jurisdiction over each Defendant on multiple bases, including: (a) some of the Defendants, including DDIL, DDPN, and Delta USA Inc., are incorporated in or have entered into contracts with dentists in Illinois; (b) all of the Defendants have significant business in and contacts with Illinois through national insurance programs, both through the provision of dental goods, services, and facilities to consumers insured by DDIL, and by allocation of territories and price-fixing described above; (c) all Defendants conspired with DDIL and DDPA; (d) all of the Defendants use standardized forms prescribed by the DDPA in dealing with dentists; and (e) all of the Defendants require dentists who are in the individual provider networks of each Plan Defendant to accept patients of the other Defendants, often without compensation for services rendered.

79.     This Court therefore has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), because the Defendants transacted business in this District.

---

[19] https://www.fec.gov/updates/ao-2007-19-renaissance-health-service-corporation/.

This Court also has personal jurisdiction under Illinois law because Defendants participated in a conspiracy in which Delta Dental parent entities and at least one conspirator committed acts in furtherance of the conspiracy in Illinois. This Court also has jurisdiction because Defendants in person or through their agents and co-conspirators transacted in business, contracted to supply goods and services, regularly do business, and derive revenue within Illinois.

80.     Venue is proper in this District under: (a) Section 12 of the Clayton Act (15 U.S.C. § 22) because Defendants transact business in this District, and (b) 28 U.S.C. § 1391, because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

## INTERSTATE COMMERCE

81.     Defendants' activities as set out in this complaint have substantially affected and are within the flow of interstate trade and commerce. Many of the Delta Dental Providers, including Provider Plaintiffs, provide services, goods, or facilities to persons who reside in other states.

82.     The DDPA is involved in interstate commerce.  It controls many of the operations of each of the individual Plans, controls the marketing and use of the "Delta Dental" brand by each of the Plans, and dictates the terms and conditions of the standardized Delta Dental Provider Agreement that each Plan imposes on dentists who become part of the Delta Dental network.

83.     The individual plaintiffs have used interstate banking facilities and have purchased substantial quantities of good and services across state lines for use in providing dental services to Delta Dental insured consumers.

## FACTUAL ALLEGATIONS

### A.     The Development Of The Delta Dental System.

84.     Delta Dental was founded in 1955 when the International Longshoremen's and Warehousemen's Union ("ILWU") decided to partner with dentists to provide dental healthcare for its members' children. DDCA presents itself now as one of the leading pillars of the Delta Dental "enterprise," noting how it grew over time by creating or joining with a group of other Delta Dental Plans to form what is now DGI:[20]

---

[20] Delta Dental, *Delta Dental of California: Form a Hearing* (Oct. 29, 2018) https://dfr.oregon.gov/business/reg/insurer/mergers/Documents/moda-delta/20181029-presentation-slides.pdf. This presentation was made to Oregon regulators as part of DDCA's effort to acquire Moda Health, Inc. ("Moda"). The DDCA-Moda merger was highly criticized. As noted in one article, "[d]ental insurance giant Delta Dental of California is facing mounting criticism for paying its CEO exorbitantly, flying board members and their companions to Barbados for a meeting, and spending a small fraction of its revenue on charitable work — all while receiving significant state and federal tax breaks because of its nonprofit status." *Nonprofit Dental Insurer Under Scrutiny for "Flagrant" Spending*, California Healthline (Jan. 30, 2019), https://californiahealthline.org/news/nonprofit-dental-insurer-under-scrutiny-for-flagrant-spending/. It was pointed out that "the company paid its chief executive, Tony Barth, $14.3 million in 2016, two years before he was fired for having a secret relationship with a subordinate. The next nine highest-paid Delta executives earned more than $1 million each that year, bringing the total compensation for the top 10 to more than $30 million in 2016, according to the insurer's latest available tax filing. The company earned $5.9 billion in revenue that year. 'They just appear to be about nothing more than feathering the nests of their own managers,' said Michael Johnson, a former executive with Blue Shield of California turned whistleblower who has drawn attention to what he describes as the transgressions of nonprofit insurers. 'I can't imagine a more flagrant abuse or dereliction of their duty as a nonprofit.'" *Id*.



85. The same presentation notes how this "enterprise" of affiliates has expanded across the nation over time:



86.     DDCA further explained the "enterprise structure" by laying out the organization of the DGI group of companies:



87.     A similar story is told by DDMI, one of the founding entities of RHSC, the other

major holding company within the Delta Dental system.[21]  Its predecessor,  the Michigan

Dental Service Corporation ("MDSC"), was established by dentists in 1957 to provide

employees with better dental benefits; "it was modeled after the nonprofit medical/surgical

plans of the 1930s and 1940s," which later evolved into the BCBSA. In 1963, legislation was

passed in Michigan that allowed non-profit dental service corporations to underwrite risk. A

new business entity, Dental Care, Inc. ("DCI") was created that was separate and apart from the

---

[21] Delta Dental of Michigan, https://www.deltadentalmi.com/About/History (last visited Nov. 22, 2019).

dentists, with whom it contracted for the provision of dental services. In the 1970s, DCI became DDMI; more than 1,000 organizations were offering Delta Dental insurance coverage to their employees, including United Auto Workers-represented employees of Detroit automobile manufacturers.

88.     In the early 2000s, Delta Dental set up Renaissance Systems & Services, which was designed to promote e-commerce. The Plans also began sharing extensive transactional data about dentists participating in the Delta Dental provider network: "[t]he Research and Data Institute was established in 2005 to develop new benefit plan designs based on scientific evidence and find new ways to improve business processes and service. The institute accesses and analyzes the organization's massive data warehouse, which contains the world's largest collection of dental claims data." This data collection system also ensured that each Plan was both compliant with the market allocation scheme developed by DDPA and its members and was reimbursing dentists consistently with DDPA's systemwide policies of provider undercompensation.

89.     And just as DDCA and DDPN had done in 2000-01 in creating DGI, the first decade of the 2000s was all about coordination of and collaboration among the DDMI and other Delta Plans, as set forth in the DDMI historical webpage referenced above:

> In early 2006, Delta Dental of Michigan, with its affiliated companies in Ohio and Indiana, and Delta Dental of Tennessee, signed an affiliation agreement under a new nonprofit holding company to strengthen their market positions and increase the number of Americans with dental benefits. In 2009-2010, Delta Dental of Kentucky, Delta Dental of New Mexico and Delta Dental of North Carolina affiliated with the family of companies. The newest affiliate, Delta Dental of Arkansas, joined the enterprise in 2012.

> The enterprise provides coverage for more than 12.8 million members. In 2016 alone, it paid out $3.6 billion for dental care.

90.     As noted above, this web of Plans is now under the holding company umbrella

of RHSC. [22]

## B. The Current Dominance Of The Delta Dental System.

91.     As the DDPA says, the Delta Dental System is now the leading dental care

insurer in the United States. It operates a variety of dental insurance health plans. [23]

92.     The DDPA website also describes the association as "a network of companies

that provides dental coverage to 80 million people in the U.S. Delta Dental of California, Delta

Dental of New York, Inc., Delta Dental of Pennsylvania and Delta Dental Insurance Company,

together with our affiliate companies, form one of the nation's largest dental benefits delivery

systems, covering 36.8 million enrollees. All of our companies are members, or affiliates of

members, of the Delta Dental Plans Association, a network of 39 Delta Dental companies

throughout the country."[24] These companies are referred to on Delta Dental's website as "39

independent dental service companies." [25]

---

[22] The WSDA has a webpage recounting a similar story from the perspective of Washington State
dentists. *Changing Direction: How Delta Dental Went from WSDA Startup to Billion-Dollar Company*,
Washington State Dental Association (Apr. 26, 2019),
https://www.wsda.org/news/blog/2019/04/26/changing-direction-how-delta-dental-went-from-wsda-
startup-to-billion-dollar-company. The Washington State Dental Service Corporation ("WDS"), the
predecessor to DDWA, was created with the help of dentists and also started out with the intention of
providing dental care to children of ILWU workers. Dentists accepted withholds of 5% of their fees to
help get it started, withholds that were never returned. By the late 1990s, it was a huge entity run by
business people. WDS faced early and repeated antitrust concerns. In response to a potential
investigation by the Federal Trade Commission, the boards of the WDS and the WSDA eliminated all
ties in 1976. In 1997, the WDS signed a consent decree with the Washington Attorney General ("AG")
in which it agreed to remove most favored nation clauses in contracts with provider dentists, following
on the Rhode Island Case district court's refusal to dismiss the DOJ's challenge to such clauses. The
AG contended that such clauses inhibited competition and injured consumers. By 2009, WDS started to
freeze dentists' reimbursement rates. As noted above, WSDA filed recently a new antitrust complaint
with the AG over DDWA's practices.

[23] These plan descriptions are found at: Delta Dental, https://www.deltadental.com/us/en/shop-for-
insurance/dental-plans.html (last visited Nov. 22, 2019).

[25] Delta Dental, https://www.deltadental.com/us/en/about-us.html (last visited Nov. 22, 2019). Some
Plans use slightly different wording. For example, DDTN on its website refers to the DDPA as being

93.     The Defendants operate a variety of dental insurance health plans.

94.     One is the Delta Dental Premier, which is a traditional fee-for-service plan that allows a subscriber to visit any licensed dentist and to change dentists without first obtaining permission from Delta Dental. It "offers the largest network of dentists. These dentists have agreed to contracted fees with Delta Dental." [26]

95.     Another plan is Delta Dental PPO™, which is a preferred provider program: "with Delta Dental PPO you have access to a network of dentists who accept reduced fees for covered services."

96.     A third plan is DeltaCare® HMO, which provides low-cost dental coverage with minimal or no copayments. The focus is on preventive care and the subscriber chooses from a fixed network of dentists.

97.     A fourth plan is Delta Dental Patient Direct, a dental service discount plan where the subscriber chooses from a panel of participating dentists who charge discounted fees. The subscriber pays these fees to the dentist at the time of treatment.

98.     A fifth plan is Delta Dental PPO Plus Premier, which combines the Delta Dental PPO and Premier networks. "With this plan, even if your Delta Dental Premier dentist is not in the PPO network, you still receive the benefit of that dentist's contracted fee."

99.     There is also a special plan for members of the American Association of Retired Persons ("AARP").

100.    Delta Dental's website provides the following description of which Plans

---

"[m]ade up of 39 independent, affiliated member companies." *Id*.

[26] These descriptions can be found at Delta Dental, https://www.deltadental.com/us/en/shop-for-insurance/dental-plans.html (last visited Nov. 22, 2019).

provide these various services:

> Delta Dental of California offers and administers Delta Dental PPO™ and other fee-for-service dental programs for groups headquartered in the state of California.
> Delta Dental of New York offers and administers Delta Dental PPO and other fee-for-service programs in New York.
>
> Delta Dental of Pennsylvania and its affiliates offer and administer Delta Dental PPO and other fee for-service dental programs in Delaware (Delta Dental of Delaware), Maryland, Pennsylvania, West Virginia (Delta Dental of West Virginia) and the District of Columbia (Delta Dental of the District of Columbia).
>
> Delta Dental Insurance Company offers and administers Delta Dental PPO and other fee-for-service dental programs to groups headquartered or located in Alabama, Florida, Georgia, Louisiana, Mississippi, Montana, Nevada and Utah, and vision programs to groups headquartered in West Virginia. In Texas, Delta Dental Insurance Company offers and administers fee-for-service dental programs and provides a dental provider organization (DPO) plan.
>
> DeltaCare® USA is underwritten in these states by these entities: AL — Alpha Dental of Alabama, Inc.; AZ — Alpha Dental of Arizona, Inc.; CA — Delta Dental of California; AR, CO, IA, MA, ME, MI, MN, NC, ND, NE, NH, OK, OR, RI, SC, SD, VA, VT, WA, WI, WY — Dentegra Insurance Company; AK, CT, DC, DE, FL, GA, KS, LA, MS, MT, TN, WV — Delta Dental Insurance Company; HI, ID, IL, IN, KY, MD, MO, NJ, OH, TX — Alpha Dental Programs, Inc.; NV — Alpha Dental of Nevada, Inc.; UT — Alpha Dental of Utah, Inc.; NM — Alpha Dental of New Mexico, Inc.; NY — Delta Dental of New York, Inc.; PA — Delta Dental of Pennsylvania. Delta Dental Insurance Company acts as the DeltaCare USA administrator in all these states. These companies are financially responsible for their own products.
>
> The AARP® Dental Insurance Plan is insured by Delta Dental Insurance Company (Contract 1230) in AK, AL, DC, DE, FL, GA, LA, MD, MS, MT, NV, NY, PA, PR, TN, TX, UT, VI and WV, by Dentegra Insurance Company (Contract 1230) in AR, AZ, CA, CO, CT, HI, IA, ID, IL, IN, KS, KY, ME, MI, MN, MO, NC, ND, NE, NH, NJ, NM, OH, OK, OR, RI, SC, SD, VA, VT, WA, WI and WY, and by Dentegra Insurance Company of New England (Contract 1230) in MA. The plan is administered by Delta Dental Insurance Company. For Texas residents your Master Policy Form number is TX-AMD-MC-DPO-D-DC(DELTAUSA1-2005). These companies are financially responsible for their own products.[27]

101.     As can be seen from the foregoing description, while Delta Dental Plans operate

in various states and territories, and they offer a common set of dental insurance programs from

---

[27] Delta Dental, https://www.deltadentalins.com/about/legal/who-we-are.html (last visited Nov. 22, 2019).

which subscribers can choose, which operate on a nationwide basis in terms of the overall structure of how participating dental providers are compensated.

## C.     **Defendants' Market Allocation Scheme.**

102.     The DDPA is an association of the 39 independent Delta Dental Plans.

103.     The Plans are the members of, and govern, the DDPA.

104.     The DDPA is entirely controlled by its member Plans, all of whom are independent dental insurance companies or an affiliate of those companies.

105.     The Plans control the Board of Directors of the DDPA. The Board of Directors of DDPA is comprised of Presidents and CEOs of the independent Delta Dental companies.

106.     The DDPA promotes this group of independent companies as a single provider ("Delta Dental") and names it as the nation's largest dental insurance covering more than 80 million American and providing the largest dental network in the nation.

107.     Defendants have entered into a "contract, combination or conspiracy" to provide dental insurance under the "Delta Dental" brand in exclusive territories.

108.     Although the Defendant Plans do not compete head to head with each other using the "Delta Dental" brand in any states or territories and have never done so since the Delta Dental organization was created in 1966, the independent Plans are potential competitors.

109.     The DDPA is an instrumentality of the Defendant Plans. The Plans elect the Board and appoint the officers of the DDPA. The members of the Board and the officers of the DDPA are officers of the Defendant licensees. [28]   The Plans vote on any major actions of the

---

[28] *See, e.g.*, Delta Dental Plans Association, *Delta Dental Plans Association and DeltaUSA Appoint New Officers to National Boards*, Cision PR Newswire (Jan. 7, 2019, 6:45 AM), https://www.prnewswire.com/news-releases/delta-dental-plans-association-and-deltausa-appoint-new-

DDPA.  The Plans thus exercise actual control over the major decisions of the DDPA.

110.    The Defendant Plans have used their control over the DDPA to coordinate their activities. The DDPA and its license agreements are among the vehicles used by the Defendant Plans to enter into agreements that restrain competition.  Each Plan has entered into a licensing agreement with the DDPA. Each Defendant who is a licensee from the DDPA is an independent company or legal entity.  Because of the control that the Defendant plans exercise over the DDPA, the territorial allocation imposed by the DDPA through these licenses is, in fact, a territorial allocation that the member Plans have agreed to implement.

111.    Because the DDPA is controlled by its member Plans, any agreement between the DDPA and one of its member Plans constitutes a horizontal agreement between and among the Plans themselves.

112.    The affiliate license agreements limit each Delta Plan to compete on a branded basis only in its own state of domicile. Thus, each Plan is only licensed to provide "Delta Dental" branded dental insurance in a single state, and has not sought to operate outside the state using the "Delta Dental" name. Through the license agreement and the DDPA, which the Plans create and control, each Defendant agrees that the Plans will not compete under the "Delta Dental" trademarks and trade names outside of their designated territory and reports no revenue received from other states. Some, like Delta Dental Insurance Company, do operate in multiple states, but create separate entities to operate in each state. Those separate entities are licensed to do business only in a particular state, do not compete outside the borders of that state, and report no revenue from other states. Thus, the territorial restraints imposed upon Delta Dental Plans are nationwide.

---

officers-to-national-boards-300773351.html.

113.     As noted above in connection with DDMI, MDSC, the predecessor entity to DDMI, was modeled on the medical health plans of the 1930s and 1940s, which gave each such health plan an "exclusive service area" in which to operate free from like-branded competition. The DDPA utilizes an analogous approach.

114.     This approach is reflected in the creation of DGI, as discussed above. In 2000, DDCA had reached a plateau in extracting dental insurance revenue from its home state and wanted "fresh markets" in the form of revenue from other states. It could have chosen to commence operations in states served by DDPN and its affiliates and to try to steal some market share in those localities by competing on price or services. Instead, it allied with DDPN to create DGI, resulting in an "affiliation" of Delta Dental Plans in fifteen states and three United States territories.

115.     Holding companies such as Defendants DGI and RHSC only cement the use of exclusive territories and result in "affiliate" Plans being under the thumb of the key companies in those structures. Thus, for example, DDDC, DDDE, DDMD and DDWV all share headquarters addresses with DDPN. DDPN is never going to permit those other Plans to compete directly with it or with DDCA and its affiliates. Similarly, DDAL, DDFL, DDLA, DDMS, DDMT, DDNV, and DDTX all share headquarters addresses with DDGA, all of which are part of Delta Dental Insurance Company, which falls under the DGI banner. DDGA is never going to permit those other Plans to compete directly with it or allow DDCA or DDPN to compete in those states because all of those companies now purport to function as part of the DGI "enterprise structure." In a truly competitive world, it is inconceivable that a company like DDCA, on the hunt for "fresh markets," would not have invaded nearby Nevada, Utah, or Montana. Its web of DDPA-sanctioned "affiliations" and the chilling effect of the DDPA's policies of territorial allocation caused it not to do so.

116.    The DGI family of Plans has its own website that confirms the territorial

allocation of Defendants. It depicts its operations on the following map:



It then goes on to state that "Delta Dental of California, Delta Dental of Pennsylvania, Delta

Dental of New York, Inc., and Delta Dental Insurance Company, together with their affiliate

companies, form one of the largest dental benefits delivery systems in the country. We provide

dental benefits plans in 15 states, the District of Columbia, Puerto Rico and the Virgin Islands.

Our group of companies and affiliates are members of the Delta Dental Plans Association, a

network of 39 independent Delta Dental member companies. This gives our enrollees access to

some of the largest dentist networks nationwide."[29]

117.    These affiliations" of "independent Delta Dental member companies" were fully

encouraged by DDPA. The organizations that were early to the Delta Dental development

_____

[29] Delta Dental, https://www.deltadentalins.com/about/corporate-profile.html (last visited Nov. 22,
2019).

initiative won licenses in multiple states."[30] As the DDPA stated in a 2015 Form 990 filed with

the Internal Revenue Service ("IRS"):[31]

THE ORGANIZATION HAS TWO CLASSES OF MEMBERSHIP - ACTIVE AND AFFILIATE ANY DENTAL SERVICE CORPORATION THAT IS ACTIVELY ENGAGED IN ADMINISTERING A PREPAYMENT PROGRAM OR PROGRAMS IS ELIGIBLE FOR ACTIVE MEMBERSHIP THE TERM "DENTAL SERVICES CORPORATION" MEANS ANY NOT-FOR-PROFIT CORPORATION ORGANIZED PRINCIPALLY TO PROVIDE DENTAL HEALTH CARE SERVICES BY MEANS OF CONTRACTS WITH DENTISTS TO BE ELIGIBLE FOR AFFILIATE MEMBERSHIP, AN ORGANIZATION MUST BE (I) A NOT-FOR-PROFIT DENTAL CARE COMPANY THAT IS LOCATED OUTSIDE THE UNITED STATES, ITS TERRITORIES AND POSSESSIONS, OR (II) A CORPORATION, WHICH MAY BE A FOR-PROFIT CORPORATION (AND INCLUDING ANY ENTITY LOCATED OUTSIDE THE UNITED STATES, ITS TERRITORIES AND POSSESSIONS), WHICH DESIRES TO COOPERATE WITH THE ORGANIZATION AND/OR ITS AFFILIATES IN PROVIDING DENTAL PREPAYMENT PROGRAMS TO THE PUBLIC AN ORGANIZATION WISHING TO BECOME A MEMBER MUST APPLY AND BE APPROVED FOR MEMBERSHIP MEMBERS MAINTAIN THEIR MEMBER STATUS BY PAYING ANNUAL DUES AND ASSESSMENTS AND COMPLYING WITH THE ORGANIZATION'S MEMBERSHIP STANDARDS AND OTHER REQUIREMENTS THE MEMBERS HAVE THE POWER (A) TO APPROVE AMENDMENTS TO THE ORGANIZATION'S ARTICLES OF INCORPORATION, BYLAWS AND THE MEMBERSHIP STANDARDS PORTION OF THE MEMBERSHIP STANDARDS AND GUIDELINES ADOPTED BY THE MEMBERS, (B) TO SET AND REVISE ANNUAL DUES, AND (C) TO ELECT AND REMOVE THE ORGANIZATION'S BOARD OF DIRECTORS

Under this approach, "affiliate" membership in the DDPA can include any non-profit or for-profit

entity (such as DGI or its sub-entities) that "desires to cooperate with the [DDPA] and/or its

affiliates in providing dental prepayment programs to the public."[32]

118. The Delta Dental State Insurer's annual statements to state insurance

---

[30] AMB Report at 2.

[31] ProPublica, https://projects.propublica.org/nonprofits/display_990/362551984/2017_02_EO%2F36-2551984_990O_201512 (last visited Nov. 22, 2019).

[32] The National Association of Insurance Commissioners ("NAIC") has noted the potential inequities associated with the holding company organizational structure. "When health entities are organized into a holding company structure, capital, assets, and profits can be moved between the entities. Ownership of one health entity by another can result in a 'stacking' of capital, with the capital of the parent health entity dependent on the capital of the subsidiary health entity….. Operations can be centralized in one entity and the other affiliates pay a fee for the services provided through management and service agreements. Commonly centralized services include data processing, actuarial, investment management, accounting, and payroll. The service agreements may be merely a vehicle to move funds from one affiliate to another, if the services are not supported by a cost/benefit analysis and/or service charges are not based upon a reasonable cost allocation methodology. Profitability can also be moved from one affiliate to another by moving policyholders from one entity to another. Profitable products and their policyholders can be moved to the controlling entity leaving the subsidiary in a weaker financial position." National Association of Insurance Commissioners, *Financial Analysis Handbook Health Edition* at 354 (2012 Annual, 2013 Quarterly), available at https://www.naic.org/prod_serv/FAH-ZU-13_combined.pdf.

departments also confirm that insurance premiums are "Allocated by States and Territories." The statements also confirm that Defendants obtain revenues exclusively from their exclusive territories.

119.    Holding companies like DGI and RHSC also are subject to the limitations imposed by DDPA and its members. They must agree to "cooperate" with the Delta Dental system and abide by its various "requirements." Given the possibility of reaping windfall rewards off the backs of dentists compelled to accept depressed fee levels, they cooperated and policed willingly.

120.    Accordingly, efforts by a Plan using the "Delta Dental" brand to branch out of its territory and seek the business of an employer or group in another state have been rebuffed. This includes, for example, a Plan seeking to bid on a national retailer's dental insurance business being told that the account was reserved for another state's Plan.

121.    This restriction on competition enforced by the DDPA and implemented by its members and their affiliates is not in the individual self-interest of each Plan, limits its ability to grow and increase output, and effectively shackles it as a competitor.

**D.      Defendants' Joint Anticompetitive Compensation of Dentists.**

122.    As reflected in the discussion above, Defendants wield their considerable market power by compelling dentists to accept onerous reimbursement terms for the provision of dental services that do not compensate them for those services. This compulsion is implemented through standardized provider service contracts which, as the WSDA explained in a quotation above, are offered "on a 'take it or leave it' basis, with no room for negotiation, and with complete control of rates and terms." Thus, for example, when Delta Dental adjusts its compensation rates for dentists under the Delta Dental PPO™ plan or the Delta Dental Premier

plan, it endeavors to ensure that those adjustments are applied on a nationwide basis by all of the member Plans to the greatest extent possible. This ensures that Delta Dental programs have common compensation structures and operate as similarly as possible across the nation.

123.    In its second amended complaint filed on April 21, 2017 in the CDA case, the CDA attached a sample form provider agreement used by DDCA as Exhibit A to that complaint.[33] It contains the following clause:

**2. Basis of Fees.** A participating dentist will accept his or her "Contracted Fees"* fees with Delta Dental as full payment for services provided to any eligible patient.* If the participating dentist does not have a Contracted Fee with Delta Dental for a particular procedure submitted on an Attending Dentist's Statement, payment will be based on a maximum amount as determined by Delta Dental applying the same factors used for Contracted Fees.

The term "Contracted Fee" is defined in this sample agreement as follows:

"Contracted Fee" means the fee for each Single Procedure that a participating dentist has contractually agreed with Delta Dental to accept as payment in full for treating Enrollees.

The "Contracted Fee" will be subject to a maximum amount allowed as determined by Delta Dental for the network, specialty and location in which the dentist participates. The maximum amount is based on an actuarial calculation, and taking into account filed fees, general inflation rates, health care inflation rates, market pricing by competitors, and acceptability by customers. The maximum amount will not be reduced unless participating dentists' filed or submitted fees decrease to such an extent that Delta Dental is warranted in reducing the maximum amount allowed.

---

[33]Second Amended Complaint, *California Dental Ass'n, et al. v. Delta Dental of Cal*., Transaction ID# 60505636, No. CGC 14-538849 (Cal. App. Dep't Super. Ct. Apr. 21, 2017).

124.     Present Delta Dental provider contracts contain similar, non-negotiable fee clauses. For example, the DDVA PPO form provider agreement states that "[i]n our Delta Dental PPO program, we base our payments on Dental PPO Allowances. You agree to accept Delta Dental PPO Allowances as payment in full for Covered Benefits that you provide to Delta Dental PPO Enrollees"[34] Similarly, the DDCO standard agreement for dentists in its Premier network states that "[t]he Corporation agrees to compensate the Dentist for covered benefits in the following manner. The submitted charge for any covered service will be compared to the Maximum Plan Allowance (the allowable amount as determined by Delta Dental for a procedure). The lesser of the submitted charge or the Delta Dental Maximum Plan Allowance will be used to compute the patient copayment and compensation due to the Dentist from Corporation."[35] Likewise, the DDRI provider agreement states that "[t]he Dentist shall be compensated for the provision of Covered Services in accordance with (i) the compensation arrangements established by Delta Dental from time to time; and (ii) the terms and conditions of the agreements entered into from time to time by Delta Dental or other Qualified Entities regarding provision of dental services to covered persons."[36] And the DDNC PPO Provider Agreement states that "DDNC herein agrees to pay me for each commonly performed procedure performed by me to an eligible DDNC Subscriber in accordance herewith and covered by such subscriber's agreement with DDNC an amount equal to the Maximum Plan

---

[34] Delta Dental, *Delta Dental PPO Participating Dentist Agreement*, https://www.deltadentalva.com/uploadedFiles/Dentists/DeltaDentalPPOcontract.pdf (last visited Nov. 22, 2019).

[35] Delta Dental, *Delta Dental Premier Participating Dentist Agreement*, https://www.deltadentalco.com/uploadedFiles/Dentists/PremierAgreement.pdf (last visited Nov. 22, 2019).

[36] Delta Dental, *Participating Dentist Agreement*, https://www.deltadentalri.com/Content/Docs/ProvidersContract.pdf (last visited Nov. 22, 2019).

Allowance as established by DDNC and incorporated by reference herein, which fees may be amended from time to time by DDNC in its sole discretion."[37]

125.    Recent examples of Delta Dental's unilateral and unfair pricing practices--which are implemented across the nation by each of the Plans--are as follows.[38]

126.    Delta Dental Plans also imposed upon dental providers in its network a series of onerous reimbursement fee cuts in recent years. On June 15, 2011, WDS, the predecessor entity of DDWA, imposed an average reduction of dentist compensation rates of 15% for providers in the Delta Dental Premier network and 5% for those in the Delta Dental PPO network. When dentists complained, the WDS's Chief Executive Officer ("CEO"), Jim Dwyer ("Dwyer"), blithely remarked that they should just work harder. By 2013, WDS had undertaken a restructuring and had renamed itself DDWA. Meanwhile, its cash investments had reached $234 million and its premium revenues exceeded $1 billion. Aggregate compensation for DDWA Board members (excluding Dwyer) increased from $677,000 in 2015 to $1.28 million

---

[37] Delta Dental of North Carolina, Delta Dental PPO Participation Application and Agreement, https://northcarolina.deltadental.com/content/dam/member-companies/north-carolina/form-library/Dentist%20PPO%20Contract.pdf (last visited Nov. 22, 2019).

[38] There are other past examples. In the 1990s, the Antitrust Division of the United States Department of Justice ("DOJ") challenged DDRI's use of a Most Favored Nations contractual clause ("MFN") that required dentists in its network to give DDRI any lower price that they furnished to other health insurers. A federal district court refused to dismiss the DOJ's lawsuit, finding it had alleged a viable antitrust claim. *United States v. Delta Dental of R.I.,* 943 F.Supp. 172, 179 (D.R.I. 1996). DDRI eventually entered into a consent decree abandoning the practice. Department of Justice, https://www.justice.gov/atr/case-document/final-judgment-68 (last visited Nov. 22, 2019). The DOJ also entered into a similar consent decree with DDAZ. Department of Justice, https://www.justice.gov/atr/case-document/second-amended-final-judgment-0 (last visited Nov. 22, 2019). The Washington AG also entered into a similar consent decree with DDWA, as noted above. As a result, Delta Dental was forced to cease the use of explicit MFN clauses in contractual agreements with dental providers on a nationwide basis.

in 2016. Dwyer's compensation increased to $2.7 million in 2016, compared to $1.1 million in 2011.

127.    Similar types of draconian rate decreases were implemented by Delta Dental Plans across the nation. In 2011, DDID reduced dental reimbursement fees between 4% and 13%; in June of 2012, the Plans in New Jersey and Connecticut engaged in similar reductions.[39] Thereafter, DDMO cut dentist reimbursements in Missouri by an average of 7% and Delta Dental of New England implemented 4% rate cuts in New Hampshire and Vermont.[40] Delta Dental Plan representatives used a common script in attempting to justify these rate cuts occurring throughout the nation.

128.    The same course of conduct was attempted in California. In August of 2013, DDCA declined to honor its contractual commitment to dental service providers under its Premier Plan to calculate maximum reimbursement rates "based on actuarial calculation, and taking into account filed fees, health care inflation rates, market pricing by competitors, and acceptability by customers" and instead allowed maximum fees existing as of January 1, 2011 for each dental procedure to remain in effect as the maximum allowable fee.  This change in policy had the effect of eliminating language in dental service provider contracts that DDCA Delta will only lower its maximum amount payable if "participating dentists' filed or submitted fees decrease to such an extent that Delta is warranted in reducing the maximum amount allowed."

---

[39] Kelly Soderlund, Delta Dental Cuts Reimbursement Fees for New Jersey and Connecticut Dentists, ADA News (June 18, 2012), http://www.ada.org/sitccorc/contcnt/homc-ada/publications/ada-news/2012-archive/june/delta-dental-cuts-reimbursement-fees-for-new-jersey-and-connecticut-dentists.

[40] Advanced Practice Management, https://advancedpracticemanagement.com/financial-management-managed-care-update/ (last visited Nov. 22, 2019).

129.     As noted above, the CDA responded by filing, along with various dentists, a suit for injunctive and monetary relief against DDCA in January of 2014. On March 27, 2015, the Superior Court denied DDCA's motion to dismiss for lack of standing and its demurrer to the complaint.[41] As explained previously, the suit eventually resulted in a class action settlement for $65 million.

130.     In Massachusetts, DDMA since 1990 had used a Consumer Price Index ("CPI") in calculating fees for dentists who provided services pursuant to its Delta Premier network. Affected dentists challenged those fees before the Massachusetts Department of Insurance ("MDOI"). In an opinion issued in April of 2009, the MDOI condemned this fee methodology and ordered DDMA to replace it.[42] The Hearing Examiner stated:

> Delta has not justified why the cost to an urban consumer of purchasing a basket of goods and services on a retail basis constitutes a reasonable basis upon which to cap reimbursements of Premier participating dentists. Delta has not demonstrated that its CPI reflects a Massachusetts dentist's cost of doing business. I am not persuaded that these costs are tracked or mirrored by the consumer price index that Delta employs.
>
> In part, Delta defends its CPI adjustment because the prices charged for dental services are included in its CPI under the category of medical care. Delta, however, rejects the use of the "dental CPI" for its adjustment, dismissing it as merely an index of what dentists charge. The inclusion of retail dental charges in Delta's CPI is no justification for its use, for the same reason that Delta rejects use of the "dental CPI." Justifying Premier's use of its CPI because it includes dental charges for the region, furthermore, creates an intellectual anomaly. Delta already collects Massachusetts-specific information about the prices at which dental services are billed when it collects the data on which Premier's "customary fees" are based. Unlike Delta's CPI, the "customary fees" are based specifically on the charges submitted to Delta by Massachusetts dentists (their "usual fees"). Delta has not explained why it is reasonable to cap dental reimbursements to Massachusetts dentists by reference to a CPI that contains within it dental charges made by dentists in several states, when Massachusetts-specific data has been collected.

---

[41] Order Denying Delta's Motion to Dismiss, *California Dental Ass'n, et al. v. Delta Dental of Cal.*, Transaction ID# 56991002, No. CGC 14-538849 (Cal. App. Dep't Super. Ct. Mar. 27, 2015).

[42] Decision and Order Regarding the Fee Methodology of the Delta Dental Premier Plan, No. G2008-10 (Commonwealth of Mass. Div. Ins. Apr. 14, 2009), https://www.mass.gov/files/documents/2016/07/ny/g2008-10.pdf.

****

Another problem with Delta's CPI adjustment is that, if the CPI-driven nature of the April 1, 2008 periodic update is duplicated for several periodic updates *ad seriatim*, the "customary maximum allowable fee" for a procedure will lag further and further behind the amount that lies at the 90th percentile of participating dentists' "usual fees" for that procedure. Over years of updates, the "customary" aspect of Premier's fee methodology would depart, for the vast majority of dental procedures, further and further from the reality of the 90th percentile at which Massachusetts dentists usually are charging their nonsubscriber patients. A fee methodology with such a dramatic disconnect is inherently unreasonable.[43]

131.    DDMA went back to the drawing board and came up with a revised fee methodology in 2009 for both Premier and PPO plans. Dentists again challenged it and, once again, a Hearing Examiner for MDOI determined that the bases for the new methodology were insufficient to justify its use.[44] DDMA eventually adopted a fee methodology based on a consumer price index specifically applicable to dental services (the "Dental CPI").

132.    In 2016, DDMA introduced Total Choice, a new PPO product that reimbursed dentists at about 25% to 30% less than they received under the then-current Premier Plan. "'This PPO product was communicated to dentists with very short notice and caused considerable concern for dentists, employers and legislators,' said Ellen Factor, director of dental practice and membership engagement services for the Massachusetts Dental Society."[45] The dentists in Massachusetts were forced to accept this new product offering or leave some of their patients without coverage for procedures. As stated in one article:

---

[43] *Id.* at 14-15 (footnotes omitted).

[44] Decision and Order Regarding the New Fee Methodology Proposed for the Delta Premier and Delta PPO Plans, No. G2010-03 (Commonwealth of Mass. Div. Ins. Mar. 16, 2010), https://www.mass.gov/files/documents/2016/07/xt/g2010-03.pdf.

[45] David Burger, *Delta Proposes New Fee Methodology in Massachusetts*, ADA News (June 27, 2018), https://www.ada.org/en/publications/ada-news/2018-archive/june/delta-proposes-new-fee-methodology-in-massachusetts.

Dentists complained to the Legislature on Monday that they felt coerced into joining Delta Dental's new, lower-cost insurance plan, called Total Choice, and they asked lawmakers to impose more government control over the dental benefits giant.

Last year, Delta told dentists it was offering a new plan through a for-profit subsidiary of the non-profit parent and initially gave them about a month to sign onto the new network or face a "one-year lockout," Massachusetts Dental Society President David Lustbader told lawmakers.

Because of Delta's market share, dentists felt they had little choice but to join the Total Choice Preferred Provider Organization (PPO), and the lower rates paid to dentists under the plan have forced them to weigh tough business decisions, they told the Committee on Financial Services.

Lindi Ezekowitz, a pediatric dentist in Newburyport, said she couldn't afford to continue accepting both MassHealth patients and Total Choice PPO patients, so she no longer accepts Total Choice. Patients with that plan who choose to still see her must pay in full out of their own pockets.

"Those patients are suffering," Ezekowitz told the committee.[46]

133.    In July of 2019, DDMA also was able to revise its fee methodology for Delta Dental Premier and Delta Dental PPO. It abandoned use of the Dental CPI and announced that fees to providers would be reduced by 8.8% for non-incentive/standard fee schedule rates.[47] That led to DDMA sending an intentionally misleading letter to the patients of dentists who had to drop out of the Delta Dental network because of these rate cuts:

As a result of the diminished fee schedule remuneration rates, many doctors stopped participating with Delta Dental of Massachusetts (DD of MA). Subsequent to the loss of providers in their plan, DD of MA mailed out a letter directly to these patients (see the attachment above; signature removed) from its senior dental director and vice president of clinical management.

DD of MA felt the letter was fully justified.

"We greatly value our relationships with providers and members. When dentists choose to discontinue their participation in our network, we have an obligation to inform our members, particularly when that change could result in

---

[46] State House News Service, Dentists Critical of Delta Dental Plan, Worcester Business Journal (Oct. 31, 2017), https://www.wbjournal.com/article/dentists-critical-of-delta-dental-plan.

[47] David Burger, *Delta Proposes New Fee Methodology in Massachusetts*, ADA News (June 27, 2018), https://www.ada.org/en/publications/ada-news/2018-archive/june/delta-proposes-new-fee-methodology-in-massachusetts.

a change in coverage or an increase in out-of-pocket costs," said Thomas O'Rourke, head of corporate communications at DD of MA.

"The goal of these letters is to ensure that our members have the information they need to make the best care decisions for themselves and their family members and to give them the information they need if they want to make a change," said O'Rourke.

Others in the dental community such as the Massachusetts Dental Society (MDS) took great exception to DD of MA's action, with its disallowing of assignment of benefits as a patient service one key factor among others.

"The MDS is disappointed that Delta is taking punitive aim at those providers who have made the decision to opt out of the Delta network as a result of the revised Premier reimbursement methodology," said MDS president Janis Moriarty, DMD.

"Delta's letter to patients is putting providers in an unfair and unfortunate position with respect to their patients by sending communications that are incomplete, and therefore misleading, and intrusive of the dentist-patient relationship," said Moriarty.

"Delta's letter informs patients that their dentist is no longer a member of the Delta network without any explanation as to why, but the why is relevant. The letter also warns patients that they may be asked to pay up front and pay out of pocket for treatment. Delta, of course, has imposed this burden on patients by disallowing the assignment of benefits. The MDS will continue to have discussions with Delta regarding the importance of adding assignment of benefits contract provisions to all its programs," said Moriarty.[48]

134.    DDMA has taken the position that its customers prefer its PPO program. In fact, the Plans have encouraged the migration of customers from the Delta Dental Premier plan to the Delta Dental PPO plan.[49] Pursuant to the latter, reimbursement rates are not tethered to some dynamic Dental CPI or other type of index. Instead, the Provider Agreement under the PPO plan sets forth fixed compensation rates for specified dental services; as Delta Dental's

---

[48] Michael W. Davis, *Delta Dental of Massachusetts Patient Letter Upsets Dental Community*, Dentistry Today (Oct. 8, 2019), https://www.dentistrytoday.com/news/todays-dental-news/item/5452-delta-dental-of-massachusetts-patient-letter-upsets-dental-community.

[49] *See* Advanced Practice Management, https://advancedpracticemanagement.com/financial-management-managed-care-update/ (last visited Nov. 22, 2019).

website puts it, "[p]articipating dentists agree to scheduled fees as payment in full."[50] Those reimbursement rates do not change rapidly as a general matter and can stay in place for years, even though a dentist's costs of providing service (equipment, materials, labor, etc.) are continually rising. Any gap between the fixed Delta Dental PPO reimbursement rate and a dentist's usual and customary rate for the service in question has to be written off by the dentist. In a Delta Dental PPO, it is in the interests of the relevant Delta Dental Plan to contain costs by encouraging dentists to forego some services, like ensuring that a patient undergoes a regular dental checkup every six months.

135.    If Delta Dental Plans could compete with each other in the territories in which other Delta Dental Plans operate, the resultant competition would provide dentists with more opportunities to receive fairer compensation.

136.    This chronology demonstrates the adverse impact of Defendants' anticompetitive practices on Class members. The ADA has developed research which shows that dentists' average, inflation-adjusted net income from 2001-18 has declined significantly, due in large part to the conduct of Defendants:

---

[50] Delta Dental, https://www.deltadental.com/us/en/dentist/dentist-faq-.html (last visited Nov. 22, 2019).



137.    The foregoing chart depicts nationwide average annual income for dentists.

Those figures tend to mask the disparities at a state by state level. The following map, also

from the ADA, shows average annual incomes by state for general dentists in 2018, which are

sometimes significantly lower than the national average of $190,440.



AVERAGE ANNUAL INCOME, GENERAL DENTISTS, ADJUSTED FOR COST OF LIVING, 2018

138.    Notably, while dentists' incomes have decreased significantly, the cost for four years of dental education has risen, as has the associated debt accumulated by dental school graduates.[51]  The average cost for four years of dental education at a public school in 2016-17 was $145,000 (not accounting for living expenses or supplies). The similar figure at private dental schools was $265,596. Other additional expenses include lab fees, preclinical supplies, books, dental kits, scrubs, and exam costs. As a result, dentists who graduate from private schools in 2016 started their careers with an average of $291,668 in debt, $53,086 more than

---

[51] Sarah Goldy-Brown, *Average Dental School Debt 2018*, Student Debt Relief (May 9, 2019), https://www.studentdebtrelief.us/news/average-dental-school-debt/.
.

public school graduates.

139.    These costs have climbed over time. In 1996, dental school graduates as a whole had an average debt load of $129,927. Two decades later, it was $262,119. From 2006 to 2016, the debt load for public and private dental school graduates increased by 44% and 24% respectively. [52]

140.    The near-universal decline in dental reimbursements that has squeezed dentists' earning ability is shown on a state-by-state level in the following ADA chart:

---

[52] *Id.*



Reimbursement

% Change in Inflation-Adjusted Reimbursement to Dentists through Private Dental Insurance, 2002-17

| State | % |
|---|---|
| Alaska | -13.2% |
| Alabama | -9.8% |
| Arkansas | -9.8% |
| Arizona | -14.3% |
| California | -9.2% |
| Colorado | -11.4% |
| Connecticut | -2.2% |
| District of Columbia | -6.6% |
| Delaware | -6.7% |
| Florida | -9.5% |
| Georgia | -2.9% |
| Hawaii | -7.3% |
| Iowa | -3.7% |
| Idaho | -9.1% |
| Illinois | -4.7% |
| Indiana | -8.8% |
| Kansas | -6.0% |
| Kentucky | -11.3% |
| Louisiana | -8.5% |
| Massachusetts | -3.9% |
| Maryland | -9.6% |
| Maine | -7.5% |
| Michigan | -10.2% |
| Minnesota | -3.4% |
| Missouri | -10.0% |
| Mississippi | -5.1% |
| Montana | 15.5% |
| North Carolina | -8.2% |
| North Dakota | 1.3% |
| Nebraska | -3.7% |
| New Hampshire | -3.8% |
| New Jersey | -10.0% |
| New Mexico | -13.0% |
| Nevada | -9.6% |
| New York | -5.7% |
| Ohio | -7.6% |
| Oklahoma | -8.8% |
| Oregon | -7.2% |
| Pennsylvania | -10.8% |
| Rhode Island | -8.0% |
| South Carolina | -3.8% |
| South Dakota | 1.4% |
| Tennessee | -8.7% |
| Texas | -9.1% |
| Utah | -9.9% |
| Virginia | -6.9% |
| Vermont | -0.2% |
| Washington | -11.5% |
| Wisconsin | -6.5% |
| West Virginia | -5.0% |
| Wyoming | -9.4% |
| United States | -7.8% |

All of this constitutes antitrust injury to members of the proposed Class.

141.     The declining compensation for hard-working dentists contrasts starkly with the skyrocketing salaries and benefits given to executives and directors of the ostensibly "not for profit" Delta Plans.

142.     For example, based on its Form 990 filed with the IRS in 2016, DDCA's CEO got paid significantly more than his counterparts at much larger for profit and not for profit companies:

**CEO Total Compensation, 2016**

| | |
|---|---|
| Apple (116K employees, revenues of $216B) | $8.7 million |
| Anthem (53K employees, revenues of $85B) | $13.6 million |
| Delta Dental of CA (2K employees, revenues of $6B) | $14.3 million |

Sources: Delta Dental IRS Form 990, Apple and Anthem proxy statements.

Likewise, DDCA spent $54 million in compensating its executives and Board of Directors in 2016, which constituted over one-fifth of total pay to company personnel, a percentage far exceeding other health-related companies:

**Exec & Director Pay as % of Total Personnel Costs**

| | |
|---|---|
| Delta Dental of CA (2K employees, $54M executive & director pay) | 21.0% |
| Blue Cross Blue Shield of MA (4.1 employees, $13M executive & director pay) | 4.4% |
| Geisinger Health Plan (1.5K employees, $4M executive & director pay) | 3.6% |

Sources: IRS Forms 990 for 2016, Part 1, Line 5 & Part IX, Lines 5 & 7

And DDCA's executives got numerous other expensive executive perks:

**Delta Dental Executive Perks Reported on IRS Form 990**

| | | | |
|---|---|---|---|
| ✔ | First class or charter travel | ✔ | Housing allowance or residence for personal use |
| ✔ | Travel for companions | | Payments for business use of residence |
| ✔ | Tax indemnification and gross up payments | ✔ | Health or social club dues or initiation fees |
| | Discretionary spending account | ✔ | Personal services (e.g., maid, chauffeur, chef) |

All of this was happening while DDCA was paying lobbyists to help defeat California Senate Bill 1008, which would have required it to devote a minimum of 70% of premiums to dental care.[53]

143.    DDWA provides another example of the contrast between what dentists earn and what Delta Plan executives make. The compensation given to Dwyer, the former CEO of DDWA, in 2013 has already been mentioned, but it did not decrease in succeeding years. In 2016, he received a raise of $766,943.[54] Members of DDWA's Board, who work between seven and twelve hours a week, also got healthy raises: the then-board chair, Douglas Beck, got a raise from $96,732 in 2015 to $154,573 in 2016, even though he only worked an average of eleven hours per week. Total executive and board compensation for DDWA in 2016 was about $10 million.

144.    A third example is DDMA. A June 2017 article in the *Boston Globe* reported as

---

[53] *See* Michael Johnson, *The Nonprofit Whose Top Exec Earns More Than Apple's CEO*, Daily Kos (Dec. 14, 2018, 2:11 PM), https://m.dailykos.com/stories/2018/12/14/1819015/-The-nonprofit-whose-top-exec-earns-more-than-Apple-s-CEO. The chart on executive and director compensation taken from this article has a typographical error: Blue Cross Blue Shield of Massachusetts in 2016 had approximately 4100 employees.

[54] The data in this paragraph is set forth in Ruth McCambridge, *A Citizen Board to Monitor High Nonprofit CEO and Board Compensation*, Nonprofit Quarterly (Jan. 3, 2019), https://nonprofitquarterly.org/a-citizen-board-to-monitor-high-nonprofit-ceo-and-board-compensation/.

follows:

> In 2015, the last year for which tax filings are available, eight executives at Delta Dental's parent company earned more than $1 million in total compensation, up from just one in 2011. Total compensation includes base salary, bonuses, and retirement benefits.

> By comparison, Blue Cross Blue Shield of Massachusetts, which has eight times the revenues, reported total compensation of at least $1 million for seven executives in 2015, including almost $2.9 million for chief executive Andrew Dreyfus. The pay packages at Delta's parent company were also more generous than at Harvard Pilgrim Health Care and Tufts Health Plan, two other nonprofit insurers.

> Delta's top earner in 2015 was the former president, Fay Donohue, who received more than $7 million in total compensation despite working just a few months before retiring that year; much of that sum came in the form of retirement benefits and was previously reported in tax filings.

> Others who earned seven figures that year included Steven J. Pollock, who took over as president midyear and earned $2.4 million in total compensation, and Sheryl Traylor, senior vice president of human resources, who earned $2.6 million.[55]

145.    All of the foregoing indicates that Delta Dental Plans are profiting extensively off the backs of the dental care providers in the Delta Dental network. As explained in one article published in 2018, Delta Dental and its Plans have essentially decided to exploit the community of dentists in their networks:

> The inception of Delta Dental goes back to the mid-1950s and 1960s. Dentists collaborated to establish nonprofit insurance companies to increase the public's access to dental services. Initially, member dentists ran Delta Dental.

> Today, operational control of the various Delta Dental groups has been largely removed from dentist membership. Most authority rests in the hands of a variety of corporate officers and directors, few of whom are doctors. Salaries for senior managers of these nonprofits are generally well into six figures and often several million dollars annually.

> As one might expect, friction has grown between doctors, who formerly controlled these largely nonprofit insurance providers, and current management. Conflict has centered upon management's reductions in dollars

---

[55] Priyanka Dayal McCluskey, Delta Dental Wants to Lower Reimbursements. Dentists Have a Different Solution, Boston Globe (June 11, 2017, 5:44 PM), https://www.bostonglobe.com/business/2017/06/11/delta-dental-pays-high-salaries-reimbursements-decline/VxgTM4PknnbKS869oJZddI/story.html.

paid under fee schedules, reduced scheduled benefits for patients, operation with allegedly exploitive medical loss ratios (dental loss ratios or DLRs), lack of transparency in company operations and investments, loss of control by member dentists, and allegedly unfair claims review processes.[56]

146.    As this article reflects, Delta Dental's contract, combination or conspiracy to reduce compensation to dentists did not just injure dental care providers, but also injured their patients, as various dentists have stated in articles quoted in this complaint.

147.    Delta Dental's practices of lowering compensation rates to dentists and disallowing payment of certain types of dental procedures has led to a lower standard of dental; Delta Dental's professed concerns about improving the "quality of care" are pretextual. This fact is confirmed by dentists who wrote letters published in the *Journal of the American Dental Association*.

148.    For example, one Texas dentist said about Delta Dental's plans to disallow payments for certain dental procedures (a move which, as noted above, the ADA challenged):

> This is all about money and money only regardless of what Delta states. They want to discourage treatment and make the dentist work harder and take more time to complete a procedure. The less money they pay, the more they make and profit. Also, Delta is hopeful that the patient will not return for the other quadrants of treatment. Again, money saved is money profited.
>
> It is a total joke for Delta to state "quality of care issues." Insurance has cut the fees for dentistry by 30-70 percent for most common dental procedures. There is nothing about Delta or any other insurance for that matter, that they care or have any interest in "quality care."
>
> It is only about money and profit on their behalf. Insurance is a for-profit entity and they are doing their very best to increase profits daily at the expense of the patient, dentist and employer.[57]

---

[56] *See* Michael W. Davis, *Delta Dental of Massachusetts Patient Letter Upsets Dental Community*, Dentistry Today (Oct. 8, 2019), https://www.dentistrytoday.com/news/todays-dental-news/item/5452-delta-dental-of-massachusetts-patient-letter-upsets-dental-community.

[57] *Letters: Delta Disallow Policy*, ADA News (Aug. 22, 2016), https://www.ada.org/en/publications/ada-news/viewpoint/letters-to-the-editor/2016/august/delta-

149.     Likewise, a California dentist had this to say about CDA's challenge to DDCA's rate cuts:

> Delta's further contention of being "committed to acting in the long-term best interests that balance the needs of its stakeholders, including enrollees, client groups and dentists" must be some sort of code for "our business model proposes diverting part of each benefit dollar to commissions, administrative expenses, executive salaries, profit, etc. and then convincing the ratepayers that the 65 percent left over to provide treatment somehow mystically provides a better result than the $1 that was originally available."[58]

150.     And a South Carolina dentist supported the ADA's challenge to Delta Dental's practice of sending patients Explanations of Benefits that did not adequately advise them about why certain charges were not being reimbursed:

> My front office team applauds you for this. You cannot imagine the stack of explanation of benefits statements that we have in the queue that require us to practically become full-time advocates for the patient because of such instances. The time involved in doing this takes us away from servicing patients, stalls other claims and postpones treatment. Such makes providing quality care nearly impossible when being forced to answer to a staff dentist working on behalf of a dental insurance company who doesn't have to answer to the patient. Please continue to look into this matter as we continue to seek the best for every patient.[59]

151.     Delta's compensation practices also undermine dentists' ability to serve Medicare patients, as noted above. Given that its compensation levels do not adequately cover dentists' rising costs, they have less ability to take time from their commercially insured customers and serve the dental needs of Medicaid patients.

---

disallow-policy. *See* Letters: Delta Disallow Policy, ADA News (June 20, 2016) https://www.ada.org/en/publications/ada-news/viewpoint/letters-to-the-editor/2016/june/deltas-disallow-policy.

[58] *Letters: Delta Kerfuffle*, ADA News (Oct. 21, 2013), https://www.ada.org/en/publications/ada-news/viewpoint/letters-to-the-editor/2013/october/delta-kerfuffle.

[59] *Letters: Delta Dental*, ADA News (Oct. 16 2017), https://www.ada.org/en/publications/ada-news/viewpoint/letters-to-the-editor/2017/october/delta-dental.

## CLASS ACTION ALLEGATIONS

152.    The ADA (on behalf of its members), and Peppy and Moriarty on behalf of themselves (as Provider Plaintiffs), bring this action on behalf of a nationwide injunctive class under Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, and seek injunctive relief on behalf of the following class (the "Injunction Class"):

> All Delta Dental Providers, not owned or employed by any of the Defendants, that provide dental goods or services to Delta Dental insureds pursuant to a Delta Dental insurance policy within the United States and its territories.

153.    Peppy and Moriarty also bring this action on behalf of themselves and as a class action under Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, and seek monetary damages on behalf of the following class (the "Nationwide Damages Class"):

> All Delta Dental providers, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the United States and its territories and within four years of the date of filing of this action.

154.    A third proposed Class is the "New York Damages Class" represented by Peppy. It is defined as follows:

> All Delta Dental Providers in the State of New York, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of New York and within four years of the date of filing of this action.

The New York Damages Class is presented as an alternative to the Nationwide Damages Class and, as noted above, Plaintiffs intend to expand the number of such individual statewide damage classes by adding additional Provider Plaintiffs from other states.

155.    A fourth proposed Class is the "Massachusetts Damages Class" represented by

Moriarty. It is defined as follows:

> All Delta Dental Providers in the State of Massachusetts, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of Massachusetts and within four years of the date of filing of this action.

The Massachusetts Damages Class is presented as an alternative to the Nationwide Damages Class and, as noted above, Plaintiffs intend to expand the number of such individual statewide damage classes by adding additional Provider Plaintiffs from other states.

156.    All four of these Classes will be referred to collectively herein as the "Class."

157.    Plaintiffs believe there are thousands of members of the Class, the exact number and their identities being known by Delta Dental, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

158.    There are numerous questions of law and fact common to each Class member, including, but not limited to:

a.    Whether the conduct of Defendants alleged in this complaint constituted an unlawful market allocation in violation of Sections 1 and 3 of the Sherman Act;

b.    Whether the conduct of Defendants alleged in this complaint constituted an unlawful price-fixing in violation of Sections 1 and 3 of the Sherman Act;

c.    Whether the conduct of Defendants alleged in this complaint caused damages to Provider Plaintiffs and other members of the Class and the amount and extent of those damages; and

d.    Whether the conduct of Defendants alleged in this complaint is ongoing and should be enjoined.

159.    Peppy and Moriarty are members of the Class, have claims that are typical of the

claims of the Class members, have interests coincident with and not antagonistic to those of the other members of the Class, and will fairly and adequately protect the interests of the members of the Class.

160.    As described above, the ADA seeks to protect interests of its members, who would otherwise have standing to sue in their own right, which interests are germane to the ADA's purpose.  In addition, the ADA and the Provider Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

161.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

162.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

163.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. The Class is readily definable and is one for which records should exist in the files of DDPA and/or the Plans or others, and a class action will eliminate the possibility of repetitious litigation.

164.    Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate claims such as those asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## COUNT ONE –NATIONWIDE INJUNCTIVE RELIEF

165.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

166.     This is a claim for nationwide injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26) brought by all Plaintiffs on behalf of all Delta Dental providers, not owned or employed by any of the Defendants, that provide dental goods or services to Delta Dental insureds pursuant to a Delta Dental insurance policy within the United States and its territories.

167.     Defendants' concerted acts of market allocation, output restraint and suppression of compensation as described herein constitute *per se* violations of Sections 1 and 3 of the Sherman Act (15 U.S. C. §§ 1 and 3) or, at least, are subject to a "quick look" rule of reason analysis.

168.     Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants and all others acting in concert from continuing their illegal contract, combination, or conspiracy and ordering them to take appropriate remedial action to correct and eliminate any remaining effects of  their illegal contract, combination, or conspiracy.

169.     Plaintiffs reserve the right to seek preliminary injunctions as necessary.

## COUNT TWO – NATIOWIDE MONETARY DAMAGES

170.     The Provider Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

171.     The Provider Plaintiffs bring this claim under Section 4 of the Clayton Act (15 U.S.C. § 15) for treble damages and interest on behalf of all Delta Dental providers, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the United States and its territories and within four years of the date of filing of this action.

172.     As alleged more specifically above, Defendants have engaged in a market allocation scheme and price-fixing that represent a contract, combination, or conspiracy in restraint of trade within the meaning of Section 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3).

173.     Defendants have agreed to divide and allocate the geographic markets for the provision of dental insurance into a series of exclusive territories for each of the Plans. By so doing, Defendants have also entered into a contract, combination or conspiracy to suppress competition and reduce compensation to dental providers in violation of Sections 1 and 3 of the Sherman Act. Due to the lack of competition which results from Defendants' illegal conduct, providers who choose not to be in-network have an extremely limited market for the dental services they provide and are undercompensated for those services. Defendants' anticompetitive acts are illegal *per se* under Section 1 and 3 of the Sherman Act or, at least, are subject to a "quick look" rule of reason analysis.

174.     As a direct and proximate result of Defendants' continuing violations of Section 1 and 3 of the Sherman Act, the Provider Plaintiffs and absent nationwide damage class members have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

59

## <u>COUNT THREE – NEW YORK MONETARY DAMAGES</u>

175.    Provider Plaintiff Peppy incorporates the allegations set forth in the foregoing paragraphs as though set forth herein. The claim presented in this Count is presented as an alternative to the claim advanced in Count Two.

176.    Provider Plaintiff Peppy brings this claim under Section 4 of the Clayton Act (15 U.S.C. § 15) for treble damages and interest on behalf of all Delta Dental providers in the State of New York, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of New York and within four years of the date of filing of this action.

177.    As alleged more specifically above, Defendants have engaged in a market allocation scheme and price-fixing that represent a contract, combination, and conspiracy in restraint of trade within the meaning of Section 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3).

178.    Defendants have agreed to divide and allocate the geographic markets for the provision of dental insurance into a series of exclusive territories for each of the Plans. By so doing, Defendants have also conspired to suppress competition and reduce compensation to dental Providers in violation of Sections 1 and 3 of the Sherman Act. Due to the lack of competition which results from Defendants' illegal conduct, providers who choose not to be in-network have an extremely limited market for the dental services they provide and are undercompensated for those services. Defendants' anticompetitive acts are illegal *per se* under Section 1 and 3 of the Sherman Act or are subject to a "quick look" rule of reason analysis.

179.    As a direct and proximate result of Defendants' continuing violations of Section 1 and 3 of the Sherman Act, Provider Plaintiff Peppy and absent New York statewide damage class members have suffered and continue to suffer injury and damages of the type that the

federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

## **COUNT FOUR – MASSACHUSETTS MONETARY DAMAGES**

180.    Provider Plaintiff Moriarty incorporates the allegations set forth in the foregoing paragraphs as though set forth herein. The claim presented in this Count is presented as an alternative to the claim advanced in Count Two.

181.    Provider Plaintiff Moriarty brings this claim under Section 4 of the Clayton Act (15 U.S.C. § 15) for treble damages and interest on behalf all Delta Dental Providers in the State of Massachusetts, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of Massachusetts and within four years of the date of filing of this action.

182.    As alleged more specifically above, Defendants have engaged in a market allocation scheme and price-fixing that represent a contract, combination, and conspiracy in restraint of trade within the meaning of Section 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3).

183.    Defendants have agreed to divide and allocate the geographic markets for the provision of dental insurance into a series of exclusive territories for each of the Plans. By so doing, Defendants have also conspired to suppress competition and reduce compensation to dental Providers in violation of Sections 1 and 3 of the Sherman Act. Due to the lack of competition which results from Defendants' illegal conduct, providers who choose not to be in-network have an extremely limited market for the dental services they provide and are undercompensated for those services. Defendants' anticompetitive acts are illegal *per se* under Section 1 and 3 of the Sherman Act or are subject to a "quick look" rule of reason analysis.

184.     As a direct and proximate result of Defendants' continuing violations of Section

1 and 3 of the Sherman Act, Provider Plaintiff Moriarty and absent Massachusetts statewide

damage class members have suffered and continue to suffer injury and damages of the type that

the federal antitrust laws were designed to prevent. Such injury flows directly from that which

makes Defendants' conduct unlawful. These damages consist of having been paid less, having

been forced to accept far less favorable rates and other contract terms, and/or having access to

far fewer patients than they would have but for Defendants' anticompetitive agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated

persons and entities, respectfully request that the Court:

e.     Determine that this action may be maintained as a class action under Rule

23 of the Federal Rules of Civil Procedure and appoint Plaintiffs as Class

Representatives, and Counsel for Plaintiffs as Class Counsel;

f.     Adjudge and decree that Defendants have violated Section 1 and 3

of the Sherman Act;

g.     Permanently enjoin Defendants from entering into, or from honoring or

enforcing, any agreements that restrict the territories or geographic areas

in which any of the Delta Dental Plans may compete;

h.     Permanently enjoin Defendants from continuing with any price-fixing

and to remedy all effects or vestiges of those conspiracies;

i.     Permanently enjoin Defendants from retaliating against any Plaintiff for

participation in the litigation or enforcement of any remedy;

j.     Require ongoing periodic reporting on compliance by the Defendants,

monitoring by the Court, and a process through which class members will

be represented in any compliance issue at Defendants' cost, all of which

should continue until Defendants show that they have corrected the effects

of their illegal conduct;

k.      Award the Provider Plaintiffs and the Damages Classes treble the amount

of damages suffered by Provider Plaintiffs and members of the Damages

Classes as proven at trial;

l.      Award costs and attorneys' fees to Plaintiffs;

m.      Award prejudgment interest; and

n.      Award any such other and further relief as may be just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all issues so triable.


Dated:  November 26, 2019

/s/ Robert A. Clifford
Robert A. Clifford
Shannon M. McNulty
Kristofer S. Riddle
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois  60602
(312) 899-9090
(312) 251-1160 (fax)
rclifford@cliffordlaw.com
smm@cliffordlaw.com
ksr@cliffordlaw.com

Scott Martin[†]
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, New York  10004
(646) 357-1100
(212) 202-4322 (fax)
smartin@hausfeld.com

---

[†] Applications for admission *pro hac vice* will be forthcoming from Hausfeld LLP counsel not admitted in this District.

Michael P. Lehmann
Megan E. Jones
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, California 94111
(415) 633-1908
(415) 633-4980 (fax)
mlehmann@hausfeld.com
mjones@hausfeld.com

Michael D. Hausfeld
Swathi Bojedla
HAUSFELD LLP
1900 K Street, N.W., Suite 650
Washington, D.C. 20006
(202) 540-7200
(202) 540-7201 (fax)
mhausfeld@hausfeld.com
sbojedla@hausfeld.com

*Counsel for Plaintiffs*