**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| IN RE DELTA DENTAL ANTITRUST LITIGATION | ) ) ) ) ) | No. 1:19-cv-06734 <br><br> Hon. Elaine E. Bucklo |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 6

I.   The Parties ................................................................................................... 6

II.  Framework of the Dental Insurance Industry ......................................... 6

    A.   Dental Plans and Provider Networks. .............................................. 6

    B.   Two-Sided Nature of Dental Insurance. ........................................... 7

III. History of Delta Dental ............................................................................. 9

    A.   Non-Profit Dental Service Corporations. ......................................... 9

    B.   DDPA Was Founded to Enable the Sale of Multistate Dental Plans. ......................... 11

    C.   DDPA Has Always Been the Sole Owner of the "Delta Dental" Trademarks. ........... 12

    D.   The Membership Guidelines Do Not Cap Revenue for Second-Brand Products Nor Do They Facilitate "Fixing" Reimbursement Rates. ......................... 13

LEGAL STANDARD ......................................................................................... 14

ARGUMENT ...................................................................................................... 14

I.   Plaintiffs Fail to State a *Per Se* Claim ................................................... 16

    A.   Plaintiffs Do Not Allege Any *Per Se* Unlawful Restraints. ......... 16

    B.   There Are No Well-Pled Allegations That DDPA "Restricts" Second-Brand Business for Member Companies. ......................... 18

    C.   There Are No Well-Pled Allegations That Delta Dental "Fixes" Prices. .................. 19

    D.   The Alleged "Market Allocation Mechanism" Is Not *Per Se* Unlawful. .................. 21

        1.   Courts Must Distinguish Between Ancillary and Naked Restraints. .................... 21

        2.   The Territorial Rights Are Ancillary to a Procompetitive Venture That Increases Interbrand Competition. ......................... 22

        3.   The *Per Se* Rule Is Especially Inappropriate in a Two-Sided Transaction Platform Market. ......................... 26

i

## TABLE OF CONTENTS (continued)

**Page**

    E.    The *Blues* Case Is Inapposite.................................................................. 28

           1.    The *Blues* Case Involved Different Alleged Restrictions. .................... 29

           2.    The *Blues* Court Applied Different Law.............................................. 30

           3.    *Topco* and *Sealy* Do Not Apply. ...................................................... 31

II.    Plaintiffs Fail to State a Rule-Of-Reason Claim ................................................ 34

    A.    Plaintiffs Do Not Allege Effects on the Market as a Whole. ......................... 34

    B.    Plaintiffs Do Not Allege a Legally Cognizable Market. .............................. 37

           1.    Plaintiffs Fail to Allege a Two-Sided Market...................................... 37

           2.    Plaintiffs Fail to Allege a Cognizable Product Market........................ 37

           3.    Plaintiffs Fail to Allege a Cognizable Geographic Market.................. 39

           4.    Plaintiffs Fail to Allege Market Power. .............................................. 41

III.    Plaintiffs Fail to Allege Antitrust Injury ............................................................ 42

IV.    Plaintiffs Do Not Allege "Concerted Action" with Regard to Governance of the "Delta Dental" Trademarks ......................................................................... 44

    A.    Defendants Have a Unified Interest in Governance of the Trademarks....................... 44

    B.    *American Needle* Shows That Defendants Cannot Conspire with Regard to Governance of the Trademarks. ..................................................... 46

V.    Plaintiffs' Claims Are Barred by the McCarran-Ferguson Act.............................. 48

    A.    Plaintiffs' Claims Challenge the "Business of Insurance." ........................... 48

    B.    Defendants Are Regulated by State Law. .................................................. 50

CONCLUSION............................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Baxter Int'l Inc.*,
　2002 WL 467147 (N.D. Ill. Mar. 27, 2002)..........................................................................32

*Addamax Corp. v. Open Software Found., Inc.*,
　152 F.3d 48 (1st Cir. 1988)..............................................................................................30

*Agnew v. NCAA*,
　683 F.3d 328 (7th Cir. 2012) ................................................................................14, 34, 37

*Allen v. Dairy Farmers of Am., Inc.*,
　2014 WL 2610613 (D. Vt. June 11, 2014) .........................................................................40

*Am. Deposit Corp. v. Schacht*,
　84 F.3d 834 (7th Cir. 1996) .........................................................................................48, 50

*Am. Needle, Inc. v. NFL*,
　538 F.3d 736 (7th Cir. 2009) .............................................................................................45

*Am. Needle, Inc. v. NFL*,
　560 U.S. 183 (2010)........................................................................................46, 47, 48

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)...........................................................................................................14

*Atl. Richfield Co. v. USA Petroleum Co.*,
　495 U.S. 328 (1990)...........................................................................................................2

*Augusta News Co. v. Hudson News Co.*,
　269 F.3d 41 (1st Cir. 2001).........................................................................................31, 32

*Aydin Corp. v. Loral Corp.*,
　718 F.2d 897 (9th Cir. 1983) .............................................................................................32

*Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
　784 F.2d 1325 (7th Cir. 1986) ..........................................................................7, 41, 42, 44

*Baxter Int'l, Inc. v. Abbott Labs.*,
　315 F.3d 829 (7th Cir. 2003) .............................................................................................30

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007)........................................................................................... *passim*

## TABLE OF AUTHORITIES (continued)

**Page(s)**

**Cases**

*Bland v. Edward D. Jones & Co.*,
    375 F. Supp. 3d 962 (N.D. Ill. 2019) .......................................................................12

*In re Blue Cross Blue Shield Antitrust Litig.*,
    26 F. Supp. 3d 1172 (N.D. Ala. 2014) ..........................................................4, 29, 49

*In re Blue Cross Blue Shield Antitrust Litig.*,
    308 F. Supp. 3d 1241 (N.D. Ala. 2018) ................................................ *passim*

*Brillhart v. Mutual Medical Ins., Inc.*,
    768 F.2d 196 (7th Cir. 1985) ...........................................................................2, 43

*Broad. Music, Inc. v. CBS*,
    441 U.S. 1 (1979) ..........................................................................................16, 22

*Brooks v. Ross*,
    578 F.3d 574 (7th Cir. 2009) ..................................................................................20

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ...............................................................................................43

*Cal. Dental Ass'n v. F.T.C.*,
    526 U.S. 756 (1999) ...............................................................................................22

*Campfield v. State Farm Mut. Auto Ins. Co.*,
    532 F.3d 1111 (10th Cir. 2008) ..............................................................................39

*Car Carriers, Inc. v. Ford Motor Co.*,
    745 F. 2d 1101 (7th Cir. 1984) ...............................................................................16

*Chi. Prof'l Sports Ltd. P'ship v. NBA*,
    754 F. Supp. 1336 (N.D. Ill. 1991) ........................................................................32

*Chi. Prof'l Sports Ltd. P'ship v. NBA*,
    961 F.2d 667 (7th Cir. 1992) ............................................................................24, 43

*City of Mt. Pleasant v. Associated Electric Co-op.*,
    838 F.2d 268 (8th Cir. 1988) ..................................................................................45

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) .................................................................................................22

iv

## TABLE OF AUTHORITIES (continued)

**Page(s)**

**Cases**

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) .............................................................................................44, 45, 46

*Deslandes v. McDonald's USA, LLC*,
2018 WL 3105955 (N.D. Ill. June 25, 2018) ..............................................................4, 22, 25

*Dominick v. Collectors Universe, Inc.*,
2012 WL 6618616 (C.D. Cal. Dec. 18, 2012) ........................................................42

*F.T.C. v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ........................................................................................34

*Feinstein v. Nettleship Co. of Los Angeles*,
714 F.2d 928 (9th Cir. 1983) ..........................................................................48, 49

*Generac Corp. v. Caterpillar, Inc.*,
172 F.3d 971 (7th Cir. 1999) ..........................................................................27

*Hopping v. Standard Life Ins. Co.*,
1983 WL 1946 (N.D. Miss. Sept. 14, 1983) .....................................................49

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) ........................................................................41

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) .....................................................38

*Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*,
407 F.3d 1027 (9th Cir. 2005) ........................................................................45

*Kartell v. Blue Shield of Mass., Inc.*,
749 F.2d 922 (1st Cir. 1984) ..........................................................................28

*Kingray, Inc. v. NBA, Inc.*,
188 F. Supp. 2d 1177 (S.D. Cal. 2002) ...........................................................18, 20

*Kraft Food Holdings, Inc. v. Helm*,
2002 WL 31473843 (N.D. Ill. Nov. 4, 2002) ....................................................12

*In re Late Fee and Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) .............................................................20

**TABLE OF AUTHORITIES (continued)**

Page(s)

<u>Cases</u>

*Little Rock Cardiology v. Baptist Health*,
    591 F.3d 591 (8th Cir. 2009) ......................................................................38, 39

*Maple Flooring Mfrs. Ass'n v. United States*,
    268 U.S. 563 (1925)......................................................................................20

*Marion Healthcare LLC v. S. Ill. Healthcare*,
    2013 WL 4510168 (S.D. Ill. Aug. 26, 2013) ............................................39

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
    922 F.3d 713 (6th Cir. 2019) ...................................................................30, 31

*Metro Pub'g, Ltd. v. San Jose Mercury News*,
    987 F.2d 637 (9th Cir. 1993) ......................................................................12

*Mich. State Podiatry Ass'n v. Blue Cross & Blue Shield of Mich.*,
    671 F. Supp. 1139 (E.D. Mich. 1987).......................................................43

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)....................................................................................44

*Mueller v. Apple Leisure Corp.*,
    880 F.3d 890 (7th Cir. 2018) ......................................................................12

*NaBanco v. Visa U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ....................................................................31

*nFinanSe Inc. v. Interactive Commc'ns Int'l, Inc.*,
    2012 WL 13009231 (N.D. Ga. July 24, 2012)...........................................25

*North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*,
    385 F. Supp. 2d 740 (N.D. Ill. 2005) ..........................................24, 25, 28, 43

*Northrop Corp. v. McDonnell Douglas Corp.*,
    705 F.2d 1030 (9th Cir. 1983) ....................................................................32

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) .......................................................... *passim*

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*,
    745 F.2d 248 (3d Cir. 1984).......................................................................39

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

**Cases**

*Phillips v. Prudential Co. of Am.*,
    714 F.3d 1017 (7th Cir. 2013) ....................................................................................14

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) ............................................................... *passim*

*Prescient Med. Holdings, LLC v. Lab. Corp. of Am. Holdings*,
    2019 WL 635405 (D. Del. Feb. 14, 2019) ..................................................................39

*Preuher v. Seterus, LLC*,
    2014 WL 7005095 (N.D. Ill. Dec. 11, 2014) .............................................................19

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010).................................................................................30

*Quality Auto Body, Inc. v. Allstate Ins. Co.*,
    660 F.2d 1195 (7th Cir. 1981) ............................................................................28, 50

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997).....................................................................................38

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)..................................................................................................28

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ....................................................................22, 24, 32

*Rozema v. Marshfield Clinic*,
    977 F. Supp. 1362 (W.D. Wis. 1997) .......................................................................30

*Sanders v. Brown*,
    504 F.3d 903 (9th Cir. 2007) ....................................................................................12

*Sanger Ins. Agency v. HUB Int'l, Ltd.*,
    802 F.3d 732 (5th Cir. 2015) ..............................................................................49, 50

*Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*,
    40 F.3d 247 (7th Cir. 1994) ......................................................................................44

*Sausalito Pharmacy, Inc. v. Blue Shield of California*,
    544 F. Supp. 230 (N.D. Cal. 1981) ..........................................................................20

## TABLE OF AUTHORITIES (continued)

Page(s)

**Cases**

*SEC v. Nat'l Sec., Inc.*,
 393 U.S. 453 (1969)................................................................................................48

*Sidibe v. Sutter Health*,
 2013 WL 2422752 (N.D. Cal. June 3, 2013)........................................................38

*Spinelli v. NFL*,
 96 F. Supp. 3d 81 (S.D.N.Y. 2015) ......................................................................47

*Stamatakis Indus., Inc. v. King*,
 965 F.2d 469 (7th Cir. 1992) ................................................................................43

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
 373 F.3d 57 (1st Cir. 2004)...................................................................................39

*In re Sulfuric Acid Antitrust Litig.*,
 703 F.3d 1004 (7th Cir. 2012) ...................................................................... *passim*

*Texaco, Inc. v. Dagher*,
 547 U.S. 1 (2006)................................................................................3, 16, 22, 26

*Travelers Ins. Co. v. Blue Cross of W. Penn.*,
 481 F.2d 80 (3d Cir. 1973)...................................................................................36

*Tunis Bros. Co. v. Ford Motor Co.*,
 952 F.2d 715 (3d Cir. 1991).............................................................................39, 40

*U.S. Dep't of Treasury v. Fabe*,
 508 U.S. 491 (1993)..............................................................................................49

*U.S. Gypsum Co. v. Ind. Gas Co.*,
 350 F.3d 623 (7th Cir. 2003) ................................................................................42

*Unigestion Holding, S.A. v. UPM Tech., Inc.*,
 305 F. Supp. 3d 1134 (D. Or. 2018) .....................................................................33

*Union Labor Life Ins. Co. v. Pireno*,
 458 U.S. 119 (1982)..............................................................................................49

*United States v. E.I. du Pont de Nemours & Co.*,
 351 U.S. 377 (1956)........................................................................................37, 38

TABLE OF AUTHORITIES (continued)

**Page(s)**

<u>Cases</u>

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) ............................................................30

*United States v. Sealy, Inc.*,
    1964 WL 8089 (N.D. Ill. Oct. 6, 1964)..................................................47

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967).........................................................................31

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972)....................................................................31, 33

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978).........................................................................21

*UNR Indus., Inc. v. Cont'l Ins. Co.*,
    607 F. Supp. 855 (N.D. Ill. 1984)........................................................50

*US Airways, Inc. v. Sabre Holdings Corp.*,
    2017 WL 1064709 (S.D.N.Y. Mar. 21, 2017) .......................................33

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019).............................................................26, 34

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).........................................................................27

*Washington v. NFL*,
    880 F. Supp. 2d 1004 (D. Minn. 2012)..................................................47

*Wheeler v. Dynamic Eng'g, Inc.*,
    850 F. Supp. 459 (E.D. Va. 1994) .......................................................36

*Witt Co. v. RISO, Inc.*,
    948 F. Supp. 2d 1227 (D. Or. 2013) .....................................................42

<u>Statutes</u>

15 U.S.C. § 1..................................................................................... *passim*

15 U.S.C. § 1012...............................................................................48, 50

Ala. Code § 22-21-375...........................................................................10

## TABLE OF AUTHORITIES (continued)

**Page(s)**

**Statutes**

Colo. Rev. Stat. § 10-16-312 ................................................................................10

215 ILCS § 110/32 ..................................................................................................10

215 ILCS § 110/115 ................................................................................................10

Kan. Stat. § 40-19a04 .............................................................................................10

Ky. Rev. Stat. § 304.32-170 ....................................................................................10

Mass. Gen. L., c. 176E, § 4 ....................................................................................19

Mass. Gen. L., c. 176E, § 12 ..................................................................................10

N.J. Rev. Stat. § 17:48C-20 ....................................................................................10

Okla. Stat. tit. 36, § 2672 .......................................................................................10

Okla. Stat. tit. 36, § 2675 .......................................................................................10

Wash. Rev. Code § 48.43.730(2) ............................................................................19

**Other Authorities**

Erik Hovenkamp, *Antitrust Policy for Two-Sided Markets* 16 (Feb. 9, 2018),
 available at https://ssrn.com/abstract=3121481 ...........................................8

Nat'l Ass'n of Dental Plans, 2018 Annual Report, available at
 https://tinyurl.com/rtjsj5f ............................................................................41

## INTRODUCTION

The 39 Delta Dental Member Companies, together with Delta Dental Plans Association ("DDPA") (collectively, "Delta Dental"), provide more than 80 million Americans with access to high-quality, affordable dental care. Delta Dental Member Companies are the intermediaries that bring patients and dentists together. On the one hand, they develop networks of dentists by entering into contracts with them to provide services to patients at discounted rates; on the other, they sell dental plans to individuals and employers who in turn can receive dental services from network dentists at a reasonable price. Delta Dental, therefore, operates in what the Supreme Court recently described as a "two-sided platform" market. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018) ("*AmEx*") ("As the name implies, a two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them.").

The Delta Dental model has existed for over 50 years. Most Delta Dental Member Companies are nonprofit organizations that grew their businesses on a "state-by-state" basis. Cmplt. ¶ 72. Each Member Company invests in the development of broad in-state provider networks that facilitate access to statewide care, including in underserved rural areas often ignored by large national insurance companies. Delta Dental Member Companies work to keep premiums and prices affordable for individuals, employers, and groups to whom they sell dental coverage. By negotiating appropriate reimbursement rates with dentists and passing the savings on to subscribers, Delta Dental's prices remain competitive for those looking to purchase coverage.

The dentists and clinics bringing this lawsuit do not invoke the antitrust laws in an effort to lower the cost of dental insurance or broaden the availability of dental services. Just the opposite. Plaintiffs want Defendants to reimburse them at higher rates—a request that, if successful, would inevitably *raise* premiums and out-of-pocket costs for consumers seeking dental care. Such a request is antithetical to the purpose of the antitrust laws, which "are designed to protect

competition and not competitors." *Brillhart v. Mutual Medical Ins., Inc.*, 768 F.2d 196, 200 (7th Cir. 1985) (rejecting antitrust claims where "plaintiffs' real complaint . . . is the failure to make more money"; noting health insurers are "free to insist upon a lower charge" and "pass those savings along to subscribers through lower prices"). As the Supreme Court has explained, "[l]ow prices benefit consumers regardless of how those prices are set, and as long as they are above predatory levels, they do not threaten competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990).

Plaintiffs' claims are not only antithetical to the consumer focus of the antitrust laws, they also would reduce competition in the dental insurance market more broadly. In addition to selling dental coverage to individuals and local accounts, Delta Dental Member Companies offer dental plans to national employers whose employees live in multiple states. A multistate employer is likely to only purchase dental coverage from a company with a national network of providers who are available to treat employees throughout the country. For national accounts, Delta Dental Member Companies, which are state-based insurers, cooperate through DDPA to provide a national network that can effectively service multistate accounts. This enables nonprofit Delta Dental Member Companies to compete with large, for-profit insurance companies like Aetna, Cigna, and MetLife for the business of national accounts.

Delta Dental's business structure, in other words, allows it to offer a valuable product that simultaneously provides individuals and employers with *both* broad local networks *and* national coverage—thereby increasing competition with national dental insurance companies and, in turn, reducing the prices that consumers pay. This type of *inter*brand competition (*e.g.*, competition between Delta Dental and other national insurers)—as opposed to *intra*brand competition (*i.e.*, competition between Delta Dental trademark licensees)—is "the primary purpose of the antitrust

laws." *AmEx*, 138 S. Ct. at 2290 (internal quotations and citation omitted). The Consolidated Complaint ("Complaint" or "Cmplt."), however, does not allege **any** harm to *inter*brand competition. To the contrary, the relief Plaintiffs seek (tearing down the Delta Dental model), if successful, would **reduce** interbrand competition among national dental insurance companies and "chill the very conduct the antitrust laws are designed to protect." *Id.* at 2287 (internal quotations and citation omitted). Plaintiffs thus are seeking to impose a "cure" far worse than the purported "disease" they claim to have diagnosed. Unsurprisingly, their Complaint fails for several reasons.

To begin with, Plaintiffs purport to bring this case under the *per se* rule, but they do not come close to asserting a viable *per se* antitrust claim. The *per se* rule is a narrow exception to the presumptive rule-of-reason standard and is applied only to a limited number of practices that are "so plainly anticompetitive that **no elaborate study of the industry** is needed to establish their illegality." *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (emphasis added). However, as the Supreme Court recently made clear in *AmEx*, two-sided platform markets, like dental insurance, **require** a close analysis of the industry. For these markets, pricing and demand are interconnected between the two groups, and it is "**necessary**" to "[e]valuat[e] both sides" of the platform in order "to accurately assess" an alleged restraint's net effect on competition. 138 S. Ct. at 2287 (emphasis added). This type of close analysis, including consideration of indirect network effects (discussed below), is fundamentally incompatible with application of the *per se* rule.

Nor do any of Plaintiffs' three supposedly anticompetitive "restrictions"—(i) a "Market Allocation Mechanism," (ii) "Price Fixing," and (iii) "Revenue Restrictions," *see* Cmplt. ¶ 121—meet the *per se* standard. Two of the alleged "restrictions"—"Revenue Restrictions" and "Price Fixing"—are not pled with anything near the amount of factual detail needed to pass muster under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). While Plaintiffs nakedly allege that

"Revenue Restrictions" are "agreed to . . . pursuant to the Delta Dental Plan Agreement," *id.* ¶ 107, nothing of the sort can be found in that "agreement." There is simply no limitation or "cap" on a Member Company's ability to generate business from non-Delta Dental brands—indeed, "[s]everal" Member Companies have highly successful second-brand businesses, *id.* ¶108. Nor is there anything to support the conclusory allegation of "Price Fixing." In fact, as pled, Plaintiffs' claims do not even allege "price fixing"; rather the Complaint merely contends that Defendants have "access to market rates data." *Id.* ¶ 101. As discussed below, "revenue restrictions" and "price fixing" claims based on such threadbare factual allegations do not assert a *per se* claim—or a claim of any sort—and should be dismissed.

The third alleged "restriction" ("Market Allocation") also is not *per se* illegal. Plaintiffs' "market allocation" claim, though poorly defined, appears to be based on the fact that when DDPA has granted a Member Company the right to use DDPA's "Delta Dental" trademarks, the scope of that license is limited to a particular state or group of states. But Plaintiffs ignore that the territorial rights at issue here are part of a business structure that improves economic productivity and increases interbrand competition with national dental insurers. Seventh Circuit law is clear: where, as here, a restraint is ancillary to a legitimate business purpose, the *per se* rule does **not** apply as a matter of law. *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 186 (7th Cir. 1985). And this is particularly true in this case, given the economic features of two-sided platform markets. Because Plaintiffs' *per se* claim is contrary to Supreme Court and Seventh Circuit precedent, it should be dismissed. *See Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955, at *7 (N.D. Ill. June 25, 2018) (dismissing *per se* claims where the restraint was ancillary).[1]

---

[1] Plaintiffs cannot save their *per se* claim by pointing to the rulings in *In re Blue Cross Blue Shield Antitrust Litigation* ("the *Blues* case"), a case pending in Alabama federal court involving the Blue Cross and Blue Shield Association ("BCBSA") and its participating health plans (the "Blue Plans"). *See In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241 (N.D. Ala. 2018) ("*Blues II*"); *In re Blue Cross Blue*

Next, Plaintiffs assert, in the alternative, that the purported "restrictions" are anticompetitive under a rule-of-reason analysis. Cmplt. ¶ 122. But the Complaint fails there, too. While Plaintiffs concede the two-sided nature of dental insurance, *see id.* ¶ 98 n.5, they do not allege necessary *facts* about both sides of the platform—nor do they address the net impact the practices they challenge have on the platform as a whole, as *AmEx* explicitly requires. Instead, Plaintiffs simply seek higher reimbursement rates without any consideration of how those higher rates will affect consumers, the platform, or the overall cost of dental insurance. Plaintiffs' failure to plead facts about both sides of an admittedly two-sided market renders their rule-of-reason claim insufficient as a matter of law. Furthermore, Plaintiffs have not alleged proper product and geographic markets or market power—all of which are necessary elements to plead a rule-of-reason claim and provide additional reasons for dismissal under Fed. R. Civ. P. 12(b)(6).

Finally, even assuming Plaintiffs could properly plead either a *per se* claim or a rule-of-reason claim, the Complaint still fails for three independent reasons. Plaintiffs have not alleged antitrust injury. Their purported harm (low reimbursement rates) is not the type of injury the antitrust laws protect against, especially where, as here, Plaintiffs only allege harm to one side of a two-sided market. Nor can Plaintiffs show concerted action with respect to the licensing and use of the "Delta Dental" trademarks, since the Member Companies have never had a separate interest in the marks. And Plaintiffs' claims are barred by the McCarran-Ferguson Act, which exempts the "business of insurance" from the federal antitrust laws.

For all of these reasons, Plaintiffs' Complaint should be dismissed.

---

*Shield Antitrust Litig.*, 26 F. Supp. 3d 1172 (N.D. Ala. 2014) ("*Blues I*"). As discussed below, that case involves different alleged restrictions, different controlling law, and was decided **before** the Supreme Court's decision in *AmEx*.

## BACKGROUND

### I.     THE PARTIES

DDPA is a not-for-profit association. It owns and licenses the Delta Dental name and trademarks to 39 Delta Dental Member Companies to use in the sale of dental insurance products. Cmplt. ¶ 2. The Member Companies collectively operate in all 50 states and Puerto Rico. *Id.* ¶¶ 22-63. Nearly all are not-for-profit entities, whose boards typically include dentists. *Id.* ¶ 2. DeltaUSA is a non-profit corporation that assists the Member Companies in offering dental services and benefits to national or multistate accounts. *Id.* ¶ 24.

Plaintiffs are 14 individual dentists or dental providers located in 10 different states. *Id.* ¶¶ 9-21. Each Plaintiff has contracted with a Member Company to be a participating dentist in a Delta Dental network. *Id.*

### II.    FRAMEWORK OF THE DENTAL INSURANCE INDUSTRY

#### A.     Dental Plans and Provider Networks.

Dental insurers, like Delta Dental, contract with two different groups of individuals. First, they build networks of dentists ("provider networks") by entering into contracts with individual dental providers. Cmplt. ¶ 83. Pursuant to these contracts, the dentists agree to provide dental goods and services at discounted rates to the individuals who are eligible for coverage under the dental insurance plan. *Id.* ¶ 81. These contracts provide the rates at which the dental insurance company will reimburse a participating dentist for treatment to an enrolled patient. *Id.* ¶ 82. Dentists can, and almost always do, participate in multiple insurance networks. By participating in these networks, dentists gain access to patients who are covered by the dental plans. Here, Plaintiffs do not allege whether they are participating providers for networks other than Delta Dental, nor do they allege how the rates they are paid by those other networks compare to the rates they are paid by Delta Dental.

Second, dental insurers sell access to their provider networks to employers, other large groups, and individual subscribers who enroll in their dental plans ("enrollees" or "subscribers"). *Id.* ¶ 76. Some consumers purchase individual dental plans for themselves and their dependents. Others are enrolled in a group plan as a benefit of their employment. *Id.* ¶ 87. The enrollees or their employers pay insurance premiums to be a member of the dental plan. Enrollees may also be responsible for a portion of the dental fees in the form of copayments, deductibles, and/or co-insurance. *Id.* ¶ 76. Because provider fees for dental services constitute the substantial majority of a dental plan's costs, insurance premiums paid by subscribers and employers increase when a plan pays higher reimbursement rates to providers.

### B.     Two-Sided Nature of Dental Insurance.

Dental insurance is, therefore, a "two-sided platform"—it offers simultaneous services to two distinct groups. *See AmEx*, 138 S. Ct. at 2280. For subscribers, it offers coverage for dental services received at in-network providers; for dentists, it provides access to insured patients in need of dental services. Both groups depend on the insurer to intermediate between them. *See Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986) (health plans are "financial intermediaries, purchasing agents for the consumers of medical services"). Subscribers depend on the insurance company to provide coverage that allows them to obtain needed dental services at a reasonable cost, while dentists look to the insurer to provide access to more patients and guaranteed payment for the provision of dental services to those patients.

More specifically, dental insurance is a special type of two-sided platform known as a "transaction" platform. "The key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." *AmEx*, 138 S. Ct. at 2280. Using the example of credit-card networks, the Supreme Court explained that "no credit-card transaction can occur unless both the merchant and the cardholder simultaneously agree to

7

use the same credit-card network." *Id.* The same is true here.

Dental insurance is a way to pay for dental services in much the same way that using a credit card is a way to pay for other goods and services. An individual insured by Delta Dental can use her insurance to pay for dental treatments in lieu of cash, checks, or other forms of insurance. This can happen if (i) she has a Delta Dental insurance policy and (ii) the dental practitioner she has visited has agreed to accept Delta Dental insurance as full or partial payment for the dental services provided. Indeed, the Complaint concedes that every dental insurance transaction requires both "(1) patients willing to pay the dental insurer's premiums" in exchange for coverage and access to the provider network and "(2) dental providers willing to accept" such insurance as payment for the provision of dental services to the patients. Cmplt. ¶ 98 n.5.[2]

Two-sided platforms "differ from traditional markets in important ways." *AmEx*, 138 S. Ct. at 2280. One is that the two user groups are linked across the platform through "indirect network effects," which exist "where the value of the two-sided platform to one group of participants depends on how many members of a different group participate. . . . In other words, the value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases." *Id.* at 2280-81. The Supreme Court explained that a credit card "is more valuable to cardholders when more merchants accept it, and is more valuable to merchants when more cardholders use it." *Id.* at 2281. Dental insurance is no different. A dental insurance plan is more valuable to subscribers when more dentists accept it as payment for services, and it is more valuable to dentists (through increased patient volume and assured payment) when more subscribers enroll. The Supreme Court further noted that transaction

---

[2] Commentators agree that insurance is a transaction platform market. *See, e.g.*, Erik Hovenkamp, *Antitrust Policy for Two-Sided Markets* 16 (Feb. 9, 2018), available at https://ssrn.com/abstract=3121481 (noting that "health insurance networks" are a kind of "transaction platform").

platforms, such as this one, inherently "exhibit more pronounced indirect network effects and interconnected pricing and demand" than other two-sided markets. *Id.* at 2286.

The differences between two-sided platforms and traditional markets have important consequences for economic and legal analysis. For example, "[t]o ensure sufficient participation" and maximize competition with competing platforms, "two-sided platforms must be sensitive to the prices that they charge each side." *Id.* at 2281. Raising reimbursement rates to dentists on one side of the platform risks losing subscribers on the other side, who must pay for those increased costs through higher premiums and out-of-pocket costs (*e.g.*, copayments, deductibles, and co-insurance). And lower subscriber or group participation, in turn, reduces the value of the platform to dentists, due to the smaller volume of patients available to them. *See id.* at 2285. As a matter of law, therefore, it is necessary for courts to "[e]valuat[e] *both* sides of a two-sided transaction platform" to "accurately assess competition." *Id*. at 2287 (emphasis added).

## III.   HISTORY OF DELTA DENTAL

### A.   Non-Profit Dental Service Corporations.

Beginning in the 1950s, state dental societies began forming non-profit "dental service corporations" to meet the public's growing demand for a way to finance the cost of dental care services. Cmplt. ¶¶ 72-73. Dental service corporations' policies and operations are guided by dentists, who serve on the boards of directors for the companies. Between 1954 and 1955, predecessors to Delta Dental Member Companies were incorporated as non-profit dental service corporations in Washington, Oregon, and California. *Id.* ¶ 72. In the following years, additional non-profit dental service corporations were "incorporated on a state-by-state basis" across the country. *Id.* ¶¶ 72-73. Today, nearly all of the 39 Member Companies are incorporated as non-profit dental service corporations. *Id.* ¶¶ 2, 71.

Dental service corporations are created pursuant to enabling legislation that is enacted by

the states. In order to operate as a non-profit dental service corporation, the Member Company typically must apply and be approved by the state commissioner of insurance. *See, e.g.*, Ala. Code § 22-21-375; 215 ILCS § 110/115; Okla. Stat. tit. 36, § 2672. Recognizing that in-state insurers are not attractive to employer groups that operate on a national or multistate basis, many enabling statutes explicitly authorize dental service corporations "to join with, contract with or become a member" of an association "to facilitate the providing of dental services" to multistate employer groups. Okla. Stat. tit. 36, § 2675; *see also* N.J. Stat. 17:48C-20 ("A dental service corporation of this State may enter into agreements with other corporations in the issuance of group contracts to policyholders whose employees are located in more than one state."). Some statutes also expressly allow "participating corporations" to share information, such as "claims" and "expenses," in order to administer and provide reciprocal benefits to employees of these multistate groups. N.J. Rev. Stat. § 17:48C-20.[3]

Put simply, state laws envision that non-profit dental service corporations, like the Member Companies, will build networks of dentists licensed in their respective states, and in many cases expressly authorize them to join together with other dental service corporations or similar entities to service multistate accounts. As explained below, that is exactly what Defendants have done.

---

[3] *See also*, *e.g.*, 215 ILCS § 110/32 ("A dental service plan corporation . . . shall have the right to reimburse any other dental service plan corporation or dentists of another state . . . for services rendered to its subscribers . . . at the same rate paid participating dentists under the certificate of the subscriber"); Colo. Rev. Stat. § 10-16-312 (authorizing "agreements or contracts with other similar organizations . . . licensed in this state or any other state . . . for the reciprocal or joint provision of benefits to the subscribers of such corporation and such organizations"); Kan. Stat. § 40-19a04 (authorizing the "[t]ransfer of subscribers from one corporation to another" and "[r]eciprocity of benefits" to subscribers of other dental service corporations); Ky. Rev. Stat. § 304.32-170 ("reciprocal or joint provision of benefits to the subscribers or members of the corporation and organizations or such other joint undertakings as the corporation's governing board may approve"); Mass. Gen. L., c. 176E, § 12 ("Any dental service corporation may join with any other dental service corporation, non-profit hospital service corporation, or medical service corporation, or all of them, organized either under the laws of the commonwealth or of any other state for the purpose of establishing or maintaining an agency or corporation designed to facilitate the provisions of dental service for residents of the commonwealth.").

## B.       DDPA Was Founded to Enable the Sale of Multistate Dental Plans.

In 1965, the National Association of Dental Service Plans (the predecessor to DDPA) was incorporated to expand the availability of dental care and to enable the sale and administration of multistate accounts. Cmplt. ¶ 73. This resulted in a new and effective product.

While most national dental insurance companies build narrower networks and target the high-population parts of the country, Delta Dental Member Companies are different. By their nature, the Member Companies are state insurers that are incentivized to develop broader and deeper networks that cover more areas within their respective states—thereby increasing access to oral healthcare for patients living in rural and underserved areas. *See* Cmplt. ¶ 79 (alleging the Member Companies have "[t]he most extensive dental network offering the widest selection of dentists nationwide"). By cooperating through DDPA, moreover, the Member Companies are able to offer a national Delta Dental product that combines their broad local networks with the ability to service multistate employer groups. *Id.* ¶¶ 73-74.

Specifically, in 1967, shortly after DDPA was founded, Member Companies began selling their first dental plans that provided coverage for subscribers in multiple states—something they were unable to do (and had not done) without DDPA. *Id.* ¶ 74. Today, Member Companies offer a wide range of fully insured commercial dental plans. *Id.* ¶ 76. They also offer self-funded products—or "Administrative Services Only" plans—to employer groups, who bear the financial risk for their employees' dental service needs. *Id.* ¶ 91. And Member Companies participate in government-coordinated programs, such as Medicare Advantage and Medicaid. *Id.*

Through DDPA and DeltaUSA, Member Companies are able to offer Delta Dental plans not just locally, but on a national basis. These multistate plans *increase* competition with national, for-profit dental insurers, like Aetna, Cigna, and MetLife. As the enabling statutes recognize, the administration of multistate accounts requires the sharing of certain information in order to process

11

the claims. For these accounts, the Complaint alleges, when a patient visits a dentist outside of the Member Company's area, the Member Company can access the National Provider File ("NPF") to retrieve information about that individual dentist that is needed to process and pay the claim. *Id.* ¶ 75. The NPF is maintained by DeltaUSA, and provider information is posted to the NPF by each individual Member Company. *Id.*

### C. DDPA Has Always Been the Sole Owner of the "Delta Dental" Trademarks.

Throughout the Complaint, Plaintiffs refer to a "contract entered into by each Delta Dental State Insurer with the Delta Dental Plans Association," which Plaintiffs call the "Delta Dental Plan Agreement." Cmplt. ¶ 2, 6, 77, 94, 107, 118-119. According to Plaintiffs, this document allows Member Companies "to conduct marketing and advertising using the Delta Dental trademarks and copyrights in exchange for adhering to various rules governing the scope of conduct of their business." *Id.* ¶ 77. The actual name of the document that governs the relationship between DDPA and each Member Company is the "Delta Dental Plans Association Membership Standards and Guidelines" ("Membership Guidelines"). A sealed copy is attached to this memorandum.[4]

The Membership Guidelines require the Member Companies to have a license to use the "Delta Dental" trademarks. Accordingly, DDPA enters into a Service Mark License Agreement ("License Agmt.") with each Member Company. This agreement is incorporated by reference into the Membership Guidelines and is attached as an exhibit to the Guidelines. The trademark was first used by DDPA's predecessor "at least as early as Oct. 27, 1968." Ex. B, Federal Trademark Registration No. 1,060,976; Ex. C, Federal Trademark Registration No. 1,060,977.[5] DDPA has

---

[4] *See* Ex. A. Because it is expressly referenced and relied upon throughout the Complaint, the Court can consider the Membership Guidelines without converting this motion to one for summary judgment. *See, e.g., Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018); *Bland v. Edward D. Jones & Co.*, 375 F. Supp. 3d 962, 968 n.3 (N.D. Ill. 2019); *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).

[5] The Court may also take judicial notice of the "Delta Dental" trademark registrations on a motion to dismiss. *See Kraft Food Holdings, Inc. v. Helm*, 2002 WL 31473843, at *6 (N.D. Ill. Nov. 4, 2002); *Metro*

been the sole trademark owner since its inception. No Member Company has ever owned an interest in the trademarks.

Through the License Agreement, DDPA provides each Member Company with an exclusive right to use the "Delta Dental" trademarks in connection with the provision of dental insurance services in a particular territory or territories, while reserving and retaining all ownership rights in the marks for itself. Ex. A, License Agmt. § 1.1. The license is subject to various terms, including that the licensee operate its business in accordance with certain quality standards and requirements; maintain the strength, distinctiveness, and goodwill associated with the marks; and make available certain information relating to use of the marks to DDPA. *Id.* §§ 2.1-2.4.

### D. The Membership Guidelines Do Not Cap Revenue for Second-Brand Products Nor Do They Facilitate "Fixing" Reimbursement Rates.

Plaintiffs declare that the "Delta Dental Plan Agreement" restricts Member Companies from selling or earning revenue from non-Delta Dental branded business. Cmplt. ¶ 107. Notwithstanding this bare allegation, it is clear from the face of the Membership Guidelines that there is no such cap or restriction on non-Delta Dental products. Not only may the Member Companies operate other businesses, they may offer competing dental brands—and they do. In fact, as the Complaint acknowledges, "[s]everal" Delta Dental Member Companies offer robust second-brand insurance products. *Id.* ¶ 108.

Plaintiffs likewise declare that Defendants have engaged in an agreement to "fix" prices. Cmplt. ¶ 101. But there is nothing in the Membership Guidelines to suggest that DDPA and the Member Companies "fix" reimbursement rates. Quite the opposite. The Membership Guidelines make clear that establishing reimbursement rates and contracting with dentists are functions for

---

*Pub'g, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640-641 (9th Cir. 1993), *abrogated on other grounds by Roe v. Anderson*, 134 F.3d 1400 (9th Cir. 1998).

each Member Company, based on the local market conditions. Ex. A, at 3-4.

## LEGAL STANDARD

On a motion to dismiss, the Court must assume the truth of all well-pleaded facts and determine whether the allegations support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court does not, however, have to accept "labels and conclusions" or "naked assertion[s]' devoid of 'further factual enhancement'" as true. *Id.* (quoting *Twombly*, 550 U.S. at 555). Nor can Plaintiffs rely on ambiguous or conclusory allegations in the hope that they can be clarified later in the litigation. Groundless claims must be dismissed at the outset, before a defendant is subjected to "the potentially enormous expense of discovery," which is particularly acute in antitrust cases. *Twombly*, 550 U.S. at 559-560. Further, the Court may consider documents critical to the complaint, and referred to in it, as information that is subject to judicial notice. *Phillips v. Prudential Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013).

## ARGUMENT

Plaintiffs bring causes of action for injunctive relief and damages under Section 1 of the Sherman Act, 15 U.S.C. § 1.[6] To state a Section 1 claim, Plaintiffs must plausibly allege "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Agnew v. NCAA*, 683 F.3d 328, 338 n.4 (7th Cir. 2012). On its face, the Complaint fails to state a Section 1 claim for at least five reasons.

***First***, **Plaintiffs do not plead a *per se* claim**. The *per se* mode of analysis is limited to restraints that are so clearly anticompetitive that they can be condemned on their face without any further inquiry. Plaintiffs' claims, however, are not based on nakedly anticompetitive agreements

---

[6] The Complaint also references Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, which give private plaintiffs a right of action to sue for damages and injunctive relief. Cmplt. ¶¶ 150, 155.

but on the very structure of the Delta Dental system itself. It is well-settled that when a plaintiff challenges a restraint that is part of a broader procompetitive venture, as here, that claim must be evaluated under the rule of reason. And it is even clearer that the *per se* rule does not apply to Plaintiffs' claims after *AmEx*, given the competitive and economic considerations raised by two-sided platforms like the dental insurance market. *See infra* Part I.

**Second**, **Plaintiffs have failed to plead a rule-of-reason claim** for three reasons. They fail to plead the existence of or facts about both sides of the two-sided dental insurance transaction platform market, as required under Supreme Court precedent. They fail to plead viable product and geographic markets. And they fail to plead that Defendants have market power. All of this is necessary for a rule-of-reason claim to survive a motion to dismiss. *See infra* Part II.

**Third**, **Plaintiffs have not alleged an antitrust injury**. The antitrust laws protect competition, not competitors, and are intended to ensure low prices for consumers. Plaintiffs' claims, however, are premised on increasing their own reimbursement rates, at the expense of consumers who will face higher premiums and out-of-pocket costs for dental care. Particularly in a two-sided platform, where both sides of the market must be analyzed in tandem, merely alleging that a restraint prevents participants on one side of the market from making more money does not describe an injury to competition. *See infra* Part III.

**Fourth,** **Plaintiffs have not alleged "concerted" action**. With respect to the management and governance of the "Delta Dental" brand, DDPA and the Member Companies to whom it has licensed the "Delta Dental" trademarks are considered a single entity that is not capable of "conspiring" for purposes of Section 1. *See infra* Part IV.

**Fifth**, **Plaintiffs' claims are barred by the McCarran-Ferguson Act**. That act exempts the business of insurance from the reach of the federal antitrust laws, and Plaintiffs' claims fall

15

squarely within its scope. *See infra* Part V.

## I.      PLAINTIFFS FAIL TO STATE A *PER SE* CLAIM

Courts "presumptively appl[y]" the rule of reason to claims under Section 1 of the Sherman Act. *Dagher*, 547 U.S. at 5. Under the rule of reason, a plaintiff "must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Id*. In a narrow set of cases, courts may deem an agreement *per se* unlawful—but only if the challenged practice is "so plainly anticompetitive that ***no elaborate study of the industry*** is needed to establish their illegality." *Id*. (emphasis added). The *per se* rule is the most draconian mode of antitrust analysis and is appropriate only where the challenged practice "always or almost always tend[s] to restrict competition and decrease output." *Broad. Music, Inc. v. CBS*, 441 U.S. 1, 19-20 (1979) ("*BMI*").

### A.      Plaintiffs Do Not Allege Any *Per Se* Unlawful Restraints.

Plaintiffs allege that Defendants have agreed to three purported "restrictions" that are *per se* illegal: "market allocation," "price fixing," and "revenue restrictions." Cmplt. ¶¶ 157-158. But the mere use "of the *per se* label" is not enough "to sustain the complaint"; "the defendants' alleged activity must be scrutinized to determine whether such a characterization is appropriate." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F. 2d 1101, 1108 (7th Cir. 1984). The conduct challenged in the Complaint does not come close to warranting application of the *per se* standard.

To begin, two of the "restrictions" Plaintiffs identify—"price fixing" and "revenue restrictions"—are simply empty labels. Plaintiffs appear to have borrowed these concepts from the *Blues* case. *See supra* fn.1. There, the district court repeatedly emphasized that its application of the *per se* rule pertained only to an "aggregation" of restraints, which included a combination of an alleged "market allocation scheme"; "output restrictions" that limited the volume Blue Plans could generate from non-Blue branded business; and "price fixing" claims. *Blues II*, 308 F. Supp.

16

3d at 1276-1279.[7] By trying to shoehorn their case into the *Blues* framework, Plaintiffs' "revenue restriction" and "price-fixing" allegations are a transparent attempt to manufacture a similar "aggregation" of restraints. But the Complaint entirely fails to support these claims with any well-pleaded *facts*. Under *Twombly*, Plaintiffs' bare legal conclusions cannot form the basis for a Section 1 claim of any sort. And notably, of the twelve complaints filed by other counsel against Delta Dental to date, only one even mentions "revenue restrictions," and it does so in equally conclusory terms as the Complaint here.[8] Every other complaint omits the revenue-restriction claim entirely, in apparent recognition that there is no basis for it.

Plaintiffs' so-called "market allocation" allegation fares no better. The territorial restrictions on the use of the "Delta Dental" trademarks supports the larger procompetitive venture between DDPA and the Member Companies to offer competitive dental insurance services nationwide. Particularly in a two-sided transaction platform market like this one, such ancillary restraints are not *per se* unlawful.

In fact, although *per se* treatment is limited to "cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever," *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011-1012 (7th Cir. 2012), Plaintiffs themselves concede that the "price fixing" and other conduct they are challenging "*could have*" multiple "procompetitive benefit[s]," such as "lowering the dental insurance premiums paid by dental insurance plan sponsors and members" and "allow[ing] . . . significant funds" to be returned to communities

---

[7] The court in the *Blues* case was quite clear that it was *not* deciding whether the territorial restriction at issue there would merit *per se* condemnation standing alone. It was only the *combination* of that alleged restriction with the output restriction, *i.e.*, the limitation on second-brand revenue, that the court found warranted *per se* treatment. *See infra* p. 29.

[8] *See Kottemann Orthodontics, P.L.L.C. v. Delta Dental Plans Ass'n*, No. 19-cv-3139 (D. Minn.), Dkt. 1 ¶¶ 91-103 (filed Jan. 20, 2019). As the Court is aware, the cases filed against Defendants in other districts are the subject of a pending motion to transfer before the Judicial Panel on Multidistrict Litigation.

to "invest in better facilities, equipment, and patient services." Cmplt. ¶ 125 (emphasis added). As the Seventh Circuit has explained, "price fixing by agreement between competitors"—and "other agreements that restrict competition"—are "governed by the rule of reason, rather than being *per se* illegal, if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity.'" *Sulfuric Acid*, 703 F.3d at 1010-1011. Plaintiffs' own allegations thus underscore what the law makes clear: Plaintiffs have no *per se* claim.

## B. There Are No Well-Pled Allegations That DDPA "Restricts" Second-Brand Business for Member Companies.

Plaintiffs generically allege that Defendants have "restrict[ed] the amount of revenue" and "place[d] a direct cap on the amount of business the Delta Dental State Insurers can generate under their non-Delta Dental insurance plans." Cmplt. ¶¶ 106, 119. Yet the Complaint is devoid of any allegations as to what the "cap" is, how it is calculated, and whether it is enforced on a state, local, or national basis. Indeed, Plaintiffs do not allege any *facts* about the so-called "revenue restriction" at all. Merely alleging a "revenue restriction" does not satisfy federal pleading standards. *See Twombly*, 550 U.S. at 565; *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1196 (S.D. Cal. 2002) (dismissing conclusory output restriction claims that are "unsupported by factual allegations").[9]

Plaintiffs cannot allege any facts supporting their "revenue restriction" theory for good reason. As the only document Plaintiffs cite in "support" of their claim reveals, DDPA ***does not restrict*** how much revenue Member Companies may earn from non-Delta Dental brand insurance. *See* Cmplt. ¶ 107 (asserting that revenue restrictions are "agreed to by the Delta Dental State

---

[9] Contrast the absence of factual allegations about this so-called "revenue restriction" with the second-brand restrictions at issue in the *Blues* case. There, the defendants did not dispute that they "adopted" both: (1) a "Local Best Efforts rule," under which "at least eighty percent of a Plan's annual health revenue from within its designated service area must be derived from services offered under the Blue Marks"; and (2) a "National Best Efforts rule," which required "a Plan to derive at least sixty-six and two-thirds percent of its national health insurance revenue under its Blue brands." *Blues II*, 308 F. Supp. 3d at 1255-1256. Here, Plaintiffs allege ***no*** facts about the "revenue restrictions" or the amount of the supposed "cap."

Insurers pursuant to the Delta Dental Plan Agreement"). The Membership Guidelines simply do not limit the amount of second-brand business that Member Companies can generate. *See* Ex. A. There is no "direct cap," *see* Cmplt. ¶ 119, no output restriction, nor anything resembling the "local" and "national best efforts" rules at issue in the *Blues* case. Plaintiffs' allegations are thus not only conclusory but contradicted by the very document they cite. *See Preuher v. Seterus, LLC*, 2014 WL 7005095, at *1 (N.D. Ill. Dec. 11, 2014) (documents central to the complaint take precedence over contrary allegations). In sum, Plaintiffs have not (and cannot) state *any* claim for supposed "revenue restrictions," let alone a *per se* violation. All such claims should be dismissed.

### C. There Are No Well-Pled Allegations That Delta Dental "Fixes" Prices.

Plaintiffs also allege that Defendants are engaged in *per se* illegal price fixing in order to "fix artificially low rates at which they reimburse Dental providers for goods and services provided to Delta Dental insureds." Cmplt. ¶ 100. Once again, these vague and generic allegations are not supported by *facts* that sufficiently outline the scope and substance of the supposed agreement.[10]

The Complaint alleges that Delta Dental "imposes" reimbursement rates through the "Delta Dental Provider Agreement." *Id*. at ¶ 101. But this conclusory allegation does not put Defendants on notice of the specifics of the alleged conspiracy. *Twombly*, 550 U.S. at 565 n.10. For example, Plaintiffs fail to plead facts about: (1) *who* agreed to fix prices (*e.g.*, which Member Companies); (2) what prices they agreed to fix (*e.g.*, what rates for what dental services, for how much money, and in which territories); (3) when the agreement was reached; or (4) how Defendants agreed on

---

[10] Plaintiffs allege that Defendants' reimbursement rates "are not filed with nor subject to review by any state insurance regulatory authorities," Cmplt. ¶ 78, but that is not accurate. *See, e.g.*, Mass. Gen. L., c. 176E, § 4 ("The fees to be paid to participating dentists for their services . . . shall at all times be subject to . . . the written approval of the state commissioner."); Wash. Rev. Code § 48.43.730(2) ("A carrier must file all provider contracts and provider compensation agreements with the commissioner thirty calendar days before use."). That certain Defendants must file their rates with state regulators shows that the assertion that Defendants are conspiring to "fix" reimbursement rates is not just conclusory but also entirely implausible.

what prices to charge to which dental providers—all of which are necessary to state a claim. *Twombly*, 550 U.S. at 565 n.10. Allegations that "the defendants agreed" to fix prices, with "no details as to when, where, or by whom this alleged agreement was reached[,]" are insufficient. *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007); *Kingray*, 188 F. Supp. 2d at 1190 (bare allegations of price fixing are "too conclusory to maintain a Section 1 claim"). A plaintiff must do more than incant "price fixing" to state a claim, because such legal conclusions are afforded no weight. *Brooks v. Ross*, 578 F.3d 574, 781 (7th Cir. 2009).

Although the Complaint on this point is too conclusory and summary to draw any confident inferences about what Plaintiffs are even trying to convey with the term "price fixing," as close as Defendants can surmise, the term "price fixing" is just intended as a pejorative shorthand for an assertion about information exchanges that are integral to the successful operations of the Delta Dental network. For instance, the Complaint alleges that Defendants "draw upon their access to market rates data for dental goods and services across the U.S. via the records obtained and held by [DDPA]" and "use" this data "to collectively determine the below[-]market rates they will impose." Cmplt. ¶ 101; *see id.* ¶ 75 (alleging DDPA has "access to the prices charged by Dental Providers" through the NPF and such access "facilitated Defendants' implementation of their Price Fixing"). But if that is what is intended, then it does not remotely spell out a *per se* offense.

Whatever Plaintiffs may have in mind, the Supreme Court has said, "We do not conceive that the members of trade associations become . . . conspirators merely because they gather and disseminate information . . . bearing on the business in which they are engaged and make use of it in the management and control of their individual businesses." *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 584 (1925); *see also Sausalito Pharmacy, Inc. v. Blue Shield of California*, 544 F. Supp. 230, 241 (N.D. Cal. 1981) ("the mere passing of price information,

20

without more, does not create an inference of a horizontal conspiracy nor does it state a claim for violation of the Sherman Act"). And "data access" allegations certainly do not state a *per se* claim. "The exchange of price data and other information among competitors does not invariably have anticompetitive effects" and accordingly "do[es] not constitute a *per se* violation of the Sherman Act." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n. 16 (1978).

The "price-fixing" claims here: (1) are far too conclusory to state a Section 1 claim; and (2) do not allege a *per se* violation regardless. They too should be dismissed.

### D. The Alleged "Market Allocation Mechanism" Is Not *Per Se* Unlawful.

Plaintiffs' final attempt to state a *per se* claim rests on an alleged "market allocation mechanism." Plaintiffs allege that Defendants have violated Section 1 by agreeing that each Member Company will provide Delta Dental-branded dental insurance "*exclusively* in the territories where the Delta Dental State Insurers are located." Cmplt. ¶¶ 93-94 (emphasis in original). But there is no support for applying the *per se* rule to this alleged restraint either.

First, where, as here, the alleged territorial restriction is ancillary to a procompetitive venture, courts must apply the rule of reason. Second, applying the *per se* rule to a two-sided transaction platform market, like dental insurance, cannot be squared with the Supreme Court's recent decision in *AmEx*—a ruling the *Blues* court did not have the benefit of when assessing the appropriate standard.

### 1. Courts Must Distinguish Between Ancillary and Naked Restraints.

Plaintiffs incorrectly characterize the agreement between DDPA and the individual Member Companies as a "horizontal" conspiracy. Cmplt. ¶ 93. Regardless of how that agreement is characterized, however, Plaintiffs have no basis for challenging alleged restrictions within that agreement under the *per se* rule.

The Seventh Circuit instructs courts to distinguish between two types of horizontal

21

restraints on competition: "naked" restraints and "ancillary" restraints. Naked restraints are those that are "unaccompanied by new production or products" and do not have redeeming virtues; ancillary restraints are "those that are part of a larger endeavor whose success they promote." *Polk Bros., Inc.*, 776 F.2d at 188-189. Where a restraint is ancillary, "the court *must* apply the Rule of Reason to make a more discriminating assessment" even if the constraint is horizontal or might be deemed *per se* illegal in other contexts. *Id*. at 186 (emphasis added).

The naked-versus-ancillary distinction recognizes that cooperation is inherent in nearly all forms of economically productive activity and a rule that condemns horizontal cooperation too strictly would chill a great deal of procompetitive conduct that the Sherman Act is meant to foster. *See Polk Bros.*, 776 F.2d at 188-189; *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 215-217 (D.C. Cir. 1986). Indeed, it is not even necessary that the horizontal restraint "itself" enhance output so long as the restraint is ancillary to a larger procompetitive agreement. *Deslandes*, 2018 WL 3105955, at *7. Plaintiffs cannot simply plead "market allocation" and thereby obtain *per se* treatment.[11]

### 2. The Territorial Rights Are Ancillary to a Procompetitive Venture That Increases Interbrand Competition.

Under controlling precedent, the territorial rights in the License Agreement are ancillary to a procompetitive purpose and thus must be analyzed under the rule of reason. Indeed, that is true of all three alleged "restrictions" (even if Plaintiffs had adequately alleged "revenue restrictions"

---

[11] The Seventh Circuit's approach is consistent with Supreme Court law. A restriction is not *per se* illegal simply because it might be characterized as a "market allocation" or "territorial" agreement in a formalistic sense. To the contrary, "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . formalistic line drawing." *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-59 (1977). Thus, the Supreme Court has frequently applied something less than *per se* analysis to conduct that could literally be characterized as horizontal market allocation or an otherwise ostensibly *per se* restraint. *See, e.g.*, *Dagher*, 547 U.S. at 6-8 (price fixing); *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756 (1999) (restrictions on discount advertising); *BMI*, 441 U.S. at 9 ("When two partners set the price of their goods or services they are literally 'price fixing,' but they are not *per se* in violation of the Sherman Act.").

and "price fixing," which they have not). The Seventh Circuit has explained that "if a joint venture has a legitimate business purpose, . . . the fact that as part of the venture the prices of the venturers are coordinated does not condemn it out of hand, but instead subjects it to scrutiny under the rule of reason." *Sulfuric Acid*, 703 F.3d at 1013. As noted above, this applies to "other agreements that restrict competition, as well." *Id*. at 1010-1011.

Here, the challenged territorial restrictions are part of, and further, a cooperative structure of Member Companies that has resulted in increased competition and choice for national purchasers of dental insurance. *See supra* pp. 11-12. The territorial rights encourage Member Companies to develop and maintain broad local networks within their respective territories—providing more coverage to patients all over the state. Working with DDPA, the Member Companies are also able to compete with national and local competitors to sell their networks to multistate accounts. Put another way, Defendants' network is structured so that it can compete effectively both for local *and* national business, an approach designed to provide the network with the best of both worlds. As in *AmEx*, the introduction of these products "has spurred robust interbrand competition" against national dental insurers, which of course is the "primary purpose of antitrust law." 138 S. Ct. at 2290. This increase in interbrand competition would not be possible without coordination through DDPA and the territorial restrictions on the use of the "Delta Dental" trademarks that accompany the joint venture and facilitate its procompetitive operation.

Territorial restrictions on trademark usage have several other important procompetitive purposes that have been recognized by the Seventh Circuit and other courts. They facilitate closer relationships with local dentists and consumers by ensuring that there is a single insurer with responsibility for building and cultivating Delta Dental provider networks in a given area. They prevent consumer confusion by reducing competing uses of the "Delta Dental" marks by multiple

23

entities in the same territory. And they prevent "free-riding" by one Member Company on another Member Company's efforts to develop and promote the brand. For instance, if Delta Dental of Illinois were to sell Delta Dental-branded products in Iowa, there is a risk that it might "free ride" off the time and money Delta Dental of Iowa spent promoting the Delta Dental brand in that state and vice versa. These risks could discourage both companies from undertaking procompetitive activity to strengthen the brand or even participating in the Delta Dental venture in the first place. As the Seventh Circuit has explained, "Firms that take advantage of costly efforts without paying for them, that reap where they have not sown, reduce the payoff that the firms making the investment receive. This makes investments in design and distribution of products less attractive, to the ultimate detriments of consumers." *Chi. Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 674-675 (7th Cir. 1992). In short, "control of free-riding" is "an accepted justification for cooperation." *Id.*; *see also Rothery*, 792 F.2d at 221-223.

The procompetitive purposes behind the territorial restriction are also consistent with the history of the restriction. *See supra* pp. 9-10; *Polk Bros.*, 776 F.2d at 186 (court must ask whether an agreement "arguably" "promoted enterprise and productivity at the time it was adopted"). As Plaintiffs concede, most Member Companies were incorporated as dental service corporations "on a state-by-state basis." Cmplt. ¶ 72. Those state laws are largely focused on in-state operations, but expressly permit Member Companies to work together to offer dental insurance nationwide.

Because the effect of the challenged restraint is, at the very minimum, arguably pro-competitive, the rule of reason must apply. The decision in *North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740 (N.D. Ill. 2005) ("*Caremark*"), is squarely on-point. There, the plaintiff, an independent retail pharmacy, entered into an agreement with Caremark, a pharmacy benefits manager that administered prescription drug benefits plans, by which the

plaintiff agreed to dispense drugs to plan subscribers in exchange for inclusion in Caremark's network. The plaintiff alleged that Caremark violated Section 1 by conspiring with plan sponsors to fix prices. *Id*. at 744. The defendant then filed a Rule 16(c) motion, which required the court to take as true the allegations in the Complaint and other undisputed facts, asking the court to decide whether the *per se* standard or the rule of reason applied to the plaintiff's claims. *Id*. at 743.

The *Caremark* court concluded that the "relevant agreement" for purposes of that claim was a horizontal one between firms that would normally compete with each other to purchase prescription drugs. *Id*. at 746. But it held nonetheless that the plaintiff's "allegation of horizontal price-fixing and its asserted attachment of the '*per se*' label do not . . . constrain this Court's ability to scrutinize the alleged agreement to determine whether *per se* treatment is indeed appropriate." *Id*. Applying Seventh Circuit law, the court concluded that the challenged practice was an ancillary restriction because "*even if* it were to be viewed as reflective of an otherwise anticompetitive horizontal restraint," the challenged practice was "part and parcel of a larger cooperative enterprise whose purpose and effect is to increase competition in the insurance-reimbursed prescription drug market." *Id*. at 748 (emphasis in original). For that reason, the court applied the rule-of-reason standard. *Id*. at 751.

As in *Caremark*, the territorial restriction Plaintiffs challenge here is part and parcel of a larger cooperative effort to increase interbrand competition for dental insurance. Plaintiffs' *per se* claim thus fails as a matter of law and should be dismissed. *See Deslandes*, 2018 WL 3105955, at *7 (rejecting *per se* claim where the alleged restraint was "ancillary to an agreement with a procompetitive effect"); *nFinanSe Inc. v. Interactive Commc'ns Int'l, Inc.*, 2012 WL 13009231, at *7 (N.D. Ga. July 24, 2012) (similar).

### 3. The *Per Se* Rule Is Especially Inappropriate In A Two-Sided Transaction Platform Market.

The *per se* rule is even more inappropriate in the context of this case because the territorial restriction is not only ancillary to Defendants' procompetitive structure but part of a two-sided transaction platform market. *Per se* rules are limited to practices that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Dagher*, 547 U.S. at 5. This is not such a case. As *AmEx* makes clear, two-sided transaction platform markets, like dental insurance, require much more than a cursory review to determine whether a restraint is anticompetitive.

In *AmEx*, the Supreme Court explained that two-sided transaction platforms are unlike "traditional markets" because they exhibit indirect network effects. 138 S. Ct. at 2280. Due to these effects, the platforms "cannot raise prices on one side without risking a feedback loop of declining demand." *Id.* at 2285. Thus, "the fact that two-sided platforms charge one side a price that is below or above cost reflects differences in the two sides' demand elasticity, not market power." *Id.* at 2285-2286. And "[p]rice increases [or below-cost prices] on one side of the platform likewise do not suggest anticompetitive effects without some evidence that they increased the overall cost of the platform's services." *Id.* at 2286.

Accordingly, for two-sided platforms, *AmEx* instructs that courts cannot determine whether a particular restraint is presumptively anticompetitive simply by eyeballing the industry. The Supreme Court instead requires that any analysis of the competitive effects of an allegedly unlawful restriction in a two-sided platform market *must* take into account both sides of the platform to "accurately assess competition." *Id.* at 2287; *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 56-57 (2d Cir. 2019) (cases involving two-sided platforms must take into account both sides of the platform "as a matter of law"). Merely pleading that Defendants'

actions have caused Plaintiffs to "receive[] less reimbursement for the goods and services they provided to the Delta Dental insureds," Cmplt. ¶ 99, says nothing about the true competitive effect of the challenged practice in this two-sided platform.

This is not an academic consideration. Because of the interdependence of the two sides of an insurance platform and the importance of network effects, all participants in the Delta Dental network share a common interest in the benefits of maximizing the scale of the business everywhere. The more patients who utilize a particular network, the more attractive that network is to dentists; and the more participating dentists there are in a given network, the more attractive the network is to subscribers and employers. The "flip side" of these network effects, however, is that decisions with respect to one side of the platform must be balanced against their likely impact on the other side of the platform. For example, if reimbursement rates paid to participating dentists are raised (increasing participation on the provider side), the premiums charged to subscribers must increase (decreasing participation on the subscriber side), and the result might actually depress participation on *both* sides of the market. Ultimately, this could create a negative "feedback loop" that reduces the competitiveness of the network overall and reduces its success in interbrand competition. *AmEx*, 138 S. Ct. at 2291.

Given these economic considerations, the *per se* rule is wholly inappropriate for a market like the one at issue here. "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). As the Seventh Circuit has explained, "[w]e should not throw labels like *per se* around loosely, without some appreciation for the economic arrangement we are evaluating." *Generac Corp. v. Caterpillar, Inc.*, 172 F.3d 971, 977 (7th Cir. 1999); *see also Sulfuric Acid*, 703 F.3d at 1011-1112 ("It is a bad idea to subject a novel way of doing business

(or an old way in a new and previously unexamined context, which may be a better description of this case) to *per se* treatment under antitrust law.").

This is especially true here. This case does not only involve a two-sided transaction platform market, but, like *Caremark*, it also involves medical costs. In refusing to apply the *per se* rule, the *Caremark* court noted that "the subject matter of the present agreement—medical costs— is an area of great complexity where more than solely economic values are at stake," which "warrants judicial hesitancy to interfere." *Id*. (quoting *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 931 (1st Cir. 1984) (Breyer, J.)); *see also Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1203 (7th Cir. 1981) (observing the Supreme Court's "reluctance" to "recognize *per se* violations of the antitrust laws without considerable knowledge of the business practice in question and the impact of those practices on competition" and finding that rule-of-reason analysis was appropriate for challenges to auto insurance provider agreements).

Finally, application of the *per se* rule would also be inconsistent with the fundamental purpose of the antitrust laws—the protection of consumer welfare. *See, e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (recognizing that Congress designed the Sherman Act to protect "consumer welfare"). Lower reimbursement rates mean lower premiums for employers, groups, and individuals, and lower copayments and out-of-pocket costs for consumers. As Judge Shadur found in *Caremark*, "[t]o hold an agreement that tends to lower consumer prices illegal *per se*, without careful examination of the agreement's true economic consequences, would seem at odds with the Sherman Act's purpose." 385 F. Supp. 2d at 750.

### E. The *Blues* Case Is Inapposite.

The decision in the *Blues* case cannot save Plaintiffs' deficient Complaint. That case is inapposite for at least two reasons: (1) it involved different alleged restrictions; and (2) the court's analysis of the *per se* question cannot be squared with controlling law in this circuit or with the

Supreme Court's recent decision on two-sided markets in *AmEx*, which was decided after *Blues*.

### 1. The *Blues* Case Involved Different Alleged Restrictions.

The court's *per se* finding in the *Blues* case was explicitly limited to an "aggregation" of restraints. *Blues II*, 308 F. Supp. 3d at 1279. The court thus "expresse[d] no view" about whether territorial restrictions alone "qualify as a *per se* Sherman Act violation." *Id*. at 1258. Unlike the *Blues* case, Plaintiffs here offer no factual support for an "aggregation" of restraints. While Plaintiffs have ***tried*** to allege output restrictions and price fixing, they have failed to do so, instead proffering mere legal conclusions that do not pass muster—and are contradicted by the very document the Complaint cites for support.

As to the alleged territorial restrictions, there are once again critical differences. Unlike the *Blues* case, the Delta Dental Member Companies were not using the trademarks in competition with one another prior to the establishment of DDPA; nor did the Delta Dental Member Companies "surrender[]" any trademark rights to DDPA. *Blues I*, 26 F. Supp. 3d at 1184. Rather, as explained above, the Delta Dental trademark rights were owned by DDPA (and its predecessor) from the outset and licensed to the Member Companies consistent with the state-specific regulatory framework for dental services corporations. *See supra* pp. 12-13. Further, the Complaint does not allege that any Delta Dental Member Company competed nationally or offered similar multistate dental benefits plans prior to the formation of DDPA and the creation of the territorial trademark structure. *Compare Blues II*, at 308 F. Supp. 3d 1270-71. In short, from the beginning, territorial restrictions on the use of the "Delta Dental" trademarks have been ancillary to the creation of a national Delta Dental product and the promotion of *inter*brand competition. Having tried and failed to force themselves into the *Blues* framework, Plaintiffs can hardly claim that that decision requires *per se* treatment here.

## 2. The *Blues* Court Applied Different Law.

The *Blues* case does not help Plaintiffs for another, perhaps more fundamental reason: The district court in that case did not follow Seventh Circuit law. As noted above (*supra* pp. 21-22), the Seventh Circuit has instructed courts in this circuit to apply the rule-of-reason analysis to ancillary restrictions, even when those restrictions could be characterized in a literal sense as a "horizontal" agreement to divide territories. *See Polk Bros.*, 776 F.2d at 189 (agreement by one competitor not to sell appliances and furniture and by the other not to sell lawn products, hardware, or other supplies); *Sulfuric Acid*, 703 F.3d at 1012-1013 (grant of exclusive territory to competitors). Those decisions, and many others, foreclose *per se* treatment of the ancillary territorial restrictions in the License Agreement.[12]

The *Blues* court did not cite—let alone apply or distinguish—*Polk Bros.*, *Sulfuric Acid*, or any of the other decisions from the Seventh Circuit or other circuits and district courts. That may be because, as other circuit courts have recognized, the law of ancillary restraints in the Eleventh Circuit appears to be different from the law in this and other circuits. As recently explained in *Atrium Health*, in the Sixth and Seventh Circuits, as well as in the Second, Eighth, and Ninth, a restraint is "ancillary and therefore inappropriate for per se categorization when, viewed at the time it was adopted, the restraint '*may* contribute to the success of a cooperative venture.'" 922

---

[12] *See, e.g.*, *Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d 829, 833 (7th Cir. 2003) (exclusivity agreement "was a lawful ancillary agreement designed to induce [another drug manufacturer] to make the investments needed to bring the new drug to market"); *Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1378 (W.D. Wis. 1997) (plaintiffs' "assertion that all market allocation agreements are *per se* illegal ignores the distinction between naked and ancillary restraints"); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 725-726 (6th Cir. 2019) (citing *Polk Bros.*); *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1336 (Fed. Cir. 2010) (same); *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 52 (1st Cir. 1988) ("[w]here the venture is producing a new product . . . there is patently a potential for a productive contribution to the economy, and conduct that is strictly ancillary to this productive effort . . . is evaluated under the rule of reason"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1365 (5th Cir. 1980) ("the Supreme Court has refused to accord *per se* treatment to practices literally comprehended within the term when, viewed in its full context, the practice appeared potentially to be reasonably ancillary to procompetitive, efficiency-creating endeavors and therefore not a naked restraint of trade").

F.3d at 726-727 (quoting *Polk Bros.*, 776 F.2d at 189) (emphasis added). By contrast, in the Eleventh Circuit, it appears that an ancillary restraint must be "***necessary***" to achieve the procompetitive purposes. *Id.* (citing *NaBanco v. Visa U.S.A., Inc.*, 779 F.2d 592, 601 (11th Cir. 1986)) (emphasis added). The *Blues* court relied heavily on whether the challenged restraints were "necessary" throughout its opinion. *Blues II*, 308 F. Supp. 3d at 1269-1271, 1273 (repeatedly discussing whether restraints were "necessary"). While that court was not bound by cases like *Polk Bros.* or *Sulfuric Acid*, the law of this circuit requires a different result.

### 3. *Topco* and *Sealy* Do Not Apply.

The decisions in *United States v. Sealy, Inc.*, 388 U.S. 350 (1967), and *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972)—two cases relied upon by the *Blues* court—also offer no support for *per se* condemnation of Defendants' practices. To the contrary, courts have consistently held that *Sealy* and *Topco* should ***not*** be read to condemn ancillary restrictions as *per se* unlawful. And neither *Sealy* nor *Topco* involved a two-sided transaction platform market like the one in this case, a distinction that the Supreme Court has found to be critical.

***First***, it is widely agreed that under *Sealy* and *Topco*, "*per se* condemnation is limited to 'naked' market division agreements, that is, to those that are not part of a larger pro-competitive joint venture." *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (1st Cir. 2001). That is the plain import of the Seventh Circuit decisions discussed above. *See Polk Bros.*, 776 F.2d at 188 ("*per se* rules are "designed for 'naked' restraints rather than agreements that facilitate productive activity" and when "cooperation contributes to productivity through integration of efforts, the Rule of Reason is the norm"); *Sulfuric Acid*, 703 F.3d at 1010-1011 ("we know" from *Polk Bros* that agreements "that restrict competition . . . are governed by the rule of reason, rather than being per se illegal, if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity'"); *see also supra* fn. 12. In accordance with these decisions, multiple

judges in this district have concluded that *Topco* and *Sealy* do not hold that "every horizontal elimination of competition is automatically illegal." *Chi. Prof'l Sports Ltd. P'ship v. NBA*, 754 F. Supp. 1336, 1357-1358 (N.D. Ill. 1991); *see also Abbott Labs. v. Baxter Int'l Inc.*, 2002 WL 467147, at *9 (N.D. Ill. Mar. 27, 2002) (distinguishing *Topco* because plaintiff "ha[d] not alleged that the agreements are naked restraints on trade with no purpose except stifling of competition") (internal quotation marks omitted). Many other courts are in accord.[13]

*Second*, neither *Sealy* nor *Topco* involved a state-sanctioned regulatory regime that authorizes companies to coordinate in order to serve interstate accounts. As discussed above, the Member Companies were created in accordance with enabling statutes that in many instances affirmatively contemplate interstate coordination through an entity like DDPA. *See supra* pp. 9-10. There are no comparable regulatory regimes or state statutes encouraging the formation of interstate associations to promote mattresses (*Sealy*) or private-label groceries (*Topco*).

*Third*, neither *Sealy* nor *Topco* involved two-sided markets—let alone two-sided transaction platforms—where indirect network effects require an analysis of both sides of a platform to assess the restraint's impact on competition. The *Blues* court did not have the benefit of *AmEx* and expressly noted that its analysis might differ after the Supreme Court's decision. *See Blues II*, 308 F. Supp. 3d at 1276 n.20 (stating "it will be worth seeing what the Supreme Court has to say in its *American Express* decision"). Indeed, in deciding that the anti-steering provisions

---

[13] *See, e.g.*, *Augusta News*, 269 F.3d at 48 ("it is commonly understood today that *per se* condemnation is limited to 'naked' market division agreements"); *Rothery*, 792 F.2d at 225-230 (holding that ancillary restraints that are part of a productive joint venture should not be condemned as *per se* illegal); *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1050-1051 (9th Cir. 1983) ("even within this class of restraints [i.e., horizontal market division], there are recognized circumstances where rule-of-reason analysis remains appropriate"); *see also Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 906 (9th Cir. 1983) (Kennedy, J., concurring) ("Even if we assume the complaint alleges a horizontal market division, it does not mean we must find it a *per se* Sherman Act violation," particularly "when an agreement is ancillary to the achievement of legitimate business concerns.").

at issue in *AmEx* were not "inherently anticompetitive," the Supreme Court *rejected* the plaintiffs' argument that *Topco* forbids any restraint that would restrict competition "in part of the market— here, for example, merchant steering." 138 S. Ct. at 2290 n.10. *Topco*, according to the *AmEx* Court, "does not stand for such a broad proposition." *Id.*[14]

In short, cases involving naked restraints in traditional markets (*i.e.*, *Sealy* and *Topco*) are not on point where, as here, the restraint at issue is ancillary to a legitimate business purpose in a two-sided transaction platform market

\*   \*   \*

As shown above, Plaintiffs' *per se* claim fails for multiple reasons. The challenged restraints either do not exist or are ancillary to a procompetitive venture that created a new product and increased competition in the dental insurance market. The restraints also operate in a two-sided platform market that "differ[s] from traditional markets in important ways." *AmEx*, 138 S. Ct. at 2280; *see also Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134, 1150 n.4 (D. Or. 2018) (recognizing that "[a] new area of antitrust law appears to be emerging for two-sided markets"); *US Airways, Inc. v. Sabre Holdings Corp.*, 2017 WL 1064709, at \*8 (S.D.N.Y. Mar. 21, 2017) (observing that "[t]he concept of two-sidedness in economics is relatively new and complex"), *rev'd on other grounds*, 938 F.3d 43 (2d Cir. 2019). Accordingly, the very premise of the *per se* rule—that a particular restraint is so likely to harm competition that anticompetitive effect can be conclusively presumed—is absent here and mandates dismissal of Plaintiffs' *per se*

---

[14] While the *AmEx* Court also stated, citing *Topco*, that "[a] horizontal agreement between competitors is markedly different from a vertical agreement that incidentally affects one particular method of competition," 138 S. Ct. at 2290 n.10, there is no indication that the Court in *AmEx* intended to suggest that its two-sided market analysis applied only to vertical restraints. Such an interpretation is particularly unwarranted because *Topco* itself did not involve a two-sided market. The force of *AmEx*'s logic is clear: balancing two-sided markets requires complex and dynamic decision-making about restrictive practices or rules that often have procompetitive benefits. In this context, it makes no sense to apply the *per se* rule because the restraints are not plainly anticompetitive.

claim. *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458-459 (1986) (courts should not "extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of [the] practices is not immediately obvious").

## II.     PLAINTIFFS FAIL TO STATE A RULE-OF-REASON CLAIM

Plaintiffs alternatively allege that, if not *per se* illegal, the challenged restrictions fall "under a quick-look or rule-of-reason analysis." Cmplt. ¶ 122. Here, too, Plaintiffs' claims fail.

Under a rule-of-reason analysis, the plaintiff "carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew*, 683 F.3d at 335. The plaintiff also must show "that the defendant has market power." *Id*. Plaintiffs' allegations do not satisfy these standards.[15]

### A.     Plaintiffs Do Not Allege Effects on the Market as a Whole.

In assessing whether a plaintiff has shown anticompetitive effect under the rule of reason, *AmEx* makes clear that courts must consider the structure of the industry and product in question. For a two-sided transaction platform like dental insurance, "competition cannot be accurately assessed by looking at only one side of the platform in isolation." 138 S. Ct. at 2287. Rather, a court must "analyze the two-sided market . . . *as a whole*" to determine if practices "have anticompetitive effects." *Id*. (emphasis added). Indeed, in the *Sabre* case, the Second Circuit reversed the judgment following a nine-week trial due to the plaintiffs' erroneous one-sided market definition. 938 F.3d at 56.

---

[15] A "quick-look" analysis is similar, except that the plaintiff need not plead facts showing market power. *Agnew*, 683 F.3d at 336-337. However, a quick-look approach is not warranted here. That test applies when the *per se* framework is inappropriate but a "rudimentary" understanding of economics shows that the arrangement likely has an anticompetitive effect. *Agnew*, 683 F.3d at 336. As explained above, ancillary restraints in a complex two-sided transaction platform can hardly be condemned with a "rudimentary" economic analysis. *See supra* pp. 26-28. Where a "quick look" shows procompetitive justifications for the agreement, moreover—*see supra* pp. 22-25—a "full rule-of-reason analysis" is appropriate. *Id*. at 336.

Contrary to these requirements, Plaintiffs fail to allege a two-sided platform market at all. Their allegations of anticompetitive effect are almost entirely confined to *one* side: the provider side. Plaintiffs allege that Defendants' agreement has "depress[ed] dental treatment reimbursement rates" and reduced incomes for dentists. Cmplt. ¶¶ 137, 139. But as a matter of law, the fact that prices charged to buyers have gone up (or, as alleged here, that prices paid to sellers have gone down) on *one* side of a two-sided market does not show anticompetitive effect.

In *AmEx*, the Court held that "[f]ocusing on merchant fees alone misse[d] the mark because the product that credit-card companies sell is transactions, not services to merchants, and the competitive effects of a restraint on transactions cannot be judged by looking at merchants alone." 138 S. Ct. at 2287. Focusing on dental reimbursement rates alone here is similarly off target. Delta Dental does not merely buy dental goods and services from dentists. It matches patients with dentists and facilitates payments in much the same way as a credit-card company does when processing merchant transactions for its cardholders. Analysis of anticompetitive effect must therefore assess the market "as a whole" to determine whether an agreement violates Section 1. *Id.*

Attempting to meet this burden, the Complaint makes cursory allegations about anticompetitive effect on the subscriber side of the market. Plaintiffs allege, for example, that absent the "market allocation," there would be more competition for insurance business and decreased premiums for dental plan sponsors and members. Cmplt. ¶ 130. This assertion lacks any supporting factual allegations and should be rejected on that ground alone. In fact, the cooperation afforded by DDPA allows the Member Companies to effectively compete with the national carriers, and therefore enhances competition.

What is more, Plaintiffs' conclusory allegations are inconsistent with basic economics and common sense. Insurers compete for business by negotiating lower provider reimbursement rates,

35

so they can reduce costs and lower premiums for subscribers. *See Travelers Ins. Co. v. Blue Cross of W. Penn.*, 481 F.2d 80, 84 (3d Cir. 1973) ("In its negotiating with hospitals, Blue Cross has done no more than conduct its business as every rational enterprise does, *i.e.*, get the best deal possible. This pressure encourages hospitals to keep their costs down; and, for its own competitive advantage, Blue Cross passes along the saving thus realized to consumers."). Plaintiffs allege that removing the "market allocation" mechanism would cause dentists to obtain *higher* reimbursement rates. Cmplt. ¶ 130. But if so, co-payments and premiums charged to Delta Dental plan subscribers would go *up*, and subscribers would reach their annual coverage limits more quickly.[16]

Plaintiffs also make vague allegations that low reimbursement rates "*may . . . have incentivized dentists across the U.S.*" to reduce output by providing less necessary care to Delta Dental insureds. Cmplt. ¶ 103 (emphasis added). But the Complaint pointedly does not allege that any Plaintiff has refused to perform medically necessary procedures on a patient or that any such reductions in output have actually occurred. Indeed, they are careful to note that refusal to perform procedures would likely raise significant legal—not to mention ethical—questions. Cmplt. ¶ 102 n.6. These hypothetical allegations do not constitute well-pleaded allegations of harm.

Absent a showing of harm on both sides of the two-sided platform, alleging that dentists are paid less for goods and services does not meet Plaintiffs' burden. "Evidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power." *AmEx*, 138 S. Ct. at 2287. To the contrary, such economic effects are consistent with a business model that has delivered substantial benefits to consumers and "spurred

---

[16] This is especially true for self-funded group plans, Cmplt. ¶ 91, where a group pays for dental services received by their members using the group's own funds, rather than paying a premium and shifting the group risk to the carrier. *See Wheeler v. Dynamic Eng'g, Inc.*, 850 F. Supp. 459, 462 n.4 (E.D. Va. 1994) (describing self-funded plans). This means that the out-of-pocket costs of both the group and enrollees go up immediately and directly whenever the dentists are able to negotiate higher reimbursement rates for themselves.

robust interbrand competition" and "increased the quality and quantity" of transactions. *Id.* at 2290. That is just what Delta Dental has done here. Plaintiffs' rule-of-reason claim should be dismissed for failure to allege anticompetitive effect.

### B. Plaintiffs Do Not Allege a Legally Cognizable Market.

In a rule of reason case, a plaintiff must provide "a *precise* market definition in order to demonstrate that a defendant wields market power." *Agnew*, 683 F.3d at 337 (emphasis added). Here, the Complaint's market definition is inadequate for multiple reasons. First, Plaintiffs fail to allege a two-sided market as required by *AmEx*. Next, even putting the two-sided nature of the dental insurance platform aside, Plaintiffs do not allege a viable product market or geographic market, providing two more independent grounds for dismissal. And furthermore, Plaintiffs fail to allege that Defendants have market power.

#### 1. Plaintiffs Fail to Allege a Two-Sided Market.

In cases involving two-sided platforms, plaintiffs must define a "single" market "as a whole" instead of focusing on "one dimension of competition." *AmEx*, 138 S. Ct. at 2887. Plaintiffs fail to allege facts to satisfy this requirement. As explained above, their market definition focuses exclusively on the purported national and/or state market for individual and group dental insurance without defining a relevant two-sided market. Cmplt. ¶ 87. After *AmEx*, such a one-sided market definition is insufficient as a matter of law.

#### 2. Plaintiffs Fail to Allege a Cognizable Product Market.

Even if viewed as a one-sided market, Plaintiffs' product allegations are plainly inadequate. A product market consists of "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). A court should dismiss a claim when "the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fails even to attempt a plausible explanation

as to why a market should be limited in a particular way." *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (internal quotation marks omitted); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

> The Complaint identifies both group *and* individual dental insurance as relevant products:

> The relevant product market includes insurance provided to dental patients who purchase dental insurance for themselves, or groups who purchase dental insurance on behalf of their members, for dental good[s] and services . . . .

Cmplt. ¶ 87. This barebones definition, however, is too broad and too imprecise to define a relevant product market. *See Sidibe v. Sutter Health*, 2013 WL 2422752, at *15-16 (N.D. Cal. June 3, 2013) (dismissing complaint that described product market as "health care services [accessed] through health [insurance] plans" because plaintiffs "do not allege specific products . . . that compete with each other"). Two specific defects are apparent on the face of the Complaint.

*First*, the Complaint fails to explain whether Plaintiffs are alleging two different product markets—one for dental insurance sold to individuals/families, and another for dental insurance sold to groups—or whether Plaintiffs believe those products exist in the *same* market. *See Little Rock Cardiology v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) (plaintiff was not clear if market included a "single, conjoined" service or "two distinct and complementary services").

*Second*, as mentioned above, a product market must include all products "that have reasonable interchangeability for the purpose for which they are produced." *E.I. du Pont de Nemours & Co.*, 351 U.S. at 404. Plaintiffs, however, do not explain whether the proposed product market encompasses self-funded insurance plans (which are an alternative for large employer groups) or public programs (which are an alternative for individuals and families). Nor do Plaintiffs explain whether the market includes discount programs—where customers simply visit a participating dentist, pay the charges out of pocket, and receive a pre-negotiated discount—or so-called healthcare "clubs"—where customers pay a monthly subscription to a group of providers

38

in return for the group rendering all necessary services for a specified period of time. Plaintiffs' scattershot product market thus excludes interchangeable substitute products.

This incomplete market definition is deficient. Where, as here, "an antitrust claim [is] brought by a seller," the product market "cannot be limited to a single method of payment when there are other methods of payment that are acceptable to the seller." *Little Rock Cardiology*, 591 F.3d at 597-598 (product market definition that excluded government insurance plans); *see also, e.g.*, *Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1118-1119 (10th Cir. 2008) (dismissing complaint where plaintiff did not include other insurance companies or individual car owners without insurance coverage); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004) (market definition limited to insurance-reimbursed pharmaceutical products was flawed because "Walgreens and Stop & Shop sell prescription drugs to lots of customers including those whose purchases are not reimbursed"); *Marion Healthcare LLC v. S. Ill. Healthcare*, 2013 WL 4510168, at *11 (S.D. Ill. Aug. 26, 2013) (dismissing claim where plaintiff "failed to include in the relevant markets all potential buyers of inpatient or outpatient services"). Plaintiffs' product market definition thus fails as a matter of law.

### 3. Plaintiffs Fail to Allege a Cognizable Geographic Market.

Ordinarily, the relevant geographic market is "the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984). "Stated differently, 'the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather comprised of the area where his customers would look to buy such a product." *Prescient Med. Holdings, LLC v. Lab. Corp. of Am. Holdings*, 2019 WL 635405, at *4 (D. Del. Feb. 14, 2019) (quoting *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991)). In an alleged monopsony case, the tables are reversed: "the relevant geographic market is where sellers in the candidate market may turn to

avoid unlawful price suppression by buyers." *Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2610613, at *4 (D. Vt. June 11, 2014). In any event, "[t]he mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market." *Tunis Bros.*, 952 F.2d at 727.

> The Complaint identifies the following national "and/or" state geographic market(s):

> The relevant geographic markets for such dental insurance is the whole United States comprising the territories that the Defendants have allocated to themselves pursuant to the Market Allocation Mechanism, and/or, in the alternative, the territories the Defendants have allocated to themselves pursuant to the Market Allocation Mechanism.

Cmplt. ¶ 88. This allegation is legally inadequate. Plaintiffs define the relevant geographic market in terms of where Delta Dental seeks to sell its insurance products—*i.e.*, the "whole United States," or "in the alternative, the territories" where the Defendants operate. *Id*. But as noted above, their focus is wrong. In an alleged monopsony, the market is where the allegedly aggrieved sellers (*i.e.*, the dentists) sell their services. Dentists do not sell (and subscribers do not purchase) primary dental services in national or even statewide markets.

Consider Plaintiff Bemus Point Dental, LLC ("BPD"), a dental services provider in western New York. Cmplt. ¶ 18; https://www.bemuspointdental.com. BPD is likely to draw dental patients from nearby Jamestown (10 miles east). But BPD likely does not draw patients from Buffalo (70 miles north)—and almost certainly does not draw patients from New York City (over 400 miles away). Simply put, whatever market power Defendants have with respect to BPD does not turn in any way on Defendants' purported share of insured patients in mid-town Manhattan—much less in Manhattan, Kansas. Plaintiffs' allegation that the "national and/or statewide" market is relevant to analyzing antitrust claims by a dentist in Bemus Point, New York is clearly misplaced.

Having failed to identify a cognizable geographic market in which trade was purportedly restrained, Plaintiffs' rule-of-reason claim necessarily fails.

### 4.    Plaintiffs Fail to Allege Market Power.

Even if Plaintiffs were to allege viable product or geographic markets, they do not come close to alleging market power. Market power is "a necessary ingredient in every case under the Rule of Reason"—"[u]nless the defendants possess market power, it is unnecessary to ask whether their conduct may be beneficial to consumers." *Ball Memorial Hosp.*, 784 F.2d at 1334-1335. Here, Plaintiffs baldly allege that Defendants have between 59% and 66% of the national market for dental insurance. Cmplt. ¶ 90. And although Plaintiffs allege geographic markets at both the state and national level, *id.* ¶ 88, they do not allege any state-level market shares. Nor do they allege local market shares.

Plaintiffs' alleged national market share is wholly implausible—and, indeed, wildly inaccurate.[17] Plaintiffs cite an "S&P database of insurance filings" to support their allegations, Cmplt. ¶ 90, but the S&P database does not list national "market share" data, much less data that would suggest that Defendants have anything near a 60% or greater national share. It is also unclear why the Complaint names only California and Hawaii insurance regulators as "sources" for their "nationwide" estimate, but omits any mention of the 48 other states or Puerto Rico. *Id.*

In any event, even if the Court were to accept the pled market share (and overlook that a national share is irrelevant to the dentists' claims), market share alone is not sufficient to state a claim. "[W]hile market share may indicate market power in certain cases, the two are not necessarily the same." *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989). As the Seventh Circuit has noted, "[t]he insurance industry is not like the steel industry, in

---

[17] Plaintiffs allege that Delta Dental had a roughly 65% national market share in 2017 and that it insures 78 million people. Cmplt. ¶¶ 90, 133. If Plaintiffs were correct, that would imply that the national dental insurance market includes only 120 million people. Yet as a recent National Association of Dental Plans report suggests, that is a vast underestimate. *See* Nat'l Ass'n of Dental Plans, 2018 Annual Report at 5, available at https://tinyurl.com/rtjsj5f (last visited Jan. 27, 2020) (more than 250 million enrollees—166.1 million enrollees in commercial plans and 87.7 million in publicly funded plans—as of year-end 2017).

which a firm must take years to build a costly plant before having anything to sell. The 'productive asset' of the insurance business is money, which may be supplied on a moment's notice, plus the ability to spread risk, which many firms possess and which has no geographic boundary." *Ball Memorial Hosp.*, 784 F.2d at 1335. Especially in the health insurance context, therefore, "a firm's share of current sales does not reflect an ability to reduce the total output in the market" and accordingly "does not convey power over price." *Id.*

Here, Plaintiffs have pled no facts to support entry barriers that would allow Defendants to exercise market power without rivals entering the market. For instance, Plaintiffs do not plead that subscribers are locked in to long-term insurance contracts or that dentists cannot join multiple insurance networks to access patients from multiple carriers, as almost all dentists do. Indeed, Plaintiffs do not plead *any* facts about interbrand competition in the dental insurance market. *See Witt Co. v. RISO, Inc.*, 948 F. Supp. 2d 1227, 1244 (D. Or. 2013) (granting motion to dismiss where plaintiff alleged 65% market share but failed to "plead allegations regarding barriers to entry"); *Dominick v. Collectors Universe, Inc.*, 2012 WL 6618616, at *3-7 (C.D. Cal. Dec. 18, 2012) (same where plaintiffs "fail to establish any barriers to entry in the relevant market, much less significant ones"). Plaintiffs' rule-of-reason and quick-look claims should be dismissed.

## III. PLAINTIFFS FAIL TO ALLEGE ANTITRUST INJURY

Even if Plaintiffs had pled (1) an unreasonable restraint of trade (under the *per se*, quick-look, or rule-of-reason standards) or (2) appropriate product and geographic markets, their claims would fail for yet another independent reason: they do not allege antitrust injury. "The antitrust-injury doctrine was created to filter out complaints by competitors and others who may be hurt by productive efficiencies, higher output, and lower prices, all of which the antitrust laws are designed to encourage." *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003). Put another way, the antitrust injury requirement recognizes that the antitrust laws are fundamentally

concerned with "the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

To show antitrust injury, a plaintiff must plead facts showing that their "loss comes from acts that reduce output or raise prices to consumers." *Chi. Prof'l Sports*, 961 F.2d at 670; *see also Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992). This requirement is particularly important in the context of a two-sided transaction platform, where competition can be assessed only by looking at *both* sides of the market. For instance, *AmEx* recognized that due to indirect network effects, the "optimal price might require charging" one side a lower rate in order to increase participation to the other. *Id.* at 2281. There is no injury to dentists, let alone an antitrust one, if larger subscriber numbers (*i.e.*, more patients) offset the allegedly low reimbursement rates.

Plaintiffs, however, do not allege harm to competition on the platform as a whole. They do not allege a decrease in demand for dental insurance or dental services. Nor do they allege any plausible harm to competition on the subscriber side of the market. *See supra* pp. 35-36. Instead, Plaintiffs allege that Defendants' conduct has forced dentists to accept lower reimbursement rates, Cmplt. ¶¶ 129-132, and that dentists' salaries (and total dental expenditures) have grown slower than the healthcare industry overall, *id.* ¶¶ 133-137. But controlling reimbursement rates is a core and legitimate function of insurance and the fact that physicians are receiving less reimbursement "does not indicate that an antitrust injury has occurred." *Mich. State Podiatry Ass'n v. Blue Cross & Blue Shield of Mich.*, 671 F. Supp. 1139, 1152-1153 (E.D. Mich. 1987). Accordingly, "an agreement is not anticompetitive because it seeks to lower prices, and antitrust plaintiffs have to do more than complain about their failure to make more money." *Caremark*, 385 F. Supp. 2d at 748-749 (citing *Brillhart*, 768 F.2d at 200).

That Defendants have structured themselves to negotiate more effectively the prices

43

dentists will accept to treat Delta Dental insureds, *see* Cmplt. ¶ 84 n.3, is something the antitrust laws should applaud, not condemn. *Cf. Ball Memorial Hosp.*, 784 F.2d at 1134 ("Whenever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding 'antitrust injury.'"). In the Seventh Circuit's words, "the claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up. . . . Indeed, it does not even state an antitrust injury." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251-252 (7th Cir. 1994).

## IV.     PLAINTIFFS DO NOT ALLEGE "CONCERTED ACTION" WITH REGARD TO GOVERNANCE OF THE "DELTA DENTAL" TRADEMARKS

Furthermore, even if Plaintiffs could adequately allege antitrust injury, their claims fail for yet another independent reason: Defendants' agreements with respect to the licensing and governance of the "Delta Dental" trademarks are not "concerted action" under Section 1. The Sherman Act reflects a "basic distinction between concerted and independent action." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). "Independent action" is "not proscribed" under Section 1. *Id*. Under these standards, Defendants cannot conspire to restrict competition with respect to the use of the "Delta Dental" trademarks.[18]

### A.     Defendants Have a Unified Interest in Governance of the Trademarks.

In assessing whether a plaintiff has shown concerted action or agreement within the meaning of Section 1, the ultimate question is whether the parties to the agreement are "separate economic actors pursuing separate economic interests." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984). If there is "no sudden joining of economic resources that had previously served different interests," then "there is no justification for § 1 scrutiny." *Id*. at 771. Applying

---

[18] Plaintiffs' "price-fixing" and "revenue restriction" allegations do not make up for this deficiency. As explained above, they are empty labels applied in an attempt to bolster Plaintiffs' claims. *See supra* pp. 18-21.

these principles, the Supreme Court held that a parent and its wholly owned subsidiary could not conspire for purposes of Section 1. *Id.* at 777. "Federal courts in later cases extended the single-entity concept beyond the context of a parent-subsidiary relationship, stating that affiliated companies or individuals could also be considered a single entity in certain circumstances." *Am. Needle, Inc. v. NFL*, 538 F.3d 736, 738-739 (7th Cir. 2009) (collecting cases), *rev'd on other grounds*, 560 U.S. 183 (2010).

In *City of Mt. Pleasant v. Associated Electric Co-op.*, 838 F.2d 268 (8th Cir. 1988), for instance, the Eighth Circuit held that the corporations that made up a rural electric cooperative were a single enterprise under Section 1. The court reasoned that "economic reality, not corporate form, should control the decision of whether related entities can conspire," and that the association should be deemed "a single enterprise pursuing a common goal—the provision of low-cost electricity to its rural consumer-members." *Id.* at 275-277. The cooperative did not represent a "joining of two independent sources of economic power previously pursuing separate interests" because "[t]heir power depends, and has always depended, on the cooperation among themselves." *Id.* at 277; *see also Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 & n.15 (9th Cir. 2005) (applying single-entity rule to nonprofit association and its regional affiliates based on a "unity of all relevant interests and policies").

The same is true here. As explained above, DDPA is and always has been the exclusive owner and licensor of the "Delta Dental" trademarks. While DDPA has granted the Member Companies non-transferable rights to use the "Delta Dental" trademarks in specified territories, DDPA maintains all ownership rights in the trademarks. Ex. A, License Agmt. ¶ 2.1.1. Pursuant to that license, DDPA and the Member Companies cooperate to offer national Delta Dental networks that no Member Company can provide alone. Although the Member Companies operate

45

independently in other ways, with respect to *this* function, the Member Companies have always had common, integrated interests with DDPA. Decisions about licensing the trademarks thus do not deprive the market of any "separate economic actors" pursuing "separate economic interests." *Copperweld*, 467 U.S. at 769.

### B. *American Needle* Shows That Defendants Cannot Conspire with Regard to Governance of the Trademarks.

The Supreme Court's decision in *American Needle* further confirms that Defendants are not capable of conspiring to restrict the use of the DDPA-owned trademarks. There, the Supreme Court reiterated that "there is not necessarily concerted action simply because more than one legally distinct entity is involved." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 192 (2010). "[T]he question is not whether a defendant is legally a single entity or has a single name," or "whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense." *Id*. at 195. Rather, it is whether the agreement is one between "separate economic actors pursuing separate economic interests," such that the agreement "deprives the marketplace of independent centers of decisionmaking" and a "diversity of entrepreneurial interests." *Id*.

The Court in *American Needle* applied these principles to hold that the NFL teams were engaged in concerted action when licensing their separate *team* trademarks through the collective NFL properties. In so doing, however, the Supreme Court stressed that each of the teams "compete in the market for intellectual property" through their own *individual* team marks, so that "[a]lthough NFL teams have common interests such as promoting the NFL brand," their "interests in licensing team trademarks are not necessarily aligned." 560 U.S. at 198. Apart from the teams' agreement "to cooperate in exploiting those assets," the Court observed, "there would be nothing to prevent each of the teams from making its own market decisions relating to purchases of apparel and headwear, to the sale of such items, and to the granting of licenses to use its trademarks." *Id*.

at 200. For that reason, the Court held, "decisions by NFLP regarding *the teams' separately owned* intellectual property constitute concerted action"—albeit action reviewable under the rule of reason. *Id*. at 201-203 (emphasis added).

The decision in *Washington v. NFL*, 880 F. Supp. 2d 1004 (D. Minn. 2012), confirms that Defendants are incapable of engaging in concerted action with respect to the licensing of the "Delta Dental" trademarks. There, the plaintiffs alleged that the NFL and individual teams violated Section 1 with respect to the licensing of historic game footage—footage which was always owned by the NFL itself and never by an individual team. The court explained that these allegations were not sufficient to survive a motion to dismiss. "[U]nlike in *American Needle*, the intellectual property involved is historical football game footage, something that the individual teams do not separately own, and never have separately owned." *Id*. at 1006; s*ee also Spinelli v. NFL*, 96 F. Supp. 3d 81, 114–115 (S.D.N.Y. 2015). Because the NFL and its teams could not conspire to market property that they could "only collectively own," the plaintiffs "failed to establish any concerted action that is illegal under the Sherman Act." *Washington*, 880 F. Supp. 2d at 1006.

The same conclusion applies here. Unlike the individual NFL teams in *American Needle*, the Member Companies do not and have never separately owned the relevant intellectual property here—the "Delta Dental" trademarks. *See supra* pp. 12-13. The market, therefore, has not been "deprived" of "independent centers of decisionmaking"; no Member Company has ever been a "decisionmaker" with respect to the trademarks. Because Plaintiffs cannot "conspire" with respect to the management of the "Delta Dental" trademarks, Plaintiffs' "market allocation" claim is not actionable under Section 1.[19]

---

[19] *Sealy*, cited as an example of concerted action by *American Needle* (560 U.S. at 191), is distinguishable for this reason. The "Sealy" trademark was in use prior to the formation of the joint Sealy Corporation, and the licensees organized a new corporation to purchase the intangible assets and dole them out to existing competitors. *See United States v. Sealy, Inc.*, 1964 WL 8089, at *4-5 (N.D. Ill. Oct. 6, 1964). Thus, that

## V.     PLAINTIFFS' CLAIMS ARE BARRED BY THE MCCARRAN-FERGUSON ACT

Finally, Plaintiffs' claims should be dismissed because they are barred by the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq*. The Act provides that federal antitrust law shall not apply to the "business of insurance" if that business is "regulated by state law." 15 U.S.C. § 1012(b).

### A.     Plaintiffs' Claims Challenge the "Business of Insurance."

Courts apply a three-factor test to determine if conduct falls within the "business of insurance": (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *Am. Deposit Corp. v. Schacht*, 84 F.3d 834, 839 (7th Cir. 1996). Setting aside Plaintiffs' imagined revenue-restriction claim, Plaintiffs' allegations easily satisfy this test.

*First*, Plaintiffs' challenge to Defendants' territorial restrictions implicates the business of insurance. The Supreme Court has held that the "selling and advertising of policies is part of the business of insurance." *SEC v. Nat'l Sec., Inc.,* 393 U.S. 453, 460 (1969). A provision that governs where and under what circumstances a Member Company can use the "Delta Dental" trademarks falls squarely within this function.

For each Member Company, moreover, the territorial restrictions define the "pool of insureds over which risk is spread." *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928, 931-932 (9th Cir. 1983). The restrictions directly serve this goal by delimiting potential subscribers and encouraging broad, geographically diverse networks instead of coverage limited to major cities

---

conduct *did* "deprive[] the marketplace of independent centers of decisionmaking" that would otherwise exist. *American Needle*, 560 U.S. at 195. The *Blues* court reached a similar conclusion. In finding questions of fact as to application of the single-entity defense, the court noted that "certain Plans initially developed 'individual trademark rights'" and surrendered those marks to BCBSA, which in turn "'licensed' the marks back to the Plans.'" *Blues II*, 308 F. Supp. 3d at 1264-1265. Here, by contrast, judicially noticeable documents demonstrate that DDPA is the original (and only) owner of the trademarks.

or low-risk individuals. *See supra* pp. 23-24. Such risk-pooling is "precisely what the Supreme

Court described when it formulated the risk spreading criterion." *Feinstein*, 714 F.2d at 932; *see*

*also Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 743 (5th Cir. 2015) ("Keeping a large,

geographically and professionally diverse pool of veterinarians in the Program . . . spreads risk.");

*Hopping v. Standard Life Ins. Co.*, 1983 WL 1946, at *8 (N.D. Miss. Sept. 14, 1983) (holding that

an arrangement intended to prevent activity that could "reduce the effectiveness of the marketing

strategy created by the Blue Cross/StandardLife agreement" was related to risk-spreading). The

territorial restrictions also make up an integral part of the relationship between insurer and insured,

defining the persons to whom each Member Company may offer a Delta Dental policy. Finally,

the territorial restrictions between DDPA and the Member Companies are plainly limited to entities

within the insurance industry. All three elements of the test accordingly are satisfied.[20]

**Second**, Plaintiffs' "price-fixing" challenge is, if anything, even more clearly directed at

the "business of insurance." As discussed above, Plaintiffs' price-fixing claim is based on Member

Companies' "access" to data through the NPF, which Member Companies use to process claims

and facilitate the administration of multistate accounts. Cmplt. ¶¶ 75, 101. But "[t]here can be no

doubt that the actual performance of an insurance contract falls within the 'business of insurance.'"

*U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 503 (1993). The Seventh Circuit is in accord. It has

held that an alleged agreement between auto insurers to fix low prices for repair work was exempt

---

[20] The *Blues* court erred in reasoning that "horizontal allocation of geographic markets" was not "specific to the insurance industry" because it was a practice that "can occur in any number of industries." *Blues I*, 26 F. Supp. 3d at 1192. That misconstrues the third factor, which is not focused on the ubiquity of a particular practice in the economy generally, but whether the arrangement in question involves "third parties outside the insurance industry." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 133 (1982). The *Blues* court also erred in holding that McCarran-Ferguson did not apply because the alleged behavior concerned "the relationship between fellow insurers." 26 F. Supp. 3d at 1191. The territorial agreement here might be between insurance companies, but it directly impacts the insured-insurer relationship for the reasons discussed above. In addition, as the Seventh Circuit's decision in *Quality Auto* indicates, agreements between insurers are fully capable of falling within the scope of McCarran-Ferguson. *See infra* p. 50.

from the antitrust laws because it involved "claims procedures," which are "an important determinant of commonly made rates and the spreading of risk." *Quality Auto*, 660 F.2d at 1201 n.4. Allegations that Defendants are somehow violating the antitrust laws by accessing data to process and pay subscriber claims thus lie at the heartland of the McCarran-Ferguson exemption.

### B. Defendants Are Regulated by State Law.

The McCarran-Ferguson Act also requires that the challenged activities be regulated pursuant to state law. 15 U.S.C. § 1012(b). As the Fifth Circuit has explained, however, this is not a "high bar." *Sanger*, 802 F.3d at 745. "If the state's insurance industry is 'regulated by state law,' then the antitrust laws simply do not apply." *Id.*; *see also UNR Indus., Inc. v. Cont'l Ins. Co.*, 607 F. Supp. 855, 862 (N.D. Ill. 1984) (Illinois's "comprehensive insurance code" was "sufficient to satisfy this requirement"). As explained above, the Member Companies are subject to myriad state laws and regulations. Indeed, many state insurance statutes expressly authorize dental service corporations to work together and share information needed to process subscribers' claims. *See supra* pp. 9-10. This extensive regulation further underscores that what Plaintiffs are challenging is the "business of insurance." *Cf. Schacht*, 84 F.3d at 842 (observing that "forty-two state legislatures currently consider annuities to be an insurance industry activity and regulate them as such").

Because Plaintiffs' allegations satisfy both prongs of the McCarran-Ferguson Act exemption, the federal antitrust claims against Defendants should be dismissed.

### CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed with prejudice.

Dated: January 27, 2020

Respectfully submitted,

*/s/ Kathy L. Osborn*
Kathy L. Osborn
Ryan M. Hurley
Anna Marie Behrmann
FAEGRE BAKER DANIELS LLP
300 N. Meridian St., Suite 2500
Indianapolis, IN 46204
(317) 237-8261
kathy.osborn@faegrebd.com
ryan.hurley@faegrebd.com
anna.behrmann@faegrebd.com

Colby Anne Kingsbury
FAEGRE BAKER DANIELS LLP
311 S. Wacker Dr., #4400
Chicago, IL 60606
(312) 212-6573
colby.kingsbury@faegrebd.com

Jeffrey S. Roberts
Joshua P. Mahoney
FAEGRE BAKER DANIELS LLP
1144 15th Street, Suite 3400
Denver, CO 80203
(303) 607-3500
jeff.roberts@faegrebd.com
joshua.mahoney@faegrebd.com

*Counsel for Defendants Delta Plan of Arkansas,
Inc., Delta Dental of Indiana, Inc., Delta Dental
of Kentucky, Inc., Delta Dental Plan of Michigan,
Inc., Delta Dental Plan of New Mexico, Inc.,
Delta Dental of North Carolina, Delta Dental
Plan of Ohio, Inc., and Delta Dental of Tennessee*

*/s/ Benjamin W. Hulse*
Jerry W. Blackwell
Benjamin W. Hulse
Gerardo Alcazar
BLACKWELL BURKE P.A.
431 South Seventh Street
Suite 2500
Minneapolis, MN 55415

*/s/ Britt M. Miller*
Britt M. Miller
Daniel K. Storino
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dstorino@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendants Delta Dental Plans
Association, DeltaUSA, Delta Dental of
Connecticut Inc., Delta Dental Plan of
Idaho, Inc. d/b/a Delta Dental of Idaho,
Dental Service of Massachusetts, Inc. d/b/a
Delta Dental of Massachusetts, Delta
Dental of Missouri, Delta Dental of New
Jersey, Inc., Oregon Dental Service d/b/a
Delta Dental of Oregon, Delta Dental of
South Dakota, Delta Dental of Washington,
and Delta Dental Plan of Wyoming d/b/a
Delta Dental of Wyoming*

*/s/ Howard Ullman*
Stephen V. Bomse
Russell P. Cohen
Howard Ullman
Nicole Gelsomini
ORRICK HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
415-773-5700
sbomse@orrick.com
rcohen@orrick.com
hullman@orrick.com

612-343-3200
blackwell@blackwellburke.com
bhulse@blackwellburke.com
galcazar@blackwellburke.com

Lori Swanson
Mike Hatch
SWANSON HATCH, P.A.
431 South 7th Street
Suite 2545
Minneapolis, MN 55415
612-315-3037
lswanson@swansonhatch.com
mhatch@swansonhatch.com

*Counsel for Defendants Delta Dental of
Minnesota and Delta Dental of Nebraska*


*/s/ David E. Dahlquist*
David E. Dahlquist
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
312-558-5600
ddahlquist@winston.com

*Counsel for Defendants Arizona Dental Insurance
Service, Inc. d/b/a Delta Dental of Arizona,
Hawaii Dental Service, Delta Dental of Iowa,
Delta Dental of Kansas Inc., Maine Dental
Service Corporation d/b/a Delta Dental Plan of
Maine, Delta Dental Plan of New Hampshire,
Inc., Delta Dental Plan of Oklahoma, Delta
Dental of Rhode Island, and Delta Dental Plan of
Vermont, Inc.*

Emily Luken
ORRICK HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
202-339-8400
eluken@orrick.com

Brian Joseph Murray
Timothy D. Elliot
RATHJE WOODWARD LLC
300 E. Roosevelt Road
Suite 300
630-668-8500
Wheaton, IL 60187
bmurray@rathjewoodward.com
telliott@rathjewoodward.com

*Counsel for Defendants Delta Dental
Insurance Company, Delta Dental of
California, Delta Dental of Delaware, Delta
Dental of the District of Columbia, Delta
Dental of New York, Delta Dental of
Pennsylvania, Delta Dental of Puerto Rico,
and Delta Dental of West Virginia*

*/s/ Scott D. Stein*
Scott D. Stein
Colleen M. Kenney
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
sstein@sidley.com
ckenney@sidley.com

*Counsel for Defendants Colorado Dental
Service, Inc. d/b/a Delta Dental of
Colorado, Delta Dental of Illinois, and
Delta Dental of Virginia*

/s/ Allison W. Reimann
Allison W. Reimann
GODFREY & KAHN, S.C.
One East Main Street
Suite 500
Madison, WI 53703
608-257-3911
koconnor@gklaw.com
areimann@gklaw.com

*Counsel for Defendant Delta Dental of Wisconsin, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

      I, Britt M. Miller, an attorney, hereby certify that on January 27, 2020, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and separately via email to counsel of record. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
