**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE DELTA DENTAL ANTITRUST LITIGATION | **CIVIL ACTION NO.** <br><br> 1:19-CV-06734 <br><br> Hon. Elaine E. Bucklo |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ALLEGATIONS IN THE CONSOLIDATED COMPLAINT..........................................2

THE PARTIES................................................................................................................2

THE MARKET FOR THE PURCHASE OF DENTAL GOODS AND SERVICES ....................3

DEFENDANTS' DOMINANCE IN THE MARKET FOR THE PURCHASE OF
    DENTAL GOODS AND SERVICES ...........................................................................4

DEFENDANTS' ANTICOMPETITIVE SCHEME............................................................6

    The Territorial Market Allocation Mechanism..................................................6

    The Price Fixing Mechanism ...........................................................................8

    The Revenue Restriction Mechanism ...............................................................9

    Defendants' Misdirected Profits.......................................................................10

    The Anticompetitive Effects Of Defendants' Conspiracy ................................11

ARGUMENT.................................................................................................................11

LEGAL STANDARD.....................................................................................................11

I.     PLAINTIFFS PLAUSIBLY PLEAD A PER SE ILLEGAL MONOPSONY
     CLAIM.................................................................................................................14

     A.    Defendants' Market Allocation Mechanism Is *Per Se* Unlawful. .........16

     B.    Defendants' Price Fixing Mechanism Is *Per Se* Unlawful. ..................23

     C.    Defendants' Revenue Restriction Mechanism is *Per Se* Unlawful. .....27

     D.    *Blue Cross* Strongly Supports Plaintiffs' Claim. ................................28

     E.    *Amex*'s Two-Sided Market Analysis Does Not Apply. .........................30

          1.    *Amex's* Analysis Does Not Apply To The Horizontal Constraints
              Alleged Here. ...............................................................................31

          2.    The Purchase Of Dental Services Is A One-Sided Market Because
              Of The Lack Of Indirect Network Effects. ...................................32

i

3. There Is No Single, Simultaneous Transaction And, As A Result, No Two-Sided Transaction Platform At Issue Here ....................................35

II. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED CLAIMS UNDER A "QUICK-LOOK" ANALYSIS ................................................................37

III. IN THE ALTERNATIVE, PLAINTIFFS' ALLEGATIONS ARE SUFFICIENT UNDER A RULE OF REASON ANALYSIS ..................................................39

A. Plaintiffs Have Sufficiently Alleged Direct Anticompetitive Effects on the Market for the Purchase of Dental Goods and Services. ........................................40

1. Plaintiffs Sufficiently Allege a Relevant Product Market. ........................43

2. Plaintiffs Sufficiently Allege a Relevant Geographic Market. ..................45

3. Plaintiffs Sufficiently Allege Defendants' Market Power. ........................46

B. The Alleged Anticompetitive Effects Outweigh Any Pro-Competitive Market Benefits. ..........................................................47

1. The Conspiracy Has No Pro-Competitive Effect on Premiums Charged to Dental Patients. ..........................................................48

2. Defendants' Abuse of Monopsony Power in the Market for Purchase of Dental Goods and Services Is Not Necessary for Defendants' to Compete in the Separate Nationwide Dental Insurance Market. ..........................................................49

IV. PLAINTIFFS SUFFICIENTLY ALLEGE ANTITRUST INJURY ................................51

V. PLAINTIFFS SUFFICIENTLY ALLEGE CONCERTED ACTION WITH REGARD TO THE DELTA DENTAL TRADEMARKS ..................................52

VI. THE MCCARRAN-FERGUSON ACT DOES NOT BAR PLAINTIFFS' CLAIMS ..........................................................55

CONCLUSION..........................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Active Disposal, Inc. v. City of Darien*,
635 F.3d 883 (7th Cir. 2011) ................................................... 47

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) .............................................. 37, 39

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*,
129 F. Supp. 3d 614 (N.D. Ill. 2015) .................................. 45

*Am. Deposit Corp. v. Schacht*,
84 F.3d 834 (7th Cir. 1996) ................................................... 56

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ............................................................... 60

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010) .............................................................. 54

*AnchorBank, FSB v. Hofer*,
649 F.3d 610 (7th Cir. 2011) ................................................ 23

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
2020 U.S. Dist. LEXIS 1565 (N.D. Ill. Jan. 7, 2020) ........... 12

*Arizona v. Maricopa Cty. Med. Soc'y*,
457 U.S. 332 (1982) ............................................................... 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................... 12, 33

*Avila v. Bronger Masonry, Inc.*,
2014 U.S. Dist. LEXIS 103742 (S.D. Ind. July 30, 2014) ...... 13

*Ball Memorial Hosp. v. Mutual Hosp. Ins*,
784 F.2d 1325 (7th Cir. 1986) .......................................... 15, 36

*Bausch v. Stryker Corp.*,
630 F.3d 546 (7th Cir. 2010) ............................................ 27, 28

*Been v. O.K. Indus., Inc.*,
495 F.3d 1217 (10th Cir. 2007) ............................................. 11

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007) ......................................................... 12, 33

*Blackburn v. Sweeney*,
53 F.3d 825 (7th Cir. 1995) ................................................... 19

*Brennan v. Concord EFS, Inc.*,
369 F. Supp. 2d 1119 (N.D. Cal. 2005) ................................. 22

*Brillhart v. Medical Ins. Inc.*,
   768 F.2d 196 (7th Cir. 1985) .............................................................. 48

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979).............................................................. 15, 20, 22

*Brown Shoe Co. v. U.S.*,
   370 U.S. 294 (1962).............................................................. 45

*Cal. Dental Ass'n v. F.T.C.*,
   224 F.3d 942 (9th Cir. 2000) .............................................................. 44

*Cal. Dental Ass'n v. F.T.C.*,
   526 U.S. 756 (1999).............................................................. 22, 27, 37

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
   961 F.2d 667 (7th Cir. 1992) .............................................................. 20

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*,
   838 F.2d 268 (8th Cir. 1988) .............................................................. 55

*City of Rockford v. Mallinckrodt ARD, Inc.*,
   360 F. Supp. 3d 730 (N.D. Ill. 2019) .............................................................. 13, 23

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962).............................................................. 13

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984).............................................................. 15, 54

*Ctr. Ins. Agency, Inc. v. Byers*,
   1976 WL 1273 (N.D. Ill. June 10, 1976) .............................................................. 56

*Deslandes v. McDonald's USA, LLC*,
   2018 WL 3105955 (N.D. Ill. June 25, 2018) .............................................................. 37, 50

*EEOC v. Concerta Health Serv.*,
   496 F.3d 773 (7th Cir. 2007) .............................................................. 12

*Ellison Educ. Equip. v. Heartfelt Creations, Inc.*,
   2019 U.S. Dist. LEXIS 160416 (N.D. Ind. Sept. 20, 2019).............................................................. 12

*F.T.C. v. Ind. Fed'n of Dentists*,
   476 U.S. 477 (1986).............................................................. 40, 42, 44

*Facebook, Inc. v. Teachbook.com LLC*,
   819 F. Supp. 2d 764 (N.D. Ill. 2011) .............................................................. 14

*Feinstein v. Nettleship Co. of Los Angeles*,
   714 F.2d 928 (9th Cir. 1983) .............................................................. 58, 59

*Firestone Fin. Corp. v. Meyer*,
   796 F.3d 822 (7th Cir. 2015) .............................................................. 12

*Fontana Aviation, Inc. v. Beech Aircraft Corp.*,
   432 F.2d 1080 (7th Cir. 1970) .............................................................. 53

*F.T.C. v. Travelers Health Assn.*,
   362 U.S. 293 (1960) ........................................................................................... 60

*Gardunio v. Town of Cicero*,
   674 F. Supp. 2d 976 (N.D. Ill. 2009) ................................................................. 13

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
   744 F.2d 588 (7th Cir 1984) ........................................................ 19, 20, 50, 53

*Generac Corp. v. Caterpillar, Inc.*,
   172 F.3d 971 (7th Cir. 1999) .............................................................................. 41

*Great Atl. & Pac. Tea Co. v. F.T.C.*,
   440 U.S. 69 (1979) .............................................................................................. 41

*Group Life & Health Ins. Co. v. Royal Drug Co.*,
   440 U.S. 205 (1979) ........................................................................... 55, 56, 58

*Haff Poultry, Inc. v. Tyson Foods, Inc.*,
   No. 17-cv-33, Dkt. No. 268 (E.D. Okla. Jan. 8, 2020) ................................. 25, 41

*Harris v. Illinois Vehicle Premium Fin. Co.*,
   2000 WL 1307513 (N.D. Ill. Sept. 12, 2000) ................................................... 56

*Hopping v. Standard Life Ins. Co.*,
   1983 WL 1946 (N.D. Miss. Sept. 14, 1983) ..................................................... 59

*In re Blue Cross Blue Shield Antitrust Litig.*,
   26 F. Supp. 3d 1172 (N.D. Ala. 2014) .............................................................. 57

*In re Blue Cross Blue Shield Antitrust Litig.*,
   308 F. Supp. 3d 1241 (N.D. Ala. 2018) ...................................... 13, 28, 29, 30, 53

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   123 F.3d 599 (7th Cir. 1997) .............................................................................. 34

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ........................................................... 12, 26

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) ................................................................. 12

*In re Dental Supplies Antitrust Litig.*,
   2016 WL 5415681 (E.D.N.Y. Sept. 28, 2016) ................................................... 34

*In re High Tech Employee Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ............................................................ 13

*In re Insurance Brokerage Antitrust Litigation*,
   608 F.3d 300 (3d Cir. 2010) ............................................................................. 57

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   514 F. Supp. 2d 683 (E.D. Pa. 2007) ................................................................. 45

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*,
   2018 WL 4241981 (N.D. Cal. Sept. 3, 2018) ............................................... 32, 36

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) ................................................... 26

*In re Sulfuric Acid Antitrust Litig.*,
  703 F.3d 1004 (7th Cir. 2012) ................................................ 20, 21, 22

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ................................................ 25, 26, 28

*Int'l Equipment Trading, Ltd. v. AB SCIEX LLC*,
  2013 WL 4599903 (N.D. Ill. Aug. 19, 2013) ......................................... 44

*Int'l Outsourcing Servs., LLC v. Blistex, Inc.*,
  420 F. Supp. 2d 860 (N.D. Ill. 2006) ................................. 15, 24, 25, 51

*Kaiser Aluminum & Chem. Corp. v. FTC*,
  652 F.2d 1324 (7th Cir.1981) .......................................................... 44

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
  2013 WL 1768706 (N.D. Cal. Mar. 29, 2013)......................................... 22

*Kennedy v. Butler Fin. Solutions, LLC*,
  2009 WL 290471 (N.D. Ill. Feb. 4, 2009) ............................................ 56

*Kingray, Inc. v. NBA, Inc.*,
  188 F. Supp. 2d 1177 (S.D. Cal. 2002)............................................ 28, 29

*L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*,
  979 F. Supp. 632 (N.D. Ill. 1997) .................................................... 44

*Law v. NCAA*,
  134 F.3d 1010 (10th Cir. 1998) ....................................................... 38

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)..................................................................... 18

*Lumber Liquidators, Inc. v. Cabinets To Go*,
  2019 WL 5854067 (E.D. Va, Nov. 8, 2019)............................................ 22

*Mandeville Island Farms v. American Crystal Sugar Co.*,
  334 U.S. 219 (1948)..................................................................... 15

*Maple Flooring Mfr.'s Ass'n v. United States*,
  268 U.S. 563 (1925)..................................................................... 42

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
  817 F.3d 934 (6th Cir. 2016) .......................................................... 53

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) .......................................................... 13

*Mich. State Podiatry Ass'n v. Blue Cross & Blue Shield of Mich.*,
  671 F. Supp. 1139 (E.D. Mich. 1987).................................................. 51

*Nandorf, Inc. v. Applied Underwriters Captive Risk Assur. Co.*,
  410 F. Supp. 3d 882 (N.D. Ill. 2019) ................................................. 55

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) ...................................................................................... *passim*

*Nat'l Macaroni Mfrs. Ass'n v. F.T.C.*,
345 F.2d 421 (7th Cir. 1965) ............................................................................ 24

*NewSpin Sports, LLC v. Arrow Electronics, Inc.*,
910 F.3d 293 (7th Cir. 2018) ............................................................................ 11

*North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*,
385 F. Supp. 2d 740 (N.D. Ill. 2005) ............................................................... 21

*Northstar Energy LLC v. Encana Corp.*,
2014 WL 5343423 (W.D. Mich. Mar. 10, 2014) .............................................. 42

*O'Neil v. Unum Life Ins. Co. of Am.*,
2002 WL 31356453 (N.D. Ill. Oct. 17, 2002) .................................................. 56

*Oakland County Employees' Retirement System v. Massaro*,
772 F. Supp. 2d 973 (N.D. Ill. 2011) ............................................................... 12

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ................................................................................ *passim*

*Omnicare, Inc. v. Unitedhealth Group, Inc.*,
524 F. Supp. 1031 (N.D. Ill. 2007) ...................................................... 14, 15, 51

*Page v. Liberty Mut. Fire Ins. Co.*,
869 F. Supp. 596 (N.D. Ill. 1994) .................................................................... 60

*Palmer v. BRG of Georgia, Inc.*,
498 U.S. 46 (1990) ...................................................................................... 18, 20

*Pierce v. Zoetis, Inc.*,
818 F.3d 274 (7th Cir. 2016) ............................................................................ 11

*Pinski v. Adelman*,
1995 WL 669101 (N.D. Ill. Nov. 7, 1995) ...................................................... 56

*Polk Bros., Inc. v. Forest City Enters.*,
776 F.2d 185 (7th Cir. 1985) ............................................................... 19, 20, 21

*Quality Auto Body Inc., v. Allstate Ins. Co.*,
660 F.2d 1195 (7th Cir. 1981) .......................................................................... 59

*Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*,
381 F.3d 717 (7th Cir. 2004) ............................................................................ 44

*Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*,
407 F.3d 1027 (9th Cir. 2005) .......................................................................... 54

*Sanger Ins. Agency v. HUB Int'l, Ltd.*,
802 F.3d 732 (5th Cir. 2015) ............................................................................ 59

*Sanner v. Bd. of Trade of City of Chi.*,
62 F.3d 918 (7th Cir.1995) ............................................................................... 14

*Schilke v. Wachovia Mortgage, FSB*,
    758 F. Supp. 2d 549 (N.D. Ill. 2010) ................................................................ 56

*S.E.C. v. National Sec., Inc.*,
    393 U.S. 453 (1969) ............................................................................................ 55

*Taha v. Int'l Bhd. of Teamsters, Local 781*,
    947 F.3d 464 (7th Cir. 2020) ............................................................................ 47

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
    305 F.3d 1124 (10th Cir. 2002) ........................................................................ 11

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ........................................................................................ 15, 22

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001).......................................................................... 25, 44

Toys "R" Us, Inc. v. F.T.C.,
    221 F.3d 928 (7th Cir. 2000)............................................................................42

*U.S. Dep't of Treasury v. Fabe*,
    508 U.S. 491 (1993) ............................................................................................ 59

*U.S. v. Andreas*,
    216 F.3d 645 (7th Cir. 2000) ............................................................................ 27

*U.S. v. Healthco, Inc.*,
    387 F. Supp. 258 (S.D.N.Y. 1975) .................................................................... 44

*U.S. v. Sealy, Inc.*,
    388 U.S. 350 (1967)...................................................................................... 17, 52

*U.S. v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)............................................................................................ 24

*U.S. v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972)................................................................................... *passim*

Union Labor Life Ins. Co. v. Pireno,
    458 U.S. 119 (1982)...................................................................................... 55, 56

*United States v. Am. at Home Healthcare & Nursing Servs., Ltd.*,
    2017 WL 2653070 (N.D. Ill. June 20, 2017) .................................................... 13

*United States v. Container Corp. of Am.*,
    393 U.S. 333 (1969)............................................................................................ 41

*United States v. Cueto*,
    151 F.3d 620 (7th Cir. 1998) ............................................................................ 13

*United States v. Kemp & Associates, Inc.*,
    2019 WL 763796 (D. Utah, Feb. 21, 2019) ...................................................... 15

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)............................................................................................ 41

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)................................................................... 37

*Vogel v. Am. Soc. of Appraisers*,
    744 F.2d 598 (7th Cir. 1984) ..................................... 14, 15, 24, 51

*Wallace v. Free Software Foundation, Inc.*,
    2005 WL 3239208 (S.D. Ind. Nov. 28, 2005) ........................... 41

*Washington v. Nat'l Football League*,
    880 F. Supp. 2d 1004 (D. Minn. 2012)..................................... 54

*West Penn Allegheny Health System, Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010)............................................... 32, 34

## Statutory Authorities

Sherman Act § 1 (15 U.S.C. §1) ....................................... *passim*

15 U.S.C. § 1012(a) ................................................. 55

## Treatises

Herbert Hovenkamp, *Antitrust Law,* ¶1911a (2d ed. 2005).................... 38

Phillip Areeda, *Antitrust Law,* ¶1507b (1986) ........................... 39

## Additional Authorities

Herbert J. Hovenkamp, *Platforms and the Rule of Reason: The American Express Case*,
    2019 Colum. Bus. L. Rev. 35 (2019) ..................................... 35

## PRELIMINARY STATEMENT

This action concerns a conspiracy among horizontal competitors – the Defendant dental insurance companies – who have established a buyers' cartel that they use to impose anticompetitively low prices for the purchase of dental goods and services from the dentists and dental groups that are the plaintiffs in this action. It is well established that *buyers'* collusion to *lower* the price at which a product will be *purchased* is as much a *per se* violation of the federal Sherman Act as is collusion among *sellers* to *raise* the price at which a product is *sold*. As detailed in the Consolidated Complaint (Dkt. 96) (the "CC"), the conspiracy to artificially lower reimbursements to dentists and dental groups below competitive levels has been accomplished by three principal and interrelated means: the allocation of territorial markets, price fixing (facilitated by collusive sharing of pricing information), and agreed restrictions on competition.

Defendants' motion to dismiss seeks to disregard the detailed allegations of the conspiracy, which at this stage of the litigation must be accepted as true, and instead puts forward an alternative narrative necessarily based on mere unsubstantiated assertions. Defendants further rely on (and self-servingly characterize) materials outside the four corners of the CC, which Defendants have cherry-picked from among the broad universe of documents and information that are relevant to this dispute. These materials, while inappropriate to submit on a motion to dismiss, actually further support plaintiffs' allegations.

Defendants also seek to sidestep the large and well-established body of Supreme Court and lower court precedents finding the type of conduct alleged here violates Sherman Act Section 1. Instead, Defendants mistakenly characterize the claim here as subject to the "two-sided market" analysis set forth in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex*"). This is nothing short of seeking to place a square peg in a round hole. The Supreme Court explained that *Amex's* "two-sided market" analysis does not apply in horizontal collusion cases, as here, "involv[ing]

agreements between competitors not to compete in some way," which "[t]ypically … qualify as unreasonable *per se*." *Amex* at 2283-84, 2285 n.7. The allegations here also are readily distinguishable from those in *Amex* in other critical ways discussed herein.

Moreover, Defendants' assertion that the relief plaintiffs seek would lead to increased dental insurance premiums is both specious and directly at odds with the CC's allegations. The CC alleges with specificity that absent the Defendants' anticompetitive conduct, there would be greater competition not just for the purchase of dental goods and services but also for the sale of dental insurance, which would result in greater insurance choice and *lower* premiums for dental plan sponsors and members, and greater insurance choice and higher rates of reimbursement for dental goods and services provided by dentists and dental practices. In addition, the CC also alleges with specificity that any purported "savings" Defendants generate from their alleged anticompetitive conduct is not passed to dental patients in the form of lower premiums and/or other economic benefits. Rather, these "savings" are a windfall that Defendants use to pay their executives exorbitant salaries and to build and maintain capital reserves far beyond their liabilities.

The CC here sets forth precisely the type of non-conclusory, detailed factual allegations that bring its claims far across the line of plausibility. The motion to dismiss should be denied.

## ALLEGATIONS IN THE CONSOLIDATED COMPLAINT

### The Parties

Defendants are the Delta Dental Plans Association ("DDPA"), DeltaUSA, and the 39 state-level dental insurers licensed to use the Delta Dental name ("Delta Dental State Insurers" or "Member Companies," and, collectively with DDPA and DeltaUSA, "Delta Dental" or "Defendants"). CC ¶¶22-63. The 39 Delta Dental State Insurers comprise, fund and manage DDPA. *Id.* ¶22. DDPA owns the "Delta Dental" brand name and trademarks, and DDPA licenses them to the Delta Dental State Insurers. *Id.* DeltaUSA assists in servicing the national accounts

for the 39 Delta Dental State Insurers. Defendants' Memorandum of Law in Support of Motion to Dismiss (Dkt. 243) ("Def. Br.") at 6. Collectively, Defendants insure more than 80 million people nationwide. *Id.* at 1.

By agreement among Defendants, each Delta Dental State Insurer operates within an exclusive geographic territory, composed of a state or multi-state area, that renders it free from competition by any other Delta Dental State Insurer. CC ¶¶93-99. Within their respective territories, each Delta Dental State Insurer reimburses dentists and dental practices ("Dental Providers") for goods and services the dentists provide to patients who are insured by that Delta Dental State Insurer. *Id.* ¶71. Reimbursement terms are set forth in contracts each Delta Dental State Insurer imposes upon Dental Providers (the "Delta Dental Provider Agreement"). *Id.* ¶¶69, 78. Approximately 70% of all Dental Providers nationwide receive reimbursement for dental goods and services from the Delta Dental State Insurers. *Id.* ¶133.

Plaintiffs are fourteen Dental Providers. *Id.* ¶¶9-21. Because Defendants, operating through Delta Dental, control the overwhelming majority of insured dental patients in the United States, Plaintiffs – and all the similarly-situated Dental Providers they seek to represent as a class – effectively are forced to accept Defendants' artificially low reimbursement rates for dental goods and services when treating patients insured by Delta Dental. *Id.* ¶80. Plaintiffs have been injured, and continue to be injured, by being forced to accept lower reimbursement rates from Defendants for goods and services provided to Delta Dental-insured patients than they would receive in a competitive market. *Id.* ¶¶9-21.

**The Market For The Purchase of Dental Goods And Services**

Employers, individuals, and families purchase dental insurance from insurance companies such as Delta Dental. Once enrolled, either the sponsoring employers or the individual enrollees (or some combination of the two) make premium payments to the insurance company. The

employer and/or individual insured is responsible for continuing to make premium payments during the insured period – regardless of whether the insured actually visits a Dental Provider and receives dental treatment. *Id.* ¶98 n.5. Depending on the service or goods provided and the patient's individual plan (including any co-pays and deductibles), the insurer may cover some, all, or none of the cost.

The majority of dental goods and services in the U.S. are provided on an insured, fee-for-service basis. *Id.* ¶81. Dental Providers thus are most typically reimbursed by dental insurers based on the number and type of insured goods and services provided to insured patients. *Id.* ¶82. The insurer, not any government rate-setting agency, determines the reimbursement rates. Those reimbursement rates normally vary depending on whether the Dental Providers are "participating" or "nonparticipating" in the insurer's dental plan(s). *Id.* ¶81. A "participating" Dental Provider has an agreement with a dental insurer to provide goods and services to patients insured by that insurer. A "non-participating" Dental Provider has not entered such an agreement, but nonetheless receives reimbursement for those services pursuant to the insured's policy. Delta Dental routinely reimburses "non-participating" Dental Providers at lower rates than "participating" Dental Providers. *Id.* ¶102.

**Defendants' Dominance In The Market For The Purchase Of Dental Goods and Services**

The Delta Dental State Insurers have an unprecedented degree of power in the market for the purchase of dental goods and services. *Id.* ¶89. This power exists because most dental goods and services in the United States are provided to patients who are insured, *id.* ¶81, and the Delta Dental State Insurers insure an overwhelming majority of the insured patients, *id.* ¶89. Indeed, Defendants pride themselves on having "[t]he most extensive dental network offering the widest selection of dentists nationwide." *Id.* ¶79. Between 2013 and 2017, the 39 Delta Dental State Insurers received an average of 59% to 66% of premiums paid by or on behalf of insured dental

patients in each state, *id.* at ¶90. These market share figures are conservative because they do not include revenue derived by Defendants through their administration of self-funded ERISA plans, and their underwriting for publicly-insured programs such as Medicare Advantage and Medicaid. *Id.* ¶91. Through such plans and programs, Defendants gain significant additional revenue and further market share, given that Dental Providers must deal with Delta Dental to receive reimbursement. *Id.*

In some states, Defendants' insurance plans are the *only* form of dental insurance available to many patients. *Id.* ¶102. In California, for example, Delta Dental California receives 87% of the premiums paid by or on behalf of insured dental patients. *Id.*

Plaintiffs and similarly-situated Dental Providers thus effectively are forced to accept Defendants' below-market reimbursement rates if they wish to maintain a viable business. *Id.* ¶102. For a Dental Provider to decline patients insured by Defendants means losing access to the largest pool of potential dental patients. *Id.* ¶¶102, 133. To gain access to those patients insured by Delta Dental, Plaintiffs and similarly-situated Dental Providers have had no realistic alternative but to accept Delta Dental insureds and receive reimbursement rates lower than what would be paid in a competitive market. *Id.* ¶102.

The Delta Dental Provider Agreement imposes coercive and non-negotiable rules that Defendants unilaterally set. *Id.* ¶¶82-83. The most important such rules are the terms, conditions and rates under which Dental Providers can seek reimbursement for dental goods and services. *Id.* ¶82. Dental Providers are required, among other things, to (1) charge Delta Dental-insured patients only the amounts established by the Delta Dental State Insurer; (2) accept an agreed-upon schedule of rates for any goods and services rendered to Delta Dental insureds, and not charge the insured

any amounts other than copayments or deductibles; and (3) submit to audits by Defendants.  *Id.* ¶83.

**Defendants' Anticompetitive Scheme**

As detailed in the CC, Defendants have established a buyers' cartel that enables them artificially to suppress, below competitive levels, the price Defendants pay Plaintiffs and other similarly situated Dental Providers for dental goods and services.  The Defendants have established and maintained this buyers' cartel through three interrelated means:  a territorial market allocation mechanism, a price fixing mechanism, and a revenue restriction mechanism (all of these mechanisms together, the "Conspiracy").

### The Territorial Market Allocation Mechanism

Defendants have agreed not to compete and, instead, to divide the United States into 39 state or multi-state territories, within which each of the 39 Delta Dental State Insurers has the *exclusive* right to reimburse Dental Providers for dental goods and services provided to Delta Dental insureds.  *Id*. ¶¶93-94.  Pursuant to this agreement (the "Market Allocation Mechanism"), Delta Dental State Insurers do not sell or attempt to sell dental insurance to dental plan sponsors or members outside of the Delta Dental State Insurer's own allocated territory.  *Id*. ¶¶94, 95. Because Delta Dental insureds constitute the overwhelming majority of any given Dental Provider's prospective patients, Dental Providers have a Hobson's choice: either accept the low reimbursement rates imposed by the Delta Dental State Insurer that has been assigned the territory in which the provider is based, or forgo the practical opportunity to treat the large majority of potential patients in that territory.  *Id.* ¶¶85-86.

If the Market Allocation Mechanism did not exist, each Delta Dental State Insurer would compete for dental insurance business – and thus compete to sign up Dental Providers – outside of the exclusive territory it presently has been allocated.  *Id.* ¶¶92, 97.  Dental Providers in Carson

City, Nevada, for example, would not be restricted to accepting reimbursement *solely* from the Delta Dental State Insurer assigned to Nevada (which is headquartered approximately 2400 miles away in Georgia). *Id.* ¶97. Instead, Dental Providers in Carson City could consider the *competing* reimbursement rates offered by Delta Dental California, just 130 miles away in Sacramento, California. *Id.* ¶97. In turn, the Delta Dental State Insurers for California and Nevada would no longer enjoy an artificial exclusivity allowing them to impose anticompetitive terms on Dental Providers within their territories. Dental Providers thus could contract with whichever Delta Dental State Insurer offered the best reimbursement rates and other terms. *Id.*

Defendants' Market Allocation Mechanism serves no legitimate insurance-based need. It does not transfer or spread the risk of patients insured by Delta Dental, or otherwise benefit patients. *Id.* ¶96. It eliminates competition among the Delta Dental State Insurers in the territories in which they are based, thus reducing competition across the United States as a whole. *Id.*

Defendants do not deny the existence of the Market Allocation Mechanism or that it has caused lower reimbursement rates for Dental Providers across the United States. Def. Br. at 17. Defendants' Annual Statements confirm no Delta Dental State Insurer receives any income from outside its assigned territory. *Id.* ¶95. Each Delta Dental State Insurer's license to use the Delta Dental brand gives an "exclusive right to use the Service Marks" only "in the Territory or Territories as designated for Licensee" and not "outside of its Territory." Def. Br., Ex A at 67.[1]

---

[1] The CC explains that competition among the Delta Dental State Insurers also would benefit dental plan employer sponsors and insureds by driving down premiums and/or increasing the scope of the coverage offered for the same premium price. CC ¶¶98-99. Absent the Market Allocation Mechanism, patients and plan sponsors could choose the Delta Dental State Insurer that provides the most favorable terms, rather than the one that, through Defendants' Conspiracy, has been allocated a geographic territory. *Id.* ¶¶98, 109.

**The Price Fixing Mechanism**

Defendants also have secured and abused their monopsony power through a "Price Fixing Mechanism," by which Defendants agree to impose artificially below-market reimbursement rates in each of their respective geographic territories. *Id.* ¶¶1, 5, 100-101. Defendants imposition of below-market reimbursement rates has been facilitated by an agreement to share information on the prices charged by Dental Providers across the United States. *Id.* ¶75. This information sharing is enabled, in turn, by a "National Provider File" maintained by DDPA, which gives Defendants access to prices for the majority of dental goods and services across the country. *Id.* ¶¶75, 101, 125, 133.

The Delta Dental State Insurers have used this information to determine among themselves, including by and through DDPA, the lowest below-market reimbursement rates they can impose on Dental Providers in each Delta Dental State Insurer's allocated territory. *Id.* ¶¶75, 125. As a result of the Price Fixing Mechanism, Dental Providers are routinely required to accept reimbursement from the applicable Delta Dental State Insurer that is as much as 35% or more below the competitive market rate that would otherwise prevail. *Id.* ¶84. Indeed, Defendants themselves boast of achieving "the industry's best effective discount – averaging 19.6% nationally" compared to average market prices. *Id.* ¶84, n.3. For Dental Providers, these heavily discounted reimbursement rates are an unavoidable "take it or leave it" cost of doing business with Delta Dental – and thereby being able to provide goods and services to the large majority of insured dental patients. *Id.* ¶85.

Defendants' imposition of these below-market reimbursement rates has caused a steady decline in dentists' earnings throughout the United States – and at a time when household income, healthcare spending and medical provider income all have increased. *Id.* ¶135. Indeed, since 2011, the growth rate of healthcare spending in the U.S., excluding prescriptions and medical

equipment, has increased by 3% to 5.8% per annum. Over the same period, the average salary for a physician has increased even more, from $200,000 to $300,000. *Id.* ¶¶135-36. Yet since 2010, the incomes of both general practitioners and specialty dentists have declined by about 1.5%, notwithstanding inflation. *Id.* ¶137. There is only one type of dental practice generally not reimbursed by insurance and thus not affected by Defendants' Conspiracy – that is, cosmetic dentistry – and earnings *increased* for that practice. *Id.* ¶138.

### The Revenue Restriction Mechanism

Defendants also have agreed to restrict competition between any Delta Dental State Insurer and the "Delta Dental" brand (the "Revenue Restriction Mechanism"). *Id.* ¶¶1, 6, 106, 109, 119. All Delta Dental State Insurers have the wherewithal to offer non-Delta-branded dental insurance to patients and non-Delta-branded reimbursement to Dental Providers. *Id.* ¶108. But through the Revenue Restriction Mechanism, the Delta Dental State Insurers agree to limit or forego altogether the development of dental insurance under non-Delta Dental plans that would compete with Delta Dental plans, whether directly or through their subsidiaries. *Id.* The Delta Dental State Insurers also agree to limit competition in the administration of Delta Dental policies. *Id.* The revenue restrictions applicable to the Delta Dental State Insurers are set forth in a series of agreements that the CC refers to collectively as the "Delta Dental Plan Agreement." *Id.* ¶¶77, 107, 119.[2]

---

[2] Defendants purport to provide the Delta Dental Plan Agreement with their motion to dismiss. *See* Def. Br., Ex. A. Without discovery, however, there is no ground for assuming Defendants have provided the full set of Agreement documents from throughout the relevant time period. *Cf.* CC, ¶¶77, 107, 119. Indeed, the two documents Defendants have provided reference at least *nine* other governing documents, including DDPA Bylaws, DeltaUSA Bylaws, the DeltaUSA Policies and Procedures Manual, Delta's Interplan Participation Agreement, the Delta Dental Member Company Rating Factors, the National Provider File License Agreements, the Policy Governing e-Business and Technology Requirements, and the DeltaUSA Processing Policies. *See* Def. Ex. A at, *e.g.,* p. 39, "Guidelines," par. 1; p. 40; p. 142, par. 11-13; *see also id.* at 7 (referencing the "DDPA Position on the Examination of Member Companies" and noting a "DDPA Compliance Department" exists and has "full, free and unrestricted access" to examine Delta Dental State Insurers to ensure each "complies with DDPA Standards, DeltaUSA Policies, rules, regulations, contracts, agreements, and other governing documents.") Furthermore, the Guidelines submitted by Defendants list "Effective Dates" in 2021 and 2022, indicating that the terms and conditions have changed over time and

**Defendants' Misdirected Profits**

While Defendants now baldly assert that increasing reimbursement rates for Dental Providers would "inevitably *raise* premiums and out-of-pocket costs for consumers seeking dental care," Def. Br. 1 (emphasis in original), the CC alleges with specificity that Defendants do not pass through savings from lower reimbursement rates to consumers in the form of reduced premiums. Rather, Defendants use their ill-gotten gains to reward their officers, executives, and directors with exorbitant salaries, as well as to build up excessive and unnecessary capital reserves. CC ¶¶110, 115. Notwithstanding their status as purported nonprofit entities, Defendants' executives each receive million, or multi-million, dollar annual compensation. *Id.* ¶111. Delta Dental CEOs in Michigan, Ohio, and Indiana each earn over $15 million annually. *Id.* ¶112. The CEO of Delta Dental in California received over $14 million in total compensation in 2016. *Id.* ¶111. Average Delta Dental State Insurer CEO compensation in 2016 was $3,145,912. *Id.* ¶113.

Such compensation is highly atypical for not-for-profit entities.[3] The average U.S. annual compensation for the CEO of a US not-for-profit during the same time period was $146,653 – meaning the average Delta Dental State Insurer CEO earned over *20 times* the pay of the average nonprofit CEO. *Id.*

---

continue to do so. *Id.*, at p. 125, ¶¶xxvii-iii; p. 126, ¶xxix. And contrary to Defendants' arguments, the documents Defendants have provided contain broad language that expressly grants DDPA extensive power over the Delta Dental State Insurers, including to impose and police the alleged Revenue Restriction Mechanism. CC ¶101; *cf.* Def. Br., Ex. A, Cl. 2.1(2) ("Service Market License Agreement," prohibiting the Delta Dental State Insurers from "tak[ing] action to impair, harm the repute or, in Association's sole judgment lessen the value of" the Delta Dental brand); *see also id.* at Cl. 2.3(3) (prohibiting the Delta Dental State Insurers from "engag[ing] in any conduct … that, in the sole determination of Association, harms the business of the Association or that dilutes the value of, harms, or in any way lowers the public repute associated with" the Delta Dental brand.)

[3] In at least one state, a coalition of concerned dentists has petitioned the state attorney general to investigate whether the nature and extent of the compensation received by the executives of the local Delta Dental State Insurer violates the laws regarding compensation paid to executives of a charitable organization. CC ¶114.

Defendants have also used their large profits to build capital reserves far beyond their liabilities. *Id.* ¶115. For example, in 2016, Delta Dental New Jersey had total assets of $321 million, and total liabilities of only $80 million; Delta Dental Illinois had total assets of $145 million compared to total liabilities of only $44.8 million; Delta Dental Plan of Ohio had total assets of almost $200 million, and total liabilities of only $37.8 million; and Delta Dental Rhode Island had total assets of almost $114 million, and total liabilities of only $21.8 million. *Id.*

**The Anticompetitive Effects Of Defendants' Conspiracy**

The CC details how Defendants' anticompetitive conduct has harmed Dental Providers by reducing reimbursement rates below the rates that would be paid in a competitive market. *Id.* ¶¶7, 98, 99, 102, 124-126, 129-132, 134. The CC further explains that Defendants' anticompetitive conduct also harms dental patients by increasing the premiums paid by purchasers of dental insurance, and by decreasing the quality and quantity of the goods and services dentists provide to dental patients. *Id.* ¶¶7, 98, 103, 124-126, 129-132, 134.[4]

## ARGUMENT

## LEGAL STANDARD

On a Rule 12(b)(6) motion, Courts must accept "all well-pleaded facts in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *NewSpin Sports, LLC v. Arrow Electronics, Inc.*, 910 F.3d 293 (7th Cir. 2018) (quoting *Pierce v. Zoetis, Inc.* 818 F.3d 274, 277 (7th Cir. 2016) (internal quotations omitted)). "[T]o survive a motion to dismiss, the plaintiff must allege enough facts to state a claim to relief that is plausible on its face." *Id.* Plaintiffs "need not

---

[4] This allegation is consistent with how monopsonies work in practice. *See, e.g., Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1232 (10th Cir. 2007) ("According to economists, without competition from other buyers, a monopsonist will lower prices paid to sellers, which over time results in higher consumer prices. . . . depression of prices potentially injures both producers and consumers."); *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1135 (10th Cir. 2002) ("monopsonies fall under antitrust purview because monopsonistic practices will eventually adversely affect consumers."

provide detailed factual allegations, but they must provide enough factual support to raise their right to relief above a speculative level." *Arbitrage Event-Driven Fund v. Tribune Media Co.*, 2020 U.S. Dist. LEXIS 1565, at *18-19 (N.D. Ill. Jan. 7, 2020). A claim is plausible "[w]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility requirement "is not a probability requirement"; it "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal the defendant's liability on the claims pled." *Ellison Educ. Equip. v. Heartfelt Creations, Inc.*, 2019 U.S. Dist. LEXIS 160416, at *11 (N.D. Ind. Sept. 20, 2019); *see also Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007); *EEOC v. Concerta Health Serv.*, 496 F.3d 773, 776 (7th Cir. 2007) (if a complaint alleges facts "raising that possibility above a speculative level," the motion to dismiss must be denied); *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772,779 (N.D. 2017) (citing *Twombly*, 550 U.S. at 555); *Oakland County Employees' Retirement System v. Massaro*, 772 F. Supp. 2d 973, 976 (N.D. Ill. 2011) (complaint sufficient where allegations raise the right to relief above speculation).

A complaint need only provide a short, plain statement of its claims showing the plaintiff's entitlement to relief, Fed R. Civ. P. 8(a) (2), and affording the defendants fair notice of the plaintiff's claim and the basis for it, *Twombly*, 550 U.S. at 555. A plausible claim survives a motion to dismiss even if "recovery is very remote and unlikely," *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015), and even if a different version of the events may appear more plausible. *In re Dealer Mgmt. Sys. Antitrust Litig.,* 313 F. Supp. 3d 931, 952 (N.D. Ill. 2018) (internal citations omitted).

It is well established that in general, and particularly at the motion to dismiss stage, an alleged conspiracy must be evaluated as a whole, and should not be disaggregated and assessed

piecemeal. *See*, *e.g.*, *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole"); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011) (plaintiff "should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 754 (N.D. Ill. 2019) ("Discovery will elucidate whether the purported conspiracy *as a whole* is patently anticompetitive 'such as would always or almost always tend to restrict competition and decrease output.'") (emphasis added; citing cases); *see also In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1258 (N.D. Ala. 2018) (alleged antitrust conspiracy involving medical health insurers should be analyzed as a whole, and thus no need to assess separately whether each restriction utilized within the alleged conspiracy constituted an independent violation); *In re High Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) ("In antitrust conspiracy cases, 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each") (internal quotations omitted).

Courts also generally must confine their review to the allegations within the complaint. *See*, *e.g.*, *United States v. Am. at Home Healthcare & Nursing Servs., Ltd.*, 2017 WL 2653070, at *9 (N.D. Ill. June 20, 2017); *Gardunio v. Town of Cicero*, 674 F. Supp. 2d 976 (N.D. Ill. 2009). In conflict with this principle, Defendants' Motion relies heavily (*see*, *e.g.*, Def. Br. 12-14, 19, 22, 30, 45) on two Delta Dental Plan documents. *See* Def. Br. Ex. A. But whether these documents even represent the full set of relevant agreements from throughout the relevant time period can only be assessed through discovery. *See*, *e.g.*, *Avila v. Bronger Masonry, Inc.*, 2014 U.S. Dist.

LEXIS 103742, at *6 (S.D. Ind. July 30, 2014) ("It is not appropriate for a defendant to submit a document in support of a motion to dismiss that would 'require[] discovery to authenticate or disambiguate.'"). Defendants' cherry-picking of two documents at the motion to dismiss stage is wholly inappropriate. *See*, *e.g.*, *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 773 (N.D. Ill. 2011).[5]

## I. PLAINTIFFS PLAUSIBLY PLEAD A PER SE ILLEGAL MONOPSONY CLAIM

This case concerns the establishment of a *buyers'* cartel. In contrast to a *seller's* cartel, which seeks to raise the prices the buyers must pay, in a *buyer's* cartel "the harm caused is not artificially raised prices for consumers, but rather artificially *lowered* prices for sellers." *See Omnicare, Inc. v. Unitedhealth Group, Inc.,* 524 F. Supp. 1031, 1040 (N.D. Ill. 2007) (emphasis added) (citing *Vogel v. Am. Soc. of Appraisers,* 744 F.2d 598, 601 (7th Cir. 1984) (Posner, J.)). *See also Sanner v. Bd. of Trade of City of Chi.,* 62 F.3d 918, 927–28 (7th Cir. 1995) (a buyers' cartel "occurs when a group of buyers band together in order to fix a maximum price (below

---

[5]  It is particularly inappropriate here for Defendants to suggest that the court consider two Defendant-selected documents, when so much material in the public record supports the allegations here. For example, Delta Dental's website acknowledges that "more than 70% of dentists participate in the Delta Dental Premier® network." Delta Dental, *Frequently Asked Questions: What Is The Best Dental Plan For Me?* https://www.deltadentalcoversme.com/s/frequently-asked-questions; *see also* Delta Dental Oklahoma, *Why Delta Dental?* http://offsite.deltadentalok.org/client/ok/why_delta_dental.cfm ("Delta Dental is part of a nationwide organization of dental carriers with more than 132,000 practicing dentists in more than 200,000 locations"). Defendants have also at times boasted that as many as 80% of Dental Providers have entered into provider agreements with Delta Dental. *See, e.g.*, Delta Dental Indiana, *What Is The Delta Dental Premier Network?* https://www.deltadentalin.com/Dentist/Help/Participation-FAQs/Premier ("four out of five dentists participate in one or more Delta Dental programs."); Delta Dental South Carolina, *Which Delta Dental Network Should I Recommend to My Client?* https://www.deltadentalsc.com/Producers/FAQs ("The Delta Dental Premier® Network offers the greatest access to providers with more than 80 percent of providers nationwide participating with this network."). Defendants also concede that very few insured patients will seek treatment from a Dental Provider that does not participate in their insurance network. *See, e.g.*, Delta Dental Arizona, *2020 Fee Schedule Changes – Dentist FAQs* https://deltadentalaz.com/documents/DDAZ_FeeScheduleChanges2020_DentistFAQsfor Web_FINAL.pdf ("It is important to keep in mind that the percentage of Delta Dental members who go to a non-participating dentist is low (less than 3% in Arizona).")

competitive levels) that they will pay for an item."); *Int'l Outsourcing Servs., LLC v. Blistex, Inc.,* 420 F. Supp. 2d 860, 864 (N.D. Ill. 2006) (Bucklo, J.).

As Judge Posner explained in *Vogel*, and as this Court itself has recognized, "buyer cartels, the object of which is to force the prices that suppliers charge the members of the cartel below the competitive level, are illegal *per se.*" *Vogel*, 744 F.2d at 601; *Int'l Outsourcing Servs.,* 420 F. Supp. at 864 (buyers' cartels are *per se* illegal under the Sherman Act, even though their goal is to *lower* the price of output) (Bucklo, J.). *See also Omnicare,* 524 F. Supp. at 1039 (denying motion to dismiss; plaintiff institutional pharmacy stated a *per se* antitrust claim as victim of a buyers' cartel); *Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 242 (1948) (agreement among beet refiners to lower the price of beets constituted an unreasonable restraint on trade prohibited by the Sherman Act.).[6]

While sellers' cartels involve *monopoly* power, a buyers' cartel, as alleged here, involves *monopsony* power. Indeed, Defendants concede that they are "purchasing agents for the consumers of medical [dental] services." Def. Br. at 7 (quoting *Ball Mem. Hosp. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1334 (7th Cir. 1986)). The CC alleges that Defendants here have engaged in a single Conspiracy that artificially suppresses the prices paid to Plaintiffs and other similarly

---

[6] Defendants misstate the law when they argue that *per se* treatment is unavailable to Plaintiffs without an "elaborate study" of the dental insurance industry. Def. Br.at 16 (citing *Texaco Inc. v. Dagher,* 547 U.S. 1, 5 (2006). In general, *per se* violations of Sherman Act §1 are practices that appear "to be one[s] that would always or almost always tend to restrict competition and decrease input." *Broad. Music, Inc. v. Columbia Broad Sys., Inc.,* 441 U.S. 1, 19-20 (1979). "Certain agreements, such as horizontal price-fixing and market allocation, are thought to be so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768 (1984). Courts determine the use of *per se* treatment based upon their "experience with the particular *practice* being challenged and need not have experience within the specific *industry* in which the allegedly unlawful practice was used." *United States v. Kemp & Associates, Inc.,* 2019 WL 763796 (D. Utah, Feb. 21, 2019) (citing *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 351 (1982) (judiciary's limited experience with health care industry did not mean that *per se* rule should not apply to Sherman Act price-fixing claims, reversing trial court)). One purpose of *per se* treatment is to avoid needless industry analysis when faced with trade restraints known to have an anticompetitive impact. *Maricopa Cty. Med. Soc'y*, 457 U.S. at 351.

situated Dental Providers for the purchase of dental goods and services. That single Conspiracy has been effectuated with three interrelated mechanisms that enable Defendants to maintain and abuse the monopsony power of their buyers' cartel. *First*, Defendants have agreed not to compete and, instead, to divide the United States into 39 state or multi-state territories, within which each of the 39 Delta Dental State Insurers has the *exclusive* right to pay Dental Providers for dental goods and services provided to Delta Dental insureds (the Market Allocation Mechanism). *Second*, they have agreed to impose reimbursement rates in each of their respective geographic territories that are artificially below-market for that territory, and then impose these rates upon Dental Providers providing dental goods and services to Delta Dental insureds (the Price Fixing Mechanism). *Third*, Defendants have agreed to restrict the amount of business any Defendant can do in competition with the "Delta Dental" brand (the Revenue Restriction Mechanism). The CC details the who, what, when, why, and how of each of Defendants' agreed means of maintaining and abusing their monopsony power and thereby establishing a powerful buyers' cartel.

### A. Defendants' Market Allocation Mechanism Is *Per Se* Unlawful.

Defendants do not dispute the existence of the Market Allocation Mechanism; to the contrary, Defendants acknowledge that, pursuant to the Delta Dental Provider Agreement, each Delta Dental State Insurer is limited to operating in "a particular state or group of states." Def. Br. at 4. Nothing more is needed for Plaintiffs to state a claim.

The Supreme Court "has reiterated time and again that horizontal territorial limitations are naked restraints of trade with no purpose except stifling of competition." *U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (collecting cases) (internal alterations omitted). Indeed, "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition" is "[o]ne of the classic examples of a per se violation." *Id*. Plaintiffs have alleged – and Defendants have admitted – precisely such an agreement in this case.

16

*See* CC ¶¶93, 94-99 ("Defendants have agreed (1) that the market for dental insurance will be divided into 39 territories allocated to the exclusive control of a particular Delta Dental State Insurer, and (2) that the Delta Dental State Insurers will not sell or attempt to sell dental insurance to dental plan sponsors or members outside of each … allocated territory").

Defendants nonetheless assert that *per se* review is inappropriate because, their argument goes, their allocation of markets among the Delta Dental State Insurers is "ancillary" to "a cooperative structure of Member Companies that has resulted in increased competition and choice for national purchasers of dental insurance." Def. Br. at 23. In essence, Defendants claim that the territorial restraint is necessary to allow the individual state insurers to collectively compete with nationwide insurers. Yet Defendants offer no authority for the proposition that "ancillary" competitive benefits, if any, can justify a naked horizontal territorial restraint. This is not surprising, because both the Supreme Court and Seventh Circuit have held precisely the opposite.

In *U.S. v. Sealy, Inc.*, 388 U.S. 350 (1967), approximately 30 licensees of Sealy-branded mattresses and bedding products agreed on an exclusive territorial allocation system in which each licensee would not manufacture or sell Sealy products outside its designated geographic area. *Id.* at 352. Notwithstanding that defendants "vigorously argue[d] that territorial exclusivity served many [pro-competitive] purposes," the Supreme Court held that such territorial restraints among horizontal competitors were *per se* "unlawful under § 1 of the Sherman Act without the necessity for an inquiry in each particular case as to their business or economic justification, their impact in the marketplace, or their reasonableness." *Id.* at 357-58.

In *Topco*, 25 small and medium-sized independent regional supermarket chains operating in 33 states formed a cooperative for the purchase of more than 1,000 different items that each store sold under the Topco brand name. *Id.* at 598. Topco's bylaws established exclusive

territories for each store so that no member could sell Topco brand products outside the territory in which it was licensed. *Id*. at 596. Just as Delta Dental argues here that territorial restraints are necessary to allow it to compete effectively with national insurers (Def. Br. at 23), so too Topco argued that "[s]maller retail grocery stores and chains are unable to compete effectively with the national and large regional chains without also offering their own exclusive private label products.… The only feasible method by which Topco can procure private label products and assure the exclusivity thereof is through trademark licenses specifying the territory in which each member may sell such trademarked products." *Topco Assocs, Inc*., 405 U.S. at 605. The Supreme Court rejected the purported pro-competitive justification: "We think that it is clear that the restraint in this case is a horizontal one, and, therefore, a *per se* violation of § 1.… In applying these rigid rules, the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because they are allegedly developed to increase competition." *Id*. at 608, 610.[7]

The rule that territorial restraints between horizontal competitors are *per se* illegal still stands today. *See*, *e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 909 (2007) (citing *Topco* for the proposition that "sometimes this Court has imposed a rule of *per se* unlawfulness – a rule that instructs courts to find the practice unlawful all (or nearly all) the time"); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990) (territorial restriction imposed by two bar review courses in an exclusive licensing agreement that provided for use of "Bar/Bri" tradename and course materials was *per se* illegal).

---

[7] Defendants purport to distinguish *Sealy* and *Topco* on grounds that those cases did not involve state-regulated industries. Def. Br. at 32. But this is a distinction without a difference here because Defendants' purchase of dental goods and services from the plaintiff Dental Providers is not state-regulated. *See* Point VI, *infra.* Nor do Defendants even suggest (nor could they legitimately) that the conduct alleged here has been approved by any state regulator.

The Seventh Circuit reached the same result in *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir 1984).  There, defendant trucking companies in states across the country created an association and entered into an agreement to "enable each member [to] compete with the national truck-leasing companies, which have their own service depots all over the United States."  *Id.* at 589.  Specifically, "[e]ach [association] member operates under a franchise from the Association that designates the particular location at which he may do business as a National franchisee and forbids him to do business as a National franchisee at any other location."  *Id.* at 590.  Thus, the association's state-level members (like the Delta Dental state members here) had agreed on a territorial market allocation purportedly to unite to compete at a national level.  Judge Posner rejected this attempt to escape *per se* scrutiny, explaining:

> The *per se* rule would collapse if every claim of economies from restricting competition, however implausible, could be used to move a horizontal agreement not to compete from the *per se* to the Rule of Reason category.  We are told, therefore, to apply the *per se* rule when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.  In other words, if the elimination of competition is apparent on a quick look, without undertaking the kind of searching inquiry that would make the case a Rule of Reason case in fact if not in name, the practice is illegal *per se*.

*Id.* at 595 (quotations omitted).  *See also Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (an agreement by competing advertisers "to limit advertising to different geographical regions was intended to be, and sufficiently approximates an agreement to allocate markets so that the *per se* rule of illegality applies.").

In opposing this abundant authority, Defendants rely primarily on *Polk Bros.*, *Inc. v. Forest City Enters.*, 776 F.2d 185 (7th Cir. 1985).  But *Polk Bros.* is distinguishable, because it created an output-increasing joint venture (a combined store where products were complementary) that would not have existed absent the agreed restraint, *id.* at 189-190:  two retailers agreed to build a

single facility large enough to house both stores, where Polk Bros sold "appliances and home furnishings," while Forest City sold "building materials, lumber, tools, and related products," *id.* at 187. The two stores agreed not to compete in the sale of these specific products. *Id.* That is very different from here, where all the Delta Dental State Insurers offer the same product, and simply agree to a naked territorial restraint against competing against each other for the sale of the same product.[8]

Moreover, unlike the territorial restraints here, and those found *per se* illegal in *Sealy, Topco, Palmer*, *General Leaseways* and their progeny, *Polk Bros.* involved, as noted, a shopping facility *that could not exist at all* but for the restraint at issue. This is true as well of other cases Defendants cite. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 103-04 (1984) ("*NCAA*") (horizontal restraints are necessary to foster the amateur character of college football and increase choice for both sports fans and athletes)[9]; *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979) (blanket licenses negotiated by BMI and ASCAP allow broadcasters "unplanned, rapid, and indemnified access to any and all of the repertory of compositions," and copyright owners "a reliable method of collecting for the use of their copyrights").[10]

---

[8] In deciding which standard to apply to the dispute, the Seventh Circuit in *Polk Bros.* began by recognizing that "the *per se* rule is designed for 'naked' restraints" such as territorial allocations or price-fixing. 776 F.2d at 188. Indeed, the Seventh Circuit stressed that the critical first step in determining what standard to apply was to "distinguish[] between 'ancillary' and 'naked' restraints." *Id.* at 190. Finding no naked restraint in the product allocation between the two stores, the Seventh Circuit held that "the court must apply the Rule of Reason to make a more discriminating assessment." *Id.* at 189. Again, *Polk Bros.* has no application where, as here, a naked territorial restraint is at issue.

[9] Defendants cite to various sports league cases throughout their brief. But as the Seventh Circuit noted, such cases are particularly anomalous because the teams making up the leagues "must cooperate to have any product to sell." *See Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992). In this respect, league sports are inherently different from the sale of mattresses, private-label vegetables, or dental insurance, for which cooperation is not essential.

[10] Defendants argue that a territorial restraint was at issue in *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004 (7th Cir. 2012). But the Seventh Circuit made clear that "the main focus of this case" was "shutdown

*North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740 (N.D. Ill. 2005) (cited at Def. Br. at 24-25), belongs to this line of authority where naked restraints were *not* at issue. As with *Polk Bros.*, *Caremark* did not involve a territorial restraint, *id.* at 743, and Rule 12(b)(6) motions were twice denied, *id.* The defendant in *Caremark* was a pharmacy benefit manager that entered agreements with over 1,200 pharmacies nationwide, pursuant to which the pharmacies agreed to provide a discount to *Caremark* customers. *Id.* at 744. The plaintiff pharmacy alleged two violations of the antitrust laws: (i) a conspiracy among plan sponsors (*e.g.*, employers) using Caremark to fix the prices paid independent pharmacies for dispensing prescription drugs to plan subscribers; and (ii) a conspiracy between Caremark and other competing pharmacy benefit managers to fix those same prices. *Id.* As relevant here, the district court held that the price-fixing claim – a "naked restraint" like the market allocation alleged here – was subject to *per se* review. *Id.* at 749. Only the alleged conspiracy between Caremark and plan sponsors, which the district court found was not a naked restraint, was subject to analysis under the Rule of Reason. *Id.* And even as to that allegation, the district court's conclusion turned on whether the defendant had monopsony power, and whether plaintiffs had alleged that the "arrangement purportedly reduces competition." *Id.* The district court found that on the facts alleged, "monopsony … power [was] unlikely" and that plaintiffs had failed to allege any reduction in competition. *Id.* Neither is true in this case: Plaintiffs here have alleged with specificity how and why Defendants' possess monopsony power, CC ¶¶89-92, and how they have used that power to reduce competition, *id.* ¶¶98, 103, 117-139.[11]

---

agreements" that Canadian producers of sulfuric acid imposed on American distributors, not any territorial restraint. *Id.* at 1009. The Seventh Circuit held that because the "shutdown agreements" allowed the Canadian producers to enter the U.S. market, they should be judged under the Rule of Reason notwithstanding that they decreased production by American producers. *Id.* at 1010-1011.

[11] In a footnote, Defendants purport to cite to Supreme Court authority that they claim shows that a territorial restriction can be an "ancillary restraint" subject to Rule of Reason review. Def. Br. at 22, n.11.

Finally, even if Defendants could point to any authority supporting their position that a naked territorial restraint should be considered under the Rule of Reason – which they cannot – Defendants' argument is based on unsupported factual assertions that cannot be reconciled with Plaintiffs' allegations and should certainly be disregarded at the pleading stage.[12]  Plaintiffs have plausibly alleged that patients are harmed – not helped – by the Market Allocation Mechanism because it *reduces* competition.  *See*, *e.g.*, CC ¶129 (alleging that Defendants' practices have "reduced the number of insurance plans available" to patients); *id.* ¶¶7, 98, 134 (alleging that Defendants' practices have raised the premium prices that patients have to pay); *id.* ¶¶98, 103 (alleging that Defendants' practices have reduced the quality and variety of dental care that is provided to patients).[13]  Defendants' conjecture that the Market Allocation Mechanism has purported pro-competitive benefits cannot be credited at the pleading stage over Plaintiffs' well-

---

But none of the cases Defendants cite involved territorial market allocations of the type alleged here.  *See Texaco Inc. v. Dagher,* 547 U.S. 1, 3 (2006) (price fixing claims by joint venture parties in respect of two brands of gasoline); *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756 (1999) (restrictions by dental association on the types of advertising that could be conducted by its members); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 6 (1979) (issuance of blanket licenses for copyright music).

[12]  In deciding motions to dismiss, some trial courts have deferred a determination on whether to apply the *per se* rule until after fact discovery.  *Lumber Liquidators, Inc. v. Cabinets To Go,* No. 3:19-cv-153, *LLC*, 2019 WL 5854067, at  *6 (E.D. Va, Nov. 8, 2019); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1119, 1127, 1131, 1133 (N.D. Cal. 2005); *Kamakahi v. Am. Soc'y for Reprod. Med.*, No. C 11-01781 SBA, 2013 WL 1768706, at *8 (N.D. Cal. Mar. 29, 2013) (collecting cases and finding that "which method of antitrust analysis to apply is premature" at the motion to dismiss stage).  This same is true in authorities cited by Defendants.  *See, e.g.*, *Texaco, Inc. v. Dagher,* 547 U.S. 1 (2006) (antitrust standard decided on summary judgment); *In re Sulfuric Acid Antitrust Litig.,* 703 F.3d 1004 (7th Cir. 2012) (antitrust standard decided on eve of trial after nine years of litigation).

[13]  Defendants' claimed pro-competitive justifications are unconvincing on their face in any event.  For example, Defendants claim that the Market Allocation Mechanism is necessary to prevent free-riding, Def. Br. 23-24, yet there is nothing in the record to suggest the mechanism was created to prevent unaffiliated insurers from taking advantage of the Delta brand or network.  Furthermore, in the absence of the territorial restraint, competition would allow each Delta Dental State Insurer to advertise better service and/or lower premiums than its intra-brand rivals, and brand promotion could be undertaken jointly through the national association.  Similarly, Defendants argue that the mechanism serves to "facilitate closer relationships with local dentists," *id*. at 23, but the fact that scores of dentists have chosen to participate in this and related lawsuits strongly suggests the "close[ness]" of that relationship is not one that dentists believe provides them with increased competitive benefits.

pled allegations to the contrary. *See, e.g., AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011) (on a motion to dismiss, courts accept factual allegations as true and construe them most favorably to plaintiffs); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 754 (N.D. Ill. 2019) (allegations concerning the anticompetitive effects of defendants' conduct are best evaluated after discovery) (citing cases).

### B. Defendants' Price Fixing Mechanism Is *Per Se* Unlawful.

The CC alleges that Defendants have "colluded to use their dominant market position to fix artificially low rates at which they reimburse Delta Dental Providers for goods and services provided to Delta Dental insureds." CC ¶100. The Price Fixing Mechanism alleged is that Defendants "draw upon their access to market rates data for dental goods and services across the U.S. via the records obtained and held by [the DPPA,] an organization controlled by the Delta Dental State Insurers," and then use "these to collectively determine the below market rates they will impose upon the Dental Providers pursuant to the Delta Dental Provider Agreement." *Id.* ¶101; *see also id.* ¶¶2, 22, 75, 100-105, 125. The agreement was implemented through the DDPA by Defendants, "among other things, agreeing on the form of the agreements that the Delta Dental State Insurers enter into with the Delta Providers, sharing their reimbursement data, and policing the reimbursement rates of the other Delta Dental State Insurers," *id.* ¶101, so that Defendants could agree and impose "the lowest and most punitive rates of reimbursement that the Delta Dental Providers are willing to accept." *Id.* ¶125. As a result, Dental Providers are "routinely required to accept a discount of as much as 35%, or more, on market rates from the Delta Dental State Insurers when requesting reimbursement for the goods and services they provide to Delta Dental insureds." *Id.* ¶84.

While not properly submitted on a motion to dismiss, the plain language of the Guidelines that Defendants have submitted with their memorandum only confirms the CC's allegations. ∎

23

 In other

words, Defendants horizontally agreed to set reimbursements well below the average market

rates.

Thus, Plaintiffs have alleged that a group of competitors with market power exchanged

current rate information through an organization that they jointly controlled and used that

information to support and police an agreement to deflate the reimbursement rates paid to Dental

Providers.  The CC pleads that Defendants maintained the database of dental rates and that the

Delta State Insurers all reimbursed at below-market rates.  These allegations are more than

sufficient to support a *per se* violation of Section 1 of the Sherman Act.  *See*, *e.g.*, *U.S. v. Socony-*

*Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("Under the Sherman Act a combination formed for

the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a

commodity in interstate or foreign commerce is illegal per se."); *Vogel*, 744 F.2d at 601 ("[B]uyer

cartels, the object of which is to force the prices that suppliers charge the members of the cartel

below the competitive level, are illegal per se."); *Nat'l Macaroni Mfrs. Ass'n v. F.T.C.*, 345 F.2d

421, 427 (7th Cir. 1965) (finding a buyers' cartel of pasta manufacturers had engaged in a *per se*

price-fixing violation by artificially holding down demand for wheat in order to depress prices);

*Int'l Outsourcing Servs.*, 420 F. Supp. 2d at 864 ("Buyers' cartels engaged in price fixing have been held to be illegal under the Sherman Act even though their goal is to lower the price of the input.").

Defendants assert that Plaintiffs' price-fixing claim is no more than a "pejorative shorthand" for "information exchanges that are integral to the successful operation of the Delta Dental network." Def. Br. at 20. But information exchanges facilitate price fixing by making it easier to reach agreement and by establishing a means by which competitors can monitor compliance with the agreement. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001). *See also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (exchange of price information via trade association led by defendants supported price-fixing claim based on circumstantial evidence); *Haff Poultry, Inc. v. Tyson Foods, Inc.*, No. 17-cv-33, Dkt. No. 268 (E.D. Okla. Jan. 8, 2020) (analyzing *Todd v. Exxon* and finding that plaintiffs had sufficiently pled a claim based on an information exchange under the rule of reason or a facilitating practice to support a *per se* Section 1 claim). Indeed, by claiming that the exchange of pricing information is "integral" to their operation, Defendants confirm the deleterious, anti-competitive effect that exchange has on the reimbursement rates each Delta Dental State Insurer imposes on Dental Providers in its respective area.

The CC is replete with factual allegations that put defendants on notice and push the buyers' cartel price fixing claim well beyond the speculative. Defendant DDPA is not the passive entity portrayed by Defendants. *See* Def. Br. at 20. Rather, as set forth in the CC, the DDPA is the neuro-center and enforcing entity of Defendants' combination and monopsony power, exacting explicit agreements that limit the scope and geographic territory of their dental insurance businesses, CC ¶¶2, 65, 69, 77, 94, 107, 126; ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████, and

requiring Delta Dental State Insurers to police their co-conspirator insurers, through the DDPA, at

the risk of losing their Delta Dental contracts, CC ¶77.

Defendants assert that the CC is conclusory, utilizes empty terms and fails to allege the

who, what, when, how of their Conspiracy. Def. Br. at 19-20. As detailed above, Plaintiffs'

allegations make clear who entered into the agreement (Defendants), what prices they agreed to

fix (below-market reimbursement rates), where the agreements applied (collectively, nationwide),

when Defendants' agreement took place (upon entering the Delta Dental Plans Agreement with

the DDPA and thereafter), and how Defendants agreed on reimbursement rates (by sharing price

data held by DDPA, agreeing the lowest rates Dental Providers in each territory would accept, then

imposing these through the Delta Dental Provider Agreements entered between Delta Dental State

Insurers and Dental Providers). CC ¶¶101-05.

Moreover, "when a conspiracy is secret such details will not be available without

discovery, and thus cannot be required at the pleading stage." *In re Broiler Chicken Antitrust Litig.*,

290 F. Supp. 3d 772, 788 (N.D. Ill. 2017); *see also In re Plasma-Derivative Protein Therapies

Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 n.10 (N.D. Ill. 2011) ("If private plaintiffs, who do not

have access to inside information, are to pursue violations of the law, the pleading standard must

take into account the fact that a complaint will ordinarily be limited to allegations pieced together

from publicly available data."); *In re Text Messaging Antitrust Litig.*, 630 F.3d at 629 ("the district

judge was right to rule that the second amended complaint provides a sufficiently plausible case

of price fixing to warrant allowing the plaintiffs to proceed to discovery.").

### C.     Defendants' Revenue Restriction Mechanism is *Per Se* Unlawful.

Plaintiffs have alleged that Defendants also violated Section 1 by agreeing to restrict the amount of business any Defendant can do in competition with the "Delta Dental" brand.  CC ¶¶1, 6, 106, 109, 126, 132.  Pursuant to the Revenue Restriction Mechanism, the Delta Dental State Insurers have agreed to impose upon one another a limitation on the marketing of non-Delta Dental insurance plans that would compete with Delta Dental plan offerings (their own or those of other Delta Dental State Insurers).  *Id.* ¶6.  The Delta Dental State Insurers also have agreed not to compete in the administration of Delta Dental policies.  *Id.*  A Delta Dental State Insurer will lose its Delta Dental franchise if it conducts too much business under other brands or provides too many administrative services in competition with Delta Dental plans.  *Id.*

As pleaded, the Revenue Restriction Mechanism is an output restriction that limits the supply of competing insurance plans and, among other things, allows the Defendants to increase their market power and set low reimbursement rates to Dental Providers.  An agreement that has the purpose and effect of reducing output is illegal under Section 1 of the Sherman Act.  *NCAA,* 468 U.S. at 99 (1984) ("where the challenged practices create a limitation on output, our cases have held that such limitations are unreasonable restraints of trade"); *Cal. Dental Ass'n v. F.T.C.,* 526 U.S. 756, 777 (1999) (output restrictions are anticompetitive).  Horizontal output limitations "are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high."  *Id. at* 100 (internal quotation and citation omitted); *U.S. v. Andreas*, 216 F.3d 645, 667, 668 (7th Cir. 2000) ("output restrictions have long been treated as *per se* violations.") (internal citations omitted).

As to the Revenue Restriction Mechanism, the CC's detailed factual allegations far surpass the level of detail generally required to defeat a Rule 12(b)(6) motion.  *See*, *e.g.*, *Bausch v. Stryker Corp.*, 630 F.3d 546, 559-561 (7th Cir. 2010) (reversing 12(b)(6) dismissal and finding complaint

fairly put defendants on notice of the claims where details were confidential and inherently awaited discovery). When considering the sufficiency of pleadings, "a plaintiff's pleading burden should be commensurate with the amount of information available to them." *Id*. at 561 (internal quotations and citation omitted). The objective of Fed. R. Civ. P. 8 "is to decide cases fairly on their merits, not to debate finer points of pleading where opponents have fair notice of the claim or defense." *Id*. at 562. (internal quotations and citation omitted).[14]

### D. *Blue Cross* Strongly Supports Plaintiffs' Claim.

*Blue Cross*, 308 F. Supp. at 1241, held that territorial restriction and revenue restriction schemes in the medical insurance industry, similar to the types of schemes alleged here, should be analyzed under a *per se* standard of review. Defendants' efforts to distinguish *Blue Cross* are unavailing.

*Blue Cross* considered claims against the Blue Cross and Blue Shield Association and 36 Member Plans that were in the business of providing health insurance. *Blue Cross*, 308 F. Supp. 3d at 1250. Two alleged classes – one of medical providers like the dental providers here, and one of plan subscribers – brought a variety of antitrust claims against the Blue Plans. *Id*. at 1226. At summary judgment (*i.e.,* long after any motion to dismiss and after both sides had an ample opportunity for discovery), the district court considered (as relevant here) whether two sets of restraints were subject to *per se* review or review under the Rule of Reason. *Id*. at 1277. The first

---

[14] Defendants assert (Def. Br. at 18 n.9) that the CC does not set forth the level of detail present in *In re Blue Cross Blue Shield Antitrust Litig*., 308 F. Supp. 3d 1241 (N.D. Ala. 2018). But *Blue Cross* is a summary judgment decision rendered after full discovery. That level of detail is not required on a motion to dismiss. *See Text Messaging*, 630 F.3d at 629. Defendants also invoke *Kingray, Inc. v. NBA, Inc*., 188 F. Supp. 2d 1177, 1196 (S.D. Cal. 2002), but *Kingray* is inapposite. The *Kingray* plaintiffs were purchasers of bundled televised sports programming who alleged that "black out" dates on televised games were an impermissible output restriction. *Id*. at 1183, 1192-93. Plaintiffs acknowledged that all "blacked out" games in their bundle actually were being televised on other networks or later within their own bundle and that, in fact, more programming was available as a result of the bundling. Under such markedly differences circumstances from those here, the court found plaintiffs did not state an antitrust claim. *Id*. at 1195-96.

restraint – just like the Market Allocation Mechanism alleged here – involved the Blue Plans' agreement "to allocate geographic markets for the sale of commercial health insurance and/or commercial healthcare financing services." *Id*. at 1266. The second restraint – just like the Revenue Restriction Mechanism alleged here – was called the "National Best Efforts" rule and placed "restraints on the Plans' ability to compete" by requiring that no more than one-third of each Plan's revenue be earned from non-Blue insurance products. *Id*. at 1272. Relying on *Sealy* and *Topco*, and rejecting (on a full evidentiary record) nearly identical arguments to those Defendants make here, the district court held that "considered together," this "aggregation of competitive restraints – namely, the adoption of [exclusive service areas] and, among other things, best efforts rules – … constitute a *per se* violation of the Sherman Act." *Id*.

While Defendants seek to distinguish *Blue Cross* on the ground that it involved an "aggregation" of restraints, *see* Def. Br. at 16-17, the CC here likewise alleges an aggregation of restraints: a market allocation mechanism (CC ¶¶93-99), unlawful price-fixing (*id*. ¶¶100-105), and unlawful revenue restrictions (*id*. ¶¶106-109). In this regard, the CC here is even more compelling for *per se* treatment than the claims in *Blue Cross*, because added to similar market allocation and output restrictions in *Blue Cross*, Delta Dental also is alleged to have imposed an explicit price-fixing agreement.[15] Furthermore, *Blue Cross* did not hold that alleged restraints *must* be aggregated, only that an alleged antitrust conspiracy should be analyzed as a whole (and thus the court there declined to express a view regarding whether the individual restrictions utilized

---

[15] The district court in *Blue Cross* found – again at summary judgment – that a third restriction, the BlueCard, should be analyzed under the Rule of Reason. *Id*. at 1269-70. Unlike the Price Fixing Mechanism at issue here, however, BlueCard required participating providers to accept *fixed* reimbursement rates, but there was no allegation that those fixed rates were necessarily below-market and, indeed, BlueCard could result in "*higher-than-average* costs [*i.e.* payments to providers] for health care service." *Id*. at 1276 (emphasis added). Here, in stark contrast, the CC *does* allege in detail that Defendants' price-fixing scheme required dental providers to accept *below-market* payment from Delta Dental. CC ¶¶125-34.

within the alleged conspiracy were each independent *per se* violations). *Blue Cross*, 308 F. Supp. 3d at 1258. In either event, *Blue Cross* plainly supports denial of Defendants' motion to dismiss.

Defendants purport to point out two other "critical differences" between this case and *Blue Cross*. First, Defendants argue that "[u]nlike the *Blues* case, the Delta Dental Member Companies were not using the trademarks in competition with one another prior to the establishment of DDPA; nor did the Delta Dental Member Companies 'surrender[]' any trademark rights to DDPA." Br at 29. Defendants do not explain, however, how or why this distinction matters, nor do Defendants offer any authority supporting the proposition that it should. And there is none. Second, Defendants argue that the *Blues* case "did not follow Seventh Circuit law." Def. Br. at 30. But as discussed in Section I.A, *supra*, there is no authority in *any* circuit – or from the Supreme Court – supporting the proposition that naked restraints like those alleged in the CC should be judged under anything other than a *per se* standard. The conspiracy Plaintiffs describe – which includes allocation of markets, fixing of prices, and restriction of revenues – is a textbook example of practices that would always tend to restrict competition and decrease output and so should be judged under the *per se* standard.

## E.    *Amex*'s Two-Sided Market Analysis Does Not Apply.

Defendants also improperly seek to re-cast the claims here as subject to the "two-sided … 'transaction' platform" analysis applied in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2277 (2018) ("*Amex*"). But *Amex*'s two-sided market analysis does not apply here for at least three separate reasons. *First*, the Supreme Court expressly stated in *Amex* that the analysis it applied there is not appropriate where, as here, a horizontal conspiracy is alleged. *Amex* involved a *vertical* restraint between the credit card company and retail merchants, *id*. 2284. The Supreme Court expressly distinguished *horizontal* collusion "involv[ing] agreements between competitors not to compete in some way," which "typically qualify as unreasonable *per se*," *Amex* at 2283-84, 2285 n.7.

*Second*, in the two-sided credit card market at issue in *Amex*, credit card merchants could not "raise prices on one side without risking a feedback loop of declining demand," *id.* at 2285; *see also see id.* at 2286 ("A market should be treated as one sided when the impacts of indirect network effects and relative pricing in that market are minor."). Here, there are few, if any, such "indirect network effects," because Delta Dental could increase provider payments without raising patient premiums, including by decreasing their excessive executive compensation and capital reserves. CC ¶125. And *third*, unlike the two-sided credit card transaction platform at issue in *Amex*, "where they cannot make a sale to one side of the platform without simultaneously make a sale to the other," *id.* at 2280, here there is no "single, simultaneous transaction" between the dentists, patients, and insurers at issue in this case. Moreover, *Amex* was decided on a full evidentiary record after a seven-week trial, not on a motion to dismiss. *Id.* at 2283.

### 1. *Amex's* Analysis Does Not Apply To The Horizontal Constraints Alleged Here.

The Supreme Court in *Amex* explicitly distinguished between the vertical restraint at issue there, which was to be evaluated under the Rule of Reason, and horizontal restraints "involv[ing] agreements between competitors not to compete in some way," which "typically qualify as unreasonable *per se*," and for which a court "did not need to precisely define the relevant market to conclude that these agreements were anticompetitive." *Amex* 138 S. Ct. at 2283-84, 2285 n.7. Plaintiffs here allege horizontal agreements for which, according to *Amex*, no relevant market, two-sided or one-sided, needs to be defined.

The CC here alleges a horizontal agreement among 39 "competing" Delta Dental State Insurers that collectively amalgamate over 78 million dental insureds nationwide into a buyers' cartel to limit Dental Provider reimbursements to below-competitive pricing levels by capping reimbursements, restricting revenue, and allocating markets. CC ¶¶79, 99-101, 106, 109, 133.

31

*Amex* is inapplicable to such horizontal restraints. *See, e.g., In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 2018 WL 4241981, at *4 (N.D. Cal. Sept. 3, 2018) (rejecting application of *Amex* where "the restraints at issue in this litigation are horizontal agreements among competitors to limit student-athlete compensation, which is alleged to constrain competition among the universities; by contrast, the restraint analyzed in *American Express* was a vertical agreement between a single credit card company, American Express, and the merchants who participate in that credit card company's network, which American Express claimed allowed it to better compete with other credit card companies").

Defendants cite no case where the concept of a two-sided market was applied to preclude application of the *per se* rule to horizontal restraints. Defendants also fail to identify anything in *Amex* that undermines the settled legal principle that a monopsonistic cartel harms competition when it forces artificially low prices on sellers – here the Dental Providers. *See, e.g., West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 101 (3rd Cir. 2010) (complaint sufficiently alleged an anticompetitive restraint of trade where it was alleged that depressed reimbursement rates to doctors were pursuant to a conspiracy in which an insurer with substantial monopsony power created significant entry barriers into the market and left medical providers with few alternative purchasers for their services). Thus, *Amex* has no application to this case.

### 2. The Purchase Of Dental Services Is A One-Sided Market Because Of The Lack Of Indirect Network Effects.

Defendants argue that this case should be treated as subject to *Amex*'s two-sided platform analysis because of "indirect network effects." Def. Br. at 8. Indirect network effects, according to Defendants, are found "where the *value* of the two-sided platform to one group of participants depends on how many members of a different group participate. ... In other words, the *value* of the services that a two-sided platform provides increases as the number of participants on both

sides of the platform increases." *Id.* at 8 (quoting *Amex*, 138 S. Ct. at 2280-81 (emphasis added)). Then, without citation or support (and certainly without a record created through discovery and cross-examination), Defendants simply assert that "[r]aising reimbursement rates to dentists on one side of the platform risks losing subscribers on the other side, who must pay for those increased costs through higher premiums and out-of-pocket costs (*e.g.*, copayments, deductibles, and coinsurance)." *Id.* at 9.[16]

But Defendants' position directly contradicts the CC's allegations, which at this stage must be accepted as true, that the Delta Dental State Insurers in fact could raise reimbursement rates to Dental Providers without also raising patient premiums and out-of-pocket costs (and, as a result, losing subscribers). The CC sets forth specific factual allegations that: (1) insured patients already are overcharged by Defendants; and (2) increased reimbursement rates for Dental Providers would decrease only the excess amounts Delta Dental receives and retains (and pays to its executives or holds as capital reserves). The CC alleges that Delta Dental executives have received lavish executive compensation packages that are out of line with the typical compensation paid in the not-for-profit industry, CC ¶¶111-113, and that the Delta Dental State Insurers have maintained grossly large reserves wholly disproportionate to liabilities, *id.* ¶¶115-116.

Put another way, it is – at a minimum – plausible within the meaning of *Iqbal* and *Twombly* that Delta Dental, to address the anticompetitive conduct alleged here, could reduce excessive executive compensation and unneeded reserves, use the savings to increase reimbursements to Dental Providers, and keep constant (or even decrease) premiums for Delta Dental's insureds. *See*

---

[16]   This statement is also wrong as a matter of economics. Raising reimbursement rates to dentists will increase the supply of dental goods and services. If the supply of dental goods and services increases, then patients will pay less, not more, for those services. And in a competitive market, this should cause premiums to go down, not up.

*West Penn Allegheny Health System.*, 627 F.3d at 101 (rejecting defendant insurer's assertion that it could set lower insurance premiums for consumers because it paid decreased reimbursement rates to doctors, where complaint alleged the insurer pocketed the savings and did not pass them on to consumers). Moreover, any potential increase in insurance premiums may be mitigated or even eliminated by increased competition among Delta Dental State Insurers after abolition of the Market Allocation Mechanism. CC ¶130. Plaintiffs intend to prove that all this is far more than just plausible; it is exactly what *will* happen once Delta Dental's anticompetitive practices are eliminated.

Defendants' assertion that the presence of *any* "indirect network effects" means that a two-sided platform exists is overbroad and unfounded. In *Amex* itself, the Supreme Court observed that even though newspapers sell advertisements – with advertisers on one side of the "platform" and readers on the other – newspaper advertising is ***not*** a two-sided platform: "in the newspaper-advertisement market, the indirect networks effects operate in only one direction; newspaper readers are largely indifferent to the amount of advertising that a newspaper contains." *Amex*, 138 S. Ct. at 2885. As a result, the market for newspaper advertisements was not two-sided within the meaning of the antitrust laws. *Id.* And more broadly, the Supreme Court held that "[a] market should be treated as one sided when the impacts of indirect network effects and relative pricing in that market are minor." *Id.*[17] For all the reasons described, that is exactly the case here.

---

[17] Many industries have distribution channels characterized by distributors purchasing from manufacturers, on the one hand, and selling to retailers or end users on the other. According to Defendants' logic, because distributors sit between manufacturers and retailers – just as credit card companies like American Express sit between retailers and consumers – antitrust claims against distributors should always be considered as involving a two-sided market. But this simply is not the law. *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613-15 (7th Cir. 1997) (reversing summary judgment for drug wholesalers who were alleged by retail pharmacies to have conspired with manufacturers to deny discounts of brand-name drugs); *In re Dental Supplies Antitrust Litig.*, 2016 WL 5415681 (E.D.N.Y. Sept. 28, 2016) (upholding complaint by dentists against distributors of manufactured dental supplies).

### 3. There Is No Single, Simultaneous Transaction And, As A Result, No Two-Sided Transaction Platform At Issue Here

*Amex* found that "two-sided transaction platforms, like the credit-card market . . . facilitate a single, simultaneous transaction between participants." *Amex*, 138 S. Ct. at 2286 (noting that "for credit cards, the network can sell its services only if a merchant and cardholder both simultaneously choose to use the network," and that "whenever a credit-card network sells one transaction's worth of card-acceptance services to a merchant it also must sell one transaction's worth of card-payment services to a cardholder"). There is no such simultaneity with respect to Defendants' sales of dental insurance to policyholders and their purchases of dental goods and services from Dental Providers. Indeed, one leading antitrust expert noted in 2019 that "[p]latforms that 'facilitate a single, simultaneous transaction between participants' . . . *would exclude networks that sell things such as health insurance, where the buyer and seller do not engage in simultaneous transactions on a per-service basis.*" Herbert J. Hovenkamp, *Platforms and the Rule of Reason: The American Express Case*, 2019 Colum. Bus. L. Rev. 35, 54 (2019).[18]

Dental insurance is provided to insureds by an insurance company. CC ¶87. Insureds pay a regular (*e.g.*, monthly) premium for the insurance company to act as their agent to pay in whole, in part, or not at all for dental goods and services at some time other than when the insurance premium is paid. *Id.* ¶¶87, 98 n.5. Dental goods or services are provided by a dentist to his or her patients, each of whom is responsible for paying for those services either directly or through the patient's agent – normally a dental insurance company. *Id.* ¶¶87, 140, 141 & p. 33 n.5. Importantly, Defendants concede that they are "purchasing agents for the consumers of medical

---

[18] Available at https://scholarship.law.upenn.edu/faculty_scholarship/2058 ((quoting *Amex*, page at 2286) (emphasis added)).

[dental] services." Def. Br. at 7 (quoting *Ball Memorial Hosp. v. Mutual Hosp. Ins*, 784 F.2d 1325, 1334 (7th Cir. 1986)).

An insured who pays premiums for dental insurance may never visit a dentist for insured goods or services, or may not do so until weeks, months or years later. Likewise, a dentist may provide dental goods or services but not request or receive reimbursement for those goods or services until days, weeks or months later. CC ¶102. Thus, unlike the credit card transaction platform at issue in *Amex*, here there are no comparable simultaneous transactions at all. *See Amex*, 138 S. Ct. at 2280 (explaining the unique nature of transactional platform as one that requires simultaneous exchanges of equal value between merchants and card holders). In fact, if an insured does not visit a dentist during the policy period, there may be no related transaction at all, let alone a simultaneous one.[19] *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 2018 WL 4241981, at *3 (N.D. Cal. Sept. 3, 2018) (rejecting experts' characterization of a multi-sided national market for college education where there was "no simultaneous interaction or proportional consumption through a platform by different market participants of what essentially constitutes 'only one product'").[20]

---

[19] Defendants (Def. Br. at 8) misrepresent the CC's allegations (¶33 n.5) as "conced[ing]" that every dental insurance transaction *requires* both "(1) patients willing to pay the dental insurer's premiums" in exchange for coverage and access to the provider network, and "(2) dental providers willing to accept" such insurance as payment for the provision of dental services to the patients." *Id.* (Emphasis added). To the contrary, footnote 5 of the CC does no more than describe how dental insurers operate in the two separate markets for (i) the sale of dental insurance, and (ii) the purchase of dental services. Delta Dental State Insurers sell insurance, not dental services, to policyholders in exchange for premiums. A purchaser of a policy may not need or utilize dental services during the policy period, thereby resulting in no reimbursement transaction on the "other side" at all. Thus, any reimbursements by Delta Dental State Insurers do not occur simultaneously with the premiums paid by policyholders to Delta Dental State Insurers.

[20] *Compare US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57-58 (2d Cir. 2019) (finding a two-sided transaction platform in a travel-agency booking system that required simultaneous transactions). The platform at issue in *Sabre* (the "GDS") was used to connect airlines to travel agents. *Id.* at 48-49. The GDS facilitated "simultaneous transactions" between the airlines selling tickets and travel agents buying airline tickets for their clients. *Id.* at 58.

## II.     PLAINTIFFS HAVE SUFFICIENTLY ALLEGED CLAIMS UNDER A "QUICK-LOOK" ANALYSIS

As explained above, the alleged horizontal Conspiracy among Defendants is *per se* unreasonable.  Plaintiffs, however, have also alleged facts supporting the essential elements of a monopsony claim under the alternative "quick-look" analysis. A "quick-look" analysis is warranted when the anticompetitive character of an agreement is so obvious that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Agnew*, 683 F.3d 328, 334-335 (7th Cir. 2012) (citing *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999)); *see also Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955, at *5 (N.D. Ill. June 25, 2018) (same).  In these circumstances, plaintiffs need not show that the agreement had anticompetitive effects on a particular market.  *See NCAA*, 468 U.S. at 109 n.39 ("The essential point is that the rule of reason can sometimes be applied in the twinkling of any eye" because it allows the condemnation of a naked restraint on price or output without an 'elaborate industry analysis.'") (citations omitted); *see also id*. at 109-10 n. 42 ("While the 'reasonableness' of a particular alleged restraint often depends on the market power of the parties involved, because a judgment about market power is the means by which the effects of the conduct on the market place can be assessed, market power is only one test of 'reasonableness.'  And where the anticompetitive effects of conduct can be ascertained through means short of extensive market analysis, and where no countervailing competitive virtues are evident, a lengthy analysis of market power is not necessary.") (citations omitted).

Here, the anticompetitive character of Defendants' Market Allocation, Revenue Restriction, and Price Fixing Mechanisms is so obvious that a detailed market analysis into their anticompetitive effects is unnecessary.  Plaintiffs have alleged an agreement among Delta Dental

State Insurers (who are horizontal competitors) to limit competition for purchase of dental goods and services among the Delta Dental State Insurers within and between each of the territories they have been allocated (CC ¶¶93-99), to place a direct cap on the amount of business that Delta Dental State Insurers can generate under non-Delta Dental brands (CC ¶¶106-109), and to restrict competition between Delta Dental State Insurers by agreeing among themselves to pay low reimbursement rates to Dental Providers and by forcing these rates on the Dental Providers, (CC ¶¶100-105). The anticompetitive effects of these activities can easily be ascertained. *See Agnew*, 683 F.3d at 337 ("'when there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required,' and 'naked restraint[s] on price and output require some competitive justification even in the absence of a detailed market analysis.") (brackets and citations omitted); *see also Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998) ("Under a quick look Rule of Reason analysis, anticompetitive effect is established, even without a determination of the relevant market, where the plaintiffs shows that a horizontal agreement to fix prices exists. . . ."); *NCAA*, 468 U.S. at 108-109 (NCAA's television plan that limited output by capping the number of games that could be televised and fixing a minimum price was anticompetitive even without a detailed market analysis because "restrictions on price and output are the paradigmatic examples of restrains of trade that the Sherman Act was intended to prohibit").

Under the quick-look test, so long as the anticompetitive conduct can be ascertained by the average observer, and there are no valid procompetitive justifications for a defendant's behavior, an assessment of relevant markets and market power is obviated. In that case, an antitrust claim will have been properly alleged. *See* 11 Herbert Hovenkamp, *Antitrust Law*, ¶1911a (2d ed. 2005) ("What [the 'quick-look'] term is intended to connote is that a certain class of restraints, while not

unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive.").

Here, as outlined in Sections I.A thru I.C, *supra*, the CC repeatedly alleges the facially apparent anticompetitive behavior of Defendants. Furthermore, as outlined in Section III.B, *infra*, each of the pro-competitive justifications offered by Defendants is without merit and does not outweigh the anticompetitive effects of their behavior. Indeed, even one with a "rudimentary understanding of economics" can conclude that Defendants' Market Allocation, Price-Fixing, and Revenue Restriction Mechanisms would have an anticompetitive effect on the market for the purchase of dental goods and services. *See* CC ¶¶3-8, 118-122. Thus, a properly pled claim, as stated here, under Sherman Act §1 will be found under the quick-look analysis.

## III. IN THE ALTERNATIVE, PLAINTIFFS' ALLEGATIONS ARE SUFFICIENT UNDER A RULE OF REASON ANALYSIS.

Even under a Rule of Reason analysis (which, for all the reasons discussed above, should not apply here), Plaintiffs properly state a Sherman Act §1 claim. Under a Rule of Reason analysis, a plaintiff must first show that "an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew*, 683 F.3d at 335. Next, "the defendant can show that the restraint in question actually has a procompetitive effect on balance, while the plaintiff can dispute this claim or show that the restraint in question is not reasonably necessary to achieve the procompetitive objective." *Id.* at 335-336 (citing Phillip Areeda, *Antitrust Law,* ¶1507b, at 397 (1986)). Here, Plaintiffs have more than adequately alleged that Defendants' buyers' cartel – and the Market Allocation, Price-Fixing, and Revenue Restriction Mechanisms the cartel uses – have direct anticompetitive effects on the market for the purchase of dental goods and services, which specifically harm Dental Providers in the form of reduced reimbursement rates. The CC also alleges that Defendants' collusion causes the price of dental insurance to be elevated. And the CC

39

alleges that Defendants' claimed procompetitive justifications for their conduct either do not exist at all, or at least do not outweigh the anticompetitive effects of the conduct. Thus, Plaintiffs' Sherman Act claim survives a Rule of Reason analysis as well.

### A. Plaintiffs Have Sufficiently Alleged Direct Anticompetitive Effects on the Market for the Purchase of Dental Goods and Services.

Defendants' horizontal Conspiracy implementing the Market Allocation, Price-Fixing, and Revenue Restriction Mechanisms has direct anticompetitive effects on the market for the purchase of dental goods and services, specifically harming Dental Providers – the sellers in the relevant market. Because of Defendants' monopsony control gained from the horizontal Conspiracy, Defendants have become the dominant purchasers of dental goods and services in the states allocated among the Delta Dental State Insurers. CC ¶¶79, 88-89. Consequently, Plaintiffs and similarly situated Dental Providers are effectively forced to receive as payment for their goods and services the  artificially low reimbursement rates under Delta Dental Plans – routinely discounted as much as 35% compared to market rates. *Id.* ¶¶7, 84, 85.

As detailed above, through the Market Allocation, Price-Fixing, and Revenue Restriction Mechanisms, Defendants have abused their monopsony power, established a buyers' cartel, and imposed below-market reimbursement rates on Dental Providers, who have no practical alternative to accepting patients insured by Delta Dental. *Id.* ¶6. As discussed above, *see* Section I, *supra*, a buyers' cartel like that alleged here exists to *lower*, to below competitive levels, the prices for products and services sold by sellers (here, the Dental Providers) – a *per se* violation of Sherman Act § 1.

These anticompetitive effects must also be considered in a Rule of Reason analysis. *See, e.g.*, *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) ("agreement[s] limiting customer choice by impeding the 'ordinary give and take of the market place,' cannot be sustained under

the Rule of Reason.") (citation omitted); *NCAA v. Bd. of Regents of the University of Oklahoma*, 468 U.S. 85, 107-108 (1984) ("A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law. Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit."); *Generac Corp. v. Caterpillar, Inc.* 172 F.3d 971, 978 (7th Cir. 1999) ("Anticompetitive effect has been described as a reduction of output, increase in price, or deterioration in quality of goods or services."); *Wallace v. Free Software Foundation, Inc.*, 2005 WL 3239208, at *3 (S.D. Ind. Nov. 28, 2005) (citing *Generac Corp.*).

The Supreme Court has held that the exchange of pricing data by competitors with market power also can violate the Sherman Act if shown to have a stabilizing or downward effect on pricing. *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) ("The inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition."). Such information exchanges that facilitate exercise of monopsony buying power can be *per se* violations of the Sherman Act. *See* Transcript of Motion Hr'g at 29-33, 43-50, ECF No. 268, *Haff Poultry, Inc. v. Tyson Foods, Inc.*, No. CIV-17-33-RJS, (E.D. Okla. Feb. 21, 2020) (plaintiffs sufficiently pled a claim based on an information exchange under the Rule of Reason or as a facilitating practice to support a *per se* Section 1 claim). Such information exchanges also can support a claim under the Rule of Reason. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.163 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not *per se* unlawful have consistently been held to violate the Sherman Act."); *Great Atl. & Pac. Tea Co. v. F.T.C.*, 440 U.S. 69, 80 (1979) ("Because of the evils of collusive action, the Court has held that

the exchange of price information by competitors violates the Sherman Act.") (citing *Container Corp.*).[21]

Defendants' argument (Def. Br. at 37-42) that their horizontal Conspiracy does not cause an anticompetitive effect on the market for the purchase of dental goods and services because they do not possess market power is without merit – and also a factual argument that is improper at the motion to dismiss stage. "The Supreme Court has made it clear that there are two ways of proving market power. One is through direct evidence of anticompetitive effects." *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000), citing *F.T.C. v. Ind. Fed'n of Dentists,* 476 U.S. 477, 460-461 (1986). The second is circumstantial, "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case." *Id.*

Plaintiffs have more than plausibly alleged direct evidence of the anticompetitive effects of the Market Allocation, Price-Fixing, and Revenue Restriction Mechanisms on the market for the purchase of dental goods and services, by reducing (i) dentists' reimbursement rates, CC ¶¶130-31, (ii) the amount of business they conduct, *id.* ¶132, (iii) the number of patients they can accept, *id.* ¶133, and (iv) the geographic territory for which they can provide services, *id.* ¶134. The CC also identifies circumstantial evidence of Defendants' market power.

---

[21] *See also Northstar Energy LLC v. Encana Corp.*, 2014 WL 5343423, at *6 (W.D. Mich. Mar. 10, 2014) ("The exchange of information can establish a violation of § 1 of the Sherman Act if it 'produced adverse, anti-competitive effects within relevant product and geographic markets.'"). Defendants cite to *Maple Flooring Mfr.'s Ass'n v. United States*, 268 U.S. 563, 584-85 (1925), an old case standing for the proposition that not all exchanges of information by trade associations are anti-competitive. However, in that case, there was no allegation or proof of any anticompetitive agreement or effect, and therefore it is compatible with the Supreme Court's later holdings on information exchanges.

### 1.     Plaintiffs Sufficiently Allege a Relevant Product Market.

Defendants attempt to reframe the allegations in the CC by mischaracterizing the relevant product market as "group and individual dental insurance," Def. Br. at 38 – a reframing that makes no sense given Plaintiffs are neither buyers nor sellers of those products.  To the contrary, Plaintiffs allege that the relevant product at issue is ***the purchase of dental goods and services***:

> Delta Dental abused its market power to artificially restrain competition for insurance ***with respect to dental goods and services.*** The relevant product market includes insurance provided to dental patients ***who purchase dental insurance for themselves***, or groups ***who purchase dental insurance on behalf of their members***, ***for dental goods and services including, but not limited to, diagnostic routine periodic examinations, bitewings, X-rays, cleanings, fluoride treatments, sealants, space maintainers, minor emergency procedures, fillings, tooth extractions, biopsy of oral tissue, frenectomy, non-surgical periodontics, endodontics, crowns, and dentures.***

CC  ¶87 (emphasis added).  The group and individual dental insurance contracts between Defendants and the insureds are the mechanism that places Defendants, on behalf of insureds, in the position of the purchasers of dental goods and services sold by Plaintiffs.  *Id*. ¶¶2, 71.  Plaintiffs allege that Defendants' created a buyers' cartel and illegally used that monopsony power, and thus are liable under antitrust laws.  *Id*. ¶¶1, 3, 4.

Likewise, Plaintiffs define the Injunction Class as:

> All Dental Providers, not owned, employed by, or involved in the management or directorship of any of the Defendants, who provide ***dental goods or services*** within the United States and were ***reimbursed by a Delta Dental Defendant***.

*Id*. ¶140 (emphasis added).  Plaintiffs define the Damages Class as:

> All Dental Providers, not owned, employed by, or involved in the management or directorship of any of the Defendants, ***who provided dental goods or services*** to a Delta Dental Insured, and ***who were reimbursed directly by a Defendant*** or subject to a Delta Dental Plan Agreement within the United States from October 11, 2015, to the present.

*Id*. ¶141 (emphasis added).

Courts have routinely recognized a relevant product market of dental goods and services. *See*, *e.g.*, *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir. 2004) (defining product market in *Ind. Fed'n of Dentists* as "dental services"); *Cal. Dental Ass'n v. F.T.C.*, 224 F.3d 942, 952 (9th Cir. 2000) ("dental services" was the "precise market at issue in the litigation"); *U.S. v. Healthco, Inc.*, 387 F. Supp. 258, 260 (S.D.N.Y. 1975) ("Dental products are a recognized class of products or line of commerce within the dental industry.").

Furthermore, it cannot be disputed that the goods and services sold by all dental providers within a geographic market are readily interchangeable, whereas they cannot be substituted by goods and services outside of that market. *See Int'l Equipment Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 19, 2013) ( "the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market") (internal citations and quotations omitted). For example, if a dentist does not wish to sell her services for the price offered by Delta Dental, she can turn (at least in theory) to another dental insurance provider, but she cannot try to sell her services to a general health insurance provider let alone to a customer wanting ophthalmological services. Thus, the dental goods and services market is unique, and cannot be interchangeable with goods and services outside of that market.

In any event, market definitions are questions of fact that are inappropriate to resolve on a motion to dismiss. *See*, *e.g.*, *L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632, 638 (N.D. Ill. 1997) (denying motion to dismiss because "market definitions are fact questions, ordinarily determined at trial") (citing *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1329 (7th Cir.1981)). *See also Todd*, 275 F.3d at 199–200 (district court erred in dismissing claim

based on failure to properly plead a relevant market); *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 638 (N.D. Ill. 2015).

### 2. Plaintiffs Sufficiently Allege a Relevant Geographic Market.

Plaintiffs have alleged a relevant geographic market for the sale of dental goods and services as to each of the territories in which the Delta Dental State Insurers conduct business.[22] *See* CC ¶¶88-89, 117, 122-23. "The geographic market selected must … both 'correspond to the commercial realities' of the industry and be economically significant." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 336-337 (1962). The "commercial reality" here is that through the Market Allocation Mechanism, Defendants have created 39 separate markets in which the monopsony power of each of the Delta Dental State Insurers operates. That monopsonistic power is the economically significant fact – and not, as Defendants argue (Def. Br. at 40), whatever limited area a particular Dental Provider draws its patients from. It takes buyers and sellers to make a market, and here it is the geographic reach of the sellers that determines the market.

Thus, Plaintiffs have properly stated a relevant geographic market for acquiring dental goods and services. And, as with the definition of the relevant product market, "because the relevant geographic market is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry, [the court] cannot accept at this point defendants' argument [whether the geographic market has been properly defined] as a proper basis for a motion to dismiss." *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 698 (E.D. Pa. 2007); *see also Alarm Detection Sys.* 129 F. Supp. 3d 614 at 638 ("To the extent [a defendant] challenges the sufficiency of [the alleged geographic market] … for purposes of the

---

[22] The market for the sale of dental goods and services should be contrasted with the nationwide market for dental insurance in which Defendants admit they compete with national insurance companies. CC ¶88; *see* Def. Br. at 2.

antitrust laws, that issue is a deeply fact-intensive inquiry, and courts hesitate to grant motions to dismiss for failure to plead a relevant product market.") (brackets, citations, and internal quotes omitted).

### 3. Plaintiffs Sufficiently Allege Defendants' Market Power.

In support of Defendants' market dominance, Plaintiffs allege:

> Through the above-described anticompetitive practices, and including through their subsidiaries and affiliates, the Delta Dental State Insurers have achieved an unprecedented degree of dominance in the market for dental insurance. They are often the largest providers of dental insurance plans within the territory they have been assigned under the Market Allocation Mechanism, and are often the only viable provider of dental insurance for a patient in a given state.

CC ¶89 (emphasis in original). Defendants' "average market share [for dental insurance] across the whole of the United States remained between 59% and 65% between 2013 and 2017." *Id*. ¶90. This dominant share – and the aggregate purchasing power of more than 78 million insured it entails – enables the buyers' cartel for the purchase of dental goods and services from Dental Providers.

Defendants argue that Plaintiffs failed to allege state-level, or local, market shares. Def. Br. at 41. However, the allegations of an average market share between 59% and 65% across the whole United States, combined with the allegations of the Market Allocation Mechanism, are sufficient on a motion to dismiss to plausibly show that there was market power in each allocated territory without specifying a market share territory by territory.

Defendants further argue that Plaintiffs' allegation that Defendants have between 59% and 66% of the dental insurance market nationwide is inaccurate. *See* Def. Br. at 41. & n.17. But this is a pure question of fact, and Defendants on a motion to dismiss cannot substitute their view of

the facts in place of the view set forth in the CC.[23]  Certainly, Defendants have not challenged the well-pled status of the market share allegations.  The question on a motion to dismiss is whether the CC states a claim, not whether Defendants, without any discovery, can articulate a different set of facts.  *See Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011) ("Our analysis rests on the complaint, and we construe it in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts alleged and drawing all permissible inferences in their favor.").  Plaintiffs' burden is only to plead enough facts to state a claim for relief plausible on its face. *See Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020).[24]

## B.  The Alleged Anticompetitive Effects Outweigh Any Pro-Competitive Market Benefits.

Defendants argue that their anticompetitive horizontal Conspiracy implementing the Market Allocation, Price-Fixing, and Revenue Restriction Mechanisms is ancillary to pro-competitive market benefits, and thus their behavior purportedly is justified under a Rule of Reason analysis.  In so doing, Defendants again ask the Court to accept their reframed factual assertions over those in the CC.

---

[23]  Defendants ignore the allegation that this measure of Defendants' share is conservative, because it does not include the significant revenue Defendants derive through their administration of self-funded ERISA plans and their underwriting for publicly insured programs such as Medicare Advantage and Medicaid.  CC ¶91.

[24]  In this context, Defendants wrongly assert that Plaintiffs have failed to plead any barriers to entry in the market for the purchase of dental goods and services.  *See* Def. Br. at 42.  In fact, the CC alleges that "[t]he Market Allocation Mechanism is anticompetitive because it prevents competition among the Delta Dental State Insurers within and between each of the territories allocated to the Delta Dental State Insurers.  This lack of competition in turn strengthens the market dominance of the Delta Dental State Insurers, *which creates an unfair barrier to entry for non-Delta Dental branded insurance providers seeking to provide dental insurance within the Delta Dental territories*." CC ¶18 (emphasis added).

### 1. The Conspiracy Has No Pro-Competitive Effect on Premiums Charged to Dental Patients.

Defendants argue that their anticompetitive horizontal Conspiracy implementing the Market Allocation, Price-Fixing, and Revenue Restriction Mechanisms is pro-competitive because these Mechanisms enable them to keep the reimbursement rates to Dental Providers low, and thus the premium costs to dental patients low. Def. Br. at 1, 5, 17, 28. According to Defendants, if they increase the reimbursement rates to Dental Providers, they will have to correspondingly raise the premium and out-of-pocket costs to dental patients seeking dental care. In support, Defendants cite to *Brillhart v. Medical Ins. Inc.*, 768 F.2d 196, 200 (7th Cir. 1985) "noting health insurers are 'free to insist upon a lower charge' and pass those savings along to subscribers through lower prices.'" Def. Br. at 1.

However, the CC alleges with specificity that any purported "savings" Defendants generate from the alleged anticompetitive Mechanisms are not passed to dental patients in the form of lower premiums and/or other economic benefits. To the contrary, these "savings" are actually an immense windfall that Defendants use to pay their executives exorbitant salaries and to build and maintain capital reserves far beyond their liabilities. CC ¶¶110, 115. For example, the CC alleges that Defendants' executives receive million, or multi-million, dollar annual compensation, with the CEOs of Delta Dental State Providers in Michigan, Ohio, and Indiana receiving over $15 million in annual salaries, and the CEO of Delta Dental in California receiving over $14 million in total compensation in 2016. *Id.* at ¶¶111-112. In fact, across all 39 Delta Dental State Providers, the average Delta Dental State Insurer CEO compensation in 2016 was $3,145,912, compared to average U.S. not-for-profit CEO compensation during the same time period of $146,653. *Id.* at ¶113.

48

Likewise, with respect to Defendants' over-inflated capital reserves, in 2016, for example, Delta Dental New Jersey had total assets of $321 million, and total liabilities of only $80 million; Delta Dental Illinois had total assets of $145 million compared to total liabilities of only $44.8 million; Delta Dental Plan of Ohio, Inc. had total assets of almost $200 million, and total liabilities of only $37.8 million; and Delta Dental Rhode Island had total assets of almost $114 million, and total liabilities of only $21.8 million. *Id*. ¶115. Indeed, the excessive salaries and bountiful reserves, together, reveal that Defendants' main objective is the generation of supra-competitive profits – not to provide lower premiums or other economic benefits to insureds.

The detailed factual allegations regarding salaries and capital reserves thus are more than sufficient to establish, at least for pleading purposes, that the benefits of suppressing dentist reimbursement below market levels certainly are not passed on to Delta Dental's insureds – and at the very least that there would be substantial leeway for Delta Dental not to raise insurance premiums for insureds in the event Defendants were to raise their reimbursements to Dental Providers to competitive levels.

Moreover, the CC specifically alleges that absent the Defendants' anticompetitive conduct, there would be greater competition for dental insurance and other dental services, which would result in both (i) greater insurance choice and higher rates of reimbursement for dental goods and services provided by dentists and dental practices, and (ii) greater insurance choice and *lower* premiums for dental plan sponsors and members. *Id*. ¶99

> ## 2. Defendants' Abuse of Monopsony Power in the Market for Purchase of Dental Goods and Services Is Not Necessary for Defendants' to Compete in the Separate Nationwide Dental Insurance Market.

Defendants make the wholly unsubstantiated factual assertion that "Plaintiffs' claims would reduce competition in the dental insurance market more broadly" because their "business structure allows it to offer a valuable product that simultaneously provides individuals and

employers with both broad local networks and national coverage – thereby increasing competition with national dental insurance companies and, in turn, reducing the prices that consumers pay." *See* Def. Br. at 2. *See also id.* at 4, 10, 11, 17, 23, 35. Such factual assertions have no place in a 12(b)(6) motion, let alone wholly unsubstantiated assertions of disputed facts. *Cf. General Leaseways, Inc.*, 744 F.2d at 595 (rejecting defendants' argument that territorial restrictions purportedly designed to permit an association to compete nationally are a procompetitive justification for circumventing *per se* scrutiny.)

Here, the CC plausibly explains how dental patients also are harmed by Defendants' conduct, including through suppression of interbrand competition among the Delta Dental State Insurers. *See*, *e.g.*, CC ¶129 (Defendants' practices have "reduced the number of insurance plans available" to patients); *id.* at ¶¶98, 134 (Defendants' practices have raised the premium prices that patients have to pay); *id.* at ¶¶98, 103 (alleging that Defendants' practices have reduced the quality and variety of dental care provided to patients).

Defendants' argument that Plaintiffs allege only *intra*brand competition, and not *inter*brand competition, is also baseless. In *Deslandes*, 2018 WL 3105955, at *8, the plaintiff, a former McDonald's employee alleged that the Defendants, independently owned McDonald's franchises, divided the market for employees by prohibiting restaurants from hiring each other's current or former employees. The Court found that "[i]n the employment market, the various McDonald's stores are competing brands. Dividing the market does not promote intrabrand competition for employees, it stifles interbrand competition." *Id.* The same rationale applies here. In the market for the purchase of dental goods and services, the individual Delta Dental State

Insurers are competing brands. Thus, Defendants' agreement to divide the market for the purchase of dental goods and services stifles interbrand competition for those purchases.[25]

## IV.    PLAINTIFFS SUFFICIENTLY ALLEGE ANTITRUST INJURY

In addressing antitrust injury (Def. Br. at 42-44), Defendants confuse a sellers' cartel (which will raise prices paid by a buyer) with a buyers' cartel (where "the harm caused is not artificially raised prices for consumers, but rather artificially lowered prices for sellers," *see Omnicare*, 524 F. Supp. 2d at 1040 (citing *Vogel*, 744 F.2d at 601)).  Where, as here, a buyers' cartel is alleged, "[the] seller sufficiently alleges antitrust injury by pleading that it has received excessively low prices from members of the buyers' cartel." *Omnicare*, 524 F. Supp. 2d at 1040; *see also Int'l Outsourcing Servs.,* 420 F. Supp. at 865 (antitrust injury pleaded where complaint alleged horizontal price-fixing scheme among buyers to fix reimbursements paid to retailers).

Plaintiffs allege that as a result of Defendants' Conspiracy – involving allocation of markets, fixing of prices, and limiting revenues from non-Delta Dental branded business – Plaintiffs were forced to accept reduced reimbursement rates from Delta Dental State Insurers, the quality and amount of Plaintiffs' business output has been reduced, the number of insurance plans and patients Plaintiffs can accept has decreased, and the geographic territory for which Plaintiffs can provide services has been reduced.  CC ¶¶129-134.  That is antitrust injury.[26]

---

[25]  Defendants' other procompetitive justifications are similarly meritless, and in any event inappropriate to assert on a motion to dismiss.  "Free-riding" (*see* Def. Br. 23-24) is not at issue in this case, because the Revenue Restriction Mechanisms are alleged to force down the price Defendants will pay for goods and services from dentists.  Likewise, no evidence at this stage supports Defendants' bald assertion (*see id.*) that the Market Allocation Mechanism purportedly facilitates closer relationships with local dentists and prevents consumer confusion.

[26]  *Mich. State Podiatry Ass'n v. Blue Cross & Blue Shield of Mich.*, 671 F. Supp. 1139 (E.D. Mich. 1987), quoted by Defendants (Def. Br. at 43), is not on point.  There, plaintiffs failed to show any injury as podiatrists lost no patients and all physicians, not just podiatrists, using the same foot surgery procedures were subject to the same screens. *Id.* at 1151-52.

## V.    PLAINTIFFS SUFFICIENTLY ALLEGE CONCERTED ACTION WITH REGARD TO THE DELTA DENTAL TRADEMARKS

The Defendants seek to exempt themselves from liability by arguing (1) the territorial restrictions at issue are set forth in a licensing agreement governing the use of Delta Dental trademarks; (2) the trademarks are held by a Defendant-controlled group formed for the purpose of allowing the Defendants to cooperate to form larger networks rivalling that of their national competitors; and (3) therefore Defendants have such a closely aligned, unified economic interest in using the Delta Dental marks that they should be treated as one entity incapable of collusion. Def. Br. at 45-46. These arguments, embedded with factual assertions – *e.g.*, "that DDPA is the original (and only) owner of the trademarks," *Id.* at 47-48 & n.19 – are inappropriate on a motion to dismiss.[27]

Moreover, the Supreme Court consistently has rejected the argument that a group of competitors can become a unitary enterprise immune from Section 1 scrutiny merely by using a jointly controlled association or licensing agreement to undertake their otherwise collusive goals. In *Sealy*, defendants were 30 licensees of the Sealy brand and argued that the territorial restrictions in that case were necessary for them to effectively compete on behalf of the Sealy brand. 388 U.S. at 352, 356, n3. Nevertheless, the Supreme Court held that "[t]he territorial arrangements must be regarded as the creature of horizontal action by the licensees. It would violate reality to treat them as equivalent to territorial limitations imposed by a manufacturer upon independent dealers as incident to the sale of a trademarked product." *Id*. at 354. In *Topco*, the supermarket defendants were licensees of the Topco brand, which was created to compete with the private labels of national

---

[27] Defendants also acknowledge that their "unified interest" argument applies *only* to the alleged territorial restraints preventing Defendants from competing with one another; it is not a defense either to the price-fixing allegations or to the Revenue Restriction Mechanism. Def. Br. at 44 n.18.

and large regional chains. *Id.*, 504 U.S. at 598-600. The Supreme Court held that joining together under a single trademark did not shield defendants from antitrust scrutiny: "[competition] cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition . . . ." *Id.* at 610.

Several circuit courts likewise have rejected the spurious assertion that the benefits of cooperation somehow "transform concerted action into unilateral action" that is exempt from antitrust scrutiny. *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 942-43 (6th Cir. 2016); *see also Gen. Leaseways,* 744 F.2d 588 at 594 ("It does not follow that because two firms sometimes have a cooperative relationship there are no competitive gains from forbidding them to cooperate in ways that yield no economies but simply limit competition."); *Fontana Aviation, Inc. v. Beech Aircraft Corp.*, 432 F.2d 1080, 1084 (7th Cir. 1970) ("Agreements or arrangements providing for an aggregation of trade restraints are violative of the act; nor can the restraints of trade be justified as reasonable steps taken to implement a valid trademark licensing system.")

The type of "unified interest" argument Defendants assert here also was rejected in *Blue Cross*, where Defendants argued "that Plaintiffs' Section 1 claims fail as a matter of law because Defendants operate as a single entity with respect to the governance of the Blue Marks." *Blue Cross,* 308 F. Supp. 3d at 1266. *Blue Cross*, relying on *Sealy* and *Topco*, denied Defendants' request for summary judgment on these arguments, observing that "Courts have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Id.*, at 1265-66 (internal quotations and citations omitted).[28]

---

[28] Defendants here attempt to distinguish *Blue Cross* (and *Sealy*) on the grounds that the marks in those cases pre-existed and were surrendered to the jointly controlled associations while here, the marks

Defendants invoke *Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 187 (2010), but the Supreme Court there *reversed* a ruling that members of a football league had a joint economic interest in competing with other forms of entertainment and, therefore, that actions taken to license each team's intellectual property jointly were immune from Sherman Act scrutiny. *Id.* at 204. The Supreme Court, citing *Sealy* and *Topco,* held "members of a legally single entity violate[] § 1 when the entity [is] controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Id.* at 191-92.[29]

The out-of-circuit cases Defendants cite are inapposite. *See Washington v. Nat'l Football League,* 880 F. Supp. 2d 1004, 1005 (D. Minn. 2012) (retired football players alleged NFL and its members violated Sherman Act by refusing to allow them rights to game footage over which the NFL held a copyright; because football game footage depicts players from more than one team, and there is therefore no way to carve out separate rights to that product, there was no restraint that foreclosed competition for a separately marketed product that the defendants would otherwise be free to compete to sell); *Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.,* 407 F.3d

---

purportedly always belonged to the DDPA. As set forth at the outset of this section, and as Defendants concede, this argument is made outside the four corners of the CC and must be tested through discovery. Def. Br. at 47-48, n.19. Regardless, this is a distinction that no court has ever recognized because it makes no functional difference. In neither *Blue Cross* nor *Sealy* was the initial surrendering of the marks a dispositive issue—it was whether the defendants were using a joint venture or third-party intermediary, and the marks held by that intermediary, to engage in collusive conduct. *See, e.g. Blue Cross,* 308 F.Supp.3d at 1264-65. Nor does the distinction answer whether the restraint at issue deprived the market of independent centers of decision-making, and "therefore of actual or potential competition." *Am. Needle,* 560 U.S. at 197 (emphasis added). Here, the Plaintiffs properly have pled that Defendants were independent businesses and potential competitors who, but for restraints that they collectively imposed, could have competed on rates and innovation in the market for health insurance products. Because the CC's well-pled allegations meet the standard articulated by *Sealy, Topco,* and *Am. Needle,* Defendants' concerted actions are subject to scrutiny under Section 1.

[29] In *Am. Needle,* the Supreme Court distinguished its *Copperweld* decision, on which Defendants also rely, holding that a parent and its wholly owned subsidiary were "incapable of conspiring with each other for purposes of § 1." *Am. Needle,* 560 U.S. at 194 (quoting *Copperweld,* 467 U.S. at 777). Here, the 39 separately owned and managed Delta Dental State Providers are not "divisions" of a single corporation.

1027, 1029, 1035 (9th Cir. 2005) (nationwide dog-breeding association and its affiliates could not have conspired within the meaning of Section 1 because they were not "actual or potential competitors" and did not pursue "different economic goals"); *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 276 (8th Cir. 1988) (members of rural electricity cooperative association were not "actual or potential competitors" of each other).

The Supreme Court has found that Defendants' type of "unified interest" argument would mean "members of any cartel could insist that their cooperation is necessary to produce the 'cartel product' and compete with other products," and this is not the law. *Am. Needle*, 560 U.S. at 199.

## VI. THE MCCARRAN-FERGUSON ACT DOES NOT BAR PLAINTIFFS' CLAIMS

The McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq*., has no application here. To begin with, "the statutory language [of McCarran-Ferguson] exempts 'the business of insurance' and not the 'business of insurance companies.'" *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211 (1979). *See also* 15 U.S.C. § 1012(a) (preemption applies to "the business of insurance"). It is "the contractual relationship ***between insurer and insured*** [that is] the essence of the 'business of insurance.'" *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 136 (1982) (emphasis added); *see also S.E.C. v. National Sec., Inc.,* 393 U.S. 453, 459-460 (1969) ("The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these [are] the core of the 'business of insurance.'"). A claim is not subject to McCarran-Ferguson preemption when it is "not . . . a matter predominantly of concern to policyholders alone [but] is at least as important to [others] as it is to those holding the [insurance] policies." *S.E.C.* 393 U.S. 453 at 463.[30] Of course, Plaintiffs' claims here are brought on behalf of Dental Providers, not policyholders.

---

[30] Thus, courts in this District have held dozens of times that claims challenging a wide variety of insurance-related practices are not barred by the Act. *See, e.g., Nandorf, Inc. v. Applied Underwriters*

The Supreme Court has made clear that the "business of insurance" should be narrowly construed. As the Supreme Court recognized in *Royal Drug*, "every business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer." *Royal Drug*, 440 U.S. at 216–17. If the statue were interpreted so expansively, "almost every business decision of an insurance company could be included in the 'business of insurance.' Such a result would be plainly contrary to the statutory language, which exempts the 'business of insurance' and not the 'business of insurance companies.'" *Id*. at 217. In *Pireno*, the Supreme Court held that three factors must be satisfied to qualify a practice as the "business of insurance," including whether the practice: "[1] has the effect of transferring or spreading a policyholder's risk"; [2] "is an integral part of the policy relationship between the insurer and the insured"; and [3] "is limited to entities within the insurance industry." *Id*., 458 U.S. at 129; *see also Am. Deposit Corp. v Schacht*, 84 F.3d 834, 839 (7th Cir. 1996).

None of the three factors articulated by the Supreme Court in *Pireno* for identifying the "business of insurance" are satisfied here. Delta Dental's horizontal allocation, price-fixing, and revenue restriction schemes have no impact on "transferring or spreading a policyholder's risk." *Id*., 458 U.S. at 129. Delta Dental's anticompetitive restraints are not "an integral part of the policy relationship between the insurer and the insured." *Id*. And nothing about Delta Dental's scheme

---

*Captive Risk Assur. Co*., 410 F. Supp. 3d 882 (N.D. Ill. 2019) (Act does not apply to an arbitration clause in a contract between an insurance company and a reinsurance company); *Schilke v. Wachovia Mortgage, FSB*, 758 F. Supp. 2d 549 (N.D. Ill. 2010) (Act does not apply to lender-placed insurance); *Kennedy v. Butler Fin. Solutions, LLC*, 2009 WL 290471 (N.D. Ill. Feb. 4, 2009) (Act does not apply to Magnuson-Moss Warranty Act claims regarding vehicle service insurance contracts); *O'Neil v. Unum Life Ins. Co. of Am.*, 2002 WL 31356453 (N.D. Ill. Oct. 17, 2002) (Act does not apply to a claim under a group life and accidental death and dismemberment insurance policy); *Harris v. Illinois Vehicle Premium Fin. Co*., 2000 WL 1307513 (N.D. Ill. Sept. 12, 2000) (Act does not apply to Truth In Lending Act violations in insurance premium finance contracts); *Pinski v. Adelman*, 1995 WL 669101 (N.D. Ill. Nov. 7, 1995) (Act does not apply to RICO claims); *Ctr. Ins. Agency, Inc. v. Byers*, 1976 WL 1273 (N.D. Ill. June 10, 1976) (Act does not apply to pirating of various trade secrets, confidential information, and marketing information pertaining to an insurance carrier's policy).

is unique or otherwise "limited to entities within the insurance industry." *Id.* As a result, the CC does not assert claims arising from the "business of insurance" and the McCarran-Ferguson Act does not preempt such claims.[31]

In re Insurance Brokerage Antitrust Litigation, 608 F.3d 300 (3d Cir. 2010), is instructive. There, the defendant insurers were accused – as here – of impermissibly entering a horizontal market allocation scheme not to compete for one another's customers. *Id* at 357-58. The Third Circuit held that McCarran-Ferguson preemption did not apply, because "[t]here is nothing about the alleged agreement that is particular to the business of insurance; it is simply an agreement not to compete to sell a particular product to a particular customer." *Id.* at 359. "The mere fact that the product here happens to be insurance is not enough to trigger the McCarran-Ferguson Act's exemptions." *Id.* (internal quotations and citation omitted).

Likewise, *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172 (N.D. Ala. 2016) addressed claims against medical insurance companies similar to the claims against dental insurance companies here. The court there squarely rejected a McCarran-Ferguson defense, holding that allegations of horizontal market allocation, fixing prices, and revenue restriction against the Blue Cross/Blue Shield Plans did not go to the "business of insurance." *Id.* at 1190. *See also id.* at 1192 ("The conduct alleged in the present case – horizontal allocation of geographic markets – is not specific to the insurance industry.")

Defendants argue that their territorial restrictions are exempt from antitrust scrutiny because they purportedly "define the pool of insureds over which risk is spread" and thereby

---

[31] Defendants concede that the CC's "revenue-restriction claim" does not fall within "the business of insurance" and is not barred by the McCarran-Ferguson Act. (Def. Br. at 48). At a minimum, therefore, Defendants admit that their McCarran-Ferguson Act argument has, at best, limited application to Plaintiffs' claims. And having made this concession, Defendants offer no authority for the proposition that this Court is required – on a motion to dismiss under Fed.R.Civ.P. 12(b)(6) – to parse each of Plaintiffs' individual antitrust theories and claims to determine whether the McCarran-Ferguson Act might apply to each.

"delimit[] potential subscribers and encourage[] broad, geographically diverse networks." Def. Br. at 48. But Defendants' assertion has been expressly rejected. In *Royal Drug*, defendant Blue Shield made a similar argument that its restrictive reimbursement agreements with pharmacies "spread risk" and thereby qualified as the "business of insurance" under the McCarran-Ferguson Act. 440 U.S. at 213. The Supreme Court rejected the claim, holding that "[t]he Pharmacy Agreements [] do not involve any underwriting or spreading of risk, but are merely arrangements for the purchase of goods and services by Blue Shield." *Id*. at 214. "The Agreements thus enable Blue Shield to minimize costs and maximize profits. Such cost-savings arrangements may well be sound business practice and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the 'business of insurance.'" *Id*. So too here, while Delta Dental's territorial restraints may be a sound business practice from Defendants' perspective and maximize their profits (by artificially and wrongfully minimizing payments to dentists), they do nothing to spread the risk among insureds. To the contrary, if Delta Dental State Providers were permitted to compete across states for additional insureds, they would have the opportunity to further diversify their risk pool.

Defendants rely on *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928 (9th Cir. 1983). (Def. Br. at 48). But *Feinstein* did ***not*** involve territorial restrictions at all. In that case, a medical association negotiated an "exclusive" contract with an insurance agent to provide medical malpractice insurance; to buy insurance through the agent, a physician was required to be a member of the medical association, but medical association members were free to purchase medical malpractice insurance elsewhere if they chose. *Feinstein*, 714 F.2d at 930. The Ninth Circuit held that the practice involved the "business of insurance" because "[t]he medical association sought to provide a single insurance broker for all of its members in order to assure

coverage for certain high-risk specialties, thereby distributing risk across the membership. The effect is to spread risk across a wide area, and that is precisely what the Supreme Court described when it formulated the risk spreading criterion." *Id*. at 932.

Likewise, no territorial restraint was at issue in *Sanger Ins. Agency v. HUB Int'l, Ltd*., 802 F.3d 732 (5th Cir. 2015) or *Hopping v. Standard Life Ins. Co*., 1983 WL 1946, at *8 (N.D. Miss. Sept. 14, 1983), also cited by Defendants. In *Sanger*, similar to *Feinstein*, plaintiff challenged the defendant's role as the exclusive broker for members of the American Veterinary Medical Association. *Id*. at 736. The court held that the exclusivity arrangement "spread[] risk," including with respect to "significant numbers of small-animal, large-animal, mixed, and equine veterinarians" and thereby constituted the "business of insurance." *Id*. at 743. So too *Hopping* concerned a restriction placed on an insurance agent's activities involved in selling a package of aggregated medical insurance and life insurance products. *Id*., 1983 WL 1946, at *2. Nothing of the sort is at issue here.[32]

---

[32] Besides the territorial restriction, Defendants offer no authority for the proposition that either of the other two restraints alleged in the CC are exempt from scrutiny under the *McCarran-Ferguson* Act:

  (1) Revenue Restriction Mechanism. Defendants concede that the CC's "revenue-restriction claim" does not fall within "the business of insurance" and is not barred by the McCarran-Ferguson Act. Def. Br. at 48.

  (2) Price-Fixing Mechanism. Defendants cite no authority for the proposition that a *per se* price-fixing claim can be subject to the McCarran-Ferguson Act. *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993), cited by Defendants, did not even involve a price-fixing claim, and instead addressed whether an Ohio liquidation law would be preempted in the bankruptcy of an Ohio insurance company. *Id*. at 493.

Defendants also cite *Quality Auto Body Inc. v. Allstate Ins. Co.*, 660 F.2d 1195 (7th Cir. 1981). There, the Seventh Circuit held there was no price-fixing agreement and no antitrust violation, even before deciding whether to apply McCarran Ferguson. To the extent that the court noted in passing, and without substantial analysis, that the McCarran-Ferguson Act also would bar plaintiff's claims, it was mere dicta. *Id*. at 1201. And, in any event, the claim there, unlike here, "directly related to the relationship between the insurer and insured and involved claims procedures, which are an important determinant of commonly made rates and the spreading of risk." *Id*. at 1201 n.4.

Finally, McCarran-Ferguson preemption also does not apply for the independent reason that courts repeatedly have recognized that when the conduct involves agreements or activities spanning multiple states – as Defendants territorial restrictions do here – no single state has the ability to regulate that activity. *See Am. Ins. Ass'n. v. Garamendi*, 539 U.S. 396, 428 (2003) ("McCarran–Ferguson was not intended to allow a State to 'regulate activities carried on beyond its own borders'") (quoting *F.T.C. v. Travelers Health Assn.,* 362 U.S. 293, 300–301 (1960)); *Page v. Liberty Mut, Fire Ins. Co.*, 869 F. Supp. 596 (N.D. Ill. 1994) (McCarran–Ferguson not intended to allow a state to "regulate activities carried on beyond its own borders.")

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' motion to dismiss the Consolidated Complaint should be denied.[33]

---

[33] While for all the reasons stated herein, Plaintiffs respectfully submit that that no grounds exist for dismissal of the CC, Plaintiffs respectfully request an opportunity to amend the CC should the Court determine to dismiss any part of it.

Dated: May 14, 2020                                       Respectfully submitted,

**QUINN EMANUEL URQUHART &**          **WOLLMUTH MAHER & DEUTSCH LLP**
**SULLIVAN, LLP**

By:   */s/ Stephen R. Neuwirth*               By:   */s/ Ronald J. Aranoff*
Stephen R. Neuwirth                          Ronald J. Aranoff
Toby E. Futter                               Cassandra Postighone
Joseph Kiefer                                500 Fifth Avenue – 12th Floor
51 Madison Avenue, 22nd Floor                New York, New York  10110
New York, New York  10010                    Telephone: (212) 382-3300
Telephone:  212 849-7000                      raranoff@wmd-law.com
stephenneuwirth@quinnemanuel.com             cpostinghone@wmd-law.com
tobyfutter@quinnemanuel.com
joekiefer@quinnemanuel.com                   *Interim Co-Lead Class Counsel*


Leonid Feller, P.C.
Athena Dalton
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705-7400
leonidfeller@quinnemanuel.com
athenadalton@quinnemanuel.com

*Interim Co-Lead Class Counsel*

**KAPLAN FOX & KILSHEIMER LLP**        **SPECTOR ROSEMAN & KODROFF, P.C.**
Robert N. Kaplan                             Eugene A. Spector
Gregory Arenson                              Jeffrey L. Spector
Elana Katcher                                William G. Caldes
850 Third Avenue                             2001 Market Street, Suite 3420
New York, New York 10022                     Philadelphia, PA 19103
Telephone: (212) 687-1980                    Telephone: (215) 496-0300
rkaplan@kaplanfox.com                        espector@srkattorneys.com
garenson@kaplanfox.com                       jspector@srkattorneys.com
ekatcher@kaplanfox.com                       bcaldes@srkattorneys.com

*Chair, Plaintiffs' Interim Executive*       *Member, Plaintiffs' Interim Executive*
*Committee*                                  *Committee*

**MALKINSON & HALPERN, P.C.**
John R. Malkinson
33 North Dearborn Street, Suite 1540
Chicago, IL 60602
Telephone: (312) 427-9600
jmalkinson@mhtriallaw.com

*Member, Plaintiffs' Interim Executive*
*Committee*

**RADICE LAW FIRM**
John Radice
April Dawn Lambert
475 Wall Street
Princeton, NJ 08540
Telephone (312) 339-7140
radice@radicelawfirm.com
alambert@radicelawfirm.com

*Member, Plaintiffs' Interim Executive*
*Committee*

**CARNEY, BATES, AND PULLIAM,**
**PLLC**
William P. Creasman
519 W. 7th St.
Little Rock, Arkansas 72201
Telephone: (501) 312-8500
wcreasman@cbplaw.com

*Counsel for Plaintiffs*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Stephanie M. Beige
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
bernstein@bernlieb.com
beige@bernlieb.com

*Counsel for Plaintiffs*

**PRETI, FLAHERTY, BELIVEAU &**
**PACHIOS, LLP**
Gregory P. Hansel
Randall B. Weill
Michael S. Smith
Elizabeth F. Quinby
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com
equinby@preti.com

*Member, Plaintiffs' Interim Executive*
*Committee*

**KELLER ROHRBACK L.L.P.**
Mark A. Griffin
Raymond Farrow
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
mgriffin@kellerrohrback.com
rfarrow@kellerrohrback.com

*Counsel for Plaintiffs*

**MCLAFFERTY LAW FIRM, P.C.**
David P. McLafferty
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 940-4000 ext. 12
dmclafferty@mclaffertylaw.com

*Counsel for Plaintiffs*

**FREED KANNER LONDON & MILLEN LLC**
William H. London
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
wlondon@fklmlaw.com

*Counsel for Plaintiffs*

**REINHARD WENDORF & BLANCHFIELD**
Garrett D. Blanchfield, Jr.
Brant D. Penney
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: (651) 287-2100
Facsimile: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

*Counsel for Plaintiffs*

**BERGER MONTAGUE PC**
Eric L. Cramer
Patrick F. Madden
Richard D. Schwartz
Joshua T. Ripley
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tele: (215) 875-3000
Fax: (215) 875-4604
Email: ecramer@bm.net
Email: pmadden@bm.net
Email: rschwartz@bm.net
Email: jripley@bm.net

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Leonid Feller, an attorney, hereby certify that on May 14, 2020, I caused a copy of the foregoing Memorandum Of Law In Opposition To Defendants' Motion To Dismiss Plaintiffs' Consolidated Complaint to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.

DATED:  May 14, 2020

*Leonid Feller, P.C.*
Leonid Feller, P.C.
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191. N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7484
Facisimile: (312) 705-7401
E-Mail: leonidfeller@quinnemanuel.com

*Attorney for Plaintiffs*