**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**


IN RE DELTA DENTAL
ANTITRUST LITIGATION

_____

)  No. 1:19-cv-06734
)
)  MDL No. 2931
)
)  Hon. Elaine E. Bucklo


**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

I.   PLAINTIFFS ALLEGE NO "REVENUE RESTRICTION" OR "PRICE FIX." ................ 3

    A.   Plaintiffs Do Not Plead Facts To Show A "Revenue Restriction." ............................... 4

    B.   Plaintiffs Do Not Plead Facts That Plausibly Allege "Price-Fixing." ........................... 5

II.  THE "MARKET ALLOCATION MECHANISM" IS NOT *PER SE* ILLEGAL. ................. 7

    A.   The Ancillary-Restraint Doctrine Controls Here. ........................................................ 8

    B.   Delta Dental's Network Structure Is Ancillary To Procompetitive Purposes. ............. 11

    C.   Plaintiffs' Counter-Arguments Are Unavailing. .......................................................... 13

    D.   *AmEx* Confirms That *Per Se* Treatment Is Inappropriate. ........................................ 17

    E.   The Court Should Dismiss The *Per Se* Claims Now. .................................................. 19

III. THE RULE-OF-REASON CLAIM FAILS TO ALLEGE PROPER MARKETS. ............... 21

    A.   Plaintiffs Fail To Allege Harm To Both Sides Of The Market. ..................................... 21

    B.   Plaintiffs Cannot Rewrite Their Product And Geographic Market Definitions. ........... 22

    C.   Plaintiffs Do Not Allege Market Power. ...................................................................... 23

IV.  PLAINTIFFS' CLAIMS FAIL FOR THREE OTHER INDEPENDENT REASONS. ........ 23

    A.   Plaintiffs Do Not Allege Antitrust Injury. .................................................................... 23

    B.   Plaintiffs Do Not Allege Concerted Action. ................................................................ 24

    C.   The McCarran-Ferguson Act Bars Plaintiffs' Claims. ................................................. 25

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Needle v. NFL, Inc.*,
    560 U.S. 183 (2010) ............................................................................................. *passim*

*Arrington v. Burger King Worldwide, Inc.*,
    2020 WL 2479690 (S.D. Fla. Mar. 24, 2020) ......................................................... 25

*Augusta News Co. v. Hudson News Co.*,
    269 F.3d 41 (1st Cir. 2001) .................................................................................... 11

*Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
    784 F.2d 1325 (7th Cir. 1986) ................................................................................ 24

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
    166 F. Supp. 3d 988 (N.D. Cal. 2015) ............................................................... 6, 23

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................... 3, 5, 6

*Bissessur v. Indiana Univ. Bd. of Trs.*,
    581 F.3d 599 (7th Cir. 2009) .................................................................................... 5

*In re Blue Cross Blue Shield Antitrust Litig.*,
    308 F. Supp. 3d 1241 (N.D. Ala. 2018) .......................................................... 4, 7, 25

*Brillhart v. Mutual Med. Ins., Inc.*,
    768 F.2d 196 (7th Cir. 1985) .................................................................................. 24

*Broadcast Music, Inc. v. CBS*,
    441 U.S. 1 (1979) ................................................................................... 8, 9, 15, 16

*California Dental Ass'n v. FTC*,
    526 U.S. 756 (1999) ............................................................................................. *passim*

*Car Carriers, Inc. v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ................................................................................ 19

*Chi. Prof'l Sports Ltd. P'ship v. NBA*,
    754 F. Supp. 1336 (N.D. Ill. 1991), *aff'd*, 961 F.2d 667 (7th Cir. 1992) ................ 15

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ............................................................................................ *passim*

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

<u>Cases</u>

*Copperweld Corp. v. Independence Tool Works*,
467 U.S. 752 (1984)................................................................................8, 9

*Deslandes v. McDonald's USA, LLC*,
2018 WL 3105955 (N.D. Ill. June 25, 2018) .........................................20

*Feinstein v. Nettleship Co. of Los Angeles*,
714 F.2d 928 (9th Cir. 1983) .................................................................25

*General Leaseways v. National Truck Leasing Ass'n*,
744 F.2d 588 (7th Cir. 1984) ...........................................................10, 16

*Goldberg v. 401 N. Wabash Venture LLC*,
2010 WL 1655089 (N.D. Ill Apr. 22, 2010) ...........................................5

*Group Life & Health Ins. Co. v. Royal Drug Co.*,
440 U.S. 205 (1979)................................................................................25

*In re Humira (Adalimumab) Antitrust Litig.*,
2020 WL 3051309 (N.D. Ill. June 8, 2020) ...........................................20

*In re Insurance Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)....................................................................25

*Int'l Outsourcing Servs., LLC v. Blistex, Inc.*,
420 F. Supp. 2d 860 (N.D. Ill. 2006) .....................................................24

*J&S Cmty. Pharmacy Inc. v. Prime Therapeutics LLC*,
2018 WL 4871137 (N.D. Ill. Aug. 16, 2018) .........................................23

*Kendall v. Visa, U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .................................................................6

*Levine v. Central Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996) .................................................................7

*NCAA v. Board of Regents of University of Okla.*,
468 U.S. 85 (1984)........................................................................ *passim*

*North Jackson Pharmacy, Inc. v. Caremark Rx, Inc.*,
385 F. Supp. 2d 740 (N.D. Ill. 2005) ...............................................11, 24

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

**Cases**

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ................................................................................ *passim*

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990) ................................................................................................14

*Peaceable Planet, Inc. v. Ty, Inc.*,
    362 F.3d 986 (7th Cir. 2004) ..............................................................................13

*Polk Bros, Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) ......................................................................... *passim*

*Prescient Med. Holdings, LLC v. Lab. Corp. of Am. Holdings*,
    2019 WL 635405 (D. Del. Feb. 14, 2019) .........................................................23

*In re Processed Egg Prods. Antitrust Litig.*,
    — F.3d —, 2020 WL 3407761 (3d Cir. June 22, 2020) .......................................4

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ............................................................................16

*Rozema v. Marshfield Clinic*,
    977 F. Supp. 1362 (W.D. Wis. 1997) ...............................................................11

*Seasongood v. K & K Ins. Agency*,
    548 F.2d 729 (8th Cir. 1977) ..............................................................................25

*In re Sulfuric Acid Antitrust Litig.*,
    703 F.3d 1004 (7th Cir. 2012) ....................................................................... *passim*

*Tennessean Truckstop, Inc. v. NTS, Inc.*,
    875 F.2d 86 (6th Cir. 1989) ................................................................................19

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) .......................................................................................... *passim*

*In re Text Messaging Antitrust Corp.*,
    630 F.3d 622 (7th Cir. 2010) ................................................................................5

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ..................................................................................5

# TABLE OF AUTHORITIES (continued)

**Page(s)**

**Cases**

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
  552 F.3d 430 (6th Cir. 2008) .......................................................................................6

*United States v. Sabre Corp.*,
  2020 WL 1855433 (D. Del. Apr. 7, 2020) .............................................................18

*United States v. Sealy, Inc.*,
  388 U.S. 350 (1967).............................................................................. *passim*

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972).............................................................................. *passim*

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978)...................................................................................5

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019)......................................................................18

*Washington v. NFL*,
  880 F. Supp. 2d 1004 (D. Minn. 2012)..................................................24

**Statutes and Regulations**

26 C.F.R. § 53.4958-6(c)(2)(i)...................................................................22

## INTRODUCTION

Plaintiffs' Complaint is not only legally deficient but divorced from antitrust law's primary purpose: promoting interbrand competition. If successful, Plaintiffs' claims would lead to the dismantling of a longstanding procompetitive joint venture, reduction of insurance plans available to multistate employers and their employees, and an increase in prices for customers—all in the name of increasing the compensation paid to dentists.

The Complaint suffers from a variety of fatal deficiencies that mandate its dismissal. First among these is Plaintiffs' failure to plausibly allege a Section 1 claim under the *per se* rule. That narrowly-applied standard prevents defendants from demonstrating that their business structure and practices are procompetitive. Because of these extreme consequences, the Supreme Court and Seventh Circuit have held that application of the *per se* rule is an "unusual step" that should not be taken unless the restraint is "so likely to be anticompetitive that there is no point in searching for a potentially beneficial instance." *Polk Bros, Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (citing *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 47-51 (1977)). For that reason, the *per se* rule does not apply if the restraints at issue are even "arguably" ancillary to a procompetitive purpose. *Id.* That is particularly true of rules that accompany a joint venture. *Id.* at 188 ("[j]oint ventures . . . are assessed under a Rule of Reason").

Here, Plaintiffs' own allegations establish, as a matter of law, that the *per se* rule does not apply to Defendants. The Complaint concedes the challenged practices are ancillary to a joint venture that "[f]rom its creation . . . worked to coordinate dental benefit programs for Delta Dental customers (and potential customers) that had employees in multiple states." Dkt. 96 ("Cmplt.") ¶ 73. As Plaintiffs acknowledge, Delta Dental Member Companies are state-based insurers with strong *local* networks of dental providers. *Id.* ¶¶ 71-72. Employers with employees in multiple states, however, require dental coverage with a *national* network that allows employees to see

dentists where they live. Member Companies work collaboratively to establish a national network to provide such coverage. Without their joint venture, the local nonprofit Member Companies could not compete against national for-profit insurers. As the Complaint recognizes, each Member Company contributes one of its most valuable assets to the joint venture—its network of local providers. *Id.* ¶¶ 73-74. By working together, Member Companies can market and provide dental insurance plans under a common brand name that offers national coverage. This increases the supply of national dental plans and improves competition with national for-profit companies.

Plaintiffs' effort to dismantle the Delta Dental business model and render it unlawful *per se* rests almost entirely on their misreading of two Supreme Court cases, *Sealy* and *Topco*, decided half a century ago. *See* Dkt. 275 ("Opp.") 16-18. But Plaintiffs ignore decades of subsequent Supreme Court and lower court precedent that makes clear that *Sealy* and *Topco* do not apply to joint ventures like Delta Dental. Plaintiffs also claim that Defendants' argument rests on disputed assertions of fact. *Id.* 1. This conflates the merits of Defendants' procompetitive justifications with a threshold question: the proper mode of analysis. The Court need not decide now whether the challenged restraints are *in fact* procompetitive. Rather, if the restraints are even "*arguably*" "part of a cooperative venture with prospects for increasing output," *Polk Bros.*, 776 F.2d at 189 (emphasis added), then the *per se* rule does not apply as a matter of law and Defendants are entitled to have their justifications heard. Defendants easily pass that low threshold here. Indeed, even the face of the Complaint pleads restraints ancillary to a joint venture that facilitates competition for the sale of dental insurance to multistate accounts. Cmplt. ¶ 73.

Moreover, the *per se* rule is inapplicable as a matter of law for a separate reason: dental insurance is a quintessential two-sided platform market as recognized in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*AmEx*"). Dental insurers must balance how to price what they offer

both to patients and dentists because without both sides' participation they have nothing of value to sell to either. Cmplt. ¶ 98 n.5. *AmEx* mandates that any alleged restraints on competition in a two-sided market can only be "assessed" by closely "[e]valuating both sides" of the platform. 138 S. Ct. at 2287. Such an assessment is antithetical to the *per se* rule.

Plaintiffs' failure to plausibly allege a *per se* violation of the antitrust laws is the most significant of the Complaint's shortcomings, but by no means the only deficiency. Plaintiffs do not and cannot plead facts to support two of the so-called "restraints" at issue. Dkt. 243 ("Mem.") 16-21. Nor do they allege the necessary elements of the alternative claim under the rule of reason. *Id.* 34-42. Finally, the Complaint fails to plead antitrust injury or concerted action, and Plaintiffs' claims fall squarely within the McCarran-Ferguson Act exemption. *Id.* 42-50.

## I.     PLAINTIFFS ALLEGE NO "REVENUE RESTRICTION" OR "PRICE FIX."

Although Plaintiffs purport to allege a conspiracy based on "three interrelated mechanisms," Opp. 16, their Opposition confirms they cannot allege a single *fact* supporting the existence of "revenue restrictions" or "price fixing." They thus fail to meet the requirements of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), by a wide margin. These allegations are not only conclusory, they are affirmatively *contradicted* by the "Delta Dental Plan Agreement" cited in the Complaint as the purported source of the restrictions. Plaintiffs shift course by now claiming the Agreement does not refer to a single document but rather a "series of agreements." Opp. 9. Yet that is directly contrary to their own Complaint, which refers to the Agreement as "*a* contract" under which Member Companies "are allowed to conduct marketing and advertising using the Delta Dental trademarks and copyrights." Cmplt. ¶ 2, 77 (emphasis added). Only one document matches Plaintiffs' description—the Membership Guidelines. Mem., Ex. A (Dkt. 244).[1]

---

[1] Plaintiffs are flatly incorrect that Defendants' submission of the Membership Guidelines "conflict[s]" with pleading standards. Opp. 13-14. The Membership Guidelines are the *express basis* for the supposedly

Plaintiffs also urge the Court to view the alleged conspiracy "as a whole" instead of "disaggregat[ing]" individual restraints. Opp. 12-13. But the Complaint itself contends that the three "mechanisms" are separate antitrust violations. Cmplt. ¶¶ 118-21, 157-58. What is more, the Third Circuit recently rejected this same argument from these very same Plaintiffs' counsel, holding that a plaintiff's "characterization of the defendants' conduct—whether as a single overarching conspiracy or as three separate conspiracies—does not determine how a court is to assess differing actions that the defendants are accused of taking." *In re Processed Egg Prods. Antitrust Litig.*, — F.3d —, 2020 WL 3407761, at *6 (3d Cir. June 22, 2020).

## A. Plaintiffs Do Not Plead Facts To Show A "Revenue Restriction."

Plaintiffs assert that the "Delta Dental Plan Agreement" imposes a "direct cap" on the revenue Member Companies can generate under their second-brand businesses. Cmplt. ¶¶ 106-07, 119. It is unsurprising that Plaintiffs want to bring such a claim: they admittedly mimic their case after the *Blues* litigation (Opp. 29), where the court found revenue restrictions critical to the application of the *per se* rule. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1272-73 (N.D. Ala. 2018) ("*Blues II*"). Unlike in *Blues*, however, Plaintiffs cannot allege any *facts*. They cannot tell the Court or Defendants where the alleged restrictions are found, what the restrictions are, or how they limit the sale of second-brand products. Indeed, Defendants have supplied the "Delta Dental Plan Agreement" described in the Complaint, and Plaintiffs *still* cannot point to anything remotely resembling a "revenue restriction"—because no such restriction exists.

With nothing else for support, Plaintiffs accuse Defendants of "cherry-picking" documents and claim to need discovery to "assess[]" whether revenue restrictions exist elsewhere. Opp. 9 n.2, 13, 14. That is nothing short of an admission that their Complaint is deficient. As the Seventh

---

unlawful restrictions, and the Seventh Circuit has repeatedly held that courts can consider documents central to the complaint on a motion to dismiss. Mem. 12 n.4 & 14.

Circuit has held, the position "that the exact details of the contract will become clear during discovery runs counter to the holding of *Twombly*, which dictates that the complaint itself must contain sufficient factual detail to describe the parameters of the contract before discovery may commence." *Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009). It is Plaintiffs' responsibility to include such detail in their Complaint. *Id.*; *see also Goldberg v. 401 N. Wabash Venture LLC*, 2010 WL 1655089, at *5 (N.D. Ill Apr. 22, 2010) ("the Supreme Court has roundly rejected [the] contention that the pleading requirements are relaxed when a plaintiff has not yet had an opportunity to conduct discovery"). Under *Twombly*, their failure to do so forecloses a fishing expedition to support conclusory (and false) claims.

## B. Plaintiffs Do Not Plead Facts That Plausibly Allege "Price-Fixing."

Plaintiffs also do not plead an agreement to fix prices. At most, they have alleged that Defendants share provider reimbursement rates and other information through the National Provider File ("NPF"). But as all parties agree, information exchanges are not *per se* unlawful or equivalent to fixing prices. Mem. 21 (citing *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)); Opp. 41 (same). While Plaintiffs argue that information exchanges can sometimes *support* an inference of price fixing, Opp. 25-26, that is true only where there are other non-conclusory allegations to support the claim.[2] Unlike the cases cited in their brief, Plaintiffs' price-fixing allegations rest solely on the Member Companies' alleged "access to market rates." Cmplt. ¶ 101. And here there is an "obvious alternative explanation" for the alleged information sharing, *Twombly*, 550 U.S. at 567: the NPF is procompetitive. As Plaintiffs admit, it enables "centralize[d] administration" of national accounts and allows Member Companies to provide coverage for

---

[2] *E.g.*, *In re Text Messaging Antitrust Corp.*, 630 F.3d 622, 627-28 (7th Cir. 2010) (alleging "mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion" and "historically unprecedented changes in pricing"); *Todd v. Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001) (analyzing information exchange under rule of reason where there were no well-pled facts of a price fix).

"organizations with employees and subscribers located in multiple states." Cmplt. ¶ 75. Plaintiffs never explain how sharing information for these legitimate purposes—as explicitly authorized by numerous state statutes, *see* Mem. 10—in any way suggests a "price fix."

Moreover, to the extent Plaintiffs try to allege an *actual* price agreement, as opposed to an information exchange, they do not dispute that, to survive dismissal, they must plead facts showing the "who, what, when, where, and how" of the "price-fixing mechanism." Mem. 26. Plaintiffs argue the Complaint satisfies this obligation by identifying the who ("Defendants"), what ("below-market reimbursement rates"), when ("upon entering the Delta Dental Plans Agreement . . . and thereafter"), where ("nationwide"), and how ("sharing price data," "agreeing [upon] the lowest rates" dentists would accept, and "imposing these through the Delta Dental Provider Agreements"). Opp. 26. These are, however, exactly the sort of generic allegations that courts find insufficient to state a price-fixing claim. *E.g.*, *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 995 (N.D. Cal. 2015) (rejecting allegations of "Defendant Insurers" as the "who," "early 2010 and continuing thereafter" as the "when" and "restrict[ing] patient choice as to the selection, price and quality of surgical facilities" as the "what"); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (similar).[3]

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[3] Instead, to bring a price-fixing claim, "the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall v. Visa, U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 565 n.10). Plaintiffs do not come close to meeting that standard.



[4]

"[I]t would be inconsistent" with the Supreme Court's precedents "to condemn the internal pricing decisions of a legitimate joint venture as *per se* unlawful." *Dagher*, 547 U.S. at 7; *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1013 (7th Cir. 2012) (coordinated pricing activities among joint venturers are subject to rule of reason). Even the case Plaintiffs use as a supposed template recognized that "[p]ricing decisions within a legitimate joint venture between competitors . . . do not constitute *per se* violations of the Sherman Act." *Blues II*, 308 F. Supp. 3d at 1275.[5]

## II.  THE "MARKET ALLOCATION MECHANISM" IS NOT *PER SE* ILLEGAL.

Plaintiffs' remaining allegations focus on Defendants' decision to structure their joint venture through territorial rights that make the venture more efficient and increase its ability to compete with national insurers. A joint venture's use of such a business model does not constitute a *per se* violation of the antitrust laws.

---

[4] A "method of negotiating fees, in which the payors decide the maximum amount they are willing to reimburse providers for medical services and providers decide whether they are willing to accept that limitation on the reimbursement they receive, is a kind of 'price fixing,' but it is a kind that the antitrust laws do not prohibit." *Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1548 (11th Cir. 1996). That does not change simply because Defendants act through a joint venture. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006) (rejecting claim that the Equilon joint venture fixed prices because "though Equilon's pricing policy may be price fixing in a literal sense, it is not price fixing in the antitrust sense").

[5] Plaintiffs claim that *Blues* involved "no allegation" that providers were forced to accept "necessarily below-market" rates. Opp. 29 n.15. But the provider-plaintiffs in the *Blues* case made just such allegations. *E.g.*, *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000 (N.D. Ala.), Dkt. 86 ¶ 7 ("the Blue Card program . . . makes those below-market rates available to all other Blues"), ¶ 212 (the "price fixing Blue Card regime" allowed defendants to "force Providers to join their network at below market rates").

### A.      The Ancillary-Restraint Doctrine Controls Here.

As Plaintiffs concede, the rule of reason is the presumptive standard under Section 1. The *per se* rule only applies to "naked" horizontal price-fixing and market division agreements—that is, agreements that "do[] nothing but suppress competition" and are ***not*** part of a larger "endeavor whose success they promote." *Polk Bros.*, 776 F.2d at 189. By contrast, restrictions among joint venture members that "arguably" further the legitimate interests of their integration are considered "ancillary" and "must" be evaluated under the traditional rule of reason. *Id*. at 188-89. Beginning with *GTE Sylvania* (1977) and continuing through *Broadcast Music, Inc. v. CBS*, 441 U.S. 1 (1979) ("*BMI*"), *NCAA v. Board of Regents of University of Okla.*, 468 U.S. 85 (1984), *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999), *Dagher* (2006), and *American Needle v. NFL, Inc.*, 560 U.S. 183 (2010), the Supreme Court has consistently applied the rule of reason in cases that literally involved price-setting or other forms of *per se* restrictions on horizontal competition, where the restraints were part of some broader productive integration, such as a joint venture. The Court made the reason for that approach explicit in *Copperweld Corp. v. Independence Tool Works,* 467 U.S. 752, 768 (1984): "joint ventures . . . hold the promise of increasing a firm's efficiency and enabling it to compete more effectively" and are accordingly "judged under a rule of reason."

Here, Plaintiffs fail to explain why the ancillary-restraint doctrine does not apply or why the use of territorial rights does not arguably promote the success of the Delta Dental joint venture. Plaintiffs assert that "Defendants offer no authority for the proposition that 'ancillary' competitive benefits . . . can justify a naked horizontal territorial restraint." Opp. 17. But that simply begs the very question to be answered. The whole point of the ancillary-restraint inquiry is to determine *whether* there is a plausible justification for the challenged restraint—*i.e.*, a horizontal territorial restraint is "naked," rather than "ancillary," only if there are no plausible procompetitive benefits. A court "must distinguish between 'naked' restraints, those in which the restriction on competition

is unaccompanied by new production or producers, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote." *Polk Bros.*, 776 F.2d at 188-89.

Plaintiffs note that the Supreme Court decisions cited by Defendants did not involve a market division agreement, Opp. 21-22 n.11, but that makes no difference. *BMI*, *California Dental*, *NCAA*, and *Dagher* involved horizontal pricing or output restraints which (absent ancillarity) are also *per se* illegal. Indeed, *American Needle* involved a customer restraint directly analogous to a territorial market division, yet the Court remanded the case for trial under the rule of reason, 560 U.S. at 203-04, indicating that it considered the *per se* issue not even worthy of comment.

Ultimately, however, Plaintiffs' position that the ancillary-restraint doctrine does not apply to market division agreements crumbles in the face of Seventh Circuit authority that holds that price fixing and "*other agreements* that restrict competition" are "governed by the rule of reason" if "plausibly" ancillary to a procompetitive purpose. *Sulfuric Acid*, 703 F.3d at 1011 (citing *Polk Bros.*, 776 F.2d at 189) (emphasis added). Plaintiffs not only ignore these principles, but turn them on their head. Plaintiffs' position, in essence, is that the Member Companies should be forced to compete, rather than cooperate, because competition is always preferable to cooperation. But that premise is irreconcilably at odds with the notion of joint ventures as a procompetitive business structure, *Copperweld*, 467 U.S. at 768, and is refuted by the Seventh Circuit's opinion in *Polk Bros.*: "antitrust law is designed to ensure an appropriate blend of cooperation and competition, not to require all economic actors to compete full tilt at every moment." 776 F.2d at 188.

Plaintiffs are incorrect that *Polk Bros.* is "distinguishable" because "[t]he two stores agreed not to compete in the sale of . . . specific products." Opp. 19-20. The Seventh Circuit rejected that distinction, pointing out that "a covenant not to compete . . . *does not operate any differently* from a horizontal market division among competitors." 776 F.2d at 189 (emphasis added). Plaintiffs

also claim that *Sulfuric Acid*'s "main focus" was a shutdown agreement, Opp. 20 n.10, but again that ignores what the Seventh Circuit said. The *Sulfuric Acid* court explicitly noted that "[t]he plaintiffs do not rest their case entirely on the shutdown agreements"—*per se* treatment was also inappropriate for the challenged "grant of exclusive territories." 703 F.3d at 1012-13.

Even less persuasively, Plaintiffs attempt to distinguish *Polk Bros.* because the defendants there "created an output-increasing joint venture (a combined store where products were complementary) that would not have existed absent the agreed restraint." Opp. 19-20. Defendants specifically addressed this argument in their opening brief. *See* Mem. 30-31. Neither *Polk Bros.* nor any Supreme Court case requires a joint venture to establish that it could not exist but for the challenged restraint before the rule of reason applies.[6] And in *General Leaseways v. National Truck Leasing Ass'n*—on which Plaintiffs put extensive but misplaced emphasis (*see infra* 15-16)—the court observed that "*NCAA* did not condition the applicability of the Rule of Reason on proof that the particular restriction that had been challenged was necessary if the product was to be brought to market at all." 744 F.2d 588, 595 (7th Cir. 1984).

What is more, it is fundamentally wrong to say that this case is different from *Polk Bros.* because "all the Delta Dental State Insurers offer the same product." Opp. 20. Member Companies sell access to their provider *networks*. Selling access to an Illinois network of dentists is not the same as selling access to a California one—nor is it the same as selling access to a national network. In agreeing to cooperate to offer Delta Dental subscribers access to insurance networks in multiple states, the Member Companies are providing a new product—dental insurance with a nationwide reach—that differs significantly from their local networks. That integration is vastly

---

[6] Dentistry, for example, would exist regardless of whether certain forms of advertising are permitted (*California Dental*); Texaco and Shell gasoline not only could be sold but continued to be sold under separate brands following the combination in *Dagher*; and NFL teams could play football whether or not teams competed in the manufacture of trademarked merchandise (*American Needle*).

*more* "complementary," Opp. 19, than the cooperative venture in *Polk Bros.*, in which two retailers simply agreed to sell their products from a single retail location. 776 F.2d at 187.[7]

The claim that Defendants "offer no authority" for application of the rule of reason in these circumstances (Opp. 17) is simply incorrect. In addition to Seventh Circuit cases such as *Polk Bros.* and *Sulfuric Acid*—which involved "market division" and "exclusive territories"— Defendants cited almost a *dozen* cases holding that restraints like the ones challenged here are not *per se* illegal. *See* Mem. 30 n.12 & 32 n.13. In *Rozema v. Marshfield Clinic*, for instance, the court squarely rejected the "assertion" that "all market allocation agreements are *per se* illegal," explaining that this "ignores the distinction between naked and ancillary restraints." 977 F. Supp. 1362, 1378 (W.D. Wis. 1997). Likewise, in *Augusta News Co. v. Hudson News Co.*, the court held that "*per se* condemnation is limited to 'naked' market division agreements, that is, to those that are not part of a larger pro-competitive joint venture." 269 F.3d 41, 48 (1st Cir. 2001). Plaintiffs do not even bother to address these cases, or the many others cited in Defendants' opening brief.

### B.    Delta Dental's Network Structure Is Ancillary To Procompetitive Purposes.

To conclude the rule of reason applies, the Court need only determine that a challenged restraint "arguably" supported "productive cooperation" "at the time it was adopted." *Polk Bros.*, 776 F.2d at 189-90. That standard is not only easily satisfied, but far surpassed here.

1. *Interdependence and Interbrand Competition*. Delta Dental Member Companies

---

[7] Plaintiffs' attempt to distinguish *North Jackson Pharmacy, Inc. v. Caremark Rx, Inc.*, 385 F. Supp. 2d 740 (N.D. Ill. 2005), is equally far-fetched. There the court correctly rejected *per se* analysis at an early stage of the litigation, holding that an agreement among health plan sponsors and Caremark to utilize a single Pharmacy Benefit Manager to negotiate lower reimbursement rates for prescription drugs was not a "naked" restraint and should be evaluated under the rule of reason. The totality of Plaintiffs' response is that *Caremark* "belongs to [the] line of authority where naked restraints were *not* at issue" and that "the district court's conclusion turned on whether the defendant had monopsony power." Opp. 21. The first argument again begs the question; Plaintiffs offer no explanation of how *Caremark* and this case differ as to application of the ancillary-restraint doctrine to a cooperative relationship. The second is contradicted in *Caremark* itself, where the court held that the defendant's allegedly "immense market power" was irrelevant to whether the *per se* standard applied. 385 F. Supp. 2d at 749 n.2.

compete for customer accounts against a number of companies, including large for-profit insurance companies that do business nationwide and swamp the size of any single Member Company. National employers require their dental plans to have (1) a national network of providers who can serve patients in all the states in which they have employees and (2) a mechanism to pay claims for services provided to those patients. Cmplt. ¶¶ 73-74. The joint venture allows Delta Dental to achieve both aims. Each participant in the joint venture can use the provider networks of every other Member Company when servicing a national account. *Id.* And when a patient receives services from a dentist participating in an out-of-state Member Company's network, the claims are paid according to the terms negotiated by the provider and that Member Company. *Id.* ¶¶ 82-83. Dismantling Delta Dental's interdependent structure, as Plaintiffs propose, would make it nearly impossible for Defendants to compete for national accounts against unitary, for-profit insurers like MetLife, Aetna, and Cigna—and, in turn, weaken interbrand competition.

**2.** ***Efficient Collaboration***. Delta Dental's joint venture structure promotes efficient collaboration that allows it to offer low-cost, national dental insurance to consumers. Without the joint venture, to offer an equivalent product, each Member Company would have to build in-state networks everywhere across the country. This would require myriad duplicative negotiations that would be economically inefficient and prohibitively expensive. Turning each Member Company into a competitor with every other joint venturer would destroy the incentive for and efficiencies realized from the venture. As *Polk Bros.* recognizes, "[w]hen cooperation contributes to productivity through integration of efforts, the Rule of Reason is the norm." 776 F.2d at 188.

**3.** ***Free Riding***. The flip side of efficient collaboration is the problem of free riding—a classic justification for application of the rule of reason. *See* Mem. 24; *GTE Sylvania*, 433 U.S. at 55 ("'free rider' effect" can justify territorial restraints). Member Companies invest resources to

promote the success of Delta Dental-brand insurance in their licensed territories. If another Member Company could compete under the Delta Dental name in that same territory, it would be able to free ride on the brand promotion by the "home" licensee. Paying for such efforts would increase the "local" operator's costs (thereby rendering it less cost-competitive), while providing an advantage to out-of-state companies that would "free ride" off of the local member's promotional efforts. *See Polk Bros.*, 776 F.2d at 190 (finding product allocation agreement supported procompetitive purpose of joint venture because it reduced potential for free-riding).

**4. *Provider/Subscriber Confusion***. Finally, avoidance of consumer confusion is the touchstone of trademark protection. *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 993 (7th Cir. 2004). Plaintiffs' proposed world in which all Member Companies would be competitors against one another as "Delta Dental" in any area of the country is the definition of consumer confusion.[8]

Plaintiffs fail to challenge the substance of any of these justifications, instead offering the tepid rejoinder that they are unsupported by the "record." Opp. 22-23 & n.13. That misunderstands the relevant inquiry. Defendants do not ask the Court to determine the merits of their joint venture's procompetitive justifications at this stage of the litigation. So long as the justifications are merely *plausible*, *Polk Bros.* requires that Defendants have the right to be heard—to explain why the alleged conduct actually benefits rather than harms competition, 776 F.2d at 189.

**C. Plaintiffs' Counter-Arguments Are Unavailing.**

In asking the Court to disregard the many facially plausible procompetitive benefits of the Delta Dental business model, Plaintiffs' position rests almost entirely on *Sealy* and *Topco*,

---

[8] Employers and purchasers would need to figure out which of the 39 "Delta Dentals" is marketing to them. Subscribers would need to determine which provider accepts which "Delta Dental" plan. And providers would need to determine which "Delta Dental" covered each patient. Alternatively, to avoid these problems, suppose no member of the network could use the Delta Dental name. All of the goodwill built up over the years for the Delta Dental brand would simply be forfeited.

decades-old Supreme Court cases which they contend establish that "territorial restraints between horizontal competitors are *per se* illegal." Opp. 17-18. As Defendants have explained, those cases do not apply in this context, Mem. 31-33, and Plaintiffs' attempt to argue otherwise ignores the facts of *Sealy* and *Topco* and the last 50-plus years of case law.

As an initial matter, the market for dental insurance is vastly different than commodity markets for mattresses (*Sealy*) or grocery products (*Topco*)—neither of which implicate issues of interdependence or the sharing of provider networks (as expressly contemplated by state law). Mem. 32. By Plaintiffs' own allegations, Defendants' joint venture enables the construction and integration of separate provider networks that allow individual Member Companies to sell, under a common brand name, national insurance plans and process claims outside of their own networks. No such productive integration existed in *Sealy* or *Topco*. Yet it is exactly such "complementary" cooperative production that the Seventh Circuit has emphasized requires application of the rule of reason. *Polk Bros.*, 776 F.2d at 187-89. *Sealy* and *Topco* thus do not mandate *per se* condemnation where, as here, a joint venture uses territorial arrangements as part of a broader integration of operations that plausibly further the venture's procompetitive purpose. Rather, those cases merely stand for the unremarkable proposition that a horizontal market division agreement that is indeed "naked"—*i.e.*, not "ancillary" to any broader integration—is unlawful *per se*.

While *Topco* and *Sealy* are sometimes cited by the Supreme Court, Opp. 18, the Court does so only in cases involving actual "naked" market division agreements. For instance, in *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), there was no meaningful integration of the defendants at all; they simply agreed to divide markets. Plaintiffs do not cite any case—and Defendants are not aware of one—in which the Supreme Court or any court of appeals has applied *Sealy* or *Topco* in the context of a joint venture to condemn ancillary restraints as *per se* illegal. That is not

surprising, because the Supreme Court's application of antitrust law to joint ventures has not stood still in the half-century since those cases were decided. Starting with *GTE Sylvania*, the Court fundamentally reoriented antitrust law by: (i) declaring that "interbrand" competition is the primary concern of antitrust; (ii) basing its ruling upon an explicit balancing of intra- and inter-brand effects (something the Court declined to do in *Topco*); and (iii) acknowledging free-riding as a justification for limiting intrabrand competition. 433 U.S. at 55-56. In *BMI*, the Court then extended this approach to horizontal restraints, rejecting application of the *per se* rule to a horizontal price-fixing agreement among venture members. 441 U.S. at 24-25. And in the following years, the Supreme Court has taken the same approach, again and again, in *NCAA*, *California Dental*, *Dagher*, and, most recently, *American Needle*. *See supra* 8-9; Mem. 22 n.11.

Lower courts have followed the Supreme Court's lead. In the last 50 years, courts "generally have not applied *Topco*'s *per se* rule to horizontal and customer allocations that are ancillary to a procompetitive integration of the parties' economic activities and have analyzed such restraints under the rule of reason." ABA Section of Antitrust Law, Antitrust Law Developments 107-08 (8th ed. 2017). That is clearly the approach adopted in the Seventh Circuit. As another case cited in Defendants' opening brief (Mem. 31-32) holds, "in the wake especially of *BMI* and *NCAA*, it is clear that *Topco* and *Sealy* no longer stand for the proposition that every horizontal elimination of competition is automatically illegal, in case they ever did." *Chi. Prof'l Sports Ltd. P'ship v. NBA*, 754 F. Supp. 1336, 1357 (N.D. Ill. 1991), *aff'd*, 961 F.2d 667, 673 (7th Cir. 1992) ("[i]f the [defendant] is a joint venture, then the Rule of Reason supplies the framework for antitrust analysis, as the district properly held"). Plaintiffs ignore that discussion—just as they fail to address virtually all of the dozen or so other cases Defendants cited that hold the same.

Rather than grapple with this authority, Plaintiffs rely on the Seventh Circuit's decision in

*General Leaseways* as supposed support for their position. Opp. 19. But that opinion—authored before *Polk Bros.* and by the same judge who later wrote *Sulfuric Acid*—supports *Defendants*. It involved an appeal from a preliminary injunction challenging a nationwide truck leasing and servicing network "created in order to set up and administer a reciprocal service arrangement that would enable each member to lease trucks on a full-service over-the-road basis and thus compete with the national truck-leasing companies, which have their own service depots all over the United States." 744 F.2d at 589. The Seventh Circuit noted that *GTE Sylvania*, *BMI*, *NCAA*, and other cases created a significant "tension" with a broad reading of *Sealy* and *Topco*,[9] but concluded it was unnecessary to resolve that tension in the case before it. *Id.* at 594-96. Rather, the court's decision turned on the lack of any plausible connection between the challenged restriction on truck *leasing* and the unquestioned need of the defendants to create a reciprocal national *servicing* network. *Id.* at 592-93. Also, unlike this case, the defendants in *General Leaseways* did not jointly market or produce any products under a common brand name. *Id.* at 593 (the "franchisees do little advertising or other promotion" of the trademark and half did not even use the name). As a result, there were no genuine opportunities for free-riding, and the court found no reason why defendants could not maintain their lawful nationwide servicing system while competing with respect to leasing. *Id.* at 592-93. In short, because the leasing restraints had no plausible "connection" to defendants' "cooperative needs," it was not an ancillary restraint. *Id.* at 595.

Finally, Defendants have already explained at length why the *Blues* case does not support Plaintiffs. Mem. 28-31. Plaintiffs admit they are trying to mimic the "aggregation" of restraints in that case, Opp. 29, but, as their Opposition confirms, they cannot allege any factual predicate for two of the three supposed "restraints." *Supra* Part I. Nor do Plaintiffs dispute that the *Blues* court

---

[9] *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 226-30 (D.C. Cir. 1986), another decision that Defendants cited and Plaintiffs ignore, makes the same point.

was not bound by Seventh Circuit law, *id.*, or that Seventh Circuit law regarding ancillary restraints is substantively different from the law in the Eleventh Circuit. *See* Mem. 30-31. Instead, they say there is no authority "in *any* circuit" that would support application of something less than the *per se* standard. Opp. 30 (emphasis in original). But once again, Plaintiffs are asking this Court to pretend that the mountain of authority Defendants have cited—much of it binding—does not exist.

### D. *AmEx* Confirms That *Per Se* Treatment Is Inappropriate.

For the reasons described above, the *per se* rule would be inapplicable in this case even if the Supreme Court had not decided *AmEx*. That case, however, further establishes that Plaintiffs' *per se* claim is completely untenable. Mem. 26-28. *AmEx* adopted a new paradigm for assessing the practices of a network platform operator, such as American Express or Delta Dental. The value of a Delta Dental policy to subscribers is related to the number of dentists willing to accept it as payment for services. Meanwhile, the value of the plan to providers is related to how many potential patients have Delta Dental insurance. Assessing the state of competition for such a two-sided platform *requires* evaluating and balancing effects on both sides of the market. 138 S. Ct. at 2287. That is fundamentally inconsistent with the *per se* rule, which eschews any balancing.

Plaintiffs' three reasons for why *AmEx* purportedly does not apply here are unavailing. First, *AmEx*'s analysis of the unique features of two-sided markets is not limited to vertical restraints, as Plaintiffs contend. Opp. 31-32. Because they operate platform markets with network effects, all insurers (whether they are unitary or not) must balance the reimbursement rates paid to providers against the premiums charged to subscribers by taking into account the "optimal balances" on both sides of the market. *Amex*, 138 S. Ct. at 2281. Put another way, whether a particular *market* should be analyzed as a two-sided platform has to do with the nature of the business, not the organizational structure of a particular party or the restraints being challenged.

Nothing in *AmEx* suggests otherwise. The first portion of the opinion to which Plaintiffs

17

refer (Opp. 30) notes that there is a "small group of restraints" that are considered illegal *per se*. 138 S. Ct. at 2283. That proposition has nothing to do with whether two-sided market analysis precludes the *per se* rule from attaching in the first instance. The second portion merely addresses the argument that the plaintiffs in *AmEx* did not need to define a market because they had "offered actual evidence of adverse effects on competition." *Id*. at 2285 n.7. The Court referred in passing to the fact that markets do not need to be defined in cases involving horizontal naked restraints. But that does not speak to whether the existence of a two-sided market matters in determining if a particular restraint is illegal *per se* in the first instance. *See also* Mem. 33 n.14.

Indeed, in the recent Sabre-Farelogix merger case, the district court rejected the government's challenge to an acquisition due to its failure to satisfy the standards established in *AmEx. United States v. Sabre Corp*., 2020 WL 1855433, at *32-*34 (D. Del. Apr. 7, 2020). A merger is the ultimate form of "horizontal" restraint, since it entirely eliminates any future competition between the merging parties. Yet that court found "highly persuasive" the Second Circuit's *Sabre* decision that was premised on the need (under *AmEx*) to consider both sides of the two-sided platform market for airline reservation services. *See id*. at *34 (citing *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 56-57 (2d Cir. 2019)).

Second, Plaintiffs assert there are "few, if any . . . indirect network effects" because "Delta Dental could increase provider payments without raising patient premiums." Opp. 31. That assertion, without a single citation to case law or academic commentary, is a *non sequitur*. The point of *AmEx* is that network effects require platforms to "be sensitive to the prices that they charge each side" of the market. 138 S. Ct. at 2281. "In other words, the value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases." *Id*. That is equally true of credit card markets and dental insurance markets. As courts

have recognized, "[a] provider of health insurance belongs to a different economic genus than a provider of credit card services, perhaps, but from an economic standpoint the functions they perform are similar." *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 90 (6th Cir. 1989).

Third, Plaintiffs assert that *AmEx* is inapplicable because "there is no single simultaneous transaction" in the dental insurance business. Opp. 35-36. This, too, misses the mark. The central consideration for determining if both sides of the platform must be considered is simply whether indirect network effects need to be taken into account, not whether the market is a transaction platform. *Amex*, 138 S. Ct. at 2285-86 (stating it is only unnecessary to consider both sides of a platform when the indirect network effects are "minor"). But in any event, dental insurance is a transaction platform that *does* involve a "simultaneous" transaction as defined by *AmEx*. "The key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Id.* at 2280. In the payment card business, that means a credit card transaction cannot take place unless there is a cardholder possessing and wishing to use a particular credit card and a merchant willing to accept that brand of card as payment for the cardholder's purchase. In the insurance business, there must be a patient with an insurance plan and a dentist willing to accept it. Cmplt. ¶ 98 n.5. The manner and timing of the actual transfer of *payment* is not relevant to whether a two-sided transaction platform market exists.[10]

### E. The Court Should Dismiss The *Per Se* Claims Now.

Finally, the Court can and should dismiss the *per se* claims now, rather than wait to address the issue at summary judgment. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984) (on a motion to dismiss, "the defendants' alleged activity must be scrutinized to

---

[10] Plaintiffs argue that insurance can be paid for but never used, which is supposedly unlike the credit card business. Opp. 36. But that confuses the way in which products are priced with the nature of the "transaction" that determines the character of the market. Besides, even with credit cards, merchants often pay fees that are independent of any transaction, and many cardholders pay sizeable annual fees.

determine whether" the "*per se* label" is "appropriate"). Indeed, courts in this District frequently dismiss *per se* claims at the pleading stage where, as here, it is clear the standard does not apply.

*Deslandes v. McDonald's USA, LLC*, for example, dismissed *per se* claims on the pleadings where it was plausible that the alleged restraint was "ancillary to an agreement with a procompetitive effect." 2018 WL 3105955, at *7 (N.D. Ill. June 25, 2018). Plaintiffs do not address *Deslandes*'s dismissal of the *per se* claims, noting only that "some" other courts have waited until summary judgment to decide the appropriate standard. Opp. 22-23 & n.12.[11] Unlike those cases, however, the Court does not need discovery to hold that there are at least "plausible" justifications for the territorial restraints. Plaintiffs affirmatively plead that "[f]rom its creation," Defendants' joint venture used territorial rights to "coordinate" the provision of national insurance coverage to multistate accounts. Cmplt. ¶¶ 73-74. As shown above, if a restraint, "viewed at the time it was adopted, may promote the success of . . . more extensive cooperation, then the court *must* scrutinize things carefully under the Rule of Reason." *Polk Bros.*, 776 F.2d at 189 (emphasis added).

A recent opinion from this District provides another compelling illustration. There, Judge Shah dismissed a *per se* claim alleging that the defendant entered into a "market allocation agreement" forbidden by *Topco*. *In re Humira (Adalimumab) Antitrust Litig.*, 2020 WL 3051309, at *17-18 (N.D. Ill. June 8, 2020). Where the complaint makes clear "the basic terms of the agreements and how they affected the market," he explained, "there are no facts that need to be developed before determining which rule to apply" and a court can hold that "[t]he rule of reason is a better fit." *Id*. at *18 & n.16. *Humira* involved a different branch of antitrust analysis than this

---

[11] Plaintiffs do argue that *Deslandes* supports their rule-of-reason claim by showing that territorial restrictions stifle "interbrand" competition, Opp. 50, but they are entirely wrong. That case held that *with respect to the employment market* for fast food workers, different McDonald's franchises are different "brands." *Deslandes*, 2018 WL 3105955, at *8. But it recognized that restraints on "competition for the sale of hamburgers to consumers" was a valid restriction on "*intra*brand competition." *Id*. (emphasis added).

case (patent law rather than an integrated joint venture). But the principle is exactly the same: here, the Complaint itself makes clear that, as a matter of law, the *per se* rule cannot apply.[12]

## III. THE RULE-OF-REASON CLAIM FAILS TO ALLEGE PROPER MARKETS.

Plaintiffs' rule-of-reason claim fails for lack of sufficient allegations of a relevant market or the existence of market power within that market.

### A. Plaintiffs Fail To Allege Harm To Both Sides Of The Market.

Under *AmEx*, Plaintiffs must show anticompetitive effects on both sides of the insurance market. 138 S. Ct. at 2287; Mem. 34-37. Plaintiffs' allegations, however, are focused almost entirely on the seller (provider) side of the market and fail to plausibly allege harm on the buyer (subscriber) side. *See* Mem. 35-37. For example, Plaintiffs do not dispute that self-funded plans pay dental costs out of their own assets and therefore benefit directly and immediately from lower reimbursement rates. Mem. 36 n.16. Plaintiffs make baseless assertions that lower rates do not benefit consumers, Opp. 10, but they never explain how their requested relief (higher reimbursement rates) does not come at the expense of such customers, which in turn risks decreasing participation on the subscriber side and damaging the two-sided platform as whole.

While Plaintiffs make conclusory allegations about high capital reserves or large salaries, Opp. 48-49, these do not support a reasonable inference of anticompetitive impact either. Plaintiffs never allege that Defendants carry excessive reserves relative to other insurers or industry

---

[12] Plaintiffs suggest that even if the *per se* rule does not apply, Defendants' restrictions can be found unlawful under the "quick look" doctrine. Opp. 37-39. But as the Supreme Court has explained, "quick look" is narrowly applied, if at all, *only* where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental*, 526 U.S. at 770. As just shown, that is hardly the case here. Restraints that are ancillary to a joint venture in a two-sided platform market cannot be condemned based on a quick "rudimentary" look. Indeed, the Supreme Court has summarily rejected application of the quick-look doctrine where, as here, the restraints were ancillary to a joint venture, noting (in a footnote) that "for the same reasons that *per se* liability is unwarranted here, we conclude that petitioners cannot be held liable under the quick look doctrine." *Dagher*, 547 U.S. at 7 n.3.

standards. And while they claim that some Defendant CEOs receive high salaries compared to the average for heads of *all* U.S. non-profits (no matter how small), Opp. 10, that is not a meaningful comparison. Even assuming salary figures were relevant, the appropriate comparison would be CEOs at similarly-sized dental or health insurers, regardless of whether they are for-profit or non-profit. *Cf.* 26 C.F.R. § 53.4958-6(c)(2)(i) (fair market value is determined by taking into account "compensation levels paid by similarly situated organizations, both taxable and tax-exempt, for functionally comparable positions"). On that comparison, the Complaint is silent.

**B.      Plaintiffs Cannot Rewrite Their Product And Geographic Market Definitions.**

Defendants' opening brief explained that the product and geographic markets in the Complaint fail as a matter of law. Mem. 37-40. Plaintiffs essentially concede the point in response.

As to product markets, Plaintiffs accuse Defendants of "reframing" Plaintiffs' allegations in characterizing the market as one for "group and individual dental insurance." Opp. 43. But it is Plaintiffs, not Defendants, who are "reframing" their allegations. Plaintiffs alleged "[t]he relevant product market includes *insurance*" and "dominance" in the "market for *dental insurance.*" Cmplt. ¶¶ 87, 89 (emphases added). Plaintiffs now claim the relevant product market is the market for "the purchase of dental goods and services"—disregarding the Complaint's repeated references to "insurance." Opp. 43. But even under this revised definition, Plaintiffs cannot exclude from the market self-funded plans, discount programs, uninsured individuals, and the many purchasers of dental goods and services other than dental insurance companies. *See* Mem. 38.

As to geographic markets, the Complaint alleged a national market (*i.e.*, "the whole United States") "and/or, in the alternative, the territories" in which Defendants operate. Cmplt. ¶ 88. Plaintiffs now abandon their national market entirely and argue that the geographic market consists solely of their "alternative" definition—the "39 separate markets" in which Defendants operate. Opp. 45. Plaintiffs claim that it is the "geographic reach of the sellers that determines the market,"

*id.*; but the Member Companies are *buyers* of dental goods and services, not sellers. Therefore, the revised geographic market definition makes no sense even on Plaintiffs' terms. And as Plaintiffs concede, the actual sellers (dental providers) do not offer dental goods and services in statewide markets, let alone in multistate "territories" or nationwide. *See* Opp. 45 (acknowledging the "limited area" where dental providers "draw[] . . . patients from"); Mem. 39-40.[13]

### C. Plaintiffs Do Not Allege Market Power.

Plaintiffs' market-power allegations are based on Defendants' supposed "average market share [*for dental insurance*] across the *whole of the United States.*" Opp. 46 (emphases added). As just discussed, however, Plaintiffs now concede that the relevant market is neither (i) limited to insurance nor (ii) nationwide. Plaintiffs say that an "average" nationwide market share, plus the "allegations of the Market Allocation Mechanism," plausibly show that Defendants' have market power in each "territory" in which they operate, Opp. 46, but cite nothing to support this proposition. If one Member Company has an 80% market share in State X, and another has a 20% market share in State Y, that does not plausibly suggest that *both* have market power.

## IV. PLAINTIFFS' CLAIMS FAIL FOR THREE OTHER INDEPENDENT REASONS.

### A. Plaintiffs Do Not Allege Antitrust Injury.

In a two-sided platform market, optimal pricing can require lower prices on one side of the market to increase participation on the other. Simply alleging lower reimbursement rates to dentists, without considering the interrelationship of pricing on the subscriber side, does not show harm to competition as a whole—and therefore does not allege an antitrust injury. Mem. 43; *AmEx*, 138 S. Ct. at 2287-90. Relatedly, because insurers purchase health services for the benefit of their

---

[13] It is no answer that market definition is often a fact question. Opp. 44-45. Where an alleged market is facially deficient, the complaint should be dismissed. Mem. 38-39; *Prescient Med. Holdings, LLC v. Lab. Corp. of Am. Holdings*, 2019 WL 635405, at *5 (D. Del. Feb. 14, 2019); *Aetna*, 166 F. Supp. 3d at 996-97; *J&S Cmty. Pharmacy Inc. v. Prime Therapeutics LLC*, 2018 WL 4871137, at *3 (N.D. Ill. Aug. 16, 2018).

subscribers, *Brillhart v. Mutual Med. Ins., Inc.*, 768 F.2d 196, 199 (7th Cir. 1985), the supposed "harm" to Plaintiffs (lower prices) directly benefits consumers. For this reason, "an agreement is not anticompetitive because it seeks to lower prices, and antitrust plaintiffs have to do more than complain about their failure to make more money." *Caremark*, 385 F. Supp. 2d at 748-749. Plaintiffs accuse Defendants of "confus[ing]" sellers' and buyers' cartels, asserting that in a buyer cartel case antitrust injury exists if a seller allegedly receives "excessively low prices." Opp. 51. But there is no confusion. Neither case cited by Plaintiffs addressed two-sided platform markets or a scenario in which the "buyer" was purchasing on consumers' behalf—a critical distinction in assessing antitrust injury. *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1134 (7th Cir. 1986) ("[w]henever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding 'antitrust injury'"). Indeed, the defendant in *Int'l Outsourcing Servs., LLC v. Blistex, Inc.* (cited at Opp. 51) challenged only whether the plaintiff's injury was "direct." 420 F. Supp. 2d 860, 865 (N.D. Ill. 2006).

### B. Plaintiffs Do Not Allege Concerted Action.

Section 1 of the Sherman Act prohibits only concerted action. But Defendants have always had a *unified* interest in the governance of the Delta Dental marks. *See* Mem. 44-47. Plaintiffs respond that the law prohibits a cartel from insisting that cooperation is "necessary" to produce the "cartel product." Opp. 55. That is a strawman. Defendants' argument focuses not merely on cooperation, but on Section 1's touchstone: whether an agreement "deprives the marketplace of independent centers of decisionmaking." *American Needle*, 560 U.S. at 195. Courts have granted motions to dismiss on single-entity grounds where (as here) plaintiffs allege cooperation regarding "intellectual property . . . that the [individual defendants] do not separately own, and never have separately owned." *Washington v. NFL*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012). Plaintiffs call *Washington* an "out-of-circuit" case, Opp. 54, but never explain why it is not on-point here.

Indeed, another court recently held on a motion to dismiss that the Burger King franchise system—which (similar to Defendants' structure) "enhances Burger King's ability to compete with other chain burger restaurants"—reflects "the type of unity [of] decisionmaking untouched by § 1." *Arrington v. Burger King Worldwide, Inc.*, 2020 WL 2479690, at *3-6 (S.D. Fla. Mar. 24, 2020).[14]

### C.    The McCarran-Ferguson Act Bars Plaintiffs' Claims.

Plaintiffs argue that the McCarran-Ferguson Act exemption does not apply because the challenged restrictions have "no impact" on spreading policyholder risk. Opp. 56 (discussing *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979)). But the arrangements in *Royal Drug* were contracts used to *fulfill* the insurer's underwriting obligations. Here, the territorial restrictions "define the 'pool of insureds over which risk is spread.'" Mem. 48 (quoting *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928, 931-32 (9th Cir. 1983)). Plaintiffs never explain why the exclusive broker relationship in *Feinstein* spreads risk but exclusive territorial rights do not. Plaintiffs' reliance (at Opp. 57) on *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010), is also misplaced, for that case, like *Blues*, misinterprets *Royal Drug. See* Mem. 49 n.20. Finally, Plaintiffs claim that the Act does not apply to conduct that "span[s] multiple states." Opp. 60. But courts have long recognized that the contention that "interstate insurance activity cannot at all be regulated by state law within the meaning of McCarran-Ferguson" is "categorically mistaken." *Seasongood v. K & K Ins. Agency*, 548 F.2d 729, 737 (8th Cir. 1977).

### CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed.

---

[14] Plaintiffs claim that *Sealy* implicitly rejected Defendants' single-entity argument. Opp. 52. But in *Sealy* (and *Blues*), the individual companies *were* using the trademark prior to the joint venture's formation. Mem. 47 n.19. Plaintiffs call this "a distinction that no court has ever recognized," Opp. 54 n.28, but the very case they use as a model recognizes it. *See Blues II*, 308 F. Supp. 3d at 1264-65. That is not surprising: since Defendants never had individual rights to the marks, joint governance does not "deprive[]" the marketplace" of independent decisionmaking. *American Needle*, 560 U.S. at 190.

Dated: July 13, 2020

Respectfully submitted,

/s/ Kathy L. Osborn
Kathy L. Osborn
Ryan M. Hurley
Anna Marie Behrmann
FAEGRE DRINKER BIDDLE & REATH LLP
300 N. Meridian St., Suite 2500
Indianapolis, IN 46204
(317) 237-8261
kathy.osborn@faegredrinker.com
ryan.hurley@faegredrinker.com
anna.behrmann@faegredrinker.com

Colby Anne Kingsbury
FAEGRE DRINKER BIDDLE & REATH LLP
311 S. Wacker Dr., #4400
Chicago, IL 60606
(312) 212-6573
colby.kingsbury@faegredrinker.com

Jeffrey S. Roberts
Joshua P. Mahoney
FAEGRE DRINKER BIDDLE & REATH LLP
1144 15th Street, Suite 3400
Denver, CO 80203
(303) 607-3500
jeff.roberts@faegredrinker.com
joshua.mahoney@faegredrinker.com

*Counsel for Defendants Delta Plan of Arkansas, Inc., Delta Dental of Indiana, Inc., Delta Dental of Kentucky, Inc., Delta Dental Plan of Michigan, Inc., Delta Dental Plan of New Mexico, Inc., Delta Dental of North Carolina, Delta Dental Plan of Ohio, Inc., and Delta Dental of Tennessee*

/s/ Benjamin W. Hulse
Jerry W. Blackwell
Benjamin W. Hulse
Gerardo Alcazar
BLACKWELL BURKE P.A.
431 South Seventh Street
Suite 2500
Minneapolis, MN 55415
612-343-3200

/s/ Britt M. Miller
Britt M. Miller
Daniel K. Storino
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
dstorino@mayerbrown.com
jglickstein@mayerbrown.com

Mark W. Ryan
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
mryan@mayerbrown.com

*Counsel for Defendants Delta Dental Plans Association, DeltaUSA, Delta Dental of Connecticut Inc., Delta Dental Plan of Idaho, Inc. d/b/a Delta Dental of Idaho, Dental Service of Massachusetts, Inc. d/b/a Delta Dental of Massachusetts, Delta Dental of Missouri, Delta Dental of New Jersey, Inc., Oregon Dental Service d/b/a Delta Dental of Oregon, Delta Dental of Washington, and Delta Dental Plan of Wyoming d/b/a Delta Dental of Wyoming*

/s/ Howard Ullman
Stephen V. Bomse
Russell P. Cohen
Howard Ullman
Nicole Gelsomini
ORRICK HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
415-773-5700
sbomse@orrick.com
rcohen@orrick.com
hullman@orrick.com

blackwell@blackwellburke.com
bhulse@blackwellburke.com
galcazar@blackwellburke.com

Lori Swanson
Mike Hatch
SWANSON HATCH, P.A.
431 South 7th Street
Suite 2545
Minneapolis, MN 55415
612-315-3037
lswanson@swansonhatch.com
mhatch@swansonhatch.com

*Counsel for Defendants Delta Dental of Minnesota and Delta Dental of Nebraska*

/s/ David E. Dahlquist
David E. Dahlquist
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
312-558-5600
ddahlquist@winston.com

*Counsel for Defendants Arizona Dental Insurance Service, Inc. d/b/a Delta Dental of Arizona, Hawaii Dental Service, Delta Dental of Iowa, Delta Dental of Kansas Inc., Maine Dental Service Corporation d/b/a Delta Dental Plan of Maine, Delta Dental Plan of New Hampshire, Inc., Delta Dental Plan of Oklahoma, Delta Dental of Rhode Island, Delta Dental of South Dakota, and Delta Dental Plan of Vermont, Inc.*

/s/ Allison W. Reimann
Allison W. Reimann
GODFREY & KAHN, S.C.
One East Main Street
Suite 500
Madison, WI 53703
608-257-3911
areimann@gklaw.com

*Counsel for Defendant Delta Dental of Wisconsin, Inc.*

Emily Luken
ORRICK HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
202-339-8400
eluken@orrick.com

Brian Joseph Murray
Timothy D. Elliot
RATHJE WOODWARD LLC
300 E. Roosevelt Road
Suite 300
630-668-8500
Wheaton, IL 60187
bmurray@rathjewoodward.com
telliott@rathjewoodward.com

*Counsel for Defendants Delta Dental Insurance Company, Delta Dental of California, Delta Dental of Delaware, Delta Dental of the District of Columbia, Delta Dental of New York, Delta Dental of Pennsylvania, Delta Dental of Puerto Rico, and Delta Dental of West Virginia*

/s/ Scott D. Stein
Scott D. Stein
Colleen M. Kenney
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
sstein@sidley.com
ckenney@sidley.com

*Counsel for Defendants Colorado Dental Service, Inc. d/b/a Delta Dental of Colorado, Delta Dental of Illinois, and Delta Dental of Virginia*

## CERTIFICATE OF SERVICE

I, Britt M. Miller, an attorney, hereby certify that on July 13, 2020, I caused a true and correct copy of the foregoing **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and separately via email to counsel of record. Parties may access this filing through the court's CM/ECF System.

*/s/ Britt M. Miller*
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com