IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
|  | ) |  |
| In re Delta Dental | ) | No. 19 CV 6734 |
| Antitrust litigation | ) |  |
|  | ) | MDL No. 2931 |
|  | ) |  |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs in this multi-district litigation are dental service providers who claim on behalf of themselves and a class that defendants — thirty-nine dental service corporations licensed to use the Delta Dental name (the "Delta Dental State Insurers"), together with the Delta Dental Plans Association ("DDPA"), and DDPA's affiliates and subsidiaries Delta Dental Insurance Company, DeltaCare USA, and Delta USA Inc. — violated Section 1 of the Sherman Act, 15 U.S.C. § 1, through a multifaceted conspiracy to exercise monopsony power and restrain competition in the dental insurance business. According to the consolidated complaint ("CC," or sometimes, for simplicity, "the complaint"), defendants engaged in three types of concerted, anticompetitive conduct: First, they agreed to divide the market for dental insurance into thirty-nine states or territories, allocating exclusive control of each to a specific Delta Dental State Insurer, and agreeing that none would sell or attempt to sell dental insurance outside of its own

allocated territory. Second, they allegedly conspired to fix artificially low reimbursement rates to providers of dental goods and services, which providers were constrained to accept due to defendants' dominant market position. Finally, defendants allegedly agreed to restrict the amount of revenue that any Delta Dental State Insurer could derive from selling non-Delta Dental branded dental insurance. Plaintiffs allege that rather than pass on to consumers the savings they achieved through their anticompetitive conduct, defendants paid exorbitant salaries to their executives and padded their already inflated capital reserves.

Defendants move to dismiss the consolidated amended complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, I deny the motion.

I.

In reviewing the sufficiency of a complaint, I accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *Agnew v. Nat'l Collegiate Athletic Ass'n,* 683 F.3d 328, 334 (7th Cir. 2012). "The Federal Rules of Civil Procedure require only that a complaint provide the defendant with 'fair notice of what the ... claim is and the grounds upon which it rests.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

2

Plaintiffs' claims arise under Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Plaintiffs assert their claims pursuant to the Clayton Act, which establishes a private right of action for injunctive relief (which plaintiffs seek in Count I) and damages (which they seek in Count II) by persons threatened or injured by a violation of the antitrust laws.

According to the consolidated complaint, the DDPA is "funded and controlled by the Delta Dental State Insurers, and acts as a vehicle for their concerted activity, including via a contract entered into by each Delta Dental State Insurer with the Delta Dental Plans Association (the 'Delta Dental Plan Agreement')." CC at ¶ 2. Together, defendants are the "largest providers of insurance for dental services in the U.S." *Id*. at ¶ 3. Plaintiffs allege that defendants have divided the national market into thirty-nine exclusive territories, *id*., with each Delta Dental State Insurer exercising significant market power in the dental insurance market of its allotted territory. *See* CC at ¶¶ 25-63. Delta Dental's average market share across the United States was between 59% and 65% between 2013 and 2017. *Id*. at ¶ 90.

The cornerstone of defendants' allegedly anticompetitive conduct is the "market allocation mechanism." Plaintiffs state that:

> By carving the 50 U.S. States into 39 exclusive territories in which Delta Dental State Insurers are guaranteed to be free from competition from other Delta Dental State Insurers, the Delta Dental State Insurers have each secured monopsony power within their assigned territories, and Defendants as a group have secured monopsony control over the market for dental insurance across the U.S.

*Id.* at ¶ 3. "Absent the monopsony powers and territorial protections secured" through the market allocation mechanism, plaintiffs allege, consumers would have greater choice in the dental insurance they purchase, while dental providers would have greater choice in the insurance they choose to accept from their patients. *Id.*

The complaint goes on to allege that defendants have enhanced their monopsony control through a second unlawful restraint in the form of a price-fixing agreement, which defendants carry out by sharing pricing information to determine, in concert, "the lowest and most punitive rates of reimbursement" that dental providers will accept. CC at ¶ 125. Plaintiffs claim that providers have no choice but to accept defendants' below-market reimbursement rates due to defendants' market dominance. *Id.* Plaintiffs acknowledge that defendants' below-market reimbursement rates could, theoretically, translate to savings in the premiums paid by their

4

policyholders; but they assert that rather than passing on any savings to consumers of dental products and services, defendants have paid lavish salaries to their executives and bloated their capital reserves. *Id*.

Plaintiffs term the third alleged element of defendants' anticompetitive conspiracy the "revenue restriction mechanism." They allege that the Delta Dental Plan Agreement establishes "a direct cap," on the amount of non-Delta Dental branded business the Delta Dental State Insurers may conduct. CC at ¶ 119. Plaintiffs assert that these restrictions "directly limit the amount of competition and the number of competitors in the market in which Delta Dental State Insurers (or their subsidiaries) could compete for customers," reducing the insurance options available to both providers and consumers.

## II.

A claim under Section 1 of the Sherman Act comprises three elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc*., 8 F.3d 1217, 1220 (7th Cir. 1993). Courts employ three modes of analysis to determine whether conduct alleged to violate Section 1 has anticompetitive effects: the Rule of Reason,

per se analysis, and the quick-look approach. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012).

"The standard framework for analyzing an action's anticompetitive effects on a market is the Rule of Reason." *Id*. Under this mode of analysis, "the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market." *Id*. In a narrower class of cases, however, the challenged conduct may be deemed anticompetitive per se, which is appropriate when a "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Id*. at 336 (quoting *National Collegiate Athletic Association v. Board of Regents*, 468 U.S. 85, 100 (1984) ("*NCAA*")). Yet, "there is often no bright line separating per se from Rule of Reason analysis. Per se rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *NCAA*, 468 U.S. at 104 n. 26. Courts have also developed a third mode of analysis called the "quick-look" approach, which is employed where "no elaborate industry analysis is required to demonstrate the anticompetitive character of ... an agreement." *Id*. This approach asks whether an "observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect." *Id*. (quoting *NCAA*, 468 U.S. at 109, and *California Dental*

*Ass'n v. F.T.C.,* 526 U.S. 756, 770 (1999)). All of these frameworks are intended to answer the same question: "whether or not the challenged restraint enhances competition." *Id.* (citations omitted).

The theory of plaintiffs' case is that through the market allocation mechanism, the price-fixing mechanism, and the revenue restriction mechanism—each of which plaintiffs allege to be anticompetitive—defendants have formed a buyers' cartel to exert monopsony power that is illegal per se under the Sherman Act. *See Vogel v. American Soc. Of Appraisers*, 744 F.2d 598, 601 ("buyer cartels, the object of which is to force the prices that suppliers charge the members of the cartel below the competitive level, are illegal per se."); *see also Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219 (1948) (control of sugar beet market by conspiracy of buyers violated Sherman Act). Plaintiffs claim that defendants' conduct violates the Sherman Act per se, but that defendants are liable even if the quick-look or Rule of Reason analyses are employed. CC at ¶¶ 121-22. Defendants challenge plaintiffs' claims on numerous legal and factual fronts, adding up to their view that the complaint does not state an actionable antitrust claim on any theory. In addition, defendants raise three independent grounds for dismissal: failure to plead an

antitrust injury, failure to plead concerted action, and exemption from liability under the McCarran-Ferguson Act.

### Per Se Analysis

The core of the alleged conspiracy is the market allocation mechanism, which defendants acknowledge functions generally in the manner plaintiffs describe. Each Delta Dental State Insurer is allocated a defined territory within the United States and agrees to sell Delta Dental-branded insurance only within that market. Plaintiffs claim that this mechanism is a so-called "naked" restraint that is illegal per se under Section 1. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608, 92 S. Ct. 1126, 1133–34, 31 L. Ed. 2d 515 (1972) (characterizing horizontal territorial limitations as "naked restraints of trade with no purpose except stifling of competition."). By defendants' lights, however, the territorial restrictions in their agreements are lawful ancillary restraints that are "part of a business structure that improves economic productivity and increases interbrand competition with national dental insurers." Def.'s Mem. at 4 (citing *Polk Bros., Inc. v. Forest City Enterprises, Inc*., 776 F.2d 185, 188 (7th Cir. 1985)). In addition, defendants argue that plaintiffs' theory of per se liability fails to appreciate that the dental insurance market is a "two-sided transaction platform" requiring analysis

under *Ohio v. American Express Co.*, l138 S. Ct. 2274, 2283 (2018), and their allegations fail to state a claim under that framework.

Plaintiffs ground their view of the market allocation mechanism in *Topco* and *United States v. Sealy, Inc.,* 388 U.S. 350 (1967). *Sealy* involved an agreement among licensees of Sealy-branded bedding products to sell products under the Sealy trademark only in each licensee's exclusive territory. 388 U.S. 350 at 352. The licensees also agreed to the price at which Sealy products could be sold. *Id*. at 355. Although Sealy was the licensor of the trademark, because the licensees owned substantially all of Sealy's stock and controlled the corporate entity's operations, the Court considered the territorial exclusivity agreement to be a horizontal restraint that was unlawful per se, regardless of the "many other purposes" it may have served. *Id*. at 356. The Court held that the restriction's "connection with the unlawful price-fixing is enough to require that it be condemned as an unlawful restraint and that appellee be effectively prevented from its continued or further use." *Id*. at 356–57.

*Topco* involved a group of independently owned, small and medium-sized grocery store chains that formed a cooperative to purchase merchandise to sell under the Topco brand. 405 U.S. at 599. Each member of the cooperative was required to sign an agreement "designating the territory in which that member may sell

Topco-brand products," and no member could sell those products outside of the territory in which it was licensed. *Id.* at 602. All of the licenses were either formally or functionally exclusive. *Id.* The Court rejected the collective's asserted justification that the territorial divisions were necessary "to compete more effectively with larger national and regional chains," *id.* at 599—an argument defendants echo here, *see* Def.'s Mem. at 23. Relying on *Sealy*, the Court concluded that the territorial divisions were naked restraints that violated the Sherman Act per se. *Id.* at 608.

It is true, as defendants point out, that the law has evolved since *Topco* and *Sealy* were decided, and that to the extent these cases "stand for the proposition that all horizontal restraints are illegal per se," the Court's later cases have narrowed that holding. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 226 (D.C. Cir. 1986) (noting that the Court "reformed the law of horizontal restraints" in *Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1 (1979) ("*BMI*"), and *NCAA*, *inter alia*). But *Topco* and *Sealy* need not be interpreted so broadly to support plaintiffs' claims at this stage. Both *BMI* and *NCAA* were decided after lengthy trials, and the Court's decision not to apply the per se rule in these cases was based on highly fact-specific analyses that addressed unique features of the markets at

issue and the products resulting from the defendants' collaboration.

In *BMI*, the Court upheld the "blanket licenses" commonly used in the music industry to enable associations of composers to sell performance rights to radio stations and other performance outlets. The Court acknowledged that the licenses amounted to horizontal price fixing in the literal sense, but it declined to hold them illegal per se, since the practical realities of the market made it "nearly impossible for each radio station to negotiate with each copyright holder separate licenses for the performance of his works on radio." *BMI*, 441 U.S. at 6, 20.

In *NCAA*, the Court declined to apply the per se rule to horizontal restrictions on the televising of college football games. The Court recognized that the challenged agreement was an output limitation of the kind the antitrust laws generally condemn per se. Yet it applied the Rule of Reason, observing that league sports are quintessentially a joint activity, and that organized athletic competition is "an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.* at 101.

It does not appear at this stage that the circumstances warranting the Court's departure from the per se mode of analysis in *BMI* and *NCAA* justify the same treatment here. The Supreme Court

11

and the Seventh Circuit have reiterated since those cases were decided that territorial restraints and price-fixing among competitors generally remain subject to per se analysis. *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("[r]estraints that are per se unlawful include horizontal agreements among competitors to fix prices...or to divide markets") (citations omitted). *See also Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) ("[h]orizontal territorial limitations ... are naked restraints of trade with no purpose except stifling of competition.") (quoting *Topco*, 405 U.S. at 608); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir. 1984) (distinguishing *BMI* and *NCAA* and holding territorial restraints by trucking company to be a per se violation of the Sherman Act). Prior to any factual development, defendants' argument that their collaboration resulted in a "new and effective product" does not warrant dismissal of plaintiffs' per se claim under *BMI* or *NCAA*. Def.'s Mem. at 11. *See In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1259 (N.D. Ala. 2018) (health insurance not a "unique product" compelling dismissal of per se claim).

Nor is dismissal appropriate based on defendants' characterization of the market allocation mechanism as an "ancillary restraint." Defendants rely heavily for this argument

on *Polk Bros. v. Forest City Enterprises,* F.2d 185, 189 (7th Cir. 1985), in which the Seventh Circuit explained that "[a] restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output," and held that "courts must ask whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment." *Id.* Setting aside the difficulty of answering this question at the pleadings stage — *Polk Bros.*, too, was decided after a trial — the Supreme Court has since made clear that "the ancillary restraints doctrine has no application...where the business practice being challenged involves the core activity of the joint venture itself." *Texaco Inc. v. Dagher,* 547 U.S. 1, 7 (2006). That certainly appears to be the case here, as the challenged restrictions govern defendants' core activity of selling dental insurance. For at least these reason, *Polk Bros.* does not compel application of the Rule of Reason to the market allocation mechanism.[1]

---

[1] I note that defendants' ancillary restraint argument rests largely on their own view of the facts, not on facts alleged in the complaint. For example, defendants take for granted that their cooperation is properly characterized as a "joint venture." *See id.* at 23, 31, 21. As plaintiffs observe, however, defendants' collaboration is unlike the joint venture in *Polk Bros.*, where the two entities offered complementary household products and the agreement to sell them at a single location was likely to increase the output by each. Here, all of the Delta Dental State Insurers

*Ohio v. American Express Co.*, l138 S. Ct. 2274, 2283 (2018) ("*AmEx*"), also does not dispose of plaintiffs' per se claim as a matter of law. *AmEx* involved a challenge to antisteering provisions that American Express imposed upon merchants as a condition of participating in its credit card network. The Court explained that credit card companies like American Express operate a "two-sided platform," meaning that they offer "different products or services to two different groups who both depend on the platform to intermediate between them." *Id.* at 2280. Two-sided platforms "often exhibit what economists call 'indirect network effects,'" which exist when the value of the platform to participants on each side depends on the number of participants on the other. *Id.*

Credit card networks, the Court continued, belong to a special subset of two-sided platforms known as "transaction" platforms. *Id.* "The key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Id.* Due to the nature of the product credit card companies offer—transactions that are jointly consumed by the cardholder and the merchant—credit card networks "exhibit more pronounced indirect network effects and interconnected

---

offer the same products. And in *Dagher,* the Court presumed for purposes of its decision that the combination at issue was a "lawful joint venture," but there is no basis on which to make that assumption here.

pricing and demand." *Id*. at 2286. Accordingly, both sides of the market had to be considered to determine whether AmEx's antisteering provisions had anticompetitive effects. Yet the plaintiffs in *AmEx* "stake[d] their entire case on proving that Amex's agreements increase merchant fees," without considering the agreements' effects, if any, on the other side of the market. *Id*. at 2287. For that reason, and because the plaintiffs also had not proven that the anti-steering restrictions "increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, or otherwise stifled competition in the credit-card market," the Court concluded that the plaintiffs had not established a violation of federal antitrust laws. *Id*.

Defendants argue that dental insurance companies, like credit card companies, operate two-sided transaction platforms with dental providers on one side and consumers of dental goods and services on the other. In their view, this means that the territorial restraints require a nuanced analysis that considers indirect network effects and is "fundamentally incompatible with the *per se* rule." Def.'s Mem. at 3. While there are indeed some similarities between the role credit card companies play in facilitating transactions between merchants and consumers and the role dental insurance companies play in facilitating the care

15

dentists provide patients, defendants overstate the impact of *AmEx* on the claims plaintiffs articulate.

At the outset, the parties in *AmEx* agreed that the plaintiffs' claim challenged a vertical restraint governed by the Rule of Reason. *Id.* at 2284. Accordingly, the Court did not discuss the per se mode of analysis at all, except to acknowledge that horizontal restraints, i.e., "restraints imposed by agreement between competitors" are "[t]ypically" the kind that qualify as unreasonable per se. *Id.* (internal quotation marks and citation omitted). Specifically, the Court did not address the availability or contours of a per se challenge to a horizontal restraint in a two-sided market. So even assuming that dental insurers operate in a two-sided market, *AmEx* does not necessarily foreclose plaintiffs' claim that defendants' agreement to eliminate intrabrand competition through territorial divisions is anticompetitive per se.[2]

---

[2] Plaintiffs appear to agree that the dental insurance market operates a two-sided platform: "A dental insurer offering a dental plan needs at least two things for the plan to succeed:(1) patients willing to pay the dental insurer's premiums in exchange for the terms and coverage offered by the plan, and (2) dental providers willing to accept patients under that plan given the reimbursement rates the dental insurer is offering for the good[s] and services provided to the dental patient. In a free and competitive market, patients will not accept the plan if the dental insurer's premiums are too high, and dental providers will not accept the plan if the dental insurer's reimbursement rates are too low." CC at ¶ 98 n. 5.

Defendants also overreach in their characterization of the dental insurance market as a two-sided transaction platform. Indeed, dental insurance lacks the "key feature" of a transaction platform: simultaneity of the exchange. *See* 1138 S. Ct. 2280. As common experience teaches, consumers of dental services typically pay insurers fixed premiums at regular intervals, regardless of when or even whether they visit the dentist. And the amount of the insured's premium generally depends on the terms and coverage of her plan, not on the cost of the goods or services she receives on any particular visit. Yet as plaintiffs allege, insurers reimburse dental providers based on the goods and services they actually provide to patients. So a dental provider receives no payments at all on behalf of an insured who paid her premiums in full but did not actually receive dental care during the plan year. And reimbursements paid on behalf of an insured who does receive covered services during her plan year are untethered in both time and cost from the insured's premium payment. In these ways, dental insurance operates decidedly differently from the "two-sided transaction platform" in *AmEx*.

Defendants baldly assert that "[l]ower reimbursement rates mean lower premiums for employers, groups, and individuals, and lower copayments and out-of-pocket costs for consumers" and argue that "[t]o hold an agreement that tends to lower consumer prices

illegal per se, without careful examination of the agreement's true economic consequences, would seem at odds with the Sherman Act's purpose." Def.'s Mem. at 28, quoting *North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740, 750 (N.D. Ill. 2005). But their factual premise is contrary to the complaint, which alleges that consumers do *not* benefit from defendants' artificially low reimbursement rates. Indeed, plaintiffs allege that defendants could maintain or even reduce their insureds' premium costs even at higher reimbursement rates by decreasing their executives' compensation and/or their flush capital reserves. In plaintiffs' view, any indirect network effects that exist in the market are minimal, so the two-sided market analysis is inapplicable. *See AmEx*, 138 S. Ct. at 2286. This is not a dispute that can be resolved at this stage. For the foregoing reasons, I conclude that plaintiffs' allegations describing the market allocation mechanism articulate a viable per se violation of the Sherman Act.

With respect to the second and third mechanisms plaintiffs challenge, defendants do not dispute that horizontal agreements to fix prices or limit output are anticompetitive per se. But they claim that plaintiffs' allegations of "price-fixing" and "revenue restrictions" are merely empty labels that are factually insufficient to articulate a Section 1 violation. Defendants are

correct that Rule 8 requires more than mere labels and conclusions, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but wrong in their assertion that the consolidated complaint does not cross that threshold.

Contrary to defendants' characterization, plaintiffs do not merely incant the words "price fixing" and "revenue restrictions" without more. With respect to price fixing, plaintiffs allege that defendants:

> draw upon their access to market rates data for dental goods and services across the U.S. via the records obtained and held by Delta Dental Plans Association, and use these to collectively determine the below market rates they will impose upon the Dental Providers pursuant to the Delta Dental Provider Agreement. Defendants coordinate their reimbursement rates through the Delta Dental Plans Association by, among, other things, agreeing on the form of the agreements that the Delta Dental State Insurers enter into with the Delta Providers, sharing their reimbursement data, and policing the reimbursement rates of the other Delta Dental State Insurers.

CC at ¶ 100. This paragraph describes how defendants obtain and share pricing information, agree collectively upon below-market reimbursement rates, then police payment of those rates to ensure uniformity in practice. These allegations give substance to the label "price fixing" and are sufficient to inform defendants of the nature of plaintiffs' claim.[3]

---

[3] Defendants contend that to survive dismissal, plaintiffs were required to "plead facts showing the 'who, what, when, where, and how' of the 'price-fixing mechanism.'" Reply at 6. This formulation

The factual allegations surrounding plaintiffs' claim that defendants have agreed to a "direct cap" on revenue derived from non-Delta Delta business is decidedly less substantial. Nevertheless, their description of the revenue restrictions mechanism is sufficient to give defendants "fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "There is no heightened pleading standard for antitrust claims." *Int'l Outsourcing Servs., LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860, 862 (N.D. Ill. 2006) (citing *Hammes v. AAMCO Transmissions*, 33 F.3d 774, 782 (7th Cir. 1994). This means that plaintiffs must allege only "enough factual matter (taken as true) to suggest that

---

echoes the one courts in this circuit routinely use to describe the heightened pleading standard of Rule 9(b). *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (plaintiff alleging fraud must plead "the who, what, when, where, and how: the first paragraph of any newspaper story."). But the Seventh Circuit has made clear that Rule 8, not Rule 9(b), governs antitrust claims. *Hammes v. AAMCO Transmissions*, 33 F.3d 774, 782 (7th Cir. 1994). And I apply Seventh Circuit law because "[t]he law of the circuit where the transferee court sits governs questions of federal law in MDL proceedings." *In re Bridgestone/Firestone, Inc., ATX, ATX II*, 129 F. Supp. 2d 1202, 1204 n. 2 (S.D. Ind. 2001) (citing *In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171, 1176 (D.C.Cir. 1987)). Accordingly, defendants' reliance on *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 995 (N.D. Cal. 2015), which applied the Ninth Circuit standard articulated in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (complaint claiming Sherman Act conspiracy must "answer the basic questions: who, did what, to whom (or with whom), where, and when?") is not persuasive.

an agreement was made." *Twombly*, 550 U.S. at 556. Here, no one disputes that defendants conducted Delta Dental business by agreement. If that agreement limited the revenue Delta Dental State Insurers could derive from other business in a manner that restricted output as plaintiffs allege, then defendants are potentially liable under § 1 of the Sherman Act. *See In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1272-73 (N.D. Ala. 2018).

Defendants flatly dispute that they have agreed to such restrictions, noting that the "Delta Dental Plans Association Membership Standards and Guidelines" ('Membership Guidelines')" "simply do not limit the amount of second-brand business that Member Companies can generate." On that ground, they insist that "the very document" plaintiff cite belies their claim. Def.'s Mem. at 12, 19. But the consolidated complaint does not refer to the "Membership Guidelines." As noted above, plaintiffs cite "a contract entered into by each Delta Dental State Insurer with the Delta Dental Plans Association (the 'Delta Dental Plan Agreement')." In their opposition brief, plaintiffs explain that the "Delta Dental Plan Agreement" comprises not only the Membership Guidelines but also a number of other documents that collectively embody defendants' agreement. Indeed, the Membership Guidelines refer to numerous additional documents governing the parties'

agreement, including DDPA Bylaws, DeltaUSA Bylaws, the DeltaUSA Policies and Procedures Manual, Delta's Interplan Participation Agreement, the Delta Dental Member Company Rating Factors, the National Provider File License Agreements, the Policy Governing e-Business and Technology Requirements, and the DeltaUSA Processing Policies. Accordingly, that the Membership Guidelines do not facially establish revenue caps does not dispose of the question whether defendants have agreed to limit their revenue from non-Delta Dental business. Although the factual basis for plaintiffs' belief that defendants have agreed to restrict their non-Delta Dental branded business is indeed modest,[4] they have alleged facts that, if proven, may entitle them to relief.

<u>Rule of Reason</u>

To state a claim under the Rule of Reason, the consolidated complaint must allege concerted action with "an anticompetitive effect on a given market within a given geographic area." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012).

---

[4] The basis for plaintiffs' belief that a revenue restriction agreement exists seems to be largely inferential. Plaintiffs allege that Delta Dental State Insurers in fact conduct little to no competing business despite having the wherewithal to do so, CC at ¶ 108, and they point to "broad language" governing defendants' relationship that they construe as giving the DDPA the authority to impose and police the revenue restriction mechanism. Opp. at 10, n. 2. This is perhaps a slim reed on which to base their claim, but in the context of their allegations as a whole, I conclude that it is enough to entitle them to discovery.

Accordingly, "a plaintiff's threshold burden under the Rule of Reason analysis involves the showing of a precise market definition...." *Id.* at 337. Plaintiffs' obligation to define a relevant market comprises both product and geographic components. *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 324 (1962); *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (citing cases).

Nevertheless, defendants contend that dismissal is appropriate because the complaint fails to allege an anticompetitive effect on the market as a whole, reprising their argument about dental insurance being a two-sided platform. But as noted above, no judgment can be made at this stage regarding the significance of any indirect network effects, which may or may not require a two-sided market analysis. At all events, plaintiffs have in fact alleged that the conspiracy is harmful to *both* sides of the platform, and they have described the injuries suffered by each. *See* CC at, e.g., ¶¶ 5, 6, 9-21, 92, 99 (provider injuries); ¶¶ 3, 6, 92, 99, 130 (consumer injuries). And defendants' insistence that lower premiums for policyholders are the necessary corollary of lower reimbursement rates for providers is not only

contrary to plaintiffs' allegations but is belied by one of the very cases defendants cite. *See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62 (1st Cir. 2004) ("Blue Cross might pass the savings [from an exclusive dealing arrangement subject to the Rule of Reason] on to customers (lower premiums, smaller co-payments, broader coverage) or keep the savings itself and pay its executives more (if competition among health insurers is inadequate and state regulation absent).").

Defendants' next argument is that plaintiffs do not allege a cognizable product market because their complaint refers to both individual and group insurance and because they "do not explain" whether the market includes self-funded programs, public programs, discount programs, and the like. The consolidated complaint alleges:

> The relevant product market includes insurance provided to dental patients who purchase dental insurance for themselves, or groups who purchase dental insurance on behalf of their members, for dental goods and services including, but not limited to, diagnostic routine periodic examinations, bitewings, X-rays, cleanings, fluoride treatments, sealants, space maintainers, minor emergency procedures, fillings, tooth extractions, biopsy of oral tissue, frenectomy, non-surgical periodontics, endodontics, crowns, and dentures.

CC at ¶ 87.

I agree that plaintiffs' unbounded market definition that "includes insurance" for a non-exhaustive list of dental goods and services is ambiguous. At first blush, it seems to identify

"insurance" as the basic product, with a list of goods and services that may be covered serving to narrow the field of substitute products. But plaintiffs' response brief identifies the relevant product market as "the market for the purchase of dental goods and services," which I interpret to mean that the product is not the "insurance" sold to individuals and groups by insurers such as defendants, but rather the dental goods and services sold by plaintiffs to insurers, which they can also sell (assuming a competitive market) to uninsured individuals paying out-of-pocket, or to government programs on behalf of their participants. While that meaning is less than self-evident from plaintiffs' alleged market definition, it is consistent with the statement that the market "includes insurance" in the sense that insurance providers are among the purchasers in the market for plaintiffs' goods and services.

Understood in this way, plaintiffs' market definition avoids the under-inclusiveness of the product markets defined in the cases defendants cite. *See, e.g., See Little Rock Cardiology v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) (rejecting product market expressly "limited to a single method of payment when there are other methods of payment that are acceptable to the seller"); *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (rejecting product market

limited to a single brand given the existence of competitors, but noting that courts "are generally hesitant to dismiss a Sherman Act claim for failure to allege a relevant product because market definition is a deeply fact-intensive inquiry."). So while the product market articulated in the consolidated complaint is not a model of clarity, it does not appear to suffer from the infirmities defendants identify and is consistent with their theory that defendants have combined to form a buyers' cartel with monopsony power that makes it difficult for alternative buyers to compete, thereby depressing the market price for the sale of dental goods and services.

Corresponding ambiguities in plaintiffs' alleged geographic market also do not warrant dismissal. Plaintiffs state that:

> The relevant geographic markets for such dental insurance is the whole United States comprising the territories that the Defendants have allocated to themselves pursuant to the Market Allocation Mechanism, and/or, in the alternative, the territories the Defendants have allocated to themselves pursuant to the Market Allocation Mechanism.

CC at ¶ 88. As defendants observe, plaintiffs appear to have trained their focus on the geographic areas in which defendants sell dental insurance, rather than on the areas in which plaintiffs could sell dental goods and services to other buyers, despite the fact that they identify dental goods and services as the relevant product. *See* Def.'s Mem. at 40. In the case of a buyers' cartel,

26

"the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Todd*, 275 F.3d at 202 (citation omitted). So on plaintiffs' theory of the case, the issue is whether defendants' anticompetitive conduct has diminished the availability of substitute buyers in the geographic market where plaintiffs sell their goods and services.

Defendants argue that because plaintiffs are likely to draw patients primarily from nearby communities, the relevant geographic market should comprise only the areas surrounding their respective practices, not the entire territory allocated to the Delta Dental State Insurer responsible for those areas. But why should it matter where plaintiffs' patients live? There is no obvious link, in the absence of a factual record, between a dental patient's place of residence and the dental insurance options available to her. Indeed, all agree that some of defendants' competitors (that is, potential substitute purchasers of dental services) are national insurance companies that insure patients throughout the United States. Plaintiffs will undoubtedly have to develop the record to define more precisely the geographic market that is relevant to their claims, but given that they seek to represent a nationwide class and claim that defendants insure patients across the country, their identification of the United

27

States and the respective territories in which defendants participate in the market as buyers of dental goods and services is sufficient at this stage.

Defendants' final challenge to the complaint under the Rule of Reason analysis is that it does not allege (or, more precisely, does not correctly allege) defendants' market share. This argument rests almost entirely on defendants' disagreement with plaintiffs' statement that defendants have between of 59% and 66% of the national market, calling those market shares "wildly inaccurate." Def.'s Mem. at 41. Obviously, that is not a basis for dismissal. Defendants' remaining arguments do not convince me that Rule 8 requires more detailed factual allegations than those plaintiffs articulate concerning defendants' market power.

### Antitrust Injury

Defendants devote roughly three of the seventy-five pages comprising their memorandum and reply to the argument that plaintiffs have not pled an antitrust injury. They are right to have invested so little in this argument. While it is true as a general matter that in an antitrust case, "the plaintiff must allege, not only an injury to himself, but an injury to the market as well," *Agnew* 683 F.328 at 335, "[i]n a buyers' conspiracy case, a seller sufficiently alleges antitrust injury by pleading that it has received excessively low prices from members of the buyers'

28

cartel," *Omnicare, Inc. v. Unitedhealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007) (citing cases). Accordingly, in a case such as this, the injury plaintiffs claim to have suffered *is* an antitrust injury. In any event, defendants' argument boils down to the drumbeat of their insistence that lower reimbursement rates necessarily mean lower premiums for policyholders. As explained above, however, that argument is contrary to plaintiffs' allegations and is not susceptible to resolution as a matter of law. Accordingly, it does not warrant dismissal regardless of whether it is asserted to foreclose plaintiffs' per se claim, to challenge their market definition, or to argue that they have not stated an antitrust injury.

### Concerted Action

Concerted action is, of course, the *sine qua non* of any conspiracy in violation of § 1. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010) ("an arrangement must embody concerted action in order to be a 'contract, combination ..., or conspiracy' under § 1."). In defendants' view, plaintiffs cannot prove this essential element because the DDPA – which defendants assert is the sole owner the Delta Dental trademark — and the Delta Dental State Insurers — licensees of the mark — must be considered a single entity in the eyes of the law. Defendants cite the Supreme Court's application of this principle in

29

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984), where it held that a parent corporation cannot conspire with its wholly owned subsidiary, and they cite *American Needle, Inc. v. NFL*, 538 F.3d 736, 738-739 (7th Cir. 2009), *rev'd* 560 U.S. 183 (2010), for the observation that later decisions broadened the principle's scope beyond the parent-subsidiary relationship to include other types of corporate and individual affiliation. Def.'s Mem. at 44-45. These cases do not avail them.

Defendants' citation to *American Needle* is puzzling. Although the Supreme Court left undisturbed the unobjectionable observation defendants invoke, it reversed the Seventh Circuit's central holding. Although the Seventh Circuit had concluded that an agreement among the NFL's football teams to centralize the licensing activities for their separately owned intellectual property was "immune from antitrust scrutiny" because the teams acted as a single entity for that purpose, the Supreme Court disagreed. 560 U.S. at 188, *quoting* 538 F.3d at 741. The Court explained that to determine whether formally distinct legal entities are entitled to single entity treatment requires "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Id.* at 191. The Court noted that although the separate NFL teams had "common interests such as promoting the NFL brand, they are still separate, profit-

maximizing entities" with "distinct, potentially competing interests." *Id*. at 198. That is essentially plaintiffs' view of the situation here. And while defendants distinguish the Supreme Court's *American Needle* decision on the ground that DDPA, rather than the individual Delta Dental State Insurers, is and has always been the sole owner of the Delta Dental trademarks, that argument relies on facts outside the consolidated complaint. Moreover, *Sealy* and *Topco* illustrate that the fact that the licensor owns the licensed trademark is not dispositive of whether the licensees can conspire to use the trademark in a way that violates the Sherman Act.

### McCarran-Ferguson Act

Defendants' final argument for dismissal is that plaintiffs' claims are barred by the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq*, which establishes a limited antitrust exemption for the "business of insurance." For exemption to apply, the challenged practice: "(1) must constitute the 'business of insurance,' (2) must be regulated by state law, and (3) must not amount to a "boycott, coercion, or intimidation." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 124 (1982).[5] The statute does not grant the insurance industry a blanket exception to antitrust laws.

---

[5] I note that it would be unusual to resolve the issue of McCarran-Ferguson exemption on the pleadings, as it is an affirmative defense on which defendants bear the burden of proof. *See Klamath-*

Congress's primary concern in enacting the McCarran-Ferguson Act was with "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.'" *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 215 (1979)(quoting *SEC v. Nat'l Securities, Inc.*, 393 U.S. 453, 460 (1969)). To determine whether a practice constitutes the "business of insurance," courts analyze three factors: (1) whether the practice has the effect of transferring or spreading the policyholders' risks; (2) whether the practice is an integral part of the policy relationship between the insurer and insured; and (3) whether the practice is limited to entities within the insurance industry. *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 129 (1982).

Defendants focus primarily on the first factor, relying heavily on *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928, 932 (9th Cir. 1983), to argue that the territorial restrictions in their agreements function as a risk-spreading mechanism. In *Feinstein*, the court held that an exclusive agency agreement between the Los Angeles County Medical Association and

---

*Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1281, 1279 (9th Cir. 1983) (resolving the "affirmative defense of exemption from the antitrust laws under the McCarran-Ferguson Act" in summary judgment motions brought after "extensive discovery.")

an insurance agent, in which the agent received exclusivity in exchange for an agreement to insure all of the association's members, was within the scope of the McCarran-Ferguson Act. The court explained that the agreement was "demonstrably related to the allocation and spreading of risk," because its purpose was to ensure coverage for the association's members in high-risk specialties. *See id*. ("The medical association sought to provide a single insurance broker for all of its members in order to assure coverage for certain high-risk specialties, thereby distributing risk across the membership."). Defendants assert that the market allocation mechanism serves the same purpose here; but as the territorial divisions have no obvious actuarial relevance, there is no basis at this stage for construing them as essentially a risk-spreading mechanism. *See State of Md. v. Blue Cross & Blue Shield Ass'n,* 620 F. Supp. 907, 917 (D. Md. 1985) ("to meet the first *Pireno* requirement the defendants must show the challenged territorial allocation is related positively to underwriting and ratemaking; that is, that exclusive geographic territories directly facilitate risk spreading and transfer through the provision of insurance.").

Defendants' remaining citations are no more compelling. In *UNR Indus., Inc. v. Cont'l Ins. Co*., 607 F. Supp. 855, 858 (N.D. Ill. 1984), for example, the plaintiff was an insured who sought

to assert its right to defense and indemnification against its insurer. Such claims plainly involve core elements of the "business of insurance." And while the plaintiff in *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1203 (7th Cir. 1981), was not a policyholder but an auto repair shop that performed work on vehicles insured by the defendants, its antitrust case "focuse[d] on the policies and practices of the defendant insurance companies in processing automobile damage claims" — another essential aspect of the business of insurance. *Id*. at 1197.

Defendants devote no meaningful attention to the second factor — whether the practices plaintiffs challenge are "an integral part of the policy relationship between the insurer and insured" — before moving on to the third: state regulation of the practices. In this connection, they state that "many state insurance statutes expressly authorize dental service corporations to work together and share information needed to process subscribers' claims," Def.'s Mem. at 9–10, 50 (citing Oklahoma and New Jersey statutes). But even assuming that the second statutory requirement for exemption is not, as defendants submit, "a high bar," *id.* at 50 (quoting *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 745 (5th Cir. 2015)), defendant's generalized characterization of state statutes is insufficient to satisfy it.

On the whole, this case is more closely akin to *Royal Drug* and *Pireno* than it is to any of defendants' cited authorities. *Royal Drug* involved agreements between insurance companies and pharmacies for the purchase of goods and services. The Court found it "next to impossible to assume that Congress could have thought that agreements (even by insurance companies) which provide for the purchase of goods and services from third parties at a set price are within the meaning" of the phrase "business of insurance" 440 U.S. at 230. And in *Pireno*, the Court concluded that a practice "that inevitably involves third parties wholly outside the insurance industry—namely, practicing chiropractors" fell outside not the "business of insurance." 458 U.S. at 132. So, too, does it appear from the consolidated complaint that defendants' conspiracy to form a buyers' cartel to depress reimbursement rates through the alleged anticompetitive mechanisms falls outside the statutory meaning of the "business of insurance."

III.

For the foregoing reasons, defendants' motion to dismiss is denied.

Dated: September 4, 2020      **ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge