**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE DELTA DENTAL ANTITRUST LITIGATION<br><br>*This document relates to: ALL ACTIONS* | **CIVIL ACTION NO.**<br><br>1:19-CV-06734<br><br>**MDL No. 2931**<br><br>Hon. Elaine E. Bucklo |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR**
**CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ..................................................................................5

    A.    General Background: Plaintiffs..................................................................5

    B.    General Background: Defendants. ............................................................5

    C.    Market Dominance....................................................................................7

I.    MANDATORY GOVERNING AGREEMENTS.....................................8

II.    DEFENDANTS CREATED AND ENFORCE TERRITORIAL RESTRAINTS THAT DIVIDE THE UNITED STATES INTO EXCLUSIVE TERRITORIES. ............10

    A.    DDPA And DeltaUSA Impose Mandatory Territorial Restraints. ........10

    B.    DeltaUSA Decides Territorial Disputes Among Member Companies And Directs Opportunities To Particular Member Companies. ...................12

    C.    DDPA Sanctions Defendants Who Compete Outside Their Exclusive Territories.................................................................................................13

    D.    Defendants Concede That Territorial Allocation Harms Competition. ................13

III.    DEFENDANTS FIX PRICES THROUGH MANDATORY PROCESSING POLICIES, COORDINATED INFORMATION SHARING, AND AN EFFECTIVE DISCOUNT STANDARD. ..........................................................14

    A.    DeltaUSA Issues Processing Policies Mandating Reimbursement Amounts For All Member Companies. ..........................................................14

    B.    Defendants Agree To Share Pricing Information Through Central Databases. ..............................................................................................17

    C.    Defendants Share Reimbursement Amounts And Strategies To Reduce Provider Reimbursement. ......................................................................18

        1.    Defendants Share Reimbursement Rates Upon Request. .........................18

        2.    Defendants Share Strategies To Reduce Reimbursement Rates.................19

    D.    DDPA Imposes An Effective Discount Standard That Is Designed To Force Member Companies To Lower Reimbursement Rates. ..........................................20

IV.    DDPA AND MEMBER COMPANIES RESTRICT COMPETITION BY SECOND BRANDS. ..........................................................................23

    A.    Second Brands Primarily Facilitate Delta Dental-Branded Business. ..................24

    B.    Second Brands Avoid Competing With Delta Dental. ..........................25

    C.    DDPA And Member Companies Monitor And Sanction Second Brands. ...........27

    D.    Defendants' Suppression of Second Brands Prevents Insurers Offering Higher Reimbursement Rates From Effectively Competing. ...............................27

i

V.    DEFENDANTS' RECOGNIZE THAT THEIR CONDUCT IS ILLEGAL UNDER
      *BCBS*. .................................................................................................28

VI.   DEFENDANTS FACILITATED THEIR MISCONDUCT BY FAILING TO
      PROVIDE ANTITRUST TRAINING. ...............................................................29

VII.  DEFENDANTS USE CONSPIRACY PROCEEDS TO PAY EXCESSIVE
      COMPENSATION, ACCUMULATE GROSSLY EXCESSIVE CAPITAL
      RESERVES, AND INVEST IN FOR-PROFIT BUSINESSES. .....................................30

      A.    Defendants Pay Excessive Compensation, Benefits, and Perquisites to their
            Executives. ..................................................................................30

      B.    Defendants Accumulate Excessive Capital Reserves. ...........................33

      C.    Member Companies Invest Gains In For-Profit Businesses Unrelated To
            Dental Care. ................................................................................34

      D.    Plaintiffs' Compensation Expert Confirmed That Defendants' Executive
            Compensation and Capital Reserves Are Excessive. ...........................35

      E.    Defendants Admit That Excessive Compensation And Reserves Could Be
            Used To Increase Dental Provider Reimbursement Without Raising
            Consumer Premiums. .....................................................................35

VIII. CLASS-WIDE EVIDENCE IS CAPABLE OF DEMONSTRATING THAT
      SUBSTANTIALLY ALL DENTAL PROVIDERS IN THE CLASS HAVE BEEN
      IMPACTED BY THE ALLEGED CONSPIRACY. .................................................36

IX.   CLASS-WIDE EVIDENCE IS CAPABLE OF ESTABLISHING THAT
      AGGREGATE DAMAGES CAUSED BY DEFENDANTS TOTAL
      APPROXIMATELY $13 BILLION. ..................................................................38

ARGUMENT ................................................................................................39

I.    THE PROPOSED CLASS SATISFIES RULE 23(A). .............................................40

      A.    The Class Is So Numerous That Joinder Of All Members Is Impracticable. ........40

      B.    There Are Many Questions Of Law And Fact Common To The Class ................40

      C.    The Claims Of The Named Plaintiffs Are Typical Of The Claims Of The
            Class. ........................................................................................42

      D.    The Named Plaintiffs and Class Counsel Will Fairly And Adequately
            Protect The Interests Of The Class. ...................................................43

II.   THE PROPOSED CLASS SATISFIES RULE 23(B)(3). .......................................45

      A.    Common Questions Predominate. .....................................................45

            1.    Class-Wide Evidence Is Available To Prove The Common Question
                  of Territorial Allocation. .........................................................47

            2.    Class-Wide Evidence Is Available To Prove The Common Question
                  of Whether Price-Fixing Occurred. ...........................................47

3.      Class-Wide Evidence Is Available To Prove The Common Question of Second Brand Suppression. .................................................................48

4.      Class-Wide Evidence Is Available To Prove The Common Question of Impact. .................................................................48

III.      CLASS-WIDE EVIDENCE IS AVAILABLE TO PROVE THE COMMON QUESTION OF DAMAGES. .................................................................50

       A.      Class Treatment Is A Superior Method To Adjudicate This Controversy............51

IV.      A NATIONWIDE CLASS IS APPROPRIATE. .................................................................53

       A.      This *Per Se* Case Does Not Require A Defined Product Or Geographical Market. .................................................................53

       B.      Even Under A Rule Of Reason Analysis, Plaintiffs Have Sufficiently Identified The Product And Geographic Markets For Class-Wide Treatment. .................................................................54

             1.      The Product Market for Dental Goods and Services. ................................55

             2.      The Geographic Market is the United States. .............................................55

V.      DEFENDANTS' BOILERPLATE AFFIRMATIVE DEFENSES CANNOT PRECLUDE CLASS CERTIFICATION. .................................................................58

CONCLUSION.................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agnew v. NCAA*,
 683 F.3d 328 (7th Cir. 2012) ..................................................55

*Amchem Prod., Inc. v. Windsor*,
 521 U.S. 591 (1997) ..................................................43

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013) ..................................................39, 45, 46

*Balderrama-Baca v. Clarence Davids & Co.*,
 318 F.R.D. 603 (N.D. Ill. 2017) ..................................................51

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
 784 F.2d 1325 (7th Cir. 1986) ..................................................57

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ..................................................47

*Bell v. PNC Bank, Nat. Ass'n*,
 800 F.3d 360 (7th Cir. 2015) ..................................................41, 45

*Beltran v. InterExchange, Inc.*,
 2018 WL 1948687 (D. Colo. Feb. 2, 2018) ..................................................58

*Bionion v. Metropolitan Pier and Exposition Auth.*,
 163 F.R.D. 517 (N.D. Ill. 1995) ..................................................42

*In re Blue Cross Blue Shield Antitrust Litig.*,
 2:13-cv-20000-RDP, Dkt. 2931 (N.D. Ala.) ..................................................28, 46

*BMI v. CBS*,
 441 U.S. 1 (1979) ..................................................53

*In re Broiler Chicken Antitrust Litig.*,
 2022 WL 1720468 (N.D. Ill. May 27, 2022) ..................................................50

*In re Bromine Antitrust Litig.*,
 203 F.R.D. 403 (S.D. Ind. 2001) ..................................................43, 52

*Butler v. Sears, Roebuck & Co.*,
 727 F.3d 796 (7th Cir. 2013) ..................................................51, 52

*In re Cardizem CD Antitrust Litig.*,
 200 F.R.D. 297 (E.D. Mich. 2011) ..................................................50

*Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643 (1980) ................................................................53

*Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*,
797 F.3d 426 (7th Cir. 2015) ...................................................45

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ..................................................................45

*Continental T. V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977) ..................................................................54

*De La Fuente v. Stokely–Van Camp, Inc.*,
713 F.2d 225 (7th Cir. 1983) ...................................................42

*In re Dealer Mgmt. Sys.*,
581 F. Supp. 3d 1029 (N.D. Ill. 2022) ....................................50

*Dial Corp. v. News Corp.*,
314 F.R.D. 108 (S.D.N.Y. 2015) .............................................54

*In re Domestic Drywall Antitrust Litig.*,
322 F.R.D. 188 (E.D. Pa. 2017) ..............................................58

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
431 U.S. 395 (1977) ................................................................43

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig.*,
No. 17-md-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) ............................54

*In re Evanston Nw. Healthcare Corp. Antitrust Litig.*,
268 F.R.D. 56 (N.D. Ill. 2010), *vacated on other grounds sub nom.* .....................................59

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ................................................................43

*Grossman v. Waste Mgmt., Inc.*,
100 F.R.D. 781 (N.D. Ill. 1984) ..............................................40

*In re Indus. Gas Antitrust Litig.*,
100 F.R.D. 280 (N.D. Ill. 1983) ..........................................40, 58

*Johnson v. Aronson Furniture*,
No. 96 C 117, 1998 WL 641342 (N.D. Ill. Sept. 11, 1998) .....................................59

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) ...................................................41

*Kleen Prod. LLC v. Int'l Paper, Co.*,
306 F.R.D. 585 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (7th Cir. 2016) ........................48, 49, 51

*Kleen Prods. LLC v. Int'l Paper Co.*,
831 F.3d 919 (7th Cir. 2016) ................................................................45, 49, 50, 52

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)...............................................................................................53, 54

*In re Lidoderm Antitrust Litig.*,
2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .........................................................50

*Marcial v. Coronet Ins. Co.*,
880 F.2d 954 (7th Cir. 1989) ................................................................................40

*Marion Healthcare, LLC v. S. Ill. Healthcare*,
2015 WL 3466585 (S.D. Ill. May 29, 2015).........................................................55

*McNeil v. NFL*,
790 F. Supp. 871 (D. Minn. 1992).........................................................................55

*Med Alert Ambulance, Inc. v. Atl. Health Sys., Inc.*,
2007 WL 2297335 (D.N.J. Aug. 6, 2007) .............................................................55

*Merk v. Jewel Food Stores*,
702 F.Supp. 1391 (N.D. Ill. 1988) .........................................................................59

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) .....................................................40, 45, 46, 48, 51

*Moehrl v. Nat'l Ass'n of Realtors*,
2023 WL 2683199 (N.D. Ill. Mar. 29, 2023).......................................................49, 52

*NCAA v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984)....................................................................................................53

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015).......................................................................................50

*Nitsch v. DreamWorks Animation SKG Inc.*,
315 F.R.D. 270 (N.D. Cal. 2016)............................................................................58

*In re NorthShore Univ. HealthSystem Antitrust Litig.*,
657 F. Supp. 3d 1077 (N.D. Ill. 2023) ...................................................45, 46, 54

*Pinkett v. Moolah Loan Corp.*,
1999 WL 1080596 (N.D.Ill. Nov. 2, 1999) ...........................................................58

*Polk Bros. v. Forest City Enterprises*,
  F.2d 185, 189 (7th Cir. 1985) ................................................................60

*In re Pork Antitrust Litig.*,
  665 F. Supp. 3d 967 (D. Minn. 2023) ......................................................58

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
  148 F.3d 283 (3d Cir. 1998)...................................................................42

*In re Ready-Mixed Concrete Antitrust Litig.*,
  261 F.R.D. 154 (S.D. Ind. 2009)......................................................42, 46

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009)..............................40, 41, 42, 43, 55

*Rohlfing v. Manor Care, Inc.*,
  172 F.R.D. 330 (N.D. Ill. 1997) ...............................................................46

*Rosario v. Livaditis*,
  963 F.2d 1013 (7th Cir. 1992) ...............................................................41

*Ruiz v. Stewart Assocs., Inc.*,
  171 F.R.D. 238 (N.D. Ill. 1997)...............................................................42

*Sebo v. Rubenstein*,
  188 F.R.D. 310 (N.D. Ill. 1999).............................................................43

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020) ...................................................................54

*Smith v. Family Video Movie Club, Inc.*,
  311 F.R.D. 469 (N.D. Ill. 2015)...............................................................51

*Spano v. Boeing Co.*,
  633 F.3d 574 (7th Cir. 2011) ...................................................................40

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997)....................................................................................54

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) ...................................................................52

*In re Sulfuric Acid Antitrust Litig.*,
  2007 WL 898600 (N.D. Ill. Mar. 21, 2007)............................................58

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006)....................................................................................60

iv

*Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.*,
    97 F.R.D. 668 (N.D. Ill. 1983) ................................................................46

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ................................................................58

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................45

*U.S. v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ................................................................53

*United States v. Philadelphia Nat. Bank*,
    374 U.S. 321 (1963) ................................................................55

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ................................................................55

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................41, 45

*Wigod v. PNC Bank, N.A.*,
    338 F. Supp. 3d 758 (N.D. Ill. 2018) ................................................................60

## **Statutes**

Cal. Ins. Code § 923.5 ................................................................33

## **Rules**

Fed. R. Civ. P. 23 ................................................................1, 40

Fed. R. Civ. P. 23(a) ................................................................4, 39, 40

Fed. R. Civ. P. 23(a)(1) ................................................................40

Fed. R. Civ. P. 23(a)(2) ................................................................40, 41

Fed. R. Civ. P. 23(a)(3) ................................................................42

Fed. R. Civ. P. 23(a)(4) ................................................................43

Fed. R. Civ. P. 23(b) ................................................................39

Fed. R. Civ. P. 23(b)(3) ................................................................4, 40, 45, 46, 51, 52, 58, 60

Fed. R. Civ. P. 23(g) ................................................................4, 43, 44, 60

Fed. R. Civ. P. 23(g)(1)(A) ................................................................44

**Other Authorities**

2B Philip E. Areeda et al., Antitrust Law ¶ 570e.............................................................57

15 U.S.C. § 1........................................................1, 38, 39, 41, 42, 46, 47, 49, 50, 53, 54

## INTRODUCTION

This case concerns a conspiracy among the members of the largest dental insurance system in the United States—Delta Dental, comprised of 39 state-level Member Companies and their national coordinating entities, Delta Dental Plans Association ("DDPA") and DeltaUSA (collectively, "Defendants")[1]—to artificially lower the reimbursement rates paid for dental goods and services to Plaintiffs, who are dentists and dental practices ("Dental Providers"). Dkt. 96, Am. Compl. ¶¶ 22-63.

Defendants formed a monopsonistic buyers' cartel and committed *per se* violations of Section 1 of the Sherman Act by agreeing to reduce Dental Providers' reimbursements through each of the following mechanisms: (i) agreeing to operate only within exclusive geographic territories ("Territorial Allocation"); (ii) agreeing to uniform prices set by DDPA and DeltaUSA for specific dental goods and services, as well as sharing information that facilitated price coordination, and adopting a discount standard that required the Member Companies to reduce reimbursement rates ("Price-Fixing"); and (iii) agreeing to restrict competition by "second brands" operated by some of the Member Companies ("Second Brand Restrictions," and together with (i) and (ii), the "Conspiracy"). The Conspiracy has harmed substantially all Class members in the form of reduced reimbursement rates for many years, resulting in billions of dollars in damages. This is precisely the type of case Fed. R. Civ. P. 23 contemplates for class certification.

Evidence common to the Class confirms the existence of the Conspiracy to suppress reimbursement rates. This evidence includes, among other things:

---

[1] The Member Companies (with several covering multiple states) are referred to by "DD" followed by two-character U.S.P.S. state abbreviations (*e.g.*, DDAR, DDAZ), except Delta Dental Insurance Company (DDIC); Delta Dental of Pennsylvania (DDP); Delta Dental of Puerto Rico (DDPR); Oregon Dental Service (ODS also known as DDOR); and Hawaii Dental Service (HDS).

- Every Member Company entered into written agreements with DDPA and DeltaUSA as a condition of membership. These written agreements impose territorial restrictions on and require price-fixing by the Member Companies. Under these agreements, DDPA has the right to audit Member Companies' compliance with DDPA and DeltaUSA territorial and price-fixing rules and to impose sanctions for violations. Sanctions include severe monetary penalties (up to hundreds of thousands of dollars) and the potential loss of a Member Company's license.

- The terms of the Member Companies' agreements with DDPA and DeltaUSA require every Member Company to agree to allocate territories amongst themselves and not to compete outside their assigned territories. DDMI's CEO described the territorial restraints as "███████████████████████████████████████████." Specifically, Member Companies cannot recruit Dental Providers outside their territories, sell insurance to individuals located outside of their territories, or sell insurance to employers with headquarters located outside their territories. ██████ ███████████████████████████████████████████. Even DDKY's CEO described DDPA's absolute authority to assign customers to Member Companies as "██████████████████████████."

- The Conspiracy required Member Companies to follow national pricing policies set by DeltaUSA, to share reimbursement rate information, and to meet a discount standard that requires them to maintain or reduce reimbursement rates. One Defendant characterized the fact that Dental Provider reimbursement had not increased in nearly a decade as a "███████████████." Defendants have referred to their centralized data platforms, ███████████████████████████████████████████ as Delta Dental's "█████████████" because they serve as repositories for all Member Companies' reimbursement rates, provider information, market share data, and much more, and thereby facilitate the Conspiracy.

- Member Companies also restrict one another's efforts to sell dental insurance under "second brands" that are not expressly subject to the Delta Dental written agreements. Member Companies use the second brands ██████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████. As one DDKS executive bluntly stated, second brands "███████████████████████████."

- Defendants knew that they could suppress Dental Provider reimbursement with impunity because Delta Dental's market power made accepting Delta Dental insurance a "*must-have*"—as a result, over ██ percent of dentists nationwide are enrolled with Delta Dental. Defendants also recognized that, even if they reduced reimbursement rates, Dental Providers could not terminate their participating provider agreements because of Delta Dental's market power. As DDMI's Chief Science Officer observed, Dental Providers will "████████████████" about low reimbursement rates but "█████ ██████████████████████████."

2

- Defendants' pro-competitive justifications are irrelevant in a *per se* case but, in any event, are a sham. Premiums paid by consumers ***increased*** substantially both on an annual basis and over the Class Period, eclipsing any modest increases in Dental Provider reimbursement (which overwhelmingly remained constant or fell relative to inflation). Put in stark terms, the data plainly show that Delta Dental continued to gouge consumers while cheating Dental Providers over the Class Period. Far from benefitting consumers, Defendants—almost all of which operate as ***non-profits*** to avoid paying federal income taxes on the hundreds of millions in "operating gain" (*i.e.*, profits) they amassed each year—used the proceeds of their Conspiracy to: (1) pay obscene salaries, benefits, and perquisites (over $14-$16 million paid per year to some Member Company CEOs, trips on private jets, leases for luxury apartments and vehicles, country club memberships, "meetings" at extravagant resorts, and much more); and (2) hoard billions in capital reserves far in excess of any regulatory requirements. The accompanying report of Plaintiffs' compensation expert, Dr. David Lewin—the Neil H. Jacoby Professor Emeritus of Management, Human Resources and Organizational Behavior in the Anderson School of Management at the University of California at Los Angeles (UCLA) and a Managing Director and Head of the Labor and Employment Practice at the Berkeley Research Group—demonstrates that evidence common to the Class is capable of proving that both Defendants' executive compensation and capital reserves were grossly excessive compared to relevant benchmarks.

This evidence, common to all members of the Class, demonstrates that the Conspiracy was intended to—and did—unlawfully suppress the reimbursement rates paid to Dental Providers. Furthermore, the accompanying report of Plaintiffs' economic expert, Dr. Gustavo Bamberger of Compass-Lexecon—who has both an M.B.A. and a Ph.D. from the University of Chicago and has consulted or testified for both plaintiffs and defendants in hundreds of antitrust matters across the globe—confirms that evidence common to the Class can demonstrate that the Conspiracy caused widespread impact and injury to substantially all Dental Providers throughout the country who entered into participating provider agreements with a Member Company during the Class Period. Dr. Bamberger concludes that more than 99 percent of the proposed Class experienced a negative ***gross*** impact (*i.e.*, were reimbursed less by Delta Dental than the expected reimbursement amount for at least one claim), and about 98 percent of the Class experienced a negative ***net*** impact (*i.e.*, were reimbursed less by Delta Dental across all of that Dental Provider's claims during the Class

Period).[2] In his report, Dr. Bamberger also sets out a reliable methodology for determining Class-wide damages and finds that the proposed Class was underpaid by about $12.6-$13.2 billion as a result of the Conspiracy during the Class Period.[3]

Plaintiffs submit that they have met their burden under Rules 23(a) and 23(b)(3) and respectfully request that the Court certify the following Class:

> All Dental Providers not owned, employed by, or involved in the management or directorship of the Defendants, who provided dental goods or services to a Delta Dental insured and were reimbursed directly by a Defendant, and who were subject to a Delta Dental participating provider agreement (excluding HMO and public entitlement[4] plans) in the United States[5] from October 11, 2015, to December 31, 2022 (the "Class Period").[6]

Plaintiffs also ask the Court to appoint Leonid Feller of Quinn Emanuel Urquhart & Sullivan LLP and Ronald Aranoff of Wollmuth Maher & Deutsch LLP as Co-Lead Class Counsel pursuant to Fed. R. Civ. P. Rule 23(g).[7]

---

[2] Ex. 1, Bamberger at ¶ 100.

[3] *Id.* ¶¶ 110-11.

[4] As used herein, "public entitlement" plans refer to Medicare, Medicaid, CHIP, Indian Health Services, and similar publicly-funded programs. Ex. 2, DDWI000222407 at 412 n.2.

[5] As used herein, "United States" includes Puerto Rico to capture Dental Providers subject to participating provider agreements with Defendant DDPR.

[6] The Class definition presently includes a December 31, 2022 cut-off for membership because Defendants have provided data only through that date. When Defendants supplement their data production, Plaintiffs anticipate that Dr. Bamberger will update his damages calculation to include any subsequent years.

[7] Mr. Feller's CV is attached as Ex. 3; Mr. Aranoff's CV is attached as Ex. 4.

## FACTUAL BACKGROUND

### A.     General Background: Plaintiffs.

Plaintiffs are Dental Providers who provided goods and services to patients insured by one of the Member Companies pursuant to their "Premier" or "PPO" plans during the Class Period.[8]

The Class includes approximately 240,000 Dental Providers who participate pursuant to provider agreements in Delta Dental's Premier or PPO networks. Ex. 1, Bamberger at ¶ 85. Class members received reimbursement from and contracted with Member Companies as in-network providers. The standard-form contracts between Member Companies and Dental Providers require Providers to accept maximum plan allowances set by Defendants for dental goods and services.[9]

### B.     General Background: Defendants.

DDPA was founded in the 1960s to coordinate state dental service corporations that were predecessors to the Delta Dental Member Companies. Ex. 19, DDPA000187248 at 254-57 (2015

---

[8] B. Kyle Benton practices in Arkansas, Ex. 5, 1/20/23 Benton Tr. 14:12-15, and has been a Delta Dental provider since at least 2010, *id.* at 14:17-18, 79:19; Kaufman & Kaufman Smile Design Studio LLC in Illinois has had providers in a Delta Dental network since at least 2001, Ex. 6, DDIL000000010; Legacy Dental Associates, P.C., in Texas, has had providers in a Delta Dental network since at least 2014, Ex. 7, 10/17/22 Supp. R&Os to Rog 1, at 1; Richard Lindley practices in California and has been a Delta Dental provider since at least 1985, Ex. 8, 2/24/23 Lindley Tr. 52:4-9; Steven P. Dultz practiced in New Jersey and was a Delta Dental provider for at least 15 years until he retired in 2019, Ex. 9, 1/12/23 Dultz Tr. 21:16-24; 49:2-16, 102:12-20; Simon and Simon, P.C., in Illinois, has had providers in a Delta Dental network since at least 2014, Ex. 10, 5/25/23 Simon Tr. 144:13-19; Ex. 11, 5/23/23 3d Am. R&Os to Rog 1, at 6; Mary M. Fisher practices in Michigan and was a Delta Dental provider from 1981 to 2019, Ex. 12, 11/28/22 Fisher Tr. 31:21-32:2; Tooth Town Pediatric Dentistry, in Michigan, has had providers in a Delta Dental network since at least 2011, Ex. 13, 6/9/23 Ghezzi Tr. 27:22-23, 150:15-20; Rittenhouse Smiles, P.C., in Pennsylvania, has had providers in a Delta Dental network since at least 2014, Ex. 14, 7/21/23 Am. R&Os to Rog 1, at 1; and Timothy C. Verharen practices in Washington and was a Delta Dental provider from at least 2014 to 2020, Ex. 15, 1/25/23 Verharen Tr. 47:5-11; Ex. 16, 10/21/22 Supp. R&Os to Rog 1, at 2.

[9] *E.g.*, Ex. 17, DD-ENT-000002654 at 657-58 (DDCA Participating Provider Agreement, stating that " ████████████████████████████████████████████ ████████ "); Ex. 18, 3/16/23 Basel Tr. 223:6-225:6 (DDMI CFO confirming same).

DDPA presentation). CEOs of Member Companies make up DDPA's and DeltaUSA's boards of directors. Ex. 20, 12/4/23 DDCA 30(b)(6) (Navid) Tr. 65:13-15. DDPA created DeltaUSA in the 1990s to further facilitate sharing of information among Member Companies. Ex. 19, DDPA000187248 at 252; *see also* Ex. 21, 3/17/23 Stich Tr. 162:20-23.

The Member Companies—so-called because they must belong to DDPA and DeltaUSA to use the Delta Dental brand—each are assigned territories generally corresponding to the states allocated to their exclusive control. Ex. 22, DD-ENT-000658639, at 715 (2022 DDPA Membership Standards and Guidelines and Service Mark License Agreement, mandating that Member Company names "█████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████"). Twenty-one Member Companies have formed four affiliated groups in which the Member Companies that make up each affiliation are under common control: (1) the Enterprise Defendants;[10] (2) the Renaissance Defendants;[11] (3) Northeast Delta Dental ("NEDD");[12] and (4) DDMN and Affiliates.[13] The Enterprise Defendants alone would be the largest dental insurance company in the country. Ex. 23, DD-ENT-000248614 at 626.

---

[10] "Enterprise" is DDCA, DDDE, DDDC, DDIC (which covers 9 states), DDNY, DDP (which also covers Maryland), DDPR, and DDWV, ███████████████████████████ ████████████ Ex. 23, DD-ENT-000248614 at 616 (2018 Enterprise Strategic Plan).

[11] "Renaissance" is DDAR, DDIN, DDKY, DDMI, DDNM, DDNC, DDOH, and DDTN. Ex. 24, REN001746647 at 649-651 (2019 Renaissance Health Services Corp. ("RHSC") report).

[12] NEDD Director of Board Relations testified that NEDD "████████████████████ █████." Ex. 25, 12/6/22 Brehm Tr. 31:19-24. ████████████████████████. *Id.* Brehm Tr. 34:4-18.

[13] The DDMN group consists of DDMN (which also controls the North Dakota territory) and DDNE. Ex. 26, 12/5/23 DDMN 30(b)(6) (Robinson) Tr. 129:18-130:11, 165:19-24; Ex. 27, 12/16/22 Robinson Tr. 22:13-22:3 (DDMN President testifying that █████████████████ ████████████████████████). All of DDMN and DDNE's senior level executives are employed by ████████. Ex. 27, 12/16/22 Robinson Tr. 22:21-23:6.

### C.     Market Dominance.

Member Companies purchase dental goods and services from Dental Providers on behalf of Delta Dental insureds. Common evidence demonstrates that Delta Dental dominates the U.S. market for purchasing dental goods and services. Delta Dental has more contracted dentists and more insureds than any other carrier. Over ███ percent of all dentists nationwide contract with at least one Delta Dental network. Ex. 28, DDPA000146770 at 787 (2014 DDPA board presentation); Ex. 29, 12/7/22 Vinci Tr. 128:23-129:5 (DDPA Director of Industry Analysis Jim Vinci confirming same); Ex. 30, 4/25/23 Olson Tr. 83:15-84:2 (former DDPA CEO admitting same). In 2020, Delta Dental provided commercial dental insurance to ███ percent of insured Americans. Ex. 2, DDWI000222407 at 411. The bulk of Delta Dental's business comes from selling dental insurance to large, multistate employers, and Delta Dental provides coverage to more than ███ percent of Fortune 500 companies. Ex. 31, REN001102038 at 040 (2020 Delta Dental Fact Sheet). In many states, Member Companies enjoy ███████████ percent market share.[14]

For those few Member Companies that do not already enjoy dominant market share in their territories, DDPA imposes minimum market penetration[15] requirements. Ex. 22, DD-ENT-000658639 at 685. In addition to monetary penalties that have totaled hundreds of thousands of dollars, the ultimate penalty for failing to meet market penetration requirements is ceding the

---

[14] Ex. 32, 10/12/23 DDMI 30(b)(6) (Hall) Tr. 262:16-263:14 (testifying that, for groups with over ███████████████████████); Ex. 33, 12/1/22 Chavarria Tr. 194:15-23 (DDCA has "███████████████████████" in CA); Ex. 34, DDCO000188666 at 4 (DDCO: "████████████████ with ████" in the "███ ████████ category); Ex. 35, DDVA000033070 at 070 ("████████████████████████").

[15] Market penetration is measured against total population rather than the percentage of individuals that have dental insurance. Ex. 22, DD-ENT-000658639 at 685 (2022 DDPA Membership Standards measuring market penetration by "████████████████████████████████████████████████████). Thus, market penetration typically is a fraction of market share.

Member Company's exclusive territory to another Member Company. 

" Ex. 36, DD-ENT-000157584 at 584.

Delta Dental's national dominance makes participation in Delta Dental networks a "must have" for Dental Providers. Ex. 1, Bamberger at ¶¶ 54-62. If a Dental Provider is not in-network with Delta Dental, a substantial number of patients will leave for an in-network dentist. *Id.* at ¶¶ 55-59. Consequently, very few providers terminate their contracts or leave Delta Dental networks notwithstanding reimbursement levels that are sometimes at or below a Dental Provider's costs. Ex. 37, REN002784149 (2019 DDPA Turnover Report, showing that majority of Delta Dental territories have provider attrition around ███ percent); Ex. 38, REN002781670 at 670 ("████ ██████████████████████████████████████████████████████."); Ex. 39, REN000198377 (similar). As DDMI's Chief Science Officer wrote to other DDMI executives, while Dental Providers may "█████████████████" Delta Dental's reimbursement rates, █████████████ ████████████████████████" Ex. 40, REN000242008 at 008.

## I. MANDATORY GOVERNING AGREEMENTS.

A central facet of the Conspiracy is that every Member Company agrees to follow the same written rules and agreements promulgated by DDPA and DeltaUSA. This includes the Service Mark License Agreement, the DDPA Membership Standards and Guidelines, the DeltaUSA Policies Manual (formerly known as the DeltaUSA Policy and Procedures Manual), and the DeltaUSA Processing Policy Manual (formerly known as the DeltaUSA Processing Policies

Manual).[16]   The key anticompetitive mechanisms contained in each agreement are discussed briefly below and set forth in detail in a Rule 1006 summary chart attached to the accompanying Declaration of Bevin Brennan ("Brennan Decl.") Exhibit A.

The Service Mark License Agreement assigns to the Member Companies their respective territories. Ex. 22, DD-ENT-000658639 at 707, 709, 724. The DDPA Membership Standards and Guidelines set forth mandatory rules regarding substantially all facets of the Member Companies' operations including, *inter alia*, requiring Member Companies to maintain certain levels of market penetration, discussed above, and effective discount requirements that have the purpose and effect of lowering reimbursement rates. *Id.* at 685. The DeltaUSA Policies Manual contains rules governing resolution of territorial disputes. Ex. 45, DD-ENT-000658789 at 822-29. The DeltaUSA Processing Policy Manual sets specific reimbursement rates and pricing requirements for hundreds of procedures that each Member Company is required to follow. Ex. 46, DDPA001042070.

Every Member Company must enter into the Service Mark License Agreement, follow the DDPA Membership Standards and Guidelines, abide by the DeltaUSA Policies Manual, and comply with the DeltaUSA Processing Policy Manual as a condition of membership. Ex. 41, DDPA000000776 at 788 (



"); Ex. 42, DDPA000004363 at 367, 373

Ex. 22, DD-ENT-000658639 at 651

). DDPA and DeltaUSA

---

[16] In addition, Defendants agree to abide by a host of other written agreements used to effectuate the Conspiracy, including (without limitation): the DeltaUSA Membership Agreement, Ex. 41, DDPA000000776 at 788; the Interplan Participation Agreement, Ex. 42, DDPA000004363; the DeltaUSA Risk-Sharing Agreement, Ex. 43, DDPA000000850; and the National Provider File License Agreement, Ex. 44, DDPA000000554.

have exclusive authority to enforce these agreements, including by performing annual audits of Member Companies to measure compliance and by imposing sanctions totaling millions of dollars during the relevant period for violations of territorial allocation rules, pricing rules, second brand restrictions, and more. *Infra* at C.3, D.1, D.4, E.3.

## II. DEFENDANTS CREATED AND ENFORCE TERRITORIAL RESTRAINTS THAT DIVIDE THE UNITED STATES INTO EXCLUSIVE TERRITORIES.

Plaintiffs have amassed common Class-wide evidence capable of demonstrating that, as part of the Conspiracy, DDPA imposes and enforces *per se* illegal territorial restrictions (*see infra* at II.A.1), and that Member Companies comply despite recognizing that the rules harm competition.

### A. DDPA And DeltaUSA Impose Mandatory Territorial Restraints.

The Service Mark License Agreement grants Member Companies "███████████████ ███" Delta Dental trademarks in their assigned territories. Ex. 22, DD-ENT-000658639 at 709. This means that each Member Company is prohibited both from recruiting Dental Providers and soliciting business outside its assigned territory.[17] *Id.* at 709-10; Ex. 45, DD-ENT-000658789 at 816 ███████████████████████████████████████████████████████

███████████████████████████

Member Companies are prohibited from bidding on business from multi-state employers that are headquartered outside their assigned territories. Ex. 45, DD-ENT-000658789 at 823. Once an employer's headquarters is determined, only one Member Company, deemed the "████

---

[17] Member Companies are prohibited from using the Delta Dental service and trademarks outside their exclusive territorial allocations unless one of the following narrow exceptions applies: ███ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████. Ex. 22, DD-ENT-000658639 at 709-10.

██████ may bid on the business. *Id.* at 827 ("██████████████████████████████████

████████████████████████████████.").

This means that every other Member Company is required to boycott that employer and

neither seek nor accept its business once a ███████████ designation is assigned to another Member

Company. Two Member Companies are never permitted to bid on the same business. Ex. 20,

12/4/23 DDCA 30(b)(6) (Navid) Tr. 63:7-17 (agreeing that ████████████████████████

███████████████████████"). This is true even when an employer requests competing

bids because ██████████████████████████████ Ex. 47, DD-ENT-000264959 at 959.

It also makes no difference if a different Member Company could offer lower fees. As DDMA

president Erik Montlack admitted when asked "██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Ex. 48, 10/19/23 Montlack Tr. 197:3-16.

When two Member Companies inadvertently bid on the same business, they are sanctioned. Ex.

49, 3/16/23 Glossy Tr. 74:8-76:14 ████████████████████████).

To prevent multiple Member Companies from bidding on the same opportunity, DDPA

requires that Member Companies enter prospective customers into an "████████████████

███████████████████████ Ex. 45, DD-ENT-000658789 at 827 ████████████████

████████████████████████████████████████████████

████████████████████"); Ex. 50, DDPA000675656 at 666 (discussing requirement). DDPA

and Member Companies review these entries to confirm that the correct Member Company is

bidding. Ex. 51, 12/2/22 Hughes Tr. 106:7-107:12 (DDPA VP Compliance ████████████████

████████████████████████████████████████████████

████████).

**B.     DeltaUSA Decides Territorial Disputes Among Member Companies And Directs Opportunities To Particular Member Companies.**

Member Companies routinely discuss territorial disputes to determine which Member Company should be the ███████, with the purpose of appointing a single Member Company to bid. Ex. 51, 12/2/22 Hughes Tr. 125:12-126:7. In some circumstances, a Member Company will affirmatively cede a business opportunity to another Member Company. For example, DDCA ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Ex. 52, DDIL000185003 at 003. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████ Ex. 53, DDCO000468547 at 548. In these examples (and many others), Member Companies follow the territorial restrictions contrary to their own self-interest.

If Member Companies cannot agree on which one will bid on a particular opportunity, █ ████████████████████████████████████████████████████████████ ████████████████ Ex. 21, 3/17/23 Stich Tr. 166:21-167:5. "████████████████████ ████████████████████████████████████████████████████████████ ████████████████ Ex. 45, DD-ENT-000658789 at 824. In one Control Plan dispute, DDKY's CEO called DeltaUSA's mandate "████████████████████████████████████████████ ████████████████████████████████." Ex. 54, DDAZ001225483 at 483-484.

### C. DDPA Sanctions Defendants Who Compete Outside Their Exclusive Territories.

DDPA audits Member Companies for compliance with the exclusive territorial restrictions. *See, e.g.*, Ex. 55, REN002543581 at 585-586 (2016 audit finding DDMI noncompliant). If a Member Company is found to have issued a proposal without proper authority, it is referred "█

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████. Ex. 45, DD-ENT-000658789 at 825.

DDPA has imposed fines of hundreds of thousands of dollars for violating territorial restraints. ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████ Ex. 56, DDPA000699404 at 404, 406. ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████. Ex. 57, DDMO000042709 (████████████████████

██████████████████████████ Ex. 58, 12/6/23 Goren Tr. 43:7-44:5 ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████

### D. Defendants Concede That Territorial Allocation Harms Competition.

Defendants admit that Territorial Allocation harms competition. DDMI's CEO candidly described the territorial restraints as "████████████████████████████████████████████████

███████." Ex. 59, REN002668555 at 556. DDCA's 2020 strategic plan conceded that "█████

13

█████████████████████████ Ex. 60, DD-ENT-000411725 at 736. At deposition, DDPA's corporate representative admitted that the only purportedly pro-competitive justification offered for these territorial restraints—*i.e.*, to avoid brand confusion—does not actually prevent brand confusion. This is because there are 39 Member Companies all called "Delta Dental," each of which already operates in most states to service multi-state employers, resulting in "████ █████████████████████████ Ex. 61, 11/17/23 DDPA 30(b)(6) (Hughes) Tr. 53:16-19, 57:5-14, 58:7-15.

## III. DEFENDANTS FIX PRICES THROUGH MANDATORY PROCESSING POLICIES, COORDINATED INFORMATION SHARING, AND AN EFFECTIVE DISCOUNT STANDARD.

Defendants have agreed to fix prices in at least four ways: (i) DeltaUSA directives bar all Member Companies from reimbursing for certain procedure codes (*i.e.*, fixing the price for these procedure codes at $0), mandate that certain procedure codes be priced the same as a benchmark procedure code, and "recommend" prices for other procedure codes; (ii) Member Companies share reimbursement rate information for all procedure codes through the █████████████; (iii) Member Companies share reimbursement amounts and strategies to reduce reimbursement rates; and (iv) DDPA imposes an effective discount standard requiring every Member Company to have the lowest (or among the lowest) reimbursement rates of all competitor insurance companies.

### A. DeltaUSA Issues Processing Policies Mandating Reimbursement Amounts For All Member Companies.

DeltaUSA promulgates a Processing Policy Manual that imposes three mandatory pricing requirements on Member Companies, which DDPA enforces through audits and sanctions.

First, the Processing Policy Manual requires that reimbursement for many procedure codes be disallowed or denied.[18] Ex. 46, DDPA001042070 (2022 Manual). Because Member Companies are required by agreement to follow the Processing Policy Manual, they effectively fix the price for these procedures at $0. The following is one of hundreds of possible examples of a procedure code that must be disallowed or denied:



Ex. 62, DDPA000007501 at 517 (2016 Processing Policies Manual); *see also* Ex. 63, DDPA000084510 at 514-16 (DeltaUSA Dental Policy Committee minutes reflecting disallowed codes).

Second, the Processing Policy Manual requires that reimbursement for certain procedure codes be fixed at the same amount as the reimbursement for a different code. For example:

Ex. 62, DDPA000007501 at 557 (2016 Processing Policies Manual).

---

[18] "Procedure codes" or "fee codes," also known as CDT (Current Dental Terminology) codes, are sequences of letters and numbers assigned by the ADA to identify particular procedures. *See* https://www.ada.org/publications/cdt/glossary-of-dental-clinical-terms#cc (ADA Glossary of Dental Clinical Terms for "*Code on Dental Procedures and Nomenclature* (*CDT Code*)").

Third, each year, the DeltaUSA Dental Policy Committee approves new procedure codes promulgated by the ADA and "recommends" specific prices for reimbursement, which the Member Companies overwhelmingly adopt. Ex. 62, DDPA000007501. The following highlighted cells contain examples of "recommended" prices for new procedure codes:



Ex. 64, REN000017934 at "Fee Guidance" Tab. Although described as a "recommendation," Defendants' witnesses agreed that Member Companies uniformly adopted recommended fees.[19]

Compliance with DeltaUSA's Processing Policy Manual is mandatory. Ex. 66, 11/16/23 DDPA 30(b)(6) (Achenbaugh) Tr. 95:23-24 ("███████████████████████████ █████████████████████████."); Ex. 67, DDOK000295415 at 415-16 (2014 DDPA email to DDOK CEO referring to Dental Policy Committee's "███████████████████████" and stating that "████████████████████████"); Ex. 68, DDNJ000118207 (2019 email from DDNJ Chief Clinical Officer to DDKS Dental Director: "██████████████████ ███████████████████████████████."). [20] When Member Companies deviate from these policies, DDPA issues failed audits, gives remedial instructions, and imposes fines. Ex. 69,

---

[19] *E.g.*, Ex. 32, 10/12/23 DDMI 30(b)(6) (Hall) Tr. 73:17-74:8, 76:15-77:18 (DDMI Chief Actuary admitting that the Dental Policy Committee ████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████); Ex. 65, 10/12/23 DDWA 30(b)(6) (Lo) Tr. 390:6-15 ████████████████████████████████████████████████████ ██████████████).

[20] Additional examples can be found in Brennan Decl. Exhibit B (summarizing evidence regarding mandatory compliance with DDPA and DeltaUSA policies).

3/31/23 Hall Tr. 243:5-16 (█████████████████████████████████████).[21]

### B.    Defendants Agree To Share Pricing Information Through Central Databases.

Defendants also facilitate their Price-Fixing by agreeing to share reimbursement rates in two databases, the ███████████. DDPA requires Member Companies to upload their reimbursement rate information to the ████ and audits whether they have done so. Ex. 22, DD-ENT-000658639 at 704 (2022 DDPA Membership Standards and Guidelines: "████████ ████████████████████████████████████████████████████████████████████ █████████████). All Member Companies have access to the ████████████. Ex. 29, Vinci Tr. 141:7-9 (re ████ access); Ex. 70, 3/15/23 Achenbaugh Tr. 194:14-195:5 (same for ████

Member Companies share all their provider reimbursement data on the ████ including ████████████████████████████████████████████████████████████████████ ██████ Ex. 29, Vinci Tr. 141:7-142:21, 143:24-144:12; Ex. 45, DD-ENT-000658789 at 795 (2023 DeltaUSA Policies Manual describing ████ Defendants admit that other Member Companies' reimbursement rate schedules can be determined from the ████ and have referred to the ████ as Delta Dental's "████████." Ex. 71, 3/16/23 Hall Tr. 179:17-182:4 (DDMI Chief Actuary); *see also* Ex. 72, DD-ENT-000183194 at 194 (DDCA Chief Actuarial Officer: "████ ████████████████████████████████████████████████").

The ████ contains all the information from the ████ plus additional data such as ████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████ Ex. 73, REN000176880 at 880-81.

---

[21] *Id.*

Member Company employees have broad access to the ██████████ Ex. 32, 10/12/23 DDMI 30(b)(6) (Hall) Tr. 58:13-63:10 (DDMI Chief Actuary testifying that ██████████ █████████████████████████████████████████████████████████████████████ ███████ ). Access is so widespread that several Member Companies have been cited by DDPA for having inadequate controls—not that these censures have resulted in any meaningful restrictions on access. Ex. 55, REN002543581 at 591 (██████████████████ ████████████████████████████████████ ). There are effectively no restrictions on use of the ████████ . Ex. 20, 12/4/23 DDCA 30(b)(6) (Navid) Tr. 84:10-19.

Defendants have asserted that the ██████████ are necessary for claims processing on multi-state accounts, *i.e.*, so Member Companies can "██████████████." Ex. 74, 8/22/2023 DDPA and DeltaUSA's Response and Objections to Interrogatories at 26-27. Yet, for decades, Delta Dental ████████████████████████████████ ████████████████ Ex. 28, DDPA000146770 at 780 (2014 DDPA board presentation, stating ██████████████████████████████████████████████████ ).

### C. Defendants Share Reimbursement Amounts And Strategies To Reduce Provider Reimbursement.

#### 1. Defendants Share Reimbursement Rates Upon Request.

DDPA and the Member Companies also share reimbursement rate information via direct communications between and among themselves outside of the ████████████ . For starters, Member Companies directly share reimbursement rates for particular CDT codes. *See* Ex. 75, DDMO000225272-74 (circulated spreadsheet containing DDMA and DDIA specific proposed amounts for certain CDT codes); Ex. 76, REN002315669 at 669-70 (██████████████████ ████████████████████████████████; Ex. 77, REN000274768 at 768-70 (██████████████ ████████████████████████ ).

Member Companies even share entire fee schedules directly with one another. Ex. 78, DDPA000016742 at 742-43 (█████████████████████████████████████████ ███████████████████████████████████████); Ex. 79, DD-ENT-000416642 at 643, 645-55 (███████████████████████████████████████████████████████████ █████); Ex. 80, REN000174544 ███████████████████████████████████ ██████████████████████████████████).

2.    **Defendants Share Strategies To Reduce Reimbursement Rates.**

Defendants also share non-public information with DDPA and other Member Companies about planned reductions in reimbursement rates before they are implemented or announced to Dental Providers. *See, e.g.,* Ex. 81, REN000172002 (█████████████████████ █████████████████████████████████); Ex. 82, REN000172173 █████████████████████████████████████████████████████████████ ████████); Ex. 83, REN000252964 (██████████████████████████████ ██ ███ ██ ████████ █████████ ████████ █ ███████████ ██); Ex. 84, REN002171844 ████████████████████████████████████████████████████ ████████████; Ex. 85, REN002162262 (███████████████████████████ █████████████████████████████████████████████████████████ Ex. 86, REN001984473 (█████████████████████████████████████).

Member Companies use these fee reduction announcements to evaluate the impact of implementing similar reductions in their own reimbursement schedules. Ex. 87, 12/5/23 DDCA 30(b)(6) (Leibowitz) Tr. 166:2-6 (DDCA Chief Actuarial Officer agreeing that information ███████████████████████████████████████████████████████████ ████████████"); Ex. 88, DD-ENT-000136682 at 682-83 (█████████████████ ███████████████████████████████████████████████████████████

█████████████████████████████████████████); Ex. 87, 12/5/23 DDCA 30(b)(6)

(Leibowitz) Tr. 180:15-181:10 (confirming same); Ex. 89, 3/22/23 Johnston Tr. 258:12-17 ("Q:

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████

### D. DDPA Imposes An Effective Discount Standard That Is Designed To Force Member Companies To Lower Reimbursement Rates.

The DDPA Membership Standards impose an effective discount standard that requires each

Member Company's effective discount ████████████████████████████████████████

███████████████████████████████████████████. Ex. 22, DD-ENT-

000658639 at 689. The higher the effective discount, the lower the reimbursement rate paid to

dentists: "█████████████████████████████████████████████████

██████████████████." *Id.* (2022 DDPA Membership Standards, defining "Effective

Discount"). As a practical matter, the effective discount standard "████████████████

█████████████████████████████████████████████████████."

Ex. 90, 10/24/23 Barth Tr. 159:25-160:6.

After DDPA implemented the effective discount standard in ████ Member Companies

were forced to keep reimbursement rates constant or to lower them. *See, e.g.,* Ex. 90, 10/24/23

Barth Tr. 166:13-167:1 (former DDCA CEO: "█████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████); Ex. 91, 1/5/23 Snyder Tr. 119:20-120:10 (DDWA COO: ███████████████████

███████████████████████████████████████████████████████. Ex. 58, 12/6/23

Goren Tr. 110:5-22 (DDMO CEO admitting ███████████████████████████████████

███████████████████████████████████.

Indeed, the two largest affiliations of Member Companies, Renaissance (headed by DDMI) and Enterprise (headed by DDCA) d███████████████████████████████████████ ██████████████████ as a result of the effective discount standard. Ex. 92, REN002890166 (2020 email where DDMI Provider Relations Supervisor states that it is a ████████████████ ██████████████████████████████████████████████); Ex. 20, 12/4/23 DDCA 30(b)(6) (Navid) Tr. 25:4-12 (DDCA Chief Relationship and Business Development Officer testifying that ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████).

The same was true of most Member Companies, freezing or lowering rates to meet the effective discount standard. Ex. 93, 10/11/23 30(b)(6) (Lo) Tr. 269:24-270:3 (███████████████ ██████████████████████████████████████; Ex. 94, 10/3/23 DDMO 30(b)(6) (Mascote) Tr. 217:17-218:10 (███████████████████████████████████████████); Ex. 95, 3/28/23 Perroni Tr. 101:22-25 (███████████████████████████████████████████████ ████████████████████████████); Ex. 69, 3/31/23 Hall Tr. 216:9-15, 217:12-14, 249:17-250:1 (█████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████ Ex. 96, 3/2/23 Inge Tr. 97:21-98:5, 104:16-23 (████████████████████ █████████████████████████).[22]

The ultimate potential sanction for failure to meet the effective discount ███████████████ ███████████████████████████████████████████████████████████████████████ █████████████████. Ex. 97, DD-ENT-000285513 at 513 (2015 Enterprise Strategic Plan: "███████ ███████████████████████████████████████████████████████████████████████



---

[22] Additional examples can be found in Brennan Decl. Exhibit C.



Implementation of the effective discount standard worked. It is undisputed that, as measured by third-party Milliman, Delta Dental has the highest effective discount in the country. Ex. 98, REN001053005 (

Defendants' primary defense of the effective discount standard is that low reimbursement rates allow Delta Dental to keep premiums low. Not so. Although reimbursement rates near-uniformly were kept constant (or even lowered) for a decade or more, Member Companies have raised premiums to consumers annually.

Ex. 32, 10/12/23 DDMI 30(b)(6) (Hall) Tr. 48:12-49:3; *see also* Ex. 99, 12/4/23 DDCA 30(b)(6) (Weber) Tr. 135:4-11, 137:15-138:16 (

22

[REDACTED]

This pattern held true across the Delta Dental network throughout the Class Period: increases in premiums to consumers were many multiples of any modest increases in reimbursement rates to Dental Providers, empirically putting the lie to Defendants' claim that they robbed Peter (*i.e.*, Dental Providers) to pay Paul (*i.e.*, consumers); Delta Dental robbed them both. Ex. 66, 11/16/23 DDPA 30(b)(6) (Achenbaugh) Tr. 64:20-65:17 (" [REDACTED]

[REDACTED]

[REDACTED] *see also* Ex. 100, DDOR000009125 at 129 ( [REDACTED]

## IV. DDPA AND MEMBER COMPANIES RESTRICT COMPETITION BY SECOND BRANDS.[23]

One excuse that Defendants provide for the imposition of territorial restraints is that because Member Companies are required to be licensed in only a single state to maintain their non-profit status (a dubious proposition to begin with), Member Companies are barred by state regulations from selling policies to multi-state employers unless the employer is headquartered in the Member Company's home state. *E.g.*, Ex. 101, 12/6/22 Pyle Tr. 158:16-169:3. This is false. Several Member Companies have formed for-profit "second brands"—licensed in every state— and sell policies nationwide. Ex. 102, 10/11/23 DDMI 30(b)(6) (Jenkins) Tr. 58:13-24. Among the largest second brands are Dentegra Insurance Company (second brand of Enterprise), Renaissance Life and Health Insurance Company (second brand of Renaissance), and Dentaquest (second brand of DDMA).

---

[23] *See* Brennan Decl. Ex. D (summarizing evidence on restrictions of second brands).

DDPA and Member Companies agree to impose both express and implied restrictions on the operations of these and other second brands. Second brands exist primarily to facilitate multistate Delta Dental-branded business, rather than competing with Delta Dental. Ex. 103, 2/28/23 Herbert Tr. 142:10-14 (DDKS CFO describing second brand restrictions: "█████████████████████████████████████████████████████████████████████████████████████████████████████████."). They are closely monitored, on threat of sanctions, by DDPA and Member Companies.

### A. Second Brands Primarily Facilitate Delta Dental-Branded Business.

Instead of competing with Member Companies, second brands operate primarily to ██████████████████████████████████████████████████████████████████████████████████████████████████████████. Ex. 102, 10/11/23 DDMI 30(b)(6) (Jenkins) Tr. 60:13-22 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

The overwhelming majority of second brand revenue comes from underwriting Delta Dental-branded business. Ex. 104, 10/26/23 DDMI 30(b)(6) (Kolesar) Tr. 120:21-122:1; *id.* at 177:5-8 (███████████████████████████████████); Ex. 20, 12/4/23 DDCA 30(b)(6) (Navid) Tr. 184:6-185:6 (███████████████████████████████████. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 102, 10/11/23 DDMI 30(b)(6) (Jenkins) Tr. 67:2-

68:6 ("█████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████. Ex. 104, 10/26/23 DDMI 30(b)(6)

(Kolesar) Tr. 248:22-251:1.

**B.      Second Brands Avoid Competing With Delta Dental.**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ Ex. 104, 10/26/23 DDMI 30(b)(6) (Kolesar) Tr. 61:20:24 (Renaissance does not target

large national employers); Ex. 105, 11/3/23 Mulligan Tr. 142:1-2 (same).

███████████████████████████████████████████████████████

█████████ Ex. 20, 12/4/23 DDCA 30(b)(6) (Navid) Tr. 140:21-141:4 (█████████████

███████████████████████████████████████████████████████

██████████████████████████████████; Ex. 105, 11/3/23 Mulligan Tr. 36:7-10 ("████████

███████████████████████████████████████████████████████

████████████████████████████████████).

Rather than compete, second brands have ceded opportunities to Member Companies. Ex.

106, DD-ENT-000248075 at 076 █████████████████████████████

███████████████████████████████████ Ex. 107, DD-ENT-000268956 at 957 (████████

███████████████████████████████████████████████████████

██████████████; Ex. 108, DD-ENT-000430896 at 899 (██████████████████ █████████████

█████████████████████████████████████████████████████

████████████████████████████████ Ex. 109, DDKS000253754 at 755 ████████

█████████████████████████████████████████████████████

████████████████████████████████████ ).

Corporate representatives for DDPA and the two largest Member Companies, DDCA and DDMI, could not identify any circumstances where second brands competed directly with Member Companies. Ex. 20, 12/4/23 DDCA 30(b)(6) (Navid) Tr. 139:14-19 █████████████

█████████████████████████████████████████████████████

█████████████████████████████████ Ex. 110, 11/9/23 Czelada Tr. 308:17-21 ("███████████████████████████████████

██████████████████████████████████████████████ *see also* Ex. 61, 11/17/23 DDPA 30(b)(6) (Hughes) Tr. 314:23-316:19 ████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████ ).

In the rare circumstances where competition inadvertently occurred between a Delta Dental product and a second brand, Member Company CEOs raised objections, and DDPA convened a ████████████████ to quash it. Ex. 111, DDOK000515888 at 889 (████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████ Ex. 112, DDCO000464381 (████████████

█████████████████████████████████████████████████████

██████████████████████████████████ .

### C.  DDPA And Member Companies Monitor And Sanction Second Brands.

DDPA audits the conduct of both Member Companies and their affiliated second brands. Ex. 113, REN000117594 at 595-96 (████████████████████████████████ ████████████); *see also* Ex. 55, REN002543581 at 585 (████████████████████); Ex. 114, DD-ENT-00452067 at 067-71 (████████████████████████); Ex. 115, DDPA000091666 at 666-70 ████████████████████████

DDPA has sanctioned Member Companies tens of thousands of dollars for violating second brand restrictions. *See, e.g.*, Ex. 116, DD-ENT-000621488 at 489 ████████████ ████ Ex. 117, DDKS000548396 ████████████████████ ████████████████████; Ex. 118, DDPA000118636 at 659-60 ████████ ████

Worst of all, ████████████████████████ ████████████████████. Ex. 119, DDIL000231671 at 672 ████████ ████████████████ Ex. 120, 10/18/23 DDIL 30(b)(6) (Bon) Tr. 35:17-22 ████████ ████████████████████████████████ ████████████████████

### D.  Defendants' Suppression of Second Brands Prevents Insurers Offering Higher Reimbursement Rates From Effectively Competing.

Provider networks recruited by second brands generally have higher reimbursement rates than Member Companies. *See, e.g.*, Ex. 108, DD-ENT-000430896, at 896 ████████████ ████████████████████████; Ex. 20, 12/4/23 DDCA 30(b)(6) (Navid) Tr. 212:19-213:2 (same); Ex. 121, 8/10/23 Jackson Tr. 104:23-24 ████ ████████████████████████████████ ████████████ Ex. 122, DD-ENT-000244937 at 941 ████████████



███████████████████████ Ex. 1, Bamberger at ¶ 105 (████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████.

But because of the express and implied restrictions on second brands, second brands effectively are prohibited from competing with Delta Dental, thereby depriving Dental Providers of the opportunity to obtain higher reimbursement rates from a competing insurance company.

## V. DEFENDANTS' RECOGNIZE THAT THEIR CONDUCT IS ILLEGAL UNDER *BCBS*.

Defendants have expressed great concern about the Blue Cross Blue Shield ("BCBS") antitrust litigation, where a class alleging a substantially similar aggregation of anticompetitive restraints was certified.[24] Defendants recognize the overwhelming similarities between the Delta Dental system and the BCBS conspirators. Ex. 24, REN001746647 at 677-78 (██████████████

████████████████████████████████████); Ex. 89, 3/22/23 Johnston

Tr. 206:2-209:24 (████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████).

Because of these concerns, ████████████████████████████████

███████ Ex. 30, 04/25/23 Olson Tr. 50:12-17; 54:10-55:24 (██████████████

███████████████████████████████████████████████

████████████████████████).

---

[24] *In re Blue Cross Blue Shield Antitrust Litig.*, 2:13-cv-20000-RDP, Dkt. 2931 (N.D. Ala.) (certifying class against 35 BCBS member companies, alleging they conspired to limit competition in the health insurance market by allocating territories, price-fixing, and restricting second brand operations).



. Ex. 24, REN001746647 at 676-77 (

); Ex. 124, REN002285122 at 147-48

## VI. DEFENDANTS FACILITATED THEIR MISCONDUCT BY FAILING TO PROVIDE ANTITRUST TRAINING.

Prior to the filing of this suit, none of the Defendants (with one possible exception) offered antitrust training.[25] Although DDPA has a "compliance" department, its purpose is not compliance with state or federal law, but rather with DDPA rules and standards. Ex. 21, 3/17/23 Stich Tr. 101:23-102:17 (

Ex. 125, 12/21/23 Hutchison Tr. 140:4-20 (DDPA CEO: "

---

[25] *See* Brennan Decl. Ex. E (summarizing admissions re lack of antitrust training).

## VII. DEFENDANTS USE CONSPIRACY PROCEEDS TO PAY EXCESSIVE COMPENSATION, ACCUMULATE GROSSLY EXCESSIVE CAPITAL RESERVES, AND INVEST IN FOR-PROFIT BUSINESSES.[26]

As the fruits of their conspiracy, Defendants reap hundreds of millions of dollars per year in profits (euphemistically referred to as "operating gains" because Defendants purportedly operate as not-for-profit entities). Rather than fairly compensate Dental Providers or even pass savings on to consumers, the supposedly non-profit Defendants instead have funneled billions of dollars in ill-gotten gains into: (1) excessive compensation and perquisites paid to their executives, as much as $14-16 million per executive per year, in addition to use of private air travel and chauffeured limousines; (2) capital reserves of billions of dollars, orders of magnitude in excess of any statutory requirements; and, (3) investing hundreds of millions in for-profit businesses having nothing to do with dental care.

### A. Defendants Pay Excessive Compensation, Benefits, and Perquisites to their Executives.[27]

Defendants use the proceeds of their antitrust conspiracy to pay obscene compensation to their "non-profit" executives. For example, DDMI and DDCA have compensated their CEOs $14-$16 million per year. Ex. 126, DDMI 2017 Form 990, at Schedule J, Part II additional data table ($15.1 million compensation for CEO Laura Czelada); Ex. 90, 10/24/23 Barth Tr. 109:9-12 (DDCA CEO, Gary Radine, "███████████████████████████"). DDCA paid one of its CEOs, Tony Barth, ███████████████████████████

---

[26] On November 21, 2023, the Court deferred further discovery regarding damages, including the use of billions of ill-gotten proceeds from Defendants' antitrust conspiracy, until after a decision on class certification. Dkt. No. 728. Plaintiffs offer the following summary of information gathered prior to the Court's ruling for the Court's consideration in the context of class certification, without prejudice to submitting further proofs at the completion of damages-related discovery.

[27] *See* Brennan Decl. Ex. F (summarizing evidence regarding Defendants' executive compensation).

██████████████████████████████████████████. Ex. 90, 10/24/23 Barth Tr. 153:14-154:1 (████████████████████████████████); Ex. 127, DD-ENT-000611952 at 953 (████████████████████████████████████████████████████ ██████)

As to perquisites, ████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████. Ex. 128, REN001651293 (███████████████████████████████████████████); Ex. 32, 10/12/23 DDMI 30(b)(6) (Hall) Tr. 108:13-115:22 (██████████████████ █████████████████; Ex. 129, 4/6/23 Jurkovic Tr. 242:23-243:4 (█████████ ███████████; Ex. 130, REN001142623 at 626 (████████████████████████ ████████████); Ex. 110, 11/9/23 Czelada Tr. 156:13-157:7 ██████████████ ████████████████████); 12/6/23 DDCA 30(b)(6) (Sherman) Tr. 202:10-25 (████████████████████████████████████████████████████████████ ███████████████████); Ex. 90, 10/24/23 Barth Tr. 95:16-96:15 (██████████ █████████████████████████████████████.

Even the Member Companies' own compensation consultants recognized that Defendants' compensation exceeded the market. Ex. 131, REN000174303 at 307, 309, 310, 322-26, 337, 350-57 (██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████); Ex. 132, DDPA000043743 (███████████████████████████████████████████████

████████████████████████████████████████████████████ Ex. 133, DD-ENT-000350237 at 237 ██████████████████████████████████████████

████████████████████████████████████

And Member Companies' compensation consultants made these findings even though they were *not* independent. Rather than objectively evaluating compensation, their goal was to "████████ compensation philosophies set by the Member Companies. Ex. 131, REN000174303 at 307, 310. The compensation consultants were paid hundreds of thousands of dollars for both compensation opinions and unrelated work performed on behalf of Member Companies. Ex. 102, 10/11/23 DDMI 30(b)(6) (Jenkins) Tr. 342:7-343:17 (████████████ ██████████████████████████████ Ex. 134, DDIL000310957 at 961 (██████████████████████████████ ██ ████████ ████ ████ █ ██████); Ex. 135, REN003117120, Ex. 136, REN003117133, Ex. 137, REN003117137 (██████████████████████ ██████████████████).

Defendants also concealed some perquisites from both their compensation consultants and the IRS. Ex. 102, 10/11/23 DDMI 30(b)(6) (Jenkins) Tr. 329:2-335:23 ███████████ ████████████████████████████████; *id.* at 378:12-381:24 (███████████████████████████████████████████ Meanwhile, other Member Companies and their consultants considered some of these same types of hidden perks to be unreasonable. Ex. 138, DD-ENT-000465003 at 004 (████████████ ████████████████████████████").

The facts also refute Defendants' transparent excuse for these outrageous payouts—*i.e.*, that they purportedly were necessary to recruit and retain high-end talent. In reality, promotions

overwhelmingly occurred in-house. Ex. 129, 4/6/23 Jurkovic Tr. 222:11-23 (

); Ex. 139,

12/6/23 DDMN (Robinson) 30(b)(6) Tr. 360:7-361:6 and Ex. 140, DDMN00120119 at 123

(

). And there have

been no actual threats that any executive planned to leave if not paid exorbitant salaries and

benefits. Ex. 110, 11/9/23 Czelada Tr. 203:7-208:18.

### B.    Defendants Accumulate Excessive Capital Reserves.[28]

By law, insurers are required to have a minimum level of capital reserves to fund the

payment of claims in the event that some financial adversity interferes with ordinary operations.

*See, e.g.*, Cal. Ins. Code § 923.5. DDPA also imposes a minimum reserve requirement on Member

Companies. Ex. 22, DD-ENT-000658639 at 687 (

). But the capital reserves that the Member Companies have

amassed far exceed both statutory requirements and DDPA's standard.

Defendants' reserves have increased by billions of dollars during the Class Period. By their

own admission, Member Companies are over-capitalized with reserve levels for which there is

neither any need nor any credible explanation:



- The reserves of the Enterprise-affiliated Member Companies
  Ex. 99, 12/4/23 DDCA 30(b)(6) (Weber) Tr.
  107:8-108:17; DD-ENT-000285489 at 493 (
  )

- The risk-based capital for the Renaissance-affiliated companies
  *Compare* Ex. 141, REN002155389 at 408 *with* Ex.
  142, REN001413020 at 064. The net assets of the Renaissance Member Companies

---

[28]    *See* Brennan Decl. Ex. G (summarizing evidence regarding Defendants' capital reserves).

███████████████████████████. *Compare* Ex. 143, REN001204494 at 498 *with* Ex. 144, REN000209620 at 623.

- DDWA maintains capital reserves ████████████████████████ ████████ Ex. 93, 10/11/23 Lo Tr. 112:2-114:22.

- NEDD's surplus █████████████████████████ Ex. 145, 10/5/23 NEDD 30(b)(6) (Raffio) Tr. 127:20-24; *see also* Ex. 146, 3/30/23 Raffio Tr. 146:16-148:9 (NEDD CEO admitting ███████████ ████████████████████████████ ████████████

Member Companies could withstand multiple worst-case scenarios occurring simultaneously and still be over-capitalized. Ex. 24, REN001746647 at 684-85 (███████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████████████████

### C. Member Companies Invest Gains In For-Profit Businesses Unrelated To Dental Care.

Member Companies also invest their operating gains in for-profit businesses that have nothing to do with dental care, █████████████████████████████ ██████████████████. Ex. 102, 10/11/23 DDMI 30(b)(6) (Jenkins) Tr. 190:8-194:18, 199:15-200:21, 223:1-18.

When these for-profit businesses are successful, the Member Companies squirrel away the profits rather than use them to increase provider reimbursement or reduce consumer premiums. Ex. 102, 10/11/23 DDMI 30(b)(6) (Jenkins) Tr. 202:12-22 █████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

**D.      Plaintiffs' Compensation Expert Confirmed That Defendants' Executive Compensation and Capital Reserves Are Excessive.**

Plaintiffs asked Dr. David Lewin of UCLA and the Berkeley Research Group to provide an expert opinion on Defendants' executive compensation and capital reserves. Ex. 147, Lewin at ¶¶ 1-8. Dr. Lewin compares Member Companies' executive compensation and capital reserves to various peer groups and confirms that Defendants' compensation and reserves are grossly excessive. *Id.* at ¶ 13.

**E.      Defendants Admit That Excessive Compensation And Reserves Could Be Used To Increase Dental Provider Reimbursement Without Raising Consumer Premiums.**

Defendants admit that they could reduce excess executive compensation or use their excess reserves to increase reimbursements without raising premiums. Ex. 32, 10/12/23 DDMI 30(b)(6) (Hall) Tr. 214:1-217:22 ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

## VIII. CLASS-WIDE EVIDENCE IS CAPABLE OF DEMONSTRATING THAT SUBSTANTIALLY ALL DENTAL PROVIDERS IN THE CLASS HAVE BEEN IMPACTED BY THE ALLEGED CONSPIRACY.

Plaintiffs asked Dr. Gustavo Bamberger of Compass-Lexecon to provide an expert opinion on the issue of impact to Plaintiffs. As Dr. Bamberger explains, Defendants' Conspiracy had mutually reinforcing components: territorial allocation suppressed reimbursement rates; information sharing between member companies reinforced their territorial restrictions by giving them information about the effect of reduced reimbursement rates in other territories; and second brand suppression prevented members from evading the territorial restrictions. Ex. 1, Bamberger at ¶¶ 42-43, 45-46. Each Member Company has an incentive to participate, both to limit competition and because they benefit from lowered reimbursement levels when paying claims for employees of multi-state and national employers in other Member Companies' territories. *Id.* ¶ 44.

In analyzing antitrust impact and damages, experts attempt to establish a "but-for world," *i.e.*, the world that would have existed in the absence of Defendants' anticompetitive conduct. *Id.* ¶ 73. Here, Dr. Bamberger applies a "yardstick" approach, a common technique used by economists whereby a "but-for" world is constructed by comparing the market containing the challenged conduct to another reasonably similar market in the same time period that does not contain the challenged conduct. *Id.* ¶¶ 74-78. Here, the yardstick that Dr. Bamberger used was prices charged by Class members to patients without Delta Dental insurance (*i.e.*, uninsured patients or patients who are out-of-network) because prices for such patients should be unaffected by the challenged conduct. *Id.* ¶¶ 79-81.

Starting with the conservative assumption that reimbursement rates set by Member Companies prior to 2014 were unaffected by the Conspiracy, Dr. Bamberger used approximately two billion observations of claims data produced by Defendants to compare the rate of change in the amounts charged from 2014 to 2022 by Class members to uninsured and out-of-network

36

patients (the "submitted" charge) against the rate of change in the amount paid to Class members by Delta Dental (the "approved" amount) during the same time period, controlling for inflation. *Id.* ¶¶ 81-82, 84. Because the same changes in economic conditions (*e.g.*, changes in cost inputs such as staff, rents, and supplies) apply to dental goods and services provided to both uninsured and insured patients, both submitted charges and approved charges should exhibit the same rate of change. *Id.* ¶ 83. If, however, reimbursement amounts paid by Delta Dental increased more slowly than prices charged to uninsured patients (or if Delta Dental reimbursement amounts decreased when prices charged to uninsured consumers increased), then Dr. Bamberger concludes that this would demonstrate that the Conspiracy suppressed reimbursement amounts paid to Class members. *Id.*

Dr. Bamberger's results are depicted in the chart below: while Dental Providers' submitted charges (the blue line) remained relatively constant over the Class Period after controlling for inflation, Delta Dental reimbursement amounts for both the Premier (the green line) and PPO (the red line) networks dropped precipitously:



*Id.* ¶ 87. Indeed, Dr. Bamberger finds that the reimbursed amounts paid to Dental Providers **_decreased_** by roughly ██ percent compared to submitted charges on an inflation-adjusted basis between 2014 and 2022. *Id.* ¶¶ 87-88.

Dr. Bamberger then assessed whether reimbursement rates were suppressed for substantially all Class members. Dr. Bamberger created a series of regression models that compare the submitted and reimbursed amounts for each procedure code by year, region, and specialty, with controls for the differences in price levels between insured and uninsured patients, different procedures, specialties, and years (to account for inflation). *Id.* ¶¶ 90-94. Dr. Bamberger performed the analysis using two different geographic measures: three-digit zip codes and Milliman regions. *Id.* ¶¶ 90, 99. This allowed Dr. Bamberger to assess whether, at the level of a specific procedure code for a specific specialty in a specific region in a specific year, the reimbursed amount was underpaid relative to the submitted amount.

Using this common sense and straightforward methodology, Dr. Bamberger concluded that between 99.3 and 99.4 percent of the Class experienced a negative **gross** impact (*i.e.*, were reimbursed less by Delta Dental for at least one claim than the expected reimbursement amount based on the increase in submitted fees), and between 97.9 and 98.3 percent of the Class experienced a negative **net** impact (*i.e.*, were reimbursed less by Delta Dental across *all* of that Dental Provider's claims during the Class Period). *Id.* ¶ 100.

## IX. CLASS-WIDE EVIDENCE IS CAPABLE OF ESTABLISHING THAT AGGREGATE DAMAGES CAUSED BY DEFENDANTS TOTAL APPROXIMATELY $13 BILLION.

Plaintiffs also asked Dr. Bamberger to provide an expert opinion on the issue of damages suffered by Plaintiffs. Dr. Bamberger used the same yardstick model (discussed in Factual Background Section I, *supra*) to calculate aggregate damages to all Dental Providers in the putative Class. *Id.* ¶ 110.

Using this methodology, Dr. Bamberger concluded that the Class was underpaid by about $13 billion during the Class Period as a result of the Conspiracy. *Id.* ¶ 111. That is, had Delta Dental's approved amounts increased at the same modest rate of change as Class Members'

submitted amounts after controlling for inflation, Class Members would have received an additional $13 billion over the Class Period. The following chart shows Dr. Bamberger's estimate of annual and total damages calculated on both a "gross" and "net" basis and considered on the bases of both Milliman "regions" and three-digit zip codes:



Id.[29]

## **ARGUMENT**

The Class should be certified because Plaintiffs satisfy by a preponderance of the evidence the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and at least one subsection of Rule 23(b). *See Amgen Inc. v. Conn. Ret. Plans &*

---

[29] Applying another conservative measure of damages, Dr. Bamberger then deducted from this total the portion of the underpayment attributable to patient responsibility (*e.g.*, copays, deductibles, etc.) that would have been paid to Class Members by patients rather than being reimbursed by Delta Dental. This resulted in total underpayments to the Class attributable to payments only from Delta Dental of $8 billion. *Id.* ¶ 113. Because Defendants are jointly and severally liable to the Class under the Sherman Act for all damages suffered irrespective of their source, the appropriate damages amount (prior to trebling) remains approximately $13 billion, and this alternative calculation is presented only for purposes of responding to Defendants' anticipated arguments.

*Tr. Funds*, 568 U.S. 455, 460 (2013); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Here, Plaintiffs seek class certification under Rule 23(b)(3), which requires plaintiffs to show that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**I. THE PROPOSED CLASS SATISFIES RULE 23(A).**

**A. The Class Is So Numerous That Joinder Of All Members Is Impracticable.**

The proposed Class is so numerous that joinder of all members is impractical and, thus, the numerosity requirement is satisfied. Fed. R. Civ. P. 23(a)(1). "Plaintiffs are not required to specify the exact number of persons in the class; a properly-supported estimate is sufficient, and the court may rely on common sense in order to determine numerosity." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 578 (N.D. Ill. 2009) (citing *Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 957 (7th Cir. 1989) and *Grossman v. Waste Mgmt., Inc.,* 100 F.R.D. 781, 785 (N.D. Ill. 1984)).

Here, based on claims data provided by Defendants, there are approximately 240,000 Class Members, *supra* at Factual Background Section A, which makes joinder impractical. *See, e.g.*, *Spano v. Boeing Co.*, 633 F.3d 574, 585, 588 (7th Cir. 2011) ("No one has argued…nor could anyone take th[e] position with a straight face" that classes of 189,000 and 71,000 plaintiffs did not meet the numerosity requirement); *Reed*, 268 F.R.D. at 578-79 (finding numerosity satisfied in antitrust class with estimated 19,000 members); *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. 280, 287 (N.D. Ill. 1983) (finding numerosity in proposed antitrust class "clearly present" with an estimated 10,000 members).

**B. There Are Many Questions Of Law And Fact Common To The Class.**

Rule 23 requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The commonality requirement is not hard to meet … even a single common question

will do[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 357 (2011) (quotation omitted); *see also Reed*, 268 F.R.D. at 579. "A common nucleus of operative fact is usually enough to satisfy the commonality requirement," even if defendants could point to individual plaintiffs that were not harmed. *Rosario v. Livaditis,* 963 F.2d 1013, 1017-18 (7th Cir. 1992). If defendants "engaged in standardized conduct towards members of the proposed class," a common nucleus of operative fact exists. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998). A common question is one where the answer to the question will resolve an issue that is central to the validity of each one of the claims in one stroke. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 378-79 (7th Cir. 2015).

In this case, Plaintiffs' claims present many common questions of law and fact, including:

- Did Defendants engage in an anticompetitive conspiracy involving one or more of the following acts:

    o Allocating geographic territories between and among themselves in which other Defendants agreed not to compete?

    o Engaging in a group boycott by refusing to bid on employer groups headquartered outside their assigned territories?

    o Fixing reimbursement rates to Dental Providers, by means including (but not limited to) DeltaUSA Processing Policies, sharing reimbursement rates, and imposing an effective discount requirement?

    o Agreeing to expressly or impliedly restrict the operations of second brands?

- Did Defendants' conduct violate Section 1 of the Sherman Act?

- Should Defendants' conduct be judged under a *per se* or rule of reason standard and, if rule of reason, does any procompetitive justification outweigh the anticompetitive harm?

- What are the aggregate damages to the Class as a result of Defendants' conduct?

- Should injunctive relief be awarded to stop Defendants' anticompetitive conduct and in what form?

These questions (and others) are all provable by common evidence (as Drs. Bamberger and Lewin conclude). As such, Rule 23(a)(2) is satisfied.

### C. The Claims Of The Named Plaintiffs Are Typical Of The Claims Of The Class.

The claims of the named plaintiffs must be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). This requirement is "designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through pursuit of their own goals." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 168 (S.D. Ind. 2009) (quoting *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 311 (3d Cir. 1998)). This requirement is satisfied when the named plaintiffs' claims "arise[] from the same … practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citation omitted). It is not essential that the representatives' claims "be identical to the class members'; rather, it is sufficient if they are substantially similar." *Ruiz v. Stewart Assocs., Inc.*, 171 F.R.D. 238, 242 (N.D. Ill. 1997) (citing *Bionion v. Metropolitan Pier and Exposition Auth.*, 163 F.R.D. 517, 525 (N.D. Ill. 1995)). "In evaluating typicality, [courts] are mindful that it is not a demanding standard." *Reed*, 268 F.R.D. at 579 (finding typicality when claims of named and unnamed plaintiffs all arose from the same anticompetitive conduct of the defendants).

Here, the Class representatives and Class members all assert Sherman Act Section 1 claims that arise from Defendants' Conspiracy to suppress reimbursement rates involving the same illegal acts and claim that they were damaged as a result. This is sufficient to satisfy typicality under Rule 23(a)(3). *See, e.g.*, *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. at 168 ("Typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants.").

**D.     The Named Plaintiffs and Class Counsel Will Fairly And Adequately Protect The Interests Of The Class.**

The named representatives must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The Court must also appoint class counsel. Fed. R. Civ. P. 23(g); *see also Reed*, 268 F.R.D. at 580.

As to the first element, the inquiry generally "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997) (citing *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157-158 & n. 13 (1982)). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (internal quotation omitted).

Active involvement in the case by the named plaintiffs, such as reviewing the complaint, responding to discovery inquiries, and appearing for depositions, helps to demonstrate adequate representation. *In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 411 (S.D. Ind. 2001). Class representatives are not required to have detailed knowledge of the case or the law; "[g]eneral knowledge [of the case] and a participation in discovery are enough." *Sebo v. Rubenstein*, 188 F.R.D. 310, 316 (N.D. Ill. 1999).

Here, there is no conflict or antagonism between the Class's representatives and its members. The Class representatives are themselves members of the Class and allege that they suffered the same suppressed reimbursement rates as the Class.[30] Accordingly, the proposed Class representatives adequately represent the class under Rule 23(a)(4).

---

[30] The named plaintiffs also have reviewed the Consolidated Complaint, responded to multiple discovery requests including requests for production and interrogatories, and sat for depositions. *See, e.g.*, Ex. 7, 10/17/2022 Benton Supplemental Response to Defendants' First Set of

As to the second element, in appointing class counsel, courts are directed to consider the work performed by counsel to identify or investigate potential claims, their experience in handling class actions, complex litigation, and the types of claims at issue, their knowledge of the applicable law, and the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

On November 25, 2019, this Court appointed Stephen Neuwirth of Quinn Emanuel Urquhart & Sullivan LLP and Ronald Aranoff of Wollmuth Maher & Deutsch LLP as Interim Co-Lead Class Counsel. Dkt. No. 95 at 4. On January 25, 2023, after Mr. Neuwirth's untimely passing, the Court appointed his partner, Leonid Feller, as Interim Co-Lead Class Counsel. Dkt. No. 455. Mr. Feller and Mr. Aranoff are both experienced antitrust and class action attorneys. *See* Ex. 3, Feller CV; Ex. 4, Aranoff CV.

Mr. Feller and Mr. Aranoff (alongside dozens of lawyers at their firms, a robust Executive Committee, and a cadre of other support firms) have shepherded this litigation for more than four years. In addition to investigating the Class's claims and preparing the Consolidated Complaint, their work has included successfully defeating Defendants' motion to dismiss, briefing over a dozen party and non-party discovery motions (largely prevailing in discovery disputes), reviewing millions of documents produced by Defendants, taking and defending over 100 depositions, retaining and consulting with experts, and preparing this class certification brief.

Accordingly, the Interim Co-Lead Counsel are more than capable of adequately representing the Class. Plaintiffs respectfully request that this Court appoint Leonid Feller of Quinn Emanuel Urquhart & Sullivan LLP and Ronald Aranoff of Wollmuth Maher & Deutsch LLP as Co-Lead Class Counsel pursuant to Rule 23(g).

---

Interrogatories; Ex. 149, 5/23/2023 Simon City Smiles Third Amended Response to Interrogatory No. 1; Ex. 91, 1/12/2023 Deposition of Dr. Steven P. Dultz.

## II.     THE PROPOSED CLASS SATISFIES RULE 23(B)(3).

### A.     Common Questions Predominate.

This Class satisfies the predominance test. "This predominance requirement is meant to test whether proposed classes are sufficiently cohesive to warrant adjudication by representation, but it scarcely demands commonality as to all questions." *Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 444 (7th Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 41 (2013)). To assess whether the efficiency of a class action is greater than individual suits, "the predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal citation omitted).

Predominance is satisfied if a failure to prove a common question would end the case, and the entire class would prevail or fail together. *Bell*, 800 F.3d at 378 (citing *Amgen*, 586 U.S. at 460). A common question is one where the answer to the question will resolve an issue that is central to the validity of each one of the claims in one stroke. *Id.* (citing *Wal-Mart*, 564 U.S. at 338). Put another way, "[i]f the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question," *Id*. (citing *Messner*, 669 F.3d at 815), and if common question's failure would lose the case for the class, the common question predominates.

"The starting point of predominance analysis is the elements of the underlying action. In antitrust cases, a plaintiff must prove: (1) that defendants violated federal antitrust law; and (2) that the antitrust violation caused them some injury." *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077, 1090 (N.D. Ill. 2023) (citing *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016), and *Messner*, 669 F.3d at 814) (internal quotations and citations omitted). But in the context of class certification, plaintiffs do not need to prove the antitrust impact; rather, they "need only demonstrate that the element of antitrust impact *is*

45

*capable* of proof at trial through evidence that is *common to the class* rather than individual members." *Id.* (emphasis in original) (quoting *Messner*, 669 F.3d at 818).

In an antitrust case, the "'weight of authority…indicates [that] the existence of a conspiracy in restraint of trade is [an issue] that is common to all potential plaintiffs'" and the "common question of the existence of a horizontal price-fixing conspiracy usually satisfies Rule 23(b)(3)." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. at 169 (quoting *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 336 (N.D. Ill. 1997)). When the "primary common issue is to prove the existence of a conspiracy…in violation of antitrust laws," "[c]learly that issue will predominate the litigation. In fact, all the issues common to establishing antitrust violations are overriding." *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.*, 97 F.R.D. 668, 682 (N.D. Ill. 1983).

As the Supreme Court has made clear, Fed. R. Civ. P. 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to class-wide proof. What the rule does require is that common questions *predominate* over any questions affecting only individual class members." *Amgen*, 568 U.S. at 469 (emphasis in original; internal quotations and citations omitted; cleaned up). The Ninth Circuit in *Olean Wholesale Grocery Coop., Inc., v. Bumble Bee Foods LLC* emphasizes this same point:

> Therefore, to prove there is a common question of law or fact that relates to a central issue in an antitrust class action, plaintiffs must establish that "essential elements of the cause of action," **such as the existence of an antitrust violation *or* antitrust impact**, are capable of being established through a common body of evidence, applicable to the whole class.

31 F.4th 651, 666 (9th Cir. 2022) (en banc) (emphasis added).

Here, the Class brings claims under Section 1 of the Sherman Act for unlawful restraints of trade through an overarching Conspiracy involving Territorial Allocation, Price-Fixing, and Second Brand Restrictions. In the *BCBS* litigation involving substantially similar restraints, the court likewise certified a class. *In re Blue Cross Blue Shield Antitrust Litig.*, 2:13-cv-20000-RDP,

Dkt. 2931, at 26-28 (N.D. Ala.). The same evidence detailed above can be used to support the claims of each member of the Class here and, therefore, these are common questions that satisfy the predominance requirement.

### 1. Class-Wide Evidence Is Available To Prove The Common Question of Territorial Allocation.

The question of whether, as part of an overarching conspiracy to suppress reimbursement rates to Dental Providers, Defendants agreed to allocate territories and refused to compete in each other's territories will necessarily be answered using evidence common to all Class members. And that question will predominate over any individual question in the case.

Defendants operate pursuant to a uniform set of Membership Standards and other rules administered and enforced by DDPA and DeltaUSA. Defendants have agreed to and do abide by these rules and cooperate with DDPA and DeltaUSA to ensure enforcement. *See* Factual Background Section B.2, *supra*.

Common evidence from Member Companies demonstrates how consistent and widespread the scheme is. Defendants do not recruit providers outside of their territories, do not solicit employers headquartered outside their states, and allow DDPA and DeltaUSA to allocate business when there are disputes among Member Companies. *See* Factual Background Section C, *supra*. The evidence is common to the Class and predominates over any individual issue.

### 2. Class-Wide Evidence Is Available To Prove The Common Question of Whether Price-Fixing Occurred.

Whether Defendants' pricing behavior, as part of an overarching conspiracy to suppress reimbursement rates to Dental Providers, violated Section 1 of the Sherman Act depends on whether Defendants' conduct "stems from independent decision or from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007).

Common evidence will show Defendants conspired to lower reimbursement rates,

including but not limited to by (i) expressly setting prices required by DeltaUSA's mandatory processing policies; (ii) sharing reimbursement amounts for specific CDT codes through the ███ ███████ and one-on-one communications; (iii) sharing reimbursement strategies for the express purpose of lowering reimbursement amounts; and (iv) implementing and enforcing DDPA's and Delta USA's policies (especially the effective discount standard), which had the purpose and effect of lowering reimbursement. *See* Factual Background Section D, *supra*.

All this, individually and collectively, is sufficient to establish price-fixing through common evidence. *See, e.g., Kleen Prod. LLC v. Int'l Paper, Co.*, 306 F.R.D. 585, 596 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (7th Cir. 2016) (finding predominance criteria satisfied when plaintiffs provided record evidence of defendants' coordinated pricing).

### 3. Class-Wide Evidence Is Available To Prove The Common Question of Second Brand Suppression.

Common evidence will show that Defendants conspired to limit and suppress the ability of second brands to compete with Member Companies in the sale of insurance by imposing various express and implied restrictions on their operations. *See* Factual Background Section E, *supra*.

### 4. Class-Wide Evidence Is Available To Prove The Common Question of Impact.

At the class certification stage, Plaintiffs need not prove impact or damages but, rather, must show only that those elements are capable of proof based on common evidence. *Kleen*, 306 F.R.D. at 595-96 ("Demonstrating antitrust impact for class-certification purposes does not require that Plaintiffs *prove* antitrust impact. Instead, Plaintiffs need 'only to demonstrate that the element of antitrust impact ***is capable of proof at trial*** through evidence that is common to the class rather than individual to its members.'" (quoting *Messner*, 669 F.3d at 818) (emphasis added)); *id.* at 601 ("[A] plaintiff must produce a reliable method of measuring classwide damages based on common proof.").

48

"Impact" and "damages" are two separate elements in an antitrust claim. *Id.* at 594. Impact refers to causation, and asks "*whether* the plaintiffs were harmed," while damages "quantify *by how much*." *Id.* (first emphasis added) (quotation omitted). Impact is capable of common proof, and common issues predominate where, as here, "[e]ach class member, if forced to proceed on an individual basis, would be relying on the same evidence of the structure, conduct, and performance of Defendants' industry and their uniform [anticompetitive conduct] in order to show an elevated baseline price"—or, in a monopsony case like this one, a suppressed baseline price. *Id.* at 600. Damages are capable of common proof, and common issues predominate, where, as here, Plaintiffs proffer a reliable model, based on evidence common to the Class, for later proving damages. *Id.* at 602.

Plaintiffs have demonstrated that common issues predominate as to impact and damages by collecting evidence of a nationwide conspiracy and by offering Dr. Bamberger's analysis that uses Class-wide evidence to establish both Class-wide impact and to compute aggregate damages to the Class as a whole. Although impact and damages are separate elements, where, as here, "demonstrating impact and damages involves 'comparing the 'but-for' price—the price a customer would have paid in the absence of the conspiracy—and the actual price paid,'" the "single comparison establishes both impact and damages." *Kleen*, 306 F.R.D. at 595.

As explained in Background Section I, *supra*, Dr. Bamberger employs a "yardstick" approach, whereby he constructed a but-for world by comparing the market containing the challenged conduct to another reasonably similar market in the same time-period that does not contain the challenged conduct. Ex. 1, Bamberger at ¶¶ 78-82. The yardstick approach is a reliable and accepted method to establish both impact and damages. *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *8 (N.D. Ill. Mar. 29, 2023) ("'[T]he yardstick approach is a well-

established methodology' in antitrust actions and Defendants 'cannot complain that the methodology itself is unreliable.'" (quoting *In re Dealer Mgmt. Sys.*, 581 F. Supp. 3d 1029, 1073 (N.D. Ill. 2022))). Dr. Bamberger's model demonstrates that between 99.3 and 99.4 percent of providers experienced a negative ***gross*** impact, and between 97.9 and 98.3 percent experienced a negative ***net*** impact. *Supra* at Factual Background Section I (citing Ex. 1, Bamberger at ¶¶ 98-100).

## III.  CLASS-WIDE EVIDENCE IS AVAILABLE TO PROVE THE COMMON QUESTION OF DAMAGES.

Having demonstrated impact, Dr. Bamberger's same yardstick model and regression analyses can likewise be used to calculate damages to the Class. Indeed, Dr. Bamberger has concluded that the Class was underpaid by about $13 billion due to the Conspiracy. *Supra* at Factual Background Section J (*id.* ¶¶ 111-13).

Aggregation of damages using common evidence and a common method or formula, as Dr. Bamberger does here, is a widely accepted methodology. *See Kleen*, 831 F.3d at 929 ("Defendants complain that it is wrong to calculate aggregate rather than individual damages for the class. The district court rejected that position as a matter of law, as do we…. [A]t the class certification stage, plaintiffs are not obliged to drill down and estimate each individual class member's damages. The determination of the aggregate classwide damages is something that can be handled most efficiently as a class action…"); *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *19 (N.D. Ill. May 27, 2022) (approving use of aggregate damages); *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *10-11, 13 (N.D. Cal. Feb. 21, 2017) (same); *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 19-21 (1st Cir. 2015) (approving aggregate class-wide damages); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D. Mich. 2011) ("As

observed by a leading commentator on class actions: aggregate computation of class monetary relief is lawful and proper.") (internal quotation omitted).

The presence of individualized damages, to be calculated for each individual Class Member at a later stage, does not prevent certification, *Kleen*, 306 F.R.D at 601, 605. So long as there is common evidence to establish price changes through a reliable model, like the one Dr. Bamberger has prepared, that supports a finding of predominance. *Messner*, 669 F.3d at 819 ("By requiring uniformity of nominal price increases within and across contracts, the district court misread Rule 23(b)(3) to require a greater showing of common evidence than is contemplated by that rule."); *Smith v. Family Video Movie Club, Inc.*, 311 F.R.D. 469, 481 (N.D. Ill. 2015) (common issues predominated where "the correct amount of [damages] due can be calculated for each Plaintiff using the same mathematical formula").

## A.     Class Treatment Is A Superior Method To Adjudicate This Controversy.

Class certification under Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority is closely related to predominance. "[T]he more that common questions predominate over other issues in the case, the more likely it is that a class action is the superior method of adjudication." *Balderrama-Baca v. Clarence Davids & Co.*, 318 F.R.D. 603, 614 (N.D. Ill. 2017) (citing *Messner*, 669 F.3d at 814 n.5). This is particularly true when, as here, the "overarching liability and impact issues are common to the class and can be resolved in one stroke." *Kleen*, 306 F.R.D. at 605 (citing *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013)) (internal quotations omitted). Courts generally consider four factors: (1) the interest of class members in individually controlling prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. *Kleen*, 831 F.3d at 923.

Courts also consider whether consolidation into a class action will save time or resources, *In re Bromine Antitrust Litig.*, 203 F.R.D. at 416, and the more class members there are, the more likely it is that a class action will "yield substantial economies in litigation." *Butler*, 727 F.3d at 801. Consequently, a large class weighs in favor of a finding of superiority. *Moehrl*, 2023 WL 2683199, at *22. The upfront expense of proving the case, including the nature of the evidence and any expert testimony, can also weigh in favor of a class action. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014).

The superiority standard is met here. As discussed in Section II.A, *supra*, common issues predominate over individual ones. Further, (1) given the complexity and costs associated with this action, individual Class members would face overwhelming difficulties in prosecuting individual actions; (2) since the filing of the Consolidated Complaint, no members of the Class other than the named Plaintiffs have commenced litigation; (3) concentrating the litigation in a single forum has generated and will continue to generate efficiencies, particularly before this Court, which is familiar with the parties and the arguments; and (4) there are no apparent management difficulties associated with the Class, especially none that would be improved through another method of adjudication. Consolidation would spare the judicial system considerable time and expense compared to individual cases, particularly given the Class size, which numbers in the hundreds of thousands. It is self-evident that litigating this class action once is far more efficient than litigating separately the claims of more than two hundred thousand Dental Providers. Therefore, the superiority standard of Rule 23(b)(3) has been satisfied.

## IV.    A NATIONWIDE CLASS IS APPROPRIATE.

### A.    This *Per Se* Case Does Not Require A Defined Product Or Geographical Market.

Anticompetitive conduct is illegal *per se* when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *BMI v. CBS*, 441 U.S. 1, 19-20 (1979). "The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work[.]" *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). "In such circumstances a restraint is presumed unreasonable without inquiry into the particular market context in which it is found." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984). In the *Blue Cross Blue Shield Antitrust Litig.*, the court found the same aggregation of restraints alleged here to be illegal *per se*. 2:13-cv-20000-RDP (N.D. Ala.), Dkt. 2063, at 48. This too is a *per se* case.

The first mechanism by which the Defendants' Conspiracy operates is express Territorial Allocation. This is "[o]ne of the classic examples of a *per se* violation of § 1," as it "is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).

The second mechanism by which the Defendants' Conspiracy operates is through Price-Fixing, via the DeltaUSA processing policies, the ██████████ and other exchanges of pricing information, and DDPA's effective discount standard. *See* Factual Background Section D, *supra.* This is also a *per se* antitrust violation. "Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high[.]" *NCAA*, 468 U.S. at 100; *see also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (noting that horizontal price-fixing is the "archetypal

example" of *per se* unlawful conduct).

In a *per se* case like this one, there is no need for Plaintiffs to establish a geographic or product market. *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) (the plaintiff is only required "to identify a relevant product and geographic market" where there is no "alleged per se violation of Section 1" of the Sherman Act); *see also* Dkt. 303 at 11-12, Mem. Opinion and Order on Defendants' Mot. to Dismiss (applying *per se* analysis).

Therefore, the Court can and should certify the Class in this case without having to consider whether there is a precisely identified product market and geographic market.

**B.    Even Under A Rule Of Reason Analysis, Plaintiffs Have Sufficiently Identified The Product And Geographic Markets For Class-Wide Treatment.[31]**

A rule of reason case means "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition," considering factors such as "specific information about the relevant business and the restraint's history, nature, and effect." *Leegin*, 551 U.S. at 885 (quoting *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977), and *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). In a rule of reason case, the plaintiffs must show "both a relevant product (or services) market and a geographic market." *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d at 1093.

---

[31]  To the extent the relevant market is in dispute, that question is a common one. *See, e.g.*, *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015) ("[T]he definitions of the relevant geographic and product markets; and . . . [the defendant's] market power in the relevant market" are "questions common to the class and capable of resolution through common proof"); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, at *51 (D. Kan. Mar. 10, 2020) (finding "not persuasive" argument that one could not "establish market power in a relevant market with common evidence").

Here, Plaintiffs have identified both product and geographic markets sufficient to certify a nationwide class of Dental Providers.

### 1.    The Product Market for Dental Goods and Services.

Here, the relevant product market is the market for the purchase of dental goods and services. Plaintiffs are dentists in the business of providing dental goods and services, and Defendants are in the business of purchasing those services on behalf of insureds. This is sufficient as a product market definition, as this Court already has indicated. Dkt. No. 303 at 24-25 (noting Defendants are "purchasers in the market for plaintiffs' goods and services").

The purchase of labor or services in various industries has been recognized as a product market. *See, e.g.*, *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 356 (1963) (finding relevant product market was a cluster of products and services related to banking); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 436 (7th Cir. 2020) ("The monopolized ***service*** market in each metropolitan area is that for the sale of advertising representation ***services***[.]") (emphasis added); *Agnew v. NCAA*, 683 F.3d 328, 337 n.3 (7th Cir. 2012) (noting this is a "clear monopsony case" in the market for "student athletic labor"); *Reed*, 268 F.R.D. at 584, 589-90 (finding product market for nurse labor "well-founded" in monopsonistic wage suppression case); *see also Marion Healthcare, LLC v. S. Ill. Healthcare*, 2015 WL 3466585, at *6 (S.D. Ill. May 29, 2015) (market for inpatient and outpatient surgical services); *Med Alert Ambulance, Inc. v. Atl. Health Sys., Inc.*, 2007 WL 2297335, at *11 (D.N.J. Aug. 6, 2007) (finding plausible product market for ambulance services); *McNeil v. NFL*, 790 F. Supp. 871, 893 (D. Minn. 1992) (relevant market "for the services of professional league football players in the United States").

### 2.    The Geographic Market is the United States.

As Defendants themselves have acknowledged, they compete in a national market against other national insurance carriers for the sale of dental insurance. Ex. 29, 12/7/22 Vinci Tr. 156:22-

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

Indeed, Defendants admit that each of the anticompetitive practices at issue in this case was implemented specifically to allow them to compete in the national market. *See* Ex. 152, 1/31/2024 DDPA/DeltaUSA Supplemental Responses and Objections to Rog 25 ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████

As the Seventh Circuit noted in *Fed. Trade Comm'n v. Advocate Health Care Network*, "insurers are the most relevant buyers" in the purchase of health care services from the providers of those services, and therefore "the area of *effective* competition" is the national market in which the insurers compete. 841 F.3d 460, 471, 475-76 (7th Cir. 2016) (emphasis in original); *see also*

2B Philip E. Areeda et al., Antitrust Law ¶ 570e, at 418 (3d ed. 2007) ("The relevant market for this purpose [of analyzing buyer power] includes the full range of selling opportunities reasonably open to rivals, namely all of the product and geographic sales they may readily compete for...."). So too the Seventh Circuit has held that when assessing the geographic market in which insurance companies compete, "[t]he 'productive asset' of the insurance business is money, which may be supplied on a moment's notice, plus the ability to spread risk, which many firms possess and which has no geographic boundary." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335-36 (7th Cir. 1986).

Defendants will argue that because dentists primarily compete for ***patients*** at a local level, then the relevant geographic market is local. The Court already rejected this argument at the pleading stage and nothing has changed:

> Defendants argue that because plaintiffs are likely to draw patients primarily from nearby communities, the relevant geographic market should comprise only the areas surrounding their respective practices, not the entire territory allocated to the Delta Dental State Insurer responsible for those areas. ***But why should it matter where plaintiffs' patients live?*** There is no obvious link … between a dental patient's place of residence and the dental insurance options available to her. Indeed, all agree that some of defendants' competitors (that is, potential substitute purchasers of dental services) are national insurance companies that insure patients throughout the United States.

Dkt. No. 303 at 27 (emphasis added).

As the Court also noted, this is a monopsony case and the relevant geographic market is the one in which the buyers of dental goods and services (*i.e.*, insurers), ***not*** the sellers (*i.e.*, dentists), compete: when "defendants have combined to form a buyers' cartel with monopsony power that makes it difficult for alternative buyers to compete, thereby depressing the market price for the sale of dental goods and services," "the market is not the market of competing sellers but

57

of competing buyers." Dkt. 303 at 26-27 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)).

Defendants' local market argument repeatedly has been rejected in other cases. *See, e.g.*, *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600, at *7-9 (N.D. Ill. Mar. 21, 2007) (certifying national class of sulfuric acid purchasers and noting that class certification was not the right time to have a battle of the experts over market definition); *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. at 306 (certifying nationwide class in industrial gas market); *see also In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 997 (D. Minn. 2023) (noting that "Defendants operate on a national scale, so the entire United States is the appropriate geographic market"); *Beltran v. InterExchange, Inc.*, 2018 WL 1948687 (D. Colo. Feb. 2, 2018) (certifying nationwide class of *au pairs*, noting that "whether a [pay suppression] conspiracy exists is a common question that is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)"); *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 223 (E.D. Pa. 2017) (finding market for price-fixed dry-wall was national because productive asset traveled great distances); *Nitsch v. DreamWorks Animation SKG Inc.*, 315 F.R.D. 270, 281, 317 (N.D. Cal. 2016) (certifying nationwide class of animation industry workers).

## V.  DEFENDANTS' BOILERPLATE AFFIRMATIVE DEFENSES CANNOT PRECLUDE CLASS CERTIFICATION.

Defendants raise as many as 29 affirmative defenses in their Answers to Plaintiffs' Consolidated Complaint. *See, e.g.*, Dkt. No. 340 at 83-89, DDPA & DeltaUSA's Answer & Affirmative & Additional Defenses.

These affirmative defenses do not preclude class certification. To the contrary, "it is well established that individual counterclaims or defenses do not render a case unsuitable for class certification." *Pinkett v. Moolah Loan Corp.*, 1999 WL 1080596, at *4 (N.D.Ill. Nov. 2, 1999)

(citing *Johnson v. Aronson Furniture*, No. 96 C 117, 1998 WL 641342, at *6 (N.D. Ill. Sept. 11, 1998)); *Merk v. Jewel Food Stores*, 702 F.Supp. 1391, 1395 (N.D. Ill. 1988) ("The existence of affirmative defenses as to some class members is not by itself enough to warrant the denial of class certification."). Defendants' defenses do not defeat certification for several reasons.

First, to the extent the defenses deal with questions of law or fact common to the Class, such defenses support rather than defeat class certification. *See In re Evanston Nw. Healthcare Corp. Antitrust Litig.*, 268 F.R.D. 56, 65 (N.D. Ill. 2010), *vacated on other grounds sub nom. Messner*, 669 F.3d at 802. Here, Defendants articulate no defenses that are unique to particular Plaintiffs, and most or all relate to issues of law or fact common to the Class.[32]

Second, this Court already rejected several defenses attacking Plaintiffs' pleading in its Order on Defendants' Motion to Dismiss. *See* Dkt. No. 303, Mem. Opinion and Order, at 8-12

---

[32] *See, e.g.*, Dkt. No. 340 at 83-89 (Listing defenses containing issues of fact or law common to the class: 1) Plaintiffs failed to state a claim; 2) Statutes of Limitations or contractual limitations, when contracts were standard across the class; 3) estoppel, laches, waiver; 4) Defendants' conduct was procompetitive and ancillary to legitimate joint venture; 5) Plaintiffs lack standing; 6) Plaintiffs were not injured; 7) Plaintiffs have not suffered antitrust injury; 8) Plaintiffs failed to allege harm in relevant market; 9) Defendants' conduct is immune from scrutiny under antitrust laws; 10) Plaintiffs' claims barred by McCarran-Ferguson Act; 11) Defendants' actions authorized or permitted by state or federal law; 12) Plaintiffs' claims barred by filed-rate and state-action doctrines; 13) Plaintiffs' claims barred by contractual provisions, when contracts were standard across class; 14) Plaintiffs' claims barred by contractual alternative dispute resolution provisions, when contracts were standard across class; 15) Plaintiffs failed to allege concerted action; 16) Plaintiffs failed to state relevant product and geographic markets; 17) Defendants lack market power in relevant market; 18) Plaintiffs failed to allege two-sided market; 19) Plaintiffs failed to mitigate damages; 20) Defendants did not cause Plaintiffs' injuries; 21) To the extent Defendants caused injury, the damages should be apportioned amongst the Defendants based on each Defendant's fault; 22) Supervening or superseding events caused Plaintiffs' injury; 23) Recovery to Plaintiffs would be unjust enrichment; 24) This action cannot be maintained as a class action; 25) Plaintiffs' damages are too speculative, uncertain, or are not as stated; 26) Equitable relief is barred because there is an adequate remedy at law; 27) Plaintiffs' claims are barred by doctrine of *in pari delicto*; 28) Plaintiffs' claims are barred to the extent they are settled, dismissed, contractually limited, or Defendants' conduct was consented to; and, 29) Plaintiffs failed to exhaust statutory or administrative remedies or claims conflict with state law.)

(rejecting argument that *per se* treatment does not apply – Defendants' 4th and 16th defenses, Dkt. No. 340 at 84, 86); 12-13 (rejecting argument that restraints are ancillary to otherwise legitimate joint venture[33] – Defendants' 4th defense, Dkt. No. 340 at 84); 14-17 (rejecting argument that dental insurance is a two-sided market – Defendants' 18th defense, Dkt. No. 340 at 86); 29-31 (rejecting argument that Plaintiffs did not allege concerted action – Defendants' 15th defense, Dkt. No. 340 at 86); 31-35 (rejecting argument that Defendants are protected by the McCarran-Ferguson Act – Defendants' 10th defense, Dkt. No. 340 at 85).

Third, courts are reluctant to deny class certification under Rule 23(b)(3) merely because affirmative defenses may be available against individual members of the class. *See, e.g.*, Newberg and Rubenstein on Class Actions § 4:57 (6th ed. 2022) ("Statute of limitations defenses—like damage calculations, affirmative defenses, and counterclaims—rarely defeat class certification.").

Fourth, if deemed necessary (which does not appear to be the case here), a class definition often can be amended to avoid individualized defenses applicable to a narrow set of plaintiffs. *Wigod v. PNC Bank, N.A.*, 338 F. Supp. 3d 758, 773 (N.D. Ill. 2018). Accordingly, Defendants' affirmative defenses do not defeat class certification.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court certify the Class defined herein and appoint Leonid Feller of Quinn Emanuel Urquhart & Sullivan LLP and Ronald Aranoff of Wollmuth Maher & Deutsch LLP as Co-Lead Class Counsel pursuant to Rule 23(g).

---

[33] As this Court noted, Defendants' reliance on *Polk Bros. v. Forest City Enterprises*, F.2d 185, 189 (7th Cir. 1985), for the proposition that restraints can be ancillary to an otherwise legitimate joint venture, is misplaced because, as the Supreme Court stated in *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006), the ancillary restraints doctrine is inapplicable where the restraint being challenged involves the core activity of the joint venture itself—as is the case here with Defendants. Regardless, this too would be a common question.

Dated: February 6, 2024

Respectfully submitted,

**QUINN EMANUEL URQUHART**
**& SULLIVAN,  LLP**

By: */s/ Leonid Feller*
Leonid Feller, P.C.
R. Allan Pixton
Bevin Brennan
Samantha T. Zuba
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705-7400
leonidfeller@quinnemanuel.com
allanpixton@quinnemanuel.com
bevinbrennan@quinnemanuel.com
samanthazuba@quinnemanuel.com

Aaron M. Lawrence
51 Madison Ave., 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
aaronlawrence@quinnemanuel.com

**WOLLMUTH MAHER & DEUTSCH LLP**

By: */s/ Ronald J. Aranoff*
Ronald J. Aranoff
Jay S. Handlin
Philip Schatz
William J. Hagan
Alexandra C. Spina
500 Fifth Avenue – 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
raranoff@wmd-law.com
jhandlin@wmd-law.com
pschatz@wmd-law.com
whagan@wmd-law.com
aspina@wmd-law.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Gregory Arenson
Elana Katcher
850 Third Avenue
New York, New York 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

**CARNEY, BATES, AND PULLIAM, PLLC**
William P. Creasman
519 W. 7th St.
Little Rock, Arkansas 72201
Telephone: (501) 312-8500
wcreasman@cbplaw.com

**PRETI, FLAHERTY, BELIVEAU**
**& PACHIOS, LLP**
Gregory P. Hansel
Michael S. Smith
Randall B. Weill
Elizabeth F. Quinby
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
msmith@preti.com

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes
Mary Ann Giorno Geppert
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
bcaldes@srkattorneys.com
mgeppert@srkattorneys.com

rweill@preti.com
equinby@preti.com

**RADICE LAW FIRM**
John Radice
April Dawn Lambert
475 Wall Street
Princeton, NJ 08540
Telephone (646) 245-8502
radice@radicelawfirm.com
alambert@radicelawfirm.com

**BERGER MONTAGUE PC**
Eric L. Cramer
Patrick F. Madden
Richard D. Schwartz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tele: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
pmadden@bm.net
rschwartz@bm.net

**KELLER ROHRBACK L.L.P.**
Ryan McDevitt
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
rmcdevitt@kellerrohrback.com

**BARRACK RODOS BACINE**
William J. Ban
640 Eighth Avenue, 10th Fl.
New York, NY 10036
Phone: (212) 668-0782
wban@barrack.com

**SALTZ, MONGELUZZI, &
BENDESKY, P.C.**

**MALKINSON & HALPERN, P.C.**
John R. Malkinson
33 North Dearborn Street, Suite 1540
Chicago, IL 60602
Telephone: (312) 427-9600
jmalkinson@mhtriallaw.com

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Stephanie M. Beige
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
bernstein@bernlieb.com
beige@bernlieb.com

**FREED KANNER LONDON &
MILLEN LLC**
William H. London
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
wlondon@fklmlaw.com

**REINHARD WENDORF &
BLANCHFIELD**
Garrett D. Blanchfield, Jr.
Brant D. Penney
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (651) 287-2100
Facsimile: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

**MCLAFFERTY LAW FIRM, P.C.**
David P. McLafferty

Simon B. Paris
Patrick Howard
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 496-8282
sparis@smbb.com
phoward@smbb.com

**KANTROWITZ GOLDHAMER &
GRAIFMAN P.C.**
Melissa R. Emert
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977
(866) 542-9958 ext 202
memert@kgglaw.com

923 Fayette Street
Conshohocken, PA  19428
Telephone: (610) 940-4000 ext. 12
dmclafferty@mclaffertylaw.com

**CERTIFICATE OF SERVICE**

I, Leonid Feller, an attorney, hereby certify that on February 6, 2024, I caused a true and correct copy of the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's CM/ECF system and separately via email to counsel of record. Parties may access this filing through the Court's CM/ECF system.

*/s/ Leonid Feller*
Leonid Feller