## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE DELTA DENTAL ANTITRUST LITIGATION | **Civil Action No.** 1:19-cv-06734 |
| | **MDL No.** 2931 |
| *This document relates to ALL ACTIONS* | Hon. Elaine E. Bucklo |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

**TABLE OF CONTENTS**

                                                                                        Page

TABLE OF AUTHORITIES ................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................... xiv

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 5

I.      The Delta Dental System Is A Lawful, Procompetitive Joint Venture ............. 5

II.     Delta Dental Member Companies Operate In Highly Competitive, Complex,
        And Varied Markets For Dental Insurance And Dental Services ....................... 8

        A.      Member Companies Face Stiff Competition ........................................... 8

        B.      Providers Have Network Choices ......................................................... 10

        C.      Member Company Reimbursements Are Highly Competitive ............... 11

III.    The Challenged Conduct Promotes Inter-Brand Competition And Affordable
        High-Quality Dental Care ................................................................................. 13

IV.     Nothing About Defendants' "Capital Reserves" Or Executive Compensation
        Supports Certifying A Class .............................................................................. 19

V.      Plaintiffs' Motion For Class Certification Is Without Merit ............................ 20

LEGAL STANDARD ......................................................................................... 22

ARGUMENT ...................................................................................................... 23

I.      Individual Questions Predominate Over Any Common Issues ........................ 24

        A.      Common, Class-wide Evidence Cannot Prove Injury Or Damages For
                Each Class Member ............................................................................. 27

                1.      Injury And Damages Turn On Provider- And Locale-Specific
                        Facts ......................................................................................... 27

                2.      Plaintiffs Have Not Identified A Reliable Method Of Proving
                        Class-wide Injury Or Damages ................................................ 33

                        a.      Dr. Bamberger Improperly Relies On Regional
                                Averages ....................................................................... 36

## TABLE OF CONTENTS
### (continued)

Page

b. Dr. Bamberger Does Not Account For Key Industry Dynamics ........................................................38

c. Dr. Bamberger's Model Is Methodologically Unsound ...............44

3. The Proposed Class Impermissibly Includes Many Uninjured Providers That Lack Article III Standing....................................51

4. Plaintiffs' Injury And Damages Model Cannot Serve As Class-wide Proof Because It Violates *Comcast* .....................................53

B. Common, Class-wide Evidence Could Not Establish Antitrust Violations For Each Class Member Across The Varied Geographic Markets For Providers............................................................56

1. The Rule Of Reason Applies, Requiring Geographic-Market Proof............................................................56

2. Geographic Markets For Providers Are Local, Not National ...................57

3. The Thousands Of Geographic Markets Splinter The Putative Class In A Way That Makes Common Proof Of Antitrust Violations Impossible ........................................60

C. Several Defenses Further Splinter The Proposed Class............................................63

II. A Class Action Is Not Superior To Individual Actions ...................................................70

III. Named Plaintiffs Are Inadequate And Atypical Class Representatives ..........................71

CONCLUSION.....................................................................................................75

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alabama v. Blue Bird Body Co.*,
573 F.2d 309 (5th Cir. 1978) ........................................................................31, 33

*Alleman v. Collection Prof'ls, Inc.*,
2019 WL 1454425 (N.D. Ill. Apr. 2, 2019) ................................................................65

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................44

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ....................................................27, 37, 49, 51, 55

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ........................................................................22, 66

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................73

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
2020 WL 5642941 (N.D. Ill. Sept. 22, 2020), *aff'd*, 15 F.4th 831
(7th Cir. 2021) ........................................................................58

*Baxter Int'l, Inc. v. Abbott Lab'ys*,
315 F.3d 829 (7th Cir. 2003) ........................................................................66

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ....................................................25, 33, 44

*Bell v. Bimbo Foods Bakeries Distrib., Inc.*,
2013 WL 6253450 (N.D. Ill. Dec. 3, 2013) ................................................................65

*Birnberg v. Milk Street Residential Assocs. Ltd. P'ship*,
2003 WL 21267103 (N.D. Ill. May 29, 2003) ................................................................71

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ....................................................25, 32, 37

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
152 F.3d 588 (7th Cir. 1998) ....................................................38, 44, 48

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ........................................................................58

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*In re Blue Cross Blue Shield Antitrust Litig.*,
2022 WL 3221887 (N.D. Ala. Aug. 9, 2022) ........................................................... 57

*In re Blue Cross Blue Shield Antitrust Litig.*,
238 F. Supp. 3d 1313 (N.D. Ala. 2017) ................................................................... 68

*In re Blue Cross Blue Shield Antitrust Litig.*,
No. 2:13-cv-20000, ECF No. 2931 (Aug. 9, 2022) ................................................. 26

*In re Blue Cross Blue Shield Antitrust Litig.*,
85 F.4th 1070 (11th Cir. 2023) ................................................................................ 64

*Brand v. Comcast Corp.*,
302 F.R.D. 201 (N.D. Ill. 2014) .............................................................................. 37

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) ................................................................................. 68

*Broadcast Music, Inc. v. CBS*,
441 U.S. 1 (1979) ..................................................................................................... 56

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ............................................................................ 37, 66

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................................................................. 57

*City of Rockford v. Mallinckrodt ARD, Inc.*,
2024 WL 1363544 (N.D. Ill. Mar. 29, 2024) .................. 4, 25, 34-36, 38, 39, 44, 45, 48, 49

*Clark v. Bumbo Int'l Tr.*,
2017 WL 3704825 (N.D. Ill. Aug. 28, 2017) ......................................................... 51

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...................................................................... 22, 25, 34, 53-56, 66

*In re Conagra Peanut Butter Prods. Liab. Litig.*,
251 F.R.D. 689 (N.D. Ga. 2008) ............................................................................. 24

*Conde v. Sensa*,
2018 WL 4297056 (S.D. Cal. Sept. 10, 2018) ........................................................ 67

*Conrad v. Jimmy John's Franchise, LLC*,
2021 WL 3268339 (S.D. Ill. Jul. 30, 2021) ..................................................... 57, 60, 63

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*In re Cox. Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*,
2011 WL 6826813 (W.D. Okla. Dec. 28, 2011) ........................................................70

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) .......................................................................68

*Dawson v. Great Lakes Educ. Loan Servs., Inc.*,
2016 WL 5415096 (W.D. Wis. Sept. 28, 2016) .........................................................53

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
No. 1:18-cv-864, ECF No. 1512 (N.D. Ill. June 4, 2024).........................................22

*DeSlandes v. McDonald's USA, LLC*,
2021 WL 3187668 (N.D. Ill. July 28, 2021), *vacated on other grounds*,
81 F. 4th 699 (7th Cir. 2023) ..................................................................................60

*In re Digital Music Antitrust Litig.*,
321 F.R.D. 64 (S.D.N.Y. 2017) ...............................................................................43

*Dixon v. Jefferson Capital Sys., LLC*,
2021 WL 5908431 (S.D. Ind. Dec. 14, 2021)...........................................................23

*Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*,
797 F.3d 1248 (11th Cir. 2015) ...............................................................................57

*Elliott v. ITT Corp.*,
150 F.R.D. 569 (N.D. Ill. 1992)...............................................................................70

*Espejo v. Santander Consumer USA, Inc.*,
2016 WL 6037625 (N.D. Ill. Oct. 14, 2016).............................................................67

*In re Evanston Nw. Corp. Antitrust Litig.*,
2013 WL 6490152 (N.D. Ill. Dec. 10, 2013).............................................................66

*Fabert Motors, Inc. v. Ford Motor Co.*,
355 F.2d 888 (7th Cir. 1966) ...................................................................................64

*Food Lion, LLC v. Dean Foods Co.*,
312 F.R.D. 472 (E.D. Tenn. 2016)......................................................................38, 51

*Freitas v. Cricket Wireless, LLC*,
2022 WL 3018061 (N.D. Cal. July 29, 2022)...........................................................56

*FTC v. OSF Healthcare Sys.*,
852 F. Supp. 2d 1069 (N.D. Ill. 2012) ......................................................................58

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
2008 WL 7356272 (S.D. Tex. Nov. 24, 2008), *R&R adopted,* 2009 WL
10712586 (S.D. Tex. Mar. 26, 2009), *aff'd,* 695 F.3d 330 (5th Cir. 2012) ...........................72

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
695 F.3d 330 (5th Cir. 2012) ..................................................................................................60

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.,*
29 F.4th 839 (7th Cir. 2022) ..............................................................................................24, 64

*In re Graphics Processing Units Antitrust Litig.,*
253 F.R.D. 478 (N.D. Cal. 2008)..................................................................................37, 42, 48

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.,*
221 F. Supp. 3d 1033 (N.D. Ind. 2016) ...............................................................................39, 40

*Hettinger v. Glass Specialty Co.,*
59 F.R.D. 286 (N.D. Ill. 1973)...................................................................................................71

*Home Placement Serv., Inc. v. Providence Journal Co.,*
819 F.2d 1199 (1st Cir. 1987)...............................................................................................44, 49

*Honorable v. Easy Life Real Estate Sys., Inc.,*
182 F.R.D. 553 (N.D. Ill. 1998)..................................................................................................70

*Howard v. Cook Cnty. Sheriff's Office,*
989 F.3d 587 (7th Cir. 2021) ................................................................................................23, 25

*Hyderi v. Wash. Mut. Bank, FA,*
235 F.R.D. 390 (N.D. Ill. 2006)..................................................................................................63

*In re Hydrogen Peroxide Antitrust Litig.,*
552 F.3d 305 (3d Cir. 2008).........................................................................................................25

*Ins. Comm'r of Md. v. Blue Shield of Md., Inc.,*
456 A.2d 914 (Md. Ct. App. 1983).............................................................................................69

*In re Intel Corp. Microprocessor Antitrust Litig.,*
2014 WL 6601941 (D. Del. Aug. 6, 2014) .................................................................................42

*J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.,*
628 F.2d 994 (7th Cir. 1980) ......................................................................................................73

*Johnson v. Meriter Health Servs. Emp. Ret. Plan,*
702 F.3d 364 (7th Cir. 2012) ......................................................................................................72

vi

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Kentucky v. Marathon Petrol. Co.*,
464 F. Supp. 3d 880 (W.D. Ky. 2020)...................................................................49

*Keogh v. Chi. & Nw. Ry. Co.*,
260 U.S. 156 (1922).................................................................................................68

*Khanna v. Banks*,
2022 WL 1028712 (N.D. Ill. Apr. 6, 2022) ...........................................................67

*Kleen Prods. LLC v. Int'l Paper*,
306 F.R.D. 585 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (7th Cir. 2016) ...................26

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
571 F.3d 672 (7th Cir. 2009) ............................................................................51, 53

*Korsmo v. Am. Honda Motor Co.*,
2012 WL 1655969 (N.D. Ill. May 10, 2012) .........................................................53

*Kunzelmann v. Wells Fargo Bank, N.A.*,
2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ...........................................................70

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020)....................................................................................37

*Liberty Mut. Ins. Co. v. Tribco Const. Co.*,
185 F.R.D. 533 (N.D. Ill. 1999)..............................................................................71

*Lindsey v. Normet*,
405 U.S. 56 (1972)...................................................................................................63

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
415 F. Supp. 3d 703 (E.D. Va. 2019) .....................................................................28

*Mace v. Van Ru Credit Corp.*,
109 F.3d 338 (7th Cir. 1997) ..................................................................................71

*Magallon v. Robert Half Int'l, Inc.*,
311 F.R.D. 625 (D. Or. 2015)..................................................................................68

*Malaney v. UAL Corp.*,
434 F. App'x 620 (9th Cir. 2011) ...........................................................................60

*Marti v. Schreiber/Cohen, LLC*,
2020 WL 30421 (D. Mass. Jan. 2, 2020) ...............................................................67

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Martino v. McDonald's Sys., Inc.*,
  86 F.R.D. 145 (N.D. Ill. 1980) ........................................................................71

*McFields v. Dart*,
  982 F.3d 511 (7th Cir. 2020) ..........................................................................69

*McIntyre v. Household Bank*,
  2004 WL 2958690 (N.D. Ill. Dec. 21, 2004) ...................................................73

*In re Milk Prod. Antitrust Litig.*,
  195 F.3d 430 (8th Cir. 1999) ..........................................................................75

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
  2023 WL 8936389 (D. Utah Dec. 27, 2023) .............................................37, 54

*Nagel v. ADM Inv. Servs., Inc.*,
  65 F. Supp. 2d 740 (N.D. Ill. 1999) ................................................................67

*NCAA v. Alston*,
  594 U.S. 69 (2021) .....................................................................................56, 60

*In re New Motor Vehicles Can. Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ...............................................................................33

*O'Neill v. Coca-Cola Co.*,
  669 F. Supp. 217 (N.D. Ill. 1987) ...................................................................27

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) ........................................................................................57

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) ...........................................................26

*In re Online DVD Rental Antitrust Litig.*,
  2011 WL 5883772 (N.D. Cal. Nov. 23, 2011), *aff'd*, 779 F.3d 914
  (9th Cir. 2015).................................................................................................29

*In re Opana ER Antitrust Litig.*,
  2021 WL 4047034 (7th Cir. July 13, 2021).....................................................52

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014).....................................................................37

*Oshana v. Coca-Cola Bottling Co.*,
  225 F.R.D. 575 (N.D. Ill. 2005), *aff'd*, 472 F.3d 506 (7th Cir. 2006) ...................70

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Pablo v. ServiceMaster Glob. Holdings Inc.*,
  2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ..........................................................67

*Panwar v. Access Therapies, Inc.*,
  2015 WL 329013 (S.D. Ind. Jan. 22, 2015) ...........................................................53

*Parko v. Shell Oil Co.*,
  739 F.3d 1083 (7th Cir. 2014) ...............................................................48, 63, 64

*Pastor v. State Farm Mut. Auto. Ins. Co.*,
  487 F.3d 1042 (7th Cir. 2007) ...............................................................................33

*Perez v. City of Chicago*,
  2019 WL 7290848 (N.D. Ill. Dec. 27, 2019) ....................................................51, 53

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  2017 WL 275398 (E.D. Pa. Jan. 18, 2017)..................................26, 37, 41, 48, 49, 54

*In re Photochromic Lens Antitrust Litig.*,
  2014 WL 1338605 (M.D. Fla. Apr. 3, 2014)..........................................................46

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985) ................................................................................57

*In re Processed Egg Prod. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015)........................................................................39, 41

*Pumputiena v. Deutsche Lufthansa, AG*,
  2017 WL 66823 (N.D. Ill. Jan. 6, 2017) ................................................................64

*Q Club Resort & Residences Condo. Ass'n, Inc. v. Q Club Hotel, LLC*,
  2010 WL 11454483 (S.D. Fla. Jan. 6, 2010) .........................................................57

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019)..............53

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) .........................................................................25, 43

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  934 F.3d 619 (D.C. Cir. 2019) .........................................................................25, 51

*In re Rate Filing of Blue Cross Hosp. Serv., Inc.*,
  214 S.E.2d 339 (W. Va. 1975)................................................................................69

ix

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Ready-Mixed Concrete Antitrust Litig.*,
261 F.R.D. 154 (N.D. Ind. 2009) ...................................................................25

*Reed v. Advocate Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009)...............................25, 26, 33, 36, 37, 42, 44, 51

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*,
545 F.2d 18 (7th Cir. 1976) ......................................................................64

*Riffey v. Rauner*,
910 F.3d 314 (7th Cir. 2018) ....................................................................33

*Robinson v. Tex. Auto. Dealers Ass'n*,
387 F.3d 416 (5th Cir. 2004) ....................................................................42

*Rohlfing v. Manor Care, Inc.*,
172 F.R.D. 330 (N.D. Ill. 1997)..................................................................25

*Royal Mile Co. v. UPMC*,
40 F. Supp. 3d 552 (W.D. Pa. 2014).........................................................69, 70

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
601 F.3d 1159 (11th Cir. 2010) ..................................................................65

*Schilke v. Wachovia Mortg., FSB*,
820 F. Supp. 2d 825 (N.D. Ill. 2011) ...........................................................68

*Seary v. eFunds Corp.*,
2010 WL 183362 (N.D. Ill. Jan. 20, 2010)......................................................53

*Series 17-03-615 v. Express Scripts, Inc.*,
2024 WL 1834311 (N.D. Ill. Apr. 26, 2024) ....................................................35

*Siegel v. Shell Oil Co.*,
256 F.R.D. 580 (N.D. Ill. 2008).................................................................69

*Smith v. Spizzirri*,
144 S. Ct. 1173 (2024)..........................................................................66

*Soares v. Flowers Foods, Inc.*,
320 F.R.D. 464 (N.D. Cal. 2017).................................................................71

*Spano v. Boeing Co.*,
633 F.3d 574 (7th Cir. 2011) ....................................................................73

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
  476 U.S. 409 (1986)................................................................................68

*In re Steel Antitrust Litig.*,
  2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) ...................................25, 34

*In re Sulfuric Acid Antitrust Litig.*,
  703 F.3d 1004 (7th Cir. 2012) ............................................................57

*Szabo v. Bridgeport Machs., Inc.*,
  249 F.3d 672 (7th Cir. 2001) .............................................................71

*Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.*,
  97 F.R.D. 668 (N.D. Ill. 1983)............................................................26

*In re Titanium Dioxide Antitrust Litig.*,
  962 F. Supp. 2d 840 (D. Md. 2013)...................................................67

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)............................................................................51

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016).......................................................................24, 46

*Vasquez v. Ind. Univ. Health, Inc.*,
  40 F.4th 582 (7th Cir. 2022) .............................................................58

*Vigus v. S. Ill. Riverboat/Casino Cruises*,
  274 F.R.D. 229 (S.D. Ill. 2011) .........................................................53

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
  257 F.3d 256 (2d Cir. 2001)...............................................................46

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................ 22-24, 63, 65

*West v. Prudential Sec., Inc.*,
  282 F.3d 935 (7th Cir. 2002) ...........................................23, 35, 38, 48

*In re Wheat Rail Freight Antitrust Litig.*,
  759 F.2d 1305 (7th Cir. 1985) ...........................................................68

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  946 F.3d 995 (8th Cir. 2019) .........................................................41, 48

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Windham v. Am. Brands, Inc.*,
565 F.2d 59 (4th Cir. 1977) (en banc) ...................................................33

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)...................................................................46

**Statutes and Rules**

1959 Ark. Acts, Act 148 § 677 ...............................................................6

Ark. Code § 23-75-110 .........................................................................6

Fed. R. Civ. P. 23 ......................................................................... *passim*

Fed. R. Civ. P. 23(a) ...........................................................................24

Fed. R. Civ. P. 23(a)(3) .......................................................................71

Fed. R. Civ. P. 23(a)(4) .......................................................................71

Fed. R. Civ. P. 23(b)(1) .......................................................................23

Fed. R. Civ. P. 23(b)(2) .......................................................................23

Fed. R. Civ. P. 23(b)(3) ................................................. 20, 23-25, 54, 70

Fed. R. Evid. 702 .....................................................................19, 35, 36

215 ILCS § 110/32 .............................................................................6, 15

Iowa Code § 514.8 ...............................................................................69

Mass. Gen. Laws ch. 176E, § 4 ............................................................69

Mass Gen. Laws, ch. 176E, § 12 ............................................................6

1968 N.J. Laws, ch. 305, §§ 12, 15 ........................................................6

N.J. Rev. Stat. § 17:48C-12 ...................................................................6

N.J. Rev. Stat. § 17:48C-15 ...................................................................6

N.J. Rev. Stat. § 17:48C-20 ................................................................6, 15

Okla. Stat. tit. 36, § 2675 ......................................................................6

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Tenn. Code § 56-30-102 ................................................................6

Tenn. Code § 56-30-107 ................................................................6

1961 Tenn. Pub. Acts, ch. 340, §§ 2, 7 ........................................6

9 U.S.C. § 3 ...................................................................................66

Sherman Act § 1, 15 U.S.C. § 1 ..............................................20, 25

15 U.S.C. § 15 ...............................................................................71

28 U.S.C. § 2072(b) ......................................................................63

1961 Wash. Sess. Laws, ch. 197, § 1(3) ......................................6

**Other Authorities**

54 Am. Jur. 2d *Monopolies and Restraints of Trade* § 508 (2024) ...........64

Heartland Dental, *Heartland Dental Celebrates Record New Construction,
Affiliation Growth, and Technology Enhancements in 2023* (Jan. 31, 2024),
https://blog.heartland.com/heartland-dental-celebrates-record-new-
construction-affiliation-growth-and-technology-enhancements-in-2023 ...........9, 10

IIA Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF
ANTITRUST PRINCIPLES AND THEIR APPLICATION (5th ed. 2023) ...........44, 49

Kelly Ganski, *More Dentists Affiliating with DSOs*, ADA News (June 01, 2023),
https://adanews.ada.org/ada-news/2023/june/more-dentists-affiliating-with-
dsos/ ...........9

S.A. Elkund, *Trends in Dental Treatment, 1992-2007*, 141 J. of Am. Dental Ass'n
391-99 (2010)...........7

Smile Source, *Membership Benefits*, https://smilesource.com/membership-
benefits-for-private-dental-practice-growth-and-success ...........75

VantageOne, FAQs, https://vantageonesavingsplan.com/faq...........10

VantageOne, Savings Summary, https://vantageonesavingsplan.com/savings-
summary...........10

## TABLE OF ABBREVIATIONS

| Cite | Description | Exhibit |
|------|-------------|---------|
| Achenbaugh Dep. | Transcript of Videotaped Deposition of Suzanne Achenbaugh, taken Mar. 15, 2023 | DX 72 |
| ADA | American Dental Association | N/A |
| ADA (Vujicic) Dep. | Transcript of Video Deposition of American Dental Association by and through Marko Vujicic, taken Dec. 14, 2023 | DX 73 |
| ADA (Aravamudhan) Dep. | Transcript of Video Deposition of American Dental Association by and through Dr. Krishna Aravamudhan, taken Dec. 14, 2023 | DX 74 |
| Aetna Dep. | Transcript of Zoom Video Deposition of Molly Imming [Rule 30(b)(6) designee of Aetna Inc.], taken Oct. 20, 2023 | DX 75 |
| Aon Dep. | Transcript of Zoom Video Deposition of Rich Stephens [Rule 30(b)(6) designee of Aon Corp.], taken Dec. 14, 2023 | DX 76 |
| Bamberger Dep. | Transcript of Video Deposition of Gustavo Bamberger, Ph.D., taken Apr. 17, 2024 | DX 77 |
| Bamberger Rep. | Expert Report of Gustavo Bamberger, dated Feb. 6, 2024 | PX 1 |
| BCBS | Blue Cross Blue Shield | N/A |
| Benton 30(b)(6) Dep. | Transcript of Remote 30(b)(6) Deposition of Kyle Benton, DDS, P.A., by and through Brandon Kyle Denton, DDS, taken Dec. 8, 2023 | DX 78 |
| Benton Dep. | Transcript of Hybrid Zoom Videoconferenced/Video Recorded Deposition of B. Kyle Benton, DDS, taken Jan. 20, 2023 | DX 79 |
| Cigna Decl. | Declaration of Carin Chambers, Program Management Senior Advisor at Cigna Dental & Vision, executed Dec. 22, 2023 | DX 4 |
| Croley Dep. | Transcript of Video Deposition of Daniel Croley, taken Apr. 3, 2023 | DX 80 |

## TABLE OF ABBREVIATIONS
### (continued)

| Cite | Description | Exhibit |
|------|-------------|---------|
| Cronin Dep. | Transcript of Zoom Video Deposition of Andrea Cronin, taken Aug. 4, 2023 | DX 81 |
| Cumberland Rep. | Expert Rebuttal Report of Brian L. Cumberland, dated June 18, 2024 | DX 2 |
| Current Dental Dep. | Transcript of Video-Recorded 30(b)(6) Deposition Upon Oral Examination of Current Dental by Timothy Charles Verharen, DDS, taken Nov. 15, 2023 | DX 82 |
| Czelada Dep. | Transcript of Videotaped Deposition (Volume 1) of Laura Czelada, taken Nov. 9, 2023 | DX 83 |
| DD__ | Delta Dental Member Companies are referred to by "DD" followed by their two-character state postal abbreviations, except Delta Dental of Pennsylvania | N/A |
| DDAR Dep. | Transcript of Oral and Videotaped Deposition of Ed Choate as Corporate Designee for Delta Dental of Arkansas, taken Nov. 29, 2023 | DX 84 |
| DDCA Dep. | Transcript of Videotaped 30(b)(6) Deposition of Mohammadreza Navid [Rule 30(b)(6) designee of DDCA], taken Dec. 4, 2023 | DX 85 |
| DDMI (Hall) Dep. | Transcript of the Videotaped 30(b)(6) Deposition of Toby Hall [as designee of DDMI], taken Oct. 12, 2023 | DX 86 |
| DDMI (Jenkins) Dep. | Transcript of Videotaped 30(b)(6) Deposition of Sue Jenkins [as designee of DDMI], taken Oct. 11, 2023 | DX 87 |
| DDMI (Kolesar) Dep. | Transcript of Individual and 30(b)(6) Deposition of Jeffrey Kolesar on behalf of Delta Dental of Michigan, taken Oct. 26, 2023 | DX 88 |
| DDMO Dep. | Transcript of Video Deposition of Cipriano Mascote [Rule 30(b)(6) designee of DDMO], taken Oct. 3, 2023 | DX 89 |
| DDNJ Dep. | Transcript of Videotaped Deposition of Lori Acker [Rule 30(b)(6) designee of DDNJ], taken Dec. 12, 2023 | DX 90 |

## TABLE OF ABBREVIATIONS
### (continued)

| Cite | Description | Exhibit |
|------|-------------|---------|
| DDOK Dep. | Transcript of Videotaped Deposition of John Gladden 30(b)(6) [designee of DDOK], taken Sept. 27, 2023 | DX 91 |
| DDPA | Delta Dental Plans Association | N/A |
| DDPA (Achenbaugh) Dep. | Transcript of Video Deposition of Delta Dental Plans Association by and through Suzanne Achenbaugh, taken Nov. 16, 2023 | DX 92 |
| DDPA (Hughes) Dep. | Transcript of Video Deposition of Delta Dental Plans Association by and through Amy Hughes, taken Nov. 17, 2023 | DX 93 |
| DDSD Dep. | Transcript of Videotaped Deposition of Scott Jones [Rule 30(b)(6) designee of DDSD], taken Sept. 21, 2023 and Sept. 22, 2023 | DX 94 |
| DDWA Dep. | Transcript of Video-Recorded 30(b)(6) Deposition upon Oral Examination of Delta Dental of Washington [by and through] Eric Lo, taken Oct. 11, 2023 | DX 95 |
| Dkt. __ | Items entered or filed on the electronic docket in *In re Delta Dental Antitrust Litigation*, No. 1:19-cv-06734 (N.D. Ill.), by docket number | N/A |
| Donaca Dep. | Transcript of Remote Videotaped Deposition of Greg Donaca, taken Mar. 30, 2023 | DX 96 |
| Dultz Dep. | Transcript of Deposition of Steven P. Dultz, DMD, taken Jan. 12, 2023 | DX 97 |
| DX __ | Exhibit filed in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, by Exhibit number | N/A |
| Ferlet Dep. | Transcript of Videotaped Deposition of Reachelle Ferlet, taken May 18, 2023 | DX 98 |
| Fisher Dep. | Transcript of Videoconference Video Recorded Deposition of Mary M. Fisher, DDS, taken Nov. 28, 2022 | DX 99 |

## TABLE OF ABBREVIATIONS
### (continued)

| Cite | Description | Exhibit |
|------|-------------|---------|
| Ginter Dep. | Transcript of Videotaped Deposition of Kelsey Ginter, taken May 18, 2023 | DX 100 |
| Glogowski Dep. | Transcript of Videotaped Deposition of Karyn Glogowski, taken Jan. 25, 2023 | DX 101 |
| Glossy Dep. | Transcript of Video Deposition of Bernard Glossy, taken Mar. 16, 2023 | DX 102 |
| Goren Dep. | Transcript of Deposition of Rob Goren, taken Dec. 6, 2023 | DX 103 |
| Hall Dep. | Transcript of Zoom Videoconferenced/Video-Recorded Deposition of Toby Hall, taken Mar. 16, 2023 | DX 104 |
| Herbert Dep. | Transcript of Videotaped Deposition of Michael Herbert, taken Feb. 28, 2023 | DX 105 |
| Hoyt Rep. | Expert Rebuttal Report of Robert E. Hoyt, dated June 18, 2024 | DX 3 |
| Hughes Dep. | Transcipt of Videotaped Deposition of Amy Hughes, taken on Dec. 2, 2022 | DX 106 |
| Humana Dep. | Transcript of Zoom Video Deposition of Michelle Hart [Rule 30(b)(6) designee for Humana], taken Nov. 9, 2023 | DX 107 |
| Johnston Dep. | Transcript of Deposition of Jeffery Johnston, D.D.S., taken Mar. 22, 2023 | DX 108 |
| Kaufman Dep. | Transcript of Video Deposition of Louis Kaufman, taken June 9, 2023 | DX 109 |
| Knopf Dep. | Transcript of Videotaped Videoconference Deposition of Bradley Knopf, taken Oct. 5, 2023 | DX 110 |
| Kropp Dep. | Transcript of Video Examination of Kevin Kropp, taken Dec. 14, 2023 | DX 111 |
| Lindley Dep. | Transcript of Videotaped Deposition of Richard G. Lindley, DDS, FICD, taken Feb. 24, 2023 | DX 112 |

## TABLE OF ABBREVIATIONS
### (continued)

| Cite | Description | Exhibit |
|------|-------------|---------|
| Long Hill Dep. | Trancript of the Zoom video deposition of Steve Dultz, DMD [Rule 30(b)(6) designee of Long Hill Dental], taken Oct. 17, 2023 | DX 113 |
| Mazzocco Dep. | Transcript of Zoom Video Deposition of Sarah Mazzocco, taken Oct. 2, 2023 | DX 114 |
| Mercer Dep. | Transcript of Zoom Video Deposition of Rich Fuerstenberg [Rule 30(b)(6) designee of Mercer], taken Nov. 16, 2023 | DX 115 |
| MetLife Dep. | Transcript of Zoom Video Deposition of Tony Tobia [Rule 30(b)(6) designee of MetLife], taken Oct. 31, 2023 | DX 116 |
| Milliman Dep. | Transcript of Videotaped Deposition of Milliman, Inc. by Its Designee: Joanne Fontana, taken Nov. 7, 2023 | DX 117 |
| Mulligan Dep. | Transcript of Video Deposition of Robert Mulligan, taken Nov. 3, 2023 | DX 118 |
| Murphy Rep. | Expert Report of Kevin M. Murphy, dated Jun. 18, 2024 | DX 1 |
| Nagle Dep. | Transcript of Videotaped Deposition of Joseph Nagle, taken Dec. 13, 2023 | DX 119 |
| NEDD Dep. | Transcript of Videotaped Deposition of Northeast Delta Dental by Thomas Raffio, taken Oct. 5, 2023 | DX 120 |
| Newton Dep. | Transcript of Video Deposition of Dean Newton, taken Nov. 8, 2023 | DX 121 |
| ODS Dep. | Transcript of Video-Recorded Deposition of Scott Loftin [Rule 30(b)(6) designee of ODS], taken Oct. 18, 2023 | DX 122 |
| Osborne Dep. | Transcript of Videotaped Oral Deposition of Dr. William Jeffrey Osborne, taken Feb. 10, 2023 | DX 123 |
| Perroni Dep. | Transcript of Remote Videotaped Deposition of Joseph Perroni, taken on Mar. 28, 2023 | DX 124 |

## TABLE OF ABBREVIATIONS
### (continued)

| Cite | Description | Exhibit |
|---|---|---|
| Pls. Br. | Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification and Appointment of Class Counsel | N/A |
| PX __ | Exhibit filed in support of Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, by Exhibit number | N/A |
| Raffio Dep. | Transcript of Videotaped Deposition of Thomas Raffio, taken on Mar. 30, 2023 | DX 125 |
| S. Ghezzi Dep. | Transcript of Videotaped/Zoom Videoconferenced Deposition of Stephen Ghezzi, D.D.S., taken Jun. 9, 2023 | DX 126 |
| Simon Dep. | Transcript of Video Deposition of William Simon, taken May 25, 2023 | DX 127 |
| Smile Source Dep. | Transcript of Remote 30(b)(6) Video Deposition of Smile Source by and through Thomas Allmon, taken Dec. 6, 2023 | DX 128 |
| Thompson Dep. | Transcript of Video Deposition of Robert Mark Thomspon, taken Mar. 8, 2023 | DX 129 |
| UCC Dep. | Transcript of Remote 30(b)(6) Video Deposition of United Concordia Companies by and through Robert W. Mitchell, Jr., taken Jan. 11, 2024 | DX 130 |
| Verharen Dep. | Transcript of Video-Recorded Deposition Upon Oral Examination of Timothy Verharen, DDS, taken Jan. 25, 2023 | DX 131 |
| White Dep. | Transcript of the Videotaped Deposition of Michael White (Individual), taken on Oct. 20, 2023 | DX 132 |

## INTRODUCTION

This case is the very antithesis of a proper class action. There simply is no way to litigate the class claims with common evidence. Plaintiffs seek certification of a sprawling nationwide class of 240,000 dental service providers ("Providers") who contracted with any one of 39 Delta Dental Member Companies ("Member Companies") to accept discounted reimbursements for treating patients with Delta Dental insurance. Plaintiffs falsely allege that Defendants engaged in various forms of supposedly anticompetitive conduct that purportedly suppressed reimbursements that Member Companies paid to Providers.

But none of the challenged conduct uniformly applied to and injured all (or nearly all) putative class members. Those dentists practiced in thousands of different locales, each with its own mix of Providers, patients, competing insurers, and reimbursements. And they received different reimbursements based on different contracts with different Member Companies, each of which made its own reimbursement decisions on location- or Provider-specific bases. As a result, different Providers would have very different liability, injury, causation, and damages evidence and would face very different defenses in trying to prove the asserted antitrust claims.

Courts routinely reject requests to certify similarly sprawling antitrust class actions. As in those suits, the highly individualized claims of the putative class members here do not even come close to satisfying the exacting requirements of Federal Rule of Civil Procedure 23.

Plaintiffs try to disguise that fact in two ways. First, they mischaracterize Defendants' conduct and otherwise misrepresent the record to create a false narrative about Defendants' efforts to provide affordable, high-quality dental insurance to millions of Americans while vigorously competing against more than a dozen national insurers. For example:

- The purported "territorial restrictions" are procompetitive trademark licensing agreements that protect intellectual property, incentivize insurance coverage for underserved markets,

and allow the Delta Dental joint venture to compete against large national dental insurers for multi-state customers.

- There are no "second brand restrictions"; indeed, Delta Dental policies have long forbidden such restrictions.

- The various forms of alleged "price fixing" do not "fix" Provider reimbursements at all, but instead consist of (a) efforts to encourage competitive discounts that reduce the cost of oral care for patients and (b) appropriate sharing of information that allows the Delta Dental joint venture to compete for and service multi-state employer groups.

Second, Plaintiffs attempt to overcome the class-splintering variation among Providers by offering an injury and damages model developed by their expert, Dr. Gustavo Bamberger. But Dr. Bamberger's never-before-used model rests on a series of untested and false assumptions. It therefore fails to provide common evidence that all (or nearly all) putative class members were injured by the allegedly anticompetitive conduct.

Dr. Bamberger's model assumes, without support, that in the absence of the challenged conduct, approved reimbursements paid by Member Companies to Providers ("Approved Amounts") would have grown at the same rate as list prices submitted by Providers to Member Companies ("Submitted Amounts"), which he wrongly assumes to be what uninsured patients paid. He then further assumes that each region's average difference in growth rates—that is, how much faster list prices grew than reimbursements—is an "underpayment" attributable to the challenged conduct for all Providers in that region. Relying on those average regional "underpayments," Dr. Bamberger asserts that 98-99% of the putative class is injured, and he calculates billions of dollars in aggregate class damages.

Dr. Bamberger's model, however, has no connection to Plaintiffs' theories of liability. It does not measure whether or how the alleged "territorial allocations" or "second brand restrictions" or "price fixing" affected Providers. Instead, his model simply assumes that the alleged anticompetitive conduct must account for any difference in growth rates for list prices (Submitted

Amounts) and reimbursements (Approved Amounts), based on unsubstantiated and convoluted theories about how that conduct supposedly affected Providers. Dr. Bamberger provides no *evidence* that his model can reliably measure, on a class-wide basis, any injury and damages attributable to the supposedly anticompetitive conduct.

That is not surprising. All of the evidence is to the contrary. One of Defendants' experts—Dr. Kevin Murphy—tested the many critical assumptions underlying Dr. Bamberger's model. Dr. Murphy found that the evidence in this case thoroughly refutes those assumptions and confirms the need for individual injury inquiries. A few examples make the point:

- ███████████████████████████████████████████████████ undermining the theory that Defendants possessed and exercised monopsony bargaining power over Providers.[1]

- Market-share data show that Delta Dental reimbursement percentages ███████████████, contrary to Plaintiffs' hypothesis that the alleged limitations on Member Company competition depressed reimbursements.

- If Member Companies had paid the reimbursements Dr. Bamberger says they should have, ████████████████████████████████████████████

- Applying Dr. Bamberger's model to individual Providers, instead of averaging within regions, exposes wide disparities among Providers and reveals that *at least 33%* of the proposed class is uninjured, far more than Dr. Bamberger's 1-2% estimate.

Dr. Bamberger also incorrectly assumes that more Member Company-on-Member Company competition to sell insurance would have raised Provider reimbursement percentages. The truth is that additional competition of that sort likely would have ████████████████████

---

[1]    When this Brief speaks of "reimbursement percentages," it is referring to the reimbursements paid to Providers as a percentage of Provider-submitted list prices. For example, if a Provider submits a claim for $100, and the insurer pays $80, the reimbursement percentage would be 80%. This Brief also sometimes speaks of reimbursement "discounts," which refer to the difference between the submitted list price and the reimbursed amount as a percentage of the submitted amount. For the example noted, the reimbursement discount would be 20%.

In addition, Dr. Bamberger's "yardstick" model is deeply flawed because its most fundamental assumption—that Submitted Amounts (list prices) and Approved Amounts (reimbursements) should grow at the same pace—is false. The record evidence shows that there are many reasons other than the challenged conduct that Submitted Amounts might grow faster than Approved Amounts, none of which Dr. Bamberger's model controls for. Those reasons include Providers raising Submitted Amounts to obtain higher Approved Amounts, flat demand for dental services, an increasing supply of dentists, and more competition to sell dental insurance. Also, the theory that changes in Approved Amounts should parallel changes in Submitted Amounts ignores that securing discounts from Providers to reduce the costs of care is a key purpose of insurance.

Dr. Bamberger's fatally defective model, in short, is incapable of providing common, class-wide evidence of injury or damages. This case is therefore like the many dozens of antitrust cases in which courts have denied class certification because the expert model offered by the plaintiffs could not reliably establish injury and damages on a class-wide basis. In fact, a recent case from this District denied class certification after rejecting a similarly flawed "yardstick" model. *City of Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at *7-10 (N.D. Ill. Mar. 29, 2024).

Here, too, class certification should be denied. Plaintiffs' claims necessarily turn on individual injury and damages questions that prevent common questions from predominating under Rule 23. *See infra* Argument I.A. Further, in this case, which should be analyzed under the Rule of Reason rather than the *per se* standard, the local nature of the markets for Provider services

would make class-wide proof of an actionable restraint-of-trade impossible. *See infra* Argument I.B. And several affirmative defenses likewise defy common proof. *See infra* Argument I.C. Plaintiffs also cannot satisfy Rule 23's superiority requirement, given the unmanageable individual issues and meaningful individual stakes present here. *See infra* Argument II. Nor would the named Plaintiffs be typical or adequate class representatives under Rule 23 because their claims are materially different from those of wide swaths of the proposed class. *See infra* Argument III.

In the end, the claims asserted here are far too individualized to allow fair and cohesive class litigation. Class certification should therefore be denied.

## **BACKGROUND**

Defendants operate a procompetitive joint venture that has, since its inception, improved the oral health of patients and the compensation of dentists, while offering dental plans in a highly competitive environment. ▇▇▇▇▇▇▇▇▇▇▇ the Member Companies typically pay dentists *higher* reimbursements; often charge customers *lower* premiums; and generally maintain broader networks of dentists that provide comprehensive, state-wide coverage. And any anticompetitive effects of the challenged conduct would vary by location and Provider.

## I.    **The Delta Dental System Is A Lawful, Procompetitive Joint Venture.**

Dentists created the Delta Dental system to expand access to oral care, provide financing for dental care costs, and respond to public demand for dental plans with multi-state or national coverage. Beginning in the 1950s, state dental societies, working with local dentists and the American Dental Association ("ADA"), began to establish "dental service corporations," the predecessors of today's Delta Dental Member Companies, on a state-by-state basis. DX 17 at 3. A dental service corporation is a non-profit company organized under state law that operates a dental insurance benefits plan and offers a network of dentists licensed in that state. DX 16 at ADA-Archive000021186. In the 1950s and 1960s, state laws commonly limited those corporations to

operating in their home state, and some state laws still do. DX 14 at ADA-Archive000001462; *see, e.g.*, 1959 Ark. Acts, Act 148 § 677; Ark. Code § 23-75-110; 1968 N.J. Laws, ch. 305, §§ 12, 15; N.J. Rev. Stat. §§ 17:48C-12, -15; 1961 Tenn. Pub. Acts, ch. 340, §§ 2, 7; Tenn. Code §§ 56-30-102, -107; 1961 Wash. Sess. Laws, ch. 197, § 1(3).

But there was strong demand from unions and employer groups for dental plans that could offer coverage to employees in multiple states. DX 14 at ADA-Archive000001462. Because of their state-based focus, the dental service corporations were hamstrung in their ability to offer multi-state plans. The ADA and its dentist members therefore concluded it was necessary to create ███████████████████████████████████████████ whose members could collectively provide coverage for multi-state accounts. DX 14 at ADA-Archive000001462-63, -479 (finding ██████████████████████████████ ████████████████████). State legislatures agreed, enacting laws that expressly permitted and encouraged dental service corporations to join such an association in order to provide coverage to multi-state groups. *See, e.g.*, N.J. Rev. Stat. § 17:48C-20 ("A dental service corporation of this State may enter into agreements with other corporations in the issuance of group contracts to policyholders whose employees are located in more than one state."); Okla. Stat. tit. 36, § 2675 (similar); 215 ILCS § 110/32 (similar); Mass Gen. Laws, ch. 176E, § 12 (similar).

In 1965, the ADA created the National Association of Dental Service Plans, the predecessor to the Delta Dental Plans Association ("DDPA"). To facilitate multi-state competition against national insurers, the Delta Dental brand was then adopted and trademarked. DX 15 at ADA-Archive000003698-99. Ever since, DDPA (or its predecessor) has owned the trademark and licensed it to the Member Companies. DX 44 at DDPA000009531-56.

From the beginning, the national association worked to expand the availability of dental care and facilitate the sale and administration of dental plans for multi-state accounts. DX 43 at DDPA000006220. The Delta Dental system—a joint venture comprised today of 39 Member Companies, DDPA, and DeltaUSA (which assists Member Companies in administering multi-state accounts)—has succeeded on both counts. It has dramatically increased access to affordable and quality dental care through the Member Company insurance programs. *See* S.A. Elkund, *Trends in Dental Treatment, 1992-2007*, 141 J. of Am. Dental Ass'n 391-99 (2010). And it has been able to offer plans not just locally, but on a national basis, meeting the demand for dental plans with multi-state coverage and, in the process, increasing competition among insurance carriers for such accounts. DX 125 at 114:17-115:23 (Raffio Dep.).

To promote the Delta Dental brand and protect the associated trademark, the national association also established standards to ensure best-in-class customer service, prompt and accurate reimbursement payments to dentists, and efficient handling of multi-state accounts. *See, e.g.*, DX 45 at DDPA000010011 (████████████████████████████████████ ████████████████████████████████████ ████████████████████); *id.* at -070-71 (████████████████████ ████████████████████████████████████ ████████████████████). Those standards are a major reason that Member Companies pay over ███████ claims a year within an average of ██████████████████ ██████████████████████████. *See, e.g.*, DX 36 at DDMN000090909, -013; DX 65 at REN000200124 (████████████████████████████████████ ██████████); DX 30 at DDKS000708605 (██████████████████████████).

7

Delta Dental Member Companies thus offer a valuable product combining the local focus required to provide broad coverage throughout each state with the national structure necessary to serve multi-state groups. Simply put, they are hometown companies with a national reach.

## II. Delta Dental Member Companies Operate In Highly Competitive, Complex, And Varied Markets For Dental Insurance And Dental Services.

### A. Member Companies Face Stiff Competition.

There is robust competition for the sale of dental coverage. ███████████████████

█████████████████████████████████ DX 115 at 67:9-13 (Mercer Dep.)

(████████████████████). Large national powerhouse insurers such as Aetna, Cigna, Guardian, Humana, MetLife, UnitedHealthcare, and Ameritas compete against the Member Companies. *See* DX 1 ¶¶ 77-78 (Murphy Rep.); DX 50 at DDPA000856050. And smaller regional insurers also compete for more localized business. DX 1 ¶ 77 (Murphy Rep.).

Competition to sell dental insurance is fierce, and Member Companies must compete on customer costs, the largest of which is Provider reimbursement. ██████████████████

████████████████████████████████████████

██████████████████████████████

███████████████████████████████████; *see also* DX 122 at 120:2-8 (ODS Dep.) (█████████████████████████

████████████). And when other insurers have offered lower prices, Member Companies have lost groups to those insurers. *See, e.g.*, DX 68 at REN001748785 (██████████████

████████████████); DX 29 at DDIL000194377 (██████████████████

████████████████████████████████████████

███████); DX 50 at DDPA000856075 (███████████████████████████).

To keep their plans competitive, Member Companies offer both traditional "Premier" plans, which have higher premiums and higher reimbursement percentages, and PPO plans of the sort used by their competitors, which have lower premiums and lower reimbursement percentages. DX 1 ¶¶ 66-68 (Murphy Rep.). Still, on average across all states, Member Companies in 2022 covered only ███ of all persons with dental insurance (known as "enrollees"). *Id.* Ex. 1. And their market share varied tremendously by state, with their share of enrollees at or below ███ in ███ states. *Id.* ¶ 62 & Ex. 1

Further, insurers are not the only source of competition. Non-insurance discount programs offer services at deeply reduced prices. Some of those programs come from third-party companies. *See, e.g.*, DX 24 at DDIA000160702 (██████████████████████████████ ██████████████████████). Others are offered by Providers themselves, including some of the named Plaintiffs. *See, e.g.*, ██████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████.[2] Still other discount programs are available at dental clinics owned or managed by dental support organizations ("DSOs"), which employ or affiliate with 13% of U.S. dentists and are often owned or funded by large private equity investors.[3]

---

[2]  Some Providers also coordinate in-office plans with each other to prop up their prices. *See* DX 53 at DD-PL-00228353 (████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████).

[3]  *See* Kelly Ganski, *More Dentists Affiliating with DSOs*, ADA News (June 01, 2023), https://adanews.ada.org/ada-news/2023/june/more-dentists-affiliating-with-dsos/; Heartland Dental, *Heartland Dental Celebrates Record New Construction, Affiliation Growth, and Technology Enhancements in 2023* (Jan. 31, 2024), https://blog.heartland.com/heartland-dental-celebrates-record-new-construction-affiliation-growth-and-technology-enhancements-in-2023.

For instance, Heartland Dental—a DSO with 2,800 dentists—promotes a Vantage One discount plan; and, for $79 per year, Vantage One's classic plan provides patients up to 50% off dental services—"far below your dentist's normal retail fees."[4]

**B.  Providers Have Network Choices.**

Providers have many options in deciding which insurer networks to join, if any. In fact, Providers are typically free to join multiple networks if they so choose. DX 1 ¶ 43 (Murphy Rep.).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████. A Provider's ability to freely join networks means that insurers generally do *not* compete against each other to entice Providers to join their networks, but rather compete against a Provider's decision to forgo participation in their network altogether. DX 1 ¶¶ 113-16 (Murphy Rep.).

Joining an insurance network can benefit a Provider. By agreeing to accept discounted payments from an insurer and its enrollees, a Provider can obtain increased patient volume from enrollees seeking an in-network Provider. *Id.* ¶¶ 33, 41-42; DX 73 at 129:11-32:13 (ADA (Vujicic) Dep.). But some Providers find it attractive to not participate in a network because they typically can bill their full, undiscounted charges when they are out-of-network. *See* ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████. How each Provider would weigh network participation decisions thus varies

---

[4]  Heartland Dental, *supra* note 3; VantageOne, FAQs, https://vantageonesavingsplan.com/faq; VantageOne, Savings Summary, https://vantageonesavingsplan.com/savings-summary.

by insurer, location, and Provider. Accordingly, as Plaintiffs' own expert concedes, whether Delta Dental is a ███████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████.

### C. Member Company Reimbursements Are Highly Competitive.

Each Member Company, like every insurer, faces its own tradeoffs in establishing Provider reimbursements for each of its local markets. They consider customer-pricing impacts, competitor reimbursements, the supply of dentists, feedback from Providers, individual negotiations, and other local market dynamics. *See, e.g.,* ███████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████.

Ultimately, each Member Company must balance the competitive customer cost structure necessary to attract business against the competitive reimbursement levels needed to build broad Provider networks that can supply local care for enrollees. *See* ████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████.

11

In practice, the intense competition to sell dental insurance restrains the amount that Member Companies can charge ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████.

Provider reimbursements matter even more for the over ████ of Delta Dental enrollees associated with administrative services only ("ASO") groups. *Id.* ¶ 75. For those self-funded groups, the customer has chosen to assume the risk of liability for claims and pays the Member Company a per-enrollee fee for administrative services. *Id.* ¶ 30. ASO customers pay 100% of Provider reimbursements and thus have an obvious incentive to shop around if reimbursements become uncompetitive. *Id.* ¶¶ 30, 125.

Despite the pressures created by price competition from other dental insurers, Delta Dental Member Companies have consistently ████████████████████████████████████ ██████████████ *Id.* ¶ 79 & Ex. 2. And individual Member Companies rarely have had the lowest reimbursement percentages in their service areas; since 2014, ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ Meanwhile, according to an independent third-party study

by ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████. Those facts "put the lie to" Plaintiffs' accusation (Pls. Br. 23) that "Delta Dental robbed" Providers and consumers.

## III.    The Challenged Conduct Promotes Inter-Brand Competition And Affordable High-Quality Dental Care.

The Delta Dental standards and policies that Plaintiffs challenge as anticompetitive actually confer substantial benefits on patients, Providers, and Delta Dental customers.

**Exclusive Service Areas.** DDPA licenses the Delta Dental name and trademark to each Member Company for exclusive use in its home state(s), carrying forward the Companies' historical (and state-authorized) operating areas. DX 44 at DDPA000009533. Those exclusive service areas ("ESAs") incentivize Member Companies to provide insurance coverage in all parts of a state and build their own broad local networks of high-quality Providers. DX 101 at 19:19-20:15 (Glogowski Dep.). The state-wide coverage and proprietary networks offered by Member Companies help them compete against large national insurers that may limit coverage to densely populated areas or lease Provider networks from another insurer or a leased network company. *Id.*; DX 96 at 63:2-12 (Donaca Dep.) ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████; DX 1 ¶¶ 81-83 & App'x C (Murphy Rep.) (describing network leasing). The broad Delta Dental networks also benefit patients and Providers in underserved communities by making affordable oral care available. *See,*

*e.g.*, DX 129 at 227:10-228:21 ██████████████████████████████████████████████

████████████████████████.[5]

     The ESAs also prevent confusion and free riding. If 39 Delta Dental-branded insurers tried to compete against each other, customers, patients, and Providers would be confused about which Delta Dental they were dealing, or supposed to be dealing, with. *See, e.g.*, DX 87 at 140:23-141:14 (DDMI (Jenkins) Dep.). Further, Member Companies would have no incentive to invest resources to promote the success of Delta Dental-branded insurance in their home state(s) if another Member Company could compete under the Delta Dental name in the same state(s) by free riding off the local Member Company's promotional efforts. *See, e.g.*, DX 51 at DDPA000896404.

     **Information Sharing.** Member Companies share information to compete against national insurers for multi-state accounts and quickly and accurately process Provider reimbursements for such accounts. For example, the ██████████████████████ allows Member Companies to process and pay multi-state claims quickly at low cost. DX 48 at DDPA000493491 ████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████; PX 22 at DD-ENT-000658703; PX 45 at DD-ENT-000658789 (DeltaUSA Policies Manual); DX 84 at 140:19-43:12 (DDAR Dep.) ████████████

████████████████████████████████████████████████████████████████████████.

---

[5]   Providers further benefit from the fact that the Delta Dental system does not engage in network leasing (DX 92 at 303:14-17 (DDPA (Achenbaugh) Dep.), a practice that can force Providers to accept low reimbursements for serving patients covered by insurers whose networks they neither joined nor knew they had become a part of. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████.

Similarly, the ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████. DX 92 at 169:8-186:1 (DDPA (Achenbaugh) Dep.). And other

information sharing within the Delta Dental joint venture likewise enables Member Companies to

service national customers—which have covered employees across the country—and respond to

inquiries from Providers, customers, and others about network changes. DX 72 at 278:19-279:12,

319:14-321:19, 348:4-349:16 (Achenbaugh Dep.). The ████████████████████████████

██████ in short, make it possible for Member Companies to compete and operate nationally.

DX 119 at 46:7-47:11 (Nagle Dep.) (████████████████████████████████████████████

████████████████████).

Notably, state laws explicitly allow for such information sharing. *See, e.g.*, <u>N.J. Rev. Stat.</u>

<u>§ 17:48C-20</u> (agreements among dental service corporations "may provide for … sharing of the

premium, claims, and expenses by the participating corporations"); <u>215 ILCS § 110/32</u> (similar).

And many thousands of Providers have ████████████████████████████████████████████

██████████████████. *See, e.g.*, DX 20 at DDAZ000462697; DX 34 at DDMN000000545;

DX 38 at DDMO000067169; DX 67 at REN001609218.

**Effective Discount Standard.** DDPA has an "effective discount" standard that promotes

both competitive customer pricing and strong Provider networks. Under that standard, ██████

████████████████████████████████████████████████████████████████

███████████████. PX 22 at DD-ENT-000658689; DX 90 at 46:14-47:5 (DDNJ Dep.). Crucially,

the "effective discount" measured by DDPA is *not* the discount that a Provider agrees to accept in

joining a Delta Dental network—that is, the "effective discount" is not the reimbursement discount

for Providers. The "effective discount" measures savings to *customers* using a formula that considers both Provider discounts *and* whether patients are seeing in-network Providers.

As a result, Member Companies can and regularly do have better "effective discounts" than their competitors, while paying Providers *higher* reimbursement percentages, by offering broader networks that reduce the fraction of claims paid to out-of-network Providers. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████.

In other words, the "effective discount" standard does not require Member Companies to reach any particular level of reimbursement percentages or network discounts. Indeed, a Member Company can achieve a satisfactory effective discount by simply processing more claims through Providers in Delta Dental's PPO or Premier networks (where a discount applies) than through out-of-network Providers (where there is no agreed-upon discount). *See* PX 22 at DD-ENT-000658689.[6] And when a Member Company pursues that strategy—by encouraging enrollees to use in-network Providers—patients achieve more savings and Providers obtain more patients. DX 93 at 110:8-111:11 (DDPA (Hughes) Dep.).

**Coverage Recommendations.** Contrary to Plaintiffs' assertions, the DeltaUSA Processing Policies do not set any reimbursements, let alone at $0. Those Policies—which third-party experts

---

[6] ████████████████████████████████████████████████████████████. DX 93 at 111:13-117:18 (DDPA (Hughes) Dep.).

review for consistency with recognized standards of care—simply recommend how multi-state claims should be processed, including whether particular procedures should be covered. DX 72 at 30:20-33:12, 347:7-348:3, 352:20-354:11 (Achenbaugh Dep.). The Policies exist to promote consistent treatment of claims for customer groups with employees across different states. *Id.* at 33:1-16. But customers make the final decisions about what is covered. DX 1 ¶ 191 (Murphy Rep.). ████████████████████████████████████████████████████████████

█████████████████████████████████. *Id.* ¶ 192; DX 108 at 135:11-17 (Johnston Dep.); ███████████████████████████.

**Second Brands.** Also contrary to Plaintiffs' assertions, there are no restrictions on the ability of Member Companies to sell dental insurance under second non-Delta Dental brands. The Delta Dental system does not have, and has never had, "any rules or standards that govern or restrict member companies from operating or having a second brand" or "that limit the revenue that member companies can generate under second brands." DX 106 at 181:11-183:5 (Hughes Dep.); █████████████████████████████████████████████ Indeed, the "long-standing rules" of the Delta Dental system expressly authorize "member companies [to] operate 'second brands' as part of their company/enterprise strategies" and permit the second brands to "compete with the Delta Dental Brand for dental benefits business in operating areas within and outside their" service areas, provided they do not infringe the Delta Dental trademark:



DX 47 at DDPA000015243 (Second Brands Task Force Charter); DX 52 at DDPA001032153

████████████████████████████████████████████████████████████████

████████████████████████████████████████.

    Second brands thus freely compete against Delta Dental-branded insurers. *See, e.g.*, ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ And there is zero support for Plaintiffs' claim that

████████████████████████████████████████████████████████████████

████" Pls. Br. 25. Indeed, DDMA's former second brand, DentaQuest, was many times *larger*

than DDMA ████████████████████████████████████████████████████████

████████████████████████████████████████████████. DX 33 at

DDMA000220718-19.[7]

---

[7]   Tellingly, Plaintiffs have been inconsistent in describing the "restrictions" that supposedly constrain second brands. They originally asserted that DDPA "mandate[d]" that Member Companies "limit or restrain the extent to which they conduct dental insurance business and derive revenues other than under the Delta Dental brand" and that Member Companies agreed to those revenue restrictions "pursuant to the Delta Dental Plan Agreement." Dkt. 96 ¶ 107 (Compl.); *id.* ¶ 119 (alleging "Delta Dental Plan Agreement" imposes a "direct cap" on second brand revenue). Finding no such restraints in the Delta Dental Plan Agreement (or elsewhere), Plaintiffs now assert that second brands ███████████████████████████ by ███████████████████ Pls. Br. 25. In support, Plaintiffs cite (Pls. Br. 24) selectively quoted testimony speculating about DDPA rules ████████████████████████████████████████████████████████████████

## IV.    Nothing About Defendants' "Capital Reserves" Or Executive Compensation Supports Certifying A Class.

In November 2023, the Court advised that issues related to executive compensation, if relevant at all, should be deferred until after class certification. Dkt. 732 at 9-14. Yet in support of their class-certification motion, Plaintiffs not only briefed those issues but also submitted an expert report from Dr. David Lewin, who opines on compensation issues and Defendants' "capital reserves" (which are more properly called "surplus"). *See* Pls. Br. 3, 35; PX 147 (Lewin Rep.).[8] His opinions are riddled with errors rendering them unreliable, as expert rebuttal reports from Brian Cumberland and Professor Robert Hoyt, accompanying this Brief, explain. DX 2 ¶¶ 12-19 (Cumberland Rep.); DX 3 ¶¶ 14-24 (Hoyt Rep.).[9]

For example, Dr. Lewin's opinion that Member Company "capital reserves" are "excessive" ignores that state insurance departments closely regulate the Member Companies and their surplus levels and have not deemed any Member Company's surplus excessive. DX 3 ¶ 58 (Hoyt Rep.). Dr. Lewin's opinion that executive compensation for Member Companies is "excessive" similarly ignores that the IRS regulates the compensation of non-profit executives and has not concluded that any Member Company was paying excessive compensation. DX 2 ¶¶ 26-34 (Cumberland Rep.). Those are just two of the many problems with his opinions, which are irrelevant to class certification in any event.

---

██████████████████ DX 105 at 144:9-17, 209:12-210:7 (Herbert Dep.). Plaintiffs do not (and cannot) point to any actual restriction limiting second brands to certain markets. And in reality, it often makes sense for second brands to compete for smaller groups and individuals that they can service without a national provider network. *See, e.g.*, DX 119 at 333:3-23 (Nagle Dep.); DX 85 at 140:5-141:17 (DDCA Dep.); DX 118 at 35:8-36:4 (Mulligan Dep.).

[8]    "Surplus" is the difference between a Member Company's total assets and total liabilities. It provides a cushion to pay claims and helps a Member Company pursue business priorities, protect against various risks, and respond to changing conditions. DX 3 ¶ 30 (Hoyt Rep.).

[9]    In accord with the Court's scheduling order, Defendants intend to move to exclude Dr. Lewin's opinions under Federal Rule of Evidence 702 at the appropriate time.

### V.    Plaintiffs' Motion For Class Certification Is Without Merit.

Disregarding all of the procompetitive benefits delivered by the Delta Dental system, Plaintiffs—ten Providers who are or were participants in Delta Dental's ███████████ networks—claim that Defendants committed *per se* violations of Sherman Act § 1 that resulted in lower Provider reimbursements for treatment of patients with Delta Dental insurance. Plaintiffs request certification of a Rule 23(b)(3) class of "[a]ll Dental Providers not owned, employed by, or involved in the management or directorship of the Defendants, who provided dental goods or services to a Delta Dental insured and were reimbursed directly by a Defendant, and who were subject to a Delta Dental participating provider agreement (excluding HMO and public entitlement plans) in the United States from October 11, 2015, to December 31, 2022." Pls. Br. 4.

Plaintiffs—who hail from just eight states—seek to represent the proposed nationwide class and its 240,000 putative members. But Plaintiffs have little in common with each other, let alone the diverse class. They and the putative class members operated in different local markets, performed different mixes of dental procedures, had different relationships with different Member Companies, and received different reimbursements. To paper over those and other differences among class members, Plaintiffs rely on Dr. Bamberger's untested and unreliable "yardstick" methodology as their only evidence of purported class-wide injury and damages. As the expert report from Dr. Murphy accompanying this Brief explains, Dr. Bamberger's methodology is defective, and his underlying assumptions are unfounded. DX 1 ¶¶ 12-28 (Murphy Rep.).

Plaintiffs have littered their brief with misrepresentations to mask the lack of factual or legal support for class certification. They also have improperly submitted, via declaration, seven charts of purported "evidence" spanning 30-plus pages that contain even more misrepresentations. Dkt. 767 (Brennan Decl.). Two examples illustrate just how troubling their misrepresentations are.

Plaintiffs claim that "[c]orporate representatives for DDPA and the two largest Member Companies, DDCA and DDMI, could not identify any circumstances where second brands competed directly with member companies." Pls. Br. 26. They misquote the witness, omitting language establishing the exact opposite (omitted language in bold): "Q: ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ *Compare* Pls. Br. 26, *with* DX 83 at 308:17-21 (Czelada Dep.). That not only flagrantly misrepresents the witness's testimony, it also misrepresents the record as a whole, which shows that Renaissance and numerous other second brands competed against Delta Dental-branded Member Companies in multiple markets. *See, e.g.*, DX 85 at 147:5-10, 150:23-151:9 (DDCA Dep.) (Dentegra, DentaQuest, and Renaissance regularly competed against Delta Dental); DX 32 at DDMA000095062 ████████████████████████████

████████████████████████ ; DX 1 ¶¶ 65, 103 (Murphy Rep.).

Worse still, Plaintiffs proclaim that "[t]he DeltaUSA Processing Policy Manual sets specific reimbursement rates and pricing requirements for hundreds of procedures that each Member Company is required to follow." Pls. Br. 9. That is false. Nothing in the DeltaUSA Processing Policy Manual or any other Delta Dental policy or standard requires any Member Company to adopt specific reimbursements or pricing requirements. The record is filled with testimony refuting that notion and confirming that Member Companies individually set their own reimbursements based on local market conditions. *See, e.g.*, DX 72 at 345:8-19 (Achenbaugh Dep.); DX 110 at 56:13-19 (Knopf Dep.); DX 95 at 275:12-20 (DDWA Dep.); DX 86 at 193:25-194:5 (DDMI (Hall) Dep.). The ████████████████████████████████

███████████████████████████████████████████████████████████

█████████████ DX 9 at 29 (DDPA 2d Supp. Interrog. Resp. No. 3).

These examples are only the tip of the iceberg. Plaintiffs have made dozens of similar misrepresentations.[10] This Brief and Defendants' expert reports address those that relate to class certification briefing. But many of Plaintiffs' misrepresentations concern matters that have nothing to do with class certification. Defendants could have moved to strike or followed Plaintiffs' example and submitted declarations and charts refuting those (irrelevant) misrepresentations, but Defendants do not want to burden the Court with unnecessary material. Defendants therefore will respond as appropriate in summary-judgment and other future briefing. However, if the Court prefers that Defendants submit a full set of responses now, Defendants are prepared to do so promptly if granted leave. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 1:18-cv-864, ECF No. 1512 (N.D. Ill. June 4, 2024) (granting leave to file an additional response, appendix, and expert report to address 11-page appendix that was an improper attempt to skirt a 15-page brief limit).

## LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Because Rule 23 "does not set forth a mere pleading standard," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013), the

---

[10]   For example, Plaintiffs claim that █████████████████████████████████████ ████████████████████████ Pls. Br. 26. But the ███████████████████████████ states the *exact opposite*—namely, that it was ███████████████████████ ██████████████████████████████████████ DX 47 at DDPA000015243; *see also* DX 93 at 313:3-7 (DDPA (Hughes) Dep.) (confirming the ████████████████████ did not ██████ ███████████████████████████████████████; *supra* pp. 17-18.

Court must conduct a "rigorous analysis" to determine whether Plaintiffs have "*in fact*" established each of Rule 23's class-certification requirements. *Wal-Mart*, 564 U.S. at 350-51. And "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351. Indeed, "[t]ough questions" relevant to class certification "must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives." *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002).

Consistent with that approach, the Court must rule on Defendants' forthcoming motions to exclude the opinions of Plaintiffs' experts before ruling on class certification. *See Howard v. Cook Cnty. Sheriff's Office*, 989 F.3d 587, 601 (7th Cir. 2021). And even if the Court were to find some or all those opinions admissible, the Court would still need to consider the competing expert opinions and other evidence on whether injury and other key issues are, in fact, susceptible to class-wide proof and then resolve the dispute on that subject. *West*, 282 F.3d at 938.

## ARGUMENT

The sprawling nationwide class proposed by Plaintiffs falls far short of satisfying the stringent requirements for certification under Rule 23. The different circumstances of the hundreds of thousands of Providers who had a contract with and received a reimbursement from any one of the 39 Member Companies any time between 2015 and 2022 make class certification impossible.

Plaintiffs seek class certification exclusively under Rules 23(a) and 23(b)(3). They do not request certification under Rule 23(b)(2), despite allegations in their complaint about an injunctive relief class, Dkt. 96 ¶ 140, and stray references in their class-certification motion to an injunction, Pls. Br. 41. Nor do they carry forward the complaint's allegations about certification under Rule 23(b)(1). Dkt. 96 ¶¶ 140-41. Plaintiffs accordingly have forfeited any argument for a Rule 23(b)(2) injunctive-relief class or a Rule 23(b)(1) class. *See, e.g., Dixon v. Jefferson Capital Sys., LLC,*

2021 WL 5908431, at *8 n.5 (S.D. Ind. Dec. 14, 2021); *In re Conagra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 696 (N.D. Ga. 2008).

To obtain the requested class certification, Plaintiffs must establish that the proposed class action satisfies the numerosity, commonality, typicality, and adequacy prerequisites of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3). Fed. R. Civ. P. 23(a), (b)(3). Plaintiffs have failed to carry that burden. Individual questions overwhelm any common questions. Class litigation would be inferior to individual litigation by any truly aggrieved dentists. And the named Plaintiffs are neither typical nor adequate class representatives.

## I.     Individual Questions Predominate Over Any Common Issues.

Plaintiffs cannot satisfy Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). That requirement "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Such common-issue predominance is absent if adjudication of key questions would "require individualized, fact-based mini-trials" over the particulars of each class member's circumstances. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 846 (7th Cir. 2022).

A question is a common one if "it is capable of class-wide resolution" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Put differently, "[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Gorss Motels*, 29 F.4th at 843-44.

Any "evaluation of predominance begins with the elements of the underlying claim." *Howard*, 989 F.3d at 607. The elements of Plaintiffs' Sherman Act § 1 restraint-of-trade claim, whether reviewed under the *per se* or Rule of Reason standard, include "(1) a violation of antitrust law … ; (2) individual injury, or impact, caused by that violation; and (3) measurable damages." *In re Steel Antitrust Litig.*, 2015 WL 5304629, at *5 (N.D. Ill. Sept. 9, 2015); *see Reed v. Advocate Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009).

In antitrust cases, courts routinely reject class certification where injury and damages are individual questions. *See, e.g.*, *Comcast*, 569 U.S. at 34; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623-24 (D.C. Cir. 2019); *Blades v. Monsanto Co.*, 400 F.3d 562, 571-72 (8th Cir. 2005); *City of Rockford*, 2024 WL 1363544, at *10; *Reed*, 268 F.R.D. at 582-95. Indeed, decisions from this District (and many other jurisdictions) hold that "'[w]here fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.'" *Reed*, 268 F.R.D. at 582 (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)); *see also, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008).

Plaintiffs nonetheless argue that common evidence of a conspiracy in restraint of trade is sufficient alone to establish Rule 23(b)(3) predominance. Pls. Br. 46. But one of their own authorities explains that "[i]n antitrust class actions, common issues do not predominate if the fact of antitrust violation *and* the fact of antitrust impact cannot be established through common proof." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 170 (N.D. Ind. 2009) (emphasis added). And every case they cite found common-issue predominance only after concluding that injury was subject to common proof. *Ready-Mixed Concrete*, 261 F.R.D. at 169-73; *Rohlfing v.*

*Manor Care, Inc.*, 172 F.R.D. 330, 336 (N.D. Ill. 1997); *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.*, 97 F.R.D. 668, 682 (N.D. Ill. 1983); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 676-82 (9th Cir. 2022) (en banc).

Plaintiffs also get no help from their assertion that a class challenging "substantially similar restraints" was certified in the BCBS litigation. Pls. Br. 46-47. The cited decision is an unpublished order granting final approval for a class *settlement* of subscriber—not provider—claims against health insurers. *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000, ECF No. 2931 (Aug. 9, 2022). It certified the subscriber class "for settlement purposes only" based on a two-page analysis that says nothing about whether common questions would predominate and observes that manageability "is of little relevance" for a settlement class. *Id.* at 26-28.[11]

When class certification for litigation purposes has been sought in factually analogous cases—with similarly complex injury theories and similarly splintered markets—courts have not hesitated to deny certification on predominance grounds. *See, e.g.*, *Reed*, 268 F.R.D. at 577, 582-95 (rejecting class of nurses alleging hospitals conspired to suppress wages); *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *2-4, *28-31 (E.D. Pa. Jan. 18, 2017) (rejecting class of pharmacies alleging pharmacy benefit managers conspired to set prescription reimbursements at low levels).[12] This case calls for the same result. Injury, damages, and other important issues present individual questions that predominate over any common questions.

---

[11] Furthermore, whatever similarities there may have once been between the original "restraint" allegations here and the "restraint" allegations in BCBS, Plaintiffs' allegations have evolved significantly since the pleading stage, particularly as to the purported second brand restrictions, making this case very different from BCBS. *See supra* pp. 18-19, n.7

[12] In arguing predominance, Plaintiffs place great weight on *Kleen Products LLC v. International Paper*, 306 F.R.D. 585 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (7th Cir. 2016), but that decision involved straightforward coordinated supply restrictions on a commodity product in a national market with coordinated price increases. The theories of liability, injury, and damages here are far more complex and cannot be applied uniformly across geographically splintered Provider markets.

### A. Common, Class-wide Evidence Cannot Prove Injury Or Damages For Each Class Member.

Individual inquiries into injury and damages for the hundreds of thousands of Providers in the putative nationwide class are unavoidable. Plaintiffs' deeply flawed "yardstick" model does not change the fact that injury and damages depend on Provider- and locale-specific facts that defy common, class-wide proof.

### 1. Injury And Damages Turn On Provider- And Locale-Specific Facts.

Consider first the individualized evidence required to prove injury and damages for Plaintiffs' antitrust claims. Plaintiffs contend that Defendants' allegedly anticompetitive conduct—"territorial allocation," "second brand suppression," and "price fixing"—injured nearly all putative class members by suppressing competition to sell dental insurance, which then caused reimbursements paid by Member Companies to be lower than they otherwise would have been. Pls. Br. 36-38, 47-50. According to Plaintiffs, each injured Provider would be entitled to recover any such "underpayments" as damages. Pls. Br. 38-39, 50-51. But to establish the alleged injury and damages for any Provider, Plaintiffs would have to prove a series of Provider- and locale-specific facts to bridge the considerable gap between the allegedly anticompetitive conduct and the purported "underpayments" for that Provider. *See O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217, 224 (N.D. Ill. 1987) (requiring proof linking anticompetitive conduct to alleged injuries); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 46 (S.D.N.Y. 2020) (plaintiffs "must show by competent common proof each step in the causal chain leading from conspiratorial agreement to price impact").

**Territorial Allocation Allegations.** For the "territorial allocation" allegations, each Provider would first have to show that an additional Member Company would have entered the Provider's local market for dental services (or, perhaps, would have threatened to do so). *See* ▮

███████████████████████████████████████████; *Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, [415 F. Supp. 3d 703, 712](#) (E.D. Va. 2019). There is no class-wide evidence of that.

No Member Company would have entered (or threatened to enter) all areas of all states; any entry (threatened or actual) would have focused on only *some* areas in *some* states. DX 1 ¶¶ 93-100 (Murphy Rep.); *see also* ████████████████████████████████. If a Provider did not practice in a locale subject to entry, then the "territorial allocation" did not affect that Provider. Hence, a threshold question is which areas of which states each Member Company would have entered, if any. The answer to that question depends on whether particular locales were desirable for entry. DX 1 ¶ 93 (Murphy Rep.).

Many location-specific factors bear on that question. The number of potential enrollees in the area is critical. ████████████████████████. So is the household income of area enrollees, which bears on their ability to pay for dental insurance and dental services. DX 19 at DDAZ000086616; ████████████████████████. Equally important would be how many employers—and which ones—are located in the area. ████████████████████████ ████████████. The number of dental insurers already in the area also would be important, as would the history of attempted insurer entry in the area. *E.g.*, DX 105 at 210:8-20 (Herbert Dep.). In short, any factor relevant to the expected profitability of entering the market would have to be considered. DX 1 ¶¶ 93-94 (Murphy Rep.). Yet those factors vary tremendously across the United States. *Id.* ¶¶ 93-100, Exs. 1, 6-9, & App'x D6; *see also* ████████████████████████ ████████████. As a result, some local markets may have been desirable for entry, but others may not.

If a Provider showed that a second Member Company would have entered his or her local market, the Provider would then need to prove that entry (or threatened entry) would have led a

Member Company to pay higher reimbursement amounts to the Provider. *See In re Online DVD Rental Antitrust Litig.*, 2011 WL 5883772, at *11-16 (N.D. Cal. Nov. 23, 2011), *aff'd*, 779 F.3d 914 (9th Cir. 2015). Determining how increased competition to sell insurance would have affected Provider reimbursements in any state or locale would require answering a series of Provider- and locale-specific questions, including but not limited to:

- Was the Provider a general dentist or a specialist? ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* DX 61 at MIL_DD 0007198; *see* DX 1 ¶ 40 (Murphy Rep.); DX 126 at 91:10-23 (S. Ghezzi Dep.); DX 109 at 190:20-23 (Kaufman Dep.).

- How many Providers were in the locale? ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

- Would entry have occurred through a leased network or a proprietary network? Leased networks used the reimbursements of an existing competitor (or a leased network company) and regularly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (like Delta Dental's)—making it unlikely that entry through a leased network would have increased Member Company reimbursement percentages. DX 1 ¶¶ 81-83, 129-33 (Murphy Rep.); DX 118 at 193:13-25 (Mulligan Dep.); DX 72 at 102:5-19 (Achenbaugh Dep.).

- How did Member Company reimbursements compare to the reimbursements of other insurers already in a local market? In ▮▮▮▮▮▮▮▮▮▮ the local Member Company was already paying higher reimbursement percentages ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. DX 1 ¶¶ 136, 165-67 & Ex. 15 (Murphy Rep.); *see* ▮▮▮▮▮; DX 108 at 155:4-18 (Johnston Dep.).

- Did the local Member Company have market power relating to reimbursements? Member Companies face many national and regional competitors in their territories and, in many places, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. DX 1 ¶¶ 62, 77-78, 110 & Ex. 1 (Murphy Rep.). As Dr. Bamberger has admitted, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DX 77 at 218:12-15 (Bamberger Dep.); DX 1 ¶¶ 147-56 (Murphy Rep.).

- What effect would higher reimbursements have had on the cost of insurance for a Member Company's customers? Member Companies would have been unlikely to increase reimbursement percentages if doing so would have led to a loss of customers. DX 1 ¶¶ 35, 119-28, 159-60 (Murphy Rep.); DX 21 at DDCO000021240-41; DX 22 at DDCO000165398.

The answers to those questions would be different for different Providers in different local markets, necessitating hundreds of thousands of individual inquiries across the putative class. DX 1 ¶¶ 90-100, 110-78 (Murphy Rep.).

**Second Brand Allegations.** For the "second brand suppression" allegations, proof of injury and damages would be similarly individualized. It would have to start with evidence that one or more of the Member Companies' second brands would have entered a Provider's local market. Such evidence would vary by location for the same market-desirability reasons already noted. DX 1 ¶ 104 (Murphy Rep.). Indeed, some second brands have long competed with Delta Dental in some, but not all, places. *See, e.g.*, DX 103 at 58:9-61:9 (Goren Dep.); DX 102 at 182:11-183:12 (Glossy Dep.); DX 110 at 102:5-103:2 (Knopf Dep.); DX 47 at DDPA000015243 (Second Brands Task Force Charter). For instance, ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

And even where second brands would enter a market, higher reimbursement amounts for Providers would not be guaranteed. DX 1 ¶¶ 132-33, 158-59, 184-86 (Murphy Rep.). Only individualized inquiries into the specific circumstances of each second brand and local market could assess impacts for particular Providers.

**Price Fixing Allegations.** For the nebulous "price fixing" allegations, a Provider would have to first prove that he or she was subject to one of Plaintiffs' four purported forms of "price fixing": (1) benefit denial policies; (2) "fee guidance" for new treatment codes; (3) sharing of reimbursement information; and (4) the effective discount standard. *See Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 327-28 (5th Cir. 1978).

The allegedly improper benefit denial policies applied only to national—not local—accounts, and Member Companies could and did deviate from the policies. *See, e.g.*, DX 92 at 96:22-97:19, 344:16-345:10 (DDPA (Achenbaugh) Dep.); DX 69 at REN002049187. Thus, a Provider would have to show both that he or she provided a benefit that the policies recommended be denied and that the relevant Member Company actually applied those policies.

Similarly, Member Companies had unfettered discretion over whether to adopt the alleged "fee guidance" issued by the Dental Policy Committee for new treatment codes. *See, e.g.*, DX 72 at 142:21-24, 345:8-19 (Achenbaugh Dep.); DX 55 at DDVA000043305 (email re ████████). Each Provider, therefore, would have to show—for each new code—that the relevant Member Company adopted the guidance and that he or she provided the services covered by the new code.

The same is true for the alleged sharing of reimbursement information. Each Provider would have to show that the relevant Member Company used the information allegedly shared to set reimbursements for particular procedures performed by the Provider, something that could not be done on a class-wide basis. DX 1 ¶ 189 & App'x D17 (Murphy Rep.); DX 102 at 180:11-17 (Glossy Dep.) ████████████████████████████████████ ████████; DX 86 at 234:12-20 (DDMI (Hall) Dep.) ████████████████████████ ████████████████████████████████████████████.

As for the effective discount standard, a Member Company might not have complied with the "effective discount" standard, or it might have complied by increasing its proportion of in-network claims instead of reducing Provider reimbursement percentages. DX 1 ¶¶ 193-97 (Murphy Rep.); ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████; DX 104 at 422:8-423:13 (Hall Dep.) ████████████████████████████████████████ ███████████████████████████████████████. All those matters vary by Provider and Member Company.

Any Provider who cleared those hurdles would then need to prove that the particular "price fixing" to which he or she was subject resulted in an injury. *See Blades*, [400 F.3d at 571-74](). For instance, contrary to Plaintiffs' claims (Pls. Br. 14-15), the DeltaUSA Processing Policies do *not* set reimbursement for *any* procedure code at $0. Rather, based on applicable standards of care and other factors, the Policies occasionally recommend that certain benefits should not be covered.



DX 108 at 135:11-17 (Johnston Dep.); ██████████████████████████████████. If ████████ ████████████████████████████, the Provider has no injury, which is presumably why Plaintiffs' damages expert conceded that the impact of ████████████████████████████ ████████████." DX 77 at 240:1-5, 243:15-245:6 (Bamberger Dep.).

Likewise, if a Provider received a reimbursement amount based on information shared among Member Companies, the Provider would not have an injury where that amount was no different from the reimbursement amount that would have been adopted based on public information alone. DX 1 ¶¶ 187-90 (Murphy Rep.). And use of recommended reimbursements or

shared reimbursement information would not injure a Provider if the Member Company used the rate recommendations or information to adopt higher reimbursements than it otherwise would have. *Id.*; *see also id.* ¶ 189 & App'x D17 ██████████████████████████████ ████████████████████████████████████████████████ Those injury inquiries are all Provider-specific.

Put simply, linking the alleged anticompetitive conduct to injury for hundreds of thousands of Providers requires proof of a whole host of facts that vary by Provider. For decades, similarly complex alleged connections between anticompetitive conduct and injury have led courts to reject class certification on predominance grounds. *See, e.g.*, *Reed*, 268 F.R.D. at 577, 582-95 (conspiracy to exchange information about and depress nurse compensation); *In re New Motor Vehicles Can. Export Antitrust Litig.*, 522 F.3d 6, 27-30 (1st Cir. 2008) (conspiracy to restrict flow of Canadian cars into the U.S. through various means that allegedly increased U.S. car prices); *Bell Atl.*, 339 F.3d at 304-06 (attempted monopolization of caller ID service that caused labor-cost injuries); *Blue Bird*, 573 F.2d at 327-28 (nationwide price fixing in diverse local school bus markets); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 63, 66-70 (4th Cir. 1977) (en banc) (price fixing in tobacco auctions that varied by market, product, and day). The outcome here should be no different. *See also Riffey v. Rauner*, 910 F.3d 314, 319 (7th Cir. 2018) (rejecting class certification where complex injury theory splintered class); *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1046-47 (7th Cir. 2007) (similar).

### 2. Plaintiffs Have Not Identified A Reliable Method Of Proving Class-wide Injury Or Damages.

Plaintiffs describe no plans to offer any evidence, common or otherwise, on whether Member Companies or second brands would have entered new markets, which ones they would have entered, how their entry would have affected reimbursements, or how any "price fixing"

affected Providers. Instead, Plaintiffs rely on an injury and damages model developed by Dr. Bamberger. Pls. Br. 36-39, 49-50. That purported "yardstick" model compares (a) the rate of change in Provider list prices submitted to Member Companies between 2014 and 2022 (Submitted Amounts) to (b) the rate of change in Member Company approved reimbursement amounts during the same period (Approved Amounts). PX 1 ¶¶ 78-100 (Bamberger Rep.). ███████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ According to Dr. Bamberger, ██████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████. *Id.* ¶¶ 89-100.

Dr. Bamberger then estimates "underpayments" by calculating what the Approved Amounts would have been had they grown at the same rate as Submitted Amounts. *Id.* Summing those "underpayments" gives Dr. Bamberger his aggregate damages. *Id.* ¶¶ 110-13.

Dr. Bamberger's model does not satisfy Plaintiffs' burden to come forward with a common methodology capable of proving injury and damages for each member of the putative class. *See Comcast*, 569 U.S. at 34 (rejecting class certification because model did not "establish[] that damages are capable of measurement on a classwide basis"); *Steel*, 2015 WL 5304629, at *6 (antitrust plaintiff must "demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class"); Pls. Br. 51 (acknowledging their burden).

Indeed, a decision from this District recently denied class certification in an antitrust case after rejecting a "yardstick" model closely resembling the one advanced by Plaintiffs here. *City of Rockford*, 2024 WL 1363544, at *10. The model there attempted to measure overcharges for a prescription drug (Acthar) due to alleged price fixing and output restrictions by assuming that any

growth in Acthar's price exceeding the growth in an index of prices for all pharmaceuticals constituted damages to Acthar purchasers. *Id.* at *5-6. The court concluded that the model did not provide "a reliable estimate of damages for the members of the proposed classes." *Id.* at *5. Selection of the pharmaceutical index as a "yardstick" was "fundamentally unreasoned" because it rested on assumptions rather than evidence that the index shared sufficient characteristics with Acthar's pricing to make the index "an appropriate point of comparison." *Id.* at *7-9. And the model did not "control for" factors—including market share, competition, and market structure—that could legitimately explain the divergence between the index and Acthar's price. *Id.* at *8-9; *see also Series 17-03-615 v. Express Scripts, Inc.*, 2024 WL 1834311, at *3-4 (N.D. Ill. Apr. 26, 2024) (rejecting similar models for similar reasons in related litigation).

Dr. Bamberger's "yardstick" model exhibits the same failings as the model rejected in *City of Rockford*, and many more besides. His model—which he acknowledges ████████████ ████████████████████████████████████, DX 77 at 99:5-24 (Bamberger Dep.)— simply is not a reliable measure of injury or damages attributable to the alleged anticompetitive conduct. Three fatal problems, detailed below, stand out. The model improperly uses averaging to obscure variation in class-member injury and damages. *See infra* Argument I.A.2.a. It fails to account for real-world industry dynamics. *See infra* Argument I.A.2.b. And it is not a proper "yardstick" model. *See infra* Argument I.A.2.c.

For those and other reasons, Defendants will separately move to exclude Dr. Bamberger's injury and damages opinions under Federal Rule of Evidence 702 pursuant to the Court's Scheduling Order for *Daubert* motions. But whether or not the Court excludes those opinions, Dr. Bamberger's unreliable injury and damages model cannot survive the rigorous analysis this Court must give to Plaintiffs' proposal for class-wide proof. *See West*, 282 F.3d at 938-39; *City of*

*Rockford*, 2024 WL 1363544, at *10 (expert yardstick model excluded as unreliable under Rule 702 could not establish common-question predominance); *Reed*, 268 F.R.D. at 593-94 (denying *Daubert* motion but rejecting expert model for class certification purposes after rigorous analysis). As a result, injury and damages remain predominating individual questions.

### a.    Dr. Bamberger Improperly Relies On Regional Averages.

Dr. Bamberger improperly calculates injury and damages for putative class members by using region-wide averages. For each ██████████████████████████, Dr. Bamberger calculates an average Submitted Amount and an average Approved Amount. PX 1 ¶ 92 (Bamberger Rep.). For areas in which average Submitted Amounts grew faster than average Approved Amounts, Dr. Bamberger posits that each Provider in the area was injured and has damages based on the difference in average growth rates. *Id.* ¶¶ 92-97. Thus, according to Dr. Bamberger, ████████████████████████████████████████ ████████████████████████████████████████████████ ███████████. Dr. Bamberger does nothing to assess whether ███████████████ are accurate for *individual* Providers. DX 77 at 130:5-18, 134:10-136:22 (Bamberger Dep.); DX 1 ¶¶ 250-51 (Murphy Rep.).

Dr. Murphy did the analysis that Dr. Bamberger did not. Applying Dr. Bamberger's (deeply flawed) model on a Provider-by-Provider basis, he found that changes in both Submitted and Approved Amounts vary tremendously among Providers in each region. DX 1 ¶¶ 251-58 (Murphy Rep.). Indeed, for *33% of Providers*, there is no statistically significant injury as measured by the difference in growth between their individual Submitted and Approved Amounts. *Id.* ¶ 258 & Ex. 27. Plaintiff Rick Lindley ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* ¶¶ 249, 252. ███

████████████████████████████████████████████████████

████████████████████████████████████  *Id.* ¶ 252 & Ex. 23.

Courts have repeatedly rejected attempts to use averages as class-wide proof of injury and damages precisely because averages conceal individual variations like the ones hidden by Dr. Bamberger's model. *See, e.g.*, *Blades*, 400 F.3d at 573-75 (increased average price is not common proof of injury across hundreds of list prices); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342-44 (4th Cir. 1998) (similar for average damages figures); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (similar for average overcharge). As one decision in an antitrust case from this District explained, use of a "single estimated average percentage of [wage] suppression" for all class members is a "fundamental flaw." *Reed*, 268 F.R.D. at 590-91. "Measuring average base wage suppression does not indicate whether each putative class member suffered harm," because "averages can hide substantial variation across individual cases." *Id.*; *see also Pharmacy Benefit Managers*, 2017 WL 275398, at *20-21, *31 ("averages cannot demonstrate antitrust impact for individual" pharmacies subject to challenged reimbursement practices); *Brand v. Comcast Corp.*, 302 F.R.D. 201, 227 (N.D. Ill. 2014); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493-94 (N.D. Cal. 2008).

Accordingly, models relying on averages cannot serve as common proof of injury or damages absent evidence that they produce accurate results for each class member. *See, e.g.*, *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 193-94 (3d Cir. 2020) (vacating class certification to determine if averaging masked variation); *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 2023 WL 8936389, at *10-13 (D. Utah Dec. 27, 2023) ("average overcharge benchmark" was "not capable of showing whether any individual class member was injured"); *Aluminum Warehousing*, 336 F.R.D. at 56-57 (averaging "flout[ed] the requirement that an

expert's model reliably prove that *each* putative class member suffered individual injury"); *Food Lion, LLC v. Dean Foods Co.*, 312 F.R.D. 472, 489-90 (E.D. Tenn. 2016) (use of average zip code-level overcharges could not "prove impact for all" where "actual customer-level data" showed many uninjured class members). That bedrock rule applies here.

        **b.**        **Dr. Bamberger Does Not Account For Key Industry Dynamics.**

No injury or damages model is reliable if it fails to account for important real-world factors. *See West*, 282 F.3d at 939-40 (model that failed to "consider[] *other* potential reasons" for price movements did not support class certification); *City of Rockford*, 2024 WL 1363544, at *8 (denying class certification because "[s]tatistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment" (quoting *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998))). Dr. Bamberger's injury and damages model fails that requirement by repeatedly relying on untested assumptions that are contrary to established dynamics in the dental insurance industry.

*First*, Dr. Bamberger assumes that, in the absence of the alleged "territorial allocation,"

████████████████████████████████████████████████████████████████████.

DX 77 at 42:9-43:17 (Bamberger Dep.). But that assumption, which Dr. Bamberger never tested, flies in the face of indisputable industry facts. Competition to sell dental insurance has long been intense. DX 1 ¶¶ 50, 77-88 (Murphy Rep.). Yet not every dental insurer (and not even every national dental insurer) competes in every state and locale, because doing so would not be profitable. *Id.* ¶¶ 93-100. Accordingly, there is no reason to assume that Member Companies "freed" from "territorial allocations" would enter every market. *Id.* ¶¶ 93-100. In other words, Dr. Bamberger does not account for existing competition in the dental insurance industry and the

resulting need to assess the ███████████████████████████████████████

████████████████████████ DX 77 at 43:9-17 (Bamberger Dep.).

That alone makes his model unreliable. *See, e.g.*, *City of Rockford*, 2024 WL 1363544, at

*8, 10 (failure to account for market share made model unreliable and incapable of providing class-

wide proof of injury); *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 153 (E.D. Pa.

2015) (same where impact model failed to account for supply from non-conspiring producers); *see

also Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1041-

43 (N.D. Ind. 2016) (excluding damages model that failed to account for competition).

*Second*, █████████████████████████████████████████

████████████████████████████████████ DX 77 at 42:16-43:17 (Bamberger Dep.).

Again, however, the real-world facts refute that assumption. To start, increased competition to sell

dental insurance would create ████████████████████████████████████

███████████████, which would put *downward* pressure on reimbursement amounts, ████████████

████████████████████████████ DX 1 ¶¶ 30, 35, 50, 86, 125, 159-64 (Murphy Rep.).

██████████████████████████████████████████████████████

████████████████████████████████ *Id.*

In addition, Providers can and do join the networks of multiple insurers. *Id.* ¶¶ 43, 113.

Entry of a new insurer, therefore, likely would ████████████████████████████████

██████████████████████████████████████████████████████

████████████████████. *Id.* ¶¶ 111-16.

Furthermore, any entry would likely be accomplished by network leasing because Member

Companies could not rely on ready access to each other's networks ████████████████████

███████ *Id.* ¶ 132. When a new entrant leases an existing market participant's network, it ordinarily

uses the reimbursements established by the existing participant. *Id.* ¶ 131. Provider reimbursement percentages therefore might not increase because the number of networks needing Providers would not change. *Id.* ¶¶ 129-33. Indeed, according to Plaintiffs' theories, the existing market participant leasing its network could try to leverage the network's increased enrollee base to *reduce* reimbursement percentages. *Id.*; *see also* DX 85 at 56:14-58:12 (DDCA Dep.) (leased networks often have lower reimbursements); DX 72 at 102:5-19 (Achenbaugh Dep.) (similar).

Crucially, empirical analysis by Dr. Murphy demonstrates that ▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮ DX 1 ¶¶ 165-66 & Ex. 3 (Murphy Rep.). In other words, where Member Companies have *less* competition to sell insurance (according to Plaintiffs' enrollment-share measure), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That fact undermines Plaintiffs' whole notion that a lack of competition among Member Companies in the sale of dental insurance suppressed Provider reimbursements, which is a core assumption of Dr. Bamberger's model.

Plus, as competition to sell dental insurance has risen in recent years, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 167. Indeed, the increased competition for insurance customers led Member Companies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶¶ 68, 70. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶¶ 165-67. The real-world data thus show that Dr. Bamberger's assumptions about the effect of the alleged "territorial allocation" on Provider reimbursements are entirely unfounded.

Similar departures from real-world facts routinely prevent expert analyses from serving as common proof of injury or damages. *See, e.g.*, *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1002-04 (8th Cir. 2019) (expert methodology that "failed to incorporate economic realities" did not support class certification); *Pharmacy Benefit Managers*, 2017 WL 275398, at *32 (model that "fail[ed] to account for the effect of local market forces on reimbursement rates differentials" provided no class-wide injury evidence); *Processed Egg*, 312 F.R.D. at 158-59, 161-62 (expert analysis that "ignore[d] the realities of retail egg pricing, which are highly varied and individualized," did not supply class-wide proof). This case should be no different.

*Third*, ███████████████████████████████████████████

███████████ PX 1 ¶ 50 (Bamberger Rep.). Once again, real-world facts belie that unsupported assumption. Member Company second brands routinely competed in many places outside the Member Company's home state, consistent with the express Delta Dental policy allowing second-brand competition. DX 1 ¶¶ 64-65, 103 (Murphy Rep.); ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Although second brands ██████████████████████████████

███████████ that reflects business strategy and market forces rather than the result of "second brand suppression." DX 1 ¶¶ 103, 184-86 (Murphy Rep.). And, no matter what type of customers the second brands pursued, they built or leased Provider networks and thus were already participating in many local Provider markets. *Id.* ¶¶ 132, 185; DX 105 at 131:16-23 (Herbert Dep.);

DX 89 at 38:5-21 (DDMO Dep.); DX 88 at 37:24-38:11 (DDMI (Kolesar) Dep.). Dr. Bamberger simply ignores those facts.

Dr. Bamberger's failure to account for existing second-brand competition in attributing injury and damages to purported "second brand suppression" also renders his opinions incapable of supporting class certification. *See, e.g.*, *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 423-24 (5th Cir. 2004) (assumption that "defie[d] the realities" of vehicle market was no basis for class certification); *In re Intel Corp. Microprocessor Antitrust Litig.*, 2014 WL 6601941, at *15-19 (D. Del. Aug. 6, 2014) (expert analysis was not common proof because "it fail[ed] to account for many of the real-world facts surrounding this complicated market"); *Graphics Processing Units*, 253 F.R.D. at 496 ("generic model" omitting "many factors influencing pricing" fell "exceptionally short" of showing common impact).

*Fourth*, Dr. Bamberger assumes that the alleged "price fixing" negatively affected putative class members ███████████ PX 1 ¶¶ 47-49 (Bamberger Rep.); DX 77 at 74:10-13 (Bamberger Dep.). But he does nothing to test that assumption. And the facts do not support it. ███████████

███████████████████████████████████████████

███████████████ *See supra* pp. 31-32. Even for Providers subject to any of the purported "price fixing," injury did not necessarily follow. As noted above, ███████████████

███████████████████████████████████████████

██████ DX 1 ¶ 192 (Murphy Rep.). And sharing of fee guidance, reimbursement announcements, and other information could easily have led some Member Companies to adopt *higher* reimbursements than they otherwise would have. *Id.* ¶¶ 188-90.

Untested assumptions about price fixing contradicted by the facts supply no common evidence of injury and damages. *See, e.g.*, *Reed*, 268 F.R.D. at 591-92 (rejecting injury model that

did not control for substantial variation in nurse compensation); *Rail Freight*, 725 F.3d at 252-53 (model provided no basis for class certification where underlying assumption was unproven and contradicted); *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 93-94 (S.D.N.Y. 2017) (similar).

*Fifth*, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████ DX 77 at 51:7-14, 149:4-150:2 (Bamberger Dep.). That assumption cannot be squared with reality in two ways.

To start, Member Companies ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████ DX 1 ¶¶ 260-64 & Exs. 28-30 (Murphy Rep.). ████████████████

███████████████████████████████████████████ *Id.* Member Companies could have paid the reimbursements proposed by Dr. Bamberger only by substantially increasing the price of dental insurance, which would have hurt customers and made the Member Companies less competitive. *Id.* ¶ 263; *see also id.* ¶¶ 228-36 ███████████████████████

████████████████████████████████████████████████████████████

██████ That financial reality refutes Dr. Bamberger's assumption ████████████████

██████████████████████████████████████████████

So too does the business reality that ███████████ Member Company business is ASO, where customers bear the cost of Provider reimbursements. *Id.* ¶¶ 30, 75, 125; DX 77 at 166:22-167:5 (Bamberger Dep.) (conceding that ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ DX 37 at

43

DDMN00247096. Any move to increase reimbursements would necessarily and directly increase costs to those ASO customers. Dr. Bamberger's assumption ███████████████████████████████ ███████████████████████████████████████████████████████████

The baselessness of that assumption further precludes Dr. Bamberger's injury and damages model from supplying class-wide proof. *See, e.g.*, *Reed*, 268 F.R.D. at 592-93 (failing to account for real-world variation was "fundamental flaw" that "spell[ed] doom for any method of proving common impact"); *Bell Atl.*, 339 F.3d at 304-05 (model that failed to account for "[n]umerous factors that would have affected the amount of damages" did not support common-proof assumptions); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165-70 (C.D. Cal. 2007) (rejecting expert pricing assumptions at odds with real-world pricing).

### c. Dr. Bamberger's Model Is Methodologically Unsound.

Untested and baseless assumptions are far from the only problems with Dr. Bamberger's injury and damages model. That purported "yardstick" model also suffers from a series of fundamental methodological flaws that prevent it from reliably assessing class-member injury and damages. To serve as common, class-wide proof, a yardstick model must be capable of establishing injury and damages by measuring real-world outcomes for individual class members against outcomes in a reasonably comparable market unaffected by the allegedly anticompetitive conduct, so that any difference between the real-world and the "yardstick" market must be the impact of the anticompetitive conduct. *See Blue Cross*, 152 F.3d at 592-93; *City of Rockford*, 2024 WL 1363544, at *10; *Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987); IIA Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 392f1 (5th ed. 2023); PX 1 ¶¶ 74, 78 (Bamberger Rep.); DX 77 at 81:4-20 (Bamberger Dep.).

Dr. Bamberger's "yardstick" model does none of that. Indeed, his model is even more flawed than the similar yardstick model that *City of Rockford* found to be "[m]arred" by "yawning methodological gaps" and thus incapable of providing class-wide proof of antitrust injury. 2024 WL 1363544, at *10. Just as in *City of Rockford*, 2024 WL 1363544, at *7, the fact that *other* "yardstick" models have been accepted in *other* antitrust cases does not require this Court to accept the unreliable and never-before-used "yardstick" proposed by Plaintiffs.

*First*, a premise of Dr. Bamberger's "yardstick" model—that Submitted Amounts (*i.e.*, Provider list prices) reflect ███████████████████████████████ (PX 1 ¶¶ 78-88 (Bamberger Rep.); DX 77 at 84:11-17 (Bamberger Dep.))—is patently false. Dr. Bamberger did not analyze the question, but the record is clear that many Providers ████████████ ██████████████████████████████████████████████████ ███████████████████████ DX 1 ¶¶ 209-11 (Murphy Rep.). For example, Dr. Lindley typically ████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████ DX 98 at 104:8-19, 107:2-111:17, 115:11-116:15 (Ferlet Dep.); DX 100 at 31:10-32:14 (Ginter Dep.). Other named Plaintiffs testified to their own ██████████████████████████ *See, e.g.*, DX 127 at 242:1-244:7 (Simon Dep.) ████████████████████████████████████████; DX 78 at 223:6-238:3 (Benton 30(b)(6) Dep.) (Benton Family Dentistry ████████████████). ██████████████████████ ██████. DX 1 ¶ 210 (Murphy Rep.). In short, the assumption ████████████████████ ███████ equal Submitted Amounts is utterly unfounded. And there is no evidence that such ███████ grew at the same rate as Submitted Amounts on average, let alone in every local market.



Because Dr. Bamberger's model rests on a baseless assumption that is contrary to established market facts, it cannot provide class-wide evidence of injury and damages. *See supra* pp. 38-44; *Tyson Foods*, 577 U.S. at 459 ("[r]epresentative evidence that is … based on implausible assumptions could not lead to a fair or accurate estimate" of injury or damages). "[H]ypothetical assumptions cannot substitute for actual market data" in constructing reliable injury and damages models. *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (rejecting yardstick model based on projections rather than actual financial data); *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *24-25 (M.D. Fla. Apr. 3, 2014) (use of "price card data" in injury model scuttled predominance where it did not correlate with "transactional data"). Dr. Bamberger's model does not heed that rule.

*Second*, the rate of change in Submitted Amounts cannot be a "yardstick" for the rate of change in Approved Amounts because those two amounts are not reasonably comparable such that any difference in growth rates must be attributed to the challenged conduct. Dr. Bamberger asserts ███████████████████████████████████████████████████████████████. DX 77 at 81:4-20, 123:17-125:1, 258:18-259:14 (Bamberger Dep.). But he has done *nothing* to test that assumption or otherwise validate the comparability of Submitted and Approved Amounts. *Id.* at 258:18-259:14. And like the other assumptions underlying his model, it is demonstrably wrong.

Doing the testing that Dr. Bamberger did not, Dr. Murphy found that ordinary supply and demand factors affect Submitted and Approved Amounts quite differently, refuting the notion that only the challenged conduct could explain different rates of change for Submitted and Approved Amounts. DX 1 ¶¶ 215-22 (Murphy Rep.); *see also* DX 77 at 97:6-12 (Bamberger Dep.)
███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ DX 1 ¶¶ 50, 216, 237 (Murphy

Rep.). █████████████████████████████████████████████

████████████████████████████████ *Id.* ¶¶ 167, 237-41. Evidence also

shows that ████████████████████████████████████████

██████████████████████████████████ *Id.* ¶¶ 50, 216, 237.

Indeed, plotting changes in insurance premiums for Member Companies on the same chart Plaintiffs use to illustrate the divergence of Submitted and Approved Amounts shows that the changes ████████████████████████████████████. *Id.* ¶¶ 240-41. In other words, the ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

Consider also the undisputed fact that the supply of dentists has far outpaced the demand for dental services throughout the class period. *Id.* ¶ 48; █████████████████████████ ████████████████████████████████. Dr. Murphy tested the impact of that imbalance and found that it reduced Approved but not Submitted Amounts. DX 1 ¶¶ 219-20 (Murphy Rep.). Dr. Bamberger's foundational assumption that supply and demand factors █████████████ ████████████████████████ simply does not survive testing against the facts and data.

More broadly, the notion that changes in Approved Amounts (reimbursements paid to Providers) should increase at the same rate as Submitted Amounts (list prices set by Providers) ignores a key purpose of insurance. Insurers act on behalf of customers and patients to manage costs of care by securing discounts that save customers and patients money. *Id.* ¶ 33; ████████



. Indeed, by Dr. Bamberger's own calculations, Member Companies saved patients ███████████████████████████████████████ ████████████████████████████████████████████████ PX 1 ¶¶ 111-13 (Bamberger Rep.). Dr. Bamberger does nothing to account for that legitimate and essential function of insurance, even though it readily explains why ██████████████ ████████████████████████████ Nor has he identified a single healthcare market in which provider reimbursements increase in lockstep with submitted charges.

When an injury or damages model fails to control for non-conspiratorial factors that could account for its results, courts do not hesitate to reject the model and deny class certification. *See, e.g.*, *City of Rockford*, 2024 WL 1363544, at *8-9 (failure to control for "nonconspiratorial factors" that might have caused allegedly anticompetitive price to deviate from yardstick index); *Wholesale Grocery*, 946 F.3d at 1002-04 ("failure to control for non-conspiratorial factors" potentially explaining divergence from benchmark); *Pharmacy Benefit Managers*, 2017 WL 275398, at *32 (failure "to account for the effect of local market forces on reimbursement rates differentials"); *Graphics Processing Units*, 253 F.R.D. at 496-97 (failure to include factors that would have influenced prices). Indeed, the need to control for such factors is a fundamental tenet of Seventh Circuit law. *See Blue Cross*, 152 F.3d at 592-93; *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085-87 (7th Cir. 2014); *West*, 282 F.3d at 939-40. By failing to account for competition to sell dental insurance, premium trends, demand for dental services, supply of Providers, and cost control functions, among other factors, Dr. Bamberger's model flouts that law.

*Third*, growth in Submitted Amounts cannot serve as a clean "yardstick" because Approved Amounts, and thus the allegedly anticompetitive conduct, affected Submitted Amounts. ██ ████████████████████████████████████████████



DX 1 ¶¶ 213, 215 (Murphy Rep.).

A "yardstick" model is not reliable if the allegedly anticompetitive conduct affects both the class-member metric (here, Approved Amounts) and the "yardstick" metric (here, Submitted Amounts). *See Home Placement*, 819 F.2d at 1206; *Kentucky v. Marathon Petrol. Co.*, 464 F. Supp. 3d 880, 894 (W.D. Ky. 2020); Areeda & Hovenkamp, *supra* ¶ 392f1; DX 77 at 80:18-24 (Bamberger Dep.) ████████████████████████████████. In that circumstance, the difference between the two metrics is not reliably measuring the impact of the anticompetitive conduct. A model with such reliability problems cannot serve as common proof of injury or damages. *See, e.g.*, *City of Rockford*, 2024 WL 1363544, at *7-10 (model that did not reliably attribute difference between yardstick and challenged prices to anticompetitive conduct could not be common proof of injury); *Aluminum Warehousing*, 336 F.R.D. at 44-63 (similar); *Pharmacy Benefit Managers*, 2017 WL 275398, at *18-22, *31-32 (similar). So it is for Dr. Bamberger's model here.

*Fourth*, the results produced by Dr. Bamberger's injury and damages model do not square with the theory of anticompetitive conduct asserted in this case. One problem is that the model produces incoherent results. Dr. Bamberger's model implies that every ████████████████ ████████████████████████████ DX 1 ¶ 225 (Murphy Rep.). And Dr. Murphy has demonstrated that applying Dr. Bamberger's model to individual Providers would make 24% of Providers across the country *beneficiaries* of the anticompetitive conduct. *Id.* ¶ 255

(percentage of class with negative "underpayments"). Plaintiffs offer no theory or evidence to explain how the allegedly anticompetitive efforts to hold down Provider reimbursements could somehow make nearly a quarter of Providers better off. Dr. Bamberger's model must be capturing something other than the impact of the challenged conduct.

Another problem is that the ostensible "underpayments" calculated by Dr. Bamberger bear no relation to his measure of Member Company monopsony power. The anticompetitive conduct alleged by Plaintiffs involves the Member Companies supposedly exercising monopsony power— allegedly acquired by suppressing competition to sell dental insurance and purportedly reflected in high enrollee market shares—to restrain Provider reimbursements. PX 1 ¶¶ 51-62 (Bamberger Rep.). But Dr. Murphy's analysis shows that ████████████████████████████████ ████████████████████████████████. DX 1 ¶¶ 223-27, Ex. 16, & App'x D20 (Murphy Rep.). In other words, Dr. Bamberger's injury metric (underpayments) is not measuring the impact of the supposedly suppressed competition.

The growing disparity between Submitted and Approved Amounts during the class period, despite the lack of any change in the alleged anticompetitive conduct, presents still another problem. Dr. Bamberger conceded ████████████████████████████████████ ███████████████████████ DX 77 at 142:15-23, 144:3-145:16 (Bamberger Dep.). Yet the difference between Submitted and Approved Amounts calculated by Dr. Bamberger ████████████ █████████████████ PX 1 ¶ 88 & Fig. 3 (Bamberger Rep.). There is zero reason to believe that unchanged conduct produced ██████████████████████ over an eight-year period. DX 1 ¶¶ 203-06 (Murphy Rep.). Again, something else must account for the ███████████ between list prices and reimbursements. *See also id.* ¶¶ 242-45 (identifying additional ████ ████████.

Similar defects have led numerous courts to reject expert models offered as common proof of injury and damages in antitrust suits. *See, e.g.*, *Reed*, 268 F.R.D. at 592-93 (rejecting model with "high error rate"); *Rail Freight*, 934 F.3d at 623-24 (rejecting model that produced "negative overcharges" for 12.7% of class); *Aluminum Warehousing*, 336 F.R.D. at 63 (rejecting model that produced "false positives"); *Food Lion*, 312 F.R.D. at 488-96 (rejecting model that, when applied to customer-level data, showed 19% of purchases benefited class members and that produced "false positives"). The outcome should be no different here.

### 3. The Proposed Class Impermissibly Includes Many Uninjured Providers That Lack Article III Standing.

"Every class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Accordingly, class certification must be denied if a proposed class "contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *see also, e.g.*, *Perez v. City of Chicago*, 2019 WL 7290848, at *13 (N.D. Ill. Dec. 27, 2019) (denying certification on that ground). While "[t]here is no precise measure for" the "great many persons" standard, class certification is improper if the totality of the circumstances makes it apparent that a meaningful portion of the class suffered no injury. *Clark v. Bumbo Int'l Tr.*, 2017 WL 3704825, at *4 (N.D. Ill. Aug. 28, 2017). At least two circumstances show that a considerable portion of the class proposed here is uninjured, even using Dr. Bamberger's "yardstick."

To begin with, over ███████ putative class members received the entirety of every single one of their Submitted Amounts and thus could not have been injured by the allegedly anticompetitive reimbursement percentages. ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



███████ *See, e.g.*, DX 26 at DDIA001428343 (DDIA PPO Agreement); DX 27 at DDIA001430145 (DDIA Premier Agreement). ██████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████

That is not just a theoretical possibility—██████████████████████████

██████████████████████████████████████████████████████. DX 1

¶ 245 & Ex. 21 (Murphy Rep.). Although Dr. Bamberger's damages methodology assigns $███

███ in phantom damages to those Providers (*id.*), they could not possibly have suffered the

claimed injury. *In re Opana ER Antitrust Litig.*, 2021 WL 4047034, at *1 (7th Cir. July 13, 2021)

(class members who "had insurance plans that charged the same flat copay for both generic and

non-generic drugs … could not have been injured because they would have paid the same amount

regardless of what drug they received or whether prices were inflated").[13]

In *Vista Healthplan, Inc. v. Cephalon, Inc.*, the court denied class certification where 5%

of putative class members were unquestionably uninjured, and there was a "substantial likelihood"

of even more putative class members with no injury. 2015 WL 3623005, at *20 (E.D. Pa. June 10,

2015). That is precisely the case here. As noted already, Dr. Bamberger's own injury model, when

applied to *actual individual Providers*, shows that 33% of putative class members—roughly

80,000 individuals—suffered no statistically significant damages at all because their Submitted

Amounts did not grow faster than their Approved Amounts. *See* DX 1 ¶ 258 (Murphy Rep.).

---

[13] The existence of ██████ indisputably uninjured providers, despite Dr. Bamberger's assurances that his model shows injury for over 98% of the class, further confirms the complete unreliability of that model. *See supra* Argument I.A.2.

That figure is well beyond the "*de minimis*" number of uninjured class members that ordinarily poses no obstacle to class certification. *Kohen*, 571 F.3d at 678-79; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 137-38 (D.D.C. 2017) (suggesting that "5% to 6% constitutes the outer limits" of permissible uninjured class members and refusing to certify because 12.7% had no injury), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019). The high likelihood that over 33% of the putative class has no injury requires that class certification be denied here. *See Perez*, 2019 WL 7290848, at *13 (denying certification because "the class likely contains a great many persons who have suffered no injury at the hands of the defendant" (cleaned up)); *Korsmo v. Am. Honda Motor Co.*, 2012 WL 1655969, at *5 (N.D. Ill. May 10, 2012) (similar); *Seary v. eFunds Corp.*, 2010 WL 183362, at *3 (N.D. Ill. Jan. 20, 2010) (similar).[14]

In sum, contrary to Plaintiffs' misleading assertions that 98-99% of the putative class were injured by the alleged anticompetitive conduct (Pls. Br. 3), sizable groups of putative class members could not be (and in fact were not) impacted at all. Because the Seventh Circuit has instructed that a class should not be certified if it includes a "great many persons" who have suffered no injury, the class proposed here cannot be certified. *Kohen*, 571 F.3d at 678.

### 4. Plaintiffs' Injury And Damages Model Cannot Serve As Class-wide Proof Because It Violates *Comcast*.

Dr. Bamberger's injury and damages model also flunks the basic requirement under *Comcast* that such models "must measure only those damages attributable to" the "theory of antitrust impact accepted for class-action treatment." *Comcast*, 569 U.S. at 35. A plaintiff's "damages case must be consistent with its liability case, particularly with respect to the alleged

---

[14]    *See also Dawson v. Great Lakes Educ. Loan Servs., Inc.*, 2016 WL 5415096, at *3 (W.D. Wis. Sept. 28, 2016) ("A district court cannot certify a class including a large number of persons that have not suffered a tangible injury."); *Vigus v. S. Ill. Riverboat/Casino Cruises*, 274 F.R.D. 229, 236 (S.D. Ill. 2011) (similar); *Panwar v. Access Therapies, Inc.*, 2015 WL 329013, at *3-4 (S.D. Ind. Jan. 22, 2015) (similar).

anticompetitive effect of the violation." *Id.* And if the damages model measures damages beyond those attributable to the theories of class liability, "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Dr. Bamberger's injury and damages model fails to satisfy *Comcast*'s requirements in two ways.

**Inconsistency with Liability Case.** Plaintiffs allege, ███████████████████████ that the challenged conduct—"territorial allocation," "price fixing," and "restrictions" on second brands— has been going on for decades. Dkt. 96 ¶¶ 73-76 (Compl.); DX 77 at 144:19-145:8 (Bamberger Dep.). Yet Dr. Bamberger's model is not based on an analysis of any of that alleged conduct. It instead compares the rates of change in submitted Provider list prices and approved Provider reimbursement amounts. PX 1 ¶¶ 78-100 (Bamberger Rep.). He simply ███████████████ ████████████████████████████████████████████████████████████████ DX 77 at 116:17-118:10 (Bamberger Dep.).

"Merely assuming that any difference observed has to be the result of Plaintiffs' allegations of antitrust behavior is insufficient" under *Comcast*. *Pharmacy Benefit Managers*, 2017 WL 275398, at *31. When an expert "fail[s] to isolate the difference in reimbursement rates attributable to an alleged antitrust conspiracy from any difference attributable to legitimate bargaining power or other market factors," the "proposed damages model fails the *Comcast* test." *Id.* That is precisely what happened here. As described above, Dr. Bamberger did not test the assumptions underlying his model in a way that could differentiate any impact of the alleged antitrust violations from the impact of normal, competitive market forces. *See supra* pp. 46-48; *N. Brevard*, 2023 WL 8936389, at *13-14 (denying class certification because damages "methodology [did] not distinguish between … lawful and allegedly unlawful overcharges").

In addition, as further described above, the results produced by Dr. Bamberger's model do not square with Plaintiffs' liability and injury theories. Many putative class members were made better off according to the model. The purported underpayments calculated by the model are unrelated to competition levels. And growing harm shown by the model is inconsistent with the lack of any worsening or intensification of the challenged conduct. *See supra* pp. 49-50. Here again, the injury and damages model is not translating the legal theory of alleged anticompetitive conduct into the economic impact of that conduct, and so it cannot support class certification. *See Aluminum Warehousing*, 336 F.R.D. at 52-53 (damages model "suffer[ed] from a classic *Comcast* infirmity"—"impermissibly identif[ying] damages that are not the result [of the] wrong").

***Inability to Attribute Damages to Particular Theories.*** Dr. Bamberger ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ DX 77 at 239:11-241:1 (Bamberger Dep.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also id.* at 67:13-74:13, 234:5-235:24. While ▮▮▮▮▮▮▮ unsurprising given the total disconnect between Dr. Bamberger's injury and damages model and Plaintiffs' liability theories, it is still one of great consequence. Should the Court find that class treatment is inappropriate for any one of Plaintiffs' theories, Dr. Bamberger's model would then fail as evidence of class-wide injury and damages, as it cannot not isolate and exclude the injuries and damages attributable to that theory. *Comcast*, 569 U.S. at 35.

As detailed above, none of Plaintiffs' theories is appropriate for class treatment because none could be established for the entire class with common evidence. *See supra* Argument I.A.1; *infra* Argument I.B. Those theories also lack record support. For example, Plaintiffs continue to pretend there are second brand restrictions, despite all of the evidence to the contrary. *See supra*

pp. 17-18 & n.7. Unless a class trial on all three of Plaintiffs' theories is to occur—which, for reasons explained herein and in Defendants' eventual motion for partial summary judgment, *see infra* p. 57, n.15, it should not—Dr. Bamberger's failure to disaggregate injury and damages among Plaintiffs' liability theories precludes class litigation. *Cf. Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061, at *2-6 (N.D. Cal. July 29, 2022) (decertifying class after court determined that damages model did not satisfy *Comcast*). The Court should act now to enforce *Comcast*'s requirement that injury and damages models must measure only the impact of viable class theories of liability. It should accordingly deny class certification.

**B.    Common, Class-wide Evidence Could Not Establish Antitrust Violations For Each Class Member Across The Varied Geographic Markets For Providers.**

Individual issues also predominate because evidence as to whether the alleged restraints of trade were on balance anticompetitive would vary across the thousands of geographic markets in which Providers supply dental services in exchange for the challenged reimbursements.

**1.    The Rule Of Reason Applies, Requiring Geographic-Market Proof.**

The Rule of Reason is the presumptive analytical standard, and courts reserve *per se* analysis for a small set of restraints whose effects are widely understood to always or almost always be anticompetitive. *See NCAA v. Alston*, 594 U.S. 69, 88-90 (2021) (taking "special care not to deploy" the *per se* rule given the "often hard-to-see efficiencies attendant to complex business arrangements"); *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19-20 (1979) (*per se* rule applied only when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output").

As Defendants' eventual motion for partial summary judgment will explain in greater detail, the Rule of Reason applies here because the alleged conduct—which arises from a complex state regulatory structure and procompetitive licensing agreements among joint venturers

competing in two-sided insurance markets—is not among the small set of restraints considered *per se* anticompetitive. *See In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1013 (7th Cir. 2012) (Rule of Reason applies to territorial restrictions and joint ventures); *In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 3221887, at *6 (N.D. Ala. Aug. 9, 2022) (same for insurer trademark licensing system using exclusive service areas); *Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 3268339, at *10 (S.D. Ill. Jul. 30, 2021) (same for intra-brand restraints in monopsony case).[15]

Plaintiffs therefore must prove anticompetitive effects due to market power in a relevant geographic market. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (plaintiff must prove that restraint has "substantial anticompetitive effect" in "relevant market"); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 191 (7th Cir. 1985) ("[t]he first step in any Rule of Reason case is an assessment of market power").

### 2. Geographic Markets For Providers Are Local, Not National.

The relevant geographic market is the "area of effective competition in which a product or its reasonably interchangeable substitutes are traded." *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015). A properly defined geographic market "must correspond to the commercial realities of the industry." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962). The geographic market must also "include the area in which consumers can practically seek alternative sources of the product." *Q Club Resort & Residences Condo. Ass'n, Inc. v. Q Club Hotel, LLC*, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010).

---

[15] Defendants will be filing a motion (either alone or jointly with Plaintiffs if the parties are able to reach agreement) requesting a schedule for filing a motion for partial summary judgment as to the standard of review (*per se* or Rule of Reason) applicable in this case. Class certification should be denied no matter which standard applies, but if the Rule of Reason applies, class certification would be especially inappropriate for the reasons described below.

Because healthcare providers (including dentists) offer their services to patients—and patients seek those services—in limited geographic areas, markets for those services are almost always local. *See Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 585 (7th Cir. 2022) (accepting allegation that "vascular-surgery market … is inherently local"); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) (market for primary care physician services is local); *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1077 (N.D. Ill. 2012) (geographic market for two merging not-for-profit health care systems was "the area encompassing a 30-minute drive-time radius" around their hospitals). Indeed, a recent decision from this District found that a proposed nationwide geographic market of physicians subject to certain medical board requirements did not plausibly "correspond to the commercial realities of the relevant industry." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *6-7 (N.D. Ill. Sept. 22, 2020), *aff'd*, 15 F.4th 831 (7th Cir. 2021).

The evidence in this case confirms that the markets for Providers are local. *See* DX 1 ¶ 45 (Murphy Rep.) (████████████████████████████████████████████████ ██████████████████). Indeed, ██████████████████████████████████████ ██████. *See, e.g.,* ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████, the named Plaintiffs do not compete nationally with other Providers for patients. Instead, they compete with other Providers nearby. Dr. Fisher, for instance, ████████████████████████████████████████████████████████ ████████████████████████████████████████. DX 99 at 90:11-24 (Fisher Dep.) ████ ████████████████████████████████████).

58



DX 1 ¶¶ 71-72 & Exs. 9-10 (Murphy Rep.).

Ignoring all of that evidence, as well as the case law finding healthcare provider markets to be local, Plaintiffs contend that the relevant market is national because some competition to sell dental insurance occurs on a multi-state basis. Pls. Br. 55-58. This Court questioned that approach in its motion-to-dismiss order, observing that Plaintiffs "focus on the geographic areas in which defendants sell dental insurance, rather than on the areas in which plaintiffs could sell dental goods and services to other buyers, despite the fact that they identify dental goods and services as the relevant product." Dkt. 303 at 26.[16] With a more fully developed record at this stage, that observation is even more trenchant now.

---

[16]    That the Court declined to dismiss the case on market-definition grounds "in the absence of a factual record" (*id.* at 27) does not control here, where the record now shows thousands of local markets. Nor do Plaintiffs get any help from the cases they cite (Pls. Br. 58), which do not involve dental or healthcare providers but instead address commodity goods sold nationally or do not consider geographic-market questions at all.

In short, the record illustrates that there are likely "thousands of relevant markets among the class members," which would make common proof of antitrust violations impossible. *DeSlandes v. McDonald's USA, LLC*, 2021 WL 3187668, at *12 (N.D. Ill. July 28, 2021), *vacated on other grounds*, 81 F. 4th 699 (7th Cir. 2023).

### 3. The Thousands Of Geographic Markets Splinter The Putative Class In A Way That Makes Common Proof Of Antitrust Violations Impossible.

When different geographic markets splinter a putative class in a way that precludes class-wide proof of antitrust violations, courts do not hesitate to deny class certification. *See, e.g.*, *DeSlandes*, 2021 WL 3187668, at *11-12 (rejecting class spanning hundreds or thousands of geographic markets in monopsony case); *Conrad*, 2021 WL 3268339, at *11 (similar). And courts routinely reject nationwide classes where the relevant geographic market is localized, not national. *See, e.g.*, *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 350 (5th Cir. 2012); *Malaney v. UAL Corp.*, 434 F. App'x 620, 621 (9th Cir. 2011) (rejecting proposed "national market in air travel" where "a flight from San Francisco to Newark is not interchangeable with a flight from Seattle to Miami").

Ignoring market realities, Plaintiffs do not even propose a way to show, with common, class-wide evidence, that the challenged restraints' purportedly anticompetitive effects outweigh their many procompetitive benefits in the thousands of local geographic markets for Providers. That is no surprise, for such weighing could only be done on a local market-by-local market basis.

**Alleged Anticompetitive Effects.** The question of market power is central to any assessment of anticompetitive effects under the Rule of Reason. *See NCAA*, 594 U.S. at 81 (Rule of Reason requires a "fact-specific assessment of market power and market structure"). The evidence here makes plain that market power varies by geographic market.

That evidence includes the significant state and regional variations in market participation and penetration for dental insurers. For example, ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

Likewise, among Member Companies, market penetration varies widely state by state. For instance, █████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████).[17] Even within states, there can be significant variations among regions. In California, █████████████████████████████████████████

████████████ *See, e.g.*, DX 85 at 82:22-25 (DDCA Dep.).

In addition, Provider participation with Delta Dental and competitor networks varies by Provider and location. *See* DX 1 ¶¶ 42, 69 & App'x D10 (Murphy Rep.). ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

[17] ████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



The named Plaintiffs also vary in terms of the number of non-Delta insurers with which they are in-network—and why. ████████████████████████████████

In short, "[t]here is … substantial variation in competitive conditions across local provider markets," DX 1 ¶ 47 (Murphy Rep.), which makes proof of market power a matter of local-market and Provider-specific facts rather than class-wide evidence. That much is clear from the record as to Plaintiffs' assertion, ████████████████████████████████████████████████, that Delta Dental insurance is a "must have" for Providers. Pls. Br. 8. As Dr. Murphy explains, that asserted "must have" status makes no sense in the many places where Member Companies have low enrollee market shares or low Provider participation rates. DX 1 ¶¶ 147-56 (Murphy Rep.). And Plaintiffs' own expert agrees that "████████████████████████████████████ ████████████████████████" DX 77 at 218:12-15 (Bamberger Dep.). Market power, and thus purported anticompetitive effects, are anything but common questions.

**Procompetitive Benefits.** Defendants maintain that the challenged restraints are procompetitive in all geographies because they have many procompetitive benefits. For instance, much of the challenged conduct, including the ESAs and information sharing, facilitates efforts to obtain and service multi-state accounts, thereby increasing inter-brand competition against large national insurers. *See supra* Background III. Those efforts increase the number of Delta Dental enrollees that are likely to use an in-network Provider. And any resulting increase in patient volume benefits Providers. *Id.* The challenged information sharing practices also create benefits by reducing administrative burdens due to the streamlined points of contact afforded by Delta Dental's national system. *Id.*; ███████████████████████████████

███████████████████████████████████████████

Because the challenged restrictions have procompetitive benefits, and any anticompetitive effects would vary by local market, and often by Provider, Plaintiffs cannot establish net anticompetitive effects for a nationwide class of Providers in myriad local markets with common proof. *See, e.g.*, *Conrad*, 2021 WL 3268339, at *10-11 (procompetitive justifications for intra-brand restrictions in local labor markets "present overwhelming individual questions").

### C. Several Defenses Further Splinter The Proposed Class.

Class member-specific defenses add to the predominance of individual questions. Defendants have a due process right "to present every available defense," *Lindsey v. Normet*, 405 U.S. 56, 66 (1972), and the class-action device cannot "abridge, enlarge or modify" that right, *Wal-Mart*, 564 U.S. at 367 (quoting 28 U.S.C. § 2072(b)). The Court must therefore evaluate "the realism of the plaintiffs' injury and damage model in light of the defendants' counterarguments," *Parko*, 739 F.3d at 1086, with an eye toward "how the case will be tried," *Hyderi v. Wash. Mut. Bank, FA*, 235 F.R.D. 390, 398 (N.D. Ill. 2006).

At any class trial, Defendants would introduce individualized evidence of the sort described above to show that a great many class members have no claim. *See supra* Argument I.A-B. In addition, Defendants would raise at least three affirmative defenses—contractual release, mandatory arbitration, and the filed-rate doctrine, described below—that demand the sort of "person-by-person evaluation," *Pumpuhiena v. Deutsche Lufthansa, AG*, 2017 WL 66823, at *9 (N.D. Ill. Jan. 6, 2017), that prevents Plaintiffs from shouldering their burden to "proffer a viable method" to resolve these defenses on a class-wide basis, *Gorss Motels*, 29 F.4th at 846. Regardless of Plaintiffs' "hopes" to rely on a common injury and damages model, then, any trial would proceed on a class member-by-class member basis. *Parko*, 739 F.3d at 1086.

**Contractual Release.** Many class members face a contractual release defense. Contractual releases "constitute a complete defense to a private antitrust action," 54 Am. Jur. 2d *Monopolies and Restraints of Trade* § 508 (2024), and they are "fully enforceable," *Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18, 20 (7th Cir. 1976). *See Fabert Motors, Inc. v. Ford Motor Co.*, 355 F.2d 888, 890-91 (7th Cir. 1966). For example, the Eleventh Circuit recently upheld a release of claims "based upon, arising from, or relating in any way to" BCBS's alleged territorial allocations and second-brand restrictions. *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1086, 1088 (11th Cir. 2023) (collecting cases that "approved and enforced" releases of antitrust claims).

In this case, many putative class members released claims arising from the exchange of information among Member Companies. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



Class members who agreed to these provisions cannot challenge Defendants' alleged sharing of fee information or ███████████████████████████████████████████████ ████████████████████████████████████████. Pls. Br. 17. Nor can they complain about Defendants' participation in the Interplan Agreement or other programs that they specifically authorized. *Id.* at 9 & n.16. Rather, each class member's claims—and any associated damages— must relate solely to conduct outside the scope of any applicable release. Questions about the scope of the release applicable to each class member, however, lack "common answers." *Wal-Mart*, 564 U.S. at 352. As the examples above demonstrate, there are material differences among the agreements Member Companies entered with Providers. A contract-by-contract analysis would therefore be necessary to determine what claims, if any, each class member released.

Class certification is inappropriate when key contract provisions vary by class member— as here—because such variation makes class-wide proof impossible. *See, e.g.*, *Alleman v. Collection Prof'ls, Inc.*, 2019 WL 1454425, at *3 (N.D. Ill. Apr. 2, 2019); *Bell v. Bimbo Foods Bakeries Distrib., Inc.*, 2013 WL 6253450, at *10-11 (N.D. Ill. Dec. 3, 2013); *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1175-76 (11th Cir. 2010);

*Broussard*, 155 F.3d at 340. And the variation in contact-release defenses here also adds to the *Comcast* problems with the proposed class. Dr. Bamberger's injury and damages model cannot distinguish between the impact of the "price fixing" theories to which the contract-release defenses would apply and the impact of other liability theories not subject to those defenses, which prevents his model from serving as class-wide evidence. *See supra* Argument I.A.4.

**Mandatory Arbitration.** Many putative class members could not successfully litigate their claims for another, independent reason: they agreed to arbitration. Arbitration agreements are enforceable in the antitrust context. *See Am. Express*, 570 U.S. at 232-34; *Baxter Int'l, Inc. v. Abbott Lab'ys*, 315 F.3d 829, 831-32 (7th Cir. 2003). If a class were certified, Defendants could invoke their right to arbitration with every absent class member who agreed to arbitration. *See In re Evanston Nw. Corp. Antitrust Litig.*, 2013 WL 6490152, at *4 (N.D. Ill. Dec. 10, 2013) (observing that defendants can seek arbitration of unnamed class members' claims only after certification). And the Court would have to stay proceedings as to all such class members. *See* 9 U.S.C. § 3; *Smith v. Spizzirri*, 144 S. Ct. 1173, 1177 (2024).

But there is no way to determine on a class-wide basis which class members agreed to arbitration. Rather, the applicable agreements vary by state. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████; *see Khanna v. Banks*, 2022 WL 1028712, at *2 (N.D. Ill. Apr. 6, 2022) (valid "agreements to engage in alternative dispute resolution must be enforced" regardless of whether "they are aptly labeled 'arbitration'").

████████████████████████████████████████ defeat predominance. If a class were certified, "a significant portion of this litigation would be devoted to discovering which class members signed such agreements and enforcing those agreements, rather than to the resolution of plaintiffs' legal claims." *Pablo v. ServiceMaster Glob. Holdings Inc.*, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011). Individual inquiries about who "may be subject to … arbitration" would, in turn, "overshadow the common issues." *Conde v. Sensa*, 2018 WL 4297056, at *11 (S.D. Cal. Sept. 10, 2018). It follows that certification is inappropriate when it "would require th[e] Court to assess [class members'] agreements … to determine which members may participate" in the suit. *Marti v. Schreiber/Cohen, LLC*, 2020 WL 30421, at *3 (D. Mass. Jan. 2, 2020); *see Nagel v. ADM Inv. Servs., Inc.*, 65 F. Supp. 2d 740, 746 (N.D. Ill. 1999) (no predominance because, among other things, "[t]hree of the four … defendants included arbitration clauses in their contracts," but "the fourth[] did not"); *Espejo v. Santander Consumer USA, Inc.*, 2016 WL 6037625, at *12 (N.D. Ill. Oct. 14, 2016) (explaining that "the need to review several million call records to determine … whether [an] individual's loan was subject to an arbitration agreement" weighed against certification). This case is no exception.

Any potential defenses to arbitration would only add to the individual inquiries. Answering questions about the applicability or enforceability of Provider arbitration agreements would require a "class-member-by-class-member and contract-by-contract inquiry." *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 862 (D. Md. 2013). That analysis would "be based on the

contract law of the state in which [class members] signed the arbitration agreement and highly individualized," which means that questions of arbitration cannot be resolved on a class-wide basis. *Magallon v. Robert Half Int'l, Inc.*, 311 F.R.D. 625, 640 (D. Or. 2015); *see In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules.").

**Filed-Rate Doctrine.** Some putative class members have no claim due to the filed-rate doctrine, which makes prices "approved by [a] governing regulatory agency" "per se reasonable and unassailable in judicial proceedings." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 893 (N.D. Ill. 2011); *see, e.g.*, *Keogh v. Chi. & Nw. Ry. Co.*, 260 U.S. 156, 163-64 (1922); *In re Wheat Rail Freight Antitrust Litig.*, 759 F.2d 1305, 1311-16 (7th Cir. 1985). The doctrine applies with full force to state-approved insurance premiums, *see Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835-36 (N.D. Ill. 2011); *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d 1313, 1326 (N.D. Ala. 2017), and state-approved reimbursement rates are no different. After all, "deciding what rates are reasonable, or determining a hypothetically reasonable rate for the purposes of calculating damages" would undercut "the regulatory agency's ratemaking authority" to the same extent as second-guessing premium levels. *Dairy Farmers*, 767 F. Supp. 2d at 893. Class members who were paid for dental services at state-sanctioned reimbursement rates thus cannot recover damages based on the difference between those rates and the rates Plaintiffs claim would have existed in a competitive market. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 415-22 (1986); *Blue Cross*, 238 F. Supp. 3d at 1326.

Different states, however, impose different filing requirements for reimbursement rates. Some have specific reimbursement-rate review procedures. In Massachusetts, for example, "fees to be paid to participating dentists for their services … , or the method of determining such fees"

are "subject … to the written approval of the [insurance] commissioner." Mass. Gen. Laws Ch. 176E, § 4; *see* DX 31 at DDMA000009990, -992 (setting forth "the methodology to be used when determining the fees to be paid [to DDMA's] dental providers," as "approved by the Division of Insurance Commissioner"). Elsewhere, insurers must secure state approval of their contracts with dentists. In Iowa, for instance, "contracts by any [nonprofit health service] corporation with participating … dentists … shall at all times be subject to the approval of the commissioner of insurance." Iowa Code § 514.8; *see* DX 25 at DDIA001419368 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Iowa Admin. Code R. 191-36.9(1) ("Every policy… affecting benefits which is submitted for approval shall be accompanied by a rate filing …"). Still other states monitor reimbursement rates indirectly, as a factor in evaluating the reasonableness of insurance premiums. *See, e.g.*, *In re Rate Filing of Blue Cross Hosp. Serv., Inc.*, 214 S.E.2d 339, 343 (W. Va. 1975) (Insurance Commissioner can "determine the adequacy and reasonableness of the [provider] charges to be paid by [an insurer]" in evaluating insurer's request for a premium increase); *Ins. Comm'r of Md. v. Blue Shield of Md., Inc.*, 456 A.2d 914, 921 (Md. Ct. App. 1983) ("the rate approving function carries with it the power to examine costs of a plan, including reimbursements to providers").

In short, reimbursement-rate filing requirements vary by state. That means there is no way to determine whether the filed-rate doctrine bars the nationwide class's claims "in one fell swoop." *McFields v. Dart*, 982 F.3d 511, 516 (7th Cir. 2020). Rather, a state-by-state analysis is required. The "variations in state law," in turn, "swamp any common issues" and render class treatment inappropriate. *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 583 (N.D. Ill. 2008).

Several courts have accordingly rejected class treatment when the filed-rate doctrine bars some class members' claims. *See, e.g.*, *Royal Mile Co. v. UPMC*, 40 F. Supp. 3d 552, 585-86

(W.D. Pa. 2014); *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *11-12 (S.D. Fla. Jan. 10, 2013); *In re Cox. Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 6826813, at *16 & n.28 (W.D. Okla. Dec. 28, 2011). As *Cox* put it, "different levels of pricing regulation" in "different geographic regions" mean that conclusions about the filed-rate doctrine "cannot be established with common evidence." 2011 WL 6826813, at *16. By the same token, class-wide proof is impossible when "the measure of damages for one segment of the putative class … would be barred under the filed rate doctrine." *Royal Mile*, 40 F. Supp. 3d at 585-86. So too here: the varied application of the filed-rate doctrine splinters the class.

## II.    A Class Action Is Not Superior To Individual Actions.

No Rule 23(b)(3) class can be certified unless the proposed class action "is superior to other available methods for fairly and efficiently adjudicating the controversy," considering, among other things, "the class members' interests in individually controlling the prosecution or defense of separate actions" and "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

The predominating individual questions already described would make class litigation utterly unmanageable. Neither liability nor damages could be determined on a class-wide basis, necessitating thousands and thousands of mini-trials on injury, damages, unlawful restraints, and various defenses. *See supra* Argument I. The need to conduct such "essential individualized inquiries" in a class action hinders judicial economy, thwarting a key goal of class treatment. *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 586-87 (N.D. Ill. 2005), *aff'd*, 472 F.3d 506 (7th Cir. 2006); *see also Elliott v. ITT Corp.*, 150 F.R.D. 569, 572, 586 (N.D. Ill. 1992). Where, as here, there are individual issues as to both liability and damages, class treatment is inappropriate. *Honorable v. Easy Life Real Estate Sys., Inc.*, 182 F.R.D. 553, 561 (N.D. Ill. 1998).

Nor is a class action the superior method for adjudicating a case where many class members have enough at stake to make individual litigation, with trebling of damages and awards of

attorneys' fees, feasible. *See* 15 U.S.C. § 15 (allowing treble damages and attorneys' fees); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 678 (7th Cir. 2001); *Martino v. McDonald's Sys., Inc.*, 86 F.R.D. 145, 150 (N.D. Ill. 1980). Because the "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action," *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997), class treatment often is improper when individuals are well situated to bring their own claims. *See Birnberg v. Milk Street Residential Assocs. Ltd. P'ship*, 2003 WL 21267103, at *7 (N.D. Ill. May 29, 2003); *Liberty Mut. Ins. Co. v. Tribco Const. Co.*, 185 F.R.D. 533, 541-42 (N.D. Ill. 1999); *Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 485 (N.D. Cal. 2017).

Here, Plaintiffs seek damages that exceed ███████ per class member on average (Pls. Br. 38-40) and are even more significant for many class members. █████████████████

████████████████████████████████████████████

████████████████████████████████████████████

DX 1 ¶ 249 (Murphy Rep.). An individual class member's interest in controlling the prosecution of a lawsuit is heightened when the amount at stake is higher. *Soares*, 320 F.R.D. at 485. Moreover, because the antitrust laws provide for the recovery of treble damages, as well as attorneys' fees, "a denial of a class action will not prevent the litigation of a violation by individual members of the proposed class." *Hettinger v. Glass Specialty Co.*, 59 F.R.D. 286, 295 n.26 (N.D. Ill. 1973).

"Given the large number of individual questions of law and fact, the ability of the named plaintiffs to carry forth the litigation on their own, and the problems of manageability, a class action is not superior to other methods of adjudicating the instant action." *Id.* at 295.

III. **Named Plaintiffs Are Inadequate And Atypical Class Representatives.**

The class representatives must "fairly and adequately protect the interests of the class," and their claims must be "typical of the claims of the class." Fed. R. Civ. P. 23(a)(3)-(4). Here, the

proposed class representatives—the ten named Plaintiffs—are unreflective of the vast array of Providers, create intra-class conflicts, and face unique defenses—all factors that make them inadequate and atypical representatives of the putative class.

**Atypical Claims.** Despite being proposed representatives of a nationwide class, the named Plaintiffs are concentrated in only eight states. Pls. Br. 5 n.8. Class certification should be denied when the evidence shows that an antitrust plaintiff "in one state is not typical of" an antitrust plaintiff "in another state because of the difference in markets," as the "proof of impact on any one individual plaintiff would not be probative of, much less prove, impact on, or liability to, any other plaintiff." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 2008 WL 7356272, at *7 (S.D. Tex. Nov. 24, 2008), *R&R adopted*, 2009 WL 10712586 (S.D. Tex. Mar. 26, 2009), *aff'd*, 695 F.3d 330 (5th Cir. 2012). ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ The named Plaintiffs' different and limited experiences thus could "not necessarily prove all the proposed class member[s'] claims." *Exhaust Unlimited*, 223 F.R.D. at 511.

**Intra-Class Conflicts.** Conflicts of interest "create an issue of adequacy of representation by requiring the class representative to choose between competing class members." *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012). A district court thus must

ensure there are no conflicts between the named parties and the class they seek to represent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Most Member Companies offer two networks for membership—Premier, which pays higher reimbursements, and PPO, which pays lower reimbursements but offers access to a larger patient base. *See* DX 1 ¶¶ 66-68, 74 (Murphy Rep.). Changes in reimbursements across these networks are often at odds with each other. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Without representatives to pursue the claims of each of these types of Providers, the class cannot be certified. *See Spano v. Boeing Co.*, 633 F.3d 574, 588 (7th Cir. 2011) (claim is not common if alleged conduct harmed some but helped others).

**Unique Defenses.** "[T]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980); *see also McIntyre v. Household Bank*, 2004 WL 2958690, at *7 (N.D. Ill. Dec. 21, 2004) (similar). "The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to [it] so that the representation of the rest of the class will suffer." *J. H. Cohn*, 628 F.2d at 999. Here,

several named Plaintiffs are subject to unique defenses that would distract from class litigation, further establishing the atypicality of their claims.

For instance, ███████████████████████████████████████████████████ ████████, Plaintiffs posit that Delta Dental networks are a "must have" for Providers such that they are forced to accept low reimbursement levels because they would otherwise lose so many patients that their practices would be crippled. PX 1 ¶¶ 54-62 (Bamberger Rep.); Pls. Br. 8. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ They are thus subject to unique defenses on impact and damages that do not apply to a putative class that (according to Plaintiffs) "must have" Delta Dental participation. Pls. Br. 8.

Furthermore, despite decrying territorial assignments of a trademark and claiming such assignments warrant *per se* antitrust condemnation (*id.* at 10-14), ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Smile Source is a network of

"750+ highly successful private practice dentists focused on practice growth." Smile Source,

*Membership Benefits*, https://smilesource.com/membership-benefits-for-private-dental-practice-

growth-and-success; *see also* ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

In short, the named Plaintiffs are subject to unique defenses that do not apply to the class

as a whole, and so they are not typical or adequate representatives. *See In re Milk Prod. Antitrust*

*Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) ("A proposed class representative is not adequate or

typical if it is subject to a unique defense that threatens to play a major role in the litigation.").

## **CONCLUSION**

Defendants respectfully ask that the Court deny class certification.

Dated: June 18, 2024

Respectfully submitted,

/s/ Kathy L. Osborn

Kathy L. Osborn
Ryan M. Hurley
Anna Marie Behrmann
FAEGRE DRINKER BIDDLE & REATH LLP
300 N. Meridian St., Suite 2500
Indianapolis, IN 46204
(317) 237-8261
kathy.osborn@faegredrinker.com
ryan.hurley@faegredrinker.com
anna.behrmann@faegredrinker.com

Colby Anne Kingsbury
Joshua P. Mahoney
FAEGRE DRINKER BIDDLE & REATH LLP
320 S. Canal Street, #3300
Chicago, IL 60606
(312) 212-6573
colby.kingsbury@faegredrinker.com
josh.mahoney@faegredrinker.com

*Counsel for Defendants Delta Plan of Arkansas, Inc., Delta Dental Plan of Indiana, Inc., Delta Dental of Kentucky, Inc., Delta Dental Plan of Michigan, Inc., Delta Dental Plan of New Mexico, Inc., Delta Dental of North Carolina, Delta Dental Plan of Ohio, Inc., and Delta Dental of Tennessee*

/s/ Lori Swanson

Lori Swanson
SWANSON HATCH, P.A.
431 South 7th Street
Suite 2545
Minneapolis, MN 55415
612-315-3037
lswanson@swansonhatch.com

*Counsel for Defendants Delta Dental of Minnesota and Delta Dental of Nebraska*

/s/ Britt M. Miller

Britt M. Miller
Andrew S. Marovitz
Joshua D. Yount
Daniel K. Storino
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
amarovitz@mayerbrown.com
jyount@mayerbrown.com
dstorino@mayerbrown.com

*Counsel for Defendants Delta Dental Plans Association, DeltaUSA, Delta Dental of Connecticut Inc., Delta Dental of Idaho, Dental Service of Massachusetts, Inc. d/b/a Delta Dental of Massachusetts, Delta Dental of Minnesota, Delta Dental of Nebraska, Delta Dental of New Jersey, Inc., Delta Dental of Washington, and Delta Dental of Wyoming*

/s/ Howard M. Ullman

Russell P. Cohen
Howard M. Ullman
Joseph D. Trujillo
DECHERT LLP
One Bush Street, Suite 1600
San Francisco, CA 94104
415-773-5700
russ.cohen@dechert.com
howard.ullman@dechert.com
joseph.trujillo@dechert.com

Christie Boyden
DECHERT LLP
1900 K Street NW
Washington, DC 20006
202-261-3384
christie.boyden@dechert.com

/s/ Jeffrey J. Amato
Jeffrey J. Amato
Johanna Rae Hudgens
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700
jamato@winston.com
jhudgens@winston.com

Michael P. Toomey
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
(415) 591-1000
mtoomey@winston.com

Counsel for Defendants Arizona Dental Insurance
Service, Inc. d/b/a Delta Dental of Arizona,
Hawaii Dental Service, Delta Dental of Iowa,
Delta Dental of Kansas Inc., Maine Dental
Service Corporation d/b/a Delta Dental Plan of
Maine, Delta Dental Plan of New Hampshire,
Inc., Delta Dental Plan of Oklahoma, Delta
Dental of Rhode Island, Delta Dental of South
Dakota, and Delta Dental Plan of Vermont, Inc.

/s/ Allison W. Reimann
Allison W. Reimann
GODFREY & KAHN, S.C.
One East Main Street
Suite 500
Madison, WI 53703
608-257-3911
areimann@gklaw.com

Counsel for Defendant Delta Dental of
Wisconsin, Inc.

Elisa Beneze
Agnese Nadalini
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
215-994-2000
elisa.beneze@dechert.com
agnese.nadalini@dechert.com

Heather Kramer
Timothy D. Elliot
RATHJE WOODWARD LLC
300 E. Roosevelt Road, Suite 300
630-668-8500
Wheaton, IL 60187
hkramer@rathjewoodward.com
telliott@rathjewoodward.com

Counsel for Enterprise State Defendants[*]

/s/ Stephen M. Medlock
Stephen M. Medlock
Adam L. Hudes
Michael McCambridge
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
202-639-6578
smedlock@velaw.com
ahudes@velaw.com

Counsel for Defendant Delta Dental of
Missouri and Oregon Dental Service d/b/a
Delta Dental of Oregon

---

[*] The Enterprise State Defendants are Delta Dental Insurance Company, Delta Dental of California, Delta Dental of Delaware, Delta Dental of the District of Columbia, Delta Dental of New York, Delta Dental of Pennsylvania, Delta Dental of Puerto Rico, and Delta Dental of West Virginia.

/s/ Scott D. Stein
Scott D. Stein
Colleen M. Kenney
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
sstein@sidley.com
ckenney@sidley.com

*Counsel for Defendants Delta Dental of
Colorado, Delta Dental of Illinois, and Delta
Dental of Virginia*

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2024, I caused the foregoing Defendants' Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Counsel to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's CM/ECF system and separately via email to counsel of record.

Dated: June 18, 2024                              By: ___/s/ Britt M. Miller_____