**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE DELTA DENTAL ANTITRUST LITIGATION | **CIVIL ACTION NO.** |
| | 1:19-CV-06734 |
| *This document relates to: ALL ACTIONS* | **MDL No. 2931** |
| | Hon. Elaine E. Bucklo |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION**
**FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

**FILED UNDER SEAL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................1

BACKGROUND REPLY...........................................................................................7

    A.    Delta Dental's Share Of The Relevant Market Was Over 48 Percent. .................7

    B.    Delta Dental Imposed Exclusivity Requirements On Dental Providers. ...............8

    C.    Delta Dental Paid The Lowest Reimbursement During The Relevant Period. ....................................................................................................................9

    D.    Delta Dental Raised Premiums To Consumers While Reducing Reimbursement To Dental Providers.................................................................9

ARGUMENT ........................................................................................................10

I.    COMMON ISSUES PREDOMINATE, SATISFYING RULE 23(b)(3). ......................10

    A.    As A Matter Of Law, The Court Does Not Need To Find Common Impact Or Damages To Find That The Predominance Requirement Is Satisfied............12

    B.    Dr. Bamberger's Model Establishes That Impact and Damages For The Class As A Whole Can Be Established Through Common Proof.......................14

    C.    Defendants Fabricate An Obligation To Connect Discrete Portions Of Defendants' Anticompetitive Scheme To Specific Damage Amounts.................16

    D.    Defendants' Critiques of Dr. Bamberger's Model Are Meritless.........................21

        1.    Dr. Bamberger Used Thousands Of Local Market Indices, Not Simple "Averages."..................................................................................21

        2.    Dr. Bamberger's Model Accounts for Real-World Factors.....................25

        3.    Dr. Bamberger's Yardstick Model Is Well-Founded And Reliable. .........28

    E.    Plaintiffs Have Standing. ....................................................................................33

    F.    Plaintiffs' Model Comports With *Comcast*. .......................................................34

    G.    Individual Defenses Do Not Defeat Class Certification. .....................................36

II.    CLASS TREATMENT OVER THE UNIFORM CLAIMS OF 238,554 DENTAL PROVIDERS IS PLAINLY SUPERIOR. ..........................................................................37

III.    THE CLAIMS OF THE PLAINTIFFS ARE TYPICAL OF THE CLASS, AND PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE CLASS. ....................................................................................................................38

CONCLUSION......................................................................................................40

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) .............................................................................27

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ...................................................... 17, 23, 33, 35-36

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)...................................................................................................11

*Barnes v. Air Line Pilots Ass'n, Int'l*,
  310 F.R.D. 551 (N.D. Ill. 2015)...............................................................................36

*Bell Atlantic, Corp. v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) ............................................................................20, 27

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ...................................................................................23

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) ...................................................................................32

*In re Blue Cross Blue Shield Antitrust Litig.*,
  238 F. Supp. 3d 1313 (N.D. Ala. 2017)...................................................................37

*In re Blue Cross Blue Shield Antitrust Litig.*,
  308 F. Supp. 3d 1241 (N.D. Ala. 2018)...................................................................16

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  1994 WL 663590 (N.D. Ill. Nov. 18, 1994) ......................................................37, 39

*Brand v. Comcast Corp.*,
  302 F.R.D. 201 (N.D. Ill. 2014)...............................................................................25

*In re Broiler Chicken Antitrust Litig.*,
  2022 WL 1720468 (N.D. Ill. May 27, 2022) ........................................................6, 37

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) ...................................................................................24

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) .................................................................................6, 25

*Campbell v. Marshall Int'l, LLC*,
  698 F. Supp. 3d 1036 (N.D. Ill. 2023) .....................................................................36

*In re Checking Acct. Overdraft Litig.*,
    780 F.3d 1031 (11th Cir. 2015) ........................................................ 36-37

*Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*,
    797 F.3d 426 (7th Cir. 2015) .................................................................12

*In re Chocolate Confectionary Antitrust Litig.*,
    289 F.R.D. 200 (M.D. Pa. 2012)............................................................38

*City of Rockford v. Mallinckrodt ARD, Inc.*,
    2024 WL 1363544 (N.D Ill. Mar. 29, 2024)..............................27, 28, 32

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)...............................................................................35

*De La Fuente v. Stokely-Van Cap, Inc.*,
    713 F.2d 225 (7th Cir. 1983) .................................................................39

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    2024 WL 3509668 (N.D. Ill. July 22, 2024)...............................2, 13, 16

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    581 F. Supp. 3d 1029 (N.D. Ill. 2022) ....................................................4

*In re Digital Music Antitrust Litig.*,
    321 F.R.D. 64 (S.D.N.Y. 2017) .............................................................27

*In re Domestic Air Transp. Antitrust Litig.*,
    137 F.R.D. 677 (N.D. Ga. 1991)............................................................38

*Elliott v. ITT Corp.*,
    150 F.R.D. 569 (N.D. Ill. 1992).............................................................38

*In re EpiPen*,
    2020 WL 1180550 (D. Kan. 2020) ........................................................16

*In re Evanston Nw. Healthcare Corp.*,
    268 F.R.D. 56 (N.D. Ill. 2010)..........................................................36, 39

*First Impressions Salon, Inc. v. Nat'l Milk Producers Fed'n*,
    2017 WL 11681189 (S.D. Ill. Sept. 29, 2017)......................................37

*Food Lion, LLC v. Dean Foods Co.*,
    312 F.R.D. 472 (E.D. Tenn. 2016).........................................................24

*Freitas v. Cricket Wireless, LLC*,
    2022 WL 3018061 (N.D. Cal. July 29, 2022)........................................36

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
    2008 WL 7356272 (S.D. Tex. Nov. 24, 2008) ...................................................................39

*Godfrey v. GreatBanc Trust Co.,*
    2021 WL 679068 (N.D. Ill. Feb. 21, 2021) ...................................................................36

*In re Graphics Processing Units Antitrust Litig.,*
    253 F.R.D. 478 (N.D. Cal. 2008)...................................................................27, 32

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.,*
    221 F. Supp. 3d 1033 (N.D. Ind. 2016) ...................................................................27

*Home Placement Serv., Inc. v. Providence J. Co.,*
    819 F.2d 1199 (1st Cir. 1987)...................................................................33

*Honorable v. Easy Life Real Estate Sys.,*
    182 F.R.D. 553, 561 (N.D. Ill. 1998)...................................................................38

*In re Intel Corp. Microprocessor Antitrust Litig.,*
    2014 WL 6601941 (D. Del. Aug. 6, 2014) ...................................................................27

*Jacks v. DirectSat USA, LLC,*
    -- F.4th --, 2024 WL 4380256 (7th Cir. Oct. 3, 2024) .........................................................25

*Kentucky v. Marathon Petroleum Co. LP,*
    464 F. Supp. 3d 880 (W.D. Ky. 2020)...................................................................33

*Kiefer-Stewart v. Joseph E. Seagram & Sons,*
    340 U.S. 211 (1951), *overruled on other grounds by Copperweld Corp. v.*
    *Indep. Tube Corp.,* 467 U.S. 752 (1984) ...................................................................40

*Kleen Prods. LLC v. Int'l Paper Co.,*
    831 F.3d 919 (7th Cir. 2016) ...................................................................2, 11, 13

*Kohen v. Pac. Inv. Mgmt. Co. LLC,*
    571 F.3d 672 (7th Cir. 2009) ................................................................... 33-34

*In re Lamictal Direct Purchaser Antitrust Litig.,*
    957 F.3d 184 (3d Cir. 2020)...................................................................24

*Little Caesar Enters., Inc. v. Smith,*
    172 F.R.D. 236 (E.D. Mich. 1997) ...................................................................17, 19

*Louisiana Firefighters Retirement Sys. v. Northern Trust Investments, N.A.,*
    312 F.R.D. 501 (N.D. Ill. 2015)...................................................................39

*Lumber Liquidators, Inc. v. Cabinets to Go, LLC,*
    415 F. Supp. 3d 703 (E.D. Va. 2019) ...................................................................17

3

*Mejdrech v. Met-Coil Systems Corp.*,
  319 F.3d 910 (7th Cir. 2003) ............................................................38

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) ............................................................16

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ...................................................... 1-2, 39

*In re Microsoft Corp. Antitrust Litig.*,
  237 F. Supp. 2d 639 (D. Md. 2002) ...................................................3

*Moehrl v. Nat'l Ass'n of Realtors*,
  2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ....................................4, 28

*Molinari v. Fin. Asset Mgt. Sys., Inc.*,
  2021 WL 5832788 (N.D. Ill. Nov. 22, 2021) .......................................13

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  319 F.R.D. 158 (E.D. Pa. 2016) .......................................................37

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
  710 F. Supp. 3d 1090 (D. Utah 2023) ...........................................24, 35

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ...............................................................20

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) ...........................................................16, 28

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  297 F.R.D. 168 (D. Mass. 2013) .......................................................28

*O'Neill v. Coca-Cola Co.*,
  669 F. Supp. 217 (N.D. Ill. 1987) .....................................................17

*In re Online DVD Rental Antitrust Litig.*,
  2011 WL 5883772 (N.D. Cal. Nov. 23, 2011) .....................................18

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) ......................................................24

*Oshana v. Coca-Cola Bottling Co.*,
  225 F.R.D. 575 (N.D. Ill. 2005) .......................................................38

*Parko v. Shell Oil Co.*,
  739 F.3d 1083, 1084 (7th Cir. 2014) ............................................13, 14

4

*Pastor v. State Farm Mut. Auto. Ins. Co.*,
  487 F.3d 1042 (7th Cir. 2004) ........................................................20

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ..........................24, 27, 32, 33

*In re Photochromic Lens Antitrust Litig.*,
  2014 WL 1338605 (M.D. Fla. Apr. 3, 2014) ........................................30

*In re Potash Antitrust Litig.*,
  159 F.R.D. 682 (D. Minn. 1995)........................................................38

*In re Processed Egg Prod. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015).........................................................27

*In re Rail Freight Fuel Surcharge*,
  292 F. Supp. 3d 14 (D.D.C. 2017) .....................................................14

*In re Rail Freight Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ..........................................................27

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2011)..............................................20, 24, 27

*Riffey v. Rauner*,
  910 F.3d 314 (7th Cir. 2018) ...........................................................20

*Robinson v. Tex. Auto. Dealers' Ass'n*,
  387 F.3d 416 (5th Cir. 2004) ...........................................................27

*Rohlfing v. Manor Care, Inc.*,
  172 F.R.D. 330 (N.D. Ill. 1997)........................................................13

*Ross v. Gossett*,
  33 F.4th 433 (7th Cir. 2022) .........................................................1, 11

*Scott v. Dart*,
  99 F.4th 1076 (7th Cir. 2024) ..........................................................23

*Simpson v. Dart*,
  620 F. Supp. 3d 749 (N.D. Ill. 2022) .................................................39

*Smith v. City of Chicago*,
  340 F.R.D. 262 (N.D. Ill. 2021)........................................................14

*Spano v. Boeing Co.*,
  633 F.3d 574 (7th Cir. 2011) ...........................................................39

5

*State of Alabama v. Blue Bird Body Co., Inc.*,
    573 F.2d 309 (5th Cir. 1978) ...........................................................................20

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ...........................................................................13

*In re Sulfuric Acid*,
    2007 WL 898600 (N.D. Ill. Mar. 21, 2007)......................................................28

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)....................................................................................13, 29

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) .................................................................5

*Vanzant v. Hill's Pet Nutrition Inc.*,
    2023 WL 6976988 (N.D. Ill. Oct. 23, 2023)......................................................28

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
    257 F.3d 256 (2d Cir. 2001)..............................................................................30

*West v. Prudential Sec., Inc.*,
    282 F.3d 935 (7th Cir. 2002) ...........................................................................33

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    946 F.3d 995 (8th Cir. 2019) ......................................................................27, 32

*Windham v. American Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) ..............................................................................20

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)..............................................................................30

## Other Authorities

Bradley Munson & Marko Vujicic, *Projected Supply of Dentists in the United
    States, 2020-2040*, Health Policy Institute, American Dental Association (May
    2021), at 3, 5, and Figure 1 ................................................................................6

Fed. R. Civ. P. 23 ................................................................................................ *passim*

Gregory J. Werden, *Assigning Market Shares*, 70 Antitrust Law Journal, No. 1, at
    95 (2002)...............................................................................................................5

Marko Vujicic, *Why are payment rates to dentists declining in most states?*, 149
    Journal of the American Dental Association, No. 9, at 756 (Sept. 2016)..................6

*National Trends in Dental Care Use, Dental Insurance Coverage, and Cost
    Barriers*, Health Policy Institute, ADA, at 15-16 (updated March 2024) ..............30

## **<u>INTRODUCTION</u>**

Notwithstanding Delta Dental's kitchen-sink attempt to contrive individual issues, their opposition brief (Dkt. 791) confirms that the proposed Class should be certified. Defendants ***concede*** that DDPA[1] imposed uniform territorial restraints prohibiting Member Companies from competing for business or recruiting Dental Providers outside their assigned territories. Defendants ***concede*** that DeltaUSA promulgated universal processing policies, procedures, and rules requiring Member Companies to deny and disallow reimbursement for hundreds of procedures, to follow "recommendations" for specific reimbursement amounts, to meet an effective discount rule, and to share reimbursement amounts and other pricing information through the NPF, the NDP, and other means. And they ***concede*** that second brands restricted their revenues by not competing with Member Companies in the large employer group market that dominates Defendants' business.

Faced with these concessions, Defendants resort to arguments which have been soundly rejected under settled law. ***First***, they spend the bulk of their brief disputing the ***merits*** of Plaintiffs' claims. Defendants insist that the undisputed territorial restrictions are "procompetitive trademark licensing agreements." Opp. at 1-2. They maintain that price-fixing strategies "encourage competitive discounts" and facilitate "compet[ition]" for multi-state employers. *Id.* And they deny the existence of second brand restrictions, rationalizing second brands' refusal to compete with Member Companies as in their own self-interest. *Id*. at 2.

But "the class certification analysis is not an examination of the merits." *Ross v. Gossett*, 33 F.4th 433, 442 (7th Cir. 2022). The Seventh Circuit expressly has warned that class certification should not be turned "into a dress rehearsal for the trial on the merits." *Messner v. Northshore*

---

[1] All capitalized terms have the same meaning as set forth in Plaintiffs' opening brief, Dkt. 754. All emphasis is added and all internal citations and quotations are omitted unless otherwise noted.

*Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). All that Plaintiffs need to show for a class to be certified is that they "have proven each of Rule 23's elements by a preponderance of the evidence." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *8 (N.D. Ill. July 22, 2024). Plaintiffs easily have satisfied their burden. Whether a factfinder would agree with Plaintiffs on the *merits* is irrelevant at this stage. At summary judgment or trial, Plaintiffs will demonstrate that Defendants have broken the law. The point today is that these questions can be answered with common evidence for all 238,554 Dental Providers in the proposed Class.

*Second*, Defendants rely on the report of Dr. Kevin Murphy to argue that (i) not every member of the proposed Class has been impacted by Defendants' monopsonistic conspiracy, and (ii) the damages suffered by each Dental Provider need to be calculated individually. Even if Dr. Murphy's analysis was reliable (it is not), he *concedes* that, even using individual submitted amounts, Dr. Bamberger correctly calculated that at least two-thirds of the proposed Class—*i.e.*, approximately 160,000 Dental Providers—suffered a net underpayment in their approved reimbursement amounts adjusted for inflation. Determining whether those admitted underpayments were the result of anticompetitive conduct or were caused by the contrived reasons Dr. Murphy suggests is, again, a merits question. And "at the class certification stage, plaintiffs are not obliged to drill down and estimate each individual class member's damages." *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016) ("The determination of the aggregate classwide damages is something that can be handled most efficiently as a class action.").

Even if Defendants' arguments had legal merit (they do not), Dr. Murphy's contrived model is *not* reliable and his criticisms of Dr. Bamberger should be rejected. Murphy is a well-known mouthpiece for Defendants in antitrust cases like this one, repeatedly offering opinions rejected by courts—he was on the wrong side in *Blue Cross Blue Shield*, in *Visa*, and many more.

As one court observed in rejecting his conclusions, he "is blessed with an expansive and energetic intelligence, but at times his responses to questions seemed overly quick and result-oriented." *In re Microsoft Corp. Antitrust Litig.*, 237 F. Supp. 2d 639, 648 n.8 (D. Md. 2002). Indeed, ██████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

Worse, Dr. Murphy knows very little about the facts of ***this case***. ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[2] DX1 at Exhibits 1 and 6 and Appendix D-1; Ex. 2, 9/5/24 Murphy 206:6-9; Dkt. 754 at 4.

[3] *E.g.*, DX1 at Exhibit 4; Ex. 2, 9/5/24 Murphy 167:14-168:17; Ex. 1 ¶ 73 n.122.

████████████████████████████████████████████████████████████

██████████████████████████

Putting aside Dr. Murphy's bias and lack of knowledge, his critiques of Dr. Bamberger's model are meritless. A recurring attack is that Dr. Bamberger's "yardstick" model has "never-before-been-used." *E.g.*, Opp. at 2, 45. That is simply not true. Courts, including in this District, have long recognized that the yardstick approach used by Dr. Bamberger "is a well-established methodology" in antitrust actions to show impact and damages. *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *8-9 (N.D. Ill. Mar. 29, 2023); *see also, e.g. In re Dealer Mgmt Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1073-76 (N.D. Ill. 2022) (denying motion to exclude expert model employing the yardstick methodology).

As set forth in the Expert Rebuttal Report of Dr. Bamberger (attached as Exhibit 1), many of Dr. Murphy's conclusions are contrary to the undisputed record evidence and inconsistent with settled economic theory. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

4



*see generally* Dr. Lewin's opening and rebuttal reports, Dkt. 766 Ex. 147 and Ex. 34.

Ultimately, Dr. Murphy **concedes** Dr. Bamberger's key finding—*i.e.*, that from 2014 to 2022, the approved amounts paid by Delta Dental to Dental Providers substantially declined while Dental Providers' submitted amounts, a proxy for prevailing economic conditions, increased at about the rate of inflation. In other words, while Dental Providers' costs for staff, rent, and supplies increased each year with the cost of inflation, Delta Dental's reimbursement for approved procedures fell in inflation-adjusted terms by more than 10 percent, resulting in aggregate underpayments to Dental Providers of over $13 billion.

Dr. Bamberger and Dr. Murphy **agree** that this occurred. The only disagreement between Dr. Bamberger and Dr. Murphy is **why** this happened. Dr. Bamberger explains that the only credible explanation consistent with both the facts and economic theory is the exercise of monopsony power by Delta Dental, as demonstrated by the fact that Delta Dental amassed billions of dollars in capital reserves (*i.e.* profits) during the Class Period while increasing already exorbitant salaries and perquisites paid to its executives. Ex. 1 ¶¶ 9-21.

---

[4] Gregory J. Werden, *Assigning Market Shares*, 70 Antitrust Law Journal, No. 1, at 95 (2002); *United States v. Visa U.S.A., Inc*., 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001) (finding Visa and Mastercard "must-have" where Visa accounted for 47% of transactions and MasterCard for 26%).



. DX1 ¶¶ 48-50. Dr. Murphy is wrong.

is belied by the undisputed fact that Delta

Dental raised premiums to consumers while decreasing reimbursement to Dental Providers on a

per-enrollee basis, increasing Member Companies' margins and amassing billions in added wealth.

Dkt. 754 at 22-23.

.[5]

But the Court need not resolve at this stage whether Dr. Bamberger or Dr. Murphy has the

better explanation for why Dental Provider reimbursement fell during the Class Period. This is a

classic "battle of the experts" that, if Dr. Murphy survives a *Daubert* challenge, will be resolved

at summary judgment or trial. *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *17-18

(N.D. Ill. May 27, 2022) (holding the choice of which expert's models to accept "is a question

better suited to summary judgment or trial"). What matters today is that the decline in Dental

Provider reimbursement was ***either*** caused by the illegal exercise of monopsony power by Delta

Dental ***or*** is explained by ordinary course competitive factors. That critical question is common to

every member of the Class and can be resolved "in one stroke." *Butler v. Sears, Roebuck & Co.*,

727 F.3d 796, 801 (7th Cir. 2013).[6]

---

[5] *See, e.g.,* Bradley Munson & Marko Vujicic, *Projected Supply of Dentists in the United States, 2020-2040*, Health Policy Institute, American Dental Association ("ADA") (May 2021), available at www.ada.org/-/media/project/ada-organization/ada/ada-org/files/resources/research/hpi/hpibrief_0521_1.pdf, at 3, 5, and Figure 1 ("The departure of this cohort from the workforce has kept the dentists per capita measure nearly unchanged from 2015 to 2020…"); Marko Vujicic, *Why are payment rates to dentists declining in most states?*, 149 Journal of the ADA, No. 9, at 756 (Sept. 2016) ("We examined variables such as the supply of dentists per capita and the unemployment rate, and we found there was very little correlation with payment rate changes.").

[6] The Court need not decide now whether Defendants paid excessive compensation to their executives or hoarded excess capital reserves. As explained by Professor David Lewin, whether

Each of Rule 23's requirements for class certification has been satisfied. Defendants do not even contest that the Class is so numerous that joinder of all members is impractical, that the claims of the Class representatives raise questions of law or fact common to the Class, or that Interim Co-Lead Class Counsel are qualified to represent the Class. Opp. at 24. Defendants' throwaway arguments regarding individual defenses, superiority, typicality, and adequacy are easily disposed of. Therefore, Plaintiffs respectfully request that the Court certify the Class.

## BACKGROUND REPLY

Defendants' 17-page background is replete with misrepresentations and omissions. Given page limitations, Plaintiffs address here only the most egregious and relevant to certification.

### A.    Delta Dental's Share Of The Relevant Market Was Over 48 Percent.

Notwithstanding their false claim of "fierce" competition, Defendants dominate the commercial dental insurance market (Opp. at 8), Delta Dental's **own internal reports** confirm that

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

Defendants falsely represent that "Member Companies in 2022 covered only 32% of all persons with dental insurance." Opp. at 9. Defendants arrive at this artificially deflated total in two ways. **First**, they ████████████████████████████████████████████████████

---

Defendants did so is a question common to the proposed Class. Dkt. 766 Ex. 147 ¶¶ 24, 33, 39, 92. Other than asserting that these issues are irrelevant to certification, Defendants do not address Plaintiffs' arguments with regard to excess compensation and capital reserves. Opp. at 19. Instead, they misconstrue the Court's November 21, 2023 Order as deferring **all** issues related to executive compensation, rather than merely deferring **further** discovery. Dkt. 732 at 14. Defendants' experts, Brian Cumberland and Robert Hoyt, purport to criticize Professor Lewin's work. But their many invented critiques are baseless for the reasons described in Dr. Lewin's Rebuttal Report. Ex. 34.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

But public entitlement plans are expressly *excluded* from the Class definition, and Member Companies overwhelmingly do not compete for government-sponsored dental care. ████████████

████████████████████████████████████████████████████

████████████████████████████████

**Second**, Defendants use a data set for litigation purposes that their corporate representative testified was not accurate enough to use in their day-to-day business. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ Based on Defendants' own business conduct, this is the same data set that Dr. Bamberger used in his report. But for litigation purposes, Defendants ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

**B.**    **Delta Dental Imposed Exclusivity Requirements On Dental Providers.**

Defendants concede that over 80 percent of Dental Providers contracted with Delta Dental but assert that Dental Providers could "freely join networks mean[ing] that insurers generally do not compete against each other to entice Providers to join their networks." Opp. at 10. But this sleight of hand conceals various Member Companies' programs punishing providers that did not enter into exclusivity agreements with Delta Dental. *E.g.*, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

### C. Delta Dental Paid The Lowest Reimbursement During The Relevant Period.

Defendants claim that "Delta Dental Member Companies have consistently had among the highest average reimbursement percentages for national insurers." Opp. at 12. Here again, their made-for-litigation claim is contradicted by the record. ██████████████████████

███████████████████████████████████████████

████████████ (*see* Dkt. 754 at 22) in the industry throughout the Class Period.[7]

### D. Delta Dental Raised Premiums To Consumers While Reducing Reimbursement To Dental Providers.

Defendants claim that "Delta Dental reimbursements and premiums grew at virtually the same rate throughout the class period." Opp. at 12. But Delta Dental documents and testimony demonstrate that Member Companies consistently *raised* customer premiums while *reducing* reimbursements to Dental Providers on an inflation-adjusted, per-enrollee basis.[8]

---

[7] Defendants argue that Milliman's calculation of net *effective* discount includes out-of-network utilization, and thus does not necessarily translate into the lowest reimbursement rates. Opp. at 15-16. But net *contracted* discount does *not* consider out-of-network utilization. Ex. 12, 12/4/23 DDCA (Navid) 30(b)(6) 310:1-6 ("Q: What is a net contracted discount? A: Net contracted discount essentially measures the level of discounts that you have with providers under contract. So it takes out-of-network utilization and overarching utilization of the network out of the equation."). Delta Dental's industry-leading net contracted discount necessarily means it has the lowest reimbursement, as admitted. *Id.* 314:4-8 ("Q: I mean if you have the largest net contracted discount, you have the largest net contracted discount in a given market, you will have the lowest aggregate reimbursement in that market every time? A: At an aggregate contract level, yes.").

[8] █████████████████████████████████████████
███ ██ ████ ██████ █████ ██████ ███ █████ ██ ████ ████
██████████████████████████████████████████████
██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████ Ex. 1 ¶¶ 15-16.

## **ARGUMENT**

### I. COMMON ISSUES PREDOMINATE, SATISFYING RULE 23(b)(3).

Defendants devote 47 of their 52 repetitive pages of argument to predominance. They do not dispute the overwhelming number of common questions. Dkt. 754 at 41. These common questions, standing alone, are sufficient to demonstrate predominance as they would surely comprise the vast majority of issues at a trial. Importantly, "Rule 23 does not demand that *every* issue be common; classes are routinely certified under Rule 23(b)(3) where common questions exist and predominate, even though other individual issues will remain after the class phase."

---

██████████████████████████████████████████████

██████████████████████████████████████████████

████ █ ████ ████ █ ██ ████ ████ ████ ██ █

[9] Defendants also make a series of merits arguments based on false allegations. Because the Court need not decide merits disputes now, Plaintiffs do not respond to the bulk of these. But by way of example, Defendants assert that territorial restraints are necessary to prevent brand confusion. Opp. at 13. But DDPA's corporate representative ████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

*Kleen*, 831 F.3d at 922 (emphasis in original). Put another way, what matters to class certification is not that common issues predominate as to each element of every claim, but rather to the case as a whole. At the class certification stage, Rule 23(b)(3) requires only that "***questions*** common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (emphasis in original); *Ross*, 33 F.4th at 442 ("a court weighing class certification must walk a balance between *evaluating* evidence to determine whether a common question exists and predominates, *without weighing* that evidence to determine whether the plaintiff class will ultimately prevail on the merits.'") (emphasis in original).

Defendants ignore both Supreme Court and Seventh Circuit authority, bizarrely arguing that this case is the "antithesis" of a class action and invent a test that would require plaintiffs in every case to prove injury and damages for every class member before the Court could find that common issues predominate. Opp. at 1. As set forth below, this plainly is not the law. But even if it were, Dr. Bamberger's model readily meets even Defendants' extraordinary test, demonstrating a common methodology to prove both impact and damages (and establishing that approximately 98 percent of the Class has been harmed, with aggregate damages to the Class of almost $13 billion). Defendants are free to challenge the merits of Dr. Bamberger's conclusions at summary judgment or trial, but their baseless attacks on his methodology at class certification are unavailing.

In attacking the predominance requirement, Defendants attempt to rehash arguments that this Court already has rejected. Defendants argue that class certification should be denied because *if* the rule of reason applies, proof about relevant geographic markets might be required. Opp. at 56-57. But the Court already rejected this argument in denying Defendants' motion to brief the

11

standard of review (*i.e.*, *per se* versus rule of reason) before deciding class certification.[10] Defendants also argue that predominance fails because ***Dental Providers*** operate in local markets. *Id.* at 60. But this is wrong as a matter of law and fact. As to the law, as the Court found at the motion to dismiss stage, ***insurers*** like Delta Dental operate in a national market and it is that national market where Plaintiffs allege that Defendants operate a monopsonistic cartel. Dkt. 303 at 27 ("Indeed, all agree that some of defendants' competitors (that is, potential substitute purchasers of dental services) are national insurance companies that insure patients throughout the United States."). As to the facts, Dr. Bamberger has found, using thousands of regressions at the regional level, that nearly all Class members were injured by the challenged conduct and, therefore, the presence of local ***provider*** markets does not impede common proof. Ex. 1 ¶¶ 56-58, 82-87. Each of Defendants' futile arguments is addressed in turn below.

### A.    As A Matter Of Law, The Court Does Not Need To Find Common Impact Or Damages To Find That The Predominance Requirement Is Satisfied.

Defendants argue that irrespective of the number of common issues, or their relative importance, Plaintiffs cannot demonstrate predominance without establishing common evidence of injury and damages. Opp. at 27. As discussed below, Dr. Bamberger's model easily clears this hurdle. But even if the Court were to find his model wanting, Defendants misstate the law.

The predominance requirement "is meant to test whether proposed classes are sufficiently cohesive to warrant adjudication by representation, but it scarcely demands commonality as to all questions." *Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 444 (7th Cir. 2015). Thus, the question is whether common issues as a whole predominate, not

---

[10] Dkt. 802 at 1 ("None of the authorities defendants cite offers a compelling basis for deciding the standard of review before resolving plaintiffs' already-pending class certification motion. … [Their cited authorities] merely confirm that where the complaint pleads a plausible antitrust violation under either standard, resolution of the issue must await summary judgment.").

whether any individual question can be met by common proof. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016) ("the predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues").

In antitrust cases, it is settled law that "the existence of a[n alleged] horizontal price-fixing conspiracy" satisfies Rule 23(b)(3). *Dealer Mgmt. Sys.*, 2024 WL 3509668, at *10. "[T]he question of the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs, and the importance of this question usually warrants treating them as a class." *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 336–37 (N.D. Ill. 1997). Indeed, Defendants concede, as they must, that the Seventh Circuit in *Kleen*, 831 F.3d at 927, affirmed class certification ***without a showing of impact or damages***, and Defendants offer no support for their novel assertion that there is one test for predominance in the context of "straightforward" restraints and a different one where "theories of liability, injury, and damages are [] more [] complex." Opp. at 26 n. 12.[11] Defendants' argument that "no class can be certified until proof exists that every member has been harmed" is plainly "wrong." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014).

In fact, the Seventh Circuit affirmed class certification even where ***most*** class members may not have been injured. For example, in *Parko v. Shell Oil Co.*, defendants appealed the certification of a class of 150 property owners with claims regarding contamination of the groundwater underneath their homes, arguing that more than 90% were not injured. 739 F.3d 1083,

---

[11] Defendants also protest that *In re Blue Cross Blue Shield Antitrust Litig.* "only" certified a settlement class. Opp. at 26. But even for a settlement class, "a court must conduct a rigorous analysis by a preponderance of the evidence that the putative class meets the criteria set forth by" Rule 23. *Molinari v. Fin. Asset Mgt. Sys., Inc.*, 2021 WL 5832788, at *5 (N.D. Ill. Nov. 22, 2021). And even Dr. Murphy (who was retained by the BCBS Defendants in that case), admitted at deposition that ███████████████████████████████████████████████ ██████████████████████████████ Ex. 2, 9/5/24 Murphy 88:20-89:24.

1084 (7th Cir. 2014). In affirming, the Seventh Circuit instructed that "[h]ow many (if any) of the class members have a valid claim is the issue to be determined after the class is certified." *Id.* at 1085; *see also Smith v. City of Chicago*, 340 F.R.D. 262, 289-90 (N.D. Ill. 2021) (certifying class over objection that 85-90% of class was not injured and finding plaintiffs' claims addressed "the same system of supervision and training that allegedly affected all class members").[12]

**B.    Dr. Bamberger's Model Establishes That Impact and Damages For The Class As A Whole Can Be Established Through Common Proof.**

Even if common proof of impact and damages were necessary to a finding of predominance, Dr. Bamberger's well-recognized yardstick model establishes both impact and damages on a classwide basis. Dr. Bamberger used approximately two billion observations of claims data from 2014 to 2022 to examine the rate of change in amounts charged by Dental Providers to uninsured and out-of-network patients (the "submitted" amount) as a proxy for prevailing economic conditions (*e.g.*, changes in cost inputs such as staff, rents, and supplies). He then compared the rate of change in submitted amounts to the amounts paid to Dental Providers by Delta Dental (the "approved" amount) for each procedure code by year, region, and specialty. Dkt. 761 Ex. 1 ¶¶ 79-82, 84. Dr. Bamberger explained that , as a matter of established economic theory, the same changes in economic conditions should apply to dental goods and services provided to both uninsured and insured patients. As such, both submitted charges and approved charges should exhibit the same rate of change in a competitive market. *Id.* ¶ 85; Ex. 1 ¶¶ 57-58.

In fact, Dr. Bamberger's results—***which neither Defendants nor Dr. Murphy dispute***—demonstrate that while Dental Providers' submitted charges (the blue line) remained relatively

---

[12]  Defendants' reliance on *In re Rail Freight Fuel Surcharge*, 292 F. Supp. 3d 14, 137-38 (D.D.C. 2017), an-out-of-Circuit case, is misplaced, as the court there expressly recognized that the D.C. Circuit did ***not*** follow Seventh Circuit authority that "the existence of uninjured members does not defeat class certification." *Id.* at 133-34. Of course, this Court must follow the Seventh Circuit.

constant after controlling for inflation, Delta Dental reimbursement amounts for Premier (the green line) and PPO (the red line) networks plunged ████████████████████



████████████████████ Dr. Bamberger then excluded other possible causes for these observed effects and concluded that the only credible explanation was the exercise of monopsony power to artificially suppress reimbursement rates to Dental Providers by Delta Dental. Ex. 1 ¶¶ 6-32.

Dr. Bamberger then created a series of 2,170 regression models using two different geographic areas commonly used in the industry, three-digit zip codes and Milliman regions, to estimate what approved amounts would have been in the but-for world absent Delta Dental's exercise of monopsony power. Dkt. 761 Ex 1 ¶¶ 89-100; Ex. 1 ¶¶ 57-59. Next, Dr. Bamberger compared the estimated *but-for* approved amount—for each procedure code in each region in each year—to the *actual* approved amount each Dental Provider received in that year. Dr. Bamberger concluded that a Dental Provider was impacted if the actual approved amount was less than the estimated but-for approved amount. Dkt. 761 Ex. 1 ¶¶ 83, 89-97.

Dr. Bamberger examined the results in two separate ways: First, he considered a provider impacted on a gross basis if the provider was underpaid on at least one claim during the Class Period. *Id.* ¶ 98. Second, he considered a provider impacted on a "net" basis if they were underpaid, in the aggregate, across all of their claims during the Class Period, subtracting out any rare overpayments (*i.e.*, circumstances where a provider's but-for approved amount was lower than

their real-world approved amount). *Id.*[13] Dr. Bamberger found that at least 99.3% of the Class experienced at least one underpayment, and at least 97.9% suffered "net" harm. *Id.* ¶ 100. Dr. Bamberger then applied these results to the claims submitted by each individual provider in the proposed Class, and calculated aggregate damages to the 238,554 Class members of approximately $13 billion. *Id.* ¶¶ 110-111.

Dr. Bamberger's work readily established that common evidence could prove both impact and damages on a classwide basis. *See, e.g.*, *Dealer Mgmt. Sys.*, 2024 WL 3509668, at *10 ("At the class certification stage, a plaintiff is not required to actually *prove* [injury] and instead need only demonstrate that the element of antitrust impact is *capable of proof* at trial through evidence that is common to the class rather than individual to its members.") (emphasis in original).

### C.    Defendants Fabricate An Obligation To Connect Discrete Portions Of Defendants' Anticompetitive Scheme To Specific Damage Amounts.

Defendants claim that to satisfy the predominance inquiry, Plaintiffs must demonstrate a "bridge" between every individual anticompetitive act committed by each Defendant and the specific damages claimed by each Plaintiff. But that is not now and never has been the law. Rather, courts evaluate the challenged conduct as a whole, not element by element. *See, e.g., Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011) (plaintiff "should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."); *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1258 (N.D. Ala. 2018) (same). The cases cited by Defendants, Opp. at 27, in

---

[13] Notably, Dr. Bamberger's approach to calculating "net" harm was conservative because courts have made clear that offsetting "overpayments" are not relevant in assessing impact. *See, e.g., In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("[A]n overcharge . . . on a single purchaser suffices to show—as a legal and factual matter—impact[.]"); *In re EpiPen*, 2020 WL 1180550, at *12 (D. Kan. 2020) (one suffers "antitrust impact at the time of the initial overcharge" regardless of whether class members "offset overcharges" on related transactions).

contrast, are inapposite because the issue in those cases was whether there was *any* connection whatsoever between the parties, who were separated by multiple layers of commerce.[14] Here, it is undisputed that there is a direct contractual relationship between Plaintiffs and Defendants.

Plaintiffs respond to Defendants' arguments attacking predominance with regard to each of the three anticompetitive restraints at issue in turn below:

**Territorial Allocation.** Defendants start with the false premise that to prove damages from Defendants' *per se* unlawful territorial restrictions, Plaintiffs must establish that but-for the territorial restraints, every Member Company would have attempted to compete nationwide. Opp. at 27-28. That is wrong as a matter of economic theory. Dr. Bamberger explains that even the threat of entry would be sufficient to raise reimbursement amounts. Ex. 21, 4/17/24 Bamberger 42:16-43:7. It is also wrong as a matter of fact: the record is replete with evidence of Member Companies attempting to operate outside their territorial boundaries but being constrained by DDPA and DeltaUSA. *See, e.g.,* Dkt. 754 at 12. Defendants offer no possible explanation for why Member Companies would not continue to attempt to compete outside their artificial boundaries if the territorial restraints are held to be unlawful.[15]

Starting from the unsupported premise that Member Companies may not want to compete outside their territorial boundaries, Defendants recite a litany of purported "local" factors that

---

[14] *See O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217 (N.D. Ill. 1987) (dismissing consumer complaint against manufacturer based on distribution chain of manufacturer to wholesaler to retailer to consumer); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5 (S.D.N.Y. 2020) (addressing claims of metal traders and warehouse owners who were not direct buyers).

[15] The sole case cited by Defendants for the fanciful claim that Plaintiffs must prove that every Member Company would have competed everywhere nationwide, *Lumber Liquidators, Inc. v. Cabinets to Go, LLC*, 415 F. Supp. 3d 703 (E.D. Va. 2019), is not even an antitrust case; it is a breach of contract action. In antitrust cases, courts have rejected Defendants' argument. *See, e.g., Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 265 (E.D. Mich. 1997) (holding that party's willingness to distribute nationwide was irrelevant where "experts and other common evidence do suggest some economic impact throughout the country …").


that they would (and do) pay higher reimbursement rates in the absence of the challenged conduct.



**Second Brands.** Defendants argue that proof of injury and damages with regard to second brands is "individualized" because Plaintiffs are required to prove that every second brand would enter every "Provider's local market." Opp. at 30. For the reasons explained with regard to territorial restrictions, this is not an accurate statement of law (*see, e.g., Little Caesar*, 172 F.R.D. at 265), economics (*i.e.*, the threat of entry is sufficient to raise reimbursement rates, Ex. 21, 4/17/24 Bamberger 42:16-43:7), or fact (several second brands, including Dentegra and Renaissance, *already* operate nationwide).[17]

**Price Fixing.** Defendants pretend that each Dental Provider would have to demonstrate that they were separately impacted by Delta Dental's benefit denial policies, fee guidance, sharing of reimbursement information, and effective discount standard. Opp. at 30. But these were ***uniform, national policies administered and enforced by Defendants***. *See* Dkt. 754 at 8-28.

Defendants erect a series of strawmen that are easily dispatched. For instance, they claim that local employers could exempt themselves from national benefit denial policies. Opp. at 31. But Defendants have never identified a single local employer that did so. Defendants also claim

---

[17] Defendants falsely accuse Plaintiffs of misrepresenting that second brands do not compete with Member Companies by purportedly omitting key deposition testimony from DDMI executive Laura Czelada. Opp. at 21. But the very language Defendants cite ***confirms*** Plaintiffs' point—

that Member Companies were free to accept or reject DeltaUSA's "recommendations" of reimbursement amounts for specific procedure codes. *Id*. But Defendants never identified any Member Company that failed to follow any reimbursement recommendation for any procedure code. Defendants also argue that "a Member Company might not have complied with DDPA's effective discount requirement." *Id*. But again, Defendants offer no examples of **any** Member Company failing to do so.[18] It would be unreasonable to force 238,554 Class Members to individually prove up each Member Company's uniform compliance with DDPA's national pricing policies and procedures when it is undisputed that every Member Company complied.[19]

---

[18] Defendants also misrepresent that "the DeltaUSA Processing Policies do not set reimbursement for any procedure code at $0. Rather, … the Policies occasionally recommend that certain benefits should not be covered." Opp. at 32. This is a distinction without a difference. ██████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

[19] Defendants cite a handful of cases for the proposition that an absence of "alleged connections between anticompetitive conduct and injury have led courts to reject class certification on predominance grounds." Opp. at 32. Each is distinguishable. In *Reed v. Advocate Health Care*, 268 F.R.D. 573, 590-93 (N.D. Ill. 2011), the plaintiffs could not show common proof of impact because their expert used an imprecise regression analysis and failed to account properly for a certain subgroup of plaintiffs. In *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 29-30 (1st Cir. 2008), car buyers could negotiate the price of a car purchase (unlike Delta Dental, which refused to negotiate individual reimbursement amounts). *Id.* at 29. In *Bell Atlantic, Corp. v. AT&T Corp.*, 339 F.3d 294, 299 & 304-306 (5th Cir. 2003), the model failed to account for major variations among the proposed class, which included "[a]ll "businesses and organizations" that subscribed to CallerID (a very broad and varied group). In *State of Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 327-28 (5th Cir. 1978), there was a dispute about whether any agreement was implemented at all. In *Windham v. American Brands, Inc.*, 565 F.2d 59, 70-71 (4th Cir. 1977), the court held that the need to calculate individual damages defeated class certification, a holding that subsequently has been rejected by all of the case law cited previously. In *Riffey v. Rauner*, 910 F.3d 314, 319 (7th Cir. 2018), the court held that individual questions regarding the payment of union fees predominated. And *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042 (7th Cir. 2004), is not an antitrust case, and the court found that individual questions, such as whether cars were unusable and for how long, predominated.

20

### D. Defendants' Critiques of Dr. Bamberger's Model Are Meritless.

Defendants argue that Dr. Bamberger's model: (1) impermissibly uses simple "averaging;" (2) fails to account for real-world industry dynamics; and (3) utilizes an improper "yardstick." Each critique is without merit and is addressed in turn.

### 1. Dr. Bamberger Used Thousands Of Local Market Indices, Not Simple "Averages."

Defendants misrepresent that Dr. Bamberger used simple, classwide "averages" rather than calculating impact and damages using each individual provider's submitted amounts. Opp. at 2. In fact, Dr. Bamberger constructed a series of 370 region-specific regression models and about 1,800 three-digit-zip-code-area models that he then used to estimate differences in the growth of submitted amounts and Delta Dental PPO and Premier approved amounts. Ex. 1 ¶¶ 58-59. For each regression, Dr. Bamberger then calculated a separate coefficient for each year during the period 2015-2022, resulting in an analysis of thousands of separate effects of the challenged conduct. *Id*. Far from relying on simple averaging, in total, Dr. Bamberger uses information from **billions** of Delta Dental claims to estimate real-world and but-for economic conditions in each region, network, and year. *Id*.

In so doing, Dr. Bamberger replicated the indices used by Delta Dental in its day-to-day business and by industry organizations such as Milliman and FAIR Health. Dr. Murphy's analysis of individual submitted amounts is wrong for the simple and dispositive reason that it is undisputed that ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████

So too industry participants, including Milliman and Defendants, use indices of submitted amounts rather than individual submitted amounts. ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ Dr. Bamberger's calculation of region-specific indices of submitted amounts tracks exactly the same calculations performed by industry participants in their day-to-day business.

Dr. Bamberger uses submitted amounts to uninsured patients on a regional basis as a proxy to measure economic conditions in a competitive market. Economists measure economic conditions such as cost increases on a market or submarket basis, not on an individual provider basis. Ex. 1 ¶ 66. Defendants' economist, Dr. Murphy, identifies *no* industry participant or economic literature that considers submitted amounts at the individual provider level as a proxy for marketwide effects. The reason is simple: an individual provider's idiosyncratic submitted fee amounts tell an observer *nothing* about economic reality of systemic cost increases. In effect, Dr. Murphy is suggesting that a good way to measure nationwide inflation would be to go to a local corner market in downtown Chicago and compare the price of milk in that single store from one month to the next. Of course, such an isolated comparison would be absurd as a measure of generalized inflation, whether in Chicago, Illinois or nationwide. That is why the Consumer Price Index used to measure inflation is based on indices constructed much as Dr. Bamberger did in this case, not on individual observations. *Id.* ¶ 64.

Dr. Murphy's calculation of submitted amounts at the individual provider level is also

badly flawed. Without explanation or justification, his model ████████████

██████████████████████████████████████████████████████

████████████████████████████████████ By doing so, Dr. Murphy

arbitrarily excludes approximately 88,000 members—*i.e.*, more than one-third—of the proposed

Class from his analysis altogether.

    Even if the Court were to accept Dr. Murphy's flawed model (which it should not), ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████ Accordingly, even if the Court

accepted Defendants' argument, it easily could be addressed with a modest amendment to the

proposed Class definition. *See, e.g., Scott v. Dart*, 99 F.4th 1076, 1093 (7th Cir. 2024) ("In

circumstances such as these, involving minor overbreadth problems that do not call into question

the validity of the class as a whole, the better course is not to deny class certification entirely but

to amend the class definition as needed to correct for the over-breadth.").

    Because Dr. Bamberger did not use simple "averages" but, instead, calculated thousands

of region-specific indices using the same methodology as industry participants like Milliman,

FAIR Health, **and the Member Companies themselves**, Defendants' cases denying class

certification (Opp. at 37-38) based on the use of simple averages are inapposite. Unlike *Blades v.*

*Monsanto Co.*, 400 F.3d 562, 573-575 (8th Cir. 2005), and *In re Aluminum Warehousing*, 336

F.R.D. 5,[20] Dr. Bamberger controlled for each individual procedure code on a regional basis. Dkt.

---

[20] Notably, the court in *Aluminum Warehousing* remarked that courts *can* accept models predicated
on averages after performing a "rigorous analysis" to confirm that the methodology used was
sound. 336 F.R.D. at 48.

761 Ex. 1 ¶¶ 90-94. Unlike the expert in *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342-44 (4th Cir. 1998), who used averages that were based on broad estimates, cherry-picked data, and speculative assumptions, Dr. Bamberger ***did*** "calculate the damages that any individual [plaintiff] has suffered in this case," using actual data from actual providers and their actual approved amounts. Dkt. 761 Ex. 1 ¶¶ 91-92, 97, 110. Unlike *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321-22 & n.8 (N.D. Cal. 2014), *Reed*, 268 F.R.D. 573 at 591, and *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *20-21, *31-32 (E.D. Pa. Jan. 18, 2017), Dr. Bamberger did ***not*** apply a single average underpayment percentage to the entire Class that masked individual or local variation, but, rather, calculated thousands of regional regressions that controlled for geographic area, specialty, network, and procedure code, per year. Dkt. 761 Ex. 1 ¶¶ 92-94, 110.

Further, Dr. Bamberger did ***not*** ignore factors such as negotiation or individualized pricing, as occurred in *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 192-94 (3d Cir. 2020), and *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 710 F. Supp. 3d 1090 (D. Utah 2023). Here, it is undisputed that (i) Delta Dental overwhelmingly and admittedly does ***not*** negotiate reimbursement with individual providers, (ii) industry participants do not use individualized data, (iii) there is little to no variation in approved amounts within regions, and (iv) Dr. Bamberger calculated thousands of underpayments rather than one classwide average underpayment.[21] Nor does Dr. Bamberger's model crumble when assessed "on a zip code by zip code basis," as happened in *Food Lion, LLC v. Dean Foods Co.*, 312 F.R.D. 472, 488-90 (E.D. Tenn. 2016); rather, Dr. Bamberger ***already*** ran a "zip code by zip code" analysis and found 98-99% of providers

---

[21] *See, e.g.*, Ex. 26, Whitt Dep. Ex. 714, REN000206177 at 180 (confirming that "Delta Dental does not negotiate fees"); Ex. 1 ¶¶ 58-68, 81-86.

were injured.[22]

## 2. Dr. Bamberger's Model Accounts for Real-World Factors.

Defendants next assert that Dr. Bamberger's model purportedly "fails to account for important real-world factors" in five ways. Opp. at 38-44. But each of the alleged "real-world factors" is unsupported or contradicted by the record.

**First**, Defendants argue that some Member Companies might choose not to compete in some markets even in the absence of territorial restraints. Opp. at 38-39. This flawed argument is already addressed in Section C, *supra*.

**Second**, Defendants offer a host of far-fetched theories to argue that **increased** competition among Member Companies to recruit Dental Providers to their networks might lead to **lower** reimbursement rates. Opp. at 39. Defendants even make the absurd argument that in markets where Delta Dental has the highest market share, Dental Providers receive the highest reimbursements, suggesting that (in Defendants' worldview) the Class would best be served if Delta Dental achieved 100% market share. In any event, whether or not competition would increase reimbursement is a classic merits question that need not be decided at class certification. *Jacks v. DirectSat USA, LLC*, -- F.4th --, 2024 WL 4380256, at *5 (7th Cir. Oct. 3, 2024) ("[T]he default rule is that a court may not resolve merits questions at the class certification stage."). Again, this is a common question that can be resolved in "one stroke" with evidence common to the proposed Class, again favoring certification. *Butler*, 727 F.3d at 801.

On the merits, Defendants' counterintuitive argument directly contradicts economic

---

[22] *Brand v. Comcast Corp.*, 302 F.R.D. 201, 226-28 (N.D. Ill. 2014), cited by Defendants, held that statistical averages could not show a pattern of racial discrimination to satisfy the commonality requirement under Fed. R. Civ. P. 23(a). Here, Defendants have not contested commonality. Dkt. 754 at 1; Opp. at 24, 71. And, even if they had, as explained, Dr. Bamberger is not simply "averaging" by zip code.

theory. As Dr. Bamberger explains, in a monopsonized labor market like the one Defendants have created, wages are suppressed, and the elimination of anticompetitive restraints results in increased reimbursement. Dkt. 761 Ex. 1 ¶¶ 53-64 & nn.78-79. Further, Defendants' arguments hypothesizing why increased competition might decrease reimbursement rates contradict the record. Defendants claim that Dental Providers can join multiple networks but ignore that Member Companies have imposed punitive measures on non-exclusive Dental Providers. *See* Background Reply § B, *supra*. Defendants argue that potential entry through network leasing might reduce reimbursement but ignore that ███████████████████████████████████████

███████████ Dkt. 761 Ex. 1 ¶¶ 101-109. Defendants repeat their debunked claim that there were no second brand restrictions but cannot explain why second brands paid ████████████████

███████████████████████████████████████████████████████

████████████████████████████ Dkt. 763 Ex. 59, REN002668555 at 556. Defendants claim that Dental Providers could collect from patients for disallowed procedures but ignore the testimony of their own corporate representative that this simply is not true. *See* Section I.C, *supra*. Defendants claim that Member Companies could not absorb the higher reimbursement required by Dr. Bamberger's model but ignore that Member Companies squirreled away hundreds of millions in capital with subsidiaries and that, if those amounts are added back, Member Companies could pay everything owed to Dental Providers without raising premiums by one cent. Ex. 1 ¶¶ 9-21, 106-115. And perhaps most significantly, Defendants claim that competition has increased during the Class Period but cannot explain how Delta Dental managed to increase its market share, margins, and profits, ████████████████████████████████████

████████ ██ ████████ ████████ ████████████ ████████ ████████ ████████ ████████

████████████████████████████ *Id.*

Because Dr. Bamberger *did* consider actual industry dynamics, while the "market realities" proffered by Defendants contradict the evidence, the authorities cited by Defendants are inapposite.[23] Dr. Bamberger *did* account for Defendants' market power and other factors (Dkt. 761 Ex. 1 ¶¶ 56-62), *did* consider how non-conspiring firms would behave (Ex. 1 ¶¶ 69-81), and *did* take into account competition by Member Companies (*id.* ¶¶ 98-105). Likewise, contrary to Defendants' claim that Dr. Bamberger "depart[ed] from real-world facts,"[24] he not only considered relevant real-world facts, he controlled for local conditions by running regressions at the regional level and using indices of submitted amounts.[25]

Lastly, and unlike *Reed*, 268 F.R.D. at 591-93, *In re Rail Freight Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013), *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 92-94 (S.D.N.Y. 2017), *Bell Atl.*, 339 F.3d at 304-05, and *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165-70 (C.D. Cal. 2007), Dr. Bamberger's model does not

---

[23] *See* Opp. at 39 (citing *City of Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at *8-10 (N.D Ill. Mar. 29, 2024) (expert failed to account for market share); *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1041-43 (N.D. Ind. 2016) (expert failed to account for competition); *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 153 (E.D. Pa. 2015) (expert failed to consider behavior of non-conspiring firms)).

[24] *See* Opp. at 41 (citing *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1002-04 (8th Cir. 2019) (expert "failed to incorporate economic realities"); *In re Pharmacy Benefit Mgrs.*, 2017 WL 275398, at *32 (expert "fail[ed] to account for the effect of local market forces on reimbursement rates differentials"); *In re Processed Egg*, 312 F.R.D. at 153 (expert "ignore[d] the realities" of retail egg pricing)).

[25] Defendants also rely on *Robinson v. Tex. Auto. Dealers' Ass'n*, 387 F.3d 416 (5th Cir. 2004), which does not address experts at all, let alone whether an expert's model was adequate to support a finding of predominance. *See id.* at 423-24 (reversing certification where class definition assumed all auto purchasers were harmed by payment of an inventory tax when, in fact, "bottom-line" buyers were not injured). Defendants' reliance on *In re Intel Corp. Microprocessor Antitrust Litig.*, 2014 WL 6601941 (D. Del. Aug. 6, 2014), and *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008), fares no better, as both of those cases involve proposed classes with complex, multilevel distribution chains. Nothing of the sort is at issue here. And in any event, the *Graphics Processing Units* court certified a class. 253 F.R.D. at 479, 508.

reflect untested assumptions. His model supplies competent common evidence of impact and damages and supports a finding of predominance.

### 3. Dr. Bamberger's Yardstick Model Is Well-Founded And Reliable.

Defendants generally attack the purportedly "untested" and "never-before-used" model of Dr. Bamberger as methodologically unsound. Opp. at 44-51. Not so. The yardstick regression model used by Dr. Bamberger is widely used and has been accepted in legions of cases, including ones where courts have rejected the identical critiques leveled by Defendants here. *See, e.g.*, *Moehrl*, 2023 WL 2683199, at *8 (granting certification and holding, "the yardstick approach is a well-established methodology in antitrust actions and Defendants cannot complain that the methodology itself is unreliable"); *Vanzant v. Hill's Pet Nutrition Inc.*, 2023 WL 6976988, at *9 (N.D. Ill. Oct. 23, 2023) ("There is no dispute that a 'benchmark,' or 'yardstick,' analysis is generally considered a reliable methodology upon which to calculate damages."); *In re Sulfuric Acid*, 2007 WL 898600, at *7 (N.D. Ill. Mar. 21, 2007) (same); *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 179, 182-83 (D. Mass. 2013) (same), *aff'd sub nom.*, 777 F.3d at 28 n.24.

Defendants' pervasive reliance on *City of Rockford*, 2024 WL 1363544, is misplaced. In *Rockford*, the court found that model flawed because the method for finding the but-for price was "essentially to designate the pharmaceutical industry as a whole as the relevant comparison market." *Id.* at *4, 6. The Court found that "the selection of the pharmaceutical market as a whole as the relevant yardstick" was unsupported and based only on the expert's conclusory assertions. *Id.* at *7. Here, Dr. Bamberger is not comparing the approved amount for one procedure code against the entire dental market; rather, he compares the amount approved by Delta Dental for a single procedure code in a specific region to the submitted amount *for the exact same procedure code in the same region on the same date* charged to uninsured patients. Dkt. 761 Ex. 1 ¶¶ 73-81.

Further, he explains why this yardstick makes sense as a matter of established economic theory, the same economic conditions (*e.g.*, changes in dental costs such as employee staff payroll, rent, and supplies) necessarily apply equally to the same services provided to both insured and uninsured patients, but the uninsured price (which is not reimbursed by Delta Dental) should be unaffected by Defendants' conspiracy. *Id.* ¶¶ 82-83.

Defendants' remaining critiques of Dr. Bamberger's choice of yardstick are unavailing.

**First**, Defendants claim that Dental Providers "often" charge uninsured patients less than their submitted amount. Opp. at 45. In support, Defendants cite the anecdotal testimony of **three** Dental Providers (*id.*)—out of a proposed Class of 238,554. Dr. Bamberger testified that he was not aware of any support for the proposition that discounts were widespread in the dental services industry. Ex. 21, 4/17/24 Bamberger 119:7-10. Regardless, he explained that even if a substantial number of providers offered a uniform discount to uninsured patients, it would make no difference to his model. Ex. 21, 4/17/24 Bamberger 119:7-15. This is because his model calculates year-over-year differences in the rate of change between submitted and approved amounts. If a provider gives a discount to uninsured patients, this would impact the submitted amount in absolute terms but the year-over-year rate of change of the discounted amount would remain the same.[26] Ex. 1 ¶¶ 62-65.

Consequently, Defendants' cited authorities are inapposite. Unlike in *Tyson*, 577 U.S. at 459, Dr. Bamberger's model is not based on any "implausible assumptions." His model does not substitute "hypothetical assumptions" for "actual market data" (he used actual market data), so it

---

[26] The following simple example demonstrates the point: in year 1, a cleaning costs $100 and a Dental Provider gives a 20% discount to uninsured patients, resulting in a discounted fee of $80; in year 2, the cost of a cleaning has gone up by 10%, so a cleaning costs $110 and the cost to an uninsured patient (after the 20% discount) is $88. The discounted cost of the cleaning has gone up by 10%, from $80 to $88, just as the submitted amount has gone up by 10%, from $100 to $110. It is this 10% rate of change in submitted amount that Dr. Bamberger is comparing to the rate of change in Delta Dental's approved amounts, so the discount makes no difference.

is nothing like those excluded in *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001), *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012), and *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *24-25 (M.D. Fla. Apr. 3, 2014).

**Second**, Defendants claim that submitted and approved amounts would not be expected to move together. Dr. Murphy's attempt to demonstrate this point, at Appendix D-19, is fatally flawed in two respects. (1) Variables that Dr. Murphy uses for supply and demand factors defy reason. ███

████████████████████████████████████████████████

████████████████████████████████████████ █ ████████████

████████████████████████████████████████████████

████████ (2) Dr. Murphy's analysis fails to take into account the real-world impact of the conspiracy. In a simplified example, suppose that firms conspire by agreeing to set price at $10 per unit. Using data from the conspiratorial period, an analyst estimating a regression model of price including cost and other explanatory variables will likely find that the coefficient on cost is insignificantly different from zero (because changes in cost do not affect price, which is fixed at $10 per unit). Ex. 1 ¶¶ 69-75. That is, the relationship between price and various explanatory variables is necessarily different **because of the conspiracy**. *Id.* In these circumstances, Dr. Murphy's ████████████████████████████████████████████████████

████████████████████████████████████████████████

are exactly what economists would expect to find in the presence of a monopsonist like Delta Dental exercising market power. *Id.*

---

[27] *See National Trends in Dental Care Use, Dental Insurance Coverage, and Cost Barriers*, Health Policy Institute, ADA, at 15-16 (updated March 2024), available at https://www.ada.org/-/media/project/ada-organization/ada/ada-org/files/resources/research/hpi/national_trends_dental_use_benefits_barriers.pdf.

Defendants also falsely claim Dr. Murphy found that changes in approved amounts "almost perfectly track the changes in premiums." Opp. at 47. But Dr. Murphy found ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ Dkt. 790 Ex. DX1 at Appendix D-12; Ex. 1 ¶¶ 8-21. Across millions of consumers and billions of claims, this resulted in an additional $3.9 billion in profit hoarded in Delta Dental's capital reserves or transferred to subsidiaries, and an additional $1.8 billion in "administrative expense"—*i.e.*, inflated executive compensation and perquisites. *Id.*

Defendants also claim as an "undisputed fact" that "the supply of dentists has far outpaced the demand for dental services throughout the class period." But this assertion is demonstrably false based on the sources cited by Dr. Murphy himself. *See supra*, Introduction at 6.

**Third**, Defendants argue that Dr. Bamberger's model is flawed because there is no direct relationship between a Member Company's market share and the degree of underpayment. Opp. at 50. In other words, Defendants claim ███████████████████████████████████████

██████████████████████████████████████████████ Dkt. 761 Ex. 2, DDWI000222407 at 408-09. But Dr. Bamberger never claimed that such a direct-line relationship between market share and reimbursement rates exists, and economic theory would not predict one. Because over 80 percent of providers are contracted with Delta Dental, it is "must have" from an economic perspective, meaning Dental Providers are forced to accept Delta Dental insurance or lose too many patients to remain in business. Dkt. 761 Ex. 1 ¶¶ 55, 60; Dkt. 762 Ex. 40, REN000242008 at 008 (DDMI's Chief Science Officer stating that, while Dental Providers may "moan and snivel about" Delta Dental's reimbursement rates, "they know if they term[inate], they will lose business."). As Dr. Bamberger explains, once a product is "must have," further increases

or decreases in market share will not have a direct impact on price. Ex. 21, 4/17/24 Bamberger 39:22-40:9 (including errata).

**Fourth**, Defendants claim that Dr. Bamberger's model is flawed because the difference between submitted and approved amounts increased year-over-year even though the same anticompetitive practices were in place throughout the Class Period. Opp. at 50. In fact, the challenged conduct ***did*** worsen over time: for instance, Defendants ████████████████ ████████████████████████████ Dkt. 764 Ex. 73, REN000176880 at 880-81. Defendants also grew their total enrollment by tens of millions of people and increased their commercial market share. Dkt. 790 DX1 at Ex. 5 and 7 and Appendix D-1. And even if the challenged conduct did not worsen (it did), the gap between submitted amounts (which increased year-over-year at about the rate of inflation) and approved amounts (which Defendants reduced on an inflation-adjusted, per-enrollee basis over the Class Period) would necessarily grow over time.[28]

In sum, Dr. Bamberger's model is methodologically sound, and Defendants' cited authorities (Opp. at 44-46, 48-49, 51) are inapposite. Unlike the experts in *Rockford*, 2024 WL 1363544, at *8-9, *In re Wholesale Grocery*, 946 F.3d at 1002-04, *In re Pharmacy Benefit Managers*, 2017 WL 275398, at *32, *In re Graphics Processing*, 253 F.R.D. at 496-97, *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 592-93 (7th Cir. 1998), and

---

[28] *See, e.g.*, Ex. 29,


*West v. Prudential Sec., Inc.*, 282 F.3d 935, 939-40 (7th Cir. 2002), Dr. Bamberger did not fail to control for or test "nonconspiratorial factors," "the effect of local market forces on reimbursement rates differentials," "salient factors, not attributable to the defendant's misconduct," or other factors that would have influenced reimbursement percentages. Dr. Bamberger accounted for all relevant factors and influences – and debunked Defendants' speculative and imaginary ones that contradict the record. Dr. Bamberger has not ignored explanations posited by Defendants, as in *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 894 (W.D. Ky. 2020), *In re Aluminum*, 336 F.R.D. at 44-63, and *In re Pharmacy Benefit Managers*, 2017 WL 275398, at *18-22, *31-32. Rather he examined, and rejected, Dr. Murphy's explanations, as should this Court.[29]

### E.    Plaintiffs Have Standing.

Defendants conflate standing with injury by asserting that 10,859 proposed Class members lack standing because, as a matter of administrative convenience, they set their submitted amounts at Delta Dental's corresponding approved amount, and thus, per Defendants, were not injured. Opp. at 52. That is, for about 4% of the Class, because their patients were insured with Delta Dental, and knowing their reimbursement was capped at Delta Dental's approved amount, they simply set their submitted amount at Delta Dental's approved amounts.

As discussed below, Defendants are wrong that these Dental Providers were not injured. But regardless, Seventh Circuit authority is clear that a proposed class need not prove that every class member has been injured for standing to exist and for the class to be certified. In fact, "as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676–77

---

[29] *Home Placement Serv., Inc. v. Providence J. Co.*, 819 F.2d 1199, 1206-07 (1st Cir. 1987) involved a recycled model from a prior case, which is not at issue here.

(7th Cir. 2009). Indeed, in the very case Defendants cite for the proposition that "class certification must be denied if a proposed class contains a great many persons who have suffered no injury at the hands of the defendant," the Seventh Circuit *affirmed class certification* in the face of allegations that some class members were uninjured. *Id.*

On the merits, Defendants' claim that the 10,859 members of the proposed Class whose submitted amounts equaled their approved amounts could not have been injured is wrong. In the but-for world absent Defendants' anticompetitive conduct, the approved amounts paid by Delta Dental would have been higher. Dkt. 761 Ex. 1 ¶ 92 n.98; Ex. 21, 4/17/24 Bamberger 177:18-178:17; Ex. 2, 9/5/24 Murphy 323:8-14. Thus, absent Defendants' conspiratorial conduct, the 4% of Dental Providers who set submitted amounts at Delta Dental's approved amount would have set higher submitted amounts. Ex. 21, 4/17/24 Bamberger 177:18-178:17. Thus, they too are entitled to receive the higher approved amounts Delta Dental would have paid absent the challenged conduct, and Dr. Murphy admitted as much. Ex. 2, 9/5/24 Murphy 323:8-14.

### F. Plaintiffs' Model Comports With *Comcast.*

Defendants assert that Dr. Bamberger's model fails to meet the requirements of *Comcast* because his model purportedly is inconsistent with Plaintiffs' theories of liability and is unable to attribute damages to particular theories. Opp. at 53-56. Neither of these arguments has merit.

*First*, Dr. Bamberger's model is consistent with Plaintiffs' theories of liability. Plaintiffs allege that Delta Dental violated the antitrust laws by imposing *per se* illegal territorial restraints, *per se* illegal price fixing, and unlawful second brand revenue restrictions, and thereby exercised monopsony power to suppress provider reimbursements. Dr. Bamberger's model demonstrates the exercise of Defendants' monopsony power and calculates aggregate damages to the Class. Defendants and Dr. Murphy do not even dispute Dr. Bamberger's calculations (Ex. 2, 9/5/24 Murphy 56:8-57:9)—they simply argue (wrongly) that the underpayments were the result of

34

increased competition and a rise in the *per capita* supply of dentists. Regardless, the cause of the undisputed underpayments to the proposed Class is a merits question, not a gate-keeping inquiry at class certification under *Comcast*.[30]

**Second**, Defendants assert that Dr. Bamberger's model has not isolated the damages attributable to each of Plaintiffs' three alleged mechanisms. But Defendants concede that this potentially becomes an issue **if and only if** the Court "[s]hould [] find that class treatment is inappropriate for any one of Plaintiff's theories …." Opp. at 55. In the absence of such a finding, there is no need for Dr. Bamberger to attempt to disaggregate the damages caused by Defendants' three types of antitrust violations, which are mutually reinforcing. Dkt. 761 Ex. 1 ¶¶ 42-44. He also testified that should the Court make such a finding, he could adjust his model to disaggregate the damages caused by each mechanism. Ex. 21, 4/17/24 Bamberger 69:20-72:19. And besides, "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). "Plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id.*

Defendants' cited authorities do not help them. In *N. Brevard Cnty. Hosp.*, 710 F. Supp. 3d 1090 at 1112-13, the expert combined overcharges for two different products despite admitting that defendants lacked market power in one market and was unable to distinguish between lawful and unlawful overcharges. In *In re Aluminum Warehousing*, 336 F.R.D. at 52-53, the expert

---

[30] Defendants note that the challenged conduct has been "going on for decades." Opp. at 54. It is true that for practical reasons, Dr. Bamberger was required to assume that the challenged conduct began in 2014 (the first year for which Defendants produced data), but this is a **conservative** assumption and, if anything, very substantially **understates** the impact and damages caused by Defendants' conduct. Dkt. 761 Ex. 1 ¶ 82 and n.89.

ignored a rule change related to tonnage minimums and could not correct it. *Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061, at *2-6 (N.D. Cal. July 29, 2022), stands for the unremarkable proposition that a court may decertify a class if an expert's model is later found to be unreliable.

### G. Individual Defenses Do Not Defeat Class Certification.

Defendants argue that contractual releases and arbitration provisions might raise individualized defenses, but fail to identify any named Plaintiff, much less any proposed Class member, to whom these hypothetical defenses actually would apply. Opp. at 63-70, 74. Regardless, the presence of individualized defenses does not defeat class certification. *See Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 559 (N.D. Ill. 2015) ("[T]ypicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.").

*First*, whether any such provision in a form contract is enforceable is a common issue, which supports certification. *See, e.g., In re Evanston Nw. Healthcare Corp.*, 268 F.R.D. 56, 66 (N.D. Ill. 2010), *vacated on other grounds sub nom. Messner*, 669 F.3d at 802 (holding that the applicability of ADR provisions could "be determined for all potential class members with common evidence" and thus "the possible arbitration of some class members['] claims does not destroy predominance"). This is particularly true here, where the "individual" defenses are based on form contracts that would apply on a statewide basis and can be disposed of "at one stroke." *Godfrey v. GreatBanc Trust Co.*, 2021 WL 679068, at *3-4 (N.D. Ill. Feb. 21, 2021); *see also Campbell v. Marshall Int'l, LLC*, 698 F. Supp. 3d 1036, 1042 (N.D. Ill. 2023) (rejecting attempt to defeat class certification based on individual defenses, including arbitration provision).

*Second*, Defendants do not allege that any significant number of proposed class members are subject to an arbitration term. Opp. at 66-67. To the extent any proposed Class members are subject to arbitration, it is premature to adjudicate that now. *See, e.g., In re Checking Acct.*

*Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015) ("[a]bsent class certification," the court cannot "purport[]" to rule on whether provisions are enforceable as to proposed class members).

*Third*, Defendants provide no support for the proposition that the filed-rate doctrine applies to reimbursement rates (as opposed to premiums). Whether the doctrine does apply in this case is a common question and, even if it did, would not create "antitrust immunity." *See, e.g.*, *First Impressions Salon, Inc. v. Nat'l Milk Producers Fed'n*, 2017 WL 11681189, at *11 (S.D. Ill. Sept. 29, 2017) (the applicability of filed-rate doctrine is a legal question "common to all members of the proposed class and are proper to resolve in a single hearing"); *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d 1313, 1332 (N.D. Ala. 2017) ("The Filed Rate Doctrine is not some sort of panacea for any ills Defendants may (or may not) have in this case.").

## II. CLASS TREATMENT OVER THE UNIFORM CLAIMS OF 238,554 DENTAL PROVIDERS IS PLAINLY SUPERIOR.

Defendants' attack on superiority—based on the argument that Plaintiffs seek damages of $50,000 per Dental Provider on average, DX1 ¶ 249—is specious. It is absurd to argue that 238,554 Dental Providers somehow should attempt to individually litigate claims for these relatively modest amounts. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 663590, at *6 (N.D. Ill. Nov. 18, 1994) ("We fail to see the logic in Defendant's contention that 50,000 individual actions are less complex than a single class action"). Any Dental Provider litigating the complex antitrust issues here over $50,000 would be quickly buried by Defendants.

Defendants pretend that it would be extraordinary to certify a Class of nearly 240,000 adverse to 39 defendants. Opp. at 1, 20. Not so. *See, e.g., Broiler Chicken*, 2022 WL 1720468, at *3 (certifying class including, *inter alia*, "nearly every individual consumer of chicken in the United States" against numerous defendants); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 167 n.4 and 208 (E.D. Pa. 2016) (certifying class, to which alternative would be

"thousands of individual actions" against 27 marketing cooperative members); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 225 (M.D. Pa. 2012) (same for class of "thousands" against 15 defendants); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 689 (D. Minn. 1995) (same for class of "thousands of farm co-ops, agricultural distributors and farmers" suing 16 defendants); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 681 n.1 and 698 (N.D. Ga. 1991) (same for class "at least in the hundreds of thousands" against 10 airlines).[31]

Defendants' authority is inapposite. In *Honorable v. Easy Life Real Estate Sys.,* the court *certified* a class for liability purposes, holding that individual monetary relief could be adjudicated separately later. 182 F.R.D. 553, 561 (N.D. Ill. 1998). In *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 586-87 (N.D. Ill. 2005) and *Elliott v. ITT Corp.*, 150 F.R.D. 569, 572 and 586 (N.D. Ill. 1992), no class was certified because, unlike here, the claims were based on individualized determinations concerning defendants' alleged misrepresentations and deceptive acts.

## III. THE CLAIMS OF THE PLAINTIFFS ARE TYPICAL OF THE CLASS, AND PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE CLASS.

Defendants' arguments that the ten named Plaintiffs' claims somehow are atypical, or that the representatives themselves are inadequate, are nonsense. Opp. at 20, 71-72. What difference does it make if one named Plaintiff participated in Delta Dental's Premier network while another participated in Delta Dental's PPO network, or if one Plaintiff practices general dentistry while another is a specialist, if Delta Dental suppressed reimbursements to ***both*** its Premier and PPO networks and to ***both*** general practitioners and specialists? What difference does it make if one

---

[31] *See also Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) ("If there are genuinely common issues, issues identical across all claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.").

named Plaintiff is in Michigan while another is in Arkansas if Delta Dental applied its territorial restrictions, price-fixing, and second-brand restrictions uniformly nationwide? *See De La Fuente v. Stokely-Van Cap, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (holding that typicality "may be satisfied even if there are factual distinctions between the named plaintiffs and those of other class members"); *Simpson v. Dart*, 620 F. Supp. 3d 749, 755 (N.D. Ill. 2022) (certifying class where "minor variances make no difference to the Court's class certification analysis"); *Louisiana Firefighters Retirement Sys. v. Northern Trust Investments, N.A.*, 312 F.R.D. 501, 510 (N.D. Ill. 2015) (certifying class where similarities among proposed plaintiffs "dwarf their differences"). Each of Defendants' throwaway arguments buried at the back of their brief are addressed in turn.

**Typicality.** Defendants point out that, of course, there will be differences in Dental Providers' business practices, specialties, procedures, patients, and more. But in *Funeral Consumers All., Inc. v. Serv. Corp. Int'l,* 2008 WL 7356272, at *7 (S.D. Tex. Nov. 24, 2008) (Opp. at 72), there was no uniform product or conduct at issue. Here, every Dental Provider has been subject to the same alleged anticompetitive conduct exercised by a monopsonistic cartel irrespective of the Dental Providers' individual business practices. "[F]actual variations in plaintiffs' methods of business operation does not dilute the typicality of their common claim of a conspiracy[]… the legal substance and theory of the putative class plaintiffs' claim—i.e. proof of a conspiracy and its effectuation—are the same." *Brand Name Prescription*, 1994 WL 663590, at *3 ); *Evanston*, 268 F.R.D. at 62-63, *vacated on other grounds sub nom. Messner*, 669 F.3d at 802.

**Adequacy.** Defendants attack the adequacy of the named Plaintiffs by speculating that here could be an intra-class conflict between providers in different locations or networks or practicing different specialties. Opp. at 72-73. *Spano v. Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011) demonstrates that a conflict of interest exists only if one set of class members will actually be

harmed by the relief sought by the named plaintiffs. Defendants offer no theory of why this would be true here. Further, the evidence shows providers of all types have been harmed alike. As Dr. Bamberger's model demonstrates, Dental Providers in the Premier and PPO networks suffered similar underpayments, as did general practitioners and specialists. Dkt. 761 Ex. 1 ¶¶ 84, 89-94, 97-100, 110-113. Accordingly, the legal theories advanced, and relief sought, by the Plaintiffs would benefit the Class as a whole and pose no conflict within the Class.

As to some Plaintiffs' participation in Smile Source, a bulk-buyers' cooperative for dental supplies,[32] Defendants' "they did it too" defense is not recognized in antitrust cases. *Kiefer-Stewart v. Joseph E. Seagram & Sons*, 340 U.S. 211, 214 (1951), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

<u>**CONCLUSION**</u>

For the reasons herein and those stated in their opening brief, Plaintiffs respectfully request that the Court certify the Class, appoint Kyle Benton, D.D.S., P.A.; Kaufman & Kaufman Smile Design Studio LLC; Legacy Dental Associates, P.C.; Dr. Richard Lindley, DDS, FICD; Dr. Steven P. Dultz DMD; Simon and Simon, P.C.; Mary M. Fisher, DDS, P.C.; Tooth Town Pediatric Dentistry, PLLC; Rittenhouse Smiles, P.C.; and Timothy C. Verharen D.D.S. as Class representatives, and appoint Leonid Feller of Quinn Emanuel Urquhart & Sullivan LLP and Ronald Aranoff of Wollmuth Maher & Deutsch LLP as Co-Lead Class Counsel.

---

[32] Ex. 32, 2/10/23 Osborne 77:25-78:5, 80:3-82:6; DX79 29:13-21; Ex. 33, 12/6/23 Smile Source (Allmon) 30(b)(6) 22:20-23:10; 152:13-17. Their claim that Smile Source imposes territorial restrictions akin to Delta Dental is false. Ex. 33, *Id.* at 145:5-8, 149:5-17.

Dated: October 10, 2024

Respectfully Submitted,

**QUINN EMANUEL URQUHART**
**& SULLIVAN, LLP**

By: */s/ R. Allan Pixton*
Leonid Feller, P.C.
R. Allan Pixton
Bevin Brennan
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705-7400
leonidfeller@quinnemanuel.com
allanpixton@quinnemanuel.com
bevinbrennan@quinnemanuel.com

Aaron M. Lawrence
51 Madison Ave., 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
aaronlawrence@quinnemanuel.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Gregory Arenson
Elana Katcher
850 Third Avenue
New York, New York 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

**PRETI, FLAHERTY, BELIVEAU**
**& PACHIOS, LLP**
Gregory P. Hansel
Michael S. Smith
Randall B. Weill
Elizabeth F. Quinby
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
msmith@preti.com
rweill@preti.com
equinby@preti.com

**WOLLMUTH MAHER & DEUTSCH LLP**

By: */s/ Ronald J. Aranoff*
Ronald J. Aranoff
Jay S. Handlin
Nicole M. Clark
William J. Hagan
Reuben Bauer
Vincent Kappel
500 Fifth Avenue – 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
raranoff@wmd-law.com
jhandlin@wmd-law.com
nclark@wmd-law.com
pschatz@wmd-law.com
whagan@wmd-law.com
rbauer@wmd-law.com
vkappel@wmd-law.com

**CARNEY, BATES, AND PULLIAM, PLLC**
William P. Creasman
519 W. 7th St.
Little Rock, Arkansas 72201
Telephone: (501) 312-8500
wcreasman@cbplaw.com

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes
Mary Ann Giorno Geppert
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
bcaldes@srkattorneys.com
mgeppert@srkattorneys.com

**RADICE LAW FIRM**
John Radice
April Dawn Lambert
475 Wall Street
Princeton, NJ 08540
Telephone (646) 245-8502
radice@radicelawfirm.com
alambert@radicelawfirm.com

**BERGER MONTAGUE PC**
Eric L. Cramer
Patrick F. Madden
Richard D. Schwartz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tele: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
pmadden@bm.net
rschwartz@bm.net

**KELLER ROHRBACK L.L.P.**
Ryan McDevitt
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
rmcdevitt@kellerrohrback.com

**BARRACK RODOS BACINE**
William J. Ban
640 Eighth Avenue, 10th Fl.
New York, NY 10036
Phone: (212) 668-0782
wban@barrack.com

**SALTZ, MONGELUZZI, & BENDESKY, P.C.**
Simon B. Paris
Patrick Howard

**MALKINSON & HALPERN, P.C.**
John R. Malkinson
33 North Dearborn Street, Suite 1540
Chicago, IL 60602
Telephone: (312) 427-9600
jmalkinson@mhtriallaw.com

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Stephanie M. Beige
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
bernstein@bernlieb.com
beige@bernlieb.com

**FREED KANNER LONDON & MILLEN LLC**
William H. London
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
wlondon@fklmlaw.com

**REINHARD WENDORF & BLANCHFIELD**
Garrett D. Blanchfield, Jr.
Brant D. Penney
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (651) 287-2100
Facsimile: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

**MCLAFFERTY LAW FIRM, P.C.**
David P. McLafferty
923 Fayette Street
Conshohocken, PA 19428

42

1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 496-8282
sparis@smbb.com
phoward@smbb.com

Telephone: (610) 940-4000 ext. 12
dmclafferty@mclaffertylaw.com

**KANTROWITZ GOLDHAMER &
GRAIFMAN P.C.**
Melissa R. Emert
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977
(866) 542-9958 ext 202
memert@kgglaw.com

**CERTIFICATE OF SERVICE**

I, R. Allan Pixton, an attorney, hereby certify that on October 10, 2024, I caused a true and correct copy of the foregoing **PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's CM/ECF system and separately via email to counsel of record. Parties may access this filing through the Court's CM/ECF system.

*/s/ R. Allan Pixton*
R. Allan Pixton