IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re Delta Dental Antitrust litigation | ) ) ) ) | No. 19 CV 6734<br><br>MDL No. 2931 |

<u>MEMORANDUM OPINION AND ORDER</u>

Section 1 of the Sherman Act proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. In this multidistrict litigation, ten dentist and dental practices claim that defendants—thirty-nine Delta Dental "Member Companies" ("DDMCs" or "MCs") and the Delta Dental Plan Association ("DDPA") of which these companies are members—violated this provision by conspiring to restrain competition in the market for dental goods and services, injuring dental providers by suppressing their reimbursement rates below competitive levels. Plaintiffs seek to represent a nationwide class of the roughly 240,000 dental providers who contracted to participate in Delta Dental's Premier or PPO networks.

Currently pending is plaintiffs' motion for class certification, attended by a host of *Daubert* motions in which each

side seeks to exclude the other's expert testimony in support of, or in opposition to, class certification. For the reasons explained below, I deny plaintiffs' motions to certify the class and to exclude the testimony of Kevin Murphy. I also deny defendants' motion to exclude the testimony of Gustavo Bamberger. I grant defendants' motion to exclude the testimony of David Lewin and deny as moot plaintiffs' motions to exclude the testimony of Robert Hoyt and Brian Cumberland.

## I.

The gravamen of plaintiffs' complaint is that defendants conspired to form an unlawful buyers cartel that engaged in three types of quintessentially anticompetitive conduct: First, defendants allegedly agreed to divide the United States market for the purchase of dental products and services into discrete territories known as Exclusive Service Areas ("ESAs") and to grant each Member Company the exclusive right to use Delta Dental trademarks in its assigned territory. Second, defendants allegedly coordinated to fix artificially low reimbursement rates that Member Companies paid to providers throughout the United States who contracted to participate in the Member Company's provider network. And third, defendants allegedly agreed to restrict output by limiting the amount of revenue that Member Companies could derive from non-Delta Dental branded dental insurance. Plaintiffs seek class certification under Fed. R. Civ. P. 23(a) and 23(b)(3).

2

Defendants do not dispute that Member Companies agreed to operate only in their respective ESAs, but they argue that their agreement ultimately fosters, rather than suppresses, competition in the market for dental services. With respect to plaintiffs' price-fixing allegations, defendants acknowledge that Member Companies share information about the reimbursement rates they pay to contracted dental providers in their respective ESAs. Defendants contend, however, that by sharing this information through a centralized database, Member Companies can more efficiently pay providers at their locally contracted reimbursement rates, since the Member Company responsible for paying any given claim may not be—and often is not—the Member Company with which the provider has contracted. This efficiency, defendants explain, enhances Member Companies' ability to compete with insurers who offer multistate dental plans. Further, defendants deny that Member Companies agree to, or are required to, pay claims at specific reimbursement amounts. In particular, they deny that they establish specific reimbursement rates that Member Companies must pay, and they deny that the "effective discount standards" plaintiffs challenge require Member Companies "to have the lowest (or among the lowest) reimbursement rates of all competitor insurance companies," as plaintiffs assert. Pls.' Mem., ECF 754 at 14. Finally, defendants argue that plaintiffs' allegations regarding second-brand restrictions are flatly

3

contradicted by the evidence, which shows that second brands do, in fact, compete with Delta Dental in several markets. Defendants oppose plaintiffs' motion for class certification on the ground that significant aspects of plaintiffs' claim—most notably, antitrust impact and damages—will require individualized proof.

Antitrust laws prohibit competing economic actors from engaging in collusive action that negatively affects the market. *See Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 921 (7th Cir. 2016). The parties' class certification briefing brings into focus a fundamental dispute that looms large over the case as a whole: whether defendants are properly characterized as "competing economic actors" in the relevant markets to buy dental goods and services from providers, on the one hand, and to sell dental insurance to employers, groups, and individuals, on the other; or whether they instead should be viewed as joint venturers who lawfully associate to compete effectively with national dental insurance carriers in the same markets. This distinction bears upon the merits of plaintiffs' claims, but it is also material to class certification and the parties' threshold dispute over the standard of review that governs defendants' conduct. I thus begin my analysis with that question.

## II. Standard of Review

The Supreme Court has long recognized that there are:

4

> two complementary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are "illegal per se." In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

*Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978). Courts "presumptively" invoke the second analytical framework, applying what has come to be known as the "Rule of Reason" to determine whether "a particular contract or combination is in fact unreasonable and anticompetitive." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). In *Dagher*, the Court emphasized that "[p]er se liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality,'" and concluded that an agreement by which "a lawful, economically integrated joint venture" sets prices does not fit that bill. *Id*. at 5 (quoting *National Soc. of Professional Engineers* 435 U.S. at 692), 3. Indeed, because joint ventures "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively," they "are judged under a rule of reason, an inquiry...designed to assess the combination's actual effect." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). Under either analysis, "the essential inquiry remains the same—whether or not the challenged restraint enhances competition." *Nat'l Collegiate*

5

*Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103, 104 (1984).

By plaintiffs' lights, *per se* analysis is required because defendants' conspiracy incorporates three types of restraints that the Supreme Court has identified as unlawful *per se*: market allocations, *see U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); horizontal price-fixing, *see Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940); and output restrictions, *see F.T.C. v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 436 (1990). Moreover, plaintiffs argue, defendants aggregate these restraints, compounding their anticompetitive effects and eliminating the need for an elaborate market analysis. *See U.S. v. Sealy, Inc.*, 388 U.S. 350, 357 (1967). But the labels plaintiffs attach to defendants' conduct mask both the history of defendants' association and the nuances of their collaboration.

Not every arrangement that shares characteristics of restrictions the Supreme Court has held unreasonable is *per se* unlawful. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 99 (1984) (acknowledging that the restraints at issue were "ordinarily condemned as a matter of law under an 'illegal per se' approach," but applying the Rule of Reason in view of specific product and market characteristics). If a restraint "arguably" promotes enterprise, the Rule of Reason applies. *See Polk Bros. v. Forest City Enters., Inc.*, 776 F.2d

6

185, 189 (7th Cir. 1985) (observing that because "it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects ... a court must be very sure that a category of acts is anti-competitive before condemning that category *per se*.") (citations and alterations omitted). Here, the history of group dental plans in the United States and their relationship to the Delta Dental system as it exists today offer insight into the geographical limitations and information sharing policies that plaintiffs challenge. This context suggests a principled basis for distinguishing these restraints from those that courts have held unlawful *per se*.

Defendants' expert, Dr. Monica Noether, offers a detailed discussion, substantiated by industry publications, academic literature, and evidence produced in discovery, of the history of group dental plans in the United States and its territories.[1] Dr.

---

[1] Dr. Noether's report is not among those plaintiffs move to exclude under *Daubert*. Nevertheless, their response brief regarding the appropriate standard of review includes a section urging me to strike Dr. Noether's report on the grounds that: 1) the standard of review is a question of law that is not an appropriate subject for expert testimony; and 2) Dr. Noether is not qualified to render an opinion on the standard of review. *See* ECF 913 at 24-25. But Dr. Noether offers no opinion on the applicable legal standard. Rather, she discusses the history of group dental plans in the United States and the competitive nature of the dental industry, and she examines "the structure and rules of the Delta Dental system" in this context. Dr. Noether concludes that the Delta Dental system allows Member Companies "to compete more effectively for both multistate and local customers" and "foster[s] inter-brand competition with other national dental carriers." ECF 900-1 at ¶ 12. While this conclusion obviously influences the governing

Noether explains that group dental plans were first launched in the 1950s and 1960s in response to demand from employers who wanted to provide non-wage benefits to their employees. Noether Rep., ECF 900-1 at ¶¶ 18, 26. The Washington State Dental Society developed the first prepaid dental plan in 1954, *id.* at ¶ 41, and by 1964, twenty-two state dental societies had established a "dental service corporation," which the American Dental Association's Council on Dental Health (the "ADA Council") defined as "a legally constituted not-for-profit organization sponsored by a state dental society to negotiate and administer contracts for group dental care." Defs.' 2nd Supp. Resp., ECF 785-9 (quoting ADA-Archive000021186).

> As the ADA Council explained in its 1964 Report:
>
> Each dental service corporation is essentially a creature of the state in which it is organized. A common restriction in laws and regulations governing such corporations is that of limiting enrollment in a plan to beneficiaries within the geographic area served by the plan.

Exhibit 14 to Defs.' Mem., ECF 785-14 at ADA-Archive000001462. Yet, dental plans were increasingly sought after by large groups, including employers, trade unions, and other associations, which

---

legal standard, the analysis on which it rests is economic, not legal. I am satisfied that Dr. Noether is qualified to perform this analysis and to render her opinions based on her experience as an economist specializing in the health care industry, and specifically in reimbursement and competition in health care markets.

had members living in multiple geographic areas. ECF 900-1 at ¶ 25. These groups required dental plans providing multi-state coverage, which state-based dental service corporations could not provide effectively on their own. Accordingly, in 1964, the American Dental Association created the National Association of Dental Service Plans ("NADSP," which later became defendant DDPA), to allow state dental service corporations to offer coordinated access to dental care services on a multi-state or nationwide basis. *Id.*; Exh. 19 to Pls.' Mot. for Class Cert., ECF 763-1, DDPA000187248 at 7254-57. Soon thereafter, the Delta Dental Insurance Corporation ("DDIC") was established—with financial support from the ADA—to offer group dental plans in states where the dental service corporations lacked sufficient underwriting capital to fund a standalone Delta Dental carrier. Noether Rep., ECF 900-1 at ¶ 45.

The need for efficient nationwide coordination among state-based dental service corporations crystallized after Delta Dental of California won a contract with the United States Department of Defense that would provide a dental plan to cover more than 600,000 people—the largest dental plan ever written at the time. *Id.* at ¶ 46. To facilitate such coordination, DDPA established the National Provider File ("NPF") database to allow Member Companies to share certain information about the providers in their networks and founded DeltaUSA to manage multi-state accounts. *Id.*; Exh. 19 to Pls.' Mot. for Class Cert., DDPA000187261. The NPF gives Member

Companies efficient electronic access to the reimbursement rates that providers outside of their ESAs agreed to receive in their contracts with their local Member Companies. A general description of how the Delta Dental system functions today, and how Member Companies process claims submitted by contracted providers, illustrates the role of the NPF.

The Delta Dental system is organized around the DDPA, which owns the Delta Dental trademark it licenses to the thirty-nine individual Member Companies for use in their respective ESAs. The DDPA functions as the national coordinating organization for these Member Companies and requires that they follow certain standards and policies in exchange for their right to use the trademark. Noether Rep., ECF 900-1 at ¶ 48. These include the requirement that each Member Company: 1) sell Delta Dental branded plans, and 2) contract with dental providers only within its designated ESA. Bamberger Rep., ECF 761-1 at ¶ 23. These restrictions formalize and cement the limitations noted above on state-based dental service corporations' ability to service multi-state dental plans, as no single Member Company is permitted to sell plans to customers or to contract with providers throughout the United States and its territories. *See id*. at ¶ 26. Instead, multi-state employers must, in most cases, contract with the Member Company whose ESA covers the location of the employer's headquarters, which then operates

the "control plan" for that employer. *Id.*; Noether Rep., ECF 900-1 at ¶ 114.

Delta Dental Member Companies service multi-state accounts generally as follows: One Member Company—Delta Dental of Illinois for example—sells a "control plan" to an employer headquartered in Illinois whose employees work in various states—let us say McDonald's for purposes of illustration. McDonald's employees living in Illinois can receive "in-network" dental services from Illinois dental providers who have contracted with Delta Dental of Illinois. In this scenario, Delta Dental of Illinois will reimburse the Illinois provider for those services at the rates set forth in the provider's contract with Delta Dental of Illinois. McDonald's employees in other states—let's say Wisconsin—can also receive "in-network" dental services from Wisconsin dental providers who have contracted with Delta Dental of Wisconsin. In this scenario, too, Delta Dental of Illinois will reimburse the Wisconsin provider, but the reimbursement rate is set forth in the provider's contract with Delta Dental of Wisconsin. The NPF facilitates the processing of such claims by providing Delta Dental of Illinois electronic access to the Wisconsin provider's contracted reimbursement rates. *See* Noether Rep., ECF 900-1 at ¶ 145.

This overview of Delta Dental's history and the basic contours of its system for administering multi-state group plans is consistent with defendants' assertion that "the ESAs and

11

information exchanges at issue here grew organically out of a state regulatory structure with built-in geographic limitations that has long authorized the sharing of information for the benefit of enrollees." Defs.' Supp. Mem., ECF 900 at 22. Indeed, a plausible interpretation of defendants' account—which plaintiffs do not challenge as a factual matter[2]—is that their association represents not a conspiracy among erstwhile competitors who combined to stifle competition and exercise monopsony power over dental service providers, but rather a legitimate collaboration among state-based dental services corporations established to serve local dental patients and to support the dental profession in their home states, which evolved over time to meet the needs of a changing market and developed operational efficiencies that allowed them to compete effectively with national insurers. Plaintiffs criticize this interpretation as one-sided, but they do not identify evidence to

---

[2] Plaintiffs disparage defendants' account as a "one sided...narrative" in which they "pretend[] that Defendants arose from some benevolent association of local dental societies." Pls.' Resp., ECF 913 at 6. In plaintiffs' view, defendants' narrative cannot be reconciled with the "billions of dollars Delta Dental amassed in capital reserves, the tens of millions paid annually to individual executives, and the gold-plated perquisites they receive...." *Id.* Whatever the allure of that perspective, plaintiffs do not controvert the facts defendants recite; and while they characterize defendants' motivations as acquisitive rather than charitable, they do not explain the relevance of defendants' motive to the "essential inquiry," which is "whether or not the challenged restraint[s] enhance[] competition." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103, 104 (1984).

12

suggest the state-based dental service corporations were actual or potential competitors when they joined together—at the behest and with the support of the American Dental Association[3]—to offer multi-state group dental plans, as national insurers had the inherent ability to do. This history and context differentiate the ESAs from agreements among competitors that "suddenly bring together economic power that was previously pursuing divergent goals" in the same market. *Copperweld*, 467 U.S. at 769. *See also Dagher*, 547 U.S. at 2 (applying Rule of Reason to agreement between entities that "did not compete with one another in the relevant market—*i.e.,* gasoline sales to western service stations").

Meanwhile, defendants identify several putatively procompetitive benefits associated with the ESAs, including: 1) that they encourage Member Companies to recruit providers throughout the entirety of the areas they serve, not merely in the most populous, urban areas; 2) that they discourage Member Companies from free-riding off of the network-building efforts of other Member Companies; and 3) that they prevent marketplace confusion. Plaintiffs dismiss these justifications as "a sham," but they do not meaningfully engage with defendants' evidence or

---

[3] The ADA describes itself as an organization "dedicated to supporting the dental profession" that "has represented dentists nationwide since 1859." Noether Rep., ECF 900-1 at ¶ 40 (citing American Dental Association, "History," available at https://www.ada.org/about/history-of-the-ada) (last accessed July 7, 2025).

argument in this connection. For example, Dr. Noether points to evidence of Delta Dental's considerably greater presence than its competitors in rural areas, and the greater access Delta Dental offers to in-network specialty dental services, both features she attributes to the incentive structure the ESAs create. Noether Rep., ECF 900-1 at ¶¶ 58-61. Elsewhere, Dr. Noether explains why broad networks that reach rural and other underserved areas and increased in-network options benefit both subscribers and providers. *See*, e.g., *id*. at ¶¶ 21, 61, 83, 119, 122. For example, Dr. Noether opines that "Delta Dental's broad networks allow its member companies to avoid any use of the leased networks that other national competitors rely on to fill in geographic or specialty holes in their proprietary contracted networks," and she details the drawbacks of such leasing arrangements.[4] *Id*. at ¶ 83. Plaintiffs' response that there is "no evidence in this case that Delta Dental services rural or underserved communities more effectively than any of its competitors" ignores the substance of Dr. Noether's analysis, which facially supports defendants' argument that the ESAs serve a legitimate business purpose.

---

[4] According to a 2022 Delta Dental publication titled, *Why Leased Networks Don't Deliver*, "[a] leased network arrangement is when one carrier agrees to share its dentist network, or a portion of it, with another carrier." Available at https://www1.deltadentalins.com/brokers/insider-update/2022/leased-network-disadvantages.html (last visited September 22, 2025).

Moreover, whether defendants' collaboration resulted in a "new product" is not dispositive of the question of which standard applies. *See In re Sulfuric Acid Antitrust Litigation*, 703 F.3d 1004, 1011 (7th Cir. 2012) (characterizing "'product' talk" as "an unnecessary and distracting embellishment of the rule of reason," which "directs an assessment of the total economic effects of a restrictive practice that is plausibly argued to increase competition or other economic values on balance.").[5] Nor must defendants' collaboration be "necessary to market the product at all" to warrant analysis under the Rule of Reason. *Cf.* Pls.' Resp., ECF 913 at 1 (quoting *NCAA v. Bd. of Regents of Univ. of Oklahoma* ("*NCAA*"), 468 U.S. 85, 113 (1984)). Contrary to plaintiffs' argument, the *NCAA* Court merely acknowledged that the "necessary"

---

[5] Even to the extent I take "product talk" into account, the Seventh Circuit held in *Polk Bros* that courts "must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by *new production or products*, and 'ancillary' restraints, those that are *part of a larger endeavor whose success they promote*." 776 F.2d at 188–89 (7th Cir. 1985) (emphasis added). A reasonable interpretation of the evidence is that defendants began collaborating to enable each Member Company to offer—or to offer more efficiently—multistate group plans. Under that interpretation, the challenged restrictions arguably did yield "new production or products" that promoted the success of a "larger endeavor." *See*, e.g., Nagle Dep., Defs.' Exh. 119, ECF 790–13 at 46:7–47:23 (DDRI "really didn't have a national product" and "never would have had a chance" to sell plans to large employers headquartered in Rhode Island because it "couldn't handle their employees who lived out of state or had other services out of state" before DeltaUSA).

character of the restraint at issue in *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19-20 (1979), militated in favor of applying the Rule of Reason. It did not hold that restraints must be "necessary" to escape *per se* liability. In short, because the record suggests that the ESAs serve a plausible procompetitive purpose, they must be evaluated under the Rule of Reason. *See In re Sulfuric Acid Antitrust Litig.,* 703 F.3d at 1013.

Next in plaintiffs' effort to shoehorn this case into the *per se* framework is their challenge to DDPA standards and DeltaUSA policies governing claims processing, information sharing, and effective discounts, which they characterize as "horizontal price-fixing mechanisms." But "easy labels do not always supply ready answers." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1, 8 (1979). To be sure, "price-fixing includes more than the mere establishment of uniform prices." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222, 60 S. Ct. 811, 844, 84 L. Ed. 1129 (1940). But looking beyond plaintiffs' arguments at the evidence of the policies and standards they challenge, one does not find the kinds of naked price restraints that courts have held illegal *per se*.

Take, for example, plaintiffs' assertion that "[t]he DeltaUSA Processing Policy Manual *sets specific reimbursement rates and pricing requirements* for hundreds of procedures that each Member Company is required to follow"—Pls.' Mem., ECF 754 at 9 (emphasis

16

added). One might think, based on this statement, that the cited manual contains a list of the rates and prices that Member Companies are required to pay for "hundreds of procedures." Not so. Plaintiffs support this bold assertion with a citation to the non-substantive cover page of DeltaUSA's 200-page Processing Policy Manual. Exh. 46 to Pls.' Mem., ECF 766-3 at DDPA001042070. Paging through this document—the bulk of which is organized as a chart, with columns labeled "CDT Code" (i.e., Current Dental Terminology Code), "ADA CDT Nomenclature," "ADA CDT Descriptor," and "Delta Dental Policy"—one does not find a single dollar amount attached to any procedure, nor anything resembling "specific reimbursement rates" or "pricing requirements."[6] Instead, the Delta Dental Policy typically provides benchmarks for Member Companies to use to determine the benefits payable for each procedure, and it frequently refers to the terms of the "group/individual contract."[7] This suggests that, quite the opposite of requiring

---

[6] It is true that a "Fee Guidance" issued in 2016 for new CDT procedure codes places a specific dollar amount on two of the eighteen new codes. Pls.' Exh. 60, ECF 897-60. The parties dispute whether Member Companies were required to follow the suggested fees, with defendants pointing to witness testimony indicating that Member Companies had discretion in this connection, and plaintiffs pointing to testimony suggesting that as a practical matter, the guidance was always followed. Nothing in this decision hinges on the resolution of this particular dispute.

[7] For example, the very first CDT code that appears in the manual is D0120 for "Periodic oral evaluation – established patient." The Delta Dental Policy for this code states:

Member Companies to pay specific reimbursement rates, the DeltaUSA Processing Policy Manual directs Member Companies to provide benefits according to the terms of their various contracts.

Plaintiffs make much of examples in which the stated Delta Dental Policy is to deny benefits for certain procedures, which they argue functionally "fix[es] the prices of these procedures at $0." Pls.' Resp., ECF 913 at 17. But defendants insist that establishing uniform coverage parameters furthers defendants' legitimate interest in standardizing the care associated with the Delta brand. *See* Defs.' Resp., ECF 910 at 16 (citing ADA Council report recognizing "the practical need for the development of a broad variety of interplan agreements...to deliver the benefits contracted on a measurably uniform and credible basis." ADA-Archive000070335). *See also* Pls.' Mem., Ex. 55, ECF 897-55 at DDOK000295415 (Delta policy recommendations "promote[] a consistent experience for groups, subscribers, and providers across the Delta Dental system."). Moreover, defendants add, processing policies are subject to "academic review to ensure they

---

      a. Frequency limitations for evaluations are determined by group/individual contract and should count towards contractual evaluation limitations.

      b. Benefits for D0120 performed without an intent to provide dental services to meet the patient's dental needs will be processed as D0190.

*Id.* at DDPA001042071. Other examples are similar. *See,* e.g., *id.* at DDPA001042115-42116 (Delta Dental Policy for CDT Codes relating to "Resin-Based Composite Restorations – Direct" states: "Benefits are determined by group/individual contract.").

align with current scientific output and research." Achenbaugh
Dep., ECF 788-11 at 347:7-19. Standardizing benefits to satisfy
these criteria benefits plan enrollees, defendants argue, by
enhancing the value of Delta-branded plans and thus the Member
Companies' ability to compete with national insurers. Moreover,
there is some evidence that the challenged policies, while
nominally mandatory, operate as default rules in practice, as
"group specific exceptions are always allowed" when individual
groups "desire a service(s) contrary to [DDPA's] policies." ECF
897-55 at DDOK000295415. *See also* Murphy Rep., ECF 785-1 at ¶ 191;
Achenbaugh Dep., ECF 788-11 at 347:20-348:3 (Member Companies can
deviate from DeltaUSA Processing Policies on a group-specific
basis). In short, evidence of DeltaUSA's multi-state claims
processing policies and the manner in which they are applied
counsel against plaintiffs' interpretation of them as *per se*
unlawful price-fixing.

Plaintiffs next challenge the "effective discount"
requirements described in DDPA's Membership Standards and
Guidelines, which they claim compels Member Companies to lower or
freeze provider reimbursement rates. Plaintiffs note that DDPA
defines the "effective discount" as "the difference between
dentist billed charges and the amount allowed for services," and
requires that each Member Company report an effective discount "in
the top quarter of its competitive set, and each operating area

19

must have a claims cost that is at or below the average claims cost for competitors in the top quarter." Pls.' Exh. 3, ECF 897-3 at DD-ENT-000658689. Plaintiffs point to evidence that this standard did, in fact, place downward pressure on provider reimbursements. *See*, e.g., Pls.' Ex. 16, ECF 897-16, 10/24/23 Barth Tr. 166:13-167:1 (former DDCA CEO: "Q: So by DDPA shifting its assessment to effective discount and imposing that requirement on member companies …, [DDCA] was constrained to lower provider reimbursements. Is that right? A: To comply with that standard, yes.").

Defendants insist that plaintiffs wrongly equate "effective discounts" with "reimbursement discounts," emphasizing that the formula for calculating the effective discount accounts for network coverage as well as claims payments and measures "average saving across all claims paid," including to out-of-network (i.e., non-contracted) providers. *See* Pls.' Exh. 3, ECF 897-3 at DD-ENT-000658689 (establishing calculation formula). As a result, defendants argue, in areas where a Member Company's network penetration is high, contracted (i.e., in-network) providers in that area may receive *higher* reimbursement payments than they receive from competing insurers, even as the Member Company achieves a higher effective discount in its operating area. *See* Noether Rep., ECF 900-1 at ¶¶ 103-107; Murphy Rep., ECF 785-1 at ¶ 36. And indeed, defendants identify evidence that Delta Dental

20

does in many instances pay higher reimbursement percentages (i.e., receive lower discounts) than competitors. Achenbaugh Dep., ECF 788-11 at 346:10-24 ("Q. What does it mean when it says we are not the market leader for discounts? A. It's referencing how Delta Dental's in-network discounts compare to our competitors, and we are lower in aggregate. We offer -- we do not have deeper discounts. Our competitors tend to have a better discount in-network than Delta Dental. … Q. Meaning they pay lower reimbursement rates? A. They pay lower reimbursements. We do not have deep discounts in-network.").

In short, evidence that one Member Company (DDCA) lowered some provider reimbursement rates to comply with the effective discount standard does not suggest that all Member Companies were required to adopt, agreed to adopt, or did adopt, this strategy vis-à-vis contracted providers. Notwithstanding plaintiffs' effort to blur the relationship between effective discounts and reimbursement rates, the evidence persuades me that defendants' application of the effective discount standard warrants scrutiny under the Rule of Reason.

Plaintiffs' final challenge is to the output restrictions they claim that DDPA imposes through limitations on Member Companies' ability to operate competing "second brands," i.e., non-Delta Dental branded insurance products. Specifically, plaintiffs assert that DDPA standards limit second brands to "(1)

underwriting Delta Dental-branded business and (2) selling insurance only in the small employer and individual markets, where Delta Dental does not compete." Pls.' Mot., ECF 897 at 22. They liken these putative restrictions to the "national best efforts" rule that the court concluded was "a *per se* violation of the Sherman Act" in *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1273 (N.D. Ala. 2018) ("BCBS I"), because it "limit[ed] the extent to which the Plans can compete with Blue branded business under non-Blue marks" by "requir[ing] a Plan to derive at least sixty-six and two-thirds percent of its national health insurance revenue under its Blue brands," and thus "operate[d] as an output restriction on a Plan's non-Blue brand business," *id.* at 1273, 1256, 1272. Unlike in *BCBS I* however, where evidence of the National Best Efforts rule was undisputed, defendants vigorously dispute that DDPA imposed similar restrictions.

Plaintiffs do not contend that anything in the DDPA Membership Standards imposes second brand restrictions. And as defendants observe, the record includes evidence that DDPA formally authorizes Member Companies to operate second brands that compete with Delta Dental branded insurance. They cite, for example, the DDPA "Second Brands Task Force Charter," which states:

> A number of Delta Dental member companies operate "second brands" as part of their company/enterprise strategies. These brands compete with the Delta Dental

> Brand for dental benefits business in operating areas within and outside their designated Delta Dental territories.

Defs.' Exh. 47, ECF 787-6. Additionally, documents circulated in connection with a 2015 DDPA "Board Discussion on Second Brands" answer the question, "What do our rules permit with respect to second dental brands?" with these answers: "Ownership permitted," "No restrictions on territories," and "May compete with Delta Dental member companies," among others. Defs.' Exh. 52, ECF 787-11. And several witnesses, such as Michael White, the Vice President and General Manager of DDIL's second brand, TruAssure, confirmed that second brands compete with Delta Dental in responding to requests for proposals for group business. White Dep., Defs.' Exh. 132, ECF 790-36 at 134:4-17 ("Q: Who does TruAssure compete in responding to requests for proposal? A: Many competitors, a few -- Mutual of Omaha, Best Life, Delta Dental in each state that we're in, Guardian, Dominion, Lincoln National, Dominion, Anthem....").

In response to this evidence, plaintiffs point to witness testimony and email exchanges among Member Company executives that they characterize as "direct evidence of the output restrictions" they allege. Pls.' Resp., ECF 913 at 20. Here again, plaintiffs draw a long bow. They make much of the testimony of Michael Herbert, the CFO of Delta Dental of Kansas, whom they quote as stating: "Under DDPA rules… it was decided that [second brands]

couldn't compete against Delta Dental insurance. . . ."). *Id*. But

the full passage of Mr. Herbert's testimony reads as follows:

> Q: So what was the restriction if they were selling an
> off-brand, so to speak, dental product?
> A: They -- Under the DDPA rules, whenever those DDPA
> rules were written up, it was decided then that you
> couldn't compete against Delta Dental insurance *I guess.*
> *I don't know. I do not know their logic behind that to*
> *be honest with you*.

Pls.' Exh. 26, ECF 913-26 at 142:10-16 (emphasis added). Moreover,

Mr. Herbert was later asked the following questions and gave the

following answers:

> Q: So earlier today you were testifying about Delta
> Dental Kansas second brand call (sic) Surency. Do you
> remember that?
> A: Yes.
> Q: So just as an initial matter, are there any DDPA rules
> or restrictions that prohibited Delta Dental of Kansas
> from offering a second brand of dental insurance?
> A: No, none that I'm aware of.
> Q: Okay. And what about DDPA rules or restrictions that
> restricted the amount of revenue that you could make
> from a second dental insurance brand?
> A: Again, there's none that I'm aware of.
> Q: Okay. And are there any DDPA rules or restrictions
> that would prevent Delta Dental of Kansas from selling
> a second brand of dental insurance outside of Kansas?
> A: There are no rules or restrictions preventing us from
> selling outside -- preventing Surency Dental from
> selling outside of Kansas.
> Q: Okay. And what about any DDPA rules or restrictions
> that prevented Surency from competing against another
> Delta Dental company in a different state?
> A: There are no rules that I'm aware of.

Defs.' Exh. 105 at 209:8-201:7. Viewed as a whole, Mr. Herbert's

testimony is hardly the smoking gun plaintiffs suggest. To be

clear, I do not prejudge how a finder of fact, in the context of

a trial, might interpret this testimony or the remaining evidence plaintiffs offer of the output restrictions they allege. I do conclude, however, that it is insufficient to show that defendants imposed output restrictions that are unlawful *per se* under Section 1.

The upshot of the foregoing discussion is that the evidence before me of the agreements, policies, and practices plaintiffs challenge does not place this case within the narrow class of cases subject to *per se* analysis. Because defendants raise plausible arguments, substantiated by the record, that "the challenged practice[s] when adopted could reasonably have been believed to promote enterprise and productivity," the Rule of Reason applies. *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d at 1011 (internal quotation marks and citation omitted).

### III. Class Certification

On to the heart of the matter. Plaintiffs seek to certify the following class:

> All Dental Providers not owned, employed by, or involved in the management or directorship of the Defendants, who provided dental goods or services to a Delta Dental insured and were reimbursed directly by a Defendant, and who were subject to a Delta Dental participating provider agreement (excluding HMO and public

entitlement[8] plans) in the United States[9] from October 11, 2015, to December 31, 2022 (the "Class Period").[10]

Mot., ECF 750 at 1.

For this class to be certified, plaintiffs must establish that it meets the prerequisites of Fed. R. Civ. P. 23(a)—numerosity, commonality, typicality, and adequacy of representation—which together "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 349 (2011). In addition, because plaintiffs seek certification under Rule 23(b)(3), they must show, among other things, that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b). For purposes of the predominance analysis, a "common" question is one that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of [plaintiffs'] claims in

---

[8] Plaintiffs state that "public entitlement" plans refer to Medicare, Medicaid, CHIP, Indian Health Services, and similar publicly funded programs. Mot., ECF 750 at 1, n.1.
[9] Plaintiffs state that "United States" includes Puerto Rico to capture Dental Providers subject to participating provider agreements with defendant DDPR. Mot., ECF 750 at 1, n.2.
[10] Plaintiffs state: "The Class definition presently includes a December 31, 2022 cut-off for membership because Defendants have provided data only through that date. When Defendants supplement their data production, Plaintiffs anticipate that their expert will update his damages calculation to include any subsequent years." Mot., ECF 750 at 1, n.3.

one stroke." *Dukes*, 564 U.S. at 350. An "individual" question, by contrast, is one for which "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 453 (2016).

Because "Rule 23 does not set forth a mere pleading standard," the party seeking class certification "must affirmatively demonstrate" compliance with its requirements. *Dukes*, 564 U.S. at 350. I must perform a "rigorous analysis" to ensure the factual sufficiency of the motion and resolve any factual disputes material to the Rule 23 analysis, even if my inquiry "entail[s] some overlap with the merits." *Id.* at 351; *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir. 2001) (class certification analysis may require "a preliminary inquiry into the merits."). And when the inquiry involves expert opinions that are "critical to class certification," I must rule on the admissibility of any expert testimony challenged under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579 (1993), and resolve any factual disputes that "bear on the requirements for class certification" before deciding whether to certify the class. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015)). *See also Arandell Corp. v. Xcel Energy Inc.,* No. 22-3279, 2025 WL 2218111, at *1 (7th Cir. Aug. 5, 2025); *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 812–13 (7th Cir. 2012); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010).

27

Importantly, however, "[e]xpert evidence can be admissible under Rule 702 and *Daubert* but still fall short of proving the Rule 23 requirements for class certification." *Arandell*, 2025 WL 2218111, at *7. "Like any evidence, admissible expert opinion may persuade its audience, or it may not." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008), as amended (Jan. 16, 2009). Accordingly, to the extent the parties' competing experts offer admissible but conflicting opinions that are material to class certification, I must decide which evidence "is most persuasive." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 90 (D.D.C. 2017) (citing *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014)), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019). I must conduct this inquiry, however, "without paying attention to the obvious implications for the merits." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 602 (7th Cir. 2020).

<u>Rule 23(a)</u>

All agree that plaintiffs' proposed class of approximately 240,000 dental providers satisfies the numerosity requirement of Rule 23(a), and defendants do not dispute the existence of common legal and factual issues, such as the existence of various agreements among defendants and whether their alleged conduct is consistent with the operation of a lawful joint venture. With respect to the remaining Rule 23(a) prerequisites, defendants assert that plaintiffs—who hail from only eight states—are

28

atypical of the proposed nationwide class because differences in local markets mean that providers "in different geographic areas submit different charges and receive different rates in different local markets pursuant to their contracts with individual Member Companies." Defs.' Opp., ECF 785 at 71-72 (citing *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 2008 WL 7356272, at *7 (S.D. Tex. Nov. 24, 2008) ("proof of impact on any one individual plaintiff would not be probative of, much less prove, impact on, or liability to, any other plaintiff."), *R&R adopted*, 2009 WL 10712586 (S.D. Tex. Mar. 26, 2009), *aff'd,* 695 F.3d 330 (5th Cir. 2012).

Defendants also question plaintiffs' adequacy as class representatives, arguing that the testimony of certain named plaintiffs suggests that their claims are susceptible to unique defenses that could distract from classwide issues, and that intraclass conflicts may arise between, for example, urban and rural class members; class members who practice general dentistry and class members who practice specialized dentistry; class members who participate in Premier networks and class members who participate in PPO networks; and class members who have exclusive contracts with a Member company and those with non-exclusive contracts.[11] To illustrate the potential for intraclass conflict,

---

[11] Rule 23(a) also requires inquiry into the adequacy of plaintiffs' proposed class counsel. There is no dispute, and I find based on the record, that the experienced and capable attorneys I appointed as Interim Co-Lead Class Counsel satisfy this requirement.

Defendants point to a presentation by Delta Dental of Missouri addressing proposed changes to its fee schedules. *See* Defs.' Exh. 39, ECF 786-18. The presentation examines how these changes would impact provider reimbursements and reflects that providers could expect to see higher, lower, or unchanged payments, as well as higher, lower, or unchanged net office reimbursement totals, depending on where their practice was located; whether they were generalists or specialists; whether they were in DDMO's Premier network or PPO network; whether their contracts with DDMO were exclusive or non-exclusive; and the frequency with which they perform different procedures. *Id.* at PageID #22680, #22675.

Plaintiffs disparage defendants' typicality and adequacy arguments as "nonsense," insisting that because defendants allegedly suppressed reimbursements to *all* contracted providers, the distinctions defendants highlight make no difference in terms of how they will pursue their claims. Neither side invests much in their typicality or adequacy arguments, however, which overlap with, and are eclipsed by, their primary dispute over the predominance requirement of Rule 23(b)(3). Because I ultimately conclude, for the reasons set forth in the remainder of this opinion, that plaintiffs have not satisfied the more demanding criteria of Rule 23(b)(3), the proposed class cannot be certified, and I need not decide who has the better of the Rule 23(a) arguments. *Riffey v. Rauner*, 910 F.3d 314, 318 (7th Cir. 2018)

("[w]e have no need to reach the Rule 23(a) factors...if Rule 23(b)(3)'s criteria are not met.").

### Rule 23(b)

Thus we arrive at the vigorously contested issue of predominance, which is a "qualitative rather than quantitative concept." *Arandell Corp. v. Xcel Energy Inc.*, No. 22-3279, 2025 WL 2218111, at *5 (7th Cir. Aug. 5, 2025) (quoting *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014)). I must do more than merely "tally" the common and individual issues. Rather, I must carefully scrutinize the relationship between the common and individual questions and "consider their relative importance" to the litigation as a whole. *Id*. (internal quotation marks and citations omitted).

"Analysis of predominance under Rule 23(b)(3) begins, of course, with the elements of the underlying cause of action." *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339 (7th Cir. 2023); *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 3:17-CV-50107, 2024 WL 1363544, at *3 (N.D. Ill. Mar. 29, 2024). "In antitrust cases, a plaintiff must prove: '(1) that defendants violated federal antitrust law; and (2) that the antitrust violation caused them some injury.'" *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077, 1090 (N.D. Ill. 2023) (quoting

*Messner*, 669 F.3d at 815).[12] Additionally, they must show that damages resulting from that injury are measurable "on a class-wide basis" through use of a "common methodology." *Comcast Corp. v. Behrend,* 569 U.S. 27, 30, 133 S. Ct. 1426, 1430, 185 L. Ed. 2d 515 (2013). Under Section 1 of the Sherman Act—the federal antitrust law at issue—plaintiffs must establish: (1) that defendants had an agreement; and (2) that as a result, trade in the relevant market was unreasonably restrained.[13] *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 705 (7th Cir. 2011).

There is no dispute that defendants "had an agreement." Accordingly, plaintiffs gain little traction from cases such as *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.*, 97 F.R.D. 668 (N.D. Ill. 1983), and *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 169 (S.D. Ind. 2009), where the courts found that proving "the existence of a conspiracy...in violation of antitrust laws" was an "overriding common issue" that would "predominate the litigation," *Thillens*, 97 F.R.D. at 682 (N.D. Ill. 1983), and thus "usually satisfies Rule 23(b)(3)," *In*

---

[12] Plaintiffs must also "produce a reliable method of measuring classwide damages based on common proof," *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 926 (7th Cir. 2016), but it is "well established that individual questions of damages should not defeat class certification," *Arandell Corp. v. Xcel Energy Inc.*, No. 22-3279, 2025 WL 2218111, at *1 (7th Cir. Aug. 5, 2025).

[13] Section 1 also requires proof of injury, *Omnicare,* 629 F.3d at 705, which is necessary in any event to recover damages under Section 4 of the Clayton Act.

re Ready-Mixed Concrete, 261 F.R.D. 154, 169 (S.D. Ind. 2009). Doubtless there are many cases—Kleen Prods. LLC v. Int'l Paper, 306 F.R.D. 585 (N.D. Ill. 2015), aff'd 831 F.3d 919 (7th Cir. 2016), is another that features prominently in plaintiffs' argument—in which a substantial portion of the plaintiff's case at trial would be devoted to proving the existence of an agreement, so the efficiencies to be gained by resolving that issue on a classwide basis would outweigh any individual issues. In Kleen, for instance, the plaintiffs expected to present the factfinder "largely circumstantial" evidence to convince the jury that the defendants had engaged in concerted action, which "if believed, would be enough to prove the existence of the alleged conspiracy." 831 F.3d at 927. This included "indirect evidence" such as "what appears to be coordinated price increases, coordinated supply reductions, and other similar conduct that, according to Plaintiffs, Defendants would not have engaged in unless acting as part of a conspiracy," coupled with expert testimony "that Defendants' conduct is more likely the result of collusion than independent behavior." 306 F.R.D. at 594, 596. The Kleen defendants "hotly contested" the alleged collusion, 831 F.3d at 925, "offering up several innocent reasons" for their parallel conduct. 306 F.R.D. at 594. But the court noted that "both parties...demonstrated that the evidence either proving or disproving a conspiracy will be common to the entire class" and concluded that it was "more

efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence." *Id*. at 594.

Here, defendants acknowledge that they coordinated their activities through a series of agreements to sell and administer multi-state group dental plans. Because proving that defendants' business model involved significant concerted action is unlikely to be a substantial aspect of the case, there is little efficiency to be gained by consolidating the largely undisputed evidence that defendants agreed to the terms of several "key agreements."[14] Ultimately, the predominance analysis "goes to the efficiency of a class action as an alternative to individual suits." *Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014). "If resolving a common issue will not greatly simplify the litigation...the complications, the unwieldiness, the delay, and the danger that class treatment would expose the defendant or defendants to settlement-forcing risk are not costs worth incurring." *Id.*

---

[14] Plaintiffs assert that defendants' anticompetitive agreement—with the exception of the alleged second-brand restrictions—is embodied in "key agreements" including: DDPA's Membership Standards and Guidelines; the Service Mark License Agreement; the DeltaUSA Policies Manual; the DeltaUSA Processing Policies Manual; the DeltaUSA Membership Agreement; the Interplan Participation Agreement; the DeltaUSA Risk-Sharing Agreement; and the National Provider File License Agreement. *See* Brennan Decl., Exh. A, ECF 768-1 at 1-6.

Overlooking this nuance, plaintiffs suggest that predominance is satisfied whenever a dispositive issue is susceptible to common proof, citing *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 378 (7th Cir. 2015) ("a common question predominates over individual claims if a failure of proof on the common question would end the case and the whole class will prevail or fail in unison") (internal quotation marks, alterations, and citation omitted). But *Bell* is not an antitrust case,[15] and none of the antitrust authorities plaintiffs cite certified a Rule 23(b)(3) class without concluding that antitrust impact could be established using classwide evidence. To the contrary, courts post-*Comcast* have uniformly held that to satisfy the predominance requirement of Rule 23(b)(3), antitrust impact must be susceptible to classwide proof. *See*, e.g., *Kleen*, 831 F.3d at 927 ("[w]hat is essential is whether the class can point to common proof that will establish antitrust injury...on a classwide basis."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 42 (D.D.C. 2017) ("[a]fter

---

[15] It is true that for the quoted proposition, the *Bell* court cited *Amgen Inc. v. Ct. Ret. Plans and Trust Funds,* 568 U.S. 455, 450 (2013), which is an antitrust case. But the disputed issue in *Amgen* was not whether the common question of the existence of an antitrust conspiracy predominated over all other issues, but rather whether the plaintiff had to establish "materiality"—an element of its substantive claim—to satisfy the predominance requirement of Rule 23(b)(3). *Amgen* does not suggest that a 23(b)(3) class may be certified without reliable evidence that antitrust impact can be established through common proof.

*Comcast*...under Rule 23(b)(3), the Court must undertake a rigorous analysis and determine whether there is a 'reliable means' of proving injury-in-fact and damages through common evidence"), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019).

Antitrust Impact

The "pivotal question," then, is "whether plaintiffs can use common proof to show antitrust impact from the conspiracy." *Arandell, Corp. v. Xcel Energy Inc.,* No. 22-3279, 2025 WL 2218111, at *1 (7th Cir. Aug. 5, 2025). Having concluded that defendants' conduct is subject to the Rule of Reason, I address this question through the lens of the "three-step, burden-shifting framework" the Supreme Court summarized in *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("*AmEx*"), and consider the extent to which it will require individual or common evidence.

Under the framework described in *AmEx*, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id*. This "threshold burden...involves the showing of a precise market definition in order to demonstrate that a defendant wields market power, which, by definition, means that the defendant can produce anticompetitive effects." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012), Here, as in *Arandell*, "the question of antitrust impact is

primarily an issue of causation and the scope of the geographic market." 2025 WL 2218111, at *1. The parties vehemently dispute both issues—to the tune of hundreds of pages of expert reports and accompanying exhibits, and many more in related *Daubert* briefing— and while their dispute "overlaps substantially with the merits of plaintiffs' claims," I must resolve disputed issues material to my Rule 23 analysis. *Id. See also Eddlemon v. Bradley Univ.,* 65 F.4th 335, 341 (7th Cir. 2023) ("[a]t the class certification stage, the court "must walk a balance between *evaluating* evidence to determine whether a common question exists and predominates, *without weighing* that evidence to determine whether the plaintiff class will ultimately prevail on the merits.") (original emphasis) (citation omitted).

### The Geographic Market

All agree that under the Rule of Reason, plaintiffs must define the relevant geographic market in which to evaluate the effect defendants' conduct has on competition. *See Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020). Unsurprisingly, the parties' competing views on this question could not be more contrasting. Plaintiffs argue that the relevant geographic market is the entire United States (and Puerto Rico), and that common evidence can be used to show antitrust impact in that market. Defendants insist that any impact must be assessed on a local market-by-local market basis in each of the

37

thousands of geographic markets in which the putative class members practice dentistry, and that plaintiffs' proposed methodology for assessing impact masks significant distinctions in these geographically splintered markets that bear upon the impact analysis.

Plaintiffs' argument in this connection starts off on the wrong foot, opening with the statement, "[a]s Defendants themselves have acknowledged, they compete in a national market against other national insurance carriers *for the sale of dental insurance*." Pls.' Mem., ECF 754 at 55 (emphasis added). Neither this assertion, nor evidence confirming that defendants collaborate for the purpose of winning and servicing multi-state business, establishes the United States as the relevant geographic market. Instead, it re-muddies the waters with respect to the relevant *product* market, which—as plaintiffs now acknowledge—is not the "market…*for the sale of dental insurance*," as they alleged in their complaint, but rather the "market *for the purchase of dental goods and services*[.]"[16] Mem. Op., ECF 303 at 24 (quoting Pls.'s Mem., ECF 276 at 40) (emphasis added). More on the relationship between these markets follows.

---

[16] As I previously observed, the consolidated complaint facially seemed "to identify 'insurance' as the basic product," but plaintiffs later asserted that the relevant product market was "the market for the purchase of dental goods and services[.]" Mem. Op., ECF 303 at 24 (quoting Pls.'s Mem., ECF 276 at 40).

But first, I must dispose of plaintiffs' misguided assertion that I "already rejected" the view that "the relevant geographic market should comprise only the areas surrounding [plaintiffs'] respective practices." Pls.' Mem., ECF 754 at 57. While indeed I observed, at the motion to dismiss stage, that "[t]here is no obvious link, *in the absence of a factual record*, between a dental patient's place of residence and the dental insurance options available to her," Mem. Op., ECF 303 at 27 (emphasis added), the very text of my decision makes plain that I concluded merely that defendants' proposed definition of the geographic market was not warranted on the pleadings alone. Moreover, I noted that "on plaintiffs' theory of the case, the issue is whether defendants' anticompetitive conduct has diminished the availability of substitute buyers *in the geographic market where plaintiffs sell their goods and services*," eliminating any doubt as to the ultimate focus of the inquiry. *Id.* (emphasis added)

Having now examined the substantial evidentiary record the parties have developed in the five years since I denied defendants' motion to dismiss, I conclude that plaintiffs' proposed geographic market does not "correspond to the commercial realities of the industry[.]" *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). While it is true that Member Companies across the United States may be buyers of plaintiffs' dental goods and services in the sense of issuing payments on behalf of their enrollees (who

39

are also buyers to the extent of any copayments they may owe providers under their plans), the enrollees themselves are the consumers of these goods and services, and it is they who decide which provider's goods and services they wish to buy (or to have their insurer buy on their behalf). The evidence shows that overwhelmingly, dental patients choose providers close to where they live or work. Indeed, several plaintiffs recognized that the market for the services they provide is local. *See, e.g.,* Dultz Dep., Defs.' Exh. 97, ECF 789-15 at 69:15-19 ("Q: From your perspective, would it be fair to view dentistry as a local service? … A: Generally speaking, yes."); *id.* at 68:4-8 (98 percent of patients in New Jersey plaintiff's practice are from New Jersey); Verharen Dep., Defs.' Exh 131, ECF 790-25 at 56:10-18 ("most people" visit local dentists); *id.* at 57:14-20 (plaintiff's advertising targets areas where his practices operate, not out of state); Lindley Dep., Defs.' Exh. 112, ECF 790-6 at 99:13-23 (calling dentistry a "[l]ocal service in that most of my patients, clientele, come from a closer geographic region," and stating that "most patients want to see a dentist close to where they live or work."). So while it is true that as third-party payors, Member Companies may issue payments on behalf of their insureds from anywhere in the United States, the patients on whose behalf those payments are made are predominantly local to their provider's practices.

40

What this means is that from plaintiffs' perspective, the "availability of substitute buyers" for their dental goods and services depends on the extent to which members of their local communities are either covered by non-Delta Dental insurers (including government-sponsored dental plans) or are able and willing to pay for dental care out of pocket. A provider considering the value of participating in a Delta Dental network must take into account not only how Delta Dental's reimbursement rates compare to the rates of other insurers covering patients in the area, and to the fees the provider can charge to uninsured patients in the area, but also the volume of local patients Delta Dental can deliver.[17] *See*, e.g., Dultz Dep., ECF 789-15 at 109:11-

---

[17] Moreover, how a provider values participating in an insurance network or other third-party payor plan, given the expected trade-off between patient volume and reimbursement rates, may vary from provider to provider and depend on any number of individual and local market issues. These may include, for example, the stage of the practitioner's career, s*ee, e.g.*, Verharen Dep., ECF 790-25 at 89:10-15 (testifying that he accepted Medicare Advantage when he "first started" his career, but has not done so since 2014); whether other providers in the same practice can participate in the same network, *see* Cronin Dep., ECF 788-20 at 85:9-87:24 (testifying that although she "didn't want to lose Delta because it is a portion of [her] patient pool, she made a "business decision" to go out of network because the associate she hired was unable to join the Delta Premier network she was in); or the provider's personal view about the role of insurance companies in dental care, *see* Fisher Dep., ECF 789-17 at (testifying that she has never contracted with any of seven non-Delta insurers operating in her area, and that she "would prefer not to participate with insurance at all" because she is "not a fan of insurance," which she views as "an interloper in the dentist/patient relationship"). *See also* Murphy Rep., ECF at ¶ 49 (citing industry reports explaining that in markets where the supply of dentists increases

14 ("[i]f you have a patient base that utilizes that insurance company, a significant number, you would want to try to be in one of their networks."). If few people in a provider's community are insured by Delta Dental, and especially if many others are covered by a competing commercial or government-sponsored plan or have the means to pay for dental care out of pocket, the provider has little incentive to accept below-market reimbursement rates in exchange for the marginal potential increase in patient volume Delta Dental can offer. Or to put it in familiar antitrust terms: a Member Company in that provider's area has little market power over the provider.

Yet, "[s]ubstantial market power is an essential ingredient of every antitrust case under the Rule of Reason," *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994), and the record indicates that Delta Dental's market power varies significantly across the United States. For example, defendants cite 2022 data showing that while Delta Dental's average national enrollment share was 32%,[18] its enrollment share was

<hr/>

relative to demand, network participation becomes "more valuable" (citing Vujicic, Marko, "Why are payment rates to dentists declining in most states?" *The Journal of the American Dental Association*, Vol. 149, No. 9, September 2016, pp. 755-757).

[18] Plaintiffs argue that this data is unreliable and identify competing data showing that defendants' average national market share in 2019 and 2020 was closer to 47% and 49% respectively. Plaintiffs do not dispute, however, that whatever Delta Dental's average national market share, its regional market share varied widely from state-to-state and even from region-to-region.

between 10% and 18% in ten states, while in two other states, its share was greater than 95%.[19] Murphy Rep., ECF 785-1 at 7. Other evidence indicates that in some years of the class period, some Member Companies had less than 7% market penetration in some states, and between 7% and 15% penetration in several states. *See*, *e.g.*, Defs. Exh. 6, ECF 785-6 at 47 (chart). Moreover, everyone agrees that both reimbursement rates and reimbursement percentages (i.e., the amount paid to providers as a percentage of the price they submit for payment) vary—sometimes widely—by state and even by region. *See* Bamberger Rebuttal, ECF 855-2 at ¶ 85 ("Member Companies typically set approved amounts...by geographic area");

---

[19] The parties use several different metrics to describe the extent of Delta Dental's presence in various markets. One of these is "enrollment share," another is "market share," and a third is "market penetration." The DDPA Membership Standards define "market penetration" as the number of Delta Dental enrollees in a Member Company's operating area, minus enrollees covered by public entitlement programs, divided by the total population in the area being measured (so a 30% market penetration means, as I understand it, that Delta Dental commercial or individual plans cover three in every ten lives in that community). *See* Pls.' Exh. 22 at 45, ECF 766-1 at 45. Plaintiffs define "market share" as "the total enrollees covered by a Delta Dental Plan in an operating area (as that term is used in the DDPA Membership Standards and Guidelines) divided by the total number of dental insurance subscribers in that operating are," (so a 30% market share means that Delta Dental commercial or individual plans cover three of every ten individuals with dental insurance coverage in that community), although defendants object to that definition. *See* Defs.' Exh. 6, ECF 785-6 at 12. Defendants use "Enrollment Share" in a way that appears similar to plaintiffs' definition of "market share." *See* Defs.' Opp., ECF 785 at 9. These distinctions are not material at this juncture, as the important point is that there are significant variations across regions, regardless of which metric is used.

Murphy Rep., ECF 785-1 at ¶¶ 71-72 (average Delta Dental PPO provider reimbursement percentages range from 85% to 53% across states; average Delta Dental Premier reimbursement percentages range from 97% to 60%; and nineteen states have multiple regional reimbursement rates).

Plaintiffs urge me to disregard these variations and to find that Delta Dental's alleged monopsony power throughout the United States can be established through common evidence—specifically, evidence of Delta Dental's national average market share-because "Delta Dental's national dominance makes participation in Delta Dental networks a 'must have' for Dental Providers." Pls.' Mem, ECF 754 at 8. For this argument, they rely on Dr. Bamberger's analysis, and specifically, his discussion of "multi-homing" versus "single-homing." Bamberger Rep., ECF 761-1 at ¶¶ 57-59. Dr. Bamberger explains that while providers can "multi-home" with insurers, meaning that they can join several insurers' networks, patients "single-home" with insurers, as they are covered by only one plan. *Id.* As a result of this dynamic, Dr. Bamberger opines, providers may consider an insurer with even a modest market presence to be a "must have," since unless the provider is in-network with that insurer, she will lose patients to a competitor. *Id.* at ¶ 59.

But nothing in Dr. Bamberger's discussion of single-homing versus multi-homing explains why a practitioner in a region where

Delta Dental has a modest presence would feel compelled to join the network of a Member Company promising few patients and sub-competitive reimbursement rates. As Dr. Bamberger acknowledged at his deposition, Delta Dental's ability to deliver a high volume of patients is an important factor in a provider's decision to join its network. Bamberger Dep., ECF 837-2 at 228:3-7 ("the reason dentists may want to sign up with Delta Dental is because they have a lot of patients, and a lot of patients may want a Delta Dental policy because Delta Dental has a big network"). In other words, Dr. Bamberger agrees that plaintiffs operate in a market in which "the willingness of providers to join a payer's network depends, for the same reimbursement rates, on *how many members a payer covers*." Murphy Rep., ECF 785-1 at ¶ 121 (emphasis added). Since providers draw patients from their surrounding communities, what matters is not the percentage of individuals Delta Dental covers in the aggregate throughout the United States, but only how many members of the provider's local community Delta Dental covers. As Dr. Bamberger ultimately acknowledged, "[w]hether Delta is a must have for provider[s] will vary from provider to provider." Bamberger Dep., ECF 837-2 at 218:12-15.

A final comment on plaintiffs' reliance on Delta Dental's nationwide operations to anchor their argument about the relevant geographic market: By attributing to the market for providers' sale of dental goods and services the geographic scope of the

market for defendants' sale of dental plans, plaintiffs implicitly cement defendants' characterization of the dental industry as an interdependent "two-sided market."[20] Plaintiffs resist this portrayal in their effort to discredit the impact analysis of defendants' expert, Kevin Murphy, who opines that plaintiffs' proposed methodology for establishing impact through common evidence fails to account for the significance of two-sided network effects in the market. *See* Pls.' Mem., ECF 818 at 19-20; Murphy Rep., ECF 785-1 at ¶¶ 119-128. But plaintiffs do not dispute the practical reality that dental insurers compete for customers, on the one hand, by offering plans that feature an attractive balance of broad provider networks and low premiums, while recruiting providers, on the other, by offering a valuable balance of patient volume and reimbursement rates. And while their expert doggedly resists using the label "two-sided market," *see* Bamberger Dep., ECF 837-2 at 221:2-228:19, he acknowledges that the dental industry exhibits the kinds of indirect network effects that two-sided markets typically feature, *id*. at 228:3-7.[21]

---

[20] "Broadly speaking, a two-sided market is one in which two sets of agents interact through an intermediary and the decisions of one affect the other." *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 636 (N.D. Ill. 2022).

[21] *See also* Bamberger Rep., ECF 761-1 at ¶ 81 ("Because insurance companies negotiate on behalf of a number of patients, they typically can negotiate lower prices for services than uninsured patients.")

Indeed, there is ample evidence that bidirectional network effects can and do influence provider reimbursement rates. *See generally* Noether Rep., ECF 900-1 at ¶¶ 72-109 and evidence cited therein. *See also* Murphy Rep., ECF 785-1 at ¶ 122 and evidence cited therein; *id.* at ¶ 128. Regardless of whether this competitive landscape brings the dental industry within the scope of the particular kind of two-sided market the *AmEx* Court characterized as a "two-sided transaction platform[]," 585 U.S. at 545, it is clear that plaintiffs' proposed nationwide geographic market does not account for evidence that local market conditions influence the reimbursement rates that Member Companies pay providers, and thus does not "correspond to the commercial realities of the industry[.]" *Brown Shoe*, 370 U.S. at 336.[22]

---

[22] The authorities plaintiffs cite for the proposition that "[d]efendants' local market argument repeatedly has been rejected in other cases" Pls.' Mem., ECF 754 at 58, are not to the contrary. For example, *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007), and *In re Indus. Gas Antitrust Litig.,* 100 F.R.D. 280, 306 (N.D. Ill. 1983), both rested on the courts' view that it could not resolve disputed expert testimony at the class certification stage, which the Seventh Circuit later rejected in cases such as *Am. Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010), *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360 (7th Cir. 2015), *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802 (7th Cir. 2012) and *Arandell Corp. v. Xcel Energy Inc.,* No. 22-3279, 2025 WL 2218111 (7th Cir. Aug. 5, 2025). Other cases, such as *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 997 (D. Minn. 2023), involve commodities sold on a nationwide market and are inapposite here, since plaintiffs sell dental goods and services to local consumers, even though those goods and services might be paid for by out-of-state insurers.

*Dr. Bamberger's Impact and Damages Opinions*[23]

My rejection of plaintiffs' proposed nationwide market definition vitiates significant aspects of Dr. Bamberger's opinion. In particular, Dr. Bamberger opines that "evidence, methods, and analyses, common to the Class, as a whole, are capable of establishing [that] Defendants possessed significant monopsony power with respect to the purchase of Dental Services from Class Members." Bamberger Rep., ECF 761-1 at ¶ 11. But Dr. Bamberger's monopsony power opinions rest on third-party estimates of Delta Delta's *national* enrollment shares in the years 2019 and 2020 and data from the same years indicating that Member Companies had "a share greater than 50 percent in more than half the states...and greater than 70 percent in 10 states." ECF 761-1 at ¶ 55. Even assuming these figures are correct, Dr. Bamberger's reliance on averages papers over the significant variations in Delta Dental's market share across regions, and it ignores evidence that what matters to providers is Delta Dental's market share in their local communities. *See* Murphy Rep., ECF 785-1 at ¶ 138, 144.

As noted above, it is no answer to say that providers might consider Delta Dental a "must have." Nothing in Dr. Bamberger's

---

[23] As plaintiffs observe, antitrust impact and damages are separate elements of a Section 1 claim, but where, as here, establishing both requires "comparing the 'but-for' price—the price a customer would have paid in the absence of the conspiracy—and the actual price paid...the single comparison establishes both impact and damages." *Kleen*, 306 F.R.D. at 595.

analysis or the evidence he cites explains why providers who can "multi-home"[24] by participating in various networks (or indeed, who decline to join any network at all) would uniformly view Delta Dental as a "must have," even in communities where Delta Dental's market penetration is modest.[25] Moreover, the evidence suggests otherwise: several named plaintiffs left Delta Dental networks without experiencing an adverse financial impact. *See* Defs.' Mem., ECF 784 at 74 (*citing*, *inter alia*, Verharen Dep., 790-25 at 87:5-9 (Q: "is your practice more or less profitable as a result of ceasing your relationships with [Delta Dental and other] insurers?" A: "About the same.")). Ultimately, Dr. Bamberger concedes that Delta Dental was not, in fact, a "must-have" for these providers and that he does not know "for what portion of the class...Delta is a must have." Bamberger Dep., ECF 837-2 at 218:9-10, 22-24).

Defendants argue that these flaws render Dr. Bamberger's opinions about the proof needed to establish Delta Dental's monopsony power inadmissible under Rule 702 and *Daubert* as both

---

[24] To the extent plaintiffs suggest that Member Companies prevented contracted providers from "multi-homing" by "punishing providers that did not enter into exclusivity agreements with Delta Dental," Pls.' Reply, ECF 808 at 8, I have reviewed the evidence plaintiffs cite in this connection and find that it does not support their characterization of the facts.

[25] Dr. Bamberger points to the testimony of two witnesses, both of whom stated that Delta Dental covers a significant portion of their patient population. Bamberger Rep., ECF 761-1 at ¶ 60 and n. 77.

unreliable and unhelpful. Defs.' Mem., ECF 884 at 18-20. While I agree that the shortcomings noted above weaken Dr. Bamberger's analysis, there is, nevertheless, a rational connection between the evidence he cites and the conclusions he draws. Accordingly, rather than exclude his opinion that Delta Dental's monopsony power can be established through common evidence, I simply conclude that it is unpersuasive. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1045-46 (N.D. Ill. 2022) (assuming a "rational connection between the data and the opinion," questions about whether the expert "selected the best data set to use" do not go to admissibility) (quoting *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013)).

The conclusion that Member Companies' ability to exert monopsony power over providers in their respective operating areas is not susceptible to classwide proof undermines other aspects of Dr. Bamberger's analysis, too. For example, Dr. Bamberger's opinion that "evidence, methods, and analyses common to the Class as a whole are capable of demonstrating that the challenged conduct had anticompetitive effects" is fundamentally tethered to his view that defendants collectively exercised nationwide monopsony power over the putative class members. Indeed, the analysis supporting this opinion boils down to a single substantive paragraph, which appears under the subheading, "Direct Evidence of Anticompetitive

Effect Can be Analyzed on a Class-Wide Basis." This paragraph
states:

> Standard economic theory shows that the exercise of
> monopsony power leads to anticompetitive effects. First,
> it is commonly understood in economics that the exercise
> of monopsony power in the purchase of an input directly
> harms the providers of that input by reducing what they
> receive in return for supplying that input. In this
> matter, the providers of the relevant input (dental
> services) are Class Members. Second, standard economic
> theory indicates that, in the long run, the exercise of
> monopsony power can harm consumers. When the
> compensation to Class Members is suppressed by the
> exercise of monopsony power, the supply of Dental
> Providers is likely to fall in the long run, resulting
> in fewer Dental Services and/or lower-quality Dental
> Services in the future.

*Id.* at ¶ 63.

Given my rejection of Dr. Bamberger's premise that common
evidence can establish defendants' monopsony power over the class
as a whole, this paragraph—which essentially summarizes why
economists view monopsonies as harmful to competition—adds nothing
to plaintiffs' Rule 23 predominance argument.[26] The remainder of
this subsection merely references Dr. Bamberger's "yardstick"

---

[26] There is one other subsection in support of this opinion, which
addresses Dr. Bamberger's view that "whether dental insurance is
appropriately evaluated as a 'two-sided market' can be determined
using evidence common to the class." While I agree that this is a
common issue, it does not appear to be materially in dispute. As
discussed above, the experts *agree* that the dental industry
exhibits the essential features of a two-sided market. Plaintiffs'
insistence that the dental insurance market is not the kind of
"two-sided transaction platform" the Court examined in *AmEx*
strikes me as a red herring that has no bearing on my Rule 23
analysis.

methodology and analysis supporting his opinion that classwide evidence and analyses can establish that the challenged conduct would suppress class member reimbursement rates generally. That is the issue to which I turn next.

*Dr. Bamberger's Yardstick Methodology and "But-For" World*

Dr. Bamberger proposes a "yardstick" methodology to support his opinion that common evidence is capable of establishing that the challenged restraints suppressed contracted providers' reimbursement rates. In general terms, a yardstick approach "compares prices during the period in which the antitrust violation is believed to have had an effect...to prices in other markets that are deemed to be reasonably comparable to the market at issue." Bamberger Rep., ECF 761-1 at ¶ 75. Dr. Bamberger reviewed over two billion claims that providers in Delta Dental's PPO or Premier networks submitted over the course of the class period and compares changes in the list prices providers charged to patients not insured by Delta Dental ("submitted amounts") with changes in the reimbursement amounts providers could collect for contracted services ("approved amounts"). *Id.* at ¶¶ 84, 78-81. In Dr. Bamberger's view, submitted prices are an appropriate proxy for prices in a hypothetical free market "[b]ecause the same changes in economic conditions (e.g., changes in costs) apply to Dental Services provided to both uninsured and insured patients," *Id.* at ¶¶ 81-83.

To show antitrust impact, Dr. Bamberger begins with the "assumption that reimbursement rates set by Member Companies in 2014 were unaffected by the challenged conduct." *Id*. at ¶ 82. Then, for each subsequent year, he compares the growth rates in providers' submitted amount for the services they provided with the growth rates of Member Companies' approved amounts for these services, and he attributes any difference in these rates to the challenged conduct. *Id*. at ¶¶ 82-83. Dr. Bamberger offers this concrete illustration: Suppose that in 2014, a contracted provider's submitted amount for a particular procedure was $100, and his approved amount was $80. If the provider's submitted amount for the same procedure in 2015 was $102 (i.e., a two-percent increase over the 2014 submitted amount), then in Dr. Bamberger's but-for world, the provider's approved amount in 2015 should be $81.60 (i.e., a two-percent increase over the 2014 approved amount). But if the provider's approved amount in 2015 was only $81, then Dr. Bamberger attributes the $0.60 difference between this real-world amount and the but-for world amount to the challenged restraints, and he concludes that the provider suffered antitrust injury entitling him to damages in the amount $0.60 for each claim he submitted to Delta Dental for that procedure in 2015.[27] *Id*. at ¶ 83.

---

[27] Dr. Bamberger recognizes that prices paid by uninsured patients typically exceed prices paid by insured patients because insurance

To evaluate the collective impact of the challenged restraints, Dr. Bamberger created an index of submitted amounts, an index of reimbursement rates for Delta Dental PPO policies, and an index of reimbursement rates for Delta Dental Premier polices, *id.* at ¶ 86, then constructed "a series of 370 region/network-specific regression models (or about 1,800 three-digit-zip-code-area/network-specific regression models)," which he used "to estimate differences in the growth of submitted amounts and Delta Dental PPO and Delta Dental Premier approved amounts," holding constant "the mix of procedures and Dental Providers in each geographic area and applied estimate indices of submitted amounts and approved amounts by geographic area and Delta Dental network (PPO or Premier)." Bamberger Rebuttal, ECF 855-2 at ¶ 58. Dr. Bamberger observes that providers' submitted charges rose consistently with inflation, while Delta Dental's reimbursement amounts for both Premier and PPO network providers decreased by approximately eleven percent in inflation-adjusted terms between 2014 and 2022. Bamberger Rep., 761-1 at ¶ 87; Pls.' Mem., ECF 754 at 37.

---

companies can typically negotiate lower prices in exchange for patient volume. Accordingly, he uses the difference in the rates submitted versus approved amounts changed, rather than difference in the amounts themselves, to estimate antitrust impact. Bamberger Rep., ECF 761-1 at ¶ 81.

According to Dr. Bamberger, an individual provider was "underpaid" if, in that provider's region, the average rate of change in submitted amounts exceeded the average rate of change in approved amounts. *Id.* ¶¶ 96-97. Dr. Bamberger then estimates individual damages by adding a network- and region-specific "underpayment percentage" to each provider's total approved amount for each year of the class period. For example: Suppose a provider had 1,000 Delta Dental PPO claims in a particular region with a total approved amount of $80,000 (i.e., $80 per claim), and the estimated underpayment for Delta Dental PPO claims in that region and year was 0.5 percent. In this scenario, Dr. Bamberger estimates that the provider suffered damages of $400 for that region/year. *Id.* at ¶ 97.

Dr. Bamberger proposes two metrics for estimating classwide impact: "gross impact," which is the percentage of contracted providers he concludes were underpaid for at least one claim during the class period, and "net impact," or the percentage of providers underpaid on all claims during the class period. Bamberger Rep., ECF 761-1 at ¶ 98. Based on his model, Dr. Bamberger estimates that nearly every class member was impacted, with over 99% of the class suffering gross impact and over 98% suffering net impact. *Id.* at ¶¶ 90-94. Finally, Dr. Bamberger estimates "aggregate class damages" by adding the total individual estimated damages of

55

injured class members for a total of approximately $13 billion. *Id.* at ¶ 111 and Table 13.

Defendants categorically reject plaintiffs' analysis of common impact, assailing Dr. Bamberger's yardstick methodology and the conclusions he reaches on numerous fronts and seeking exclusion of his report and opinions. Their lead argument is that Dr. Bamberger's yardstick methodology fails to satisfy *Daubert*'s reliability standard because it rests on untested assumptions, the most significant of which is his assumption that submitted charges and approved charges would be expected to rise in tandem in a free market. According to defendants' expert, Dr. Kevin Murphy, this assumption collapses under scrutiny because a number of factors independent of the challenged restraints could cause submitted charges to rise faster than approved rates, including the effect of competition from other insurers. In this connection, Dr. Murphy cites evidence that during the class period, group customers of dental insurance have become more price sensitive, which "exerts downward pressure on provider reimbursement for insured customers, but it is unlikely to have the same effect on the prices paid by uninsured patients." Murphy Rep., ECF 785-1 at ¶ 216.[28] *See also*

---

[28] Plaintiffs' assertion that "**no** competent evidence supports the claim that large employer groups became any more price sensitive during the Class Period" is incorrect. Pls.'s Mem., ECF 837 at 1. Plaintiffs deprecate witness testimony supporting the proposition that "employer groups have become more cost sensitive over time" as "unsupported personal opinions." But the witnesses in question

Noether Rep., ECF 900-1 at ¶ 80. Additionally, defendants argue that Dr. Bamberger's model purports to determine individual impact based on regional averages—a methodology that they insist courts have rejected, and that both masks the differences in reimbursement rate trends within regions and generates "false positive" when tested using the real-world data produced in this case.

As with defendants' attack on Dr. Bamberger's opinions concerning common evidence of monopsony power, these arguments do not warrant exclusion of Dr. Bamberger's opinions. All agree that "the yardstick approach is a well-established methodology in antitrust actions," *Moehrl v. Nat'l Ass'n of Realtors*, No. 19-CV-01610, 2023 WL 2683199, at *8 (N.D. Ill. Mar. 29, 2023), and in general, "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology" are not a basis for excluding an expert's opinions. *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013). It is true that in *City of Rockford v. Mallinckrodt ARD, Inc.,* No. 3:17-CV-50107, 2024 WL 1363544 (N.D. Ill. Mar. 29, 2024), the court excluded expert opinions based on a yardstick model that failed to account for "nonconspiratorial factors" that were likely to have caused the price increases the plaintiffs attributed to the alleged

---

were testifying on behalf of Aetna, MetLife, and GEHA under Fed. R. Civ. P. 30(b)(6), so their testimony reflects facts known to those entities, not the witnesses' personal opinions.

antitrust conspiracy. *Id.* at *8 (quoting *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("[s]tatistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment.")). Unlike in *City of Rockford*, however, Dr. Bamberger offers reasoned responses to plaintiffs' critiques.

For example, in response to defendants' argument that Dr. Bamberger's yardstick fails to recognize that approved amounts, but not submitted amounts, reflect competitive pressure on insurers to keep premiums low, Dr. Bamberger points to data showing that in fact, Member Companies *increased* premiums (as well as capital reserves and executive compensation) during the class period. In Dr. Bamberger's view, this evidence belies defendants' theory that competitive forces, rather than the alleged conspiracy, caused the trends his model reveals. *See* Bamberger Rebuttal, ECF 855-2 at ¶¶ 9-15. The parties' disagreement over how to interpret the evidence then goes deep into the weeds, with each side faulting the other's expert for comparing apples to oranges on issues such as accounting for inflation when comparing trends in reimbursement rates and premium costs; considering HMO and public entitlement enrollees when determining market share; and distinguishing between Premier and PPO networks when calculating

58

reimbursement averages. These highly nuanced disputes are not the hallmark of off-the-cuff *ipse dixit*, but rather of the experts' competing views about which data, metrics, and comparisons are most relevant to determining the competitive impact of defendants' conduct. Accordingly, they go to the "probative weight of [the experts'] opinions rather than their admissibility." *Moehrl*, 2023 WL 2683199, at *9.[29]

Ultimately, however, while I conclude that Dr. Bamberger's report and opinions satisfy Daubert and Rule 702, I am not persuaded that his proposed methodology satisfies the requirement of Rule 23(b)(3) of setting forth a "reliable means of proving classwide injury in fact." *In re Rail Freight Fuel Surcharge Antitrust Litig.* 934 F.3d at 621. As Dr. Bamberger plainly appreciates, plaintiffs' claims are built on the notion that

---

[29] Although my discussion here is directed primarily to Dr. Bamberger's yardstick methodology, my basis for denying defendants' motion to strike Dr. Bamberger's opinions in this connection generally supports my denial of plaintiffs' motion to strike Dr. Murphy's report. That is, I conclude that both experts utilize well-accepted methodologies and articulate rational links between the data and their opinions. In the main, the parties' respective challenges relate to the selection or accuracy of the opposing experts' data (*see, e.g.*, Pls.' Mot., ECF 818 at pp. 11-14, subsection captioned, "Dr. Murphy's Opinion Are Inconsistent With The Undisputed Facts And The Sources He Cites."). To the extent plaintiffs raise arguments of a different ilk in their *Daubert* motion targeting Dr. Murphy, including that Dr. Murphy is a "defense mouthpiece" who lacks objectivity and who was minimally involved in drafting his report, and that Dr. Murphy's opinions are contrary to established law, I have carefully considered the record and the authorities plaintiffs cite and conclude that these arguments also do not support exclusion of Dr. Murphy's testimony.

competition among insurers affects provider reimbursements. Yet, he does not examine how competitive conditions that Member Companies face at the local level in the sale of insurance affect the reimbursement rates they offer providers in those markets. Bamberger Dep., ECF 837-2 at 34:11-14, 24-25 ("Q: And you haven't conducted any empirical analysis to determine the extent to which increased competition for dental insurance impacts provider reimbursement rates; correct?" A: "I don't think I've directly looked at that question, correct."). In response to defendants' criticism that Dr. Bamberger's "averaging" methodology fails to capture variations in local markets, plaintiffs point to the sensitivity of his regression models to local economic conditions when comparing the growth rates of submitted and approved reimbursement amounts. *See* Pls. Mem., ECF 856 at 13 ("[f]ar from relying on simple averaging, Dr. Bamberger used information from billions of actual Delta Dental claims to estimate real-world and but-for economic conditions in each region, network, and year"). Yet, Dr. Bamberger acknowledges that he did not consider local variations in *customer-side* competitive dynamics, such how each Member Company's market share compares to competitors in the area. *See* Bamberger Dep., ECF 837-2 at 36:25-37:9 (did not conduct any empirical analysis on "whether there's a relationship between a member company's market share and the reimbursement rates it pays to providers."), on the view that "there is no connection between

60

Defendants' state-level market shares and the harm suffered by Dental Providers in that state." Pls. Mem., ECF 856 at 21. But that view is grounded in the assumption that the relevant geographic market is national and the belief that Delta Dental's average share of the national market allows each Member Company to exercise significant market power over all providers in its local markets. I rejected both of those premises for the reasons explained above.

As a result of Dr. Bamberger's view that Delta Dental's market share in the Member Companies' respective operating areas has no bearing on the reimbursement rates the Member Companies offer means that he fails to engage meaningfully with evidence of a *positive* correlation between enrollment shares and reimbursement percentages. While Dr. Bamberger opines that Delta Dental's exercise of its market power as a monopsonistic cartel suppressed providers' reimbursement rates, *see* Murphy Dep., ECF 860-1 at 80:6-11 (agreeing with plaintiffs' counsel's characterization), the evidence shows that Delta Dental's reimbursement percentages were actually *higher*, not lower, in markets where Member Companies' enrollment shares were higher. Murphy Rep., ECF 785-1 at ¶¶ 165-166. Although Dr. Bamberger criticizes the dataset Dr. Murphy uses for this and other portions of his report, *see* Bamberger Rebuttal, ECF at ¶ 40, he does not dispute (or even respond to) Dr. Murphy's substantive analysis on this point. And in response to Dr. Murphy's

related observations: 1) that Dr. Bamberger's "alleged underpayments are highest in states where member companies had the smallest shares in 2014," and 2) that "there is no relationship between changes in Delta Dental member companies' enrollment shares and changes in reimbursement percentages," Dr. Bamberger merely revisits the theme that because Delta Dental is a "must-have," there is no reason to expect its market share (or changes in its market share) within any Member Company's operating area to be reflected in that Member Company's reimbursement rates. *See* Bamberger Rebuttal, ECF 855-2 at ¶ 45. For reasons explained elsewhere, Dr. Bamberger's "must-have" theory cannot bear the weight of the conclusions he rests on it.

Moreover, Dr. Bamberger acknowledged at his deposition that the impact of some of the restraints plaintiffs challenge might vary from state to state. For example, Dr. Bamberger testified about the basis for his opinion that elimination of the ESAs would lead to higher provider reimbursement. He began by explaining:

> [A] Delta Dental company that has low reimbursement rates and doesn't have to worry about another Delta Dental company coming in and bidding away those dentists might be concerned about the risk that would happen. So … the threat that there would be another Delta Dental entity there or five or ten other Delta Dental entities would be expected to have a competitive impact.

Bamberger Dep., ECF 837-2 at 42:22-437. When asked whether he would "expect that the extent to which there's a real threat of entry into a state is something that would vary state to state?" Dr.

Bamberger conceded, "[i]t could," *id*. at 43:9-13, and he acknowledged that his model did not address possible variations in the threat of entry, *id*. at 43:15-17. Nor did Dr. Bamberger analyze "the extent to which Delta's competitors sell to groups in every state" or "the degree of existing insurer concentration in a market," though he acknowledged that these factors "might" have "an impact on the extent to which a new entrant would impact provider reimbursement." *Id*. at 46:9-25. "[I]t would just depend on the specifics of the particular market." *Id*. at 47:18-19.

Dr. Bamberger similarly acknowledged possible state-to-state variations in the competitive impact of the alleged second brand restrictions. Asked whether his impact model shows common impact from such restrictions, he first clarified that his model does not "parse out" the effects of each type of restraint plaintiffs challenge but rather "estimates the effect of all three mechanisms." *Id*. at 233:5. He then went on to address, as an example of a second brand restriction, "a discussion of a noncompete agreement between Dentegra [Delta Dental of California's second brand] and Delta Dental of Washington." *Id*. at 230:2-4.[30] Asked "whether [his] impact model reflects common impact resulting from" that agreement, Dr. Bamberger replied: "In the

---

[30] Dr. Bamberger acknowledged that he did not know whether the agreement "was actually ever entered into," but he understood from deposition testimony that it had been negotiated. *Id*. at 230:4-7.

but-for world – if there was a but-for world in which Dentegra had decided nonetheless to compete in Washington -- well, first of all, *it wouldn't have any effect outside of Washington*," before reiterating that his model "estimates the effect of all three mechanisms." Bamberger Dep. ECF 837-2 at 232:5-9. Implicit in Dr. Bamberger's response is that the impact on provider reimbursement, if any, of the various agreements, policies, and/or practices that plaintiffs lump together as "second-brand restrictions" cannot be determined monolithically but must be evaluated in the context of the specific agreements and entities involved and the geographic markets in which they operate.

These examples illustrate that Dr. Bamberger's common impact analysis cannot survive my conclusion that the relevant geographic markets are the respective local markets in which the individual plaintiffs operate. Because his methodology fails to consider how different competitive conditions Member Companies face in these local markets affects the reimbursement rates they pay dentists in those areas, his methodology is not a reliable means of using "common proof to show antitrust impact from the conspiracy." *Arandell*, *Corp. v. Xcel Energy Inc.,* No. 22-3279, 2025 WL 2218111, at *1 (7th Cir. Aug. 5, 2025). *See also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("nonconspiratorial factors" likely to have influenced pricing must be taken into account to make "a responsible estimate"

64

of what prices would have been "had it not been for the conspiracy").

While this conclusion is a sufficient basis for determining that common issues do not predominate and thus to deny class certification under Rule 23(b)(3), *see In re Rail Freight Fuel Surcharge Antitrust Litig.* 934 F.3d at 621, I briefly address plaintiffs' argument that even if I am not convinced that Dr. Bamberger's model offers a reliable means of proving classwide antitrust impact and aggregate damages, the remaining common issues are sufficient to warrant certification under Rule 23(b)(3). *See* Pls.' Reply, ECF 808, 12-14. Plaintiffs' argument in this connection misstates the law. First, plaintiffs trumpet the Seventh Circuit's decision in *Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014), which they say, "affirmed class certification even where **most** class members may not have been injured." Pls.' Reply, ECF 808 at 12 (original emphasis). But the *Parko* court *reversed* certification of the putative 23(b)(3) class precisely because the district court had failed to examine whether the plaintiffs' expert had proposed a "sound and convincing" methodology for proving injury and damages on a classwide basis. *Id*. at 1086 (faulting the district court for "treat[ing] predominance as a pleading requirement" and stating that "[t]he judge should have investigated the realism of the plaintiffs' injury and damage model."). And while plaintiffs accurately quote

the *Parko* court's observation, "[h]ow many (if any) of the class members have a valid claim is the issue to be determined after the class is certified," *id*. at 1085, that statement was directed to the defendants' *standing* argument. It does not, as plaintiffs suggest, signal the Seventh Circuit's endorsement of a 23(b)(3) class absent evidence that antitrust impact could be established on a classwide basis.

Plaintiffs' citation to *Smith v. City of Chicago*, 340 F.R.D. 262, 289-90 (N.D. Ill. 2021), which they characterize as "certifying class over objection that 85-90% of class was not injured and finding plaintiffs' claims addressed 'the same system of supervision and training that allegedly affected all class members," Pls.' Reply, ECF 808 at 13, is equally misleading. In *Smith*—a case challenging the City's allegedly unconstitutional "stop and frisk" policy—the court *denied* certification of the plaintiffs' proposed 23(b)(3) damages class, concluding that the plaintiffs had not satisfied the predominance requirement.[31] The court acknowledged that the existence of the alleged policy was a core common issue but explained that even if the plaintiffs proved that the City's policy was unconstitutional, they would still have

---

[31] Plaintiffs' cited portion of *Smith* is from the court's analysis of the 23(b)(2) injunctive class certified in that case. Rule 23(b)(2), unlike Rule 23(b)(3), does not require predominance of common issues.

to prove, as to each class member, that his or her rights were violated. Because the plaintiffs "would be left with tens of thousands of individualized liability and damages determinations," the court concluded that common issues did not predominate. 340 F.R.D. at 292. *Smith* also does not support certification of the class plaintiffs propose here.[32]

Defendants' Executive Compensation and Capital Reserves

Plaintiffs' class certification brief includes several pages of factual background on evidence concerning the "obscene salaries, benefits, and perquisites" paid to Member Companies' top executives and the billions of dollars in capital reserves plaintiffs claim the entities "hoard." ECF 754 at 30-35. Yet, the argument section of their brief is conspicuously silent on these issues. The reason, presumably, is that whatever one's view of not-for-profit entities lavishing their C-suite executives with seven- and eight-figure salaries, exclusive country club memberships, and the like, while squirreling away billions of dollars in capital reserves—and there is certainly room to debate these issues as matters of public policy—nothing in plaintiffs'

---

[32] I need hardly remind plaintiffs' experienced attorneys that as officers of the court, they have a duty "to set forth a fair and accurate presentation of the facts and law." *Fuery v. City of Chicago*, 900 F.3d 450, 454 (7th Cir. 2018).

submissions suggests that it is the office of Section 1 of the Sherman Act to decide them.[33]

Plaintiffs contend that these facts, and the expert report of Dr. David Lewin, whose opinions plaintiffs offer in this connection, are relevant because they show, on a classwide basis: 1) "*why* Defendants colluded to artificially lower reimbursement rates to dentists, and *how* they used their ill-gotten gains to benefit themselves"; 2) that the procompetitive justifications plaintiff offer for the challenged restraints "are a sham"; and 3) that "Defendants' suppression of reimbursement rates has been persistently successful." Pls.' Mem., ECF 853 at 2 (original emphasis). But what plaintiffs do not explain is how these issues bear on any element of the claims or defenses in this case. Indeed, I previously expressed skepticism about the relevance of these issues, *see* Defs' Exh. 150, ECF 843-7, Nov. 21, 2023, Hearing Tr. 9:1-10:25, and nothing in plaintiffs' submissions assuages my doubts. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509

---

[33] If the salaries, benefits, and capital reserves plaintiffs challenge violate some other statute, regulation, or common law, plaintiffs have not cited it. Of course, "[i]f a plaintiff has suffered financial loss from the *lawful* activities of a competitor, then no damages may be recovered under the antitrust laws." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (original emphasis). The lawfulness of defendants' executive compensation and capital reserves is beyond the scope of this decision, but plaintiffs will ultimately have to articulate how these facts support the elements of their Section 1 claim.

U.S. at 591. Yet plaintiffs offer neither reasoned analysis nor citation to authority to explain why evidence of how defendants *spent* their allegedly ill-gotten gains makes it any more or less likely that the challenged restraints suppressed competition.

Plaintiffs cite *In re EpiPen (Epinephrine Injection, USP Mktg., Sales Pracs. & Antitrust Litig.*, 2020 WL 1873989, at *43 (D. Kan. Feb. 27, 2020), for the proposition that "[e]xpert testimony focusing on "defendants' conduct and motivations" is "common to all class members" and "applies to each putative class plaintiffs' (sic) claims." Pls.' Mem., ECF 853 at 2. But *In re EpiPen* involved a RICO claim sounding in fraud, so the defendants' motivation was material to the plaintiffs' case. *See id*. at *37-*38 (noting that the plaintiffs premised their RICO claim on allegations of "a national, unified scheme to defraud... whose purpose was to fraudulently mislead and deceive American consumers to purchase the EpiPen at an inflated price").[34] By contrast, there is no obvious way in which defendants' "motivations"—common or otherwise—are relevant to "the essential inquiry" under Section 1, which is "whether or not the challenged restraint enhances competition." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of*

---

[34] Nor does plaintiffs' indirect citation to *Dukes*, 564 U.S. at 350, advance their argument, as the Court there explained that Title VII claims could not "productively be litigated at once" absent common allegations such as "discriminatory bias on the part of the same supervisor."

*Univ. of Oklahoma*, 468 U.S. 85, 103, 104 (1984). Accordingly, evidence directed to this issue, however "common," does not support plaintiffs' predominance argument. *See In re EPDM Antitrust Litig.,* 256 F.R.D. 82, 86-87 (D. Conn. 2009) ("to prevail in their motion for class certification, the plaintiffs must demonstrate that common questions of law or fact predominate over individual ones *on the issues relevant to the three elements of an antitrust claim.*") (emphasis added).

## IV. Conclusion

For the reasons explained above, I deny plaintiffs' motion for class certification, plaintiffs' motion to exclude the report and testimony of Kevin Murphy, and defendants' motion to exclude the report and testimony of Gustavo Bamberger. I grant defendants' motion to exclude the report and testimony of David Lewin. I deny as moot plaintiffs' motions to exclude the report and testimony of Robert Hoyt and Brian Cumberland, both of which are offered in response to Dr. Lewin's opinions.


**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge


Dated: September 22, 2025